No. 23-55770

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**SKOT HECKMAN; LUIS PONCE; JEANENE POPP; JACOB ROBERTS,**
**on behalf of themselves and all those similarly situated,**

*Plaintiffs-Appellees,*

v.

**LIVE NATION ENTERTAINMENT, INC.; TICKETMASTER LLC,**

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Central District of California
No. 2:22-cv-00047-GW-GIS (George H. Wu, District Judge)

# EXCERPTS OF RECORD FOR DEFENDANTS-APPELLANTS LIVE
# NATION ENTERTAINMENT, INC. AND TICKETMASTER, LLC
## VOLUME I of III (1-ER-1 to 1-ER-32)

Roman Martinez
Uriel Hinberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Sadik Huseny
LATHAM & WATKINS LLP
300 Colorado Street
Suite 200
Austin, TX 78701
(737) 910-7300

November 13, 2023

Timothy L. O'Mara
*Counsel of Record*
Andrew M. Gass
Alicia R. Jovais
Robin L. Gushman
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600
tim.omara@lw.com

*Counsel for Defendants-Appellants*
*Live Nation Entertainment, Inc. and Ticketmaster, LLC*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 22-0047-GW-GJSx | Date | August 10, 2023 |
|----------|---------------------|------|-----------------|
| Title | *Skot Heckman, et al. v. Live Nation Entertainment, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|------------------------|---------------------------------------------|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|-----------------------------------|-----------------------------------|
| None Present | None Present |

**PROCEEDINGS:**      **IN CHAMBERS - FINAL RULING ON DEFENDANTS' MOTION TO COMPEL ARBITRATION [30]**

Attached hereto is the Court's Final Ruling on Defendants' Motion to Compel Arbitration. The Court DENIES the Motion.

Initials of Preparer      JG

*__Skot Heckman et al v. Live Nation Entertainment, Inc. et al__*; Case No. 2:22-cv-00047-GW-(GJSx)
Final Ruling on Defendants' Motion to Compel Arbitration[1]

## I. __Introduction__[2]

Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts ("Plaintiffs") brought this putative class action against Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster LLC ("Ticketmaster") (collectively, "Defendants") alleging various anticompetitive practices in violation of the Sherman Act. *See generally* Compl. Plaintiffs claim that they suffered damages from paying "supracompetitive fees on primary and secondary ticket purchases from Ticketmaster's online platforms." Compl. ¶ 6. On March 8, 2022, Defendants moved to compel arbitration, arguing that this case is virtually identical to another case against Live Nation and Ticketmaster which this Court had previously sent to arbitration. *See Oberstein v. Live Nation Ent., Inc.*, No. 2:20-cv-03888-GW-(GJSx), 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023). Among the apparent differences between this case and the *Oberstein* case is that in July 2021, after the *Oberstein* complaint was filed, Defendants updated their terms of use ("TOU") to select a new arbitration provider with new arbitration procedures. Compl. ¶ 1; *see* TOU, ECF No. 31-30, at 10-13 of 15.[3] Whereas the TOU at issue in *Obsterstein* designated JAMS, the updated TOU selected New Era ADR ("New Era"). *See* Compl. ¶¶ 1-5.

---

[1] Prior to the hearing on the present motion, a Tentative Ruling was provided to the parties but lodged under seal as it referenced materials that had been previously designated as "confidential" by the parties and filed under seal. Following the hearing, the parties have advised the Court that they do not request that any portion of the Tentative Ruling remain sealed.

[2] The following abbreviations are used for the filings: (1) Complaint ("Compl."), ECF No. 1; (2) Defendants' Motion to Compel Arbitration ("Motion" or "Mot."), ECF No. 30; (3) Declaration of Kimberly Tobias in Support of Motion ("Tobias Decl."), ECF No. 31; (4) Plaintiffs' Opposition to Motion ("Opp."), ECF No. 146; (5) Defendants' Reply in Support of Motion ("Reply"), ECF No. 153; (6) Tentative Ruling on Motion ("Tentative"), ECF No. 160; (7) Declaration of Collin Williams of Non-Party New Era ("Williams Decl."), ECF No. 163; (8) Defendants' Supplemental Brief in Support of Motion ("Def. Supp. Br."), ECF No. 166; (9) Plaintiffs' Supplemental Brief in Opposition to Motion ("Pl. Supp. Br."), ECF No. 168; (10) Plaintiffs' Supplemental Reply Brief in Opposition to Motion ("Pl. Supp. Reply"), ECF No. 172; (11) Defendants' Supplemental Reply Brief in Support of Motion ("Def. Supp. Reply"), ECF No. 173; (12) Plaintiffs' Supplemental Brief in Response to the Williams Declaration ("Pl. Resp. to Williams Decl."), ECF No. 177; (13) Supplemental Declaration of Collin Williams ("Williams Supp. Decl."), ECF No. 194; (14) Defendants' Second Supplemental Brief in Support of Motion ("Def. Sec. Supp. Br."), ECF No. 195; (15) Plaintiffs' Second Supplemental Brief in Opposition to Motion ("Pl. Sec. Supp. Br."), ECF No. 196; (16) Plaintiffs' Second Response to New Era ("Pl. Resp. to Williams Supp. Decl."), ECF No. 197.

[3] For simplicity, citations to the TOU will be to Live Nation's TOU.

Unlike JAMS, New Era offers standardized procedures for administering mass arbitrations, which Defendants assert "facilitates the arbitration of mass individual consumer claims efficiently and fairly, and thereby *promotes* arbitration."[4]  Mot. at 2.  Plaintiffs, on the other hand, believe New Era's mass arbitration procedures require "consumers to engage in a novel and one-sided process that is tailored to disadvantage consumers."  Compl. ¶ 5.  According to Plaintiffs, Defendants' selection of New Era in the TOU "skews the odds so egregiously in Defendants' favor through its defense-biased provisions" that the arbitration agreement is rendered unconscionable.  *Id.*

Before filing an opposition to Defendants' Motion, Plaintiffs sought discovery related to the validity, unconscionability, and severability of the dispute-resolution provisions in the TOU. *See* ECF No. 34 at 3.  On June 9, 2022, the Court granted Plaintiffs' request and allowed the parties to conduct limited discovery as to those issues.  *See* ECF No. 50.  The parties completed such discovery on January 27, 2023.  Plaintiffs filed their Opposition to Defendants' Motion on March 22, 2023, and Defendants filed a Reply on April 18, 2023.  In advance of the May 1, 2023 hearing on the Motion, the Court issued a Tentative Ruling, which posed a number of questions for the parties to discuss at oral argument and reserved decision on the Motion pending additional argument.  *See* ECF No. 160.  Following oral argument, the Court requested and the parties submitted supplemental briefing.  *See id.*; note 2, *supra*.  The Court held a second hearing on Defendants' Motion on July 13, 2023.  *See* ECF No. 182.  An additional round of supplemental briefing followed.  *See* note 2, *supra*.

## II.  Background

This case is one of several consumer class actions alleging Ticketmaster and Live Nation engaged in anticompetitive conduct in the primary and secondary ticketing services market.  One

---

[4] Defendants seem to be asserting that promoting "arbitration" is – in and of itself – a good thing.  But there are various types of arbitration some of which are not necessarily viewed with favor.  For example, in *Lamps Plus, Inc. v. Varela*, the Supreme Court noted various differences between "the individualized form of arbitration envisioned by the [Federal Arbitration Act]" and class arbitration; and seemingly disparaged the latter in observing that:

> In individual arbitration, "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."  Class arbitration lacks those benefits.  It "sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment."  Indeed, we recognized just last Term that with class arbitration "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace."

139 S. Ct. 1407, 1416 (2019) (citations omitted).

2

**1-ER-4**

such case previously before this Court and asserting largely identical underlying allegations was *Oberstein*, filed on April 28, 2020. *See* Complaint, *Van Iderstine v. Live Nation Ent., Inc.*, No. 2:20-cv-03888-GW-(GJSx) (C.D. Cal. Apr. 28, 2020), ECF No. 1; First Amended Complaint, *Oberstein v. Live Nation Ent., Inc.*, No. 2:20-cv-03888-GW-(GJSx) (C.D. Cal. Jan. 1, 2021), ECF No. 81.[5] On September 20, 2021, this Court granted Ticketmaster and Live Nation's motion to compel arbitration in *Oberstein*, finding that: (1) Ticketmaster and Live Nation's websites provided sufficient constructive notice of the terms of use, (2) the authority to decide whether the arbitration agreement was enforceable had been delegated to the arbitrator, and (3) that delegation clause was not itself unconscionable. *See Oberstein*, 2021 WL 4772885, at *6-9. The Court's decision was affirmed on appeal. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505 (9th Cir. 2023).

On July 2, 2021, while Ticketmaster and Live Nation's motion to compel arbitration in *Oberstein* was pending, Defendants updated their TOU to select New Era as the default arbitration provider. *See* Compl. ¶ 1; TOU at 10-13. New Era was founded in 2020 and launched its alternative dispute resolution ("ADR") services in April 2021. *See* Compl. ¶ 2; Opp. Ex. C at 10:16-18, 11:3-5. New Era first reached out to Defendants' counsel Latham & Watkins ("Latham") to pitch its services on May 4, 2021. Opp. Ex. C at 86:2-88:2. At that time, New Era had not yet conducted any arbitrations and had not finalized its Rules governing mass arbitration procedures. *Id.* at 109:1-110:10. The parties herein disagree about the nature of the initial conversations between New Era and Latham and the extent to which Defendants and Latham had input on, or helped shape, New Era's Rules. However, on June 21, 2021, New Era executed a subscription agreement with Live Nation as its first subscriber, and later that same day, New Era published its ADR Rules. *Id.* at 145:6-147:10.

Plaintiffs allege that New Era was created with a decidedly pro-business mission: to help "'businesses settle legal disputes' by creating rules that 'make[] sense for businesses' and that also benefit 'law firms, who are able to provide an improved client experience' to businesses 'and handle a higher volume of cases' that are filed by consumers." Compl. ¶ 2. To that end, New Era offers businesses faced with large numbers of arbitration claims two primary advantages over traditional arbitration providers. First, in addition to a standard pricing option whereby the company pays $9,500 and the consumer pays $500 per arbitration, New Era offers a subscription

---

[5] Named plaintiff Olivia Van Iderstine was later voluntarily dismissed from the case.

option whereby the company pays an annual subscription fee and the claimant pays a $300 filing fee. *See* New Era Rules ("Rules"), ECF No 30-4, Rules 1(a)(ii), 1(e)(i), 6(a)(iii)(1)(c); *see also* Def. Sec. Supp. Br. at 4 ("[T]he primary innovation was around filing fees – i.e., creating a model that generated enough revenue to be a viable business, without imposing multi-million-dollar upfront filing fees that forced parties to settle meritless claims."). Second, New Era includes procedures for administering mass individual consumer arbitrations presenting common issues of fact or law. *See* Rules 2(x), 6(b).

Plaintiffs principally take issue with this second aspect of New Era as an arbitral forum – the use of novel mass arbitration procedures to adjudicate consumer claims. As alleged in the Complaint:

> When one of many aggrieved consumers files a dispute against Defendants with New Era ADR, the consumer has no choice but to submit to batched arbitration proceedings. On the one hand, the New Era agreement requires a consumer to bring claims "ONLY IN AN INDIVIDUAL CAPACITY" and bars "ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING." On the other hand, once multiple consumers file cases against Defendants, New Era ADR will group their cases together for any reason it deems appropriate, including the consumers' counsel of choice. The batched cases will then be assigned to a single decisionmaker, chosen under unfair procedures that abridge consumers' rights to select neutral decisionmakers and that later-filing consumers will not be able to participate in at all. That decisionmaker will then preside over the selection and litigation of a few bellwether cases, during which all other consumers will be forced to wait with no progress on their cases, and after which the outcome of those bellwether cases will be forced on all consumers. The New Era agreement thus requires consumers to engage in a novel and one-sided process that is tailored to disadvantage consumers.

Compl. ¶ 4.[6]

Following Defendants' alteration to the TOU in July 2021, each of the named Plaintiffs purchased tickets on Defendants' sites between four and eight separate times. *See* Mot. at 6-7. To make those purchases, Plaintiffs were first required to create, and then sign into, their accounts, whereupon they were notified: "By continuing past this page, you agree to the **Terms of Use** and

---

[6] By way of comparison, the arbitration provision in *Oberstein* case stated, *inter alia*:

We each agree that the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. <u>YOU AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL OR TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASSWIDE ARBITRATION</u>.

*Oberstein,* No. 2:20-cv-03888-GW-(GJSx), ECF No. 25 at 6.

4

understand that information will be used as described in our **Privacy Policy**." *Id.* at 6. Upon clicking the bolded "**Terms of Use**" text, users were redirected to the TOU. *Id.* A screenshot of the sign-in page is shown below:

## Sign In

New to Ticketmaster? Sign Up

Email Address

Password                                          SHOW

☐ Remember Me                          Forgot Password?

By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy**.

**Sign in**

*Id.*

To complete a ticket purchase, users were also required to check a box acknowledging that they had read and accept the current TOU. *Id.* An example of such notice is shown below:

☐ I have read and agree to the current Terms of Use.

**Place Order**

*Id.*

In addition, on virtually every page on Defendants' websites (including the home page), users were notified: "By continuing past this page, you agree to our **Terms of Use**" (or some similar variation thereof). *See id.* at 4 n.1; Tobias Decl. ¶¶ 14, 25.

## III.  Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its

5

terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985). "The court's role under the [FAA] is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)). "In determining whether a valid arbitration agreement exists, federal courts apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quotations omitted). Both parties have briefed the issues under California contract law.

The FAA permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Concepcion*, 563 U.S. at 339. As to unconscionability under California law, the California Supreme Court has discussed the doctrine in the following terms:

> One common formulation of unconscionability is that it refers to an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.

> The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves. In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa. Courts may find a

6

contract as a whole or any clause of the contract to be unconscionable.

*Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015) (citations omitted) (cleaned up).  Furthermore, "[a]n evaluation of unconscionability is highly dependent on context . . . . The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement."  *Id.* at 911-12 (citations omitted).

## IV.  <u>Discussion</u>

Plaintiffs do not appear to contest that they repeatedly agreed to Defendants' updated TOU prior to purchasing tickets on Defendants' website.  Nor do Plaintiffs seem to take issue with this and other courts' findings that Defendants' websites provided users sufficient notice of the TOU for purposes of constructive assent.  *See, e.g.*, *Oberstein*, 2021 WL 4772885; *Lee v. Ticketmaster LLC*, 817 Fed. App'x 393, 394 (9th Cir. 2020) (affirming finding that "Ticketmaster's website provided sufficient notice for constructive assent, and therefore, there was a binding arbitration agreement between [plaintiff] and Ticketmaster").

Instead, the gravamen of Plaintiffs' argument is that Defendants' selection of New Era as the arbitration provider along with its concomitant procedures renders the arbitration and delegation clauses within the TOU unconscionable.  Plaintiffs maintain that Defendants, faced with a mounting number of consumers pursuing individual arbitrations against them in connection with ongoing antitrust litigation, abruptly switched from JAMS (which did not provide for a grouping of individual consumer claims) to a provider Defendants knew would be beholden to their interests, and that the creation of New Era's "batched/bellwether" case resolution set of rules is manifestly unfair to Plaintiffs and other actual or potential claimants.

### A.  **Delegation Clause**

As a threshold issue, the Court must first determine whether the TOU to which Plaintiffs agreed delegates the authority to decide issues of enforceability, including unconscionability, to the arbitrmore rather than the Court.  "A court is normally tasked with two gateway issues when deciding whether to compel arbitration under the FAA: '(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue.'"  *Morgan v. Glob. Payments Check Servs., Inc.*, No. 2:17-CV-01771-JAM-CMK, 2018 WL 934579, at *2 (E.D. Cal. Feb. 15, 2018) (quoting *Chiron*, 207 F.3d at 1130).  "But the parties can agree to expressly delegate these gateway issues to an arbitrator, in which case an arbitrator, rather than a

court, must decide the issues." *Id.* A court must determine whether the underlying agreement "clearly and unmistakably" delegated the questions of arbitrability to the arbitrator. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (internal quotation marks and citations omitted). The Supreme Court has since reiterated these points. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (explaining that the "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."). The Supreme Court emphasized that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *See id.*

Here, Defendants' TOU contains a delegation clause, which provides:

> The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable.

TOU at 13.

For the reasons stated in the Court's Tentative, this clause clearly and unmistakably delegates issues of enforceability to the arbitrator, and thus "the Court's unconscionability inquiry is limited to the delegation clause instead of the arbitration clause as a whole." Tentative at 6 (quoting *Oberstein*, 2021 WL 4772885, at *8). Plaintiffs' unconscionability arguments (particularly as articulated in their supplemental briefings) are directed at the delegation clause, as is required by *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010). Having determined that the delegation clause assigns issues of arbitrability to the arbitrator, the Court next turns to whether the delegation clause itself is unconscionable.

## B. Procedural Unconscionability

As previously noted, to prove unconscionability, Plaintiffs must show that the delegation clause was both procedurally and substantively unconscionable. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).

The procedural component of unconscionability "focuses on the factors of oppression and

surprise." *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal. App. 4th 1659, 1664 (1993) (citations omitted). "Oppression results where there is no real negotiation of contract terms because of unequal bargaining power." *Id.* "'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.*

For the reasons discussed in the Court's Tentative and on the record during oral argument, and as further elaborated upon below, the Court would find that the arbitration agreement (and more specifically, the delegation clause contained therein) is procedurally unconscionable to an extreme degree.

As a preliminary matter, the Ninth Circuit has held that the elements of oppression and surprise are both "satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.'" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (quoting *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001)) (alteration in original). The Court finds both elements are present here. The agreement is certainly contained within a contract of adhesion presented to ticket purchasers on a take-it-or-leave-it basis, as there was no opportunity for consumers to negotiate individual terms. As to unequal bargaining power, it is hard to imagine a relationship with a greater power imbalance than that between Defendants and its consumers, given Defendants' market dominance in the ticket services industries. *See* Compl. ¶ 71. Because Defendants are often in effect the only ticketing game in town, would-be concert goers are forced to accept Defendants' TOU in full, or else forego the opportunity to attend events altogether. *See Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (2002) ("The availability of similar goods or services elsewhere may be relevant to whether the contract is one of adhesion . . . .").[7] The Court would find the elements of procedural unconscionability are satisfied on these grounds alone.

Here, however, the manner in which Defendants imposed the changes to their TOU evinces an extreme amount of procedural unconscionability far above and beyond a run-of-the-mill contract-of-adhesion case. Specifically, the TOU were amended: (1) to bring about a significant change in the parties' agreement (from individual, bilateral arbitration to mass arbitration); (2)

---

[7] That attending such events is arguably a nonessential recreational activity does not alter this conclusion. *See* Tentative at 7 n.6; *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 822 (2010).

unilaterally; (3) in the midst of ongoing litigation; (4) to be applied retroactively to already accrued claims; (5) without giving any notice to existing customers about this major change; and (6) while burying the true nature of this change in New Era's difficult-to-parse Rules.

Defendants dispute either the validity or legal import of each of these facts. To begin, they argue that they were not required to provide customers specific notice of the changes to the TOU. In support of that argument, they rely on *Weber v. Amazon.com, Inc.*, No. 2:17-cv-08868-GW-E, 2018 WL 6016975, at *9 (C.D. Cal. June 4, 2018), and *McKee v. Audible, Inc.*, No. 2:17-cv-01941-GW-E, 2017 WL 4685039, at *11 n.7 (C.D. Cal. July 17, 2017), in which this Court found arbitration agreements enforceable even absent specific notice of amended terms. Those cases, however, are distinguishable for two reasons. First, the Court's discussion of the sufficiency of the notice arose in the context of determining whether the plaintiffs had manifested their assent to enter into an agreement in the first instance – that is, those cases dealt with contract formation. *See, e.g.*, *Weber v. Amazon.com, Inc.*, 2018 WL 6016975, at *7 ("In the context of an electronic consumer transaction, the occurrence of *mutual assent* ordinarily turns on whether the consumer had reasonable notice of a merchant's terms of service agreement." (citing *Nguyen*, 763 F.3d at 1173) (emphasis added)). Here, by contrast, the issue is unconscionability. *Cf. id.* at *14 n.23 ("Plaintiffs did not meaningfully make arguments related to the enforceability of Amazon's COUs in terms of unconscionability or otherwise"). Plaintiffs do not contest that they manifested an agreement to be bound by the TOU, nor do they claim that specific notice is required in every circumstance for the formation or modification of a contract. Rather, their argument is that Defendants' imposition of such a significant change in the TOU without giving any notice to customers is one reason, among others, that the agreement is procedurally unconscionable. The Court would agree with that argument. The fact that Defendants' customers received no notice of the significant change to the TOU creates a situation of unfair surprise. And, because it would seem trivially easy to provide customers with such notice, Defendants' failure to do so suggests a degree of intentionality and/or oppression.[8]

---

[8] Defendants refer to the fact that, like in *Weber* and *McKee*, the TOU here provides a "Last Updated" date at the top of the page. *See* TOU at 1. However, even if a consumer were to discover that the terms had been recently updated, she would have no way of knowing *which* particular provision or provisions had been changed. To discover that fact, she would need to do a line-by-line comparison of the prior multi-page TOU, which she very likely would not have a copy of (indeed, Defendants appeared to confirm at the May 1, 2023 hearing that prior versions of the TOU are not available on Defendants' websites and would be available, if at all, through third-party sites). Defendants cite

Second, the question in *Weber* and *McKee* was whether users could be held to terms to which they affirmatively agreed when making specific *purchases* – purchases which formed the basis for their claims.[9]  The plaintiffs argued that they could not, because they did not receive specific notice that the terms had changed from when they first began using defendants' websites. In that context, the Court declined to find a failure of assent.  But here, the amended TOU does much more than bind users at the point of purchase as to future claims arising out of those purchases.  Rather, the TOU states that the amended arbitration agreement applies to "ANY DISPUTE, CLAIM OR CONTROVERSY . . . IRRESEPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE."  TOU at 10.  Furthermore, these amended terms become "effective immediately when we post a revised version of the Terms on the Site" and that by merely "continuing to use this Site after that date, you agree to the changes."  TOU at 1.  As a result, a customer who purchased a ticket prior to the changes to the TOU (thereby agreeing to arbitrate before JAMS) could then be required to bring any dispute regarding that *same* purchase before New Era merely because the customer opened Defendants' website[10] at some later date (regardless of whether they had any intention of transacting business on that occasion).  Without a doubt, that constitutes unfair surprise.  *Cf. Nguyen*, 763 F.3d at 1173 (customer could not be bound to terms

---

*Shen v. United Parcel Service*, No. 2:21-CV-08446-MCS-E, 2022 WL 17886012, at *4 (C.D. Cal. Nov. 21, 2022), for the proposition that companies are not required to "publish a redline version of the terms any time an amendment is made."  But like *McKee* and *Weber*, that case found only that "California law does not impose such a requirement for *contractual assent*."  *Id.* (emphasis added).  And where, as here, a company claims continued assent to updated terms merely by continuing to use the company's site or other passive means, courts have been more stringent in the type of notice required to infer assent.  *See Nguyen*, 763 F.3d at 1179 ("While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." (citation omitted)); *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("Even if Douglas had visited the website, he would have had no reason to look at the contract posted there.  Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side."); *Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 604985, at *10 (N.D. Cal. Feb. 12, 2015) ("[C]ustomers' assent to the revised Terms cannot be inferred from their continued use of Safeway.com when they were never given notice that the Special Terms had been altered."), *aff'd*, 694 F. App'x 612 (9th Cir. 2017).

[9] The same was true in *Lee v. Ticketmaster*, 2019 WL 9096442 (N.D. Cal. 2019), *aff'd*, 817 F. App'x 393 (9th Cir. 2020).  The district court's opinion in that case was premised on the conclusion that the plaintiff "assented to terms that included an arbitration clause *when purchasing tickets*" and did not consider whether his "use of other pages on Ticketmaster's website or other resale websites also establish an agreement to arbitrate."  *Id.* at *1 & n.1 (emphasis added).

[10] Indeed, according to Defendants, "virtually every Live Nation and Ticketmaster website page that users navigate" (including the homepage) contains a statement purporting to bind users to the latest version of the TOU merely by browsing the site.  Mot. at 4 n.1; *see* Tobias Decl. ¶¶ 14, 25.

by "merely using Barnes & Noble's website," where terms stated: "By visiting any area in the Barnes & Noble.com Site . . . a User is deemed to have accepted the Terms of Use."); *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("Even if Douglas's continued use of Talk America's service could be considered assent, such assent can only be inferred after he received proper notice of the proposed changes.").

Defendants respond that "[w]hether a consumer who agreed to arbitrate at JAMS could somehow be bound to arbitrate at New Era simply because she browsed Defendants' websites after the Terms were updated is a hypothetical with no application to this case." Def. Sec. Supp. Br. at 2. Defendants are incorrect. While it is true that the four named Plaintiffs agreed to the updated TOU by checking a box when purchasing tickets, Defendants' reliance on that fact alone again confuses assent with unconscionability. "In assessing unconscionability, the Court must examine the validity of a contractual provision as of the time of the contract is made – it is a prospective analysis which does not require proof that a particular plaintiff has already been adversely affected." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040-41 (N.D. Cal. 2022) (citations omitted) (rejecting virtually identical argument that "the unconscionability analysis must be limited to the twenty-seven Plaintiffs in this case without regard to the other 2,685 customers"). Accordingly, just because *these* Plaintiffs agreed to the updated TOU when making purchases does not immunize the TOU as to all possible plaintiffs who did not.[11] Accordingly, unlike in *Weber*, *McKee*, and *Lee*, the "hypothetical" about the TOU being applied retroactively is properly a question for the Court's consideration.

Defendants further protest that "online contracts often include a unilateral modification provision – and courts routinely enforce them." Def. Supp. Reply at 3. However, the cases Defendants cite for that proposition found only that a unilateral modification provision does not necessarily render a contract illusory *on its face* "because there are other limitations to [the company's] ability to abuse this power." *McKee*, 2017 WL 4685039, at *13; *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1066 (S.D. Cal. 2015) ("The restriction on Amazon's discretion imposed by the duty of good faith and fair dealing saves the Agreement from being illusory."), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017). But "[e]ven the cases upholding unilateral modification provisions recognize that any authority to

---

[11] Nor can Defendants simply attempt to walk away from any unfair aspects of the TOU by disclaiming them once they are challenged in Court. *See infra* Section IV.D.

modify the contract is constrained by the covenant of good faith and fair dealing." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 793 (N.D. Cal. 2019); *see also Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998) ("If the [defendant's] performance under the change of terms provision was not consonant with the duty of good faith and fair dealing, then whether the ADR clause, considered in isolation, satisfies the implied covenant makes no difference.").  Here, Plaintiffs do not allege that the mere *prospect* of an unfair unilateral modification renders the TOU facially invalid, notwithstanding the protections imposed by the duty of good faith and fair dealing.  Rather, Plaintiffs argue that Defendants *in fact* violated that duty by adding new, unreasonable terms to be applied retroactively to already accrued claims.  Thus, the situation here mirrors the one the California Court of Appeal found problematic in *Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425, 1465, (2012).  As summarized in a subsequent decision:

> [T]he *Peleg* court observed [that] had the agreement to arbitrate simply authorized the department store to make unilateral modifications, it would not be illusory under California law because the implied covenant of good faith and fair dealing would preclude any change that undermined the employee's rights.  What made the agreement problematic, in the court's view, was that it expressly applied to unfiled claims, including those that had accrued, thus potentially permitting the employer to modify the agreement retroactively to frustrate the employee's rights in arbitration.  Because the agreement specifically allowed retroactive modifications, the implied covenant could not be used to vary those express contract terms and limit the employee to prospective amendments only.  Without the benefit of the implied covenant to rein in and restrict the employer's otherwise unilateral right to modify the agreement to include unfiled claims, the court held the agreement to arbitrate was illusory and invalid under California law.

*Serpa v. California Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 707 (2013) (citations omitted).

Here too, Defendants in their TOU reserve the right to "make changes to the Terms at any time," which will become "effective immediately" and will apply to any dispute irrespective of when it arose.  TOU at 1, 10.  As a result, the TOU expressly contemplates that unilateral changes made by Defendants will be applied to already accrued claims – and indeed that is precisely what Plaintiffs allege happened, fundamentally altering the nature of the bargain in the process.  The implicit protections of the covenant of good faith and fair dealing will not save a unilateral contract modification is such situations.

As a final point on procedural unconscionability, the Court notes that even if ticket purchasers were to review the revised TOU, it is doubtful that they would understand that they

were agreeing to resolve their claims in a novel mass arbitration procedure.  The revised TOU makes no mention of mass arbitration whatsoever.  To the contrary, the TOU states, quite confusingly, that all claims will be resolved by "individual arbitration," and not "in any purported class or representative proceeding."  TOU at 10.  Thus, to discover what they were actually agreeing to, users would need to parse through New Era's separately posted Rules and comprehend their implications (no small task, as evidenced by the parties' briefing on the instant motion and New Era's repeated attempts to clarify and amend the Rules in response to this litigation).  That the "supposedly agreed-upon terms of the bargain are hidden" in this way is yet another reason the TOU is procedurally unconscionable.  *Patterson*, 14 Cal. App. 4th at 1664.  That is particularly true where, as here, the hidden terms effect a fundamental change to the bilateral nature of the individual arbitration process to which users initially agreed.  *Cf. Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 684 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so.").

The cumulative result of the above facts is significant.  To avoid mass arbitration before New Era on their already accrued claims, ticket purchasers would need to: (1) do a line-by-line comparison of the TOU each time they opened Defendants' sites[12] (regardless of whether they had any intention of transacting business on that occasion, and notwithstanding that they very likely would not have the prior version of the TOU to compare); (2) discover the switch in arbitration providers and read New Era's separate Rules; (3) analyze and comprehend those dense Rules to discover the existence and implications of the mass arbitration procedure (which the parties and the Court have all struggled to do), despite the TOU's assurances that all claims would be resolved by "individual arbitration;" and then (4) decide not only to refrain from purchasing tickets from Defendants, the largest ticket services providers in the country, but also to refrain from browsing Defendants' websites altogether.  Obviously, to expect so much out of consumers would be untenable.  For these reasons, the Court would conclude that the agreement is extremely procedurally unconscionable.

### C. Substantive Unconscionability

---

[12] Indeed, according to Defendants, the named Plaintiffs have signed into their accounts "dozens, if not hundreds of times."  Mot. at 11. The number of times they simply browsed Defendants' websites is presumably even larger.

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125 (2019) (quoting *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012)).  As stated by the California Supreme Court in *OTO*:

> This analysis ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as "overly harsh," "unduly oppressive," "so one-sided as to shock the conscience," or "unfairly one-sided." All of these formulations point to the central idea that the unconscionability doctrine is concerned not with a simple old-fashioned bad bargain, but with terms that are unreasonably favorable to the more powerful party.

*Id.* at 129-30 (cleaned up) (citations omitted).  Furthermore, "an examination of the case law does not indicate that 'shock the conscience' is a different standard in practice than other formulations or that it is the one true, authoritative standard for substantive unconscionability, exclusive of all others." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1159 (2013).

"As with any contract, the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided." *Id.* at 1146.  Because the Court has found that the TOU exhibits an extremely high degree of procedural unconscionability, "even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Id.* at 130 (citations omitted); *see also id.* at 125-26 ("[T]he more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required." (citations omitted)).

Plaintiffs argue the TOU is substantively unconscionable because: (1) New Era is biased in favor of Defendants and Latham, (2) the mass arbitration protocol and various other procedures violate claimants' due process rights, (3) the procedure for selecting the arbitrator violates California law, (4) the appeal provisions are unfair, and (5) the class action waiver violates California law.  The Court will address each contention in turn.

i.   New Era's Alleged Bias

First, Plaintiffs argue that New Era is biased in favor of Defendants and Latham. *See* Opp. at 9.  As evidence of such bias, Plaintiffs point to New Era's early outreach to Latham and the fact that Live Nation was New Era's "anchor client" and only source of revenue initially. *Id.*  Plaintiffs further assert that "New Era actively seeks business from Latham, uses Latham as a 'Reference' for other law firms, and has strong incentives to appease them." *Id.*  Defendants contest these

15

claims as "pure speculation," and argue that pre-arbitration discovery uncovered no evidence of actual bias.  Reply at 12.  Specifically, Defendants assert that the evidence shows they and Latham engaged only in arm's length discussions about the potential selection of New Era, that they had no hand in drafting New Era's Rules, and that Defendants' business now makes up only a small percentage of New Era's overall revenues.  *See* Reply at 3-4.

Although Plaintiffs' allegations are troubling, the Court is not entirely persuaded that the evidence of bias is all Plaintiffs make it out to be.  Plaintiffs cite several emails and other documents purporting to demonstrate Latham's early involvement with, support for, and influence over, New Era.  Upon review, however, those documents do not seem to indicate much more than that Latham was willing to serve as a reference for New Era, that Latham believed some of its clients would be interested in New Era's ADR services, and that New Era praised Latham and considered it an "evangelist" for the company.  But as Defendants point out, *Plaintiffs'* counsel herein were themselves listed alongside Latham and other law firms as one of New Era's "evangelists."  To be sure, the evidence that Defendants provided nearly all of New Era's revenue during its first year of operations is concerning and could certainly create an inference of bias.  On the other hand, Defendants cite evidence that they are far from New Era's only client and now make up a small percentage of New Era's revenue.  *See* Reply at 3-4.  In addition, while Plaintiffs allege Latham was involved in shaping New Era's Rules, they have not made any concrete showing to that effect.[13]  In sum, while the Court cannot rule out the possibility of impropriety or undue influence, neither can it conclude based on the existing record that New Era is "so identified with [Defendants] as to be in fact, even though not in name, [Defendants]," or that New Era lacks even "minimum levels of integrity."  *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 825, 827 (1981).

In any event, whether the delegation clause is substantively unconscionable ultimately turns on "the fairness of [the] agreement's actual terms and . . . whether they are overly harsh or one-sided."  *OTO*, 8 Cal. 5th at 125 (quoting *Pinnacle Museum*, 55 Cal. 4th at 246).  Thus, even if

---

[13] In connection with New Era's latest changes to the Rules, Plaintiffs again charge Latham with improperly communicating and coordinating with New Era "in crafting the rules *and defending and modifying them in this Court*."  Pl. Resp. to Williams Supp. Decl. at 1.  It would seem beyond dispute that there have been some joint defense efforts between Latham and New Era in connection with this Motion.  *See id.* Ex. A (acknowledging that New Era has sought to defend the Rules "in submissions with the Court, and counsel for Live Nation and New Era have engaged in discussions regarding the same").  Indeed, there appears to be a remarkable degree of coordination between Latham and New Era in terms of their interpretation and the evolution of New Era's Rules.  Nevertheless, it is not readily apparent to the Court that Latham has in fact helped *craft* or *modify* the Rules (as opposed to relying on them after the fact).

Latham's "involvement in the development of [New Era's] Protocol may raise some concern, the ultimate question is whether the Protocol is fair and impartial – *i.e.*, one that is not predisposed more favorably to [Latham], its clients (including [Defendants]), or defendants generally compared to other generally accepted conventional arbitration rules." *McGrath v. DoorDash, Inc.*, No. 19-CV-05279-EMC, 2020 WL 6526129, at *10 (N.D. Cal. Nov. 5, 2020). The Court therefore turns to the specific Rules governing the mass arbitration protocol.

      ii.    <u>Mass Arbitration Protocol</u>

           a.   *Application of Precedent*

Plaintiffs claim that New Era's mass arbitration procedure operates similar to a Fed. R. Civ. P. 23(b)(3) representative class action but does not comply with the due process requirements of class actions – namely, to provide non-represented parties an opportunity to be heard, an opportunity to remove themselves, and adequate representation by the represented party. *See Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985); *Concepcion*, 563 U.S. at 349 (noting that these requirements would also apply to class arbitrations). Defendants, on the other hand, assert that unlike a class action, absentee claimants would not be bound by the results of earlier arbitration proceedings. Instead, they liken New Era's mass arbitration procedure to a multidistrict litigation ("MDL"), in which a determination is made in a bellwether case as to a common issue and then extended to other cases within the MDL unless a party provides a case-specific reason to depart from the ruling.

The Court begins with an overview of New Era's Rules governing mass arbitration.[14] Those Rules apply if a neutral determines there are more than five cases presenting the same or similar evidence, witnesses, or issues of law and fact. Rules 2(x), 6(b)(ii)(1), 6(b)(iii)(3)(a). Although New Era may initially group together cases for administrative purposes, the ultimate determination as to whether those cases involve common issues is made by the neutral. Rules 2(x)(ii), 6(b)(ii)(2). Once that determination is made, three bellwethers are selected – one by each side and one according to an unspecified process determined by the neutral. Rule 6(b)(iii)(3). After the neutral renders a decision in the three bellwethers, the parties must conduct settlement

---

[14] As previously noted, New Era changed its Rules specifically in response to the Court's concerns in this litigation. *See* Williams Supp. Decl. However, "[u]nder California law, unconscionability of a contract or a contract clause is determined based on the law and facts at the time of the agreement." *Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167, 1173 (C.D. Cal. 1997) (citations omitted), *aff'd*, 211 F.3d 1276 (9th Cir. 2000); *see also* Cal. Civ. Code § 1670.5. The Court will therefore analyze the Rules in their prior iteration.

discussions.  Rule 6(b)(4).  If the parties reach an agreement, individual claimants or respondents may opt their particular case out of that settlement agreement.  Rule 6(b)(iii)(4).  If no agreement is reached, "each party shall provide the neutral with the case(s) that such party believes involve individualized issues of law and/or fact that should not be subject to Precedent" from the bellwether cases.  Rule 6(b)(iii)(4)*d*.  As to the remaining cases, determinations made from the bellwether cases "will act as Precedent on subsequent cases with Common Issues of Law and Fact as applied to those Common Issues of Law and Fact, solely as determined by New Era ADR affiliated neutral(s)."  Rule 6(b)(iii)(5)(a).  Precedent "shall be applied" in the same manner in later filed cases as well.  6(b)(iii)(5)(b).  The neutral creates a process for resolving the individualized issues in the remaining cases.  Rule 6(b)(iii)(6).  "Precedent will still apply to all Common Issues of Law and Fact in the Remaining Cases."  Rule 6(b)(iii)(6)(b).  "Only if a party can demonstrate that there are no Common Issues of Law and Fact will a case be removed from the Mass Arbitration."  Rule 6(b)(iii)(6)(c).

Plaintiffs primarily take issue with the use of decisions from the bellwethers as Precedent.  They read the Rules as *requiring* the neutral to apply Precedent from the bellwethers to all cases in the mass arbitration, regardless of when the case was filed, such that all claimants will be bound by those decisions.  *See* Rule 6(b)(iii)(5)(a) (determinations from the bellwethers "*will* act as Precedent on subsequent cases" (emphasis added)); Rule 6(b)(iii)(5)(b) (Precedent "*shall* be applied" in later filed cases (emphasis added)).  Under Plaintiffs' reading of the Rules, a claimant who brings a claim after the bellwethers have been resolved would effectively have had her case decided, in secret, before she even filed her case, and without having been represented in, notified of, or given an opportunity to opt out of, the earlier proceeding.  Plaintiffs distinguish New Era's mass arbitration procedure from that of an MDL on this basis, citing *Home Depot USA, Inc. v. Lafarge North America, Inc.*, 59 F.4th 55 (3d Cir. 2023), in which the Third Circuit held that it was impermissible to apply issue preclusion and the law of the case doctrine to individual cases within an MDL.

Defendants predictably take a different view.  They point to the general definition of the term Precedent, which they claim makes clear that its application is both discretionary and subject to other applicable rights, such as the right to a fair opportunity to be heard.  The definition of Precedent is contained in Rule 2(y), which provides:

When significant factual findings and legal determinations have been made in one

18

or more proceedings on the platform ("Lead Decisions"), New Era ADR affiliated neutrals may apply these determinations in the same manner and with the same force and effect to the Common Issues of Law and Fact contained in other proceedings that involve Common Issues of Law and Fact with those cases from which the Lead Decisions originated, subject to any rights contained herein.  Such determinations made from the Lead Decisions are known as "Precedent(s)."

Based on this language, Defendants argue that the application of Precedent is, by definition, discretionary.  The problem with that assertion, however, is that the Rule simply defines the term Precedent to mean "determinations made from the Lead Decisions," or, "significant factual findings and legal determinations . . . made in one or more proceedings on the platform."  *Id.*  The portion of the Rule 2(y) dealing with application of Precedent states only that neutrals, *in general*, "may apply" Precedent to Common Issues of Law and Fact in cases before New Era.  *Id.*  The Rule does not speak to *how* Precedent is to be applied in the specific context of New Era's mass arbitration procedures.  To answer that question, the Court turns to the specific Rules governing mass arbitration.

Plaintiffs point to several provisions in the mass arbitration Rules that they claim operate to mandate the application of Precedent to all future claimants.  First, Rule 6(b)(iii)(5)(a) states that determinations from bellwether cases "will act as Precedent."  Plaintiffs prefer to read that language to mean that such determinations "will *be applied* as Precedent."  However, it is not clear whether that is what to "*act* as Precedent" means.  Based on the definition in Rule 2(y), to "act as Precedent," could mean to "act as" a "determination[] made from [a] Lead Decision[]," which a neutral "may apply."  Rule 2(y).  *How* exactly the neutral is to determine whether to apply Precedent, though, is left unsaid.  Rule 6(b)(iii)(5)(a) states only that the bellwether decisions will act as Precedent "solely as determined by" the neutral.

Plaintiffs also take issue with the next subsection of the Rules, which states that in later-filed cases, Precedent "shall be applied in the manner identified in the immediately preceding paragraph."  Rule 6(b)(iii)(5)(b).  Plaintiffs quote the clause "shall be applied" (which, standing alone, would suggest that Precedent is applied automatically), but ignore the modifying clause "in the manner identified in the immediately preceding paragraph."  But as just discussed, "the manner identified in the immediately preceding paragraph" – *i.e.*, Rule 6(b)(iii)(5)(a) – leaves unclear how Precedent is to be applied by the neutral.

Lastly, Plaintiffs point to Rule 6(b)(iii)(6).  That Rule states that *after* Precedent has been applied in the cases presenting common issues, the neutral will create a process for resolving cases

19

presenting individualized issues, but that in those cases, "Precedent will still apply to all Common Issues of Law and Fact." *See* Rule 6(b)(iii)(6)(a)-(b). Sequentially, Rule 6(b)(iii)(6) follows Rule 6(b)(iii)(5) and thus comes into play only after "Application of Precedent(s)" has occurred. *See* Rule 6(b)(iii)(5)-(6). Accordingly, that "Precedent will *still* apply" could simply mean that any determination by the neutral regarding the application of Precedent remains unchanged as to the remaining cases. In short, examination of the Rules governing mass arbitration does not necessarily prove, as Plaintiffs insist, that Precedent is to be applied in all instances by the neutral without discretion.

Even so, the application of Precedent in mass arbitrations still raises a host of issues. First, as the foregoing discussion illustrates, the Rules contain a substantial amount of ambiguity as how Precedent is to be applied (and, as Plaintiffs point out, both Defendants and New Era have contradicted their prior representations about what the Rules actually mean, further indicating a lack of clarity by the very drafters and proponents of the Rules).[15] Even assuming, as the Court has, that the Rules allow for discretion on the part of the neutral, the Rules provide no guidance as to *how* the neutral is to exercise that discretion. Indeed, the Rules grant the neutral "sole discretion" in determining both whether to group together similar cases in a mass arbitration, Rules 2(x)(ii), 6(b)(iii)(3)(a), and whether and how to apply Precedent to those cases, *see* Rule 6(b)(iii)(5)(a). Such unfettered discretion invites the potential for unfairness (particularly where New Era's arbitrator selection provisions contravene the protections provided under California law, *see infra* Section IV.C.iii). This unchecked power on the part of the neutral, combined with the ambiguity contained in the Rules, is uniquely problematic when considering that Precedent could be applied to thousands of claims at once. The interpretation of whether and how to apply Precedent could be the difference between a fair arbitration process where each claimant is

---

[15] For instance, Defendants' supplemental brief states that New Era's mass arbitration procedures "are <u>only</u> triggered when there are 'similar cases filed by the <u>same</u> law firm or groups of law firms,'" which "limits, upfront, which claims can be grouped together into mass arbitration." Def. Supp. Br. at 2-3 (quoting Rule 2(x)(ii)(1)); *see also id.* at 3 ("At each stage, the claimants in any given mass arbitration are represented by the same firm or group of firms acting in coordination."). That requirement did not exist anywhere in the Rules at the time Defendants made those representations, and Defendants' earlier filings made no mention of it. *See, e.g.*, Mot. at 9 ("The rules and procedures for mass arbitrations apply where the presiding neutral determines that more than five arbitrations have been filed that present common issues."); Rule 2(x)(ii)(1) ("*Solely for administrative purposes*, New Era ADR may group similar cases filed by the same law firm or group of law firms and have them proceed through the Mass Arbitration process unless and until the presiding neutral makes a determination otherwise." (emphasis added)). New Era later amended its Rules to add the threshold requirement that mass arbitration applies only where five or more cases are "brought by the same law firm or group of law firms acting in coordination." *See* Williams Supp. Decl. Ex. B.

provided a sufficient opportunity to be heard, and a mechanical process for summarily disposing of an entire class of claimants based on an earlier proceeding to which they were not a party.

Defendants protest that the Rules provide other provisions requiring the neutral to act in a manner that will "ensure fundamental fairness and equity." Rule 6(b)(iii)(6)(a); *see* Def. Supp. Br. at 4. As an initial matter, none of those provisions speak to the application of Precedent in mass arbitrations. *See* Rules 2(p) (arbitrator has discretion to allow additional evidence "as necessary to ensure a fundamentally fair process"), 6(a)(vii)(4) (same), 6(b)(iii)(3)(d) (arbitrator has discretion to increase the number of bellwethers "but only if it is necessary to allow for a fundamentally fair process"), 6(b)(iii)(6)(a) (arbitrator will create a process for resolving *individualized* issues "to ensure fundamental fairness and equity"). In addition, the California Court of Appeal has found arbitration procedures (specifically discovery procedures) substantively unconscionable notwithstanding similar catchall language. *See Baxter v. Genworth N. Am. Corp.*, 16 Cal. App. 5th 713, 727 (2017) (discovery limitations unfair notwithstanding that arbitrator could grant additional discovery "for good and sufficient cause shown" in order "to ensure that a party has a fair opportunity to present a case"); *see also infra* Section IV.C.ii.b.

As an additional fallback, Defendants rely on the fact that the Rules allow for parties to "present evidence and arguments demonstrating that a case or cases do not involve Common Issues of Law and Fact." Rule 2(x)(iii). But whether that carve out provides an adequate safety valve is also unclear. As Plaintiffs point out, the structure of the Rules – and indeed, New Era's entire business proposition – presupposes that the mass arbitration procedure is a means for quickly and finally disposing of a large number of claims as efficiently as possible. *See* Opp. Ex. F at 11 (touting New Era's services "as critical prophylactic measure for client's mass arbitration risk"). Allowing each individual claimant a real opportunity to argue "any reason to depart from precedent in that case," as Defendants claim is the case, would seem to negate that basic premise. Def. Supp. Br. at 4.

The potential due process concerns associated with adjudicating thousands of claims on the basis of vague "Precedent" at the sole discretion of the neutral are notable given the lack of other critical procedural safeguards present in MDLs and class actions. For instance, the Rules do not provide notice to interest parties (the arbitrations are private) or an opportunity for them to be heard. There is no process for appointing leadership or impartial making determinations as to

21

**1-ER-23**

adequacy of counsel.[16]   And critically, there is no opportunity for claimants to opt out, as is required for class actions maintained under Fed. R. Civ. P. 23(b)(3).[17]  In their Motion, Defendants analogize to *McGrath*, 2020 WL 6526129, at \*9-11, in which Judge Chen of the Northern District found that a different mass arbitration protocol involving the use of randomly selected test cases was fair and impartial.  However, "[m]ost important" to the court's determination in that case was the fact that "a claimant can choose to opt out of the arbitration process and go back to court."  *Id.* No such option exists here.  For these reasons, the Court finds that the mass arbitration protocol creates a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability.

### b.   Other Procedural Limitations

Plaintiffs also challenge New Era's discovery, page, and record limitations.  Under the Rules, complaints cannot exceed 10 pages, presentations of evidence are limited to 10 total references, and argument is limited to 15,000 characters[18] (or approximately 5 pages).  *See* Rules 6(a)(ii)(1)(b), 6(a)(vii), 6(a)(x).  The Court's Tentative found that these limitations would not, standing alone, rise to the level of unconscionability.  *See* Tentative at 14.  Nevertheless, when coupled with the due process concerns identified above, they present yet another hurdle for claimants to overcome and further exacerbate the level of unfairness to claimants.

More problematic is the fact that the Rules governing expedited arbitrations (including mass arbitrations) provide for no formal process of discovery as a right.  *See* Rule 2(o)(i).  To upgrade to a "standard arbitration" with a formal process, claimants would need to pay a fee *and* obtain the consent of Defendants.  *See* Rule 2(o)(ii).  The Rules governing mass arbitration provide

---

[16] Defendants assert that "leadership conflicts are unlikely" because "cases can only be part of a mass arbitration if the individual claimants are represented by the same firm or group of firms acting in coordination."  Def. Supp. Br.  But as previously noted the same-law-firms requirement was not added until the newest version of the Rules.  Moreover, even if a subsequent claimant is represented by the same law firm that represented the bellwether claimant, that would not solve the due process issue.  *See Taylor v. Sturgell*, 553 U.S. 880, 889, 904-05 (2008) (rejecting "virtual representation theory" and holding that subsequent litigant could not be bound to judgment in prior case brought by same lawyer).

[17] Fed. R. Civ. P. 23(b)(3) applies to class actions seeking damages.  *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  By contrast, in cases where arbitration claimants would be seeking injunctive relief (the equivalent of a Fed. R. Civ. P. 23(b)(2) class), the TOU is problematic in a different respect: the non-mutual appeal provision.  *See infra* Section IV.C.iv.

[18] At his deposition, New Era's corporate representative stated that this figure (*i.e.* 15,000 characters) was "extraordinarily small" and suggested it could have been a misprint, before acknowledging its accuracy.  Opp. Ex. C at 123:19-125:18, 359:12-360:25.

only that "Documents Are Exchanged" by the parties, *see* Rule 6(a)(viii), but the documents exchanged are the 10 total files each side chooses in support of its *own* argument, *see* Rule 6(a)(vii).  Thus, this initial document exchange is not even equivalent to the initial disclosures mandated under Fed. R. Civ. P. 26(a), and it is not clear whether parties are *required* to submit any such documents.

Defendants argue that the Rules contemplate informal discovery at the discretion of the arbitrator.  For example, "if a party believes an opposing party has relevant or necessary evidence that they are not disclosing, they can make a request to the neutral that such evidence be provided or disclosed," and the neutral will determine whether "good cause for the production exists."  Rule 2(q)(i).  Additionally, in mass arbitrations, "[t]he neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process."  Rule 6(a)(vii)(4).  However, as previously noted, the California Court of Appeal found very similar provisions unconscionable in *Baxter*, 16 Cal. App. 5th at 727.  True, the procedures at issue in that case allowed for additional discovery only "for good *and sufficient* cause," *id.* (emphasis added), and furthermore, in *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 183 (2002), the court found a "good cause" standard to be sufficient.  But in *Mercuro*, the discovery provisions allowed up to "30 discovery requests of any kind."  *Id.*; *see also Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 716 (2004) ("compelling need" standard unconscionable where procedure allowed for a default of two deposition statements and testifying experts).  Here, by contrast, New Era's Rules provide for *no* discovery as a right (beyond the initial document exchange, if any).  The Court therefore agrees with the *Baxter* court's conclusion that while courts "must assume an arbitrator will act in a reasonable manner, a reasonable arbitrator would feel constrained under [New Era's Rules] to expand discovery to the extent necessary to vindicate [claimants'] statutory rights."  *Baxter*, 16 Cal. App. 5th at 730.[19]

Accordingly, the discovery limitations and other procedural limitations further support a finding of substantive unconscionability.

---

[19] Indeed, the statutory rights at issue here arise under the Sherman Act.  Antitrust lawsuits brought under the Sherman Act are notoriously complex and fact-intensive, and proving a violation generally requires extensive discovery and investigation into internal practices, pricing data, and the like which is in the exclusive possession of the defendant.  Thus, in a case such as this one, the discovery limitations provided by the Rules (that is, essentially no discovery) are wholly inadequate for claimants to even begin to prove their case.  Those same limitations might also impede claimants from making a threshold showing of "good cause" to obtain any discovery at all.

iii.     Selection of the Arbitrator

Next, Plaintiffs claim that New Era's mass arbitration protocol violates the California Arbitration Act's ("CAA") provisions regarding the selection of an arbitrator, which provides parties a right to disqualify any arbitrator based on a mandated disclosure statement.  *See* Cal. Civ. Proc. Code §§ 1281.9, 1281.91(b)(1).  Plaintiffs point to three features of New Era's Rules that they claim violate California law: (1) New Era has the power to override a claimant's decision to disqualify an arbitrator; (2) each side, rather than each individual party, has a right to disqualify an arbitrator; and (3) a single arbitrator presides over several cases at one time.  Defendants do not dispute that New Era's Rules violate these state law requirements but claim that the CAA does not apply to the TOU, and in any event is preempted by the FAA.

While Defendants are correct that, as a general matter, parties to an arbitration agreement are at liberty to select the procedural provisions governing arbitration proceedings, parties in California may not waive a right conferred by a statute "where the public benefit of the statute is one of its primary purposes."  *Azteca Constr., Inc. v. ADR Consulting, Inc.*, 121 Cal. App. 4th 1156, 1167 (2004) (cleaned up), *as modified* (Sept. 9, 2004); *see* Cal. Civil Code § 3513 ("Anyone may waive the advantage of a law intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement.").  In considering the California's arbitrator disqualification laws, the Court of Appeal in *Azteca* found that the "provisions for arbitrator disqualification established by the California Legislature may not be waived or superseded by a private contract."  *Id.* at 1160.

Nevertheless, Defendants argue that those provisions are preempted by the FAA.  In support of that argument, they rely exclusively on *Modiano v. BMW of North America LLC*, in which the court found that, assuming a conflict existed between California law and the terms of the parties' agreement, "it would be preempted by the FAA."  No. 21-CV-00040-DMS-MDD, 2021 WL 5750460, at *2 (S.D. Cal. June 29, 2021).  Plaintiffs, on the other hand, cite several cases holding that the California arbitrator disqualification provisions are not preempted.  *See* Pl. Supp. Br. at 13; *see e.g.*, *Kalasho v. BMW of N. Am., LLC*, 520 F. Supp. 3d 1288, 1295 (S.D. Cal. 2021) ("[T]he CAA provisions at issue are not preempted by the FAA because the two statutes do not conflict."); *Nguyen v. BMW of N. Am.*, No. 20-cv-2432, 2022 WL 102203, at *6 (S.D. Cal. Jan. 11, 2022) (following *Kalasho* and finding "the CAA is not preempted by the FAA with respect to the arbitration agreement at issue").

Defendants have not pointed to any conflict between California's arbitrator disclosure and disqualification rules that would indicate the existence of a conflict with the FAA in this case. Accordingly, the Court would agree with Plaintiffs (and with what appears to be the weight on authority on the issue) and find the CAA is not preempted as to those provision and this agreement. That the TOU purports to waive a nonwaivable right under California law (along with the other problems noted above) support finding the delegation clause substantively unconscionable.

    iv.    <u>Appeal Provisions</u>

Plaintiffs further challenge what they characterize as a "non-mutual right of appeal" under the TOU. Opp. at 18. The TOU provides: "[I]n the event that the arbitrator awards injunctive relief against either you or us, the party against whom injunctive relief was awarded may . . . appeal that decision to JAMS." TOU at 13. Plaintiffs argue that because it is claimants who will be seeking injunctive relief, the exclusive right to appeal only *grants* of injunctive relief favors Defendants. Relying on *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1070 (2003), Plaintiffs contend that the right of appeal would be valuable to a defendant when injunctive relief against it is granted, but only valuable to a claimant when injunctive relief is denied. Defendants, in turn, cite *Sanchez v. Valencia Holding Co., LLC* for the proposition that given the "potentially far-reaching nature of an injunctive relief remedy," the review of a grant of injunctive relief furnishes a corporate defendant a "'margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need." 61 Cal. 4th 899, 917 (2015).

The Court would agree with Plaintiffs that the right to appeal a grant, but not a denial, of injunctive relief is unfair to claimants in this case. It would seem to the Court that, for all intents and purposes, claimants would be the only parties pursuing any real form of injunctive relief (certainly in the context of a mass arbitration).[20] Thus, while the TOU's appeal provision nominally applies to Plaintiffs and Defendants in equal measure, only Defendants will benefit in practice. The same was true in *Sanchez*, but *Sanchez* involved traditional, bilateral arbitration. While the suit was brought as a putative class action, the case was before the court on a motion to

---

[20] Defendants' contention that they might seek injunctive relief against ticket resellers is unavailing. The TOU expressly allows Defendants to file claims involving unauthorized use of Defendants' websites, including for purposes of resale, in federal court. *See* TOU at 3-5, 10; *see also, e.g.*, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1116-17 (C.D. Cal. 2007) (enjoining defendants from "[p]urchasing or facilitating the purchase of tickets from Ticketmaster's website for the commercial purpose of reselling them").

compel arbitration; thus, the issue before the court was whether to send Sanchez's *individual* claim to arbitration. The fate of the rest of the putative class of claimants was not in jeopardy. If Sanchez was denied injunctive relief during arbitration, another plaintiff could try again. In that context, the California Supreme Court found that as compared to the interests of a single plaintiff, it was not unconscionable to afford the business an extra "margin of safety" against a far-reaching injunction. Here, by contrast, a denial of injunctive relief for a bellwether plaintiff could effectively foreclose the ability of the *entire class* of claimants to obtain injunctive relief. As Plaintiffs put it, "the risks of injunctive relief here are equally high-stakes for both sides, not asymmetric for Defendants." Pl. Supp. Br. at 8. The Court does not see why the interests of the business should be afforded any special protection in such a case.

That a class of individuals could be prevented from pursuing injunctive relief without the possibility of appeal is particularly significant in an antitrust case, where injunctive relief is a critical remedy for vindication of the public good. Indeed, *Sanchez* (which involved claims of unfair competition) recognized this fact when it noted: "Of course, apart from the parties' particular interests, the public has a strong interest in ensuring that fraudulent business practices are enjoined." *Id.* The Court, however, did not fully address that issue, as it was not argued on appeal. Nor, as just noted, was the Court presented with factual circumstances which would have required it to consider the possibility that *no claimant – i.e.*, no member of the public – could appeal the denial of injunctive relief or prevail on a subsequent claim seeking that relief. The appeal provision at issue here presents such a possibility.

This Court further notes that the specific procedures governing the appeal contained in the TOU highlights the inherent unfairness of Defendants' one-sided appeal provision. The TOU provides that the appeal will be taken before a three-arbitrator JAMS panel consisting of "either (a) retired state or federal judges or (b) licensed attorneys with at least 20 years of active litigation experience and substantial expertise in the substantive laws applicable to the subject matter of the dispute." TOU at 13. Moreover, the "panel will conduct a de novo review of the arbitrator's decision." *Id.* In other words, the TOU ensures that any adverse decision against Defendants that would require them to alter their business practices would be rigorously reviewed by a panel of experienced arbitrators at a trusted arbitration outfit (notably, not New Era). Claimants, on the other hand, have no recourse at all. Thus, Defendants have much more than a "margin of safety"; they have effectively stacked the deck so they can arbitrate thousands of claims in a single go, and

if they lose, simply go back to JAMS to take an appeal.

For these reasons, the Court would find the appeal provisions contained in the TOU adds another element of substantive unconscionability.

v.     Class Action Waiver

Lastly, Plaintiffs assert that the class action waiver contained in the TOU is substantively unconscionable under California law, based on the California Supreme Court's decision in *Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005).  The *Discover Bank* rule provides that waivers of the right to a class action are unconscionable "when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money."  *Id.* at 1110.  But as Plaintiffs acknowledge, the United States Supreme Court overruled *Discover Bank* in *Concepcion*, 563 U.S. 333.  Plaintiffs nonetheless contend that the *Concepcion* holding does not apply here because its reasoning was premised on the notion that the *Discover Bank* rule interfered with the FAA's purpose to facilitate *bilateral* arbitrations, not mass arbitrations.  However, there is no clear indication that once the Supreme Court considers the creation and use of mass arbitrations, it will reconsider its ruling that the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of class-wide arbitration procedures.  Accordingly, the Court does not find the existence of a class action waiver to be a basis for invalidating the agreement.

vi.     Summary

In sum, the Court finds that the TOU and New Era's Rules contain several elements supporting a finding of substantive unconscionability, specifically: (1) the mass arbitration protocol including the application of precedent from the bellwether decisions to other claimants plus the lack of corresponding procedural safeguards; (2) the lack of a right to discovery and other procedural limitations; (3) the arbitrator selection provisions; and (4) the limited right of appeal. Each of these elements is present with respect to the delegation clause specifically, as each applies to threshold issues of arbitrability.[21]  Any one of these elements, standing alone, might not suffice

---

[21] The Rules governing the application of precedent in mass arbitrations apply to threshold issues of arbitrability; for example, the neutral's determination as to unconscionability in a bellwether could apply to all future

to invalidate the agreement.  However, when viewed together and alongside the extremely high degree of procedural unconscionability present here (as the law requires, *see Sonic-Calabasas*, 57 Cal. 4th at 1146), the Court finds the agreement unconscionable.

### D. Severability

Having found both procedural and substantive unconscionability present, the Court now turns to whether the unconscionable portions of the agreement are severable.  "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ. Code § 1670.5(a).  In determining whether severance is appropriate, courts examine "(1) whether the substantively unconscionable provision relates to the arbitration agreement's chief objective; (2) whether the arbitration agreement contained multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum; and (3) a lack of mutuality that permeated the entire agreement."  *MacClelland*, 609 F. Supp. 3d at 1044 (citing *Armendariz*, 24 Cal. 4th at 124-25).  "The overarching inquiry is whether 'the interests of justice . . . would be furthered' by severance."  *Armendariz*, 24 Cal. 4th at 124 (quoting *Beynon v. Garden Grove Med. Grp.*, 100 Cal. App. 3d 698, 713 (1980).

Here, the TOU contains a clause stating that in the event New Era cannot conduct the arbitration for any reason, "the arbitration will be conducted by FairClaims pursuant to its FastTrack Rules & Procedures," and, failing that, an alternative, mutually selected arbitration provider.  TOU at 12.  However, the existence of a severability clause is not dispositive; rather, the ultimate question is whether the agreement is permeated by unconscionability.  *See MacClelland*, 609 F. Supp. 3d at 1045 ("The existence of the severability clauses does not change the fact that where an agreement is permeated by unconscionability, a court will not sever the unlawful provisions." (citations omitted)).

As was the case in *Armendariz*, there are multiple unlawful provisions here.  "Such

_____

claims which are grouped together in a mass arbitration.  Similarly, California law governing arbitrator disqualification would apply equally to threshold issues like unconscionability as they would to the underlying merits of the claim, as a single arbitrator would decide both issues.  Finally, any injunctive relief awarded on threshold issues of arbitrability would be subject to the appeal provisions (although it is not entirely clear how equitable relief such as contract recission would be treated for purposes of appeal under the TOU).

multiple defects indicate a systematic effort to impose arbitration on [a ticket purchaser] not simply as an alternative to litigation, but as an inferior forum." *Armendariz*, 24 Cal. 4th at 124. Specifically, New Era's mass arbitration Rules and the arbitration agreement's appeal provisions provide Defendants, the party with substantially superior bargaining power, an unfair advantage in contesting the claims against it.  Moreover, the way in which Defendants effected the changes to the TOU (*e.g.*, unilaterally, and in response to the looming prospect of defending against large numbers of arbitration claims) further indicates a "systematic effort to impose arbitration on a customer as an inferior forum" to avoid having to arbitrate consumer claims individually. *MacClelland*, 609 F. Supp. 3d at 1046.  It would appear to the Court that these efforts were by design, and that the effects of these unconscionable provisions were "entirely foreseeable and intended." *Id.*  The Court would thus find that unconscionability permeates the arbitration clause and decline to sever the offending provisions.

The Court also notes that the fact the arbitration agreement contains a clause designating FairClaims as a backup arbitration provider (and failing that, another backup provider) does not save the agreement.  Because the parties have not briefed the issue, the Court is unable to conclude that requiring consumers to arbitrate pursuant to FairClaims' "FastTrack Rules & Procedures" – an apparently online-only process administered by another relatively new arbitration provider – would alleviate the Court's concerns with respect to the procedural and substantively unconscionable elements of the agreement.  Moreover, "[i]f the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court." *Id.*  Nor, contrary to Defendants' suggestion, should claimants have to rely on the FAA's post-award review process for vacating an adverse award.  That process "is 'both limited and highly deferential' and an arbitration award may be vacated only if it is 'completely irrational' or 'constitutes manifest disregard of the law.'" *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004) (quoting *Coutee v. Barington Cap. Grp., L.P.*, 336 F.3d 1128, 1132 (9th Cir. 2003)); *see also Coutee*, 336 F.3d at 1133 ("Manifest disregard of the facts is not an independent ground for vacatur in this circuit.").  As Plaintiffs put it, such a limited review process "is no substitute for fair procedures up front – otherwise, unconscionability challenges would always fail."  Pl. Supp. Reply at 7.

**VI.**  <u>**Conclusion**</u>

Based on the foregoing discussion, the Court **DENIES** the motion to compel arbitration.