**No. 23-55770**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**SKOT HECKMAN; LUIS PONCE; JEANENE POPP; JACOB ROBERTS,**
**on behalf of themselves and all those similarly situated,**

*Plaintiffs-Appellees*,

v.

## LIVE NATION ENTERTAINMENT, INC.; TICKETMASTER LLC,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Central District of California
No. 2:22-cv-00047-GW-GIS (George H. Wu, District Judge)

## EXCERPTS OF RECORD FOR DEFENDANTS-APPELLANTS LIVE
## NATION ENTERTAINMENT, INC. AND TICKETMASTER, LLC
### VOLUME II of III (2-ER-33 to 2-ER-295)

Roman Martinez
Uriel Hinberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Sadik Huseny
LATHAM & WATKINS LLP
300 Colorado Street
Suite 200
Austin, TX 78701
(737) 910-7300

November 13, 2023

Timothy L. O'Mara
*Counsel of Record*
Andrew M. Gass
Alicia R. Jovais
Robin L. Gushman
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600
tim.omara@lw.com

*Counsel for Defendants-Appellants*
*Live Nation Entertainment, Inc. and Ticketmaster, LLC*

**KELLEY DRYE & WARREN LLP**
Sandra Musumeci
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:      (212) 808-7800
Facsimile:      (212) 808-7897
SMusumeci@kelleydrye.com

Becca Wahlquist
BWahlquist@kelleydrye.com

*Counsel for Nonparty New Era ADR, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKOT HECKMAN, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, | Case No.: 22-cv-00047-GW-GJS<br><br>The Honorable George H. Wu |
| Plaintiffs, | |
| vs. | **SUPPLEMENTAL DECLARATION OF COLLIN WILLIAMS ON BEHALF OF NON-PARTY NEW ERA ADR, INC.** |
| LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER LLC, | |
| Defendants. | |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 1 -
Case No.: 22-cv-00047-GW-GJS

I, COLLIN WILLIAMS, declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

2.      I am the Founder and Chairman of non-party New Era ADR, Inc. ("New Era").  I make this Supplemental Declaration in connection with the Motion to Compel Arbitration pending in the above-referenced matter.

3.      On June 1, 2023, I submitted a Declaration (ECF No. 163) clarifying certain of New Era's Rules & Procedures that had been discussed and/or questioned in the parties' briefing and oral argument on the Motion to Compel Arbitration.

4.      On July 25, 2023, New Era published a revised version of its Rules & Procedures.  The revisions are minimal and intended to clarify certain points of possible confusion within New Era's Mass Arbitration Rules & Procedures and concerning the issue of arbitrator discretion.  The clarifications made are fully in accord with statements that New Era has made publicly in prior declarations filed in this case.

5.      These revisions are noted prominently on New Era's website, and New Era currently has no parties arbitrating disputes under its Mass Arbitration Rules, including any party to this matter.

6.      Attached as Exhibit A is a copy of New Era's Rules & Procedures, revised as of July 25, 2023, which can be found at https://www.neweraadr.com/rules-and-procedures/.

7.      Attached as Exhibit B is a redline showing the specific changes made between the July 25, 2023 revision of the New Era Rules & Procedures now in effect, and the prior version of New Era Rules & Procedures previously in effect.

1    I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

2    25th day of July, 2023.

3    _____
     *Collin Williams*

4                      Collin Williams

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2-ER-36**

# Exhibit A

1. Types of Proceedings and Pricing

   **a. Pricing**

      i. Mediation

      ii. Arbitration

      iii. General Provisions and Ancillary Services

   **b. Mediation**

      i. In General

      ii. Standard

      iii. With Binding Resolution

   **c. Arbitration**

      i. In General

      ii. Standard Arbitrations

      iii. Expedited/Mass Arbitrations

   **d. Moot Arguments**

      i. Partial

      ii. Whole

   **e. Subscription Pricing/Additional Services**

      i. Subscription Pricing

      ii. Additional Services

2. General Rules and Procedures

   **a. Applicability**

   **b. Terms of Use**

   **c. Confidentiality**

   **d. Decorum/Sanctions**

   **e. Location of Proceeding/Choice of Law**

   **f. Independent Neutrals/Ultimate Authority**

   **g. Agreement to Refer Disputes**

**2-ER-38**

**h. Fees**

**i. Electronic Service**

**j. Assignment of Neutrals**

**k. Conflicts/Replacement of Neutrals**

**l. Commencement of Proceedings**

**m. Deadlines**

**n. Witnesses**

**o. Discovery**

**p. Evidence/Hearings**

**q. Evidence Disclosure**

**r. Civil Procedure/Rules of Evidence/Motion Practice**

**s. Transcription (coming soon)**

**t. Settlement**

**u. Decision/Award**

**v. Enforcement of Decision/Award**

**w. Execution of Award/Decision**

**x. Common Issues of Law and Fact**

**y. Precedent**

**z. Arbitrability**

**aa. Injunctive Relief**

**ab. Document Retention**

**ac. Educational and Legal Disclaimer**

3. Virtual Standard Mediation Rules and Procedures

**a. Process and Rules at Each Stage**

4. Virtual Mediation with Binding Resolution Rules and Procedures

**a. Process and Rules at Each Stage**

5. Virtual Standard Arbitration Rules and Procedures

**2-ER-39**

**a. Process and Rules at Each Stage**

6. Virtual Expedited Arbitration Rules and Procedures

    **a. Process and Rules at Each Stage**

    **b. Mass Arbitration Rules and Procedures**

**1. Types of Proceedings and Pricing**

    **a. Pricing**

        i. Mediation

            1. Standard Mediation – $10000 per case, inclusive of neutral fees.

            2. Mediation with Binding Resolution – $15,000 per case, inclusive of neutral fees.

        ii. Arbitration

            1. Standard – $35,000 per case, inclusive of neutral fees.

            2. Expedited/Mass Arbitration Cases – $10,000 per case, inclusive of neutral fees.

            3. Subscription – Reduced case filing fees (described below), negotiated depending on various factors, including prior litigation history.

        iii. General Provisions and Ancillary Services

            1. New Era will respect any fee allocation agreement agreed to in advance by the parties. In the absence of  such a fee allocation provision, the default allocations are as follows:

                a. Business to Business – Fees split 50/50.  This includes all standard arbitrations

                b. Business to Consumer/Employee – Split 98.5%/1.5% business to consumer/employee, respectively, for Standard Arbitrations and Mediations with Binding Resolution; and split 95%/5% business to consumer/employee, respectively, for Expedited Arbitrations and Standard Mediations.

            2. Transcription – Additional $1500.  Not available for mediation.

            3. Reasoned Decision – Unless it is the default provision to have a reasoned decision such as the Mass Arbitration bellwether or employment context, a reasoned decision will cost an additional $3000.

    **b. Mediation**

        i. In General

            1. Currently, New Era ADR offers two types of Mediation products: Standard Mediations, and Mediations with a Binding Resolution.  All Mediation products are conducted

**2-ER-40**

virtually on the New Era ADR platform.

   2. The parties will mutually agree on the type of mediation to be used for their case, and New Era ADR will conduct the mediation in accordance with the procedures corresponding to the parties' mutually agreed upon selection.

ii. Standard

   1. Standard, non-binding mediation processes are conducted entirely on New Era ADR's platform.

   2. Expected completion of process = 30 – 60 Days from assignment of a neutral.

iii. With Binding Decision

   1. If all the parties agree at the outset, and the mediation fails to achieve a resolution, final arguments will be presented and a binding decision will be issued by the neutral.

   2. Expected completion of process = 30 – 60 days from assignment of a neutral.

**c. Arbitration**

i. In General

   1. Currently, New Era ADR offers two types of Arbitration products: Standard Arbitrations and Expedited/Mass Arbitrations.  All Arbitration products are conducted virtually on the New Era ADR platform.

   2. The parties will mutually agree on the type of arbitration to be used for their case, and New Era ADR will conduct the arbitration in accordance with the procedures corresponding to the parties' mutually agreed upon selection.

   3. In the absence of agreement by the parties as to which type of New Era ADR Arbitration product applies to a particular case, the forum shall be New Era ADR's Standard Arbitration product.

ii. Standard Arbitrations

   1. Generally sought after for complex and/or more evidence-intensive disputes.  This product is the most similar to a traditional arbitration, but still wholly virtual and with limited discovery.

   2. Expected duration = <100 days from assignment/selection of a neutral.

iii. Expedited/Mass Arbitrations

   1. Generally sought after for disputes that would benefit from an even more streamlined process. For example, consumer, employment, or certain commercial disputes.

**2-ER-41**

Focused evidence submission and arguments are an essential part of this process.

2. Expected duration = 45 – 60 days from assignment/selection of a neutral.

3. Mass Arbitrations

    a. A specific type of expedited arbitration where there are (1) Common Issues of Law and Fact, (2) among five or more cases, and (3) brought by the same law firm or group of law firms acting in coordination. All mass arbitrations follow the Virtual Expedited Arbitration Rules with a few exceptions (as more fully described in Section 6B), such as neutral selection, Precedent (defined herein), a mandatory non-binding settlement conference, and reasoned decisions.

    b. Expected duration = 45-60 days from assignment/selection of a neutral for each bellwether case.

**d. Moot Arguments**

    i. Partial

        1. Moot portions of your case (e.g. opening/closing statements) or just test arguments and theories, all with one of New Era ADR's experienced neutrals.

        2. Price = Priced on a per case basis

    ii. Whole

        1. Moot your entire case.

        2. Price = Priced on a per case basis

**e. Subscription Pricing/Additional Services**

    i. Subscription Pricing

        1. All pricing for the procedures set forth herein is on a per case basis and includes neutral fees, but subscription pricing is available by contract with New Era ADR.

        2. In the absence of subscription pricing, there is only one fee, titled a "case fee," and the default pricing and allocation is set forth in Section 1(a) above.

        3. In subscription pricing, there are two components to the case fees:

            a. A "subscription fee" paid on an annual basis. This fee is paid solely by the subscriber pursuant to contract and lowers the filing fees (as defined herein) for the dispute; and

            b. Actual filing fees per case ("filing fees"), paid by each party to a dispute and which are discounted from the default per case pricing as a result of the subscription fee.

4. Subscription pricing is specific to each subscriber and based on various factors, including, for example, historical litigation data.

5. Example of default vs subscription pricing:

    a. Default Pricing = 100 Mass Arbitration cases at $10,000 per case fee = $1M

    b. Sample of Subscription Fees = 100 Mass Arbitration cases on $250,000 annual subscription fee + $300 per case filing fee = $280,000

6. Under all circumstances, ***all fees are paid up-front.***

ii. Additional Services

    1. Reasoned Decision

        a. The default for any adversarial proceeding on the New Era ADR platform, outside of Mass Arbitration bellwether cases and employment disputes, is the issuance of a standard decision.

        b. Any party can request a reasoned decision for an additional fee. A reasoned decision provides limited explanation or elaboration for the decision along with a summary of the same. A standard decision provides the decision without further explanation.

        c. A reasoned decision will not be a full judicial opinion, but will provide the neutral's reasoning and application of the law to the facts of the case. A reasoned decision *may* include findings of fact and conclusions of law, as required by law, at additional expense (and likely with the requirement that the parties submit proposed findings of fact and conclusions of law, with record citations) but this is not the default for reasoned decisions.

    2. Transcription Services (Coming Soon)

        a. A transcript of any hearing can be requested by any party.

        b. New Era ADR will use a proprietary license for transcription software to transcribe the hearing in real time.

        c. New Era ADR will endeavor to provide the transcript within 24 hours of the completion of the hearing.

## 2. General Rules and Procedures

### a. Applicability

    i. All proceedings on the New Era ADR platform are subject to the Terms of Use, the Privacy Policy, and these General Rules and Procedures.

**2-ER-43**

    ii. Each proceeding also has its own set of specific rules applicable directly to that particular proceeding. Each appears later in this outline and separately on New Era ADR's website (together, the "Proceeding-Specific Rules and Procedures").

    iii. In the event an agreement does not include an arbitral statute, the Federal Arbitration Act (FAA) shall govern.

## b. Terms of Use

    i. By using the New Era ADR platform, or contractually, you have agreed to be bound by the New Era ADR Terms of Use, the Privacy Policy, these General Rules and Procedures and any applicable Proceeding-Specific Rules and Procedures.

    ii. You represent that you have read these New Era ADR Rules and Procedures, you agree that New Era ADR provides you a fundamentally fair dispute resolution process, and you agree to be bound by any decision(s) rendered.

    iii. For more information, please refer directly to the New Era ADR Terms of Use and the Proceeding-Specific Rules and Procedures.

## c. Confidentiality

    i. New Era ADR shall maintain the confidentiality of all proceedings except where disclosure is required by law or as New Era ADR deems necessary for a judicial challenge to the result. The neutral may issue additional orders to protect the confidentiality of any portion of the proceeding or evidence and documents submitted.

    ii. The parties agree that all communications and evidence will remain confidential and neither party will take any action that would reasonably be expected to lead to unwanted or unfavorable publicity to any other party. This provision does not apply to facts or information gathered outside of the proceeding.

    iii. As noted in the Terms of Use, the services provided herein are governed by Illinois law, and the Location of Proceeding/Choice of Law provisions below indicate that "All New Era ADR proceedings are deemed to take place in the location of the neutral," which may implicate the neutral's forum state's ADR confidentiality laws. Accordingly, in connection mediation services provided through New Era ADR, all communications between New Era ADR or the neutral on the one hand, and any mediation party, counsel, or other person or allowed to participate in the mediation, whether made during such a mediation or made prior to such a mediation but in furtherance thereof, shall constitute confidential and privileged mediation communications under the Illinois Uniform Mediation Act (710 ILCS 35/1 – 35/16, as amended from time to time) or the neutral's forum state's confidentiality/privilege law.

## d. Decorum/Sanctions

**2-ER-44**

i. All parties are expected to maintain professional and respectful behavior during the duration of any proceeding(s). Should any party violate this provision, the neutral(s) and New Era ADR may sanction any party, witness, or participant to the full extent permitted by law; and such sanctions include, but are not limited to, monetary sanctions if allowed in the arbitration agreement amongst the parties, issue preclusion, adverse findings, and awards of attorneys' fees and/or costs if allowed in the arbitration agreement amongst the parties. No refunds will be granted as a result of proceedings shortened as a result of a violation of this provision.

**e. Location of Proceeding/Choice of Law**

i. Except as stated above regarding Mediation Confidentiality, all New Era ADR proceedings are conducted virtually and are deemed to take place in the venue determined by the neutral regardless of the physical locations of the parties, participants and/or evidence and witnesses. This does not impact choice of law provisions or other contractually chosen law which will be applied by the New Era ADR neutral. In determining the merits of the dispute, the neutral shall apply the choice of law previously agreed to by the parties. In the absence of such agreement, the neutral shall apply the choice of law that he/she/they deem(s) to be most applicable, in their sole discretion. If there is a dispute over the choice of law, arguments should be made by the parties using messaging on the New Era ADR platform and in accordance with Section 2(z)(ii) of these Rules and Procedure. The neutral may grant any remedy or relief that is just and equitable and within the scope of the parties' agreement or applicable law.

**f. Independent Neutrals/Ultimate Authority/Customized Provisions**

i. New Era ADR affiliated neutrals are independent contractors. They are not employees of New Era ADR and are not compensated by New Era ADR other than their contractually agreed upon hourly rates or flat fees.

ii. New Era ADR affiliated neutrals are the ultimate arbiters of all proceedings on the platform and have full authority to run proceedings as they determine in their sole discretion, including the ability to allow discovery, evidence and arguments in excess of the default guidelines and limits stated herein to ensure a fundamentally fair process. Subject to Rule 2.k, herein, the parties otherwise waive any objection to the authority of the neutrals in their proceeding(s).

iii. The parties may customize alternative dispute resolution provisions pursuant to the needs of the individual(s) and/or business(es) by written agreement. New Era ADR may honor any such customized alternative dispute resolution provisions, but only to the extent the alternative dispute resolution provisions do not contradict the letter and/or the spirit of New Era ADR's rules and procedures. New Era ADR retains sole discretion to determine whether

or not customized alternative dispute resolution provisions can or should be honored, unless New Era ADR has given prior written approval of the customized alternative dispute resolution provisions.

**g. Agreement to Refer Disputes**

    i. By referring disputes to the New Era ADR platform or by naming New Era ADR, in a pre-dispute agreement, as the dispute resolution provider to be used in the event of a dispute, you either have a binding agreement that requires dispute resolution through the New Era ADR platform or both/all parties have consented to resolve their disputes on the New Era ADR platform.  The claimant(s) may initiate a case on the platform based on either scenario, but the basis for consent (i.e. the contract, terms of use or other agreement) must be identified and a copy provided to New Era ADR.

**h. Fees**

    i. Prior to the commencement of any New Era ADR proceeding, the parties will need to pay the applicable platform fees, which include neutral fees.  Accommodation can also be made for parties whose financial position does not allow for payment.  No New Era ADR proceeding will commence without payment of all fees owed or agreeable payment terms being reached.

**i. Electronic Service**

    i. The parties consent to electronic service of process with service to be made to the email address provided contractually.  Parties using New Era ADR should provide applicable email address(es) for service in their Terms of Use or contracts.  Unless a party objects for lack of sufficiency of service, any party appearing in a proceeding waives any objection to service of process.

**j. Assignment of Neutrals**

    i. New Era ADR will provide a panel of a minimum of 3 and up to 8 neutrals for each proceeding unless otherwise provided for herein or in the Proceeding Specific Rules and Procedures.  Each such panel will consist of neutrals who have the requisite experience to preside over the dispute at issue, in New Era ADR's sole discretion.

    ii. In each proceeding, the parties will participate in New Era ADR's standard rank/strike process, outlined below, unless both parties opt to have New Era ADR appoint a neutral from the panel.

    iii. New Era ADR's Standard Rank/Strike Process

        1. Following New Era ADR proposing its panel of neutrals pursuant to these General Rules and Procedures and any Proceeding-Specific Rules and Procedures, the parties shall

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 15 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS    Document 104-1  New Era ADR Rules and Procedures | New Era ADR Filed 07/27/23    Page 11 of 36    Page ID #:4479

have five (5) business days therefrom to:

    a. If 6 or fewer neutrals are proposed as a part of the panel, strike 1 neutral each;

    b. If 7 or more neutrals are proposed as a part of the panel, strike 2 neutrals each.

2. For the remaining neutrals, the parties shall have two (2) more business days to numerically rank them, with #1 being a party's top choice and the quantitatively highest number being the least preferable.

    a. If one neutral has the best score (in this instance, the lowest score), then that neutral will be appointed and the proceeding shall move forward.

    b. In the event of a tie, then the neutrals with the worst (quantitatively highest) scores will be dropped and the parties shall re-rank the remaining neutrals. The neutral with the lowest score on the re-rank will be appointed to the proceeding.

    c. If the re-ranked scores remain tied, then within two (2) business days, New Era ADR will randomly select and appoint one of the remaining neutrals.

iv. I  If Respondent does not respond to the complaint within 14 calendar days of receipt of the initial email notice of the complaint from New Era ADR, New Era ADR shall appoint a neutral to preside over the proceeding.  If Respondent responds prior to a default award being issued by the neutral, the parties shall undergo New Era ADR's Standard Rank/Strike process to select a neutral for the remainder of the case.

v. If there is more than one attorney for any party(ies) , the attorneys for that party (ies) are responsible for meeting and conferring internally and achieving consensus for purposes of making selections for the rank/strike process.

vi. If a different process for neutral selection is contractually agreed to by the parties, New Era ADR will honor such agreement and/or the resulting neutral selection at its sole discretion. There will be no delay in the proceeding(s) to accommodate for such alternative neutral selection procedures.

vii. Please note that selection of neutral's is always subject to the neutral's availability.

**k. Conflicts/Replacement of Neutrals**

i. Neutrals shall promptly upon initial appointment, check for any actual or potential conflicts of interest and, as soon as practicable:

1. If the neutral has an actual conflict of interest, the neutral shall decline the appointment or withdraw if already appointed;

2. If the neutral has any disclosures about their background or any potential conflict of interest, the neutral shall make all such disclosures required by law or, if not required by law, that are otherwise appropriate to disclose; the neutral may, thereafter, only serve (or continue to serve), with the consent of the parties or after a New Era ADR determination that the neutral can still maintain impartiality notwithstanding the disclosed matter; and

3. If there is an irreconcilable conflict, New Era ADR will appoint the next highest ranked neutral from the Rank/Strike process until a neutral is selected that does not have any existing conflict

ii. Party consent to a neutral's service (or continued service) following a disclosure by the neutral is given by either:

1. InformingNew Era ADR (and not the neutral) of such express consent; or

2. Failing to inform New Era ADR (and not the neutral) of any objection to the neutral within seven (7) calendar days after service of the conflict disclosure.

iii. New Era ADR shall make the final determination whether, in its sole discretion, the objection to a neutral's impartiality requires replacement of the neutral.

iv. New Era ADR may also otherwise replace a neutral at its sole discretion, upon  what New Era ADR deems a legitimate request orconcern or upon unforeseeable circumstances.  If such a replacement is necessary, New Era ADR will replace the neutral at no additional charge and will provide notification to all parties about the change and a general explanation of why it was necessary.

**l. Commencement of Proceedings**

i. All New Era ADR proceedings are commenced on the New Era ADR platform application. The system will require contact information for the parties, the attorneys, the nature of the claim(s), the type of damages or relief requested, any counterclaims, and payment by credit card.  The application will guide the parties through the additional steps needed in the process.

**m. Deadlines**

i. Once a proceeding is commenced, the neutral will provide dates for hearings, meetings and deadlines for document and evidence submissions.

ii. All proceedings at New Era ADR are time limited with the following as expected timelines as set forth above:

1. Mediation = 30 – 60 days from appointment/selection of a neutral

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 17 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS    Document 104-1 Rules and Procedures | New Era ADR    Filed 07/27/23    Page 13 of 36    Page ID
#:4481

2. Mediation with a Binding Decision = 30 – 60 days from appointment/selection of a neutral

3. Expedited arbitration = 45 – 60 days from appointment/selection of a neutral

4. Standard arbitration = Under 100 days  from appointment/selection of a neutral

iii. You are expected to operate within these general time parameters and be prepared to meet expedited deadlines.  Exceptions may be granted as necessary to ensure a fundamentally fair process, as determined in the discretion of the neutral.

iv. Failure to adhere to these deadlines may result in a default decision being issued against you.

v. Neutrals are also expected to maintain these timeframes.

**n. Witnesses**

i. If a party believes witness testimony would be relevant to the dispute, the party may present that testimony to the neutral in one of three ways: by requesting that the witness attend a hearing before the neutral, by providing a transcript of the witness' deposition testimony, or by submitting an affidavit from the witness.  (Please note that some neutrals may not accept or may not find persuasive testimony adduced solely by affidavit, as the opposing party will not have had a chance to subject the affiant to cross-examination or the like.)

ii. If a witness refuses to attend, to the extent allowable under applicable law, a party may request that the neutral issue a subpoena which the requesting party must serve on the witness (and, if necessary, seek enforcement in a court of competent jurisdiction) in accordance with applicable law.  The neutral retains discretion on whether or not a subpoena should be issued and the scope of the subpoena.

iii. The party must allow sufficient time to procure the witness(es)'s attendance prior to any document submission or hearing deadline.  There will be no delays as a result of a party's failure to properly secure witness attendance.

iv. The parties are allowed a maximum of two (2) witnesses at a hearing unless the neutral specifically allows additional witnesses, on good cause shown.

v. Live testimony shall be given under oath which shall be administered by the neutral, or as otherwise required or permitted by the neutral's forum state law.

**o. Discovery**

i. New Era ADR operates on the premise that limitations on discovery are one of the primary ways efficiencies are achieved in arbitration, and discovery must be narrowly tailored only to the information necessary to advancing a neutral's understanding of the case.  A formal

discovery process exists solely in New Era ADR's Standard Arbitration process and is
described in Section 5 below.

   ii.  If the parties to New Era's Virtual Expedited Arbitration process determine that formal
discovery is necessary for their proceeding, they can make a request to be upgraded to New
Era ADR's Standard Arbitration process.  If granted, New Era ADR's normal fees for its
Standard Arbitration process shall apply.

   iii. Any request for discovery must be submitted to the neutral, at which point the neutral has
discretion to determine whether it should be allowed or not

   iv. For specific discovery requests, the parties must timely comply with any discovery request
granted by the neutral or a negative inference may be made against the noncompliant
party.  The neutral may also impose a sanction against the noncompliant party, including, by
way of non-exclusive example, entry of a default decision against the non-compliant party.

   v. The parties may customize discovery provisions pursuant to the needs of the individual(s)
and/or business(es) by written agreement.  The neutral may honor any such customized
discovery provisions, but only to the extent the discovery provisions do not contradict the
letter and/or the spirit of New Era ADR's rules and procedures.  The neutral retains sole
discretion to determine whether or not customized discovery provisions can or should be
honored.

**p. Evidence/Hearings**

   i. All evidence must be uploaded to New Era ADR's secure online platform.

   ii. Limits are generally:

     1. 30 files for documentary evidence and 50 pages per file exhibit for standard arbitrations;
and

     2. the lesser of 10 total files, 25 pages across all files or 25MB of aggregate
uncompressed uploads for expedited arbitrations.

   iii. The neutral has discretion to allow evidence in excess of the stated limits as necessary to
ensure a fundamentally fair process.

   iv. The neutral shall be the final arbiter of, and has sole discretion regarding, what evidence
shall be considered, what weight should be applied to the evidence, and whether evidence
should be excluded from consideration, based on fairness, equity, or the law (including, by
way of nonexclusive example, on the basis of forum-state recognized evidentiary privileges).

   v. Except as required by law, the parties agree not to save, record, or distribute evidence in
any way, other than through the New Era ADR system and then only for the purpose of the

proceeding.

vi. The neutral may request additional evidence which the parties shall provide, if available.

vii. The neutral may request post-hearing, supplementary evidence or argument at the neutral's
sole discretion.

viii. Unless the parties agree to the contrary, hearings shall be held in Standard Arbitrations and
Bellwether cases in Mass Arbitrations.  In all other Expedited Arbitrations, the neutral may
rule solely on the documentary evidence without any virtual hearing.  Discretion lies solely
with the neutral in making a determination of whether a hearing is necessary in all non-
standard or non-Bellwether cases.

## q. Evidence Disclosure

i. Similar to discovery, if a party believes an opposing party has relevant or necessary
evidence that they are not disclosing, they can make a request to the neutral that such
evidence be provided or disclosed.  The neutral, upon a finding that good cause for the
production exists, a decision confined to the neutral's sole discretion, may direct  the
opposing party to produce to the requesting party the requested information; in issuing such
a direction, the neutral shall make adequate provision to address any claims of privilege.

ii. Any failure to comply with the neutral's directive to produce may result in a default decision
being entered against the non-compliant party.

## r. Civil Procedure/Rules of Evidence/Motion Practice

i. The parties may offer relevant and material  facts and evidence as necessary to facilitate
the neutral's understanding of the dispute, but formal Federal and State Rules of Evidence
and Rules of Civil Procedure do not apply.

ii. The neutral has sole discretion in determining the cadence and progression of the
proceeding as well as the admissibility, weight, veracity, authenticity, relevance and
importance of any evidence or arguments submitted.

iii. For Standard Arbitrations, motion practice is not allowed unless specific exceptions are
made by your neutral, in their sole discretion.  Requests for relief may be made on the
platform via the messaging function.  For Expedited Arbitrations, motion practice is not
allowed other than for Bellwether cases in Mass Arbitrations, where motion practice is
generally not allowed unless specific exceptions are made by your neutral, in their sole
discretion.

1. Dispositive Motions: dispositive motions are not allowed on the New Era ADR platform
under these Rules and Procedures under any circumstance.  If there is a threshold
issue (i.e. the wrong party is named in the suit) that dictates the case should not move

**2-ER-51**

forward under any circumstances, that issue should be raised with the neutral through messaging on the New Era ADR platform.

2. Discovery Issues: issues related to discovery should be raised with the Neutral through messaging on the New Era ADR platform during the discovery process.  If necessary, such issues may also be included in briefing and raised at the inception of the hearing as threshold issues so the neutral may rule accordingly, in accordance with Section 2(z)(ii) of these Rules and Procedures.  Such issues must be raised at the inception of a hearing in order to be considered and may be revisited, if necessary, in the final briefing.

3. All Other Motions: in any scenario where the neutral has allowed for motions for specific exceptions, such motions must be made at the hearing and at the inception of such hearing for neutral consideration, in accordance with Section 2(z)(ii) of these Rules and Procedures.  Any motions not raised in this manner will not be considered.  Hearings shall then proceed after the neutral makes their determination with respect to such motions, unless in their sole discretion the hearing must be paused and reconvened later.

**s. Transcription**

i. The parties may request that a hearing be transcribed.  This is done with New Era ADR's proprietary license of transcription software.

ii. New Era ADR will endeavor to deliver the transcript within 24 hours of the completion of the hearing.

**t. Settlement**

i. Parties may settle their dispute before, during or after the New Era ADR proceeding whether facilitated by a New Era ADR neutral or not.

ii. ***Since all New Era ADR fees (inclusive of neutral fees) accrue at the time of filing, no rebates or refunds of any paid fees shall be given (although New Era ADR will consider and may abide by the parties' agreement to shift some or all of the New Era ADR fees from or to any particular party).***

**u. Decision/Award**

i. In the arbitration context, a decision/award will typically be issued within 7 calendar days after the neutral closes the record (i.e., after all the evidence and post-hearing submissions have been received or the deadline for their submission has passed, whichever is sooner).  The decision will be non-reasoned unless required by law or otherwise set forth herein.

**2-ER-52**

ii. If a party, or the parties, wish(es) to have a reasoned decision, the reasoned decision will typically be issued within 14 calendar days after closing of the record.

iii. A reasoned decision will include the application of the law to the facts of the case as well as the ultimate decision and award, but is not equivalent to a full judicial opinion.

iv. If the parties request findings of fact and conclusions of law, or such findings and conclusions are required by law, additional charges may apply and the issuance of the decision will require additional time beyond the 14 day period set forth above for a reasoned decision.

v. Reasoned decisions are the default standard for employment cases and Bellwether cases in Mass Arbitrations.

**v. Enforcement of Decision/Award**

i. The parties acknowledge and agree that any decision and/or award is enforceable without further action and waive any objection to the enforceability of the decision or award subject to any rights contained in the Federal Arbitration Act (FAA) or applicable state law.

ii. All decisions and/or awards may also be enforced in any state or federal court of competent jurisdiction.

iii. In cases where there is a statutory or contractual right to reasonable attorneys' fees and costs for the prevailing party, the neutral has authority to award such fees and costs as if the matter were being heard by a court of competent jurisdiction.  In such an instance, the parties should submit a statement of attorneys' fees and costs along with supporting information with their final briefs.  This additional information will not count against any applicable page or size limits.  The neutral shall identify in the decision/award which party has prevailed on the claim that carries with it prevailing party attorney's fees as an item of relief, and award such fees and costs as they deem reasonable.  .

**w. Execution of Award/Decision**

i. If the award/decision requires the payment of monetary damages, the debtor party must pay the amount owed on or before the 14th calendar day after the award was served on the parties unless otherwise noted in the award or decision.  Payment must be made via electronic payment, or certified check/money order sent via a trackable method of shipping.

ii. If the award/decision requires non-monetary relief, the required action or non-action must be taken on or before the 14th calendar day after the award was served on the parties unless otherwise noted in the award or decision.

iii. The neutral has the authority to award pre-award interest, impose post-award interest and/or may order sanctions for non-compliance.

**2-ER-53**

iv. The neutral also has the authority to award costs and sanctions for frivolous filings, at their sole discretion (however, the neutral shall consider applicable law that may limit or prohibit such sanctions in certain types of cases).

**x. Common Issues of Law and Fact**

i. "Common Issues of Law and Fact" means when cases or proceedings present the same, or similar, evidence; present the same, or similar, witnesses; and/or rely on determination of the same, or similar, facts and issues of law.

ii. Determination of whether case(s) involve Common Issues of Law and Fact rests solely in the hands of the neutral handling the proceeding or a New Era ADR neutral tasked with making such a determination.

1. Solely for administrative purposes, New Era ADR may group similar cases filed by the same law firm or group of law firms acting in coordination and have them proceed through the Mass Arbitration process unless and until the presiding neutral makes a determination otherwise.

2. New Era ADR makes no determination with respect to issues of law and fact.

3. The presiding neutral will make a determination about whether Common Issues of Law and Fact exist as a threshold issue in determining the case but has sole discretion in determining how such a decision will be made.

iii. The parties may present evidence and arguments demonstrating that a case or cases do not involve Common Issues of Law and Fact (for example as set forth in the Mass Arbitration Rules and Procedures contained herein) but the neutral's determination of Common Issues of Law and Fact is not appealable.

**y. Precedent**

i. When significant factual findings and legal determinations have been made in one or more Bellwether proceedings on the platform ("Lead Decisions"), New Era ADR affiliated neutrals may apply these determinations in the same manner and with the same force and effect to the Common Issues of Law and Fact contained in other proceedings within the same Mass Arbitration that involve Common Issues of Law and Fact with those cases from which the Lead Decisions originated, subject to any rights contained herein.  Such determinations made from the Lead Decisions are known as "Precedent(s)."  Precedent is limited to the Mass Arbitration proceeding from which it originates.

ii. Later filed cases that involve the same or similar Common Issues of Law and Fact and are brought by the same law firm or group of law firms acting in coordination, regardless of when they are filed, may be subject to Precedent(s).

**2-ER-54**

iii. Determinations of whether Common Issues of Law and Fact are present will be determined by the neutral who made the initial legal and factual determinations, unless they are otherwise unavailable, in which case New Era ADR will appoint a new neutral for purposes of these determinations.

### z. Arbitrability/Neutral Discretion

i. Any question or matter of arbitrability of a dispute shall be determined solely by the neutral(s) provided by New Era ADR Inc. and not in a court of law or other judicial forum. *The parties agree and acknowledge that they are waiving their right to seek a determination of arbitrability in a court of law or other judicial forum.*

ii. Any issues that are subject to neutral discretion and arguments from the parties related thereto, arbitrability, governing law, jurisdiction, or otherwise, shall be argued and decided at the regularly-scheduled hearings on the merits of the case, and not through any preliminary hearings or motion practice (subject to Section 2(r)(iii) of these Rules and Procedures).

### aa. Injunctive Relief

i. New Era ADR Inc. and its associated neutral(s) have the power and authority to issue injunctive relief including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions depending on the facts and the circumstances of the case. A party seeking injunctive relief must demonstrate that the legal standard under applicable law has been met and no condition contained herein waives the obligation to make such a demonstration. *In the event a party is seeking temporary, interim, or emergency injunctive relief, each party agrees that New Era ADR will appoint the neutral.*

### ab. Document Retention

i. Documents uploaded to the New Era ADR platform will be retained for sixty (60) calendar days from the termination of the proceeding or the issuance of a decision/term sheet, whichever is later (the "Deletion Deadline"). The parties will be able to download documents for their case file up to the Deletion Deadline at which point all documents from the proceeding will be permanently deleted and inaccessible. New Era ADR does not maintain backup tapes or other redundant storage mechanisms post-deletion. You agree to protect, defend, indemnify and hold New Era ADR, its neutrals and their respective organizations, assigns, employees, officers and directors harmless from and against all losses, costs, liabilities, claims, damages and expenses of every kind and character, as incurred, resulting from, relating to or arising out of any deletion of documents after the Deletion Deadline.

### ac. Neutral Immunity

i. The parties agree that use of any New Era ADR neutral's services through the New Era ADR platform does not affect any immunity or other legal protections to which the Neutral, or the Neutral's organization, may otherwise be entitled under applicable law.

**ad. Changes and Amendments to Rules**

i. New Era ADR reserves the right to make changes and amendments to these Rules at its discretion and without notice. New Era ADR will endeavor, however, to make changes only once per calendar quarter and provide notice of any changes that substantively affect proceedings.

**ae. Educational and Legal Disclaimer**

i. New Era ADR content and resources are not intended to be legal advice and the parties shall not rely on the content or services as legal advice or representations regarding outcomes, negotiation, settlement or insight into another party's behavior or practices.

### 3. Virtual Mediation Rules and Procedures

#### a. Process and Rules at Each Stage

i. Claimant Sign-Up

1. Claimant signs up using New Era ADR's simple and secure sign-up process located at app.neweraadr.com.

ii. Claimant Pays Fees

1. Claimant pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 95/5. Examples:

a. Total Fee = $10,000

b. Business vs. Business = Claimant pays $5000

c. Business vs. consumer/employee = Business pays $9500 and individual pays $500

d. Fees will be reduced if there is a subscription agreement in place.

e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iii. Respondent Sign-Up

1. Respondent signs up using New Era ADR's simple and secure sign-up process at app.neweraadr.com.

iv. Respondent Pays Fees

**2-ER-56**

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 25 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS   Document 194-1 Rules and Procedures - New Era ADR   Page 21 of 36   Page ID #:4489

1. Respondent pays half the fee unless there is a business vs individual dispute in which case the fee is split 95/5.  Examples:

    a. Total Fee = $10,000

    b. Business vs. Business = Respondent pays $5000

    c. Business vs. Individual = Business pays $9500 and individual pays $500

    d. Fees may be reduced for both parties if there is a subscription agreement in place.

    e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

v. Neutral Chosen

1. A panel of at least 3 but no more than 8 neutrals is provided to the parties for purposes of engaging in New Era ADR's standard rank/strike process.

2. New Era ADR will strive to provide a panel of neutrals with experience in the particular type of proceeding.

3. If no agreement can be reached, New Era ADR will appoint a neutral.

vi. Pre-Mediation Conferences are Scheduled and Held

1. The neutral schedules and holds 30 minute pre-mediation conferences with both parties using New Era ADR's scheduling software.

2. ***Please note these conferences are optional and can be declined when scheduling***.

vii. Mediation Scheduled

1. The neutral schedules the mediation using New Era ADR's scheduling software, based on input from the parties.

viii. Documents Are Uploaded

1. Both parties upload their relevant documents and mediation statements.  These are not visible to any other party, only the neutral.

2. There is a limit of 100MB for documents and 15K characters for mediation statements.

ix. Mediation is Held

1. The mediation is held via the preferred video conferencing software with Zoom as the default.

x. Term Sheet

1. If a settlement is reached, the mediated settlement term sheet is drafted by the neutral with input from the parties and their attorneys, and executed on the New Era ADR platform via e-signature by the parties before the mediation is closed.

## 4. Virtual Mediation with Binding Resolution Rules and Procedures

### a. Process and Rules at Each Stage

i. Parties must agree to this process prior to commencement of the mediation along with consent to the mediator converting to an arbitrator in the event the mediation fails.

ii. Claimant Sign-Up

1. Claimant signs up using New Era ADR's simple and secure sign-up process located at app.neweraadr.com.

iii. Claimant Pays Fees

1. Claimant pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 98.5/1.5.  Examples:

   a. Total Fee = $15,000

   b. Business vs. Business = Claimant pays $7500

   c. Business vs. consumer/employee = Business pays $14,775 and individual pays $225

   d. Fees will be reduced if there is a subscription agreement in place.

   e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iv. Respondent Sign-Up

1. Respondent signs up using New Era ADR's simple and secure sign-up process at app.neweraadr.com.

v. Respondent Pays Fees

1. Respondent pays half the fee unless there is a business vs individual dispute in which case the fee is split as describe below.  Examples:

   a. Total Fee = $15,000

   b. Business vs. Business = Respondent pays $7500

   c. Business vs. Individual = Business pays $14,500 and individual pays $500

   d. Fees will be reduced if there is a subscription agreement in place.

**2-ER-58**

e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

vi. Neutral Chosen

1. A panel of at least 3 but no more than 8 neutrals is provided to the parties for purposes of engaging in New Era ADR's standard rank/strike process.

2. New Era ADR will strive to provide a panel of neutrals with experience in the particular type of proceeding.

3. If no agreement can be reached, New Era ADR will appoint a neutral.

vii. Pre-Mediation Conferences are Scheduled and Held

1. The neutral schedules and holds 30 minute pre-mediation conferences with both parties using New Era ADR's scheduling software.

2. ***Please note these conferences are optional and can be declined when scheduling***.

viii. Mediation Scheduled

1. The neutral schedules the mediation using New Era ADR's scheduling software, based on input from the parties.

ix. Documents Are Uploaded

1. Both parties upload their relevant documents and mediation statements.  These are not visible to any other party, only the neutral.  ***Non-placeholder documents must be submitted in this process.***

2. There is a limit of 100MB for documents and 15K characters for mediation statements.

x. Mediation is Held

1. The mediation is held via the preferred video conferencing software with Zoom as the default.

xi. Term Sheet

1. If a settlement is reached, the mediated settlement term sheet is drafted by the neutral with input from the parties and their attorneys, and executed on the New Era ADR platform via e-signature by the parties before the mediation is closed.

xii. No Settlement

1. If no settlement is reached, the mediation moves into the "binding resolution" portion of the proceeding.

xiii. Exchange of Documents

1. Once the neutral has advanced the case into the "binding resolution" portion of the proceeding, the documents that were submitted at the beginning of the mediation will be exchanged between the parties.

2. ***The mediation statements remain confidential and will not be exchanged***.

xiv. Final Arguments

1. The parties will have no more than fourteen (14) days to review the submitted documents and provide final argument briefs to the neutral.

2. Final argument briefs shall not exceed 15K characters.

xv. Decision is Rendered

1. The neutral will render a non-reasoned decision within 7 days of receipt of final arguments.

2. A reasoned decision can be requested and will be provided within 14 days of receipt of final arguments.

## 5. Virtual Standard Arbitration Rules and Procedures

### a. Process and Rules at Each Stage

i. Standard Arbitration typically applies to standard commercial disputes that involve typical document volumes and discovery. ***The parties may contractually determine whether certain proceedings fit under Virtual Expedited or Virtual Standard arbitrations, and New Era ADR will respect those contractual agreements***.  See Section 1(c)(i) of these Rules and Procedures for more detail.

ii. Claimant Sign-Up and Complaint

1. Claimant signs up on the platform using New Era's simple and secure sign-up process and submits a Complaint located at app.neweraadr.com.

a. Complaints, whether or not using New Era's form, must contain each of the following:

1. The nature of the dispute, including applicable dates and times, parties involved, **as well as the facts specific to the Claimant(s) that gave rise to the dispute.  New Era is not a notice pleading platform.**  Generalized or generic facts are not sufficient to satisfy this requirement.

2. The legal basis upon which the Claimant is seeking such relief, whether state law, federal law, or otherwise.

3. The relief sought, whether monetary, non-monetary, or both, and the basis for such relief.

    b. Complaints are limited to 10 total pages when complete.  No additional exhibits, documents, or evidence is necessary to be attached to the Complaint.

    c. No prefatory or jurisdictional material is required in Complaints unless necessary to any claims or defenses.

2. Not abiding by these requirements for Complaints may subject Claimant to the Decorum/Sanction rules outlined in Section 2(d) of these Rules and Procedures.

iii. Claimant Pays Fees

1. Claimant pays half the fee unless there is a business vs individual dispute in which case the fee is split 98.5%/1.5%.  Examples:

    a. Total Fee = $35,000

    b. Business vs. Business = Claimant pays $17,500

    c. Business vs. consumer/employee = Business pays $34,475 and consumer/employee pays $525

    d. Fees may be reduced if there is a subscription agreement in place that specifically includes standard arbitrations.

    e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iv. Sign-Up and Answer

1. Respondent (a) receives email service of Complaint; (b) signs up on the platform; and (c) responds to the claims and asserts any counterclaims. Claimant will receive Respondent's answer via email once submitted.

2. Respondent has 21 calendar days to respond or a default judgment may be issued against them. After 14 days with no response, New Era ADR will appoint a neutral and Claimant will be able to access the dispute in order to submit documentation pursuant to Section 6(a)(vii). No default decision shall be made by the neutral without considering the evidence submitted by Claimant.

3. Answers must follow the same substantive rules as those laid out for Complaints in Section 5(a)(ii)(1) of these Rules and Procedures or Respondent risks facing the same consequences identified therein.  Answers on the New Era platform should not follow the traditional method of admitting or denying the paragraph claims, but must provide

**2-ER-61**

substantive information and facts surrounding the responses and defenses to the claims.

v. Respondent Pays Fees.

    1. Respondent pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 98.5%/1.5%. Examples:

        a. Total Fee = $35,000

        b. Business vs. Business = Respondent pays $17,500

        c. Business vs. consumer/employee = Business pays $34,475 and consumer/employee pays $525

        d. Fees may be reduced if there is a subscription agreement in place that specifically includes standard arbitrations.

        e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

vi. Neutral is Chosen

    1. The parties will engage in New Era's standard rank/strike process.

    2. The parties may opt-out of New Era's standard rank/strike process, but only if agreed to by both parties.

vii. Parties Upload Their Documents

    1. Both Claimant(s) and Respondent(s) upload the relevant documents and their initial arguments.

    2. Both parties must upload their documents within 14 calendar days of the appointment of the neutral.

    3. Uploads are limited to the lesser of 20 total files, 25 total pages for each file or 50MB of aggregate uncompressed uploads.

    4. The neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process.

viii. Documents Are Exchanged

    1. Once all documents are submitted, they are digitally exchanged between the parties.

ix. Discovery Process

    1. Following document exchange, the parties may make a request to their neutral for formalized discovery. There is no plenary right to discovery; instead, formal discovery

under these rules is only allowed by order of the neutral and then only on good cause shown.  The request must be made within seven (7) days of the exchange of documents.

2. If the request for discovery is granted, each side must submit no more than ten (10) requests for production ("RFPs") that are narrowly tailored to discover only information relevant to the arbitration as well as no more than twenty (20) search terms (the "Search Terms") they want run against the opposing party's documents through the New Era ADR discovery portal.  These RFPs and Search Terms must be submitted within four (4) calendar days of service of the order granting discovery.  Parties should also submit additional search terms necessary for an initial privilege and redaction review.  The neutral has discretion to allow submissions in excess of the stated limits as necessary to ensure a fundamentally fair process.

3. Each party shall have the opportunity to raise a written objection to the other party's submission of RFPs and Search Terms using the New Era platform's messaging function. If no such objection is raised after four (4) calendar days from the submission of the RFPs and Search Terms, the RFPs and Search Terms shall be deemed accepted and final. The Neutral will endeavor to review any such objections made and issue a decision with respect thereto within four (4) calendar days of the raised objection.

4. The parties will submit their universe of documents that are responsive to the RFPs and Search Terms to the New Era ADR discovery portal within fourteen (14) days of approval of the RFPs and Search Terms.

5. The parties' universe of documents will be submitted to New Era ADR's third party document review provider who will utilize e-discovery tools to review and determine responsiveness based on the Search Terms.  Within fourteen (14) calendar days of the submission to the third party document review provider, a responsive document subset will be submitted back to the parties (a party's "**Responsive Documents**").

6. The parties will have seven (7) calendar days from receipt of the Responsive Documents from New Era ADR's third party document review provider to perform a privilege, relevance, redaction and confidentiality review.  The parties must then submit their final set of documents along with any privilege or relevance log to the New Era ADR portal (the "**Final Discovery Package**").  Any privilege and relevance log must contain sufficient information for the neutral to determine whether the document can be fairly excluded from the Final Discovery Package.

7. Each party shall have the opportunity to raise a written objection to the other party's submission of the Final Discovery Package using the New Era platform's messaging function. If no such objection is raised after seven (7) calendar days from the

submission of the Final Discovery Package, the Final Discovery Package shall be deemed accepted and final. The Neutral will endeavor to review any such objections made and issue a decision with respect thereto within seven (7) calendar days of the raised objection. The neutral may also unilaterally review the Final Discovery Package for background information related to the arbitration.

8. The total discovery timeline is approximately fifty (50) days. During this fifty day time period, each party may take up to three (3) depositions and submit up to three (3) affidavits to the discovery portal. Requests for depositions must be made on the New Era ADR discovery portal and provide adequate justification for their necessity. The neutral has the discretion to grant any valid request and any opposing party must comply with such a grant. If a party believes a subpoena for testimony is necessary, they may request a subpoena and the neutral has the authority under these Rules and Procedures to issue such subpoena. The requesting party shall be responsible to have the subpoena served on the deponent in the manner required by law.

x. Hearing is Scheduled and Held

1. The neutral schedules the arbitration hearings using New Era ADR's scheduling software, based on input from the parties.

2. The hearings are held via the neutral's preferred video conferencing software, with Zoom as the default.

xi. Final Arguments Are Submitted

1. Within 14 days of the conclusion of the hearings, both parties must submit final arguments based on the documents and initial arguments submitted earlier in the proceeding.

2. Final arguments are limited to 30,000 characters.

3. No jurisdictional or prefatory material is necessary in the final arguments, just the caption and substantive arguments.

xii. Decision is Rendered

1. The neutral will typically render a non-reasoned decision within 7 calendar days of receipt of final arguments, or other date mutually agreed to by the parties.

2. A reasoned decision can be requested and will typically be provided within 14 calendar days of receipt of final arguments, or other date mutually agreed to by the parties.

3. As stated above, if the parties request findings of fact and conclusions of law, or such findings and conclusions are required by law, additional charges may apply and the

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 33 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS   Document 194-1   New Era ADR - Rules and Procedures Filed 07/27/23 Page 29 of 36   Page ID #:4497

issuance of the decision will require additional time beyond the 14 day period set forth above for a reasoned decision.

**6. Virtual Expedited Arbitration Rules and Procedures**

    **a. Process and Rules at Each Stage**

        i. Virtual Expedited Arbitration typically applies to consumer, employment and other commercial disputes that are not document or discovery intensive. ***The parties may contractually determine whether certain proceedings fit under Virtual Expedited or Virtual Standard arbitrations, and New Era ADR will respect those contractual agreements***. See Section 1(c)(i) of these Rules and Procedures for more detail.

        ii. Claimant Sign-Up and Complaint

            1. Claimant signs up on the platform using New Era's simple and secure sign-up process and submits Complaint located at app.neweraadr.com.

                a. Complaints, whether using New Era's form or not, must contain the following:

                    1. The nature of the dispute, including applicable dates and times, parties involved, as well the facts specific to the Claimant(s) that gave rise to the dispute. New Era is not a notice pleading platform. Generalized or generic facts are not sufficient to satisfy this requirement. You may assert claims as omnibus claims that are substantially identical across Complaints in a Mass Arbitration.

                    2. The legal basis upon which the Claimant is seeking such relief, whether state law, federal law, or otherwise.

                    3. The relief sought, whether monetary, non-monetary, or both and the basis for such relief.

                b. Complaints are limited to 10 total pages when complete. No additional exhibits, documents, or evidence is necessary to be attached to the Complaint.

                c. No prefatory or jurisdictional material is required in Complaints unless necessary to any claims or defenses.

                d. Not abiding by these requirements for Complaints may subject Claimant to the Decorum/Sanction rules outlined in Section 2(d) of these Rules and Procedures.

        iii. Claimant Pays Fees

            1. Claimant pays half the fee unless there is a business vs individual dispute in which case the fee is split 95/5. Examples:

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 34 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS    Document 104-1    New Era ADR Rules and Procedures – New Era ADR    Filed 07/27/23    Page 30 of 36    Page ID
#:4498

     a. Total Fee = $10,000

     b. Business vs. Business = Claimant pays $5000

     c. Business vs. consumer/employee = Business pays $9500 and consumer/employee pays $500

     d. Fees will be reduced if there is a subscription agreement in place.

     e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iv. Sign-Up and Answer

  1. Respondent (a) receives email service of Complaint; (b) signs up on the platform; and (c) responds to the claims and asserts any counterclaims. Claimant will receive Respondent's answer via email once submitted.

  2. Respondent has 21 days to respond or a default award may be issued against them. After 14 days with no response, New Era ADR will appoint a neutral and Claimant will be able to access the dispute in order to submit documentation pursuant to 6(a)(vii). No default decision shall be made by the neutral without considering the evidence submitted by Claimant.

  3. Answers must follow the same substantive rules as those laid out for Complaints in Section 6(a)(ii)(1) of these Rules and Procedures or Respondent risks facing the same consequences identified therein.  Answers on the New Era platform should not follow the traditional method of admitting or denying the paragraph claims, but must provide substantive information and facts surrounding the responses and defenses to the claims.  Answer(s) can be omnibus answers that apply to substantially identical claims in Mass Arbitrations.

v. Respondent Pays Fees

  1. Respondent pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 95/5.  Examples:

     a. Total Fee = $10,000

     b. Business vs. Business = Respondent pays $5000

     c. Business vs. consumer/employee = Business pays $9500 and consumer/employee pays $500

     d. Fees will be reduced if there is a subscription agreement in place.

Case: 23-55770, 11/13/2023, ID: 12823489, DktEntry: 21-2, Page 35 of 263

7/25/23, 4:2... Case 2:22-cv-00047-GW-GJS   Document 104-1 New Era ADR - Rules and Procedures - New Era ADR Page 31 of 36   Page ID #:4499

e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

vi. Neutral is Appointed

1. The parties will engage in New Era's standard rank/strike process.

2. The parties may opt-out ofNew Era's standard rank/strike process, but only if agreed to by both parties.

vii. Parties Upload Their Documents

1. Both Claimant(s) and Respondent(s) upload the relevant documents and their initial arguments.

2. Both parties must upload their documents within 14 days of the appointment of the neutral.

3. Uploads are limited to the lesser of 10 total files, 25 total pages for each file or 25MB of aggregate uncompressed uploads.

4. The neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process.

viii. Documents Are Exchanged

1. Once all documents are submitted, they are digitally exchanged between the parties.

ix. Hearing is Set and Held or Denied

1. The neutral will, in their sole discretion, decide if a hearing is necessary based on the submissions.

2. If the neutral decides a hearing is necessary, it will be scheduled using the New Era ADR scheduling software.

3. The neutral has discretion to rule solely on the documents.

x. Final Arguments Are Submitted

1. Within 14 days of the conclusion of the hearing, or the neutral's ruling that no hearing is necessary, both parties must submit final arguments based on the documents and initial arguments submitted earlier in the proceeding.

2. Final arguments are limited to 15K characters.

3. No jurisdictional or prefatory material is necessary in the final arguments, just the caption and substantive arguments.

xi. Decision is Rendered

**2-ER-67**

1. The neutral will render a non-reasoned decision within 7 days of receipt of final arguments, or other date mutually agreed to by the parties.

2. A reasoned decision can be requested and will be provided within 14 days of receipt of final arguments, or other date mutually agreed to by the parties.

**b. Mass Arbitration Rules and Procedures**

    i. Subset of Virtual Expedited Arbitration Rules and Procedures

        1. The Mass Arbitration Rules and Procedures are a subset of the Virtual Expedited Arbitration Rules and Procedures and shall apply to any Mass Arbitration where the parties have selected the Virtual Expedited Arbitration process in their arbitration agreement.

        2. In the case of any conflict between the two sets of rules and procedures, the Virtual Expedited Arbitration Rules and Procedures will apply

    ii. General

        1. As set forth in Section 1(c)(iii)(3) of these Rules and Procedures, Mass Arbitrations are defined as arbitration claims filed on the New Era Platform: (a) that number five (5) or more, (b) that arise out of Common Issues of Law and Fact, as that term is defined in Section 2(x) above, and (c) are brought by the same law firm or group of laws firms acting in coordination.

        2. If multiple cases are similar but do not arise out of Common Issues of Law and Fact, and do not satisfy the definition of Mass Arbitrations under these Rules and Procedures, as determined in the discretion of the governing neutral, each such case will be adjudicated outside of the Mass Arbitration process under New Era ADR's standard Virtual Expedited Arbitration procedures.

            a. Ultimate authority in determining whether each case arises out of Common Issues of Law and Fact rests with the presiding neutral.

            b. As explained in Section 2(x) of these Rules and Procedures, solely for administrative purposes, New Era ADR may group similar cases filed by the same law firm, or group of law firms acting in coordination, and have them proceed through the Mass Arbitration process unless and until the presiding neutral makes a determination otherwise.  New Era ADR makes no determination with respect to issues of law and fact.

        3. Bellwether cases will be subject to the timeframes set forth in the Virtual Expedited Arbitration Rules unless otherwise set forth in the Mass Arbitration Rules and Procedures.

4. All cases must be filed individually on New Era ADR's Virtual Expedited Arbitration platform.

iii. Process and Rules at Each Stage

1. Step 1: Filing and Neutral(s)

a. First, all cases are filed on the New Era ADR Virtual Expedited Arbitration platform located at app.neweraadr.com in accordance with Section 6(a) of these Rules and Procedures.

b. Next, New Era ADR will provide a panel with at least 3 and up to 8 neutrals.

c. The parties will then participate in New Era ADR's standard rank/strike process.

d. If there is more than one attorney or law firm for the claimant(s), respectively, or respondent(s), respectively, the attorneys for each side are responsible for meeting and conferring internally and achieving consensus for that side.

e. If no consensus is reached, New Era ADR will assign a neutral.

f. New Era ADR retains the right to provide more than one neutral for a particular Mass Arbitration.

g. New Era ADR will endeavor to assign any later filed cases to the same neutral(s).

h. The rank/strike process will not proceed until all fees are paid as set forth in Step 2.

2. Step 2: Fees Are Paid

a. The default case fees follow New Era ADR's standard fees pursuant to Sections 1(a)(i) and (ii) of these Rules and Procedures, unless either party has a subscription agreement in place with New Era ADR, in which case the subscription fees and filing fees will be determined pursuant to such agreement.

b. Fees are allocated pursuant to the parties' contractual agreement and paid at this time, or if the contract does not provide for an allocation, the default allocation set forth in Section 1(a)(iii) herein shall apply.

c. Financial Hardship Affidavits are available.

d. Beyond the default division of case fee responsibility, there are no prohibitions or other New Era ADR rules related to how fees need to be, or should be, allocated.

3. Step 3: Virtual Expedited Arbitration/Bellwether Cases

a. The presiding neutral will make a determination about whether Common Issues of Law and Fact exist as a threshold issue in determining the case but has sole

**2-ER-69**

discretion in determining how such a decision will be made.

b. Claimant(s), collectively on the one hand, and Respondent(s), collectively on the other hand, will each select one "Bellwether Case" from all the cases that were filed.  If there are multiple attorneys for the claimant(s) or respondent(s) they are responsible for meeting and conferring to determine their selection of the bellwether case.  A third Bellwether Case will be selected through a process to be determined by the neutral so that there are three initial Bellwether Cases.

c. The Bellwether Cases must be selected within 14 days of selection of the neutral(s).

d. Bellwether Cases will be decided by the same neutral who was chosen from the Rank and Strike process, and that neutral shall have the discretion to increase the number of Bellwether Cases prior to any of them proceeding, but only if it is necessary to allow for a fundamentally fair process.  Each party is entitled to an equal number of Bellwether Cases.

e. The Bellwether Cases will proceed individually, but parallel to the extent possible, through New Era ADR's Virtual Expedited Arbitration Process with the exception that document uploading must be done within 14 days of the selection of the Bellwether Cases.

4. Step 4: Lead Decision(s)/Settlement Conference

a. Following the virtual expedited arbitrations of the Bellwether Cases, a Lead Decision is rendered in each of the Bellwether Cases.  The Lead Decisions will be reasoned so that Precedent(s) may be applied.

b. Following the issuance of the Lead Decisions, the parties shall participate in a mandatory **non-binding** settlement conference on the New Era ADR platform with the same neutral who presided over the Bellwether Cases. If there are multiple attorneys for the claimant(s), respectively, or respondent(s), respectively, they are responsible for meeting and conferring to determine their selection of a representative group for purposes of participation in the settlement conference.

c. If the settlement conference results in a settlement, claimants and/or respondents may opt their particular case out of the results of the settlement conference, if any, but each such case will be subject to the remainder of the process outlined in this Section 6(b)(iii) of these New Era ADR Rules and Procedures and be considered "Remaining Cases," as that term is defined below.

d. If the settlement conference does not result in a settlement, each party shall provide the neutral with the case(s) that such party believes involve individualized issues of law and/or fact that should not be subject to Precedent (the "Remaining Cases"), if any. The Remaining Case(s) can be identified at the settlement conference, but must be identified within seven (7) days of the end of the settlement conference.

5. Step 5: Application of Precedent(s)

a. In the absence of a settlement, the determinations made from the Lead Decisions in the Bellwether Cases will act as Precedent that may be applied to subsequent cases with Common Issues of Law and Fact as applied to those Common Issues of Law and Fact, solely as determined by New Era ADR affiliated neutral(s). For the avoidance of doubt, parties remain free to argue that a Precedent established as to a Common Issue of Law and Fact from a Bellwether Case should not be followed as to their case, and such cases are treated as "Remaining Cases" under these Rules and Procedures.

b. In all such additional cases, even if later filed, the Precedent(s) shall be applied in the manner identified in the immediately preceding paragraph.

6. Step 6: Case Analysis and Removal Right

a. For Remaining Cases, the neutral will create a process for handling and resolving individualized issues of law and fact to ensure fundamental fairness and equity, and the parties to such arbitrations remain free to argue that a Precedent established as to a Common Issue of Law and Fact from a Bellwether Case should not be followed as to their Remaining Case, determined as appropriate by the New Era ADR affiliated neutral(s), in their discretion.

b. Precedent will otherwise still apply to all Common Issues of Law and Fact in the Remaining Cases, solely as determined by the New Era ADR affiliated neutral(s), consistent with Section 6(b)(iii)(5)(a).

c. Only if a party can demonstrate that there are no Common Issues of Law and Fact, as defined in Section 2(x) of these Rules and Procedures, will a case be removed from the Mass Arbitration (a "Removal Case"). In such a case, the Removal Case will start *de novo* as a stand-alone Virtual Expedited Arbitration. The applicable case fee shall apply to this *de novo* proceeding.

7. No Appeal

**2-ER-71**

a. No appeal is permitted from the decision(s) unless otherwise specified in the
contractual agreement between the parties.

*Last Updated: July 25, 2023*

1

2  **KELLEY DRYE & WARREN LLP**
   Sandra L. Musumeci
3  3 World Trade Center
   175 Greenwich Street
4  New York, NY 10007
   Telephone:   (212) 808-7800
5  Facsimile:   (212) 808-7897
   SMusumeci@kelleydrye.com
6
   Becca Wahlquist
7  BWahlquist@kelleydrye.com
8  *Counsel for Nonparty New Era ADR, Inc.*

9

10           **IN THE UNITED STATES DISTRICT COURT**

11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

13  SKOT HECKMAN, Luis Ponce, Jeanene      Case No.: 22-cv-00047-GW-GJS
    Popp, and Jacob Roberts, on behalf of
14  themselves and all those similarly situated,   The Honorable George H. Wu

15                  Plaintiffs,
                                                **DECLARATION OF COLLIN WILLIAMS**
16          vs.                                 **OF NON-PARTY NEW ERA ADR, INC.**
                                                **IN RESPONSE TO COURT'S TENTATIVE**
17  LIVE NATION ENTERTAINMENT, INC.             **RULING OF MAY 1, 2023**
    and TICKETMASTER LLC,                       **ON DEFENDANTS'**
18                                              **MOTION TO COMPEL ARBITRATION**
                    Defendants.
19

20

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28
                              - 1 -                Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

**2-ER-73**

1    I, COLLIN WILLIAMS, declare as follows:

2        1.    I am over 18 years of age, of sound mind, and otherwise competent to make this

3  Declaration.

4        2.    I am the Founder and Chairman of non-party New Era ADR, Inc. ("New Era"), the

5  designated arbitration provider in this matter.  I, along with New Era's counsel, attended the hearing

6  and oral argument, in person, on the Motion to Compel arbitration on May 1, 2023.  I now

7  respectfully submit this Declaration on behalf of non-party New Era to address certain factual

8  questions raised by the Court during oral argument and in its Tentative Ruling on Defendants'

9  Motion to Compel Arbitration (ECF No. 160 (under seal)), and hopefully to assist the Court in

10  understanding New Era's Rules and Procedures (the "Rules"), both generally and specifically with

11  regard to mass arbitrations.[1]

12        3.    I have been an attorney for 20 years.  I spent the first eleven years of my career as a

13  litigator at large law firms, including one of the largest law firms in the Southeast (Butler Snow

14  LLP) and one of the largest law firms in the world (Greenberg Traurig, LLP).  I practiced primarily

15  litigation, including commercial, bankruptcy, and labor and employment litigation.  I have first-

16  and second-chaired trials in both state and federal court as well as in arbitration.  I left Greenberg

17  Traurig in 2014 and joined Oracle as part of its first cloud computing group focusing on technology

18  transactions.  After approximately two years at Oracle, I moved into the start-up world, first for a

19  healthcare technology company and then for Reverb.com, where I managed all legal functions,

20  including litigation.  I handled the sale of Reverb to Etsy in 2019 for $275M and spent a year with

21  Etsy after the sale before leaving to start New Era ADR.  I have been involved in all forms of

22  litigation from both the outside counsel side as well as in-house.  In addition to my own legal

23  experience, New Era ADR has two other co-founders who are also attorneys and have both been

24  outside counsel as well as in-house counsel.  Collectively, they have an additional 27 years of

25  experience, including managing litigation.  New Era ADR was created with the purpose of

26

27  _____

[1] By filing this Declaration publicly, New Era is making its interpretation of its Mass Arbitration Rules available for

28  all – including its bench of experienced neutrals – to see and use as an additional resource.

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

1    resolving many of the issues we faced and saw in litigation, specifically arbitration.

2        4.    New Era is a technology company that provides ***neutral*** alternative dispute

3    resolution (ADR) platforms ***to all litigants*** – both plaintiffs and defendants alike.  The result is an

4    easily accessible forum for plaintiffs and defendants to resolve their disputes on the merits more

5    quickly and cost-effectively than traditional ADR forums. It was started with the sole purpose of

6    introducing efficiency and expediency to ADR, which, in its co-founders' experience, was sorely

7    lacking for both plaintiffs/claimants and defendants/respondents in traditional ADR forums.

8    Through its online platform and its streamlined Rules and Procedures (the "Rules"), New Era

9    allows all litigants to focus on the core substance of their disputes and not get bogged down by

10   unproductive and unnecessary delay.  While New Era ADR is a younger company relative to ADR

11   providers such as AAA and JAMS, we have now been in business for over two years resolving

12   disputes on behalf of a wide variety of claimants and respondents.[2]

13       5.    New Era's Rules were carefully crafted by the company's three attorney co-founders

14   (including myself), who, as mentioned above, collectively have over 40 years of law firm and in-

15   house experience, and were drafted in consultation with well-regarded ADR practitioners,

16   practicing litigators with experience representing both plaintiffs and defendants, and a highly-

17   regarded law school dean.  The Rules are designed to facilitate merits-based determinations, while

18   allowing flexibility to be applied across a wide variety of cases.  In particular, the Rules provide

19   the neutrals who actually administer and hear the cases filed on New Era's ADR platform with the

20   discretion to request whatever additional evidence, briefing, discovery, and any other information

21   from the parties that the neutral needs.  The neutral has such discretion in both expedited and

22   standard arbitrations.  The intention is ensuring the neutral has the information he, she, or they need

23   to make a fair and carefully reasoned decision.

24       6.    **New Era ADR's Neutrals** - New Era has a deep and highly qualified and

25   experienced bench of neutrals to preside over cases.  New Era's neutrals must have significant ADR

26   ─────────────────

27   [2] Indeed, on April 3, 2023, the Superior Court of California, County of Los Angeles, referred a case to arbitration on
     New Era's platform using one of New Era's arbitrators.  *See Medina v. Nissan North America, Inc.*, Case No.
28   22STCV15324 (Order of April 4, 2023).

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

experience or otherwise possess specialized knowledge and extensive experience in their field. As set forth in New Era's publicly-available Neutral Application, in order to become a New Era arbitrator, a professional must either already be a member of the National Academy of Distinguished Neutrals (NADN) or be a professional attorney in civil/commercial practice with a minimum of 15 years of uninterrupted licensed practice, including experience as a judge, significant first-chair trial experience, or an exceptionally high level of expertise in their area of law. *See* https://soapy-astrodon-b05.notion.site/New-Era-Neutrals-Program-f1db4622c663419891e26fa0451e9b81 (accessed May 17, 2023). Indeed, many of the 51 neutrals currently on New Era's roster are accredited members of prestigious professional ADR associations, such as NADN and the College of Commercial Arbitrators, and they have experience across a range of practice areas, including antitrust cases. As independent contractors, many of these neutrals have worked for, or still work for, the very same ADR providers that Plaintiffs hail as proven and well-established, including AAA and JAMS. While New Era ADR is a technology company providing platforms, solutions and rules/procedures (as guidelines) that help facilitate more efficient and less expensive decisions, the intent is, and was always, to create a bench of unassailable quality and to rely on the experience and judgment of that bench.

7. **Mass Consumer Arbitrations** - At argument on May 1, 2023, the Court expressed understandable concern regarding the "boiling the frog" evolution of consumer actions and arbitrations over the years, from the introduction of class action waivers to the emergence of mass arbitrations and the leverage that comes by virtue of a high volume of filings. Indeed, New Era's founders shared concerns about whether this market-driven evolution was eroding due process and trial on the merits for these important cases. New Era's Mass Arbitration Rules reflect a considered effort to address concerns that consumer cases were not being resolved on their merits. More specifically, New Era's Mass Arbitration Rules outline a process that uses a bellwether system to address on the merits cases that share common issues of fact and law, and at the same time allows all unique claims to be considered individually on their merits in a manner that is fair, efficient, and

- 4 -                                        Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

**2-ER-76**

1  cost-effective for all parties.[3]  New Era's intent was not to add to the confusion, but, instead, to
2  simplify the process, make it more effective, and ensure that there are mechanisms for parties to be
3  heard.  In addition, New Era retains the right of refusal to enforce any terms of use that are intended
4  to increase gamesmanship or to unfairly prejudice either party.  *See* Rule 2(f)(iii).  This will be
5  discussed further herein.

6          8.    **New Era's Mass Arbitration Rules -** Both in its tentative opinion and during oral
7  argument on May 1, in considering the stringent "shock the conscience" standard for substantive
8  unconscionability, the Court raised questions regarding how New Era's Mass Arbitration Rules
9  would operate in practice.  Specifically, the Court asked how New Era would navigate conflicts of
10  law issues for claims filed by plaintiffs from different parts of the country, and how a large group
11  of plaintiffs would select their bellwether cases.  *See* ECF 160, at 11, n. 9; Tr. 20:10-21:4.  New
12  Era's Rules provide answers to both questions.

13          9.    First, New Era's Mass Arbitration Rules are explicit that the appointed neutral is the
14  sole arbiter of whether cases involve common interests of law and fact.  *See, e.g.,* Rules 6(b)(ii)(2),
15  6(b)(iii)(3)(a).  To the extent that cases arise under the laws of different states (and the arbitration
16  clause in the applicable terms of use does not identify a particular choice of law), then those claims
17  would likely not implicate common questions of law, and they therefore would not be grouped
18  together for purposes of adjudication via the bellwether system.

19          10.   Second, Rule 6(b)(iii)(3) outlines the procedure for multiple parties on each side
20  selecting their bellwether case(s):

21          Claimant(s), collectively on the one hand, and Respondent(s),
        collectively on the other hand, will each select one "Bellwether
22          Case" from all the cases that were filed. If there are multiple
        attorneys for the claimant(s) or respondent(s) they are responsible
23          for meeting and conferring to determine their selection of the
        bellwether case.

---

[3] As set forth in greater detail herein in paragraphs 12-15, cases with individualized issues of law and fact from the bellwether cases are termed "Remaining Cases," and those unique issues are considered on the merits by the neutral, apart from any application of precedent from the bellwether cases.  Cases with no common issues of law and fact to the bellwether cases are deemed "Removal Cases" and are taken out of the Mass Arbitration process entirely to be considered on the merits via a stand-alone Virtual Expedited Arbitration. *See* Rules 6(b)(4)(d), 6(b)(6).

Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

1    Rule 6(b)(iii)(3)(b). Significantly, to the extent that fairness requires it, the neutral has the

2    discretion to increase the number of bellwether cases. Rule 6(b)(iii)(3)(d).

3           11.    The Court also raised questions about how multiple claimants with their own

4    attorneys might coordinate and appoint lead counsel. *See* ECF 160 at 13. As a threshold matter,

5    multiple similar cases would administratively need to originate from the same counsel or group of

6    counsel to even be considered for New Era's Mass Arbitration Rules, because as a practical matter,

7    when new cases from disparate law firms are filed, New Era does not review and compare them in

8    an effort to group them and manufacture mass arbitrations. Instead, New Era would designate a

9    group of cases administratively as a likely mass arbitration because those cases came from the same

10    firm or group of firms and involved similar claims. In any event, New Era's Mass Arbitration

11    Rules clearly contemplate the selection of attorney representatives in mass arbitrations. For

12    example, Rule 6(b)(iii)(1)(d) provides, "If there is more than one attorney or law firm for the

13    claimant(s), respectively, or respondent(s), respectively, the attorneys for each side are responsible

14    for meeting and conferring internally and achieving consensus for that side." Similarly, Rule

15    6(b)(iii)(3)(b) prescribes that multiple attorneys for either the claimants or respondents should meet

16    and confer to reach consensus on the selection of bellwether cases. And again, with respect to the

17    settlement conference required after the issuance of lead decisions, the Rules provide for a meet

18    and confer process between multiple attorneys for either party. *See* Rule 6(b)(iii)(4)(b). In other

19    words, like in the federal court MDL system, *see* MANUAL FOR COMPLEX LITIGATION (4th ed.), at §

20    22.62, groups of claimants bringing similar claims are instructed to work together to select a lead

21    claimants' attorney who will advocate for their representative interests. (Of course, there is nothing

22    in the Rules precluding a neutral from exercising his or her discretion to establish a process for

23    appointing a representative claimants' counsel if the claimants themselves cannot agree.) To the

24    extent that individual claimants' claims differ from the common claims of the group, their interests

25    can be separately heard.

26           12.    New Era's Rules provide for a thoughtful, streamlined, efficient process for the

27    adjudication of mass arbitrations to allow all parties (and importantly, ***all plaintiffs***) to have their

28    cases considered on the merits. Modeled on the well-established federal court MDL process, New

- 6 -                Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

2-ER-78

Era's Rules provide for the initial trial of three (with allowance for more) bellwether cases selected by the parties and the neutral after the neutral has made an initial threshold determination that the cases in the mass action present common issues of law and fact.  The trial of the bellwether cases will culminate in the neutral issuing a written "Lead Decision" for each.  *See* Rule 6(b)(iii)(4)(a). Per the Rules, the Lead Decisions will be reasoned so that Precedents may be drawn and applied. *Id.*   The Rules provide that the parties should then participate in a non-binding settlement conference.  *See* Rule 6(b)(iii)(4)(b).  If the settlement conference results in a settlement, individual claimants and/or respondents still have the opportunity to opt out of the settlement and present to the neutral their individualized issues of fact and law so that their cases may be considered independently.  *See* Rule 6(b)(iii)(4)(c).  If the settlement conference does not result in a settlement, each party has the right and opportunity to present to the neutral any individual cases that such party believes should be differentiated from the bellwethers and that they would like to argue should not be subject to Precedent.  *See* Rule 6(b)(iii)(4)(d).  In either instance, the claims that do not settle are deemed "Remaining Cases."  *See* Rule 6(b)(iii)(4)(c), 6(b)(iii)(4)(d).  The neutral will then individually consider each of the Remaining Cases and the arguments made regarding whether and to what extent Precedent should apply to a particular case.  In other words, the parties in the Remaining Cases have the opportunity to present individualized arguments to the neutral.

13.     To the extent that a mass arbitration results in a large number of potential Remaining Cases, the Rules allow for the appointment of more than one neutral to assess those cases, thereby ensuring that all cases are considered efficiently. *See* Rule 6(b)(iii)(1)(f).  That New Era has a deep bench of qualified neutrals from which multiple arbitrators can be appointed facilitates this process, prevents bottlenecks, and promotes New Era's guiding principles of giving all litigants an accessible forum that provides for faster and cheaper resolutions of their disputes.

14.     Under the Rules for Mass Arbitrations, the application of Precedent is designed to efficiently allow for a determination on the merits to the extent a case shares common issues of law and fact with the bellwether cases.  More specifically, the neutral may apply the factual findings and legal determinations made on the New Era platform in a bellwether case to other cases in the mass arbitration with the same issues of law and fact, provided the parties present no compelling

- 7 -

Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

2-ER-79

1   reason to depart from that Precedent.  *See* Rule 2(y)(i).  Notably, this can be favorable to **whichever**

2   **side** prevails in each of the bellwether cases; it is not inherently biased toward a respondent versus

3   a claimant.  Moreover, the application of Precedent can only occur after Lead Decisions have been

4   rendered on the bellwether cases and the parties' post-bellwether settlement negotiations have

5   failed.  And the Precedent rule is not absolute because parties have the right to advocate as to why

6   the Precedent should not apply to their particular case.  *See* Rule 6(b)(iii)(6)(c).

7       15.     Under the Rules for Mass Arbitrations, those plaintiffs who are deemed to have no

8   common issues of fact and law with the bellwether cases – the Removal Cases – are handled *de*

9   *novo* as stand-alone Virtual Expedited Arbitrations.  *Id.*  In other words, the Rules concerning mass

10  arbitration no longer apply and each Removal Case is handled independently, meaning each one

11  begins anew with a separate rank/strike process to select a new neutral.

12      16.     To the extent new claimants subsequently file similar claims against the same

13  respondent in a mass arbitration, such new claims would only fall within that prior mass arbitration

14  umbrella (and apply any Precedent from that prior mass arbitration) if they had common lawyers

15  and it could be shown that those new cases contained the same common issues of law and fact to

16  the bellwether cases.  Similarly, as noted, cases filed under different states' laws would almost

17  certainly also present unique issues of law and therefore not share common issues of law and fact

18  to the bellwether cases.  To the extent later filed cases do share common attorneys and common

19  issues of law and fact to the bellwether cases, they would be treated as Remaining Cases, whereby

20  Precedent would apply to common issues of fact and law, but claimants would have the opportunity

21  to present and litigate any unique issues. (Of course, the application of Precedent could actually

22  benefit new claimants if they show they have common issues of law and fact with bellwether cases

23  where the earlier claimants prevailed on the merits.)  Even to the degree that someone could

24  formulate a hypothetical fact pattern where a party believes it has not received a proper hearing

25  under the Mass Arbitration Rules, the Rules are not inherently biased in favor of one party over

26  another.  And in the rare instance that a party believes that it has been the victim of a due process

27  violation or fundamental unfairness, that party can seek recourse from the courts in a motion to

28  vacate an arbitration award. *See, e.g.,* 9 U.S.C. § 10.

- 8 -                                                            Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

**2-ER-80**

17.     Expanding on these issues, the Court expressed concern that the Rules' concept of Precedent could act as a form of collateral estoppel against subsequently-filed cases with new claimants.  This would not be the case.  Collateral estoppel could not, as a matter of law, apply in such a scenario, as there would have been no privity between the parties and new claimants would have had no opportunity to litigate the issues in the prior action.  However, to the extent that later-filed cases have common issues of law and/or fact to previously-litigated cases in the same mass arbitration, such that Precedent might apply, the parties have the opportunity to explain and argue why their particular issues of law and fact should be adjudicated differently from the Precedent.  In practice, new claimants likely would be fully aware of the prior Precedent because of the involvement of their attorneys in those prior cases.  Regardless, the claimants in subsequently-filed cases have the opportunity to argue why the Precedent should not apply to their individualized cases.

18.     New Era's Rules do not address appellate rights in mass arbitrations other than to note that the right to appeal is determined by the contractual agreement between the parties.  *See* Rule 6(b)(iii)(7).  In other words, companies that enter subscriptions with New Era, like Live Nation, determine for themselves what appellate rights, if any, they will provide to their customers within the scope of their own terms of use.  New Era customers always have the latitude to draft their terms of use as they see fit given the particular nuances and requirements of their business.  New Era will honor these customized terms of use so long as they do not "contradict the letter or spirit of New Era ADR's rules and procedures."  *See* Rule 2(f)(iii).  New Era's rule regarding terms of use specifically reflects that New Era will not allow gamesmanship and other "boiling the frog" approaches that are intended to unfairly prejudice a proceeding towards one of the parties.

19.     Finally, the Rules are not inherently biased toward any particular party, including New Era's subscription clients.  The subscription pricing model actually reduces the per-case costs of arbitration for all parties in the mass arbitration context.

20.     In sum, New Era's Rules and platform are designed to increase the efficiency and decrease the costs of getting disputes considered on the merits for all parties, whether they are bringing claims or defending against them.  The Rules, while critically important, are guardrails,

- 9 -     Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

2-ER-81

1   and they vest New Era's experienced neutrals with broad discretion to depart from the Rules where

2   warranted by the case at issue to promote fairness, efficiency, and cost effective dispute resolution.

3

4          I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

5   1st  day of June, 2023.

6

7                                                          _____

8                                                                    Collin Williams

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          - 10 -                    Case No.: 22-cv-00047-GW-GJS

DECLARATION OF COLLIN WILLIAMS OF NON-PARTY NEW ERA ADR, INC. IN RESPONSE TO
COURT'S TENTATIVE RULING OF MAY 1, 2023 ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

4867-0866-6983v.2

2-ER-82

# EXHIBIT B

# JAMS
# Comprehensive
# Arbitration Rules
# & Procedures

## Effective June 1, 2021

**Local Solutions. Global Reach.®**

JAMS®

# JAMS Comprehensive Arbitration Rules & Procedures

**Founded in 1979, JAMS is the largest private provider of alternative dispute resolution (ADR) services worldwide.** Our neutrals resolve some of the world's largest, most complex and contentious disputes, utilizing JAMS Rules & Procedures as well as the rules of other domestic and international arbitral institutions.

**JAMS mediators and arbitrators are full-time neutrals** who come from the ranks of retired state and federal judges and prominent attorneys. These highly trained, experienced ADR professionals are dedicated to the highest ethical standards of conduct. Whether they are conducting in-person, remote or hybrid hearings, JAMS neutrals are adept at managing the resolution process.

**Effective June 1, 2021, these updated Rules reflect the latest developments in arbitration.** They make explicit the arbitrator's full authority to conduct hearings in person, virtually or in a combined form, and with participants in more than one geographic location. They also update electronic filing processes to coordinate with **JAMS Access**, our secure, online case management platform.



### Summary of Revisions to the Comprehensive Rules

Scan this code with your smartphone for a complete list of all changes.

## Additional Arbitration Resources



### Arbitration Schedule of Fees and Costs

Scan for details on our professional and administrative fees.



### Latest JAMS Rules Updates

Scan for links to our updated **Streamlined, Construction, Expedited Construction** and **Employment** rules.



### Sample Contract Clauses

Scan for guidance on creating custom commercial contract clauses, including our **Diversity and Inclusion** option.



### Virtual & Hybrid ADR

Scan to learn about our concierge-level client services, including **Virtual ADR Moderators** and **premium technology**.

## jamsadr.com • 800.352.5267

# Table of Contents

RULE 1    Scope of Rules . . . . . . . . . . . . . . . . . . . . . . . .4

RULE 2    Party Self-Determination and Emergency Relief Procedures . . . . . . . . . .4

RULE 3    Amendment of Rules . . . . . . . . . . . . . . . . . .5

RULE 4    Conflict with Law . . . . . . . . . . . . . . . . . . . . . .5

RULE 5    Commencing an Arbitration . . . . . . . . . . . .5

RULE 6    Preliminary and Administrative Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

RULE 7    Number and Neutrality of Arbitrators; Appointment and Authority of Chairperson . . . . . . . . . . . . . . . . . . . . . . . . . . .6

RULE 8    Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

RULE 9    Notice of Claims . . . . . . . . . . . . . . . . . . . . . . .7

RULE 10   Changes of Claims . . . . . . . . . . . . . . . . . . . .7

RULE 11   Interpretation of Rules and Jurisdictional Challenges . . . . . . . . . . . . . . .8

RULE 12   Representation . . . . . . . . . . . . . . . . . . . . . . . .8

RULE 13   Withdrawal from Arbitration . . . . . . . . . . . . .8

RULE 14   *Ex Parte* Communications . . . . . . . . . . . . . .8

RULE 15   Arbitrator Selection, Disclosures and Replacement . . . . . . . . . . . . . . . . . . . .9

RULE 16   Preliminary Conference . . . . . . . . . . . . . . . .10

RULE 16.1 Application of Expedited Procedures . . .10

RULE 16.2 Where Expedited Procedures Are Applicable . . . . . . . . . . . . . . . . . . . . . . .10

RULE 17   Exchange of Information . . . . . . . . . . . . . . .11

RULE 18   Summary Disposition of a Claim or Issue . . . . . . . . . . . . . . . . . . . . . .12

RULE 19   Scheduling and Location of Hearing . . . .12

RULE 20   Pre-Hearing Submissions . . . . . . . . . . . . .12

RULE 21   Securing Witnesses and Documents for the Arbitration Hearing . . . . . . . . . . . .13

RULE 22   The Arbitration Hearing . . . . . . . . . . . . . . .13

RULE 23   Waiver of Hearing . . . . . . . . . . . . . . . . . . . .14

RULE 24   Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

RULE 25   Enforcement of the Award . . . . . . . . . . . . .15

RULE 26   Confidentiality and Privacy . . . . . . . . . . . .15

RULE 27   Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

RULE 28   Settlement and Consent Award . . . . . . . .15

RULE 29   Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . .16

RULE 30   Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability . . . . . . . . . . . . . . . . . .16

RULE 31   Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

RULE 32   Bracketed (or High-Low) Arbitration Option . . . . . . . . . . . . . . . . . . .16

RULE 33   Final Offer (or Baseball) Arbitration Option . . . . . . . . . . . . . . . . . . .17

RULE 34   Optional Arbitration Appeal Procedure . . . . . . . . . . . . . . . . . . . . . . . . . .17

**4**   JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

*NOTICE: These Rules are the copyrighted property of JAMS. They cannot be copied, reprinted or used in any way without permission of JAMS, unless they are being used by the parties to an arbitration as the rules for that arbitration. If they are being used as the rules for an arbitration, proper attribution must be given to JAMS. If you wish to obtain permission to use our copyrighted materials, please contact JAMS at 949.224.1810.*

## RULE 1
## Scope of Rules

(a) The JAMS Comprehensive Arbitration Rules and Procedures ("Rules") govern binding Arbitrations of disputes or claims that are administered by JAMS and in which the Parties agree to use these Rules or, in the absence of such agreement, any disputed claim or counterclaim that exceeds $250,000, not including interest or attorneys' fees, unless other Rules are prescribed.

(b) The Parties shall be deemed to have made these Rules a part of their Arbitration Agreement ("Agreement") whenever they have provided for Arbitration by JAMS under its Comprehensive Rules or for Arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims meet the criteria of the first paragraph of this Rule.

(c) The authority and duties of JAMS as prescribed in the Agreement of the Parties and in these Rules shall be carried out by the JAMS National Arbitration Committee ("NAC") or the office of JAMS General Counsel or their designees.

(d) JAMS may, in its discretion, assign the administration of an Arbitration to any of its Resolution Centers.

(e) The term "Party" as used in these Rules includes Parties to the Arbitration and their counsel or representatives.

(f) "Electronic filing" (e-filing) means the electronic transmission of documents to JAMS for the purpose of filing via the Internet. "Electronic service" (e-service) means the electronic transmission of documents to a Party, attorney or representative under these Rules.

## RULE 2
## Party Self-Determination and Emergency Relief Procedures

(a) The Parties may agree on any procedures not specified herein or in lieu of these Rules that are consistent with the applicable law and JAMS policies (including, without limitation, Rules 15(i), 30 and 31). The Parties shall promptly notify JAMS of any such Party-agreed procedures and shall confirm such procedures in writing. The Party-agreed procedures shall be enforceable as if contained in these Rules.

(b) When an Arbitration Agreement provides that the Arbitration will be non-administered or administered by an entity other than JAMS and/or conducted in accordance with rules other than JAMS Rules, the Parties may agree to modify that Agreement to provide that the Arbitration will be administered by JAMS and/or conducted in accordance with JAMS Rules.

(c) Emergency Relief Procedures. These Emergency Relief Procedures are available in Arbitrations filed and served after July 1, 2014, and where not otherwise prohibited by law. Parties may agree to opt out of these Procedures in their Arbitration Agreement or by subsequent written agreement.

(i) A Party in need of emergency relief prior to the appointment of an Arbitrator may notify JAMS and all other Parties in writing of the relief sought and the basis for an Award of such relief. This Notice shall include an explanation of why such relief is needed on an expedited basis. Such Notice shall be given by email or personal delivery. The Notice must include a statement certifying that all other Parties have been notified. If all other Parties have not been notified, the Notice shall include an explanation of the efforts made to notify such Parties.

(ii) JAMS shall promptly appoint an Emergency Arbitrator to rule on the emergency request. In most cases the appointment of an Emergency Arbitrator will be done within 24 hours of receipt of the request. The Emergency Arbitrator shall promptly disclose any circumstance likely, based on information disclosed in the application, to affect the Arbitrator's ability to be impartial or independent. Any challenge to the appointment of the Emergency Arbitrator shall be made within 24 hours of the disclosures by the Emergency Arbitrator. JAMS will promptly review and decide any such challenge. JAMS' decision shall be final.

(iii) Within two business days, or as soon as practicable thereafter, the Emergency Arbitrator shall establish a schedule for the consideration of the request for emergency relief. The schedule shall provide a reasonable opportunity for all Parties to be heard taking into account the nature of the relief sought. The Emergency Arbitrator has the authority to rule on his or her own jurisdiction and shall resolve any disputes with respect to the request for emergency relief.

JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021                    **5**

(iv)  The Emergency Arbitrator shall determine whether the Party seeking emergency relief has shown that immediate loss or damage will result in the absence of emergency relief and whether the requesting Party is entitled to such relief. The Emergency Arbitrator shall enter an order or Award granting or denying the relief, as the case may be, and stating the reasons therefor.

(v)  Any request to modify the Emergency Arbitrator's order or Award must be based on changed circumstances and may be made to the Emergency Arbitrator until such time as an Arbitrator or Arbitrators are appointed in accordance with the Parties' Agreement and JAMS' usual procedures. Thereafter, any request related to the relief granted or denied by the Emergency Arbitrator shall be determined by the Arbitrator(s) appointed in accordance with the Parties' Agreement and JAMS' usual procedures.

(vi)  In the Emergency Arbitrator's discretion, any interim Award of emergency relief may be conditioned on the provision of adequate security by the Party seeking such relief.

## RULE 3
## Amendment of Rules

JAMS may amend these Rules without notice. The Rules in effect on the date of the commencement of an Arbitration (as defined in Rule 5) shall apply to that Arbitration, unless the Parties have agreed upon another version of the Rules.

## RULE 4
## Conflict with Law

If any of these Rules, or modification of these Rules agreed to by the Parties, is determined to be in conflict with a provision of applicable law, the provision of law will govern over the Rule in conflict, and no other Rule will be affected.

## RULE 5
## Commencing an Arbitration

(a)  The Arbitration is deemed commenced when JAMS issues a Commencement Letter based upon the existence of one of the following:

(i)  A post-dispute Arbitration Agreement fully executed by all Parties specifying JAMS administration or use of any JAMS Rules; or

(ii)  A pre-dispute written contractual provision requiring the Parties to arbitrate the dispute or claim and specifying

JAMS administration or use of any JAMS Rules or that the Parties agree shall be administered by JAMS; or

(iii)  A written confirmation of an oral agreement of all Parties to participate in an Arbitration administered by JAMS or conducted pursuant to any JAMS Rules; or

(iv)  The Respondent's failure to timely object to JAMS administration, where the Parties' Arbitration Agreement does not specify JAMS administration or JAMS Rules; or

(v)  A copy of a court order compelling Arbitration at JAMS.

(b)  The issuance of the Commencement Letter confirms that requirements for commencement have been met, that JAMS has received all payments required under the applicable fee schedule and that the Claimant has provided JAMS with contact information for all Parties together with evidence that the Demand for Arbitration has been served on all Parties.

(c)  If a Party that is obligated to arbitrate in accordance with subparagraph (a) of this Rule fails to agree to participate in the Arbitration process, JAMS shall confirm in writing that Party's failure to respond or participate, and, pursuant to Rule 22(j), the Arbitrator, once appointed, shall schedule, and provide appropriate notice of, a Hearing or other opportunity for the Party demanding the Arbitration to demonstrate its entitlement to relief.

(d)  The date of commencement of the Arbitration is the date of the Commencement Letter but is not intended to be applicable to any legal requirement, such as the statute of limitations; any contractual limitations period; or any claims notice requirement. The term "commencement," as used in this Rule, is intended only to pertain to the operation of this and other Rules (such as Rules 3, 13(a), 17(a) and 31(a)).

## RULE 6
## Preliminary and Administrative Matters

(a)  JAMS may convene, or the Parties may request, administrative conferences to discuss any procedural matter relating to the administration of the Arbitration.

(b)  If no Arbitrator has yet been appointed, at the request of a Party and in the absence of Party agreement, JAMS may determine the location of the Hearing, subject to Arbitrator review. In determining the location of the Hearing, such factors as the subject matter of the dispute, the convenience of the

**6**   JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

Parties and witnesses, and the relative resources of the Parties shall be considered.

(c)   If, at any time, any Party has failed to pay fees or expenses in full, JAMS may order the suspension or termination of the proceedings. JAMS may so inform the Parties in order that one of them may advance the required payment. If one Party advances the payment owed by a non-paying Party, the Arbitration shall proceed, and the Arbitrator may allocate the non-paying Party's share of such costs, in accordance with Rules 24(f) and 31(c). An administrative suspension shall toll any other time limits contained in these Rules or the Parties' Agreement.

(d)   JAMS does not maintain an official record of documents filed in the Arbitration. If the Parties wish to have any documents returned to them, they must advise JAMS in writing within thirty (30) calendar days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing, and JAMS reserves the right to impose an additional fee for such special arrangements. Documents that are submitted for e-filing are retained for thirty (30) calendar days following the conclusion of the Arbitration.

(e)   Unless the Parties' Agreement or applicable law provides otherwise, JAMS, if it determines that the Arbitrations so filed have common issues of fact or law, may consolidate Arbitrations in the following instances:

(i)   If a Party files more than one Arbitration with JAMS, JAMS may consolidate two or more of the Arbitrations into a single Arbitration.

(ii)   Where a Demand or Demands for Arbitration is or are submitted naming Parties already involved in another Arbitration or Arbitrations pending under these Rules, JAMS may decide that the new case or cases shall be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators or panels of Arbitrators already appointed.

(iii)   Where a Demand or Demands for Arbitration is or are submitted naming Parties that are not identical to the Parties in the existing Arbitration or Arbitrations, JAMS may decide that the new case or cases shall be consolidated into one or more of the pending proceedings and referred to one of the Arbitrators or panels of Arbitrators already appointed.

When rendering its decision, JAMS will take into account all circumstances, including the links between the cases and the progress already made in the existing Arbitrations.

Unless applicable law provides otherwise, where JAMS decides to consolidate a proceeding into a pending Arbitration, the Parties to the consolidated case or cases will be deemed to have waived their right to designate an Arbitrator as well as any contractual provision with respect to the site of the Arbitration.

(f)   Where a third party seeks to participate in an Arbitration already pending under these Rules or where a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator shall determine such request, taking into account all circumstances he or she deems relevant and applicable.

## RULE 7

## Number and Neutrality of Arbitrators; Appointment and Authority of Chairperson

(a)   The Arbitration shall be conducted by one neutral Arbitrator, unless all Parties agree otherwise. In these Rules, the term "Arbitrator" shall mean, as the context requires, the Arbitrator or the panel of Arbitrators in a tripartite Arbitration.

(b)   In cases involving more than one Arbitrator, the Parties shall agree on, or, in the absence of agreement, JAMS shall designate, the Chairperson of the Arbitration Panel. If the Parties and the Arbitrators agree, a single member of the Arbitration Panel may, acting alone, decide discovery and procedural matters, including the conduct of hearings to receive documents and testimony from third parties who have been subpoenaed, in advance of the Arbitration Hearing, to produce documents.

(c)   Where the Parties have agreed that each Party is to name one Arbitrator, the Arbitrators so named shall be neutral and independent of the appointing Party, unless the Parties have agreed that they shall be non-neutral.

## RULE 8

## Service

(a)   JAMS or the Arbitrator may at any time require electronic filing and service of documents in an Arbitration, including through the JAMS Electronic Filing System. If JAMS or the Arbitrator requires electronic filing and service, the Parties shall maintain and regularly monitor a valid, usable and live email address for the receipt of documents and notifications. Any document filed via the JAMS Electronic Filing System shall

**JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021**    **7**

be considered as filed when the transmission to the JAMS Electronic Filing System is complete. Any document e-filed by 11:59 p.m. (of the sender's time zone) shall be deemed filed on that date.

(b)  Every document filed with the JAMS Electronic Filing System shall be deemed to have been signed by the Arbitrator, Case Manager, attorney or declarant who submits the document to the JAMS Electronic Filing System, and shall bear the typed name, address and telephone number of a signing attorney.

(c)  Delivery of e-service documents through the JAMS Electronic Filing System shall be considered as valid and effective service and shall have the same legal effect as an original paper document. Recipients of e-service documents shall access their documents through the JAMS Electronic Filing System. E-service shall be deemed complete when the Party initiating e-service or JAMS completes the transmission of the electronic document(s) to the JAMS Electronic Filing System for e-filing and/or e-service.

(d)  If an electronic filing and/or service via JAMS Electronic Filing System does not occur due to technical error in the transmission of the document, the Arbitrator or JAMS may, for good cause shown, permit the document to be filed and/or served *nunc pro tunc* to the date it was first attempted to be transmitted electronically. In such cases a Party shall, absent extraordinary circumstances, be entitled to an order extending the date for any response or the period within which any right, duty or other act must be performed.

(e)  For documents that are not filed electronically, service by a Party under these Rules is effected by providing one signed copy of the document to each Party and two copies in the case of a sole Arbitrator and four copies in the case of a tripartite panel to JAMS. Service may be made by hand-delivery, overnight delivery service or U.S. mail. Service by any of these means is considered effective upon the date of deposit of the document.

(f)  In computing any period of time prescribed or allowed by these Rules for a Party to do some act within a prescribed period after the service of a notice or other paper on the Party and the notice or paper is served on the Party only by U.S. mail, three (3) calendar days shall be added to the prescribed period. If the last day for the performance of any act that is required by these Rules to be performed within a specific time falls on a Saturday, Sunday or other legal holiday, the period is extended to and includes the next day that is not a holiday.

## RULE 9
## Notice of Claims

(a)  Each Party shall afford all other Parties reasonable and timely notice of its claims, affirmative defenses or counterclaims. Any such notice shall include a short statement of its factual basis. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of such prior notice to the other Parties, unless the Arbitrator determines that no Party has been unfairly prejudiced by such lack of formal notice or all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice.

(b)  Claimant's notice of claims is the Demand for Arbitration referenced in Rule 5. It shall include a statement of the remedies sought. The Demand for Arbitration may attach and incorporate a copy of a Complaint previously filed with a court. In the latter case, Claimant may accompany the Complaint with a copy of any Answer to that Complaint filed by any Respondent.

(c)  Within fourteen (14) calendar days of service of the notice of claim, a Respondent may submit to JAMS and serve on other Parties a response and a statement of any affirmative defenses, including jurisdictional challenges, or counterclaims it may have. JAMS may grant reasonable extensions of time to file a response or counterclaim prior to the appointment of the Arbitrator.

(d)  Within fourteen (14) calendar days of service of a counterclaim, a Claimant may submit to JAMS and serve on other Parties a response to such counterclaim and any affirmative defenses, including jurisdictional challenges, it may have.

(e)  Any claim or counterclaim to which no response has been served will be deemed denied.

(f)  Jurisdictional challenges under Rule 11 shall be deemed waived, unless asserted in a response to a Demand or counterclaim or promptly thereafter, when circumstances first suggest an issue of arbitrability.

## RULE 10
## Changes of Claims

After the filing of a claim and before the Arbitrator is appointed, any Party may make a new or different claim against a Party or any third party that is subject to Arbitration in the proceeding. Such claim shall be made in writing, filed with JAMS and served

on the other Parties. Any response to the new claim shall be made within fourteen (14) calendar days after service of such claim. After the Arbitrator is appointed, no new or different claim may be submitted, except with the Arbitrator's approval. A Party may request a hearing on this issue. Each Party has the right to respond to any new or amended claim in accordance with Rule 9(c) or (d).

## RULE 11
## Interpretation of Rules and Jurisdictional Challenges

(a)   Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

(b)   Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(c)   Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.

(d)   The Arbitrator may, upon a showing of good cause or *sua sponte*, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may be altered only in accordance with Rules 22(i) or 24.

## RULE 12
## Representation

(a)   The Parties, whether natural persons or legal entities such as corporations, LLCs or partnerships, may be represented by counsel or any other person of the Party's choice. Each Party shall give prompt written notice to the Case Manager and the other Parties of the name, address, telephone number and email address of its representative. The representative of a Party may act on the Party's behalf in complying with these Rules.

(b)   Changes in Representation. A Party shall give prompt written notice to the Case Manager and the other Parties of any change in its representation, including the name, address,

telephone number and email address of the new representative. Such notice shall state that the written consent of the former representative, if any, and of the new representative, has been obtained and shall state the effective date of the new representation.

(c)   The Arbitrator may withhold approval of any intended change or addition to a Party's legal representative(s) where such change or addition could compromise the ability of the Arbitrator to continue to serve, the composition of the Panel in the case of a tripartite Arbitration or the finality of any Award (on the grounds of possible conflict or other like impediment). In deciding whether to grant or withhold such approval, the Arbitrator shall have regard to the circumstances, including the general principle that a Party may be represented by a legal representative chosen by that Party, the stage that the Arbitration has reached, the potential prejudice resulting from the possible disqualification of the Arbitrator, the efficiency resulting from maintaining the composition of the Panel (as constituted throughout the Arbitration), the views of the other Party or Parties to the Arbitration and any likely wasted costs or loss of time resulting from such change or addition.

## RULE 13
## Withdrawal from Arbitration

(a)   No Party may terminate or withdraw from an Arbitration after the issuance of the Commencement Letter (see Rule 5), except by written agreement of all Parties to the Arbitration.

(b)   A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and the Arbitrator. However, the opposing Parties may, within seven (7) calendar days of service of such notice, request that the Arbitrator condition the withdrawal upon such terms as he or she may direct.

## RULE 14
## *Ex Parte* Communications

(a)   No Party may have any *ex parte* communication with a neutral Arbitrator, except as provided in section (b) of this Rule. The Arbitrator(s) may authorize any Party to communicate directly with the Arbitrator(s) by email or other written means as long as copies are simultaneously forwarded to the JAMS Case Manager and the other Parties.

JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021            **9**

(b)  A Party may have *ex parte* communication with its appointed neutral or non-neutral Arbitrator as necessary to secure the Arbitrator's services and to assure the absence of conflicts, as well as in connection with the selection of the Chairperson of the arbitral panel.

(c)  The Parties may agree to permit more extensive *ex parte* communication between a Party and a non-neutral Arbitrator. More extensive communication with a non-neutral Arbitrator may also be permitted by applicable law and rules of ethics.

## RULE 15
## Arbitrator Selection, Disclosures and Replacement

(a)  Unless the Arbitrator has been previously selected by agreement of the Parties, JAMS may attempt to facilitate agreement among the Parties regarding selection of the Arbitrator.

(b)  If the Parties do not agree on an Arbitrator, JAMS shall send the Parties a list of at least five (5) Arbitrator candidates in the case of a sole Arbitrator and at least ten (10) Arbitrator candidates in the case of a tripartite panel. JAMS shall also provide each Party with a brief description of the background and experience of each Arbitrator candidate. JAMS may add names to or replace any or all names on the list of Arbitrator candidates for reasonable cause at any time before the Parties have submitted their choice pursuant to subparagraph (c) below.

(c)  Within seven (7) calendar days of service upon the Parties of the list of names, each Party may strike two (2) names in the case of a sole Arbitrator and three (3) names in the case of a tripartite panel, and shall rank the remaining Arbitrator candidates in order of preference. The remaining Arbitrator candidate with the highest composite ranking shall be appointed the Arbitrator. JAMS may grant a reasonable extension of the time to strike and rank the Arbitrator candidates to any Party without the consent of the other Parties.

(d)  If this process does not yield an Arbitrator or a complete panel, JAMS shall designate the sole Arbitrator or as many members of the tripartite panel as are necessary to complete the panel.

(e)  If a Party fails to respond to a list of Arbitrator candidates within seven (7) calendar days after its service, or fails to respond according to the instructions provided by JAMS, JAMS

shall deem that Party to have accepted all of the Arbitrator candidates.

(f)  Entities or individuals whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of the Arbitrator selection process. JAMS shall determine whether the interests between entities or individuals are adverse for purposes of Arbitrator selection, considering such factors as whether they are represented by the same attorney and whether they are presenting joint or separate positions at the Arbitration.

(g)  If, for any reason, the Arbitrator who is selected is unable to fulfill the Arbitrator's duties, a successor Arbitrator shall be chosen in accordance with this Rule. If a member of a panel of Arbitrators becomes unable to fulfill his or her duties after the beginning of a Hearing but before the issuance of an Award, a new Arbitrator will be chosen in accordance with this Rule, unless, in the case of a tripartite panel, the Parties agree to proceed with the remaining two Arbitrators. JAMS will make the final determination as to whether an Arbitrator is unable to fulfill his or her duties, and that decision shall be final.

(h)  Any disclosures regarding the selected Arbitrator shall be made as required by law or within ten (10) calendar days from the date of appointment. Such disclosures may be provided in electronic format, provided that JAMS will produce a hard copy to any Party that requests it. The Parties and their representatives shall disclose to JAMS any circumstance likely to give rise to justifiable doubt as to the Arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the Arbitration or any past or present relationship with the Parties or their representatives. The obligation of the Arbitrator, the Parties and their representatives to make all required disclosures continues throughout the Arbitration process.

(i)  At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties, who may respond within seven (7) calendar days of service of the challenge. JAMS shall make the final determination as to such challenge. Such determination shall take into account the materiality of the facts and any prejudice to the Parties. That decision will be final.

**10**   JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

(j)   Where the Parties have agreed that a Party-appointed Arbitrator is to be non-neutral, that Party-appointed Arbitrator is not obliged to withdraw if requested to do so only by the Party that did not appoint that Arbitrator.

## RULE 16
## Preliminary Conference

At the request of any Party or at the direction of the Arbitrator, a Preliminary Conference shall be conducted with the Parties or their counsel or representatives. The Preliminary Conference may address any or all of the following subjects:

(a)   The exchange of information in accordance with Rule 17 or otherwise;

(b)   The schedule for discovery as permitted by the Rules, as agreed by the Parties or as required or authorized by applicable law;

(c)   The pleadings of the Parties and any agreement to clarify or narrow the issues or structure the Arbitration Hearing;

(d)   The scheduling of the Hearing and any pre-Hearing exchanges of information, exhibits, motions or briefs;

(e)   The attendance of witnesses as contemplated by Rule 21;

(f)   The scheduling of any dispositive motion pursuant to Rule 18;

(g)   The premarking of exhibits, the preparation of joint exhibit lists and the resolution of the admissibility of exhibits;

(h)   The form of the Award; and

(i)   Such other matters as may be suggested by the Parties or the Arbitrator.

The Preliminary Conference may be conducted telephonically and may be resumed from time to time as warranted.

## RULE 16.1
## Application of Expedited Procedures

(a)   If these Expedited Procedures are referenced in the Parties' Agreement to arbitrate or are later agreed to by all Parties, they shall be applied by the Arbitrator.

(b)   The Claimant or Respondent may opt into the Expedited Procedures. The Claimant may do so by indicating the election in the Demand for Arbitration. The Respondent may opt into the Expedited Procedures by so indicating in writing to JAMS with a copy to the Claimant served within fourteen (14) days of receipt of the Demand for Arbitration. If a Party opts into the Expedited Procedures, the other side shall indicate within seven (7) calendar days of notice thereof whether it agrees to the Expedited Procedures.

(c)   If one Party elects the Expedited Procedures and any other Party declines to agree to the Expedited Procedures, each Party shall have a client or client representative present at the first Preliminary Conference (which should, if feasible, be an in-person conference), unless excused by the Arbitrator for good cause.

## RULE 16.2
## Where Expedited Procedures Are Applicable

(a)   The Arbitrator shall require compliance with Rule 17(a) prior to conducting the first Preliminary Conference. Each Party shall confirm in writing to the Arbitrator that it has so complied or shall indicate any limitations on full compliance and the reasons therefor.

(b)   Document requests shall (1) be limited to documents that are directly relevant to the matters in dispute or to its outcome; (2) be reasonably restricted in terms of time frame, subject matter and persons or entities to which the requests pertain; and (3) not include broad phraseology such as "all documents directly or indirectly related to." The Requests shall not be encumbered with extensive "definitions" or "instructions." The Arbitrator may edit or limit the number of requests.

(c)   E-discovery shall be limited as follows:

(i)   There shall be production of electronic documents only from sources used in the ordinary course of business. Absent a showing of compelling need, no such documents are required to be produced from backup servers, tapes or other media.

(ii)   Absent a showing of compelling need, the production of electronic documents shall normally be made on the basis of generally available technology in a searchable format that is usable by the requesting Party and convenient and economical for the producing Party. Absent a showing of compelling need, the Parties need not produce metadata, with the exception of header fields for email correspondence.

**JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021**  **11**

(iii)   The description of custodians from whom electronic documents may be collected should be narrowly tailored to include only those individuals whose electronic documents may reasonably be expected to contain evidence that is material to the dispute.

(iv)   Where the costs and burdens of e-discovery are disproportionate to the nature of the dispute or to the amount in controversy, or to the relevance of the materials requested, the Arbitrator may either deny such requests or order disclosure on the condition that the requesting Party advance the reasonable cost of production to the other side, subject to the allocation of costs in the final Award.

(v)   The Arbitrator may vary these Rules after discussion with the Parties at the Preliminary Conference.

(d)   Depositions of percipient witnesses shall be limited as follows:

(i)   The limitation of one discovery deposition per side (Rule 17(b)) shall be applied by the Arbitrator, unless it is determined, based on all relevant circumstances, that more depositions are warranted. The Arbitrator shall consider the amount in controversy, the complexity of the factual issues, the number of Parties and the diversity of their interests, and whether any or all of the claims appear, on the basis of the pleadings, to have sufficient merit to justify the time and expense associated with the requested discovery.

(ii)   The Arbitrator shall also consider the additional factors listed in the JAMS Recommended Arbitration Discovery Protocols for Domestic Commercial Cases.

(e)   Expert depositions, if any, shall be limited as follows: Where written expert reports are produced to the other side in advance of the Hearing, expert depositions may be conducted only by agreement of the Parties or by order of the Arbitrator for good cause shown.

(f)   Discovery disputes shall be resolved on an expedited basis.

(i)   Where there is a panel of three Arbitrators, the Parties are encouraged to agree, by rule or otherwise, that the Chair or another member of the panel be authorized to resolve discovery issues, acting alone.

(ii)   Lengthy briefs on discovery matters should be avoided. In most cases, the submission of brief letters will sufficiently inform the Arbitrator with regard to the issues to be decided.

(iii)   The Parties should meet and confer in good faith prior to presenting any issues for the Arbitrator's decision.

(iv)   If disputes exist with respect to some issues, that should not delay the Parties' discovery on remaining issues.

(g)   The Arbitrator shall set a discovery cutoff not to exceed seventy-five (75) calendar days after the Preliminary Conference for percipient discovery and not to exceed one hundred five (105) calendar days for expert discovery (if any). These dates may be extended by the Arbitrator for good cause shown.

(h)   Dispositive motions (Rule 18) shall not be permitted, except as set forth in the JAMS Recommended Arbitration Discovery Protocols for Domestic Commercial Cases or unless the Parties agree to that procedure.

(i)   The Hearing shall commence within sixty (60) calendar days after the cutoff for percipient discovery. Consecutive Hearing days shall be established unless otherwise agreed by the Parties or ordered by the Arbitrator. These dates may be extended by the Arbitrator for good cause shown.

(j)   The Arbitrator may alter any of these Procedures for good cause.

## RULE 17
## Exchange of Information

(a)   The Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information (including electronically stored information ("ESI")) relevant to the dispute or claim immediately after commencement of the Arbitration. They shall complete an initial exchange of all relevant, non-privileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their positions, and names of individuals whom they may call as witnesses at the Arbitration Hearing, within twenty-one (21) calendar days after all pleadings or notice of claims have been received. The Arbitrator may modify these obligations at the Preliminary Conference.

(b)   Each Party may take one deposition of an opposing Party or of one individual under the control of the opposing Party. The Parties shall attempt to agree on the time, location and duration of the deposition. If the Parties do not agree, these issues shall be determined by the Arbitrator. The necessity of additional depositions shall be determined by the

**12**    JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options and the burdensomeness of the request on the opposing Parties and the witness.

(c)   As they become aware of new documents or information, including experts who may be called upon to testify, all Parties continue to be obligated to provide relevant, non-privileged documents to supplement their identification of witnesses and experts and to honor any informal agreements or understandings between the Parties regarding documents or information to be exchanged. Documents that were not previously exchanged, or witnesses and experts that were not previously identified, may not be considered by the Arbitrator at the Hearing, unless agreed by the Parties or upon a showing of good cause.

(d)   The Parties shall promptly notify JAMS when a dispute exists regarding discovery issues. A conference shall be arranged with the Arbitrator, either by telephone or in person, and the Arbitrator shall decide the dispute. With the written consent of all Parties, and in accordance with an agreed written procedure, the Arbitrator may appoint a special master to assist in resolving a discovery dispute.

(e)   In a consumer or employment case, the Parties may take discovery of third parties with the approval of the Arbitrator.

## RULE 18
## Summary Disposition of a Claim or Issue

The Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue, either by agreement of all interested Parties or at the request of one Party, provided other interested Parties have reasonable notice to respond to the request. The Request may be granted only if the Arbitrator determines that the requesting Party has shown that the proposed motion is likely to succeed and dispose of or narrow the issues in the case.

## RULE 19
## Scheduling and Location of Hearing

(a)   The Arbitrator, after consulting with the Parties that have appeared, shall determine the date, time and location of the Hearing. The Arbitrator and the Parties shall attempt to

schedule consecutive Hearing days if more than one day is necessary.

(b)   If a Party has failed to participate in the Arbitration process, and the Arbitrator reasonably believes that the Party will not participate in the Hearing, the Arbitrator may set the Hearing without consulting with that Party. The non-participating Party shall be served with a Notice of Hearing at least thirty (30) calendar days prior to the scheduled date, unless the law of the relevant jurisdiction allows for, or the Parties have agreed to, shorter notice.

(c)   The Arbitrator, in order to hear a third-party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location. Any JAMS Resolution Center may be designated a Hearing location for purposes of the issuance of a subpoena or subpoena *duces tecum* to a third-party witness.

## RULE 20
## Pre-Hearing Submissions

(a)   Except as set forth in any scheduling order that may be adopted, at least fourteen (14) calendar days before the Arbitration Hearing, the Parties shall file with JAMS and serve and exchange (1) a list of the witnesses they intend to call, including any experts; (2) a short description of the anticipated testimony of each such witness and an estimate of the length of the witness' direct testimony; (3) any written expert reports that may be introduced at the Arbitration Hearing; and (4) a list of all exhibits intended to be used at the Hearing. The Parties should exchange with each other copies of any such exhibits to the extent that they have not been previously exchanged. The Parties should pre-mark exhibits and shall attempt to resolve any disputes regarding the admissibility of exhibits prior to the Hearing.

(b)   The Arbitrator may require that each Party submit a concise written statement of position, including summaries of the facts and evidence a Party intends to present, discussion of the applicable law and the basis for the requested Award or denial of relief sought. The statements, which may be in the form of a letter, shall be filed with JAMS and served upon the other Parties at least seven (7) calendar days before the Hearing date. Rebuttal statements or other pre-Hearing written submissions may be permitted or required at the discretion of the Arbitrator.

## RULE 21
## Securing Witnesses and Documents for the Arbitration Hearing

At the written request of a Party, all other Parties shall produce for the Arbitration Hearing all specified witnesses in their employ or under their control without need of subpoena. The Arbitrator may issue subpoenas for the attendance of witnesses or the production of documents either prior to or at the Hearing pursuant to this Rule or Rule 19(c). The subpoena or subpoena *duces tecum* shall be issued in accordance with the applicable law. Pre-issued subpoenas may be used in jurisdictions that permit them. In the event a Party or a subpoenaed person objects to the production of a witness or other evidence, the Party or subpoenaed person may file an objection with the Arbitrator, who shall promptly rule on the objection, weighing both the burden on the producing Party and witness and the need of the proponent for the witness or other evidence.

## RULE 22
## The Arbitration Hearing

(a)   The Arbitrator will ordinarily conduct the Arbitration Hearing in the manner set forth in these Rules. The Arbitrator may vary these procedures if it is determined to be reasonable and appropriate to do so.

(b)   The Arbitrator shall determine the order of proof, which will generally be similar to that of a court trial.

(c)   The Arbitrator shall require witnesses to testify under oath if requested by any Party, or otherwise at the discretion of the Arbitrator.

(d)   Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as is appropriate. The Arbitrator may be guided in that determination by principles contained in the Federal Rules of Evidence or any other applicable rules of evidence. The Arbitrator may limit testimony to exclude evidence that would be immaterial or unduly repetitive, provided that all Parties are afforded the opportunity to present material and relevant evidence.

(e)   The Arbitrator shall receive and consider relevant deposition testimony recorded by transcript or videotape, provided that the other Parties have had the opportunity to attend and cross-examine. The Arbitrator may in his or her discretion consider witness affidavits or other recorded testimony even if the other Parties have not had the opportunity to cross-examine, but will give that evidence only such weight as he or she deems appropriate.

(f)   The Parties will not offer as evidence, and the Arbitrator shall neither admit into the record nor consider, prior settlement offers by the Parties or statements or recommendations made by a mediator or other person in connection with efforts to resolve the dispute being arbitrated, except to the extent that applicable law permits the admission of such evidence.

(g)   The Arbitrator has full authority to determine that the Hearing, or any portion thereof, be conducted in person or virtually by conference call, videoconference or using other communications technology with participants in one or more geographical places, or in a combined form. If some or all of the witnesses or other participants are located remotely, the Arbitrator may make such orders and set such procedures as the Arbitrator deems necessary or advisable.

(h)   When the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date determined by the Arbitrator in order to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later.

(i)   At any time before the Award is rendered, the Arbitrator may, *sua sponte* or on application of a Party for good cause shown, reopen the Hearing. If the Hearing is reopened, the time to render the Award shall be calculated from the date the reopened Hearing is declared closed by the Arbitrator.

(j)   The Arbitrator may proceed with the Hearing in the absence of a Party that, after receiving notice of the Hearing pursuant to Rule 19, fails to attend. The Arbitrator may not render an Award solely on the basis of the default or absence of the Party, but shall require any Party seeking relief to submit such evidence as the Arbitrator may require for the rendering of an Award. If the Arbitrator reasonably believes that a Party will not attend the Hearing, the Arbitrator may schedule the Hearing as a telephonic Hearing and may receive the evidence

**14**   JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

necessary to render an Award by affidavit. The notice of Hearing shall specify if it will be in person or telephonic.

(k)   Any Party may arrange for a stenographic record to be made of the Hearing and shall inform the other Parties in advance of the Hearing. No other means of recording the proceedings shall be permitted absent agreement of the Parties or by direction of the Arbitrator.

(i)   The requesting Party shall bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

(ii)   If there is no agreement to share the cost of the stenographic record, it may not be provided to the Arbitrator and may not be used in the proceeding, unless the Party arranging for the stenographic record agrees to provide access to the stenographic record either at no charge or on terms that are acceptable to the Parties and the reporting service.

(iii)   If the Parties agree to the Optional Arbitration Appeal Procedure (Rule 34), they shall, if possible, ensure that a stenographic or other record is made of the Hearing and shall share the cost of that record.

(iv)   The Parties may agree that the cost of the stenographic record shall or shall not be allocated by the Arbitrator in the Award.

## RULE 23
## Waiver of Hearing

The Parties may agree to waive the oral Hearing and submit the dispute to the Arbitrator for an Award based on written submissions and other evidence as the Parties may agree.

## RULE 24
## Awards

(a)   The Arbitrator shall render a Final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing, as defined in Rule 22(h) or (i), or, if a Hearing has been waived, within thirty (30) calendar days after the receipt by the Arbitrator of all materials specified by the Parties, except (1) by the agreement of the Parties; (2) upon good cause for an extension of time to render the Award; or (3) as provided in Rule 22(i). The Arbitrator shall provide the Final Award or the Partial Final Award to JAMS for issuance in accordance with this Rule.

(b)   Where a panel of Arbitrators has heard the dispute, the decision and Award of a majority of the panel shall constitute the Arbitration Award.

(c)   In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

(d)   In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e)   Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(f)   The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

(g)   The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

(h)   The Award shall consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim. Unless all Parties agree otherwise, the Award shall also contain a concise written statement of the reasons for the Award.

JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021    **15**

(i)   After the Award has been rendered, and provided the Parties have complied with Rule 31, the Award shall be issued by serving copies on the Parties. Service may be made by U.S. mail. It need not be sent certified or registered.

(j)   Within seven (7) calendar days after service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and file with JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c) or on account of the effect of an offer to allow judgment), or the Arbitrator may *sua sponte* propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days thereafter in which to file and serve any objection. The Arbitrator may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days of receiving a request or fourteen (14) calendar days after his or her proposal to do so. The Arbitrator may extend the time within which to make corrections upon good cause. The corrected Award shall be served upon the Parties in the same manner as the Award.

(k)   The Award is considered final, for purposes of either the Optional Arbitration Appeal Procedure pursuant to Rule 34 or a judicial proceeding to enforce, modify or vacate the Award pursuant to Rule 25, fourteen (14) calendar days after service if no request for a correction is made, or as of the effective date of service of a corrected Award.

## RULE 25
## Enforcement of the Award

Proceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C. Sec 1, *et seq.*, or applicable state law. The Parties to an Arbitration under these Rules shall be deemed to have consented that judgment upon the Award may be entered in any court having jurisdiction thereof.

## RULE 26
## Confidentiality and Privacy

(a)   JAMS and the Arbitrator shall maintain the confidential nature of the Arbitration proceeding and the Award, including the Hearing, except as necessary in connection with a judicial challenge to or enforcement of an Award, or unless otherwise required by law or judicial decision.

(b)   The Arbitrator may issue orders to protect the confidentiality of proprietary information, trade secrets or other sensitive information.

(c)   Subject to the discretion of the Arbitrator or agreement of the Parties, any person having a direct interest in the Arbitration may attend the Arbitration Hearing. The Arbitrator may exclude any non-Party from any part of a Hearing.

## RULE 27
## Waiver

(a)   If a Party becomes aware of a violation of or failure to comply with these Rules and fails promptly to object in writing, the objection will be deemed waived, unless the Arbitrator determines that waiver will cause substantial injustice or hardship.

(b)   If any Party becomes aware of information that could be the basis of a challenge for cause to the continued service of the Arbitrator, such challenge must be made promptly, in writing, to the Arbitrator or JAMS. Failure to do so shall constitute a waiver of any objection to continued service by the Arbitrator.

## RULE 28
## Settlement and Consent Award

(a)   The Parties may agree, at any stage of the Arbitration process, to submit the case to JAMS for mediation. The JAMS mediator assigned to the case may not be the Arbitrator or a member of the Appeal Panel, unless the Parties so agree, pursuant to Rule 28(b).

(b)   The Parties may agree to seek the assistance of the Arbitrator in reaching settlement. By their written agreement to submit the matter to the Arbitrator for settlement assistance, the Parties will be deemed to have agreed that the assistance of the Arbitrator in such settlement efforts will not disqualify the Arbitrator from continuing to serve as Arbitrator if settlement is not reached; nor shall such assistance be argued to a reviewing court as the basis for vacating or modifying an Award.

(c)   If, at any stage of the Arbitration process, all Parties agree upon a settlement of the issues in dispute and request the Arbitrator to embody the agreement in a Consent Award, the Arbitrator shall comply with such request, unless the Arbitrator believes the terms of the agreement are illegal or undermine the integrity of the Arbitration process. If the Arbitrator is concerned about the possible consequences of the proposed

**16**    JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021

Consent Award, he or she shall inform the Parties of that concern and may request additional specific information from the Parties regarding the proposed Consent Award. The Arbitrator may refuse to enter the proposed Consent Award and may withdraw from the case.

## RULE 29
## Sanctions

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

## RULE 30
## Disqualification of the Arbitrator as a Witness or Party and Exclusion of Liability

(a)    The Parties may not call the Arbitrator, the Case Manager or any other JAMS employee or agent as a witness or as an expert in any pending or subsequent litigation or other proceeding involving the Parties and relating to the dispute that is the subject of the Arbitration. The Arbitrator, Case Manager and other JAMS employees and agents are also incompetent to testify as witnesses or experts in any such proceeding.

(b)    The Parties shall defend and/or pay the cost (including any attorneys' fees) of defending the Arbitrator, Case Manager and/or JAMS from any subpoenas from outside parties arising from the Arbitration.

(c)    The Parties agree that neither the Arbitrator, nor the Case Manager, nor JAMS is a necessary Party in any litigation or other proceeding relating to the Arbitration or the subject matter of the Arbitration, and neither the Arbitrator, nor the Case Manager, nor JAMS, including its employees or agents, shall be liable to any Party for any act or omission in connection with any Arbitration conducted under these Rules, including, but not limited to, any disqualification of or recusal by the Arbitrator.

## RULE 31
## Fees

(a)    Each Party shall pay its *pro rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration, unless the Parties agree on a different allocation of fees and expenses. JAMS' agreement to render services is jointly with the Party and the attorney or other representative of the Party in the Arbitration. The non-payment of fees may result in an administrative suspension of the case in accordance with Rule 6(c).

(b)    JAMS requires that the Parties deposit the fees and expenses for the Arbitration from time to time during the course of the proceedings and prior to the Hearing. The Arbitrator may preclude a Party that has failed to deposit its *pro rata* or agreed-upon share of the fees and expenses from offering evidence of any affirmative claim at the Hearing.

(c)    The Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. In the event that one Party has paid more than its share of such fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration.

(d)    Entities or individuals whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of JAMS' assessment of fees. JAMS shall determine whether the interests between entities or individuals are adverse for purpose of fees, considering such factors as whether the entities or individuals are represented by the same attorney and whether the entities or individuals are presenting joint or separate positions at the Arbitration.

## RULE 32
## Bracketed (or High-Low) Arbitration Option

(a)    At any time before the issuance of the Arbitration Award, the Parties may agree, in writing, on minimum and maximum amounts of damages that may be awarded on each claim or on all claims in the aggregate. The Parties shall promptly notify JAMS and provide to JAMS a copy of their written agreement setting forth the agreed-upon minimum and maximum amounts.

JAMS Comprehensive Arbitration Rules & Procedures  •  Effective June 1, 2021 **17**

(b)   JAMS shall not inform the Arbitrator of the agreement to proceed with this option or of the agreed-upon minimum and maximum levels without the consent of the Parties.

(c)   The Arbitrator shall render the Award in accordance with Rule 24.

(d)   In the event that the Award of the Arbitrator is between the agreed-upon minimum and maximum amounts, the Award shall become final as is. In the event that the Award is below the agreed-upon minimum amount, the final Award issued shall be corrected to reflect the agreed-upon minimum amount. In the event that the Award is above the agreed-upon maximum amount, the final Award issued shall be corrected to reflect the agreed-upon maximum amount.

## RULE 33
### Final Offer (or Baseball) Arbitration Option

(a)   Upon agreement of the Parties to use the option set forth in this Rule, at least seven (7) calendar days before the Arbitration Hearing, the Parties shall exchange and provide to JAMS written proposals for the amount of money damages they would offer or demand, as applicable, and that they believe to be appropriate based on the standard set forth in Rule 24(c). JAMS shall promptly provide copies of the Parties' proposals to the Arbitrator, unless the Parties agree that they should not be provided to the Arbitrator. At any time prior to the close of the Arbitration Hearing, the Parties may exchange revised written proposals or demands, which shall supersede all prior proposals. The revised written proposals shall be provided to JAMS, which shall promptly provide them to the Arbitrator, unless the Parties agree otherwise.

(b)   If the Arbitrator has been informed of the written proposals, in rendering the Award, the Arbitrator shall choose between the Parties' last proposals, selecting the proposal that the Arbitrator finds most reasonable and appropriate in light of the standard set forth in Rule 24(c). This provision modifies Rule 24(h) in that no written statement of reasons shall accompany the Award.

(c)   If the Arbitrator has not been informed of the written proposals, the Arbitrator shall render the Award as if pursuant to Rule 24, except that the Award shall thereafter be corrected to conform to the closest of the last proposals and the closest of the last proposals will become the Award.

(d)   Other than as provided herein, the provisions of Rule 24 shall be applicable.

## RULE 34
### Optional Arbitration Appeal Procedure

The Parties may agree at any time to the JAMS Optional Arbitration Appeal Procedure. All Parties must agree in writing for such procedure to be effective. Once a Party has agreed to the Optional Arbitration Appeal Procedure, it cannot unilaterally withdraw from it, unless it withdraws, pursuant to Rule 13, from the Arbitration.

# NOTES

# NOTES

jamsadr.com • 800.352.5267

LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
    *dan.wall@lw.com*
  Timothy L. O'Mara (Bar No. 212731)
    *tim.o'mara@lw.com*
  Andrew M. Gass (Bar No. 259694)
    *andrew.gass@lw.com*
  Kirsten M. Ferguson (Bar No. 252781)
    *kirsten.ferguson@lw.com*
  Alicia R. Jovais (Bar No. 296172)
    *alicia.jovais@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

*Attorneys for Defendants Ticketmaster L.L.C.*
*and Live Nation Entertainment, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated, | Case No. 2:22-cv-00047-GW-GJS |
| Plaintiffs, | **DECLARATION OF KIMBERLY TOBIAS IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| v. | |
| Live Nation Entertainment, Inc., and Ticketmaster LLC, | The Honorable George H. Wu |
| Defendants. | Hearing Date: May 26, 2022 |
| | Hearing Time: 8:30 a.m. |
| | Courtroom: 9D, 9th Floor |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-104

1   I, KIMBERLY TOBIAS, declare as follows:

2        1.    I am the Senior Vice President of Litigation for Live Nation

3   Entertainment, Inc. ("Live Nation"), a Defendant in the above-entitled action, and

4   the parent corporation of Defendant Ticketmaster L.L.C. ("Ticketmaster").  I make

5   this Declaration in support of Defendants' Motion to Compel Arbitration.  The facts

6   set forth herein are based on my personal knowledge and my review of Ticketmaster

7   and Live Nation's records; if called upon to do so, I can and will competently testify

8   to these facts.

9        2.    I have worked for Live Nation and Ticketmaster for the past sixteen

10  years.  Since 2021, I have held the position of Senior Vice President of Litigation.

11  Previously (from 2014 to 2021), I held the position of Vice President, Legal Affairs.

12  My responsibilities in both positions have included, among other things, overseeing

13  the Terms of Use that apply to Ticketmaster and Live Nation's websites.  I am

14  familiar with and knowledgeable about those websites and the applicable Terms of

15  Use.

16       3.    Ticketmaster and Live Nation operate a number of ticketing websites,

17  including www.ticketmaster.com and www.livenation.com, where users can

18  purchase tickets to events.  Those websites allow users to purchase primary tickets

19  to events, in the first instance, and/or resale tickets (which are often referred to as

20  "secondary" tickets).

21       4.    As explained below, Ticketmaster and Live Nation's Terms of Use

22  include a mandatory arbitration clause.  The full text of the Terms of Use is available

23  on Ticketmaster and Live Nation's websites, and those websites (both the desktop

24  and mobile versions) include notices of the Terms of Use at several distinct points

25  in the user flow—including at account creation, sign-in, and purchase.

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-105

**TICKETMASTER SITE**

*Ticketmaster Account Creation Page*

5.     In order to purchase a ticket on www.ticketmaster.com (either the desktop or mobile version), users are required to create an account; users can then sign in to that account and use it to purchase tickets.  To create an account, a user must provide personal information, create a password, and click a "Next" button. Immediately above that "Next" button is the following language: "By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy**."  The phrase "**Terms of Use**" is in bold, color-contrasting text, and hyperlinks to the full text of the Terms of Use.  Attached as **Exhibit 1** is a true and correct screenshot of the current account creation page on Ticketmaster's desktop site, and attached as **Exhibit 2** is a true and correct screenshot of the current account creation page on Ticketmaster's mobile site (which provides the same notice as on the desktop site).

6.     While the look and feel of www.ticketmaster.com has changed slightly over time, the account creation page has included notice of the Terms of Use since at least 2003 (for the desktop version) and 2010 (for the mobile version).

*Ticketmaster Sign-In Page*

7.     Before purchasing a ticket on www.ticketmaster.com (either the desktop or mobile version), a user is required to sign in to his or her account.  When clicking the "Sign In" button, the user is notified that: "By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy**."  The phrase "**Terms of Use**" is in bold, color-contrasting text, and hyperlinks to the full text of the Terms of Use.  Attached as **Exhibit 3** and excerpted below is a true and correct screenshot of the current sign-in page on Ticketmaster's desktop site, and attached as **Exhibit 4** is a true and correct screenshot of the same sign-in page on Ticketmaster's mobile site.  Users who signed

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-106

1   in to their accounts on Ticketmaster's desktop and mobile sites from at least

2   December 2020 through the date of this declaration would have seen the sign-in page

3   shown below and in Exhibits 3 and 4.



16   8.    While the look and feel of www.ticketmaster.com has changed slightly

17   over time, the sign-in page (on both the desktop and mobile versions) has included

18   a substantially similar notice of the Terms of Use since at least 2012.

19   9.    For comparison, attached as **Exhibits 5 and 6** are true and correct

20   screenshots of the sign-in pages on Ticketmaster's desktop and mobile sites,

21   respectively, from June 2020; these screenshots were also submitted in connection

22   with *Oberstein v. Live Nation Entertainment, Inc.*, No. CV 20-3888, 2021 WL

23   4772885 (C.D. Cal. Sept. 20, 2021) (Wu, J.), to show the notice of the Terms of Use

24   that the *Oberstein* plaintiffs would have seen at sign-in.  Exhibits 5 and 6 show the

25   same notice as in Exhibits 3 and 4.

*Ticketmaster Purchase Page*

27   10.    After a user has signed in to his or her account, the user is ready to

28   purchase tickets.  At that point, the user must fill out payment and billing information

3

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

1   and click the "Place Order" button.  Immediately above the "Place Order" button is
2   a checkbox and notice of the Terms of Use.  Depending on whether the particular
3   event had special protocols related to COVID-19 in place, Plaintiffs would have seen
4   either: (a) "**I have read and agree to the current Terms of Use**," as shown in the
5   first excerpt below, or (b) "**I have read and agree to the current Terms of Use**,"
6   plus that event's COVID disclosure, as shown in the second excerpt below, for
7   example.  (Prior to August 2021, all users would have seen the former version.  The
8   latter variation started to be used in August 2021, with the emergence of the Delta
9   variant.  As a result, since August 2021, the purchase page notice contained a special
10  COVID-related disclosure if the event had special COVID-19 protocols in place at
11  the time of purchase; if not, users would have seen the former version instead.)
12  Either way, the notice required the user to check a box affirming that "**I have read**
13  **and agree to the current Terms of Use**," in order to make the purchase.  The notice
14  appeared in bold font, with the words "**Terms of Use**" in color-contrasting text
15  (hyperlinked to the full text of the current Terms of Use), immediately above the
16  "Place Order" button.  Attached as **Exhibits 7 and 8** and excerpted below are true
17  and correct screenshots of these notices on the purchase page on Ticketmaster's
18  desktop site, and attached as **Exhibits 9 and 10** are true and correct screenshots of
19  the same notices, but taken from Ticketmaster's mobile site.
20
21
22  
23
24
25
26
27
28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

11.    To be clear, users who purchased tickets from Ticketmaster's desktop and mobile sites from August 2020 through July 2021 would have seen the checkbox notices in Exhibits 7 and 9; since August 2021 (and through the date of this declaration), users who purchase tickets from Ticketmaster's desktop and mobile sites are presented with either (a) the checkbox notices shown in notices in Exhibits 7 and 9, or (b) checkbox notices that also include a COVID disclosure, as shown in Exhibits 8 and 10, for example.

12.    While the look and feel of www.ticketmaster.com has changed slightly over time, the payment page has included a notice of the Terms of Use since at least 2006 (for the desktop version) and 2010 (for the mobile version).  The checkbox shown in Exhibits 7 – 10 was added to the payment page on both the mobile and desktop versions in August 2020.  Since that time, users have been required to check the box affirming that they have read and agree to the current Terms of Use in order to purchase tickets; if a user chooses to not check the box affirming agreement to the Terms, that user cannot complete his or her purchase.

13.    For comparison, attached as **Exhibits 11 and 12** are true and correct screenshots of the payment pages on Ticketmaster's desktop and mobile sites, respectively, from June 2020 (i.e., before the checkbox was added); these screenshots were also submitted in connection with *Oberstein v. Live Nation Entertainment, Inc.*, No. CV 20-3888, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) (Wu, J.), to show the notice of the Terms of Use that the *Oberstein* plaintiffs would have seen on the purchase page.

### *Other Ticketmaster Pages*

14.    Finally, in order to browse for (and ultimately select) tickets for purchase on Ticketmaster's desktop and mobile sites, a user must navigate through various pages on Ticketmaster's website.  Many of those pages clearly inform the user that his or her use of the site is subject to the Terms of Use.  For example, the current homepage on both the desktop and mobile sites contains a link across the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-109

1  bottom of the page that reads: "By continuing past this page, you agree to our **Terms**

2  **of Use**."  The phrase "**Terms of Use**" is in bold and hyperlinks to the full text of the

3  Terms of Use.  Attached as **Exhibit 13** is a true and correct screenshot of the current

4  Ticketmaster desktop site homepage, showing this notice, and attached as **Exhibit**

5  **14** is a true and correct screenshot of the current Ticketmaster mobile site homepage,

6  showing this notice.

7      15.    While the look and feel of Ticketmaster's desktop and mobile sites have

8  changed slightly over time, various pages have informed users browsing the sites of

9  the Terms of Use since at least 2010.

10                    **LIVE NATION SITE**

11              *Live Nation Account Creation Page*

12      16.    In order to purchase a ticket on www.livenation.com (either the desktop

13  or mobile version), users are required to create an account; users can then sign in to

14  that account and use it to purchase tickets.  To create an account, a user must provide

15  personal information, create a password, and click a "Next" button.  Immediately

16  above that "Next" button is the following language: "By continuing past this page,

17  you agree to the **Terms of Use** and understand that information will be used as

18  described in our **Privacy Policy**."  The phrase "**Terms of Use**" is in bold, color-

19  contrasting text, and hyperlinks to the full text of the Terms of Use.  Attached as

20  **Exhibit 15** is a true and correct screenshot of the current account creation page on

21  Live Nation's desktop site, and attached as **Exhibit 16** is a true and correct

22  screenshot of the current account creation page on Live Nation's mobile site (which

23  provides the same notice as on the desktop site).

24      17.    While the look and feel of www.livenation.com has changed slightly

25  over time, the account creation page (on both the desktop and mobile versions) has

26  included notice of the Terms of Use since at least 2010.

27

28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

6

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

**2-ER-110**

1
                          ***Live Nation Sign-In Page***

2          18.      Before purchasing a ticket on www.livenation.com (either the desktop

3  or mobile version), a user is required to sign in to his or her account.  When clicking

4  the "Sign In" button, the user is notified that: "By continuing past this page, you

5  agree to the **Terms of Use** and understand that information will be used as described

6  in our **Privacy Policy**."  The phrase "**Terms of Use**" is in bold, color-contrasting

7  text, and hyperlinks to the full text of the Terms of Use.  Attached as **Exhibit 17** and

8  excerpted below is a true and correct screenshot of the current sign-in page on Live

9  Nation's desktop site, and attached as **Exhibit 18** is a true and correct screenshot of

10 the same sign-in page on Live Nation's mobile site.  Users who signed in to their

11 accounts on Live Nation's desktop and mobile sites from at least December 2020

12 through the date of this declaration would have seen the sign-in page shown below

13 and in Exhibits 17 and 18.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19.    While the look and feel of www.livenation.com has changed slightly over time, the sign-in page has included a substantially similar notice of the Terms of Use since at least 2010 (for the desktop version) and 2012 (for the mobile version).

20.    For comparison, attached as **Exhibits 19 and 20** are true and correct screenshots of the sign-in pages on Live Nation's desktop and mobile sites, respectively, from June 2020; these screenshots were also submitted in connection with *Oberstein v. Live Nation Entertainment, Inc.*, No. CV 20-3888, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) (Wu, J.), to show the notice of the Terms of Use that the *Oberstein* plaintiffs would have seen at sign-in.  Exhibits 19 and 20 show the same notice as in Exhibits 17 and 18.

### *Live Nation Purchase Page*

21.    After a user has signed in to his or her account, the user is ready to purchase tickets.  At that point, the user must fill out payment and billing information and click the "Place Order" button.  Immediately above the "Place Order" button is a checkbox and notice of the Terms of Use.  Depending on whether the particular event had protocols related to COVID-19 in place, Plaintiffs would have seen either: (a) "**I have read and agree to the current Terms of Use**," as shown in the excerpt below, or (b) "**I have read and agree to the current Terms of Use**," plus that event's COVID disclosure, as shown in the second excerpt below, for example. (Prior to August 2021, all users would have seen the former version.  The latter variation started to be used in August 2021, with the emergence of the Delta variant. As a result, since August 2021, the purchase page notice contained a special COVID-related disclosure if the event had special COVID-19 protocols in place at the time of purchase; if not, users would have seen the former version instead.)  Either way, the notice required the user to check a box affirming that "**I have read and agree to the current Terms of Use**," in order to make the purchase.  The notice appeared in bold font, with the words "**Terms of Use**" in color-contrasting text (hyperlinked to the full text of the current Terms of Use), immediately above the "Place Order"

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

**2-ER-112**

1    button.  Attached as **Exhibits 21 and 22** and excerpted below are true and correct

2    screenshots of these notices on the purchase page on Live Nation's desktop site, and

3    attached as **Exhibits 23 and 24** are true and correct screenshots of the same notices,

4    but taken from Live Nation's mobile site.



15       22.    To be clear, users who purchased tickets from Live Nation's desktop

16   and mobile sites from August 2020 through July 2021 would have seen the checkbox

17   notices in Exhibits 21 and 23; since August 2021 (and through the date of this

18   declaration), users who purchase tickets from Live Nation's desktop and mobile sites

19   are presented with either (a) the checkbox notices shown in notices in Exhibits 21

20   and 23, or (b) checkbox notices that also included a COVID disclosure, as shown in

21   Exhibits 22 and 24, for example.

22       23.    While the look and feel of www.livenation.com has changed slightly

23   over time, the payment page (on both the desktop and mobile versions) has included

24   a notice of the Terms of Use since at least 2010.  The checkbox shown in Exhibits

25   21 – 24 was added to the payment page on both the mobile and desktop versions in

26   August 2020.  Since that time, users have been required to check the box affirming

27   that they have read and agree to the current Terms of Use in order to purchase tickets;

28

1    if a user chooses to not check the box affirming agreement to the Terms, that user

2    cannot complete his or her purchase.

3        24.    For comparison, attached as **Exhibits 25 and 26** are true and correct

4    screenshots of the payment pages on Live Nation's desktop and mobile sites,

5    respectively, from June 2020 (i.e., before the checkbox was added); these

6    screenshots were also submitted in connection with *Oberstein v. Live Nation*

7    *Entertainment, Inc.*, No. CV 20-3888, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021)

8    (Wu, J.), to show the notice of the Terms of Use that the *Oberstein* plaintiffs would

9    have seen on the purchase page.

10                            ***Other Live Nation Pages***

11       25.    Finally, in order to browse for (and ultimately select) tickets for

12   purchase on Live Nation's desktop and mobile sites, a user must navigate through

13   various pages on Live Nation's website.  Many of those pages clearly inform the

14   user that his or her use of the site is subject to the Terms of Use.  For example, the

15   current homepage on both the desktop and mobile sites contains a link across the

16   bottom of the page that reads:  "By continuing past this page, you agree to our **Terms**

17   **of Use**."  The phrase "**Terms of Use**" is in bold and hyperlinks to the full text of the

18   Terms of Use.  Attached as **Exhibit 27** is a true and correct screenshot of the current

19   Live Nation desktop site homepage, showing this notice, and attached as **Exhibit 28**

20   is a true and correct screenshot of the current Live Nation mobile site homepage,

21   showing this notice.

22       26.    While the look and feel of Live Nation's desktop and mobile sites have

23   changed slightly over time, various pages have informed users browsing the sites of

24   the Terms of Use since at least 2010.

25                       **CONTENTS OF THE TERMS OF USE**

26       27.    The Terms of Use, which govern the use of Ticketmaster and Live

27   Nation's websites, include an arbitration agreement; this has been true since June 14,

28   2011.  Attached as **Exhibit 29** is a true and correct copy of the current Terms of Use

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

**2-ER-114**

1  from Ticketmaster's website; these have been effective since July 2, 2021.  Attached

2  as **Exhibit 30** is a true and correct copy of the current Terms of Use from Live

3  Nation's website; these have been effective since July 2, 2021, and are identical to

4  the Terms of Use on Ticketmaster's website.  The same Terms of Use govern the

5  desktop and mobile versions of Ticketmaster and Live Nation's websites.

6        28.    The Terms of Use have been updated from time to time; however, they

7  have contained an arbitration clause since June 14, 2011.

8        29.    Attached as **Exhibits 31, 32, 33, 34, and 35** are true and correct copies

9  of five prior versions of the Terms of Use from Ticketmaster's website—

10  specifically, the January 1, 2021 Terms of Use; September 17, 2020 Terms of Use;

11  August 5, 2020 Terms of Use; June 25, 2019 Terms of Use; and December 7, 2018

12  Terms of Use.  Some of these versions were pulled using the Wayback Machine,

13  including in connection with prior cases; I have reviewed them and can attest that

14  they are in fact true and correct copies of the Terms of Use that applied as of the date

15  specified.

16        30.    Attached as **Exhibits 36, 37, 38, 39, and 40** are true and correct copies

17  of five prior versions of the Terms of Use from Live Nation's website—specifically,

18  the January 1, 2021 Terms of Use; September 17, 2020 Terms of Use; August 5,

19  2020 Terms of Use; June 25, 2019 Terms of Use; and December 7, 2018 Terms of

20  Use.  Some of these versions were pulled using the Wayback Machine, including in

21  connection with prior cases; I have reviewed them and can attest that they are in fact

22  true and correct copies of the Terms of Use that applied as of the date specified.

23

24        I declare under penalty of perjury that the foregoing is true and correct.

25  Executed on March 8, 2022.

26

27                                        Kimberly Tobias

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DECLARATION OF KIMBERLY TOBIAS
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-115

# EXHIBIT 29

Exhibit 29
Page 86

2-ER-116

(https://www.ticketmaster.com/section/sports?tm_link=tm_sports_header)      Arts and Theatre (https://www.ticketmaster.com/section/arts-theater?tm_link=tm_d

POLICY & SECURITY
(/S/TOPIC/0TO0A000000Q41VGA ...

**Terms of Use**

🕐 · Article

Terms of Use

_____

Last Updated: July 2, 2021

Welcome! The following are the terms of use ("Terms") that govern your use of Live Nation and Ticketmaster's sites and mobile applications—including without limitation www.livenation.com (https://www.livenation.com/), www.ticketmaster.com (http://www.ticketmaster.com), and www.ticketexchangebyticketmaster.com (https://www.ticketexchangebyticketmaster.com/) (collectively, the "Site"), and your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services.

Our Privacy Policy (https://help.ticketmaster.com/s/article/Live_Nation_Entertainment_Privacy_Your_Privacy_Rights?language=en_US), Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy?language=en_US), and any other policies, rules, or guidelines that may be applicable to particular offers or features on the Site are also incorporated into the Terms. By visiting or using the Site, you expressly agree to these Terms, as updated from time to time.

Please note that while some of the events listed on the Site may appeal to children, the Site is not targeted at children under the age of 13, and they are not permitted to use the Site. We strongly encourage all parents and guardians to monitor their children's Internet use. If you use the Site, you affirm you are at least 13 years old.

## NOTICE REGARDING FUTURE CHANGES TO TERMS:

We may make changes to the Terms at any time. Any changes we make will be effective immediately when we post a revised version of the Terms on the Site. The "Last Updated" date above will tell you when the Terms were last revised. By continuing to use this Site after that date, you agree to the changes.

To the extent that these Terms differ from a prior version of the Terms which you previously agreed to, this version of the Terms supersedes and governs.

## NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:

The Terms contain an arbitration agreement and class action waiver Section 17 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17). Specifically, you and we agree that any dispute or claim relating in any way to the Terms, your use of the Site, or products or services sold, distributed, issued, or serviced by us or through us, will be resolved by binding, individual arbitration, rather than in court. By agreeing to individual arbitration, you and we each waive any right to participate in a class action lawsuit or class-wide arbitration. This agreement and waiver—along with some limited exceptions—is explained in Section 17 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17), below.

## COVID-19 WARNING:

An inherent risk of exposure to COVID 19 exists in any place where people gather. COVID 19 is an extremely contagious disease that can lead to severe illness and death. **You assume all risks, hazards, and dangers arising from or relating in any way to the risk of contracting a communicable disease or illness**—including, without limitation, exposure to COVID-19 or any other bacteria, virus, or other pathogen capable of causing a communicable disease or illness, whether that exposure occurs before, during, or after the event, and regardless of how caused or contracted   and you hereby waive any and all claims and potential claims against Ticketmaster, Live Nation, and the Event Organizer (as defined in our Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy?language=en_US))—and against any companies affiliated with Ticketmaster, Live Nation, or the Event Organizer—relating to such risks, hazards, and dangers.

## Table of Contents

1. Account Registration
2. Code of Conduct
3. Ownership of Content and Grand of Conditional License
4. Making Purchases
5. Forums and User Content

Exhibit 29
Page 87

6. Claims of Copyright Infringement on the Site
7. Links
8. Parental Controls
9. Access from Outside the United States
10. Rules for Sweepstakes, Contests and Games
11. Mobile Messaging
12. Mobile Device Application
13. Violation of the Terms
14. Disclaimer of Warranties
15. Limitation of Liability
16. Indemnification
17. Mandatory Arbitration Agreement and Class Action Waiver (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17)
18. No Reliance on Forward-Looking Statements
19. Severability
20. Questions

## 1. Account Registration

You may browse the Site without registering for an account. You will be required to register for an account to use certain features of the Site, such as reserving or purchasing a ticket. Your account username may not include the name of another person with the intent to impersonate that person, or be offensive, vulgar, or obscene. Your account username and password are personal to you. You will be responsible for the confidentiality and use of your username and password, and for all activities (including purchases) that are conducted through your account. You may not transfer or sell access to your account. We will not be liable for any harm related to disclosure of your username or password or the use by anyone else of your username or password. You may not use another user's account without that user's permission. You will immediately notify us in writing if you discover any unauthorized use of your account or other account-related security breach. We may require you to change your username and/or password if we believe your account is no longer secure, or if we receive a complaint that your username violates someone else's rights. You will have no ownership in your account or your username. We may refuse registration, cancel an account, or deny access to the Site for any reason.

## 2. Code of Conduct

You agree that you will comply with all applicable laws, rules and regulations, and that you will not:

- Restrict or inhibit any other person from using the Site.

- Use the Site for any unlawful purpose.

- Express or imply that any statements you make are endorsed by us, without our prior written consent.

- Impersonate any person or entity, whether actual or fictitious, including any employee or representative of our company.

- Submit (a) any content or information that is unlawful, fraudulent, libelous, defamatory, or otherwise objectionable, or infringes our or any third party's intellectual property or other rights; (b) any non-public information about companies without authorization; or (c) any advertisements, solicitations, chain letters, pyramid schemes, surveys, contests, investment opportunities, or other unsolicited commercial communication.

- Submit, or provide links to, any postings containing material that could be considered harmful, obscene, pornographic, sexually explicit, indecent, lewd, violent, abusive, profane, insulting, threatening, harassing, hateful, or otherwise objectionable, including any posting that includes the image or likeness of individuals under 18 years of age, encourages or otherwise depicts or glamorizes drug use (including alcohol and cigarettes), characterizes violence as acceptable, glamorous, or desirable, or contains any personal contact information or other personal information identifying any third party.

- Submit, or provide links to, any postings containing material that harasses, victimizes, degrades, or intimidates an individual or group of individuals on the basis of religion, race, ethnicity, sexual orientation, gender, age, or disability.

- Engage in spamming or flooding.

- Harvest or collect information about Site users.

- Order, or attempt to order, a number of tickets for an event that exceeds the stated limit for that event.

- Use any password or code to participate in a presale or other offer on the Site if you did not receive the password or code from us, or if you violate the terms of the presale or offer.

## 3. Ownership of Content and Grant of Conditional License

Exhibit 29
Page 88

The Site and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that reside or are viewable or otherwise discoverable on the Site, and all tickets obtained from the Site (collectively, the "Content"), are owned by us or our licensors. We own a copyright and, in many instances, patents and other intellectual property in the Site and Content. We may change the Content and features of the Site at any time.

We grant you a limited, conditional, no cost, non exclusive, non-transferable, non sub licensable license to view this Site and its Content as permitted by the Terms for non-commercial purposes only if, as a condition precedent, you agree that you will not:

- Submit any software or other materials that contain any viruses, worms, Trojan horses, defects, date bombs, time bombs, or other items of a destructive nature.

- Manipulate identifiers, including by forging headers, in order to disguise the origin of any posting that you submit.

- Link to any portion of the Site other than the URL assigned to the home page of the Site.

- "Frame" or "mirror" any part of the Site.

- Modify, adapt, sub-license, translate, sell, reverse engineer, decompile, or disassemble any portion of the Site, or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Content.

- Remove any copyright, trademark, or other proprietary rights notices contained on the Site.

- Use any computer program, bot, robot, spider, offline reader, site search/retrieval application, or other manual or automatic device, tool, or process to retrieve, index, data mine, or in any way reproduce or circumvent the security structure, navigational structure, or presentation of the Content or the Site, including with respect to any CAPTCHA displayed on the Site. Operators of public search engines may use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials. We may revoke this exception at any time and require removal of archived materials gathered in the past.

- Use any automated software or computer system to search for, reserve, buy, or otherwise obtain tickets, discount codes (including Concert Cash® and Ticketmaster Ticket Cash™), promotional codes, vouchers, credits, gift cards, or any other items available on the Site, including sending information from your computer to another computer where such software or system is active.

- Take any action that imposes or may impose (in our sole discretion) an unreasonable or disproportionately large load on our infrastructure.

- Access, reload, or refresh transactional event or ticketing pages, or make any other request to transactional servers, more than once during any three-second interval.

- Request more than 1,000 pages of the Site in any 24-hour period, whether alone or with a group of individuals.

- Make more than 800 reserve requests on the Site in any 24-hour period, whether alone or with a group of individuals.

- Reproduce, modify, display, publicly perform, distribute, or create derivative works of the Site or the Content.

- Reproduce or scan tickets in a format or medium different from that provided by the Site.

- Decode, decrypt, modify, or reverse engineer any tickets or underlying algorithms or barcodes used on or in production of tickets or the Site.

- Use the Site or the Content in an attempt to, or in conjunction with, any device, program, or service designed to circumvent any technological measure that effectively controls access to, or the rights in, the Site and/or Content in any way including, without limitation, by manual or automatic device or process, for any purpose.

- Use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

This license is expressly conditioned on your preexisting agreement to comply with, and your actual compliance with, each of the provisions described in this Ownership of Content and Grant of Conditional License section. This license exists only so long as you strictly comply with each of the provisions described in this section. Any use of the Site or Content by you or anyone acting on your behalf that does not strictly comply with each and every provision in this section exceeds the scope of the license granted to you herein, constitutes unauthorized reproduction, display, or creation of unauthorized derivative versions of the Site and Content, and infringes our copyrights, trademarks, patents, and other rights in the Site and Content. You will not acquire any ownership rights by using the Site or the Content.

The registered and unregistered trademarks, logos, and service marks displayed on the Site are owned by us or our licensors. You may not use our trademarks, logos, and service marks in any way without our prior written permission. You may inquire about obtaining permission by contacting us at trademarks@livenation.com (mailto:trademarks@livenation.com).

## 4. Making Purchases

Exhibit 29
Page 89

Please review our Purchase Policy (https://help.ticketmaster.com/hc/en-us/articles/... in addition to the Terms) whenever you purchase of any tickets or other products through the Site, including any refunds or exchanges. We may impose conditions on your use of any coupon, promotional code, credit, or gift card. You will pay all charges incurred by you or any users of your account and credit card (or other applicable payment mechanism) at the price(s) in effect when such charges are incurred, including any applicable taxes. You may only use credit or debit cards, gift cards, or vouchers that belong to you or to people who expressly authorize you to use such payment methods. You may use Concert Cash® and Ticketmaster Ticket Cash™, only in accordance with the Code Terms of Use found at www.livenation.com/concertcash () or www.ticketmaster.com/ticketcash (https://www.ticketmaster.com/ticketcash), as applicable.

You may not attempt to conceal your identity by using multiple Internet Protocol addresses or email addresses, or by any other means, to conduct transactions on the Site.

You will not hold us liable if you do not comply with laws related to your transactions. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you.

If we are unable to verify or authenticate any information or tickets you provide during any registration, ordering, purchase, ticket posting, sale, authentication, delivery, payment, or remittance process, or any other process, or if we are no longer able to verify or authorize your credit card or bank account information, your tickets may be cancelled, we may refuse to honor all pending and future ticket purchases made with those credit card or bank accounts and/or via any online accounts associated with those credit card or bank accounts. We may also prohibit you from using the Site.

You will not use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

## 5. Forums and User Content

We may host fan reviews, message boards, blog feeds, social media feeds, and other forums found on the Site (collectively, Forums), and you may be able to submit suggestions, reviews, concepts, audio and video recordings, photographs, artwork, or other materials to the Forums or other areas of the Site (User Content).

By submitting User Content, you certify that you are at least 18 years old, or that you are at least 13 years old and have obtained your parent's or legal guardian's express consent to submit User Content.

You own all rights to your User Content. If you submit User Content to the Site, you grant us a worldwide, non-exclusive, transferable, sub-licensable, royalty-free right and license to use, reproduce, modify, create derivative works of, distribute, publicly perform, display, archive, and commercialize your User Content, in our sole discretion, in all formats and in all media channels now known or hereinafter discovered, without any compensation or acknowledgment to you or anyone else. This license will not affect your ownership in your User Content, including the right to grant additional licenses to your User Content, except if it conflicts with the Terms. We are not obligated to post, display or otherwise use any User Content, or to attribute your User Content to you. You will not make or authorize any claim against us that our use of your User Content infringes any of your rights.

Statements, opinions, and reviews posted by participants in a Forum may be inaccurate, offensive, obscene, threatening, or harassing. We do not endorse and are not responsible for these postings. We will not be liable for any loss or harm caused by the posting or your reliance on information obtained through the postings.

You will be responsible for your User Content and the consequences of posting it. By submitting User Content, you represent to us that (a) you own, or have the necessary permission to submit the User Content and to grant the licenses to us under this section, and (b) you have the written permission of every identifiable person in the User Content to use that person's name and likeness in the manner contemplated by the Site and the Terms or, if the person is a minor, the written permission of the minor's parent or legal guardian.

We will have the right (but not the obligation) to monitor the Site, the Forums, and the User Content, and to disclose any User Content and the circumstances surrounding its submission in order to operate the Site properly, or to protect ourselves, our sponsors, and our users, or to comply with legal obligations or governmental requests.

If we are notified that your User Content does not comply with the Terms, we may investigate the allegation and may decide to remove your User Content and cancel your account. We may also hold you liable for any User Content that infringes the rights of a third party and require you to pay or reimburse us for any amounts we believe are necessary to resolve any complaint.

## 6. Claims of Copyright Infringement on the Site

Under the Digital Millennium Copyright Act of 1998 (the DMCA), if you believe in good faith that any content on the Site infringes your copyright, you may send us a notice requesting that the content be removed. The notice must include: (a) your (or your agent's) physical or electronic signature; (b) identification of the copyrighted work on our Site that is claimed to have been infringed (or a representative list if multiple copyrighted works are included in one notification); (c) identification of the content that is claimed to be infringing or the subject of infringing activity, including information reasonably sufficient to allow us to locate the content on the Site; (d) your name, address, telephone number, and email address (if available); (e) a

Exhibit 29
Page 90

Case 2:22-cv-00047-GW-GJS Document 31-29 Filed 03/08/22 Page 6 of 11 Page ID #:357

statement that you agree to the jurisdiction of the Federal District Court for the judicial district in which your address is located, or if your address is outside of the United States, for any judicial district in which we may be found, and that you will accept service of process from the person who provided notification under the DMCA or an agent of such person; and (f) a statement that the information in the notification is accurate and, under penalty of perjury, that you or your agent is authorized to act on behalf of the copyright owner. If you believe in good faith that a notice of copyright infringement has been wrongly filed against you, you may send us a counter-notice. You may read more information about the DMCA at www.copyright.gov (http://www.copyright.gov).

Notices and counter-notices should be sent to Live Nation Entertainment, Inc. by emailing copyrightofficer@livenation.com (mailto:copyrightofficer@livenation.com). There can be penalties for false claims under the DMCA. We suggest that you consult your legal advisor before filing a notice or counter-notice.

It is our policy to terminate, in appropriate circumstances, repeat infringers' access rights to the Site.

## 7. Links

The Site contains links to other websites that may not be owned or operated by us. The fact that we may link to those websites does not indicate any approval or endorsement of those websites. We have no control over those websites. We are not responsible for the content of those websites, or the privacy practices of those websites. We strongly encourage you to become familiar with the terms of use and practices of any linked website. Your use of other websites is at your own risk, and is subject to the terms of those websites. It is up to you to take precautions to ensure that whatever links you select or software you download (whether from the Site or other sites) is free of viruses, worms, Trojan horses, defects, date bombs, time bombs, and other items of a destructive nature.

## 8. Parental Controls

We cannot prohibit minors from visiting our Site and must rely on parents and guardians to decide what materials are appropriate for children to view and purchase. There are parental control protections (such as computer hardware, software, or filtering services) available that may assist you in limiting access to material that is harmful to minors. You can find information about parental controls at www.onguardonline.gov (http://www.onguardonline.gov). We do not endorse the products or services listed at that website.

## 9. Access from Outside the United States

The Site is directed to people residing in the United States. We do not represent that Content available on or through the Site is appropriate or available in other locations. We may limit the availability of the Site or any service or product described on the Site to any person or geographic area at any time. If you choose to access the Site from outside the United States, you do so at your own risk.

## 10. Rules for Sweepstakes, Contests and Games

In addition to the Terms, sweepstakes, contests, games, or other promotions (collectively, "Promotions") made available through the Site may have specific rules that are different from the Terms. By participating in a Promotion, you will become subject to those rules. We urge you to review the rules before you participate in a Promotion. Promotion rules will control over any conflict with the Terms, except in all instances the arbitration agreement and class action waiver set forth in Section 17 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17), below, will control and apply.

## 11. Mobile Messaging

We offer browsing and mobile messaging services which may include alerts, Promotions, and offers for products. You may choose to receive mobile alerts by signing up or participating in a Promotion. If you do, you authorize us to use automated technology to send messages to the mobile phone number you supply when you sign up. Your consent to receive mobile communications is never required in order to purchase something from us.

Message and data rates may apply, according to your rate plan provided by your wireless carrier. We will not be responsible for any text messaging or other wireless charges incurred by you or by a person who has access to your wireless device or telephone number. You may not receive our alerts if your carrier does not permit text alerts. Your carrier may not allow you to use pre-paid phones or calling plans to receive alerts. We may send you a bounce back message for every message you send to us. Service may not be compatible with all wireless carriers or devices.

You may opt out of any alerts by replying to an alert with the text message "STOP" or by sending the text message "STOP" to the shortcode provided. If you opt out by sending us a text message, we will send you a text to confirm your request. If you do not want to receive a confirmation text message, you may opt out by sending an email to texthelp@livenation.com (mailto:texthelp@livenation.com) with your request and mobile device number. It may take us up to 10 days to remove your mobile device number from our database. For additional help, text "HELP" to the shortcode provided, or email texthelp@livenation.com (mailto:texthelp@livenation.com).

You authorize your wireless carrier to disclose information about your account, such as subscriber status, payment method, and device details, if available, to support identity verification, fraud avoidance, and other uses in support of transactions for the duration of your business relationship with us. Information may also be shared with other service providers to further support identity verification and fraud prevention.

We are not responsible for the accuracy of any information displayed in our mobile messaging, for any misdelivery or untimely delivery of any mobile messaging, or for your deletion of or failure to store any mobile messaging from us.

Exhibit 29
Page 91

## 12. Mobile Device Application

If you install or use our mobile application, software, and services, including any accompanying documentation (collectively, the "App"), we grant you a limited right to install and use the App on a single authorized device located in the United States and its territories, or in another country where we may offer the App. You may use the App for your personal, non-commercial, and entertainment purposes only. We do not grant you any rights to any related documentation, support, upgrades, maintenance, or other enhancements to the App. We will not provide you with any device, internet access, or wireless connection to use the App. We are not responsible for any interaction between you and another App user, or information you transmit through the App (including your location).

## 13. Violation of the Terms

We may investigate any violation of the Terms, including unauthorized use of the Site. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you. We may take legal action (consistent with Section 17 (https://help.ticketmaster.com/s/article/Terms-of Use?language=en_US#section17), below) that we feel is appropriate. You agree that monetary damages may not provide us a sufficient remedy, and that we may pursue injunctive or other relief for your violation of the Terms. If we determine that you have violated the Terms or the law, or for any other reason or for no reason, we may cancel your account, delete all your User Content, and prevent you from accessing the Site at any time without notice to you. If that happens, you may no longer use the Site or any Content. You will still be bound by your obligations under the Terms. You agree that we will not be liable to you or any third party for termination of your access to the Site or to your account or any related information, and we will not be required to make the Site or your account or any related information available to you. We may also cancel any ticket or merchandise order, and tickets or merchandise acquired through your order. We may refuse to honor pending and future purchases made from all accounts we believe may be associated with you, or cancel a ticket or ticket order associated with any person we believe to be acting with you, or cancel your ticket postings, or exercise any other remedy available to us.

You agree that your abusive use of the Site may cause damage and harm to us, including impaired goodwill, lost sales, and increased expenses. You also agree that monetary damages for your abusive use of the Site are difficult to determine, and that if you, or others acting with you, request more than 1,000 pages of the Site or make more than 800 reserve requests on the Site in any 24 hour period, you, and those acting with you, will be jointly and severally liable for liquidated damages in the amount of twenty-five cents ($0.25) for each page request or reserve request made during that 24-hour period which exceeds those limits.

## 14. Disclaimer of Warranties

WE PROVIDE THE SITE AND THE CONTENT TO YOU "AS IS" AND "AS AVAILABLE". WE TRY TO KEEP THE SITE UP, BUG FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMISSIBLE BY LAW, AND TO THE EXTENT THAT APPLICABLE LAW PERMITS THE DISCLAIMER OF EXPRESS OR IMPLIED WARRANTIES, WE DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF TITLE, NON-INFRINGEMENT, ACCURACY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING OR COURSE OF PERFORMANCE OR USAGE OF TRADE. WE DO NOT GUARANTEE THAT THE SITE WILL ALWAYS BE SAFE, SECURE, OR ERROR FREE, OR THAT THE SITE WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE ARE NOT RESPONSIBLE FOR THE ACTIONS OR INFORMATION OF THIRD PARTIES, AND YOU RELEASE US FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE § 1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

## 15. Limitation of Liability

IN NO EVENT WILL WE OR OUR EVENT ORGANIZERS, SUPPLIERS, ADVERTISERS, AND SPONSORS, BE RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND EXPRESSLY WAIVE ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY TYPE, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED, ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE CONTENT, OR ANY PRODUCT OR SERVICE PURCHASED THROUGH THE SITE, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF WHETHER THE CLAIM IS BASED UPON ANY CONTRACT, TORT, OR OTHER LEGAL OR EQUITABLE THEORY. WITHOUT LIMITING THE FOREGOING, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT WE WILL HAVE NO LIABILITY OR RESPONSIBILITY WHATSOEVER FOR (a) ANY FAILURE OF ANOTHER USER OF THE SITE TO CONFORM TO THE CODES OF CONDUCT, (b) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT OR IN TORT, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE, (c) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (d) ANY BUGS, VIRUSES, WORMS, TROJAN HORSES, DEFECTS, DATE BOMBS, TIME BOMBS, OR OTHER ITEMS OF A DESTRUCTIVE NATURE WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SITE, (e) ANY ERRORS, MISTAKES, INACCURACIES, OR OMISSIONS IN ANY CONTENT, OR (f) ANY LOST, STOLEN, OR DAMAGED TICKETS, OR THE FAILURE OF A VENUE TO HONOR A TICKET. YOUR SOLE AND EXCLUSIVE REMEDY FOR DISSATISFACTION WITH THE SITE IS TO STOP USING THE SITE. THE LIMITATIONS IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THE ALLOCATION OF RISK BETWEEN US IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN US. OUR AGGREGATE LIABILITY ARISING OUT OF THE TERMS OR THE USE OF THE SITE WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. IN NO EVENT WILL ATTORNEYS' FEES BE AWARDED OR RECOVERABLE. OUR LIABILITY WILL BE LIMITED UNDER THIS PARAGRAPH TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND THE PROVISIONS OF THIS PARAGRAPH WILL NOT APPLY TO THE

Exhibit 29
Page 92

**2-ER-122**

EXTENT PERMITTED BY LAW, PROHIBIT THE RECOVERY OF CERTAIN DAMAGES, ARE ENFORCEABLE FOR THE REASONS STATED IN THIS PARAGRAPH. THE PROVISIONS OF THIS PARAGRAPH THAT (a) PROHIBIT DAMAGES FROM BEING MULTIPLIED OR OTHERWISE INCREASED, (b) IMPOSE A DAMAGES LIMITATION OF THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS, AND (c) PROHIBIT THE RECOVERY OF ATTORNEYS' FEES AND COSTS, DO NOT APPLY IN CERTAIN STATES, INCLUDING WITHOUT LIMITATION NEW JERSEY, TO CLAIMS BROUGHT UNDER STATUTES PERMITTING SUCH RECOVERY.

## 16. Indemnification

If anyone brings a claim against us related to your use of the Site, the Content, your User Content, or your violation of the Terms, you agree to indemnify, defend, and hold us and our affiliated companies, Event Organizers, suppliers, advertisers, and sponsors, and each of our officers, directors, employees, and agents, harmless from and against any and all claims, damages, losses, and expenses of any kind (including reasonable legal fees and costs). We reserve the right to take exclusive control and defense of any claim, and you will cooperate fully with us in asserting any available defenses.

## 17. Mandatory Arbitration Agreement and Class Action Waiver

YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY DISPUTE, CLAIM, OR CONTROVERSY RELATING IN ANY WAY TO THE TERMS, YOUR USE OF THE SITE, OR PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY BINDING, INDIVIDUAL ARBITRATION AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

**Exceptions.** The arbitration agreement and class action waiver set forth in this Section 17 shall be subject to these limited exceptions:

You may assert claims in small claims court if your claims apply.

- If a claim involves the conditional license granted to you as described in the Ownership of Content and Grant of Conditional License section (Section 3 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section3)) above, either of us may file a lawsuit in a federal or state court located within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes.

- In the event that the arbitration agreement in the Terms is for any reason held to be unenforceable, any litigation against us (except for small claims court actions) may be commenced only in a federal or state court located within Los Angeles County, California, and you and we each consent to the jurisdiction of those courts for such purposes.

- You and we each retain the right to participate in class-wide settlement of claims.

**Informal Dispute Resolution.** You and we each recognize and agree that good faith, informal efforts to resolve disputes often result in prompt, low-cost, and mutually beneficial outcomes. Therefore, you and we each agree that, before either of us may commence an arbitration or assert a claim in small claims court, you and we will engage in the following informal dispute resolution process:

- The party seeking to initiate a claim in arbitration or small claims court ("claimant") must give written notice to the other party ("respondent"). To notify us that you intend to initiate informal dispute resolution, you must send an email to Live Nation Entertainment, Inc. at disputes@livenation.com (mailto:disputes@livenation.com), providing: your full name; the email address and mailing address associated with your Live Nation or Ticketmaster account; your counsel's name and contact information, if you are represented by counsel; and a brief description of your claim(s) and the relief sought. To notify you that we intend to initiate informal dispute resolution, we will email you at the email address associated with your Live Nation or Ticketmaster account and provide a brief description of our claim(s) and the relief sought, and our counsel's name and contact information.

- You and we will then personally meet and confer, via teleconference or videoconference, in a good faith effort to informally resolve any claim covered by this mutual arbitration agreement. If either you or us is represented by counsel, that counsel may participate in the informal dispute resolution conference.

- All offers, promises, conduct, and statements made in the course of the informal dispute resolution process by any party, its agents, employees, and attorneys are confidential and not admissible for any purpose in any subsequent proceeding, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the informal dispute resolution process.

- The informal dispute resolution conference shall occur within sixty (60) days of receipt of the written notice described above, unless an extension is mutually agreed upon by you and us. If, after participating in that conference, you and we have been unable to resolve the dispute, the claimant may commence an arbitration or assert a claim in small claims court in accordance with this arbitration agreement.

- Any statute of limitations will be tolled while you and we engage in the informal dispute resolution process described in this section.

**Governing Law; Interpretation and Enforcement.** The arbitration agreement in the Terms is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA"), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver. State arbitration laws do not govern in any respect. Further, you and we each agree that the Terms evidence a transaction involving interstate commerce, and will be governed by and construed in accordance with federal law to the fullest extent possible.

Exhibit 29
Page 93

**Arbitration Generally; Relief Available.** There is no judge or jury in arbitration, and court review of an arbitration award is limited pursuant to the FAA. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the Terms as a court would. For the avoidance of doubt, the arbitrator can award public injunctive relief if authorized by law and warranted by the individual claim(s).

**Arbitration Proceedings and Rules.** The following rules and procedures shall apply:

- Any arbitration will be administered by New Era ADR in accordance with their Virtual Expedited Arbitration Rules and Procedures, as well as any applicable General Rules and Procedures, except as modified by the Terms. New Era ADR's Virtual Expedited Arbitration Rules and Procedures and General Rules and Procedures are both available at www.neweraadr.com/rules-and-procedures/ (http://www.neweraadr.com/rules-and-procedures/).

- The arbitrator shall be selected pursuant to New Era ADR's standard rank and strike process, as set forth in New Era ADR's General Rules and Procedures.

- To increase the efficiency of administration and resolution of arbitrations: in the event of a claim seeking equitable relief (including injunctive relief), the arbitrator shall bifurcate the proceeding and rule on liability first, before conducting any proceedings (including discovery) related to the appropriate relief.

- Unless applicable law provides otherwise, the arbitration proceeding and all records pertaining to it—including but not limited to any documents prepared or produced in connection with the arbitration proceeding, as well as the hearing and the arbitration award—will be confidential and will not be disclosed to any third party, except as necessary to obtain court confirmation of the arbitration award.

In the event that New Era ADR is unable to conduct the arbitration for any reason, the arbitration will be conducted by FairClaims pursuant to its FastTrack Rules & Procedures, and/or any applicable rules for consumer arbitrations, at www.fairclaims.com (http://www.fairclaims.com). In the event that FairClaims is unable to conduct the arbitration for any reason, you and we will mutually select an alternative arbitration provider, and the arbitration will be conducted pursuant to that provider's applicable rules. If, pursuant to this paragraph, the arbitration is conducted by an arbitration provider other than New Era ADR, references to New Era ADR and its rules in the Terms shall be construed as references to that arbitration provider and its applicable rules.

**Commencing an Arbitration.** A party who has complied with the informal dispute resolution provisions described above, and who wishes to start arbitration, must submit a Demand for Arbitration and a copy of the Terms to New Era ADR at app.neweraadr.com (https://app.neweraadr.com/users/sign_in), and must also give notice to the other party. If the notice is being sent to us, it must be emailed to Live Nation Entertainment, Inc. at disputes@livenation.com (mailto:disputes@livenation.com). If the notice is being sent to you, it will be sent to the email address associated with your Live Nation or Ticketmaster account.

**Arbitration Fees and Costs.** If you commence an arbitration in accordance with the Terms, you will be required to pay New Era ADR's $300 filing fee. You will not be responsible for paying any other fees for the arbitration, other than the filing fee; all other fees or expenses charged by New Era ADR will be paid by us (unless the arbitrator finds that either the substance of your claim or the relief sought is frivolous or brought for an improper purpose). Further, if New Era ADR determines that you are unable to pay any part of the filing fee, we will pay that part too.

In the event that the arbitration is conducted by a different arbitration provider in accordance with the Terms, payment of any filing, administration, or arbitrator fees shall be governed by that provider's rules.

You and we each agree that New Era ADR, FairClaims, JAMS, and any other arbitration provider selected pursuant to the Terms has discretion to modify the amount or timing of any fees due under any applicable rules or fee schedules, and further agree not to oppose any modifications to the timing or amount of any fees due—provided that such modifications do not increase the fees to either you or us.

**Attorneys' Fees.** You are responsible for your own attorneys' fees; we will not pay any attorneys' fees unless ordered to do so by the arbitrator. For the avoidance of doubt, in cases where a statute gives you the right to recover attorneys' fees if you prevail, the arbitrator may award attorneys' fees pursuant to that statute.

**Delegation; Interpretation.** The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable; however, in the event of a dispute about which particular version of this Agreement you agreed to, a court will decide that specific question. This arbitration agreement is intended to be broadly interpreted and will survive termination of the Terms.

**Limited Right to Appeal.** As explained above, court review of the arbitrator's decision is limited pursuant to the FAA; however, the Terms provide a limited right to appeal the arbitrator's decision to a panel of JAMS arbitrators, as set forth in this sub-section. Specifically, in the event that the arbitrator awards injunctive relief against either you or us, the party against whom injunctive relief was awarded may—within 21 days of the arbitrator's final decision—appeal that decision to JAMS, in accordance with the following procedure:

Exhibit 29
Page 94

**2-ER-124**

- Except as otherwise provided by the Terms, the appeal will be conducted pursuant to the JAMS Optional Arbitration Appeal Procedure, available at www.jamsadr.com (http://www.jamsadr.com).

- To commence an appeal, a party must submit the Demand for Arbitration Form available at www.jamsadr.com (http://www.jamsadr.com), and must also provide notice to the other party in the manner described above in this section.

- The JAMS appeal panel will consist of arbitrators who are either (a) retired state or federal judges or (b) licensed attorneys with at least 20 years of active litigation experience and substantial expertise in the substantive laws applicable to the subject matter of the dispute.

- The JAMS appeal panel will conduct a de novo review of the arbitrator's decision.

- Except as provided in the FAA, there will be no right of appeal from the JAMS appeal panel's decision.

**Special Provision Regarding Resale Tickets for Events Located in Illinois.** Solely for the purpose of complying with the Illinois Ticket Sale and Resale Act, 815 ILCS 414/1.5 et seq., if your dispute regards the resale of a ticket for any event located in the State of Illinois, then the following applies: You may submit any complaint you may have to New Era ADR as an arbitration demand, in accordance with the rules and procedures outlined in this section, and any such claims shall be decided by an independent arbitrator in accordance with the Terms. Without waiving the agreement to arbitrate or any other terms in this Section 17, you also agree to submit to the jurisdiction of the State of Illinois for any complaint involving a ticketed event held in Illinois. For the sake of clarity, your agreement to submit to the jurisdiction of the State of Illinois for any complaint involving a ticketed event held in Illinois does not in any way waive your and our agreement to arbitrate, or the scope of arbitration, but simply means that—for any court proceeding that may take place in conjunction with an arbitration (e.g., a motion to enforce an arbitration award), or in the event the arbitration agreement is held unenforceable—you agree to submit to jurisdiction in Illinois. If you have an inquiry regarding a ticket resale transaction made for any event located in Illinois, please contact us at 550 W. Van Buren Street, 13th Floor, Chicago, Illinois 60607 or (877) 446-9450.

## 18. No Reliance and Forward-Looking Statements

The information contained on the Site may not be current and should not be used or relied on for any investment decision regarding our securities or for any similar purpose. We file annual, quarterly, and current reports, proxy statements, and other information with the United States Securities and Exchange Commission ("SEC"). Copies of our filings are available at www.investors.livenationentertainment.com (http://www.investors.livenationentertainment.com) and also at the SEC's website at www.sec.gov (http://www.sec.gov/).

Statements on the Site regarding our financial condition, results of operations and business, and our expectations or beliefs concerning future events that are not historical facts are "Forward-Looking Statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Use of the words "believes," "expects," "anticipates," "plans," "estimates," or words of similar meaning are intended to identify Forward-Looking Statements but are not the exclusive means of identifying such statements. We caution you that there are some known and unknown factors that could cause actual results to differ materially from any future results, performance, or achievements expressed or implied by such Forward-Looking Statements, including but not limited to economic, competitive, governmental, and technological factors affecting our operations, markets, products, services, and prices, as well as the risks and uncertainties set forth in the documents we file with the SEC, specifically the section titled "Item 1A. Risk Factors" of our most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. We do not undertake any obligation to publicly update or revise any Forward-Looking Statements because of new information, future events, or otherwise.

## 19. Severability

It is our belief that the Terms do not contain any provision contrary to law. However, if any part of the Terms is determined to be illegal, invalid, or unenforceable, you agree that: (a) that part shall nevertheless be enforced to the extent permissible in order to effect the intent of the Terms, and (b) the remaining parts shall be deemed valid and enforceable.

## 20. Questions

If you have any questions, comments, or complaints regarding the Terms or the Site, please contact us at:

Live Nation Entertainment, Inc.
Attn: General Counsel
9348 Civic Center Drive
Beverly Hills, CA 90210
(800) 653-8000
LNELegal@livenation.com (mailto:LNELegal@livenation.com)

California users may also contact the Complaint Assistance Unit of the Division of Consumer Services, California Department of Consumer Affairs, located at 1625 North Market Blvd., Sacramento, CA 95834, (800) 952-5210.

Policy & Security
(/s/topic/0TO0a000000q41…

Exhibit 29
Page 95

**Related Articles**

Gift Card Terms of Use (/s/article/Gift-Card-Terms-and-Conditions)

Can I use a screenshot of my mobile ticket to enter? (/s/article/Can-I-use-a-screenshot-of-my-mobile-ticket-to-enter)

Terms Regarding Certain Cancelled, Rescheduled, Postponed and Moved Events (COVID-19) (/s/article/Terms-Regarding-Certain-Cancelled-Rescheduled-and-Postponed-Events)

How to use Promo Codes (/s/article/How-to-use-Promo-Codes)

Can I use PayPal with other forms of payment such as gift cards or vouchers? (/s/article/Can-I-use-PayPal-with-other-forms-of-payment-such-as-gift-cards-or-vouchers)

Still haven't found what you were looking for?

Contact Us

(https://www.ticketmaster.com/h/customer-service.html?tm_link=help_nav_4_contact)

By continuing past this page, you agree to our Terms of Use. (https://www.ticketmaster.com/h/terms.html)   © Ticketmaster 2022   🇺🇸 United States

(https://www.facebook.com/Ticketmaster)   /(https://twitter.com/ticketmaster)   /https://www.instagram.com/ticketmaster/?hl=en)   /(https://www.youtube.com/ticketmaster)

/(https://www.linkedin.com/company/ticketmaster/)

Preferred Language

English (US)

Exhibit 29
Page 96

2-ER-126

# EXHIBIT 30

Exhibit 30
Page 97

2-ER-127

3/7/22, 6:24 PM                                    Terms of Use

.com/member?tm_link=tm_header_signin)          Gift Cards (https://www.livenation.com/giftcards/)

POLICY & SECURITY
(/S/TOPIC/0TO0A000000KVEHGA...

## Terms of Use

🕐  . **Article**

Terms of Use

Last Updated: July 2, 2021

Welcome! The following are the terms of use ("Terms") that govern your use of Live Nation and Ticketmaster's sites and mobile applications—including without limitation www.livenation.com (https://www.livenation.com/), www.ticketmaster.com (http://www.ticketmaster.com), and www.ticketexchangebyticketmaster.com (https://www.ticketexchangebyticketmaster.com/)--(collectively, the "Site"), and your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services.

Our Privacy Policy (https://help.livenation.com/s/article/Live-Nation-Entertainment-Privacy-Policy-Your-Privacy-Rights?language=en_US) , Purchase Policy (https://help.livenation.com/s/article/Purchase-Policy?language=en_US) , and any other policies, rules, or guidelines that may be applicable to particular offers or features on the Site are also incorporated into the Terms. By visiting or using the Site, you expressly agree to these Terms, as updated from time to time.

Please note that while some of the events listed on the Site may appeal to children, the Site is not targeted at children under the age of 13, and they are not permitted to use the Site. We strongly encourage all parents and guardians to monitor their children's Internet use. If you use the Site, you affirm you are at least 13 years old.

## NOTICE REGARDING FUTURE CHANGES TO TERMS:

We may make changes to the Terms at any time. Any changes we make will be effective immediately when we post a revised version of the Terms on the Site. The "Last Updated" date above will tell you when the Terms were last revised. By continuing to use this Site after that date, you agree to the changes.

To the extent that these Terms differ from a prior version of the Terms which you previously agreed to, this version of the Terms supersedes and governs.

## NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:

The Terms contain an arbitration agreement and class action waiver Section 17 (https://help.livenation.com/s/article/Terms-of-Use?language=en_US#section17) . Specifically, you and we agree that any dispute or claim relating in any way to the Terms, your use of the Site, or products or services

https://help.livenation.com/s/article/Terms-of-Use?language=en_US                                          1/15

Exhibit 30
Page 98

3/7/22, 6:24 PM                                  Terms of Use

sold, distributed, issued, or serviced by us or through us, will be resolved by binding, individual arbitration, rather than in court. By agreeing to individual arbitration, you and we each waive any right to participate in a class action lawsuit or class-wide arbitration. This agreement and waiver—along with some limited exceptions—is explained in Section 17 (https://help.livenation.com/s/article/Terms-of-Use?language=en_US#section17) , below.

## COVID-19 WARNING:

An inherent risk of exposure to COVID-19 exists in any place where people gather. COVID-19 is an extremely contagious disease that can lead to severe illness and death. You assume all risks, hazards, and dangers arising from or relating in any way to the risk of contracting a communicable disease or illness—including, without limitation, exposure to COVID-19 or any other bacteria, virus, or other pathogen capable of causing a communicable disease or illness, whether that exposure occurs before, during, or after the event, and regardless of how caused or contracted—and you hereby waive any and all claims and potential claims against Ticketmaster, Live Nation, and the Event Organizer (as defined in our Purchase Policy (https://help.livenation.com/s/article/Purchase-Policy?language=en_US) )—and against any companies affiliated with Ticketmaster, Live Nation, or the Event Organizer—relating to such risks, hazards, and dangers.

## Table of Contents

1. Account Registration
2. Code of Conduct
3. Ownership of Content and Grand of Conditional License
4. Making Purchases
5. Forums and User Content
6. Claims of Copyright Infringement on the Site
7. Links
8. Parental Controls
9. Access from Outside the United States
10. Rules for Sweepstakes, Contests and Games
11. Mobile Messaging
12. Mobile Device Application
13. Violation of the Terms
14. Disclaimer of Warranties
15. Limitation of Liability
16. Indemnification
17. Mandatory Arbitration Agreement and Class Action Waiver (https://help.livenation.com/s/article/Terms-of-Use?language=en_US#section17)
18. No Reliance on Forward-Looking Statements
19. Severability
20. Questions

## 1. Account Registration

You may browse the Site without registering for an account. You will be required to register for an account to use certain features of the Site, such as reserving or purchasing a ticket. Your account username may not include the name of another person with the intent to impersonate that person, or be offensive, vulgar, or obscene. Your account username and password are personal to you. You will be responsible for the confidentiality and use of your username and password, and for all activities (including purchases) that are conducted through your account. You may not transfer or sell access to your account. We will not be liable for any harm related to disclosure of your username or password or the use by anyone else of your username

Exhibit 30
Page 99

**2-ER-129**

3/7/22, 6:24 PM                                                    Terms of Use

or password. You may not use another user's account without that user's permission. You will immediately notify us in writing if you discover any unauthorized use of your account or other account-related security breach. We may require you to change your username and/or password if we believe your account is no longer secure, or if we receive a complaint that your username violates someone else's rights. You will have no ownership in your account or your username. We may refuse registration, cancel an account, or deny access to the Site for any reason.

## 2. Code of Conduct

You agree that you will comply with all applicable laws, rules and regulations, and that you will not:

- Restrict or inhibit any other person from using the Site.

- Use the Site for any unlawful purpose.

- Express or imply that any statements you make are endorsed by us, without our prior written consent.

- Impersonate any person or entity, whether actual or fictitious, including any employee or representative of our company.

- Submit (a) any content or information that is unlawful, fraudulent, libelous, defamatory, or otherwise objectionable, or infringes our or any third party's intellectual property or other rights; (b) any non-public information about companies without authorization; or (c) any advertisements, solicitations, chain letters, pyramid schemes, surveys, contests, investment opportunities, or other unsolicited commercial communication.

- Submit, or provide links to, any postings containing material that could be considered harmful, obscene, pornographic, sexually explicit, indecent, lewd, violent, abusive, profane, insulting, threatening, harassing, hateful, or otherwise objectionable, including any posting that includes the image or likeness of individuals under 18 years of age, encourages or otherwise depicts or glamorizes drug use (including alcohol and cigarettes), characterizes violence as acceptable, glamorous, or desirable, or contains any personal contact information or other personal information identifying any third party.

- Submit, or provide links to, any postings containing material that harasses, victimizes, degrades, or intimidates an individual or group of individuals on the basis of religion, race, ethnicity, sexual orientation, gender, age, or disability.

- Engage in spamming or flooding.

- Harvest or collect information about Site users.

- Order, or attempt to order, a number of tickets for an event that exceeds the stated limit for that event.

- Use any password or code to participate in a presale or other offer on the Site if you did not receive the password or code from us, or if you violate the terms of the presale or offer.

## 3. Ownership of Content and Grant of Conditional License

The Site and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that reside or are viewable or otherwise discoverable on the Site, and all tickets obtained from the Site (collectively, the "Content"), are owned by us or our licensors. We own a copyright and, in many instances, patents and other intellectual property in the Site and Content. We may change the Content and features of the Site at any time.

Exhibit 30
Page 100

**2-ER-130**

3/7/22, 6:24 PM                                    Terms of Use

We grant you a limited, conditional, no-cost, non-exclusive, non-transferable, non-sub-licensable license to
view this Site and its Content as permitted by the Terms for non-commercial purposes only if, as a condition
precedent, you agree that you will not:

- Submit any software or other materials that contain any viruses, worms, Trojan horses, defects, date
  bombs, time bombs, or other items of a destructive nature.
- Manipulate identifiers, including by forging headers, in order to disguise the origin of any posting that
  you submit.
- Link to any portion of the Site other than the URL assigned to the home page of the Site.
- "Frame" or "mirror" any part of the Site.
- Modify, adapt, sub-license, translate, sell, reverse engineer, decompile, or disassemble any portion of the
  Site, or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the
  Content.
- Remove any copyright, trademark, or other proprietary rights notices contained on the Site.
- Use any computer program, bot, robot, spider, offline reader, site search/retrieval application, or other
  manual or automatic device, tool, or process to retrieve, index, data mine, or in any way reproduce or
  circumvent the security structure, navigational structure, or presentation of the Content or the Site,
  including with respect to any CAPTCHA displayed on the Site. Operators of public search engines may
  use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for
  creating publicly available searchable indices of the materials, but not caches or archives of such
  materials. We may revoke this exception at any time and require removal of archived materials gathered
  in the past.
- Use any automated software or computer system to search for, reserve, buy, or otherwise obtain tickets,
  discount codes (including Concert Cash® and Ticketmaster Ticket Cash™), promotional codes, vouchers,
  credits, gift cards, or any other items available on the Site, including sending information from your
  computer to another computer where such software or system is active.
- Take any action that imposes or may impose (in our sole discretion) an unreasonable or
  disproportionately large load on our infrastructure.
- Access, reload, or refresh transactional event or ticketing pages, or make any other request to
  transactional servers, more than once during any three-second interval.
- Request more than 1,000 pages of the Site in any 24-hour period, whether alone or with a group of
  individuals.
- Make more than 800 reserve requests on the Site in any 24-hour period, whether alone or with a group of
  individuals.
- Reproduce, modify, display, publicly perform, distribute, or create derivative works of the Site or the
  Content.
- Reproduce or scan tickets in a format or medium different from that provided by the Site.
- Decode, decrypt, modify, or reverse engineer any tickets or underlying algorithms or barcodes used on or
  in production of tickets or the Site.

https://help.livenation.com/s/article/Terms-of-Use?language=en_US                              4/15

Exhibit 30
Page 101

3/7/22, 6:24 PM                                                    Terms of Use

- Use the Site or the Content in an attempt to, or in conjunction with, any device, program, or service designed to circumvent any technological measure that effectively controls access to, or the rights in, the Site and/or Content in any way including, without limitation, by manual or automatic device or process, for any purpose.

- Use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

This license is expressly conditioned on your preexisting agreement to comply with, and your actual compliance with, each of the provisions described in this Ownership of Content and Grant of Conditional License section. This license exists only so long as you strictly comply with each of the provisions described in this section. Any use of the Site or Content by you or anyone acting on your behalf that does not strictly comply with each and every provision in this section exceeds the scope of the license granted to you herein, constitutes unauthorized reproduction, display, or creation of unauthorized derivative versions of the Site and Content, and infringes our copyrights, trademarks, patents, and other rights in the Site and Content. You will not acquire any ownership rights by using the Site or the Content.

The registered and unregistered trademarks, logos, and service marks displayed on the Site are owned by us or our licensors. You may not use our trademarks, logos, and service marks in any way without our prior written permission. You may inquire about obtaining permission by contacting us at trademarks@livenation.com (mailto:trademarks@livenation.com).

## 4. Making Purchases

Please review our Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy), which (in addition to the Terms) will govern your purchase of any tickets or other products through the Site, including any refunds or exchanges. We may impose conditions on your use of any coupon, promotional code, credit, or gift card. You will pay all charges incurred by you or any users of your account and credit card (or other applicable payment mechanism) at the price(s) in effect when such charges are incurred, including any applicable taxes. You may only use credit or debit cards, gift cards, or vouchers that belong to you or to people who expressly authorize you to use such payment methods. You may use Concert Cash® and Ticketmaster Ticket Cash™, only in accordance with the Code Terms of Use found at www.livenation.com/concertcash () or www.ticketmaster.com/ticketcash (https://www.ticketmaster.com/ticketcash), as applicable.

You may not attempt to conceal your identity by using multiple Internet Protocol addresses or email addresses, or by any other means, to conduct transactions on the Site.

You will not hold us liable if you do not comply with laws related to your transactions. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you.

If we are unable to verify or authenticate any information or tickets you provide during any registration, ordering, purchase, ticket posting, sale, authentication, delivery, payment, or remittance process, or any other process, or if we are no longer able to verify or authorize your credit card or bank account information, your tickets may be cancelled, we may refuse to honor all pending and future ticket purchases made with those credit card or bank accounts and/or via any online accounts associated with those credit card or bank accounts. We may also prohibit you from using the Site.

Exhibit 30
Page 102

**2-ER-132**

3/7/22, 6:24 PM                                                Terms of Use

You will not use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

## 5. Forums and User Content

We may host fan reviews, message boards, blog feeds, social media feeds, and other forums found on the Site (collectively, Forums), and you may be able to submit suggestions, reviews, concepts, audio and video recordings, photographs, artwork, or other materials to the Forums or other areas of the Site (User Content).

By submitting User Content, you certify that you are at least 18 years old, or that you are at least 13 years old and have obtained your parent's or legal guardian's express consent to submit User Content.

You own all rights to your User Content. If you submit User Content to the Site, you grant us a worldwide, non-exclusive, transferable, sub-licensable, royalty-free right and license to use, reproduce, modify, create derivative works of, distribute, publicly perform, display, archive, and commercialize your User Content, in our sole discretion, in all formats and in all media channels now known or hereinafter discovered, without any compensation or acknowledgment to you or anyone else. This license will not affect your ownership in your User Content, including the right to grant additional licenses to your User Content, except if it conflicts with the Terms. We are not obligated to post, display or otherwise use any User Content, or to attribute your User Content to you. You will not make or authorize any claim against us that our use of your User Content infringes any of your rights.

Statements, opinions, and reviews posted by participants in a Forum may be inaccurate, offensive, obscene, threatening, or harassing. We do not endorse and are not responsible for these postings. We will not be liable for any loss or harm caused by the posting or your reliance on information obtained through the postings.

You will be responsible for your User Content and the consequences of posting it. By submitting User Content, you represent to us that (a) you own, or have the necessary permission to submit the User Content and to grant the licenses to us under this section, and (b) you have the written permission of every identifiable person in the User Content to use that person's name and likeness in the manner contemplated by the Site and the Terms or, if the person is a minor, the written permission of the minor's parent or legal guardian.

We will have the right (but not the obligation) to monitor the Site, the Forums, and the User Content, and to disclose any User Content and the circumstances surrounding its submission in order to operate the Site properly, or to protect ourselves, our sponsors, and our users, or to comply with legal obligations or governmental requests.

If we are notified that your User Content does not comply with the Terms, we may investigate the allegation and may decide to remove your User Content and cancel your account. We may also hold you liable for any User Content that infringes the rights of a third party and require you to pay or reimburse us for any amounts we believe are necessary to resolve any complaint.

## 6. Claims of Copyright Infringement on the Site

Under the Digital Millennium Copyright Act of 1998 (the DMCA), if you believe in good faith that any content on the Site infringes your copyright, you may send us a notice requesting that the content be removed. The notice must include: (a) your (or your agent's) physical or electronic signature; (b) identification of the

Exhibit 30
Page 103

**2-ER-133**

3/7/22, 6:24 PM                                    Terms of Use

copyrighted work on our Site that is claimed to have been infringed (or a representative list if multiple copyrighted works are included in one notification); (c) identification of the content that is claimed to be infringing or the subject of infringing activity, including information reasonably sufficient to allow us to locate the content on the Site; (d) your name, address, telephone number, and email address (if available); (e) a statement that you have a good faith belief that use of the content in the manner complained of is not authorized by you or your agent or the law; and (f) a statement that the information in the notification is accurate and, under penalty of perjury, that you or your agent is authorized to act on behalf of the copyright owner. If you believe in good faith that a notice of copyright infringement has been wrongly filed against you, you may send us a counter-notice. You may read more information about the DMCA at www.copyright.gov (http://www.copyright.gov).

Notices and counter-notices should be sent to Live Nation Entertainment, Inc. by emailing copyrightofficer@livenation.com (mailto:copyrightofficer@livenation.com). There can be penalties for false claims under the DMCA. We suggest that you consult your legal advisor before filing a notice or counter-notice.

It is our policy to terminate, in appropriate circumstances, repeat infringers' access rights to the Site.

## 7. Links

The Site contains links to other websites that may not be owned or operated by us. The fact that we may link to those websites does not indicate any approval or endorsement of those websites. We have no control over those websites. We are not responsible for the content of those websites, or the privacy practices of those websites. We strongly encourage you to become familiar with the terms of use and practices of any linked website. Your use of other websites is at your own risk, and is subject to the terms of those websites. It is up to you to take precautions to ensure that whatever links you select or software you download (whether from the Site or other sites) is free of viruses, worms, Trojan horses, defects, date bombs, time bombs, and other items of a destructive nature.

## 8. Parental Controls

We cannot prohibit minors from visiting our Site and must rely on parents and guardians to decide what materials are appropriate for children to view and purchase. There are parental control protections (such as computer hardware, software, or filtering services) available that may assist you in limiting access to material that is harmful to minors. You can find information about parental controls at www.onguardonline.gov (http://www.onguardonline.gov). We do not endorse the products or services listed at that website.

## 9. Access from Outside the United States

The Site is directed to people residing in the United States. We do not represent that Content available on or through the Site is appropriate or available in other locations. We may limit the availability of the Site or any service or product described on the Site to any person or geographic area at any time. If you choose to access the Site from outside the United States, you do so at your own risk.

## 10. Rules for Sweepstakes, Contests and Games

In addition to the Terms, sweepstakes, contests, games, or other promotions (collectively, "Promotions") made available through the Site may have specific rules that are different from the Terms. By participating in a Promotion, you will become subject to those rules. We urge you to review the rules before you participate in a Promotion. Promotion rules will control over any conflict with the Terms, except in all instances the arbitration agreement and class action waiver set forth in Section 17 (https://help.livenation.com/s/article/Terms-of-Use?language=en_US#section17) , below, will control and apply.

Exhibit 30
Page 104

**2-ER-134**

3/7/22, 6:24 PM                                                    Terms of Use

## 11. Mobile Messaging

We offer browsing and mobile messaging services which may include alerts, Promotions, and offers for products. You may choose to receive mobile alerts by signing up or participating in a Promotion. If you do, you authorize us to use automated technology to send messages to the mobile phone number you supply when you sign up. Your consent to receive mobile communications is never required in order to purchase something from us.

Message and data rates may apply, according to your rate plan provided by your wireless carrier. We will not be responsible for any text messaging or other wireless charges incurred by you or by a person who has access to your wireless device or telephone number. You may not receive our alerts if your carrier does not permit text alerts. Your carrier may not allow you to use pre-paid phones or calling plans to receive alerts. We may send you a bounce back message for every message you send to us. Service may not be compatible with all wireless carriers or devices.

You may opt out of any alerts by replying to an alert with the text message "STOP" or by sending the text message "STOP" to the shortcode provided. If you opt out by sending us a text message, we will send you a text to confirm your request. If you do not want to receive a confirmation text message, you may opt out by sending an email to texthelp@livenation.com (mailto:texthelp@livenation.com) with your request and mobile device number. It may take us up to 10 days to remove your mobile device number from our database. For additional help, text "HELP" to the shortcode provided, or email texthelp@livenation.com (mailto:texthelp@livenation.com).

You authorize your wireless carrier to disclose information about your account, such as subscriber status, payment method, and device details, if available, to support identity verification, fraud avoidance, and other uses in support of transactions for the duration of your business relationship with us. Information may also be shared with other service providers to further support identity verification and fraud prevention.

We are not responsible for the accuracy of any information displayed in our mobile messaging, for any misdelivery or untimely delivery of any mobile messaging, or for your deletion of or failure to store any mobile messaging from us.

## 12. Mobile Device Application

If you install or use our mobile application, software, and services, including any accompanying documentation (collectively, the "App"), we grant you a limited right to install and use the App on a single authorized device located in the United States and its territories, or in another country where we may offer the App. You may use the App for your personal, non-commercial, and entertainment purposes only. We do not grant you any rights to any related documentation, support, upgrades, maintenance, or other enhancements to the App. We will not provide you with any device, internet access, or wireless connection to use the App. We are not responsible for any interaction between you and another App user, or information you transmit through the App (including your location).

## 13. Violation of the Terms

We may investigate any violation of the Terms, including unauthorized use of the Site. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you. We may take legal action (consistent with Section 17 (https://help.livenation.com/s/article/Terms-of-Use?language=en_US#section17) , below) that we feel is appropriate. You agree that monetary damages may not provide us a sufficient remedy, and that we may

Exhibit 30
Page 105

**2-ER-135**

3/7/22, 6:24 PM                                    Terms of Use

pursue injunctive or other relief for your violation of the Terms. If we determine that you have violated the
Terms or the law, or for any other reason or for no reason, we may cancel your account, delete all your User
Content, and prevent you from accessing the Site at any time without notice to you. If that happens, you may
no longer use the Site or any Content. You will still be bound by your obligations under the Terms. You agree
that we will not be liable to you or any third party for termination of your access to the Site or to your
account or any related information, and we will not be required to make the Site or your account or any
related information available to you. We may also cancel any ticket or merchandise order, and tickets or
merchandise acquired through your order. We may refuse to honor pending and future purchases made from
all accounts we believe may be associated with you, or cancel a ticket or ticket order associated with any
person we believe to be acting with you, or cancel your ticket postings, or exercise any other remedy
available to us.

You agree that your abusive use of the Site may cause damage and harm to us, including impaired goodwill,
lost sales, and increased expenses. You also agree that monetary damages for your abusive use of the Site
are difficult to determine, and that if you, or others acting with you, request more than 1,000 pages of the Site
or make more than 800 reserve requests on the Site in any 24-hour period, you, and those acting with you,
will be jointly and severally liable for liquidated damages in the amount of twenty-five cents ($0.25) for each
page request or reserve request made during that 24-hour period which exceeds those limits.

## 14. Disclaimer of Warranties

WE PROVIDE THE SITE AND THE CONTENT TO YOU "AS IS" AND "AS AVAILABLE". WE TRY TO KEEP THE
SITE UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. TO THE FULLEST EXTENT
PERMISSIBLE BY LAW, AND TO THE EXTENT THAT APPLICABLE LAW PERMITS THE DISCLAIMER OF
EXPRESS OR IMPLIED WARRANTIES, WE DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING
ANY WARRANTY OF TITLE, NON-INFRINGEMENT, ACCURACY, MERCHANTABILITY, FITNESS FOR A
PARTICULAR PURPOSE, OR WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING OR COURSE OF
PERFORMANCE OR USAGE OF TRADE. WE DO NOT GUARANTEE THAT THE SITE WILL ALWAYS BE SAFE,
SECURE, OR ERROR-FREE, OR THAT THE SITE WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS,
OR IMPERFECTIONS. WE ARE NOT RESPONSIBLE FOR THE ACTIONS OR INFORMATION OF THIRD
PARTIES, AND YOU RELEASE US FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING
OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES.
IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE § 1542, WHICH SAYS: A
GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES
NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND
THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH
THE DEBTOR OR RELEASED PARTY.

## 15. Limitation of Liability

IN NO EVENT WILL WE OR OUR EVENT ORGANIZERS, SUPPLIERS, ADVERTISERS, AND SPONSORS, BE
RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND
EXPRESSLY WAIVE ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL
DAMAGES OF ANY TYPE, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED,
ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE CONTENT, OR ANY PRODUCT OR SERVICE
PURCHASED THROUGH THE SITE, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH
DAMAGES, AND REGARDLESS OF WHETHER THE CLAIM IS BASED UPON ANY CONTRACT, TORT, OR
OTHER LEGAL OR EQUITABLE THEORY. WITHOUT LIMITING THE FOREGOING, YOU EXPRESSLY
ACKNOWLEDGE AND AGREE THAT WE WILL HAVE NO LIABILITY OR RESPONSIBILITY WHATSOEVER FOR
(a) ANY FAILURE OF ANOTHER USER OF THE SITE TO CONFORM TO THE CODES OF CONDUCT,
(b) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, WHETHER ARISING IN

Exhibit 30
Page 106

**2-ER-136**

3/7/22, 6:24 PM                                    Terms of Use

CONTRACT OR IN TORT, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE, (c) ANY
UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL
INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (d) ANY BUGS, VIRUSES, WORMS,
TROJAN HORSES, DEFECTS, DATE BOMBS, TIME BOMBS, OR OTHER ITEMS OF A DESTRUCTIVE NATURE
WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SITE, (e) ANY ERRORS, MISTAKES, INACCURACIES,
OR OMISSIONS IN ANY CONTENT, OR (f) ANY LOST, STOLEN, OR DAMAGED TICKETS, OR THE FAILURE OF
A VENUE TO HONOR A TICKET. YOUR SOLE AND EXCLUSIVE REMEDY FOR DISSATISFACTION WITH THE
SITE IS TO STOP USING THE SITE. THE LIMITATIONS IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED
REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THE ALLOCATION OF RISK BETWEEN US IS AN ESSENTIAL
ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN US. OUR AGGREGATE LIABILITY ARISING OUT OF
THE TERMS OR THE USE OF THE SITE WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS
($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. IN NO EVENT WILL
ATTORNEYS' FEES BE AWARDED OR RECOVERABLE. OUR LIABILITY WILL BE LIMITED UNDER THIS
PARAGRAPH TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND THE PROVISIONS OF THIS
PARAGRAPH WILL NOT APPLY TO THE EXTENT APPLICABLE LAW PERMITS THE RECOVERY OF DAMAGES,
ATTORNEYS' FEES, OR COSTS OTHERWISE PROHIBITED UNDER THIS PARAGRAPH.  THE PROVISIONS OF
THIS PARAGRAPH THAT (a) PROHIBIT DAMAGES TO BE MULTIPLIED OR OTHERWISE INCREASED,
(b) IMPOSE A DAMAGES LIMITATION OF THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE
AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS, AND (c) PROHIBIT THE RECOVERY OF
ATTORNEYS' FEES AND COSTS, DO NOT APPLY IN CERTAIN STATES, INCLUDING WITHOUT LIMITATION
NEW JERSEY, TO CLAIMS BROUGHT UNDER STATUTES PERMITTING SUCH RECOVERY.

## 16. Indemnification

If anyone brings a claim against us related to your use of the Site, the Content, your User Content, or your
violation of the Terms, you agree to indemnify, defend, and hold us and our affiliated companies, Event
Organizers, suppliers, advertisers, and sponsors, and each of our officers, directors, employees, and agents,
harmless from and against any and all claims, damages, losses, and expenses of any kind (including
reasonable legal fees and costs). We reserve the right to take exclusive control and defense of any claim, and
you will cooperate fully with us in asserting any available defenses.

## 17. Mandatory Arbitration Agreement and Class Action Waiver

YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY DISPUTE, CLAIM, OR
CONTROVERSY RELATING IN ANY WAY TO THE TERMS, YOUR USE OF THE SITE, OR PRODUCTS OR
SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN
THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY BINDING, INDIVIDUAL
ARBITRATION AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH
AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS
AGAINST EACH OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER
IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

Exceptions. The arbitration agreement and class action waiver set forth in this Section 17 shall be subject to
these limited exceptions:

You may assert claims in small claims court if your claims apply.

- If a claim involves the conditional license granted to you as described in the Ownership of Content and
  Grant of Conditional License section (Section 3 (https://help.ticketmaster.com/s/article/Terms-of-Use?
  language=en_US#section3)) above, either of us may file a lawsuit in a federal or state court located

https://help.livenation.com/s/article/Terms-of-Use?language=en_US                                          10/15

Exhibit 30
Page 107

2-ER-137

3/7/22, 6:24 PM                                    Terms of Use

within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes.

- In the event that the arbitration agreement in the Terms is for any reason held to be unenforceable, any litigation against us (except for small claims court actions) may be commenced only in a federal or state court located within Los Angeles County, California, and you and we each consent to the jurisdiction of those courts for such purposes.

- You and we each retain the right to participate in class-wide settlement of claims.

**Informal Dispute Resolution.** You and we each recognize and agree that good faith, informal efforts to resolve disputes often result in prompt, low-cost, and mutually beneficial outcomes. Therefore, you and we each agree that, before either of us may commence an arbitration or assert a claim in small claims court, you and we will engage in the following informal dispute resolution process:

- The party seeking to initiate a claim in arbitration or small claims court ("claimant") must give written notice to the other party ("respondent"). To notify us that you intend to initiate informal dispute resolution, you must send an email to Live Nation Entertainment, Inc. at disputes@livenation.com (mailto:disputes@livenation.com), providing: your full name; the email address and mailing address associated with your Live Nation or Ticketmaster account; your counsel's name and contact information, if you are represented by counsel; and a brief description of your claim(s) and the relief sought. To notify you that we intend to initiate informal dispute resolution, we will email you at the email address associated with your Live Nation or Ticketmaster account and provide a brief description of our claim(s) and the relief sought, and our counsel's name and contact information.

- You and we will then personally meet and confer, via teleconference or videoconference, in a good faith effort to informally resolve any claim covered by this mutual arbitration agreement. If either you or us is represented by counsel, that counsel may participate in the informal dispute resolution conference.

- All offers, promises, conduct, and statements made in the course of the informal dispute resolution process by any party, its agents, employees, and attorneys are confidential and not admissible for any purpose in any subsequent proceeding, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the informal dispute resolution process.

- The informal dispute resolution conference shall occur within sixty (60) days of receipt of the written notice described above, unless an extension is mutually agreed upon by you and us. If, after participating in that conference, you and we have been unable to resolve the dispute, the claimant may commence an arbitration or assert a claim in small claims court in accordance with this arbitration agreement.

- Any statute of limitations will be tolled while you and we engage in the informal dispute resolution process described in this section.

**Governing Law; Interpretation and Enforcement.** The arbitration agreement in the Terms is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA"), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver. State arbitration laws do not govern in any respect. Further, you and we each agree that the Terms evidence a transaction involving interstate commerce, and will be governed by and construed in accordance with federal law to the fullest extent possible.

**Arbitration Generally; Relief Available**. There is no judge or jury in arbitration, and court review of an arbitration award is limited pursuant to the FAA. However, an arbitrator can award on an individual basis the

Exhibit 30
Page 108

**2-ER-138**

3/7/22, 6:24 PM                                    Terms of Use

same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and
must follow the Terms as a court would. For the avoidance of doubt, the arbitrator can award public
injunctive relief if authorized by law and warranted by the individual claim(s).

**Arbitration Proceedings and Rules.** The following rules and procedures shall apply:

- Any arbitration will be administered by New Era ADR in accordance with their Virtual Expedited
  Arbitration Rules and Procedures, as well as any applicable General Rules and Procedures, except as
  modified by the Terms. New Era ADR's Virtual Expedited Arbitration Rules and Procedures and General
  Rules and Procedures are both available at www.neweraadr.com/rules-and-procedures/
  (http://www.neweraadr.com/rules-and-procedures/).

- The arbitrator shall be selected pursuant to New Era ADR's standard rank and strike process, as set forth
  in New Era ADR's General Rules and Procedures.

- To increase the efficiency of administration and resolution of arbitrations: in the event of a claim seeking
  equitable relief (including injunctive relief), the arbitrator shall bifurcate the proceeding and rule on
  liability first, before conducting any proceedings (including discovery) related to the appropriate relief.

- Unless applicable law provides otherwise, the arbitration proceeding and all records pertaining to it—
  including but not limited to any documents prepared or produced in connection with the arbitration
  proceeding, as well as the hearing and the arbitration award—will be confidential and will not be
  disclosed to any third party, except as necessary to obtain court confirmation of the arbitration award.

In the event that New Era ADR is unable to conduct the arbitration for any reason, the arbitration will be
conducted by FairClaims pursuant to its FastTrack Rules & Procedures, and/or any applicable rules for
consumer arbitrations, available at www.fairclaims.com (http://www.fairclaims.com). In the event that
FairClaims is unable to conduct the arbitration for any reason, you and we will mutually select an alternative
arbitration provider, and the arbitration will be conducted pursuant to that provider's applicable rules. If,
pursuant to this paragraph, the arbitration is conducted by an arbitration provider other than New Era ADR,
references to New Era ADR and its rules in the Terms shall be construed as references to that arbitration
provider and its applicable rules.

**Commencing an Arbitration.** A party who has complied with the informal dispute resolution provisions
described above, and who wishes to start arbitration, must submit a Demand for Arbitration and a copy of
the Terms to New Era ADR at app.neweraadr.com (https://app.neweraadr.com/users/sign_in), and must also
give notice to the other party. If the notice is being sent to us, it must be emailed to Live Nation
Entertainment, Inc. at disputes@livenation.com (mailto:disputes@livenation.com). If the notice is being sent to
you, it will be sent to the email address associated with your Live Nation or Ticketmaster account.

**Arbitration Fees and Costs.** If you commence an arbitration in accordance with the Terms, you will be
required to pay New Era ADR's $300 filing fee. You will not be responsible for paying any other fees for the
arbitration, other than the filing fee; all other fees or expenses charged by New Era ADR will be paid by us
(unless the arbitrator finds that either the substance of your claim or the relief sought is frivolous or brought
for an improper purpose). Further, if New Era ADR determines that you are unable to pay any part of the
filing fee, we will pay that part too.

In the event that the arbitration is conducted by a different arbitration provider in accordance with the
Terms, payment of any filing, administration, or arbitrator fees shall be governed by that provider's rules.

You and we each agree that New Era ADR, FairClaims, JAMS, and any other arbitration provider selected

https://help.livenation.com/s/article/Terms-of-Use?language=en_US                                    12/15

Exhibit 30
Page 109

**2-ER-139**

3/7/22, 6:24 PM                                         Terms of Use

pursuant to the Terms has discretion to modify the amount or timing of any fees due under any applicable rules or fee schedules, and further agree not to oppose any modifications to the timing or amount of any fees due—provided that such modifications do not increase the fees to either you or us.

**Attorneys' Fees.** You are responsible for your own attorneys' fees; we will not pay any attorneys' fees unless ordered to do so by the arbitrator. For the avoidance of doubt, in cases where a statute gives you the right to recover attorneys' fees if you prevail, the arbitrator may award attorneys' fees pursuant to that statute.

**Delegation; Interpretation.** The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable; however, in the event of a dispute about which particular version of this Agreement you agreed to, a court will decide that specific question. This arbitration agreement is intended to be broadly interpreted and will survive termination of the Terms.

**Limited Right to Appeal.** As explained above, court review of the arbitrator's decision is limited pursuant to the FAA; however, the Terms provide a limited right to appeal the arbitrator's decision to a panel of JAMS arbitrators, as set forth in this sub-section. Specifically, in the event that the arbitrator awards injunctive relief against either you or us, the party against whom injunctive relief was awarded may—within 21 days of the arbitrator's final decision—appeal that decision to JAMS, in accordance with the following procedure:

- Except as otherwise provided by the Terms, the appeal will be conducted pursuant to the JAMS Optional Arbitration Appeal Procedure, available at www.jamsadr.com (http://www.jamsadr.com).

- To commence an appeal, a party must submit the Demand for Arbitration Form available at www.jamsadr.com (http://www.jamsadr.com), and must also provide notice to the other party in the manner described above in this section.

- The JAMS appeal panel will consist of arbitrators who are either (a) retired state or federal judges or (b) licensed attorneys with at least 20 years of active litigation experience and substantial expertise in the substantive laws applicable to the subject matter of the dispute.

- The JAMS appeal panel will conduct a de novo review of the arbitrator's decision.

- Except as provided in the FAA, there will be no right of appeal from the JAMS appeal panel's decision.

**Special Provision Regarding Resale Tickets for Events Located in Illinois.** Solely for the purpose of complying with the Illinois Ticket Sale and Resale Act, 815 ILCS 414/1.5 et seq., if your dispute regards the resale of a ticket for any event located in the State of Illinois, then the following applies: You may submit any complaint you may have to New Era ADR as an arbitration demand, in accordance with the rules and procedures outlined in this section, and any such claims shall be decided by an independent arbitrator in accordance with the Terms. Without waiving the agreement to arbitrate or any other terms in this Section 17, you also agree to submit to the jurisdiction of the State of Illinois for any complaints involving a ticketed event held in Illinois. For the sake of clarity, your agreement to submit to the jurisdiction of the State of Illinois for any complaint involving a ticketed event held in Illinois does not in any way waive your and our agreement to arbitrate, or the scope of arbitration, but simply means that—for any court proceeding that may take place in conjunction with an arbitration (e.g., a motion to enforce an arbitration award), or in the event the arbitration agreement is held unenforceable—you agree to submit to jurisdiction in Illinois. If you have an inquiry regarding a ticket resale transaction made for any event located in Illinois, please contact us at 550 W. Van Buren Street, 13th Floor, Chicago, Illinois 60607 or (877) 446-9450.

## 18. No Reliance and Forward-Looking Statements

Exhibit 30
Page 110

**2-ER-140**

3/7/22, 6:24 PM                                        Terms of Use

The information contained on the Site may not be current and should not be used or relied on for any
investment decision regarding our securities or for any similar purpose. We file annual, quarterly, and current
reports, proxy statements, and other information with the United States Securities and Exchange Commission
("SEC"). Copies of our filings are available at www.investors.livenationentertainment.com
(http://www.investors.livenationentertainment.com)  and also at the SEC's website at www.sec.gov
(http://www.sec.gov/).

Statements on the Site regarding our financial condition, results of operations and business, and our
expectations or beliefs concerning future events that are not historical facts are "Forward-Looking
Statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Use of the words
"believes," "expects," "anticipates," "plans," "estimates," or words of similar meaning are intended to identify
Forward-Looking Statements but are not the exclusive means of identifying such statements. We caution you
that there are some known and unknown factors that could cause actual results to differ materially from any
future results, performance, or achievements expressed or implied by such Forward-Looking Statements,
including but not limited to economic, competitive, governmental, and technological factors affecting our
operations, markets, products, services, and prices, as well as the risks and uncertainties set forth in the
documents we file with the SEC, specifically the section titled "Item 1A. Risk Factors" of our most recent
Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. We do
not undertake any obligation to publicly update or revise any Forward-Looking Statements because of new
information, future events, or otherwise.

## 19. Severability

It is our belief that the Terms do not contain any provision contrary to law. However, if any part of the Terms
is determined to be illegal, invalid, or unenforceable, you agree that: (a) that part shall nevertheless be
enforced to the extent permissible in order to effect the intent of the Terms, and (b) the remaining parts shall
be deemed valid and enforceable.

## 20. Questions

If you have any questions, comments, or complaints regarding the Terms or the Site, please contact us at:

Live Nation Entertainment, Inc.
Attn: General Counsel
9348 Civic Center Drive
Beverly Hills, CA 90210
(800) 653-8000
LNELegal@livenation.com (mailto:LNELegal@livenation.com)

California users may also contact the Complaint Assistance Unit of the Division of Consumer Services,
California Department of Consumer Affairs, located at 1625 North Market Blvd., Sacramento, CA 95834, (800)
952-5210.

Policy & Security
(/s/topic/0TO0a000000kVehGAE/p…

## Related Articles

Gift Card Terms of Use (/s/article/Gift-Card-Terms-and-Conditions)

Exhibit 30
Page 111

**2-ER-141**

3/7/22, 6:24 PM                                                        Terms of Use

Terms Regarding Certain Cancelled, Rescheduled, Postponed and Moved Events (COVID-19) (/s/article/Terms-Regarding-Certain-Cancelled-Rescheduled-and-Postponed-Events)

How to use Promo Codes (/s/article/How-to-use-Promo-Codes)

American Express Terms and Conditions for Membership Rewards (/s/article/American-Express-Terms-and-Conditions-for-Membership-Rewards)

How to use Klarna and Buy Now, Pay Later (/s/article/How-to-use-Klarna-and-Buy-Now-Pay-Later)



(https://concerts.livenation.com/h/customer_serve.html?_ga=2.8882998.2068725751.1542300512-1646836460.1542300512)

LIVE NATION (http://livenation.com/)By Continuing past this page you agree to our Terms of Use (https://help.livenation.com/s/article/Terms-of-Use?language=en_US&tm_link=tm_i_terms) (https://livenation.app.link/taPUd0pRWE) (https://livenation.app.link/xl7kcExRWE)

© 2022 LIVE NATION WORLDWIDE, INC                    Privacy Policy (http://www.livenation.com/h/privacy.html?tm_link=tm_i_privacy)    Ad Choices (http://concerts.livenation.com/h/ad-choices.html?tm_link=help_nav_5_adchoices)    AODA (http://livenation.com/canada-accessibility-for-ontarians-with-disabilities)

Exhibit 30
Page 112

**2-ER-142**

# EXHIBIT 31

Exhibit 31
Page 113

2-ER-143

2/17/2021                                                          Terms of Use

on/sports?tm_link=tm_sports_header)        Arts and Theatre (https://www.ticketmaster.com/section/arts-theater?tm_link=tm_arts_header)        Family (https://www.ticketmaste

POLICY & SECURITY
(/S/TOPIC/0TO0A000000Q41VGA...

### Terms of Use

Article

●
Terms of Use

_____

Last Updated: January 1, 2021

Welcome! The following are the terms of use ("Terms") that govern your use of Live Nation and Ticketmaster's sites and mobile applications—including without limitation www.livenation.com (https://www.livenation.com/), www.ticketmaster.com (http://www.ticketmaster.com/), and www.ticketexchangebyticketmaster.com (https://www.ticketexchangebyticketmaster.com/)—( collectively, the "Site"), and your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services.

Our Privacy Policy (https://help.ticketmaster.com/s/article/Live-Nation-Entertainment-Privacy-Policy-Your-Privacy-Rights?language=en_US), Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy?language=en_US), and any other policies, rules or guidelines that may be applicable to particular offers or features on the Site are also incorporated into these Terms. By visiting or using the Site, you expressly agree to these Terms, as updated from time to time.

Please note that while some of the events listed on the Site may appeal to children, the Site is not targeted at children under the age of 13, and they are not permitted to use the Site. We strongly encourage all parents and guardians to monitor the Internet use by their children. If you use the Site, you affirm you are at least 13 years old.

### NOTICE REGARDING FUTURE CHANGES TO TERMS:

We may make changes to these Terms at any time. Any changes we make will be effective immediately when we post a revised version of these Terms on the Site. The "Last Updated" date above will tell you when these Terms were last revised. By continuing to use this Site after that date, you agree to the changes.

### NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:

These Terms contain an arbitration agreement and class action waiver, whereby you agree that any dispute or claim relating in any way to your use of the Site, or to products or services sold, distributed, issued, or serviced by us or through us, will be resolved by binding, individual arbitration, rather than in court, and you waive your right to participate in a class action lawsuit or class-wide arbitration. We explain this agreement and waiver, along with some limited exceptions, in Section 17 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17), below.

### COVID-19 WARNING:

An inherent risk of exposure to COVID-19 exists in any place where people gather. COVID-19 is an extremely contagious disease that can lead to severe illness and death. **You assume all risks, hazards, and dangers arising from or relating in any way to the risk of contracting a communicable disease or illness**—including, without limitation, exposure to COVID-19 or any other bacteria, virus, or other pathogen capable of causing a communicable disease or illness, whether that exposure occurs before, during, or after the event, and regardless of how caused or contracted—and you hereby waive any and all claims and potential claims against Ticketmaster, Live Nation, and the Event Organizer (as defined in our Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy?language=en_US))—and against any companies affiliated with Ticketmaster, Live Nation, or the Event Organizer—relating to such risks, hazards, and dangers.

### Table of Contents

1. Account Registration
2. Code of Conduct
3. Ownership of Content and Grant of Conditional License
4. Making Purchases
5. Forums and User Content
6. Claims of Copyright Infringement on the Site
7. Links
8. Parental Controls
9. Access from Outside the United States
10. Rules for Sweepstakes, Contests and Games
11. Mobile Messaging
12. Mobile Device Application
13. Violation of these Terms
14. Disclaimer of Warranties
15. Limitation of Liability
16. Indemnification
17. Disputes, Including Mandatory Arbitration and Class Action Waiver (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17)
18. No Reliance on Forward-Looking Statements
19. Severability
20. Questions

### 1. Account Registration

You may browse the Site without registering for an account. You will be required to register for an account to use certain features of the Site, such as reserving or purchasing a ticket. Your account username may not include the name of another person with the intent to impersonate that person, or be offensive, vulgar or obscene. Your account username and password are personal to you. You will be responsible for the confidentiality and use of your username and password, and for all activities

Exhibit 31
Page 114

**2-ER-144**

2/17/2021                                              Terms of Use

(including purchases) that are conducted through your account. You may not transfer or sell access to your account. We will not be liable for any harm related to disclosure of your username or password or the use by anyone else of your username or password. You may not use another user's account without that user's permission. You will immediately notify us in writing if you discover any unauthorized use of your account or other account-related security breach. We may require you to change your username and/or password if we believe your account is no longer secure or if we receive a complaint that your username violates someone else's rights. You will have no ownership in your account or your username. We may refuse registration, cancel an account or deny access to the Site for any reason.

## 2. Code of Conduct

You agree that you will comply with all applicable laws, rules and regulations, and that you will not:

- Restrict or inhibit any other person from using the Site;

- Use the Site for any unlawful purpose;

- Express or imply that any statements you make are endorsed by us, without our prior written consent;

- Impersonate any person or entity, whether actual or fictitious, including any employee or representative of our company;

- Submit (a) any content or information that is unlawful, fraudulent, libelous, defamatory, or otherwise objectionable, or infringes our or any third party's intellectual property or other rights; (b) any non-public information about companies without authorization; or (c) any advertisements, solicitations, chain letters, pyramid schemes, surveys, contests, investment opportunities or other unsolicited commercial communication;

- Submit, or provide links to, any postings containing material that could be considered harmful, obscene, pornographic, sexually explicit, indecent, lewd, violent, abusive, profane, insulting, threatening, harassing, hateful or otherwise objectionable, includes the image or likeness of individuals under 18 years of age, encourages or otherwise depicts or glamorizes drug use (including alcohol and cigarettes), characterizes violence as acceptable, glamorous or desirable, or contains any personal contact information or other personal information identifying any third party;

- Submit, or provide links to, any postings containing material that harasses, victimizes, degrades, or intimidates an individual or group of individuals on the basis of religion, race, ethnicity, sexual orientation, gender, age, or disability;

- Engage in spamming or flooding;

- Harvest or collect information about Site users;

- Order, or attempt to order, a number of tickets for an event that exceeds the stated limit for that event;

- Use any password or code to participate in a presale or other offer on the Site if you did not receive the password or code from us, or if you violate the terms of the presale or offer;

## 3. Ownership of Content and Grant of Conditional License

The Site and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that reside or are viewable or otherwise discoverable on the Site, and all tickets obtained from the Site, (collectively, the "Content") are owned by us or our licensors. We own a copyright and, in many instances, patents and other intellectual property in the Site and Content. We may change the Content and features of the Site at any time.

We grant you a limited, conditional, no-cost, non-exclusive, non-transferable, non-sub-licensable license to view this Site and its Content as permitted by these Terms for non-commercial purposes only if, as a condition precedent, you agree that you will not:

- Submit any software or other materials that contain any viruses, worms, Trojan horses, defects, date bombs, time bombs or other items of a destructive nature;

- Manipulate identifiers, including by forging headers, in order to disguise the origin of any posting that you submit;

- Link to any portion of the Site other than the URL assigned to the home page of the Site;

- "Frame" or "mirror" any part of the Site;

- Modify, adapt, sub-license, translate, sell, reverse engineer, decompile or disassemble any portion of the Site, or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Content;

- Remove any copyright, trademark or other proprietary rights notices contained on the Site;

- Use any computer program, bot, robot, spider, offline reader, site search/retrieval application or other manual or automatic device, tool, or process to retrieve, index, data mine, or in any way reproduce or circumvent the security structure, navigational structure, or presentation of the Content or the Site, including with respect to any CAPTCHA displayed on the Site. Operators of public search engines may use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials. We may revoke this exception at any time and require removal of archived materials gathered in the past;

- Use any automated software or computer system to search for, reserve, buy or otherwise obtain tickets, discount codes (including Concert Cash® and Ticketmaster Ticket Cash™), promotional codes, vouchers, credits, gift cards or any other items available on the Site, including sending information from your computer to another computer where such software or system is active;

- Take any action that imposes or may impose (in our sole discretion) an unreasonable or disproportionately large load on our infrastructure;

- Access, reload, or refresh transactional event or ticketing pages, or make any other request to transactional servers, more than once during any three-second interval;

- Request more than 1,000 pages of the Site in any 24-hour period, whether alone or with a group of individuals;

- Make more than 800 reserve requests on the Site in any 24-hour period, whether alone or with a group of individuals;

- Reproduce, modify, display, publicly perform, distribute or create derivative works of the Site or the Content;

- Reproduce or scan tickets in a format or medium different from that provided by the Site;

- Decode, decrypt, modify, or reverse engineer any tickets or underlying algorithms or barcodes used on or in production of tickets or the Site;

- Use the Site or the Content in an attempt to, or in conjunction with, any device, program or service designed to circumvent any technological measure that effectively controls access to, or the rights in, the Site and/or Content in any way including, without limitation, by manual or automatic device or process, for any purpose;

https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US                                        2/7

Exhibit 31
Page 115

2/17/2021                                                                                  Terms of Use

- Use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

This License is expressly conditioned on your preexisting agreement to comply with, and your actual compliance with, each of the provisions described in this Ownership of Content and Grant of Conditional License section. This license exists only so long as you strictly comply with each of the provisions described in this section. Any use of the Site or Content by you or anyone acting on your behalf that does not strictly comply with each and every provision in this section exceeds the scope of the license granted to you herein, constitutes unauthorized reproduction, display, or creation of unauthorized derivative versions of the Site and Content, and infringes our copyrights, trademarks, patents and other rights in the Site and Content. You will not acquire any ownership rights by using the Site or the Content.

The registered and unregistered trademarks, logos, and service marks displayed on the Site are owned by us or our licensors. You may not use our trademarks, logos, and service marks in any way without our prior written permission. You may inquire about obtaining permission by contacting us at trademarks@livenation.com (mailto:trademarks@livenation.com).

### 4. Making Purchases

Please review our Purchase Policy (https://help.ticketmaster.com/s/article/Purchase-Policy), which (in addition to these Terms) will govern your purchase of any tickets or other products through the Site, including any refunds or exchanges. We may impose conditions on your use of any coupon, promotional code, credit, or gift card. You will pay all charges incurred by you or any users of your account and credit card (or other applicable payment mechanism) at the price(s) in effect when such charges are incurred, including any applicable taxes. You may only use credit or debit cards, gift cards or vouchers that belong to you or to people who expressly authorize you to use such payment methods. You may use Concert Cash® and Ticketmaster Ticket Cash™, only in accordance with the Code Terms of Use found at livenation.com/concertcash (http://promo.livenation.com/concertcash) or ticketmaster.com/ticketcash (https://www.ticketmaster.com/ticketcash), as applicable.

You may not attempt to conceal your identity by using multiple Internet Protocol addresses or email addresses, or by any other means, to conduct transactions on the Site.

You will not hold us liable if you do not comply with laws related to your transactions. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you.

If we are unable to verify or authenticate any information or tickets you provide during any registration, ordering, purchase, ticket posting, sale, authentication, delivery, payment or remittance process, or any other process, or if we are no longer able to verify or authorize your credit card or bank account information, your tickets may be cancelled, we may refuse to honor all pending and future ticket purchases made with those credit card or bank accounts and/or via any online accounts associated with those credit card or bank accounts. We may also prohibit you from using the Site.

You will not use ticket bot technology to search for, reserve, or purchase tickets through the Site; for the avoidance of doubt, this specifically prohibits you from using automated ticket purchasing software on the Site, and prohibits you from circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

### 5. Forums and User Content

We may host fan reviews, message boards, blog feeds, social media feeds and other forums found on the Site (collectively, "Forums"), and you may be able to submit suggestions, reviews, concepts, audio and video recordings, photographs, artwork or other materials to the Forums or other areas of the Site ("User Content").

By submitting User Content, you certify that you are at least 18 years old, or you are at least 13 years old and have obtained your parent's or legal guardian's express consent to submit User Content.

You own all rights to your User Content. If you submit User Content to the Site, you grant us a worldwide, non-exclusive, transferable, sublicensable, royalty-free right and license to use, reproduce, modify, create derivative works of, distribute, publicly perform, display, archive and commercialize your User Content, in our sole discretion, in all formats and in all media channels now known or hereinafter discovered, without any compensation or acknowledgment to you or anyone else. This license will not affect your ownership in your User Content, including the right to grant additional licenses to your User Content, except if it conflicts with these Terms. We are not obligated to post, display or otherwise use any User Content, or to attribute your User Content to you. You will not make or authorize any claim against us for our use of your User Content infringes any of your rights.

Statements, opinions, and reviews posted by participants in a Forum may be inaccurate, offensive, obscene, threatening, or harassing. We do not endorse and are not responsible for these postings. We will not be liable for any loss or harm caused by the posting or your reliance on information obtained through the postings.

You will be responsible for your User Content and the consequences of posting it. By submitting User Content, you represent to us that (i) you own, or have the necessary permission to submit the User Content and to grant the licenses to us under this section, and (ii) you have the written permission of every identifiable person in the User Content to use that person's name and likeness in the manner contemplated by the Site and these Terms or, if the person is a minor, the written permission of the minor's parent or legal guardian.

We will have the right (but not the obligation) to monitor the Site, the Forums and the User Content, and to disclose any User Content and the circumstances surrounding its submission in order to operate the Site properly, or to protect ourselves, our sponsors and our users, or to comply with legal obligations or governmental requests.

If we are notified that your User Content does not comply with these Terms, we may investigate the allegation and may decide to remove your User Content and cancel your account. We may also hold you liable for any User Content that infringes the rights of a third party and require you to pay or reimburse us for any amounts we believe are necessary to resolve any complaint.

### 6. Claims of Copyright Infringement on the Site

Under the Digital Millennium Copyright Act of 1998 (the "DMCA") if you believe in good faith that any content on the Site infringes your copyright, you may send us a notice requesting that the content be removed. The notice must include: (a) your (or your agent's) physical or electronic signature; (b) identification of the copyrighted work on our Site that is claimed to have been infringed (or a representative list if multiple copyrighted works are included in one notification); (c) identification of the content that is claimed to be infringing or the subject of infringing activity, including information reasonably sufficient to allow us to locate the content on the Site; (d) your name, address, telephone number and email address (if available); (e) a statement that you have a good faith belief that use of the content in the manner complained of is not authorized by you or your agent or the law; and (f) a statement that the information in the notification is accurate and, under penalty of perjury, that you or your agent is authorized to act on behalf of the copyright owner. If you believe that a notice of copyright infringement has been wrongly filed against you, you may send us a counter-notice. You may read more information about the DMCA at http://www.loc.gov/copyright (http://www.loc.gov/copyright).

Notices and counter-notices should be sent to General Counsel, Live Nation Entertainment, Inc., 9348 Civic Center Drive, Beverly Hills, CA 90210, copyrightofficer@livenation.com (mailto:copyrightofficer@livenation.com). There can be penalties for false claims under the DMCA. We suggest that you consult your legal advisor before filing a notice or counter-notice.

It is our policy to terminate, in appropriate circumstances, the access rights to the Site of repeat infringers.

https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US                                                    3/7

Exhibit 31
Page 116

2-ER-146

2/17/2021                                        Terms of Use

### 7. Links

The Site contains links to other websites that may not be owned or operated by us. The fact that we may link to those websites does not indicate any approval or endorsement of those websites. We have no control over those websites. We are not responsible for the content of those websites, or the privacy practices of those websites. We strongly encourage you to become familiar with the terms of use and practices of any linked website. Your use of other websites is at your own risk and is subject to the terms of those websites. It is up to you to take precautions to ensure that whatever links you select or software you download (whether from the Site or other sites) is free of viruses, worms, Trojan horses, defects, date bombs, time bombs, and other items of a destructive nature.

### 8. Parental Controls

We cannot prohibit minors from visiting our Site and must rely on parents and guardians to decide what materials are appropriate for children to view and purchase. There are parental control protections (such as computer hardware, software or filtering services) available that may assist you in limiting access to material that is harmful to minors. You can find information about parental controls at http://onguardonline.gov (http://onguardonline.gov/). We do not endorse the products or services listed on this website.

### 9. Access from Outside the United States

The Site is directed to people residing in the United States. We do not represent that Content available on or through the Site is appropriate or available in other locations. We may limit the availability of the Site or any service or product described on the Site to any person or geographic area at any time. If you choose to access the Site from outside the United States, you do so at your own risk.

### 10. Rules for Sweepstakes, Contests and Games

In addition to these Terms, sweepstakes, contests, games or other promotions (collectively, "Promotions") made available through the Site may have specific rules that are different from these Terms. By participating in a Promotion, you will become subject to those rules. We urge you to review the rules before you participate in a Promotion. Promotion rules will control over any conflict with these Terms, except in all instances the arbitration agreement and class action waiver set forth in Section 17, below, will control and apply.

### 11. Mobile Messaging

We offer browsing and mobile messaging services which may include alerts, Promotions, and offers for products. You may choose to receive mobile alerts by signing up or participating in a Promotion. If you do, you authorize us to use automated technology to send messages to the mobile phone number you supply when you sign up. Your consent to receive mobile communications is never required in order to purchase something from us.

Message and data rates may apply, according to your rate plan provided by your wireless carrier. We will not be responsible for any text messaging or other wireless charges incurred by you or by a person who has access to your wireless device or telephone number. You may not receive our alerts if your carrier does not permit text alerts. Your carrier may not allow you to use pre-paid phones or calling plans to receive alerts. We may send you a bounce back message for every message you send to us. Service may not be compatible with all wireless carriers or devices.

You may opt out of any alerts by replying to an alert with the text message "STOP" or by sending the text message "STOP" to the shortcode provided. If you opt out by sending us a text message, we will send you a text to confirm your request. If you do not want to receive a confirmation text message, you may opt out by sending an email to texthelp@livenation.com (mailto:texthelp@livenation.com)with your request and mobile device number. It may take us up to 10 days to remove your mobile device number from our database. For additional help, text "HELP" to the shortcode provided, or email texthelp@livenation.com (mailto:texthelp@livenation.com).

You authorize your carrier to disclose information about your account, such as subscriber status, payment method and device details, if available, to support identity verification, fraud avoidance and other uses in support of transactions for the duration of your business relationship with us. Information may also be shared with other service providers to further support identity verification and fraud prevention.

We are not responsible for the accuracy of any information displayed in our mobile messaging, for any misdelivery or untimely delivery of any mobile messaging, or your deletion or failure to store any mobile messaging from us.

### 12. Mobile Device Application

If you install or use our mobile application, software, and services, including any accompanying documentation (collectively, "App"), we grant you a limited right to install and use the App on a single authorized device located in the United States and its territories, or in another country where we may offer the App. You may use the App for your personal, non-commercial and entertainment purposes only. We do not grant you any rights to any related documentation, support, upgrades, maintenance, or other enhancements to the App. We will not provide you with any device, internet access, or wireless connection to use the App. We are not responsible for any interaction between you and another App user, or information you transmit through the App (including your location).

### 13. Violation of these Terms

We may investigate any violation of these Terms, including unauthorized use of the Site. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you. We may take legal action that we feel is appropriate. You agree that monetary damages may not provide us a sufficient remedy, and that we may pursue injunctive or other relief for your violation of these Terms. If we determine that you have violated these Terms or the law, or for any other reason or for no reason, we may cancel your account, delete all your User Content, and prevent you from accessing the Site at any time without notice to you. If that happens, you may no longer use the Site or any Content. You will still be bound by your obligations under these Terms. You agree that we will not be liable to you or any third party for termination of your access to the Site or to your account or any related information, and we will not be required to make the Site or your account or any related information available to you. We may also cancel any ticket or merchandise order, and tickets or merchandise acquired through your order. We may refuse to honor pending and future purchases made from all accounts we believe may be associated with you, or cancel a ticket or ticket order associated with any person we believe to be acting with you, or cancel your ticket postings, or exercise any other remedy available to us.

You agree that your abusive use of the Site may cause damage and harm to us, including impaired goodwill, lost sales, and increased expenses. You also agree that monetary damages for your abusive use of the Site are difficult to determine, and that if you, or others acting with you, request more than 1,000 pages of the Site or make more than 800 reserve requests on the Site in any 24-hour period, you, and those acting with you, will be jointly and severally liable for liquidated damages in the amount of twenty-five cents ($0.25) for each page request or reserve request made during that 24-hour period which exceeds those limits.

### 14. Disclaimer of Warranties

WE PROVIDE THE SITE AND THE CONTENT TO YOU "AS IS" AND "AS AVAILABLE." WE TRY TO KEEP THE SITE UP, BUG-FREE, AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMISSIBLE BY LAW, AND TO THE EXTENT THAT APPLICABLE LAW PERMITS THE DISCLAIMER OF EXPRESS OR IMPLIED WARRANTIES, WE DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF TITLE, NON-INFRINGEMENT, ACCURACY, MERCHANTABILITY,

Exhibit 31
Page 117

**2-ER-147**

2/17/2021 — Terms of Use

FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING OR COURSE OF PERFORMANCE OR USAGE OF TRADE. WE DO NOT GUARANTEE THAT THE SITE WILL ALWAYS BE SAFE, SECURE, OR ERROR-FREE, OR THAT THE SITE WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS, OR IMPERFECTIONS. WE ARE NOT RESPONSIBLE FOR THE ACTIONS OR INFORMATION OF THIRD PARTIES, AND YOU RELEASE US FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

## 15. Limitation of Liability

IN NO EVENT WILL WE OR ANY EVENT ORGANIZERS, SUPPLIERS, ADVERTISERS AND SPONSORS, BE RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND EXPRESSLY WAIVE ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY TYPE, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED, ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE CONTENT, OR ANY PRODUCT OR SERVICE PURCHASED THROUGH THE SITE, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF WHETHER THE CLAIM IS BASED UPON ANY CONTRACT, TORT, OR OTHER LEGAL OR EQUITABLE THEORY. WITHOUT LIMITING THE FOREGOING, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT WE WILL HAVE NO LIABILITY OR RESPONSIBILITY WHATSOEVER FOR (a) ANY FAILURE OF ANOTHER USER OF THE SITE TO CONFORM TO THE CODES OF CONDUCT, (b) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT OR IN TORT, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE, (c) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (d) ANY BUGS, VIRUSES, WORMS, TROJAN HORSES, DEFECTS, DATE BOMBS, TIME BOMBS OR OTHER ITEMS OF A DESTRUCTIVE NATURE WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SITE, (e) ANY ERRORS, MISTAKES, INACCURACIES OR OMISSIONS IN ANY CONTENT, OR (f) ANY LOST, STOLEN OR DAMAGED TICKETS, OR THE FAILURE OF A VENUE TO HONOR A TICKET. YOUR SOLE AND EXCLUSIVE REMEDY FOR DISSATISFACTION WITH THE SITE IS TO STOP USING THE SITE. THE LIMITATIONS IN THIS SECTION WILL APPLY EVEN IF ANY LIMITED REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THE ALLOCATION OF RISK BETWEEN US IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN US. OUR AGGREGATE LIABILITY ARISING OUT OF THESE TERMS OR THE USE OF THE SITE WILL NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS. IN NO EVENT WILL ATTORNEYS' FEES BE AWARDED OR RECOVERABLE. OUR LIABILITY WILL BE LIMITED UNDER THIS PARAGRAPH TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND THE PROVISIONS OF THIS PARAGRAPH WILL NOT APPLY TO THE EXTENT APPLICABLE LAW PERMITS THE RECOVERY OF DAMAGES, ATTORNEYS' FEES OR COSTS OTHERWISE PROHIBITED UNDER THIS PARAGRAPH. THE PROVISIONS OF THIS PARAGRAPH THAT (A) PROHIBIT DAMAGES TO BE MULTIPLIED OR OTHERWISE INCREASED; (B) IMPOSE A DAMAGES LIMITATION OF THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID US IN THE PAST TWELVE MONTHS, AND (C) PROHIBIT THE RECOVERY OF ATTORNEYS' FEES AND COSTS, DO NOT APPLY IN CERTAIN STATES, INCLUDING WITHOUT LIMITATION NEW JERSEY, TO CLAIMS BROUGHT UNDER STATUTES PERMITTING SUCH RECOVERY.

## 16. Indemnification

If anyone brings a claim against us related to your use of the Site, the Content, your User Content or your violation of these Terms, you agree to indemnify, defend and hold us and our affiliated companies, Event Organizers, suppliers, advertisers and sponsors, and each of our officers, directors, employees, and agents, harmless from and against any and all claims, damages, losses and expenses of any kind (including reasonable legal fees and costs). We reserve the right to take exclusive control and defense of any claim, and you will cooperate fully with us in asserting any available defenses.

## 17. Disputes, Including Mandatory Arbitration and Class Action Waiver

ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO YOUR USE OF THE SITE, OR TO PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY US OR THROUGH US, WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, RATHER THAN IN COURT, with the following exceptions:

- You may assert claims in small claims court if your claims apply;
- If a claim involves the conditional license granted to you as described in the Ownership of Content and Grant of Conditional License section (Section 3 (https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section3)) above, either of us may file a lawsuit in a federal or state court located within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes; and
- In the event that the arbitration agreement in these Terms is for any reason held to be unenforceable, any litigation against us (except for small-claims court actions) may be commenced only in a federal or state court located within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes.

The arbitration agreement in these Terms is governed by the Federal Arbitration Act (FAA, including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver discussed below. State arbitration laws do not govern in any respect.

This arbitration agreement is intended to be broadly interpreted and will survive termination of these Terms. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable.

There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages) and must follow these Terms as a court would. For the avoidance of doubt, the arbitrator can award public injunctive relief.

To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to: Live Nation Entertainment, Inc., 9348 Civic Center Drive, Beverly Hills, CA 90210, Attn: General Counsel. You may download the forms located at http://www.jamsadr.com (http://www.jamsadr.com/). The arbitration will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures or, if applicable, its Comprehensive Arbitration Rules and Procedures, and any applicable supplemental rules including its Consumer Arbitration Standards of Minimum Fairness. The JAMS Rules are available online at http://www.jamsadr.com (http://www.jamsadr.com/) or by calling (800) 352-5267. Payment of all filing, administration and arbitrator fees will be governed by JAMS's rules. We will automatically reimburse administration and arbitrator fees for claims totaling less than $10,000 regardless of who the prevailing party is (unless the arbitrator determines the claims are frivolous), but we will not pay for attorneys' fees unless ordered to do so by the arbitrator. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

We each agree that the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. YOU AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL OR TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.

You agree that these Terms evidence a transaction involving interstate commerce and will be governed by and construed in accordance with federal law to the fullest extent possible.

Exhibit 31
Page 118

**2-ER-148**

2/17/2021                                                                Terms of Use

However, pursuant to the Illinois Ticket Sale and Resale Act, 815 ILCS 414/1.5 et seq., if your dispute regards the re-sale of a ticket for any event located in the State of Illinois, then the following applies: You may submit complaints to JAMS under its rules and procedures, as outlined in this section, and any such claims shall be decided by an independent arbitrator in accordance with these Terms. You also agree to submit to the jurisdiction of the State of Illinois for any complaints involving a ticketed event held in Illinois. If you have an inquiry regarding a ticket re-sale transaction made for any event located in Illinois, please contact us at 550 W. Von Buren Street, 13th Floor, Chicago, Illinois 60607 or (877) 446-9450.

### 18. No Reliance and Forward-Looking Statements

The information contained on the Site may not be current and should not be used or relied on for any investment decision regarding our securities or for any similar purpose. We file annual, quarterly and current reports, proxy statements and other information with the United States Securities and Exchange Commission ("SEC"). Copies of our filings are available at the Investor Relations section of the Site and also at the SEC's website at www.sec.gov (http://www.sec.gov/).

Statements on the Site regarding our financial condition, results of operations and business and our expectations or beliefs concerning future events that are not historical facts are "Forward-Looking Statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Use of the words "believes," "expects," "anticipates," "plans," "estimates" or words of similar meaning is intended to identify Forward-Looking Statements but is not the exclusive means of identifying such statements. We caution you that there are some known and unknown factors that could cause actual results to differ materially from any future results, performance or achievements expressed or implied by such Forward-Looking Statements, including but not limited to economic, competitive, governmental, and technological factors affecting our operations, markets, products, services and prices, as well as the risks and uncertainties set forth in the documents we file with the SEC, specifically the section titled "Item 1A. Risk Factors" of our most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. We do not undertake any obligation to publicly update or revise any Forward-Looking Statements because of new information, future events or otherwise.

### 19. Severability

It is our belief that these Terms do not contain any provision contrary to law. However, if any part of these Terms is determined to be illegal, invalid, or unenforceable, you agree that: (a) that part shall nevertheless be enforced to the extent permissible in order to effect the intent of these Terms, and (b) the remaining parts shall be deemed valid and enforceable.

### 20. Questions

If you have any questions, comments or complaints regarding these Terms or the Site, please contact us at:

Live Nation Entertainment, Inc.
Attn: General Counsel
9348 Civic Center Drive
Beverly Hills, CA 90210
(800) 653-8000
Email (https://help.ticketmaster.com/s/article/How-do-I-contact-Customer-Service?language=en_US)

California users may also contact the Complaint Assistance Unit of the Division of Consumer Services, California Department of Consumer Affairs, located at 1625 North Market Blvd., Sacramento, CA 95834, (800) 952-5210.

Policy & Security
(/s/topic/0TO0o000000q41vGAA/p...

**Related Articles**

How do I purchase tickets for events powered by Ticketmaster Verified Fan? (/s/article/How-do-I-purchase-tickets-for-events-powered-by-Ticketmaster-Verified-Fan)

Can I get a partial refund or split my options between a refund and credit? (/s/article/Can-I-get-a-partial-refund-or-split-my-options-between-a-refund-and-credit)

How do I get a presale or offer code? (/s/article/How-do-I-get-a-presale-or-offer-code)

Purchase Policy (/s/article/Purchase-Policy)

Supplemental Terms for Tickets for the 2020/2021 NBA Season (/s/article/Supplemental-Terms-for-Tickets-for-the-2020-2021-NBA-Season)



Still haven't found what you were looking for?

Contact Us

(https://www.ticketmaster.com/h/customer-service.html?tm_link=help_nav_4_contact)

By continuing past this page, you agree to our Terms of Use. (https://www.ticketmaster.com/h/terms.html)   © Ticketmaster 2021   🇺🇸 United States

(https://www.facebook.com/Ticketmaster)   (https://twitter.com/ticketmaster)   (https://www.instagram.com/ticketmaster/?hl=en)   (https://www.youtube.com/ticketmaster)

(https://www.linkedin.com/company/ticketmaster)

Exhibit 31
Page 119

2-ER-149

2/17/2021                                              Terms of Use

Preferred Language

| English (US) | ▼ |

Exhibit 31
Page 120

**2-ER-150**

LATHAM & WATKINS LLP
 Daniel M. Wall (Bar No. 102580)
  *dan.wall@lw.com*
 Timothy L. O'Mara (Bar No. 212731)
  *tim.o'mara@lw.com*
 Andrew M. Gass (Bar No. 259694)
  *andrew.gass@lw.com*
 Kirsten M. Ferguson (Bar No. 252781)
  *kirsten.ferguson@lw.com*
 Alicia R. Jovais (Bar No. 296172)
  *alicia.jovais@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

*Attorneys for Defendants Ticketmaster L.L.C.*
*and Live Nation Entertainment, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>                    Defendants. | Case No. 2:22-cv-00047-GW-GJS<br><br>**DECLARATION OF HELENE GREEN IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>The Honorable George H. Wu<br><br>Hearing Date: May 26, 2022<br><br>Hearing Time: 8:30 a.m.<br><br>Courtroom: 9D, 9th Floor |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-151

1    I, HELENE GREEN, declare as follows:

2        1.    I am the Coordinator of Litigation and eDiscovery for Live Nation

3    Entertainment, Inc. ("Live Nation"), a Defendant in the above-entitled action and

4    the parent company of Defendant Ticketmaster L.L.C. ("Ticketmaster"). I make this

5    Declaration in support of Defendants' Motion to Compel Arbitration. The facts set

6    forth herein are based on my personal knowledge and my review of Ticketmaster

7    and Live Nation's records; if called upon to do so, I can and will competently testify

8    to these facts.

9        2.    I have worked for Live Nation for the past 13 years. Since November

10   2021, I have held the position of Coordinator of Litigation and eDiscovery. My

11   responsibilities in this role include gathering customer data for legal purposes. It is

12   the regular practice of Ticketmaster and Live Nation to create and maintain records

13   of when customers create their accounts, sign into their accounts, and make online

14   purchases. In my role as Coordinator of Litigation and eDiscovery, I am familiar

15   with those records, have access to them, and rely on them to carry out my job

16   responsibilities.

17

18                          **Plaintiff Skot Heckman**

19       3.    I understand that Plaintiff Skot Heckman alleges that (a) he "is a

20   resident of San Bruno, California," and (b) he "purchased primary and secondary

21   tickets … for events at major concert venues from Defendants' online platform

22   within the class period, including after Defendants adopted the New Era

23   agreement"—i.e., between 2010 and the present. Compl. ¶¶ 25, 131, ECF No. 1.

24       4.    I directed a search of Ticketmaster's customer records database (which

25   includes both Ticketmaster and Live Nation's ticket purchase transaction data) for

26   account activity and purchases made by anyone named Skot Heckman between 2010

27   and the present. I identified one Skot Heckman with an address in San Bruno,

28   California. There was no record of any other customer named Skot Heckman in the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-152

1 San Bruno, California area who used any Ticketmaster or Live Nation website to
2 purchase tickets during this period.

3     5.    The customer records database shows that Plaintiff Skot Heckman used
4 Ticketmaster and Live Nation's websites to purchase primary and secondary tickets
5 on a number of occasions between 2010 and the present.  Specifically, Heckman
6 used the Ticketmaster desktop site, the Ticketmaster mobile site, and the Live Nation
7 desktop site to purchase tickets more than 30 times during this period.

8     6.    For example, since July 2, 2021, Heckman has made the following
9 purchases on the Ticketmaster desktop site:

10     a. On July 23, 2021, Heckman used the Ticketmaster desktop site to
11     purchase primary tickets to Metallica: Sunday Show Only to be held
12     at the Chase Center on December 19, 2021.

13     b. On August 4, 2021, Heckman used the Ticketmaster desktop site to
14     purchase primary tickets to the Guns N' Roses 2021 Tour to be held
15     at the SAP Center in San Jose on August 25, 2021.

16     c. On November 18, 2021, Heckman used the Ticketmaster desktop
17     site to purchase primary tickets to Journey: Freedom Tour 2022 to
18     be held at the Chase Center on March 31, 2022.

19     d. On November 21, 2021, Heckman used the Ticketmaster desktop
20     site to purchase primary tickets to Golden State Warriors versus
21     Sacramento Kings to be held at the Chase Center on December 20,
22     2021.

23     7.    Also, as an example of a pre-July 2, 2021 purchase: on July 1, 2021,
24 Heckman used the Ticketmaster mobile site to purchase primary tickets to The Bay
25 Strikes Back Tour with Testament, Exodus, and Death Angel to be held at the Fox
26 Theater in Oakland on November 27, 2021.

27     8.    Certain events for which Heckman purchased tickets after July 2, 2021
28 had protocols related to COVID-19 in place when he made the purchase, while

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

1   others did not.  For instance, the Golden State Warriors game at the Chase Center on
2   December 20, 2021 (¶ 6(d), above) had special protocols related to COVID-19 in
3   place as of the date of Heckman's ticket purchase.  By contrast, the Metallica:
4   Sunday Show Only event at the Chase Center on December 19, 2021 (¶ 6(a), above)
5   did <u>not</u> have any special COVID-19 protocols in place as of the date of Heckman's
6   ticket purchase.

7       9.   I further directed a search of Ticketmaster's customer records database
8   (which includes both Ticketmaster and Live Nation's account creation data) for the
9   creation date associated with the account that Heckman used to purchase tickets on
10  more than 30 occasions.  This account was created on February 28, 2014.

11
12                            **Plaintiff Luis Ponce**

13      10.  I understand that Plaintiff Luis Ponce alleges that (a) he "is a resident
14  of Coral Springs, Florida," and (b) he "purchased primary tickets … for events at
15  major concert venues from Defendants' online platform within the class period,
16  including after Defendants adopted the New Era agreement"—i.e., between 2010
17  and the present.  Compl. ¶¶ 26, 131.

18      11.  I directed a search of Ticketmaster's customer records database (which
19  includes both Ticketmaster and Live Nation's ticket purchase transaction data) for
20  account activity and purchases made by anyone named Luis Ponce between 2010
21  and the present.  I identified one Luis Ponce with an address in Coral Springs,
22  Florida.  There was no record of any other customer named Luis Ponce in the Coral
23  Springs, Florida area who used any Ticketmaster or Live Nation website to purchase
24  tickets during this period.

25      12.  The customer records database shows that Plaintiff Luis Ponce used
26  Ticketmaster and Live Nation's websites to purchase primary tickets on a number
27  of occasions between 2010 and the present.  Specifically, Ponce used the
28  Ticketmaster desktop site, the Ticketmaster mobile site, the Live Nation desktop

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-154

1   site, and the Live Nation mobile site to purchase primary tickets more than 50 times

2   during this period.

3        13.    For example, since July 2, 2021, Ponce has made the following

4   purchases on the Ticketmaster mobile site:

5            a.  On August 5, 2021, Ponce used the Ticketmaster mobile site to

6               purchase primary tickets to Disco Divas: A Tribute to Diana Ross &

7               Donna Summer to be held at Aventura Arts & Cultural Center on

8               January 15, 2022.

9            b.  On August 21, 2021, Ponce used the Ticketmaster mobile site to

10              purchase primary tickets to Daryl Hall & John Oates to be held at

11              Hard Rock Live on September 22, 2021.

12           c.  On September 6, 2021, Ponce used the Ticketmaster mobile site to

13              purchase primary tickets to Rick Springfield to be held at Lillian S.

14              Wells Hall at The Parker on September 26, 2021.

15           d.  On September 21, 2021, Ponce used the Ticketmaster mobile site to

16              purchase primary tickets to Pat Benatar & Neil Giraldo to be held at

17              Lillian S. Wells Hall at The Parker on October 16, 2021.

18           e.  On November 18, 2021, Ponce used the Ticketmaster mobile site to

19              purchase primary tickets to Andrea Bocelli to be held at FLA Live

20              Arena on February 14, 2022.

21       14.    Also, as an example of a pre-July 2, 2021 purchase: on March 18, 2021,

22  Ponce used the Ticketmaster mobile site to purchase primary tickets to One Night of

23  Queen Performed by Gary Mullen and The Works to be held at Lillian S. Wells Hall

24  at The Parker on May 12, 2022.

25       15.    I did not locate any secondary ticket purchases by Plaintiff Luis Ponce

26  in the customer records database.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

16.    <u>None</u> of the events for which Ponce purchased tickets after July 2, 2021 had special protocols related to COVID-19 in place when he made his ticket purchases.

17.    I further directed a search of Ticketmaster's customer records database (which includes both Ticketmaster and Live Nation's account creation data) for the creation date associated with the account that Ponce used to purchase tickets on more than 50 occasions.  This account was created on September 21, 2004.

### Plaintiff Jeanene Popp

18.    I understand that Plaintiff Jeanene Popp alleges that (a) she "is a resident of Clayton, Ohio," and (b) she "purchased primary tickets … for events at major concert venues from Defendants' online platform within the class period, including after Defendants adopted the New Era agreement"—i.e., between 2010 and the present.  Compl. ¶¶ 27, 131.

19.    I directed a search of Ticketmaster's customer records database (which includes both Ticketmaster and Live Nation's ticket purchase transaction data) for account activity and purchases made by anyone named Jeanene Popp between 2010 and the present.  I identified one Jeanene Popp with an address in the Clayton, Ohio area.  There was no record of any other customer named Jeanene Popp in the Clayton, Ohio area who used any Ticketmaster or Live Nation website to purchase tickets during this period.

20.    The customer records database shows that Plaintiff Jeanene Popp used Ticketmaster and Live Nation's websites to purchase primary and secondary tickets on a number of occasions between 2010 and the present.  Specifically, Popp used the Ticketmaster desktop site, the Ticketmaster mobile site, and the Live Nation desktop site to purchase tickets more than 30 times during this period.

21.    For example, since July 2, 2021, Popp has made the following purchases on the Ticketmaster mobile and desktop sites:

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-156

1        a. On July 15, 2021, Popp used the Ticketmaster mobile site to

2           purchase primary tickets to Pat Benatar & Neil Giraldo to be held at

3           Canton Palace Theater on September 19, 2021.

4        b. On July 30, 2021, Popp used the Ticketmaster desktop site to

5           purchase primary tickets to Cheap Trick, Joan Jett & The

6           Blackhearts to be held at PNC Pavilion on August 27, 2021.

7        c. On August 2, 2021, Popp used the Ticketmaster desktop site to

8           purchase primary tickets to Daughtry: The Dearly Beloved Tour to

9           be held at Andrew J. Brady Music Center on November 2, 2021.

10      d. On August 28, 2021, Popp used the Ticketmaster mobile site to

11          purchase primary tickets to Cheap Trick to be held at Packard Music

12          Hall on November 10, 2021.

13      e. On September 4, 2021, Popp used the Ticketmaster mobile site to

14          purchase primary tickets to John Legend to be held at The Rose

15          Music Center at The Heights on September 4, 2021.

16      f. On September 30, 2021, Popp used the Ticketmaster mobile site to

17          purchase primary tickets to LeAnn Rimes to be held at Taft Theater

18          on December 15, 2021.

19      g. On September 30, 2021, Popp used the Ticketmaster mobile site to

20          purchase primary tickets to Rick Springfield to be held at Andrew J.

21          Brady Music Center on December 29, 2021.

22      h. On November 27, 2021, Popp used the Ticketmaster mobile site to

23          purchase primary tickets to WTTS Rock to Read Presents: An

24          Evening with Billy Idol & Steve Stevens to be held at Old National

25          Centre on November 27, 2021.

26    22.   Also, as an example of a pre-July 2, 2021 purchase: on April 30, 2021,

27 Popp used the Ticketmaster desktop site to purchase primary tickets to REO

28 Speedwagon to be held at The Rose Music Center at The Heights on June 30, 2021.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

23.     Certain events for which Popp purchased tickets after July 2, 2021 had special protocols related to COVID-19 in place when she made the purchase, while others did not.  For instance, the WTTS Rock to Read Presents: An Evening with Billy Idol & Steve Stevens event at the Old National Centre on November 27, 2021 (¶ 21(h), above) had special protocols related to COVID-19 in place as of the date of Popp's ticket purchase.  By contrast, the Cheap Trick, Joan Jett & The Blackhearts event at PNC Pavilion on August 27, 2021 (¶ 21(b), above) did <u>not</u> have any special COVID-19 protocols in place as of the date of Popp's ticket purchase.

24.     I further directed a search of Ticketmaster's customer records database (which includes both Ticketmaster and Live Nation's account creation data) for the creation date associated with the account that Popp used to purchase tickets on more than 30 occasions.  This account was created on February 24, 2015.

### Plaintiff Jacob Roberts

25.     I understand that Plaintiff Jacob Roberts alleges that (a) he "is a resident of Fort Lauderdale, Florida," and (b) he "purchased primary tickets … for events at major concert venues from Defendants' online platform within the class period, including after Defendants adopted the New Era agreement"—i.e., between 2010 and the present.  Compl. ¶¶ 28, 131.  I further understand that Roberts resides specifically in the town of Davie, Florida.

26.     I directed a search of Ticketmaster's customer records database (which includes both Ticketmaster and Live Nation's ticket purchase transaction data) for account activity and purchases made by anyone named Jacob Roberts between 2010 and the present.  I identified one Jacob Roberts with an address in Davie, Florida.  There was no record of any other customer named Jacobs Roberts in the Davie, Florida area who used any Ticketmaster or Live Nation website to purchase tickets during this period.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

27.    The customer records database shows that Plaintiff Jacob Roberts used Ticketmaster and Live Nation's websites to purchase primary tickets on a number of occasions between 2010 and the present.    Specifically, Roberts used the Ticketmaster desktop site, the Ticketmaster mobile site, the Live Nation desktop site, and the Live Nation mobile site to purchase primary tickets more than 90 times during this period.

28.    For example, since July 2, 2021, Roberts has made the following purchases on the Ticketmaster and Live Nation desktop and mobile sites:

    a.  On July 27, 2021, Roberts used the Ticketmaster mobile site to purchase primary tickets to Alanis Morissette with Special Guest Garbage to be held at iTHINK Financial Amphitheatre on August 18, 2021.

    b.  On September 10, 2021, Roberts used the Ticketmaster desktop site to purchase primary tickets to Tampa Bay Buccaneers versus Atlanta Falcons to be held at Raymond James Stadium on September 19, 2021.

    c.  On September 10, 2021, Roberts used the Ticketmaster desktop site to purchase primary tickets to The Nightmare Before Christmas to be held at Banc of California Stadium on October 31, 2021.

    d.  On October 6, 2021, Roberts used the Live Nation mobile site to purchase primary tickets to Jimmy Buffett and the Coral Reefer Band to be held at iTHINK Financial Amphitheatre on December 9, 2021.

    e.  On November 1, 2021, Roberts used the Live Nation desktop site to purchase primary tickets to Conan O'Brien Needs A Friend to be held at The Wiltern on November 3, 2021.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-159

f.  On November 5, 2021, Roberts used the Ticketmaster desktop site to purchase primary tickets to Sebastian Bach to be held at the Culture Room on November 6, 2021.

g.  On November 28, 2021, Roberts used the Live Nation mobile site to purchase primary tickets to 97X Next Big Thing to be held at Credit Union Amphitheatre at the FL State Fairgrounds on December 4, 2021.

h.  On December 7, 2021, Roberts used the Live Nation desktop site to purchase primary tickets to Iron Maiden: Legacy of the Beast World Tour 2022 to be held at USANA Amphitheatre on September 19, 2022.

i.  On December 10, 2021, Roberts used the Ticketmaster mobile site to purchase primary tickets to Weird Al Yankovic: Unfortunate Return of the Ill-Advised Vanity Tour to be held at Lillian S. Wells Hall at The Parker on October 12, 2022.

29.  Also, as an example of a pre-July 2, 2021 purchase: on June 4, 2021, Roberts used the Ticketmaster mobile site to purchase primary tickets to Guns N' Roses to be held at Hard Rock Live on October 3, 2021.

30.  I did not locate any secondary ticket purchases by Plaintiff Jacob Roberts in the customer records database.

31.  Certain events for which Roberts purchased tickets after July 2, 2021 had special protocols related to COVID-19 in place when he made the purchase, while others did not.  For instance, the Weird Al Yankovic: Unfortunate Return of the Ill-Advised Vanity Tour event at Lillian S. Wells Hall at The Parker on October 12, 2022 (¶ 28(i), above) had special protocols related to COVID-19 in place as of the date of Roberts's ticket purchase.  By contrast, the Sebastian Bach event at the Culture Room on November 6, 2021 (¶ 28(f), above) did <u>not</u> have any special COVID-19 protocols in place as of the date of Roberts's ticket purchase.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-160

1        32.    I further directed a search of Ticketmaster's customer records database

2    (which includes both Ticketmaster and Live Nation's account creation data) for the

3    creation dates associated with the accounts that Roberts used to purchase these

4    tickets.  Two accounts were used to make these purchases: one was created on

5    April 23, 2005, and one was created on August 30, 2021.

6

7        I declare under penalty of perjury that the foregoing is true and correct.

8    Executed on March 8, 2022.

9

10

11                                          Helene Green

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DECLARATION OF HELENE GREEN
CASE NO. 2:22-CV-00047-GW-GJS

2-ER-161

# EXHIBIT A

# New Era ADR Rules and Procedures

| | |
|---|---|
| **Types of Proceedings and Pricing** | **2** |
| Pricing | 2 |
| Mediation | 2 |
| Arbitration | 2 |
| General Provisions and Ancillary Services | 3 |
| Mediation | 4 |
| In General | 4 |
| Standard | 4 |
| With Binding Resolution | 4 |
| Arbitration | 4 |
| In General | 4 |
| Standard Arbitrations | 5 |
| Expedited/Mass Arbitrations | 5 |
| Moot Arguments | 5 |
| Partial | 5 |
| Whole | 5 |
| Subscription Pricing/Additional Services | 5 |
| Subscription Pricing | 5 |
| Additional Services | 6 |
| **General Rules and Procedures** | **6** |
| Applicability | 6 |
| Terms of Use | 7 |
| Confidentiality | 7 |
| Decorum/Sanctions | 8 |
| Location of Proceeding/Choice of Law | 8 |
| Independent Neutrals/Ultimate Authority | 8 |
| Agreement to Refer Disputes | 8 |
| Fees | 9 |
| Electronic Service | 9 |
| Assignment of Neutrals | 9 |
| Conflicts/Replacement of Neutrals | 10 |
| Commencement of Proceedings | 11 |
| Deadlines | 11 |

Witnesses                                                                                    11
Discovery                                                                                    12
Evidence/Hearings                                                                            12
Evidence Disclosure                                                                          13
Civil Procedure/Rules of Evidence/Motion Practice                                            13
Transcription (coming soon)                                                                  14
Settlement                                                                                   14
Decision/Award                                                                               14
Enforcement of Decision/Award                                                                15
Execution of Award/Decision                                                                  15
Common Issues of Law and Fact                                                                16
Precedent                                                                                    16
Arbitrability                                                                                17
Injunctive Relief                                                                            17
Document Retention                                                                           17
Educational and Legal Disclaimer                                                             18

**Virtual Standard Mediation Rules and Procedures**                                          **18**
Process and Rules at Each Stage                                                              18

**Virtual Mediation with Binding Resolution Rules and Procedures**                           **19**
Process and Rules at Each Stage                                                              19

**Virtual Standard Arbitration Rules and Procedures**                                        **21**
Process and Rules at Each Stage                                                              21

**Virtual Expedited Arbitration Rules and Procedures**                                       **25**
Process and Rules at Each Stage                                                              25
Mass Arbitration Rules and Procedures                                                        28

## 1. Types of Proceedings and Pricing

    a. Pricing

        i. Mediation

            1. Standard Mediation   $10000 per case, inclusive of neutral fees.
            2. Mediation with Binding Resolution   $15,000 per case, inclusive of neutral fees.

        ii. Arbitration

            1. Standard   $35,000 per case, inclusive of neutral fees.
            2. Expedited/Mass Arbitration Cases   $10,000 per case, inclusive of neutral fees.

    3. Subscription   Reduced case filing fees (described below), negotiated depending on various factors, including prior litigation history.

  iii. General Provisions and Ancillary Services

    1. New Era will respect any fee allocation agreement agreed to in advance by the parties.  In the absence of  such a fee allocation provision, the default allocations are as follows:

      a. Business to Business   Fees split 50/50.  This includes all standard arbitrations

      b. Business to Consumer/Employee   Split 98.5%/1.5% business to consumer/employee, respectively, for Standard Arbitrations and Mediations with Binding Resolution; and split 95%/5% business to consumer/employee, respectively, for Expedited Arbitrations and Standard Mediations.

    2. Transcription   Additional $1500.  Not available for mediation.

    3. Reasoned Decision   Unless it is the default provision to have a reasoned decision such as the Mass Arbitration bellwether or employment context, a reasoned decision will cost an additional $3000.

b. Mediation

  i. In General

    1. Currently, New Era ADR offers two types of Mediation products: Standard Mediations, and Mediations with a Binding Resolution. All Mediation products are conducted virtually on the New Era ADR platform.

    2. The parties will mutually agree on the type of mediation to be used for their case, and New Era ADR will conduct the mediation in accordance with the procedures corresponding to the parties' mutually agreed upon selection.

  ii. Standard

    1. Standard, non binding mediation processes are conducted entirely on New Era ADR's platform.

    2. Expected completion of process = 30 – 60 Days from assignment of a neutral.

  iii. With Binding Decision

    1. If all the parties agree at the outset, and the mediation fails to achieve a resolution, final arguments will be presented and a binding decision will be issued by the neutral.

    2. Expected completion of process = 30 – 60 days from assignment of a neutral.

c. Arbitration
    i. In General
        1. Currently, New Era ADR offers two types of Arbitration products: Standard Arbitrations and Expedited/Mass Arbitrations. All Arbitration products are conducted virtually on the New Era ADR platform.
        2. The parties will mutually agree on the type of arbitration to be used for their case, and New Era ADR will conduct the arbitration in accordance with the procedures corresponding to the parties' mutually agreed upon selection.
        3. In the absence of agreement by the parties as to which type of New Era ADR Arbitration product applies to a particular case, the forum shall be New Era ADR's Standard Arbitration product.
    ii. Standard Arbitrations
        1. Generally sought after for complex and/or more evidence intensive disputes. This product is the most similar to a traditional arbitration, but still wholly virtual and with limited discovery.
        2. Expected duration = <100 days from assignment/selection of a neutral.
    iii. Expedited/Mass Arbitrations
        1. Generally sought after for disputes that would benefit from an even more streamlined process. For example, consumer, employment, or certain commercial disputes. Focused evidence submission and arguments are an essential part of this process.
        2. Expected duration = 45 – 60 days from assignment/selection of a neutral.
        3. Mass Arbitrations
            a. A specific type of expedited arbitration where there are Common Issues of Law and Fact among five or more cases. All mass arbitrations follow the Virtual Expedited Arbitration Rules with a few exceptions (as more fully described in Section 6B), such as neutral selection, Precedent (defined herein), a mandatory non binding settlement conference, and reasoned decisions.
            b. Expected duration = 45 60 days from assignment/selection of a neutral for each bellwether case.

d. Moot Arguments
    i. Partial
        1. Moot portions of your case (e.g. opening/closing statements) or just test arguments and theories, all with one of New Era ADR's experienced neutrals.
        2. Price = Priced on a per case basis

      ii.  Whole
1. Moot your entire case.
2. Price = Priced on a per case basis

e. Subscription Pricing/Additional Services
   i. Subscription Pricing
      1. All pricing for the procedures set forth herein is on a per case basis and includes neutral fees, but subscription pricing is available by contract with New Era ADR.
      2. In the absence of subscription pricing, there is only one fee, titled a "case fee," and the default pricing and allocation is set forth in Section 1(a) above.
      3. In subscription pricing, there are two components to the case fees:
         a. A "subscription fee" paid on an annual basis. This fee is paid solely by the subscriber pursuant to contract and lowers the filing fees (as defined herein) for the dispute; and
         b. Actual filing fees per case ("filing fees"), paid by each party to a dispute and which are discounted from the default per case pricing as a result of the subscription fee.
      4. Subscription pricing is specific to each subscriber and based on various factors, including, for example, historical litigation data.
      5. Example of default vs subscription pricing:
         a. Default Pricing = 100 Mass Arbitration cases at $10,000 per case fee = $1M
         b. Sample of Subscription Fees = 100 Mass Arbitration cases on $250,000 annual subscription fee + $300 per case filing fee = $280,000
      6. Under all circumstances, ***all fees are paid up-front.***

   ii. Additional Services
      1. Reasoned Decision
         a. The default for any adversarial proceeding on the New Era ADR platform, outside of Mass Arbitration bellwether cases and employment disputes, is the issuance of a standard decision.
         b. Any party can request a reasoned decision for an additional fee. A reasoned decision provides limited explanation or elaboration for the decision along with a summary of the same. A standard decision provides the decision without further explanation.
         c. A reasoned decision will not be a full judicial opinion, but will provide the neutral's reasoning and application of the law to the facts of the case. A reasoned decision *may* include findings of fact and conclusions of law, as required

by law, at additional expense (and likely with the requirement that the parties submit proposed findings of fact and conclusions of law, with record citations) but this is not the default for reasoned decisions.

2. Transcription Services (Coming Soon)
   a. A transcript of any hearing can be requested by any party.
   b. New Era ADR will use a proprietary license for transcription software to transcribe the hearing in real time.
   c. New Era ADR will endeavor to provide the transcript within 24 hours of the completion of the hearing.

## 2. General Rules and Procedures

### a. Applicability

i. All proceedings on the New Era ADR platform are subject to the Terms of Use, the Privacy Policy, and these General Rules and Procedures.

ii. Each proceeding also has its own set of specific rules applicable directly to that particular proceeding. Each appears later in this outline and separately on New Era ADR's website (together, the "Proceeding Specific Rules and Procedures").

iii. In the event an agreement does not include an arbitral statute, the Federal Arbitration Act (FAA) shall govern.

### b. Terms of Use

i. By using the New Era ADR platform, or contractually, you have agreed to be bound by the New Era ADR Terms of Use, the Privacy Policy, these General Rules and Procedures and any applicable Proceeding Specific Rules and Procedures.

ii. You represent that you have read these New Era ADR Rules and Procedures, you agree that New Era ADR provides you a fundamentally fair dispute resolution process, and you agree to be bound by any decision(s) rendered.

iii. For more information, please refer directly to the New Era ADR Terms of Use and the Proceeding Specific Rules and Procedures.

### c. Confidentiality

i. New Era ADR shall maintain the confidentiality of all proceedings except where disclosure is required by law or as New Era ADR deems necessary for a judicial challenge to the result. The neutral may issue additional orders to protect the confidentiality of any portion of the proceeding or evidence and documents submitted.

ii. The parties agree that all communications and evidence will remain confidential and neither party will take any action that would reasonably be expected to lead to unwanted or unfavorable publicity to any other party. This provision does not apply to facts or information gathered outside of the proceeding.

   iii.  As noted in the Terms of Use, the services provided herein are governed by Illinois law, and the Location of Proceeding/Choice of Law provisions below indicate that "All New Era ADR proceedings are deemed to take place in the location of the neutral," which may implicate the neutral's forum state's ADR confidentiality laws.  Accordingly, in connection mediation services provided through New Era ADR, all communications between New Era ADR or the neutral on the one hand, and any mediation party, counsel, or other person or allowed to participate in the mediation, whether made during such a mediation or made prior to such a mediation but in furtherance thereof, shall constitute confidential and privileged mediation communications under the Illinois Uniform Mediation Act (710 ILCS 35/1 – 35/16, as amended from time to time) or the neutral's forum state's confidentiality/privilege law.

  d.  **Decorum/Sanctions**

    i.  All parties are expected to maintain professional and respectful behavior during the duration of any proceeding(s).  Should any party violate this provision, the neutral(s) and New Era ADR may sanction any party, witness, or participant to the full extent permitted by law; and such sanctions include, but are not limited to, monetary sanctions if allowed in the arbitration agreement amongst the parties, issue preclusion, adverse findings, and awards of attorneys' fees and/or costs if allowed in the arbitration agreement amongst the parties.  No refunds will be granted as a result of proceedings shortened as a result of a violation of this provision.

  e.  **Location of Proceeding/Choice of Law**

    i.  Except as stated above regarding Mediation Confidentiality, all New Era ADR proceedings are conducted virtually and are deemed to take place in the venue determined by the neutral regardless of the physical locations of the parties, participants and/or evidence and witnesses.  This does not impact choice of law provisions or other contractually chosen law which will be applied by the New Era ADR neutral.  In determining the merits of the dispute, the neutral shall apply the choice of law previously agreed to by the parties.  In the absence of such agreement, the neutral shall apply the choice of law that he/she/they deem(s) to be most applicable, in their sole discretion.  If there is a dispute over the choice of law, arguments should be made by the parties using messaging on the New Era ADR platform and in accordance with Section 2(z)(ii) of these Rules and Procedure. The neutral may grant any remedy or relief that is just and equitable and within the scope of the parties' agreement or applicable law.

  f.  **Independent Neutrals/Ultimate Authority/Customized Provisions**

    i.  New Era ADR affiliated neutrals are independent contractors.  They are not employees of New Era ADR and are not compensated by New Era ADR other than their contractually agreed upon hourly rates or flat fees.

    ii.   New Era ADR affiliated neutrals are the ultimate arbiters of all proceedings on the platform and have full authority to run proceedings as they determine in their sole discretion.  Subject to Rule 2.k, herein, the parties otherwise waive any objection to the authority of the neutrals in their proceeding(s).

    iii.    The parties may customize alternative dispute resolution provisions pursuant to the needs of the individual(s) and/or business(es) by written agreement.  New Era ADR may honor any such customized alternative dispute resolution provisions, but only to the extent the alternative dispute resolution provisions do not contradict the letter and/or the spirit of New Era ADR's rules and procedures.  New Era ADR retains sole discretion to determine whether or not customized alternative dispute resolution provisions can or should be honored, unless New Era ADR has given prior written approval of the customized alternative dispute resolution provisions.

g.  Agreement to Refer Disputes

    i.   By referring disputes to the New Era ADR platform or by naming New Era ADR, in a pre dispute agreement, as the dispute resolution provider to be used in the event of a dispute, you either have a binding agreement that requires dispute resolution through the New Era ADR platform or both/all parties have consented to resolve their disputes on the New Era ADR platform.  The claimant(s) may initiate a case on the platform based on either scenario, but the basis for consent (i.e. the contract, terms of use or other agreement) must be identified and a copy provided to New Era ADR.

h.  Fees

    i.   Prior to the commencement of any New Era ADR proceeding, the parties will need to pay the applicable platform fees, which include neutral fees.  Accommodation can also be made for parties whose financial position does not allow for payment.  No New Era ADR proceeding will commence without payment of all fees owed or agreeable payment terms being reached.

i.  Electronic Service

    i.   The parties consent to electronic service of process with service to be made to the email address provided contractually.  Parties using New Era ADR should provide applicable email address(es) for service in their Terms of Use or contracts.  Unless a party objects for lack of sufficiency of service, any party appearing in a proceeding waives any objection to service of process.

j.  Assignment of Neutrals

    i.   New Era ADR will provide a panel of a minimum of 3 and up to 8 neutrals for each proceeding unless otherwise provided for herein or in the Proceeding Specific Rules and Procedures.  Each such panel will consist of

neutrals who have the requisite experience to preside over the dispute at issue, in New Era ADR's sole discretion.

ii.  In each proceeding, the parties will participate in New Era ADR's standard rank/strike process, outlined below, unless both parties opt to have New Era ADR appoint a neutral from the panel.

iii.  New Era ADR's Standard Rank/Strike Process

1.  Following New Era ADR proposing its panel of neutrals pursuant to these General Rules and Procedures and any Proceeding Specific Rules and Procedures, the parties shall have five (5) business days therefrom to:

a.  If 6 or fewer neutrals are proposed as a part of the panel, strike 1 neutral each;

b.  If 7 or more neutrals are proposed as a part of the panel, strike 2 neutrals each.

2.  For the remaining neutrals, the parties shall have two (2) more business days to numerically rank them, with #1 being a party's top choice and the quantitatively highest number being the least preferable.

a.  If one neutral has the best score (in this instance, the lowest score), then that neutral will be appointed and the proceeding shall move forward.

b.  In the event of a tie, then the neutrals with the worst (quantitatively highest) scores will be dropped and the parties shall re rank the remaining neutrals. The neutral with the lowest score on the re rank will be appointed to the proceeding.

c.  If the re ranked scores remain tied, then within two (2) business days, New Era ADR will randomly select and appoint one of the remaining neutrals.

iv.  I  If Respondent does not respond to the complaint within 14 calendar days of receipt of the initial email notice of the complaint from New Era ADR, New Era ADR shall appoint a neutral to preside over the proceeding. If Respondent responds prior to a default award being issued by the neutral, the parties shall undergo New Era ADR's Standard Rank/Strike process to select a neutral for the remainder of the case.

v.  If there is more than one attorney for any party(ies) , the attorneys for that party (ies) are responsible for meeting and conferring internally and achieving consensus for purposes of making selections for the rank/strike process.

vi.  If a different process for neutral selection is contractually agreed to by the parties, New Era ADR will honor such agreement and/or the resulting neutral selection at its sole discretion.  There will be no delay in the proceeding(s) to accommodate for such alternative neutral selection procedures.

    vii.  Please note that selection of neutral's is always subject to the neutral's availability.

k.  Conflicts/Replacement of Neutrals

    i.  Neutrals shall promptly upon initial appointment, check for any actual or potential conflicts of interest and, as soon as practicable:

        1.  If the neutral has an actual conflict of interest, the neutral shall decline the appointment or withdraw if already appointed;

        2.  If the neutral has any disclosures about their background or any potential conflict of interest, the neutral shall make all such disclosures required by law or, if not required by law, that are otherwise appropriate to disclose; the neutral may, thereafter, only serve (or continue to serve), with the consent of the parties or after a New Era ADR determination that the neutral can still maintain impartiality notwithstanding the disclosed matter; and

        3.  If there is an irreconcilable conflict, New Era ADR will appoint the next highest ranked neutral from the Rank/Strike process until a neutral is selected that does not have any existing conflict

    ii.  Party consent to a neutral's service (or continued service) following a disclosure by the neutral is given by either:

        1.  InformingNew Era ADR (and not the neutral) of such express consent; or

        2.  Failing to inform New Era ADR (and not the neutral) of any objection to the neutral within seven (7) calendar days after service of the conflict disclosure.

    iii.  New Era ADR shall make the final determination whether, in its sole discretion, the objection to a neutral's impartiality requires replacement of the neutral.

    iv.  New Era ADR may also otherwise replace a neutral at its sole discretion, upon what New Era ADR deems a legitimate request orconcern or upon unforeseeable circumstances. If such a replacement is necessary, New Era ADR will replace the neutral at no additional charge and will provide notification to all parties about the change and a general explanation of why it was necessary.

l.  Commencement of Proceedings

    i.  All New Era ADR proceedings are commenced on the New Era ADR platform application. The system will require contact information for the parties, the attorneys, the nature of the claim(s), the type of damages or relief requested, any counterclaims, and payment by credit card. The application will guide the parties through the additional steps needed in the process.

m.  Deadlines

    i.  Once a proceeding is commenced, the neutral will provide dates for hearings, meetings and deadlines for document and evidence submissions.

    ii. All proceedings at New Era ADR are time limited with the following as expected timelines as set forth above:
1. Mediation = 30 – 60 days from appointment/selection of a neutral
2. Mediation with a Binding Decision = 30 – 60 days from appointment/selection of a neutral
3. Expedited arbitration = 45 – 60 days from appointment/selection of a neutral
4. Standard arbitration = Under 100 days from appointment/selection of a neutral

    iii. You are expected to operate within these general time parameters and be prepared to meet expedited deadlines.  Exceptions may be granted as necessary to ensure a fundamentally fair process, as determined in the discretion of the neutral.

    iv. Failure to adhere to these deadlines may result in a default decision being issued against you.

    v. Neutrals are also expected to maintain these timeframes.

n. **Witnesses**

    i. If a party believes witness testimony would be relevant to the dispute, the party may present that testimony to the neutral in one of three ways: by requesting that the witness attend a hearing before the neutral, by providing a transcript of the witness' deposition testimony, or by submitting an affidavit from the witness.  (Please note that some neutrals may not accept or may not find persuasive testimony adduced solely by affidavit, as the opposing party will not have had a chance to subject the affiant to cross examination or the like.)

    ii.

    iii. If a witness refuses to attend, to the extent allowable under applicable law, a party may request that the neutral issue a subpoena which the requesting party must serve on the witness (and, if necessary, seek enforcement in a court of competent jurisdiction) in accordance with applicable law.  The neutral retains discretion on whether or not a subpoena should be issued and the scope of the subpoena.

    iv. The party must allow sufficient time to procure the witness(es)'s attendance prior to any document submission or hearing deadline.  There will be no delays as a result of a party's failure to properly secure witness attendance.

    v. The parties are allowed a maximum of two (2) witnesses at a hearing unless the neutral specifically allows additional witnesses, on good cause shown.

    vi. Live testimony shall be given under oath which shall be administered by the neutral, or as otherwise required or permitted by the neutral's forum state law.

o. **Discovery**

    i. New Era ADR operates on the premise that limitations on discovery are one of the primary ways efficiencies are achieved in arbitration, and

11
Exhibit A
Page 13

discovery must be narrowly tailored only to the information necessary to advancing a neutral's understanding of the case. A formal discovery process exists solely in New Era ADR's Standard Arbitration process and is described in Section 5 below.

ii.    If the parties to New Era's Virtual Expedited Arbitration process determine that formal discovery is necessary for their proceeding, they can make a request to be upgraded to New Era ADR's Standard Arbitration process. If granted, New Era ADR's normal fees for its Standard Arbitration process shall apply.

iii.   Any request for discovery must be submitted to the neutral, at which point the neutral has discretion to determine whether it should be allowed or not

iv.    For specific discovery requests, the parties must timely comply with any discovery request granted by the neutral or a negative inference may be made against the noncompliant party. The neutral may also impose a sanction against the noncompliant party, including, by way of non exclusive example, entry of a default decision against the non compliant party.

v.

vi.    The parties may customize discovery provisions pursuant to the needs of the individual(s) and/or business(es) by written agreement. The neutral may honor any such customized discovery provisions, but only to the extent the discovery provisions do not contradict the letter and/or the spirit of New Era ADR's rules and procedures. The neutral retains sole discretion to determine whether or not customized discovery provisions can or should be honored.

p.  Evidence/Hearings

i.     All evidence must be uploaded to New Era ADR's secure online platform.

ii.    Limits are generally:

   1.  30 files for documentary evidence and 50 pages per file exhibit for standard arbitrations; and

   2.  the lesser of 10 total files, 25 pages across all files or 25MB of aggregate uncompressed uploads for expedited arbitrations.

iii.   The neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process.

iv.    The neutral shall be the final arbiter of, and has sole discretion regarding, what evidence shall be considered, what weight should be applied to the evidence, and whether evidence should be excluded from consideration, based on fairness, equity, or the law (including, by way of nonexclusive example, on the basis of forum state recognized evidentiary privileges).

v.     Except as required by law, the parties agree not to save, record, or distribute evidence in any way, other than through the New Era ADR system and then only for the purpose of the proceeding.

vi.    The neutral may request additional evidence which the parties shall provide, if available.

    vii.  The neutral may request post hearing,supplementary evidence or argument at the neutral's sole discretion.

    viii.  Unless the parties agree to the contrary, hearings shall be held in Standard Arbitrations and Bellwether cases in Mass Arbitrations.  In all other Expedited Arbitrations, the neutral may rule solely on the documentary evidence without any virtual hearing.  Discretion lies solely with the neutral in making a determination of whether a hearing is necessary in all non standard or non Bellwether cases.

q.  Evidence Disclosure

    i.  Similar to discovery, if a party believes an opposing party has relevant or necessary evidence that they are not disclosing, they can make a request to the neutral that such evidence be provided or disclosed.  The neutral, upon a finding that good cause for the production exists, a decision confined to the neutral's sole discretion, may direct  the opposing party to produce to the requesting party the requested information; in issuing such a direction, the neutral shall make adequate provision to address any claims of privilege.

    ii.  Any failure to comply with the neutral's directive to produce may result in a default decision being entered against the non compliant party.

r.  Civil Procedure/Rules of Evidence/Motion Practice

    i.  The parties may offer relevant and material  facts and evidence as necessary to facilitate the neutral's understanding of the dispute, but formal Federal and State Rules of Evidence and Rules of Civil Procedure do not apply.

    ii.  The neutral has sole discretion in determining the cadence and progression of the proceeding as well as the admissibility, weight, veracity, authenticity, relevance and importance of any evidence or arguments submitted.

    iii.  For Standard Arbitrations, motion practice is not allowed unless specific exceptions are made by your neutral, in their sole discretion.  Requests for relief may be made on the platform via the messaging function.  For Expedited Arbitrations, motion practice is not allowed other than for Bellwether cases in Mass Arbitrations, where motion practice is generally not allowed unless specific exceptions are made by your neutral, in their sole discretion.

        1.  Dispositive Motions: dispositive motions are not allowed on the New Era ADR platform under these Rules and Procedures under any circumstance.  If there is a threshold issue (i.e. the wrong party is named in the suit) that dictates the case should not move forward under any circumstances, that issue should be raised with the neutral through messaging on the New Era ADR platform.

        2.  Discovery Issues: issues related to discovery should be raised with the Neutral through messaging on the New Era ADR platform during the discovery process.  If necessary, such issues may also be included in briefing and raised at the inception of the hearing

13
Exhibit A
Page 15

as threshold issues so the neutral may rule accordingly, in accordance with Section 2(z)(ii) of these Rules and Procedures. Such issues must be raised at the inception of a hearing in order to be considered and may be revisited, if necessary, in the final briefing.

3. All Other Motions: in any scenario where the neutral has allowed for motions for specific exceptions, such motions must be made at the hearing and at the inception of such hearing for neutral consideration, in accordance with Section 2(z)(ii) of these Rules and Procedures.  Any motions not raised in this manner will not be considered.  Hearings shall then proceed after the neutral makes their determination with respect to such motions, unless in their sole discretion the hearing must be paused and reconvened later.

s. Transcription
   i. The parties may request that a hearing be transcribed.  This is done with New Era ADR's proprietary license of transcription software.
   ii. New Era ADR will endeavor to deliver the transcript within 24 hours of the completion of the hearing.

t. Settlement
   i. Parties may settle their dispute before, during or after the New Era ADR proceeding whether facilitated by a New Era ADR neutral or not.
   ii. ***Since all New Era ADR fees (inclusive of neutral fees) accrue at the time of filing, no rebates or refunds of any paid fees shall be given (although New Era ADR will consider and may abide by the parties' agreement to shift some or all of the New Era ADR fees from or to any particular party).***

u. Decision/Award
   i. In the arbitration context, a decision/award will typically be issued within 7 calendar days after the neutral closes the record (i.e., after all the evidence and post hearing submissions have been received or the deadline for their submission has passed, whichever is sooner).  The decision will be non reasoned unless required by law or otherwise set forth herein.
   ii. If a party, or the parties, wish(es) to have a reasoned decision, the reasoned decision will typically be issued within 14 calendar days after closing of the record.
   iii. A reasoned decision will include the application of the law to the facts of the case as well as the ultimate decision and award, but is not equivalent to a full judicial opinion.
   iv. If the parties request findings of fact and conclusions of law, or such findings and conclusions are required by law, additional charges may apply and the issuance of the decision will require additional time beyond the 14 day period set forth above for a reasoned decision.

     v.  Reasoned decisions are the default standard for employment cases and Bellwether cases in Mass Arbitrations.

v.  Enforcement of Decision/Award

     i.  The parties acknowledge and agree that any decision and/or award is enforceable without further action and waive any objection to the enforceability of the decision or award subject to any rights contained in the Federal Arbitration Act (FAA) or applicable state law.

     ii.  All decisions and/or awards may also be enforced in any state or federal court of competent jurisdiction.

     iii.  In cases where there is a statutory or contractual right to reasonable attorneys' fees and costs for the prevailing party, the neutral has authority to award such fees and costs as if the matter were being heard by a court of competent jurisdiction.  In such an instance, the parties should submit a statement of attorneys' fees and costs along with supporting information with their final briefs.  This additional information will not count against any applicable page or size limits.  The neutral shall identify in the decision/award which party has prevailed on the claim that carries with it prevailing party attorney's fees as an item of relief, and award such fees and costs as they deem reasonable.  .

w.  Execution of Award/Decision

     i.  If the award/decision requires the payment of monetary damages, the debtor party must pay the amount owed on or before the 14  calendar day after the award was served on the parties unless otherwise noted in the award or decision.  Payment must be made via electronic payment, or certified check/money order sent via a trackable method of shipping.

     ii.  If the award/decision requires non monetary relief, the required action or non action must be taken on or before the 14  calendar day after the award was served on the parties unless otherwise noted in the award or decision.

     iii.  The neutral has the authority to award pre award interest, impose post award interest and/or may order sanctions for non compliance.

     iv.  The neutral also has the authority to award costs and sanctions for frivolous filings, at their sole discretion (however, the neutral shall consider applicable law that may limit or prohibit such sanctions in certain types of cases).

x.  Common Issues of Law and Fact

     i.  "Common Issues of Law and Fact" means when cases or proceedings present the same, or similar, evidence; present the same, or similar, witnesses; and/or rely on determination of the same, or similar, facts and issues of law.

     ii.  Determination of whether case(s) involve Common Issues of Law and Fact rests solely in the hands of the neutral handling the proceeding or a New Era ADR neutral tasked with making such a determination.

1. Solely for administrative purposes, New Era ADR may group similar cases filed by the same law firm or group of law firms and have them proceed through the Mass Arbitration process unless and until the presiding neutral makes a determination otherwise.
2. New Era ADR makes no determination with respect to issues of law and fact.
3. The presiding neutral will make a determination about whether Common Issues of Law and Fact exist as a threshold issue in determining the case but has sole discretion in determining how such a decision will be made.

iii. The parties may present evidence and arguments demonstrating that a case or cases do not involve Common Issues of Law and Fact (for example as set forth in the Mass Arbitration Rules and Procedures contained herein) but the neutral's determination of Common Issues of Law and Fact is not appealable.

y. Precedent

i. When significant factual findings and legal determinations have been made in one or more proceedings on the platform ("Lead Decisions"), New Era ADR affiliated neutrals may apply these determinations in the same manner and with the same force and effect to the Common Issues of Law and Fact contained in other proceedings that involve Common Issues of Law and Fact with those cases from which the Lead Decisions originated, subject to any rights contained herein.  Such determinations made from the Lead Decisions are known as "Precedent(s)."

ii. Later filed cases that involve the same or similar Common Issues of Law and Fact, regardless of when they are filed, may be subject to Precedent(s).

iii. Determinations of whether Common Issues of Law and Fact are present will be determined by the neutral who made the initial legal and factual determinations, unless they are otherwise unavailable, in which case New Era ADR will appoint a new neutral for purposes of these determinations.

z. Arbitrability/Neutral Discretion

i. Any question or matter of arbitrability of a dispute shall be determined solely by the neutral(s) provided by New Era ADR Inc. and not in a court of law or other judicial forum.  *The parties agree and acknowledge that they are waiving their right to seek a determination of arbitrability in a court of law or other judicial forum.*

ii. Any issues that are subject to neutral discretion and arguments from the parties related thereto, arbitrability, governing law, jurisdiction, or otherwise, shall be argued and decided at the regularly-scheduled hearings on the merits of the case, and not through any preliminary hearings or motion practice (subject to Section 2(r)(iii) of these Rules and Procedures).

aa. Injunctive Relief
    i. New Era ADR Inc. and its associated neutral(s) have the power and authority to issue injunctive relief including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions depending on the facts and the circumstances of the case. A party seeking injunctive relief must demonstrate that the legal standard under applicable law has been met and no condition contained herein waives the obligation to make such a demonstration. *In the event a party is seeking temporary, interim, or emergency injunctive relief, each party agrees that New Era ADR will appoint the neutral.*

bb. Document Retention
    i. Documents uploaded to the New Era ADR platform will be retained for sixty (60) calendar days from the termination of the proceeding or the issuance of a decision/term sheet, whichever is later (the "Deletion Deadline"). The parties will be able to download documents for their case file up to the Deletion Deadline at which point all documents from the proceeding will be permanently deleted and inaccessible. New Era ADR does not maintain backup tapes or other redundant storage mechanisms post deletion. You agree to protect, defend, indemnify and hold New Era ADR, its neutrals and their respective organizations, assigns, employees, officers and directors harmless from and against all losses, costs, liabilities, claims, damages and expenses of every kind and character, as incurred, resulting from, relating to or arising out of any deletion of documents after the Deletion Deadline.

cc. Neutral Immunity
    i. The parties agree that use of any New Era ADR neutral's services through the New Era ADR platform does not affect any immunity or other legal protections to which the Neutral, or the Neutral's organization, may otherwise be entitled under applicable law.

dd. Changes and Amendments to Rules
    i. New Era ADR reserves the right to make changes and amendments to these Rules at its discretion and without notice. New Era ADR will endeavor, however, to make changes only once per calendar quarter and provide notice of any changes that substantively affect proceedings.

ee. Educational and Legal Disclaimer
    i. New Era ADR content and resources are not intended to be legal advice and the parties shall not rely on the content or services as legal advice or representations regarding outcomes, negotiation, settlement or insight into another party's behavior or practices.

## 3. Virtual Mediation Rules and Procedures

a. Process and Rules at Each Stage
    i. Claimant Sign Up

         1. Claimant signs up using New Era ADR's simple and secure sign up process located at app.neweraadr.com.

ii. Claimant Pays Fees
         1. Claimant pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 95/5. Examples:
             a. Total Fee = $10,000
             b. Business vs. Business = Claimant pays $5000
             c. Business vs. consumer/employee = Business pays $9500 and individual pays $500
             d. Fees will be reduced if there is a subscription agreement in place.
             e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iii. Respondent Sign Up
         1. Respondent signs up using New Era ADR's simple and secure sign up process at app.neweraadr.com.

iv. Respondent Pays Fees
         1. Respondent pays half the fee unless there is a business vs individual dispute in which case the fee is split 95/5. Examples:
             a. Total Fee = $10,000
             b. Business vs. Business = Respondent pays $5000
             c. Business vs. Individual = Business pays $9500 and individual pays $500
             d. Fees may be reduced for both parties if there is a subscription agreement in place.
             e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

v. Neutral Chosen
         1. A panel of at least 3 but no more than 8 neutrals is provided to the parties for purposes of engaging in New Era ADR's standard rank/strike process.
         2. New Era ADR will strive to provide a panel of neutrals with experience in the particular type of proceeding.
         3. If no agreement can be reached, New Era ADR will appoint a neutral.

vi. Pre Mediation Conferences are Scheduled and Held
         1. The neutral schedules and holds 30 minute pre mediation conferences with both parties using New Era ADR's scheduling software.
         2. ***Please note these conferences are optional and can be declined when scheduling***.

vii. Mediation Scheduled
         1. The neutral schedules the mediation using New Era ADR's scheduling software, based on input from the parties.

    viii.   Documents Are Uploaded
1. Both parties upload their relevant documents and mediation statements.  These are not visible to any other party, only the neutral.
2. There is a limit of 100MB for documents and 15K characters for mediation statements.

    ix.   Mediation is Held
1. The mediation is held via the preferred video conferencing software with Zoom as the default.

    x.   Term Sheet
1. If a settlement is reached, the mediated settlement term sheet is drafted by the neutral with input from the parties and their attorneys, and executed on the New Era ADR platform via e signature by the parties before the mediation is closed.

## 4. Virtual Mediation with Binding Resolution Rules and Procedures

### a. Process and Rules at Each Stage

    i.   Parties must agree to this process prior to commencement of the mediation along with consent to the mediator converting to an arbitrator in the event the mediation fails.

    ii.   Claimant Sign Up
1. Claimant signs up using New Era ADR's simple and secure sign up process located at app.neweraadr.com.

    iii.   Claimant Pays Fees
1. Claimant pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 98.5/1.5.  Examples:
   a. Total Fee = $15,000
   b. Business vs. Business = Claimant pays $7500
   c. Business vs. consumer/employee = Business pays $14,775 and individual pays $225
   d. Fees will be reduced if there is a subscription agreement in place.
   e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

    iv.   Respondent Sign Up
1. Respondent signs up using New Era ADR's simple and secure sign up process at app.neweraadr.com.

    v.   Respondent Pays Fees
1. Respondent pays half the fee unless there is a business vs individual dispute in which case the fee is split as describe below.  Examples:
   a. Total Fee = $15,000
   b. Business vs. Business = Respondent pays $7500

      c. Business vs. Individual = Business pays $14,500 and individual pays $500
      d. Fees will be reduced if there is a subscription agreement in place.
      e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

  vi. Neutral Chosen
1. A panel of at least 3 but no more than 8 neutrals is provided to the parties for purposes of engaging in New Era ADR's standard rank/strike process.
2. New Era ADR will strive to provide a panel of neutrals with experience in the particular type of proceeding.
3. If no agreement can be reached, New Era ADR will appoint a neutral.

  vii. Pre Mediation Conferences are Scheduled and Held
1. The neutral schedules and holds 30 minute pre mediation conferences with both parties using New Era ADR's scheduling software.
2. ***Please note these conferences are optional and can be declined when scheduling***.

  viii. Mediation Scheduled
1. The neutral schedules the mediation using New Era ADR's scheduling software, based on input from the parties.

  ix. Documents Are Uploaded
1. Both parties upload their relevant documents and mediation statements.  These are not visible to any other party, only the neutral.  ***Non-placeholder documents must be submitted in this process.***
2. There is a limit of 100MB for documents and 15K characters for mediation statements.

  x. Mediation is Held
1. The mediation is held via the preferred video conferencing software with Zoom as the default.

  xi. Term Sheet
1. If a settlement is reached, the mediated settlement term sheet is drafted by the neutral with input from the parties and their attorneys, and executed on the New Era ADR platform via e signature by the parties before the mediation is closed.

  xii. No Settlement
1. If no settlement is reached, the mediation moves into the "binding resolution" portion of the proceeding.

  xiii. Exchange of Documents
1. Once the neutral has advanced the case into the "binding resolution" portion of the proceeding, the documents that were

submitted at the beginning of the mediation will be exchanged between the parties.

2. *The mediation statements remain confidential and will not be exchanged*.

xiv.  Final Arguments

1. The parties will have no more than fourteen (14) days to review the submitted documents and provide final argument briefs to the neutral.

2. Final argument briefs shall not exceed 15K characters.

xv.  Decision is Rendered

1. The neutral will render a non reasoned decision within 7 days of receipt of final arguments.

2. A reasoned decision can be requested and will be provided within 14 days of receipt of final arguments.

## 5.  Virtual Standard Arbitration Rules and Procedures

### a.  Process and Rules at Each Stage

i.  Standard Arbitration typically applies to standard commercial disputes that involve typical document volumes and discovery.  *The parties may contractually determine whether certain proceedings fit under Virtual Expedited or Virtual Standard arbitrations, and New Era ADR will respect those contractual agreements*.  See Section 1(c)(i) of these Rules and Procedures for more detail.

ii.  Claimant Sign Up and Complaint

1. Claimant signs up on the platform using New Era's simple and secure sign up process and submits a Complaint located at app.neweraadr.com.

   a. Complaints, whether or not using New Era's form, must contain each of the following:

      i. The nature of the dispute, including applicable dates and times, parties involved, **as well as the facts specific to the Claimant(s) that gave rise to the dispute.  New Era is not a notice pleading platform.**  Generalized or generic facts are not sufficient to satisfy this requirement.

      ii. The legal basis upon which the Claimant is seeking such relief, whether state law, federal law, or otherwise.

      iii. The relief sought, whether monetary, non monetary, or both, and the basis for such relief.

   b. Complaints are limited to 10 total pages when complete. No additional exhibits, documents, or evidence is necessary to be attached to the Complaint.

21
Exhibit A
Page 23

**2-ER-183**

          c. No prefatory or jurisdictional material is required in Complaints unless necessary to any claims or defenses.

    2. Not abiding by these requirements for Complaints may subject Claimant to the Decorum/Sanction rules outlined in Section 2(d) of these Rules and Procedures.

iii. Claimant Pays Fees

    1. Claimant pays half the fee unless there is a business vs individual dispute in which case the fee is split 98.5%/1.5%. Examples:

        a. Total Fee = $35,000

        b. Business vs. Business = Claimant pays $17,500

        c. Business vs. consumer/employee = Business pays $34,475 and consumer/employee pays $525

        d. Fees may be reduced if there is a subscription agreement in place that specifically includes standard arbitrations.

        e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

iv. Sign Up and Answer

    1. Respondent (a) receives email service of Complaint; (b) signs up on the platform; and (c) responds to the claims and asserts any counterclaims. Claimant will receive Respondent's answer via email once submitted.

    2. Respondent has 21 calendar days to respond or a default judgment may be issued against them. After 14 days with no response, New Era ADR will appoint a neutral and Claimant will be able to access the dispute in order to submit documentation pursuant to Section 6(a)(vii). No default decision shall be made by the neutral without considering the evidence submitted by Claimant.

    3. Answers must follow the same substantive rules as those laid out for Complaints in Section 5(a)(ii)(1) of these Rules and Procedures or Respondent risks facing the same consequences identified therein. Answers on the New Era platform should not follow the traditional method of admitting or denying the paragraph claims, but must provide substantive information and facts surrounding the responses and defenses to the claims.

v. Respondent Pays Fees.

    1. Respondent pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 98.5%/1.5%. Examples:

        a. Total Fee = $35,000

        b. Business vs. Business = Respondent pays $17,500

        c. Business vs. consumer/employee = Business pays $34,475 and consumer/employee pays $525

        d. Fees may be reduced if there is a subscription agreement in place that specifically includes standard arbitrations.

     e.  New Era will respect any other fee allocation agreement agreed to in advance by the parties.

vi.  Neutral is Chosen

    1.  The parties will engage in New Era's standard rank/strike process.

    2.  The parties may opt out of New Era's standard rank/strike process, but only if agreed to by both parties.

vii.  Parties Upload Their Documents

    1.  Both Claimant(s) and Respondent(s) upload the relevant documents and their initial arguments.

    2.  Both parties must upload their documents within 14 calendar days of the appointment of the neutral.

    3.  Uploads are limited to the lesser of 20 total files, 25 total pages for each file or 50MB of aggregate uncompressed uploads.

    4.  The neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process.

viii.  Documents Are Exchanged

    1.  Once all documents are submitted, they are digitally exchanged between the parties.

ix.  Discovery Process

    1.  Following document exchange, the parties may make a request to their neutral for formalized discovery. There is no plenary right to discovery; instead, formal discovery under these rules is only allowed by order of the neutral and then only on good cause shown.  The request must be made within seven (7) days of the exchange of documents.

    2.  If the request for discovery is granted, each side must submit no more than ten (10) requests for production ("RFPs") that are narrowly tailored to discover only information relevant to the arbitration as well as no more than twenty (20) search terms (the "Search Terms") they want run against the opposing party's documents through the New Era ADR discovery portal.  These RFPs and Search Terms must be submitted within four (4) calendar days of service of the order granting discovery.  Parties should also submit additional search terms necessary for an initial privilege and redaction review.  The neutral has discretion to allow submissions in excess of the stated limits as necessary to ensure a fundamentally fair process.

    3.  Each party shall have the opportunity to raise a written objection to the other party's submission of RFPs and Search Terms using the New Era platform's messaging function. If no such objection is raised after four (4) calendar days from the submission of the RFPs and Search Terms, the RFPs and Search Terms shall be deemed accepted and final. The Neutral will endeavor to review any such objections made and issue a decision with respect thereto within four (4) calendar days of the raised objection.

4.

5. The parties will submit their universe of documents that are responsive to the RFPs and Search Terms to the New Era ADR discovery portal within fourteen (14) days of approval of the RFPs and Search Terms.

6. The parties' universe of documents will be submitted to New Era ADR's third party document review provider who will utilize e discovery tools to review and determine responsiveness based on the Search Terms.  Within fourteen (14) calendar days of the submission to the third party document review provider, a responsive document subset will be submitted back to the parties (a party's "**Responsive Documents**").

7. The parties will have seven (7) calendar days from receipt of the Responsive Documents from New Era ADR's third party document review provider to perform a privilege, relevance, redaction and confidentiality review.  The parties must then submit their final set of documents along with any privilege or relevance log to the New Era ADR portal (the "**Final Discovery Package**").  Any privilege and relevance log must contain sufficient information for the neutral to determine whether the document can be fairly excluded from the Final Discovery Package.

8. Each party shall have the opportunity to raise a written objection to the other party's submission of the Final Discovery Package using the New Era platform's messaging function. If no such objection is raised after seven (7) calendar days from the submission of the Final Discovery Package, the Final Discovery Package shall be deemed accepted and final. The Neutral will endeavor to review any such objections made and issue a decision with respect thereto within seven (7) calendar days of the raised objection. The neutral may also unilaterally review the Final Discovery Package for background information related to the arbitration.

9.

10. The total discovery timeline is approximately fifty (50) days. During this fifty day time period, each party may take up to three (3) depositions and submit up to three (3) affidavits to the discovery portal.  Requests for depositions must be made on the New Era ADR discovery portal and provide adequate justification for their necessity.  The neutral has the discretion to grant any valid request and any opposing party must comply with such a grant.  If a party believes a subpoena for testimony is necessary, they may request a subpoena and the neutral has the authority under these Rules and Procedures to issue such subpoena.  The requesting party shall be responsible to have the subpoena served on the deponent in the manner required by law.

    x.  Hearing is Scheduled and Held
1. The neutral schedules the arbitration hearings using New Era ADR's scheduling software, based on input from the parties.
2. The hearings are held via the neutral's preferred video conferencing software, with Zoom as the default.

    xi.  Final Arguments Are Submitted
1. Within 14 days of the conclusion of the hearings, both parties must submit final arguments based on the documents and initial arguments submitted earlier in the proceeding.
2. Final arguments are limited to 30,000 characters.
3. No jurisdictional or prefatory material is necessary in the final arguments, just the caption and substantive arguments.

    xii.  Decision is Rendered
1. The neutral will typically render a non reasoned decision within 7 calendar days of receipt of final arguments, or other date mutually agreed to by the parties.
2. A reasoned decision can be requested and will typically be provided within 14 calendar days of receipt of final arguments, or other date mutually agreed to by the parties.
3. As stated above, if the parties request findings of fact and conclusions of law, or such findings and conclusions are required by law, additional charges may apply and the issuance of the decision will require additional time beyond the 14 day period set forth above for a reasoned decision.

## 6. Virtual Expedited Arbitration Rules and Procedures

### a. Process and Rules at Each Stage

    i.  Virtual Expedited Arbitration typically applies to consumer, employment and other commercial disputes that are not document or discovery intensive. ***The parties may contractually determine whether certain proceedings fit under Virtual Expedited or Virtual Standard arbitrations, and New Era ADR will respect those contractual agreements***. See Section 1(c)(i) of these Rules and Procedures for more detail.

    ii.  Claimant Sign Up and Complaint
1. Claimant signs up on the platform using New Era's simple and secure sign up process and submits Complaint located at app.neweraadr.com.
    a. Complaints, whether using New Era's form or not, must contain the following:
        i. The nature of the dispute, including applicable dates and times, parties involved, as well the facts specific to the Claimant(s) that gave rise to the dispute. New Era is not a notice pleading platform. Generalized or generic facts are not sufficient to satisfy this requirement. You may assert claims as

25
Exhibit A
Page 27

     omnibus claims that are substantially identical across Complaints in a Mass Arbitration.

    ii. The legal basis upon which the Claimant is seeking such relief, whether state law, federal law, or otherwise.

    iii. The relief sought, whether monetary, non monetary, or both and the basis for such relief.

  b. Complaints are limited to 10 total pages when complete. No additional exhibits, documents, or evidence is necessary to be attached to the Complaint.

  c. No prefatory or jurisdictional material is required in Complaints unless necessary to any claims or defenses.

  d. Not abiding by these requirements for Complaints may subject Claimant to the Decorum/Sanction rules outlined in Section 2(d) of these Rules and Procedures.

 iii. Claimant Pays Fees

  1. Claimant pays half the fee unless there is a business vs individual dispute in which case the fee is split 95/5.  Examples:

   a. Total Fee = $10,000

   b. Business vs. Business = Claimant pays $5000

   c. Business vs. consumer/employee = Business pays $9500 and consumer/employee pays $500

   d. Fees will be reduced if there is a subscription agreement in place.

   e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

 iv. Sign Up and Answer

  1. Respondent (a) receives email service of Complaint; (b) signs up on the platform; and (c) responds to the claims and asserts any counterclaims. Claimant will receive Respondent's answer via email once submitted.

  2. Respondent has 21 days to respond or a default award may be issued against them. After 14 days with no response, New Era ADR will appoint a neutral and Claimant will be able to access the dispute in order to submit documentation pursuant to 6(a)(vii). No default decision shall be made by the neutral without considering the evidence submitted by Claimant.

  3. Answers must follow the same substantive rules as those laid out for Complaints in Section 6(a)(ii)(1) of these Rules and Procedures or Respondent risks facing the same consequences identified therein.  Answers on the New Era platform should not follow the traditional method of admitting or denying the paragraph claims, but must provide substantive information and facts surrounding the responses and defenses to the claims.  Answer(s) can be

omnibus answers that apply to substantially identical claims in Mass Arbitrations.

   v. Respondent Pays Fees
      1. Respondent pays half the fee unless there is a business vs consumer/employee dispute in which case the fee is split 95/5. Examples:
        a. Total Fee = $10,000
        b. Business vs. Business = Respondent pays $5000
        c. Business vs. consumer/employee = Business pays $9500 and consumer/employee pays $500
        d. Fees will be reduced if there is a subscription agreement in place.
        e. New Era will respect any other fee allocation agreement agreed to in advance by the parties.

   vi. Neutral is Appointed
      1. The parties will engage in New Era's standard rank/strike process.
      2. The parties may opt out ofNew Era's standard rank/strike process, but only if agreed to by both parties.

   vii. Parties Upload Their Documents
      1. Both Claimant(s) and Respondent(s) upload the relevant documents and their initial arguments.
      2. Both parties must upload their documents within 14 days of the appointment of the neutral.
      3. Uploads are limited to the lesser of 10 total files, 25 total pages for each file or 25MB of aggregate uncompressed uploads.
      4. The neutral has discretion to allow evidence in excess of the stated limits as necessary to ensure a fundamentally fair process.

   viii. Documents Are Exchanged
      1. Once all documents are submitted, they are digitally exchanged between the parties.

   ix. Hearing is Set and Held or Denied
      1. The neutral will, in their sole discretion, decide if a hearing is necessary based on the submissions.
      2. If the neutral decides a hearing is necessary, it will be scheduled using the New Era ADR scheduling software.
      3. The neutral has discretion to rule solely on the documents.

   x. Final Arguments Are Submitted
      1. Within 14 days of the conclusion of the hearing, or the neutral's ruling that no hearing is necessary, both parties must submit final arguments based on the documents and initial arguments submitted earlier in the proceeding.
      2. Final arguments are limited to 15K characters.
      3. No jurisdictional or prefatory material is necessary in the final arguments, just the caption and substantive arguments.

   xi. Decision is Rendered

1. The neutral will render a non reasoned decision within 7 days of receipt of final arguments, or other date mutually agreed to by the parties.
2. A reasoned decision can be requested and will be provided within 14 days of receipt of final arguments, or other date mutually agreed to by the parties.

b. Mass Arbitration Rules and Procedures
   i. Subset of Virtual Expedited Arbitration Rules and Procedures
      1. The Mass Arbitration Rules and Procedures are a subset of the Virtual Expedited Arbitration Rules and Procedures and shall apply to any Mass Arbitration where the parties have selected the Virtual Expedited Arbitration process in their arbitration agreement.
      2. In the case of any conflict between the two sets of rules and procedures, the Virtual Expedited Arbitration Rules and Procedures will apply
   ii. General
      1. Mass Arbitrations are defined as arbitration claims filed on the New Era Platform (a) that number more than five (5), and (b) that arise out of Common Issues of Law and Fact, as defined in Section 2(x) above.
      2. If multiple cases are similar but do not arise out of Common Issues of Law and Fact, as determined in the discretion of the governing neutral, each such case will be adjudicated outside of the Mass Arbitration process under New Era ADR's standard Virtual Expedited Arbitration procedures.
         a. Ultimate authority in determining whether each case arises out of Common Issues of Law and Fact rests with the presiding neutral.
         b. Solely for administrative purposes, New Era ADR may group similar cases filed by the same law firm or group of law firms and have them proceed through the Mass Arbitration process unless and until the presiding neutral makes a determination otherwise. New Era ADR makes no determination with respect to issues of law and fact.
      3. Bellwether cases will be subject to the timeframes set forth in the Virtual Expedited Arbitration Rules unless otherwise set forth in the Mass Arbitration Rules and Procedures.
      4. All cases must be filed individually on New Era ADR's Virtual Expedited Arbitration platform.
   iii. Process and Rules at Each Stage
      1. Step 1: Filing and Neutral(s)
         a. First, all cases are filed on the New Era ADR Virtual Expedited Arbitration platform located at

28
Exhibit A
Page 30

**2-ER-190**

app.neweraadr.com in accordance with Section 6(a) of these Rules and Procedures.

b. Next, New Era ADR will provide a panel with at least 3 and up to 8 neutrals.

c. The parties will then participate in New Era ADR's standard rank/strike process.

d. If there is more than one attorney or law firm for the claimant(s), respectively, or respondent(s), respectively, the attorneys for each side are responsible for meeting and conferring internally and achieving consensus for that side.

e. If no consensus is reached, New Era ADR will assign a neutral.

f. New Era ADR retains the right to provide more than one neutral for a particular Mass Arbitration.

g. New Era ADR will endeavor to assign any later filed cases to the same neutral(s).

h. The rank/strike process will not proceed until all fees are paid as set forth in Step 2.

2. Step 2: Fees Are Paid

a. The default case fees follow New Era ADR's standard fees pursuant to Sections 1(a)(i) and (ii) of these Rules and Procedures, unless either party has a subscription agreement in place with New Era ADR, in which case the subscription fees and filing fees will be determined pursuant to such agreement.

b. Fees are allocated pursuant to the parties' contractual agreement and paid at this time, or if the contract does not provide for an allocation, the default allocation set forth in Section 1(a)(iii) herein shall apply.

c. Financial Hardship Affidavits are available.

d. Beyond the default division of case fee responsibility, there are no prohibitions or other New Era ADR rules related to how fees need to be, or should be, allocated.

3. Step 3: Virtual Expedited Arbitration/Bellwether Cases

a. The presiding neutral will make a determination about whether Common Issues of Law and Fact exist as a threshold issue in determining the case but has sole discretion in determining how such a decision will be made.

b. Claimant(s), collectively on the one hand, and Respondent(s), collectively on the other hand, will each select one "Bellwether Case" from all the cases that were filed. If there are multiple attorneys for the claimant(s) or respondent(s) they are responsible for meeting and conferring to determine their selection of the bellwether

case.  A third Bellwether Case will be selected through a process to be determined by the neutral so that there are three initial Bellwether Cases.

c. The Bellwether Cases must be selected within 14 days of selection of the neutral(s).

d. Bellwether Cases will be decided by the same neutral who was chosen from the Rank and Strike process, and that neutral shall have the discretion to increase the number of Bellwether Cases prior to any of them proceeding, but only if it is necessary to allow for a fundamentally fair process. Each party is entitled to an equal number of Bellwether Cases.

e. The Bellwether Cases will proceed individually, but parallel to the extent possible, through New Era ADR's Virtual Expedited Arbitration Process with the exception that document uploading must be done within 14 days of the selection of the Bellwether Cases.

4. Step 4: Lead Decision(s)/Settlement Conference

a. Following the virtual expedited arbitrations of the Bellwether Cases, a Lead Decision is rendered in each of the Bellwether Cases.  The Lead Decisions will be reasoned so that Precedent(s) may be applied.

b. Following the issuance of the Lead Decisions, the parties shall participate in a mandatory ***non-binding*** settlement conference on the New Era ADR platform with the same neutral who presided over the Bellwether Cases. If there are multiple attorneys for the claimant(s), respectively, or respondent(s), respectively, they are responsible for meeting and conferring to determine their selection of a representative group for purposes of participation in the settlement conference.

c. If the settlement conference results in a settlement, claimants and/or respondents may opt their particular case out of the results of the settlement conference, if any, but each such case will be subject to the remainder of the process outlined in this Section 6(b)(iii) of these New Era ADR Rules and Procedures and be considered "Remaining Cases," as that term is defined below.

d. If the settlement conference does not result in a settlement, each party shall provide the neutral with the case(s) that such party believes involve individualized issues of law and/or fact that should not be subject to Precedent (the "Remaining Cases"), if any.  The Remaining Case(s) can be identified at the settlement conference, but

must be identified within seven (7) days of the end of the settlement conference.

5. Step 5: Application of Precedent(s)

   a. In the absence of a settlement, the determinations made from the Lead Decisions in the Bellwether Cases will act as Precedent on subsequent cases with Common Issues of Law and Fact as applied to those Common Issues of Law and Fact, solely as determined by New Era ADR affiliated neutral(s).

   b. In all such additional cases, even if later filed, the Precedent(s) shall be applied in the manner identified in the immediately preceding paragraph.

6. Step 6: Case Analysis and Removal Right

   a. For Remaining Cases, the neutral will create a process for handling and resolving individualized issues of law and fact to ensure fundamental fairness and equity.

   b. Precedent will still apply to all Common Issues of Law and Fact in the Remaining Cases.

   c. Only if a party can demonstrate that there are no Common Issues of Law and Fact will a case be removed from the Mass Arbitration (a "Removal Case").  In such a case, the Removal Case will start *de novo* as a stand alone Virtual Expedited Arbitration.  The applicable case fee shall apply to this *de novo* proceeding.

7. No Appeal

   a. No appeal is permitted from the decision(s) unless otherwise specified in the contractual agreement between the parties.

8.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredlorig@quinnemanuel.com
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
  William R. Sears (Bar No. 330888)
  willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

KELLER LENKNER LLC
  Warren Postman (Bar No. 33069)
  wdp@kellerlenkner.com
  Albert Pak (*pro hac vice* forthcoming)
  albert.pak@kellerlenkner.com
1100 Vermont Avenue, N.W., 12th Floor
Washington, D.C. 20005
Telephone:  (202) 918-1123

Attorneys for Plaintiffs Skot Heckman,
Luis Ponce, Jeanene Popp, and Jacob
Roberts, on behalf of themselves and all
those similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Skot Heckman, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>Live Nation Entertainment, Inc., and Ticketmaster LLC,<br><br>       Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

COMPLAINT

1
2

## TABLE OF CONTENTS

**Page**

3   PRELIMINARY STATEMENT ................................................................. 1

4   PARTIES ............................................................................................... 11

5        A.   Defendants.................................................................... 11

6        B.   Plaintiffs ...................................................................... 14

7   JURISDICTION AND VENUE .............................................................. 14

8   ADDITIONAL FACTS ........................................................................... 15

9        General Background on the Live Music Industry ........................... 15

10       Defendants Have Dominance in Multiple Relevant Services Markets........... 20

11       C.   Primary and Secondary Ticketing Services ................... 20

12       D.   Concert Promotion Services.......................................... 32

13       E.   Relevant Geographic Market ........................................ 35

14       Defendants' Anticompetitive Practices Harm Competition in the
15       Market for Primary Ticketing Services for Major Concert
     Venues....................................................................................... 37

16       Defendants Are Now Attempting to Monopolize (and Succeeding in
17       Monopolizing) Secondary Ticketing Services for Major Concert
     Venues....................................................................................... 45

18       Defendants' Acts Have Had Far-Reaching Anticompetitive Effects
19       That Damaged Plaintiffs in Direct and Quantifiable Ways ................. 52

20  ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE
     TOLLING, AND FRAUDULENT CONCEALMENT ................................ 58

21  CLASS ACTION ALLEGATIONS .......................................................... 62

22  INTERSTATE TRADE AND COMMERCE ............................................. 64

23  CLAIMS FOR RELIEF .......................................................................... 65

24  PRAYER FOR RELIEF .......................................................................... 73

25  DEMAND FOR JURY TRIAL ................................................................ 73

26
27
28

-i-

**PRELIMINARY STATEMENT**

1.      This is an unusual case.  For years, Defendants Ticketmaster LLC ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation Entertainment") have compelled consumer claims against them to arbitration, including in a case brought by the undersigned attorneys in 2020, *Oberstein v. Live Nation*, 20-cv-03888 (C.D. Cal.) (Wu, J.) ("*Oberstein*").  Suddenly, on July 2, 2021—while the Court in *Oberstein* was preparing its order on Defendants' Motion to Compel Arbitration—Defendants drastically altered the arbitration agreement on which they had moved to compel arbitration.

2.      Although the old arbitration agreement ("JAMS agreement") selects JAMS, an established arbitration forum, the new agreement ("New Era agreement"), which is Section 17 of Defendants' Terms of Use, designates New Era ADR as the dispute resolution forum.[1]  New Era ADR was launched in April 2021 with the mission of "helping businesses settle legal disputes" by creating rules that "make[] sense for businesses" and that also benefit "law firms, who are able to provide an improved client experience" to businesses "and handle a higher volume of cases" that are filed by consumers.[2]  New Era ADR advertises having launched "with around 10 clients," i.e., businesses, who have designated New Era ADR as the forum "in nearly 700 contracts," which New Era ADR expected "will provide a pipeline of potential clients," i.e., additional businesses, "down the road."[3]

3.      Unlike traditional arbitral forums that, like courts, set filing fees for both claimant-plaintiffs and respondent-defendants, New Era ADR offers businesses

---

[1] *See* Ticketmaster, *Terms of Use* (last updated July 2, 2021), https://help.ticketmaster.com/s/article/Terms-of-Use?language=en_US#section17.

[2] Jim Dallke, *This startup is helping businesses settle legal disputes completely online*, Chicago Inno (May 3, 2021), https://www.bizjournals.com/chicago/inno/stories/profiles/2021/05/03/online-arbitration-mediation-startup-new-era-adr.html

[3] *Id.*

-1-

COMPLAINT

1   a subscription model whereby the businesses keep New Era ADR on retainer.[4]  Each

2   year, Defendants pay New Era ADR a "subscription fee."  Defendants pay that

3   subscription fee whether there are 100,000 consumer filings or no consumer filings

4   against it.  And once they pay the subscription fee, Defendants require each

5   consumer to pay the entirety of the additional, per-filing fee of $300.

6          4.     When one of many aggrieved consumers files a dispute against

7   Defendants with New Era ADR, the consumer has no choice but to submit to

8   batched arbitration proceedings.  On the one hand, the New Era agreement requires

9   a consumer to bring claims "ONLY IN AN INDIVIDUAL CAPACITY" and bars

10  "ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING."  On the

11  other hand, once multiple consumers file cases against Defendants, New Era ADR

12  will group their cases together for any reason it deems appropriate, including the

13  consumers' counsel of choice.  The batched cases will then be assigned to a single

14  decisionmaker, chosen under unfair procedures that abridge consumers' rights to

15  select neutral decisionmakers and that later-filing consumers will not be able to

16  participate in at all.  That decisionmaker will then preside over the selection and

17  litigation of a few bellwether cases, during which all other consumers will be forced

18  to wait with no progress on their cases, and after which the outcome of those

19  bellwether cases will be forced on all consumers.  The New Era agreement thus

20  requires consumers to engage in a novel and one-sided process that is tailored to

21  disadvantage consumers.

22         5.     Even if consumers prevail under the New Era agreement, and even if

23  the consumers have a statutory right to attorneys' fees and costs, the New Era

24  agreement strips that right away, leaving it up to the unfairly chosen

25  decisionmaker's discretion to award those fees and costs "as necessary."  The New

26  Era agreement skews the odds so egregiously in Defendants' favor through its

27  ───────────────

28  [4] *See* New Era ADR, *Rules and Procedures* (last updated October 13, 2021),
    https://www.neweraadr.com/rules-and-procedures/

defense-biased provisions, and is imposed in such a procedurally unfair manner, that it is permeated with unconscionability to a far greater degree than the prior JAMS agreement.

6.     Setting aside the New Era agreement, the core of the dispute has not changed since *Oberstein*.  Plaintiffs bring this class action against Defendants under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, to recover the damages they suffered from paying supracompetitive fees on primary and secondary ticket purchases from Ticketmaster's online platforms.

7.     For decades, Ticketmaster and its predecessor, Ticketmaster Entertainment, Inc., has dominated primary ticketing services for live music events at major concert venues throughout the nation.[5]  Today, Ticketmaster has a market share exceeding 70% of primary ticketing services for major concert venues, which has come about in part by virtue of a web of long-term exclusive dealing agreements and various anticompetitive acts detailed herein, and provided Ticketmaster with decades of market dominance.  By Defendants' own count, Ticketmaster provides primary ticketing services to over 12,000 venues, with more added every year.  As the Department of Justice's Antitrust Division noted in 2010, and as public facts from subsequent litigation have demonstrated, there are high barriers to entry in the market for primary ticketing services for major concert venues, including, among other things, the long-term exclusive dealing agreements mentioned above.  These barriers and Defendants' many anticompetitive acts have assured that Ticketmaster's market power has long been (and remains) impregnable.  As a result, over 70% of tickets for major concert venues in the U.S. are sold through Ticketmaster's online platforms, despite that—as it has done for years—Ticketmaster charges supracompetitive fees made possible by its dominant market position.

---

[5]  "Primary" ticketing refers to the initial distribution of tickets for a show.  This is as compared to "secondary" ticketing, which refers to the resale of previously-purchased tickets, typically at a higher price.

-3-

8.     But Ticketmaster is not just a standalone company; it merged with Live Nation Entertainment in 2010 and today those entities jointly form the world's largest and most powerful live music company.  In the United States alone, Live Nation Entertainment is by far the largest and most dominant concert promoter for major concert venues, with a roster of clients that includes the vast majority of top touring acts in the world.  And Ticketmaster provides the vast majority of ticketing for those top grossing tours, as the former Chief Economist of both the Federal Trade Commission and the Antitrust Division summarized in a recently-concluded lawsuit:

-4-

COMPLAINT

Figure 10. Ticketmaster's US share of Pollstar top 2015 North American tours

| PS tour rank | Tour | Share of events | Share of shows | Share of tickets sold | Share of total gross |
|---|---|---|---|---|---|
| 1 | TAYLOR SWIFT | 77.8% | 74.5% | 84.9% | 84.6% |
| 2 | KENNY CHESNEY | 77.1% | 74.1% | 82.2% | 82.0% |
| 3 | GARTH BROOKS | 66.7% | 72.0% | 74.2% | 71.7% |
| 4 | THE ROLLING STONES | 85.7% | 85.7% | 85.3% | 87.4% |
| 5 | KEVIN HART | 87.2% | 89.8% | 88.9% | 88.8% |
| 6 | U2 | 85.7% | 92.9% | 94.3% | 94.9% |
| 7 | ONE DIRECTION | 94.1% | 94.1% | 93.9% | 95.3% |
| 8 | LUKE BRYAN | 90.7% | 88.3% | 90.0% | 88.1% |
| 9 | BILLY JOEL | 61.1% | 75.9% | 72.0% | 72.8% |
| 10 | SHANIA TWAIN | 66.7% | 66.7% | 66.0% | 67.8% |
| 11 | FLEETWOOD MAC | 76.3% | 76.9% | 76.4% | 76.2% |
| 12 | JUAN GABRIEL | 82.8% | 80.0% | 80.2% | 78.8% |
| 13 | AC/DC | 75.0% | 75.0% | 73.0% | 72.1% |
| 14 | GRATEFUL DEAD - "FARE THEE WELL" | 100.0% | 100.0% | 100.0% | 100.0% |
| 15 | TRANS-SIBERIAN ORCHESTRA | 73.3% | 73.0% | 74.0% | 73.4% |
| 16 | ZAC BROWN BAND | 88.9% | 86.0% | 81.3% | 76.7% |
| 17 | CIRQUE DU SOLEIL'S KURIOS | 50.0% | 49.5% | 47.1% | 48.9% |
| 18 | MAROON 5 | 84.6% | 85.7% | 86.7% | 84.5% |
| 19 | MADONNA | 84.6% | 85.7% | 88.1% | 89.0% |
| 20 | ELTON JOHN | 64.7% | 22.4% | 44.4% | 35.6% |
| 21 | CHRIS BROWN | 88.9% | 88.9% | 90.9% | 87.8% |
| 22 | DAVE MATTHEWS BAND | 91.7% | 90.9% | 91.7% | 91.8% |
| 23 | DEF LEPPARD | 82.7% | 82.7% | 85.2% | 80.6% |
| 24 | FOO FIGHTERS | 82.1% | 78.1% | 77.8% | 76.7% |
| 25 | ED SHEERAN | 71.9% | 68.6% | 70.7% | 70.2% |

Note: "Events" are defined as a single headlining act performing at a single venue over consecutive dates; an "event" can have multiple "shows," which are individual performances by that headlining act (i.e., Irish rock band U2 putting on a three-night run at the United Center in Chicago is an "event" consisting of three "shows").

9.      Subsidized by the supracompetitive profits Ticketmaster's business generates from its domination of primary ticketing services for major concert venues, Live Nation Entertainment is able to keep a stranglehold on concert promotion services—losing tens of millions of dollars annually—by paying its clients exorbitant amounts.  Using its promotion business as a loss leader in turn helps maintain Ticketmaster's dominance, because venue operators must take into account the very

1   real possibility that Live Nation Entertainment will not route tours through their venues
2   if they do not select Ticketmaster as their primary ticketing service provider.  And, as
3   the U.S. Department of Justice's Antitrust Division recently revealed in public filings,
4   this possibility was not just theoretical.  Since shortly after Live Nation Entertainment
5   and Ticketmaster merged in 2010, Defendants regularly threatened venues with less (or
6   no) Live Nation Entertainment tours if they did not select Ticketmaster as their primary
7   ticketing service provider.  The practice was apparently so pervasive and insidious that,
8   as the DOJ put it, "venues throughout the United States have come to expect that
9   refusing to contract with Ticketmaster will result in the venue receiving fewer Live
10  Nation concerts or none at all.  Given the paramount importance of live event revenues
11  to a venue's bottom line, this is a loss most venues can ill-afford to risk."  This
12  practice—which was, until recently, invisible to concert-going consumers, because
13  consumers had no reason to know how venues contract for primary ticketing services,
14  and because Defendants affirmatively concealed the behavior—went unchecked for so
15  long that Defendants recently became brazen in their conduct.   Live Nation
16  Entertainment's CEO and President, Michael Rapino, publicly admitted (on
17  information and belief, for the first time) in September 2019 that, if a venue wants to
18  use a ticketing service provider other than Ticketmaster, the venue "won't be the best
19  economic place anymore because we don't hold the revenue."  In other words, Mr.
20  Rapino indicated that, consistent with the DOJ's recently-made-public factual findings,
21  Live Nation Entertainment would not route tours through that venue in the future
22  because Ticketmaster does not provide primary ticketing services there.  This threat
23  was not lost on any serious industry participant.
24          10.    The combined Live Nation/Ticketmaster behemoth has enormous, and
25  unique, market power in primary ticketing and concert promotion services, and has
26  shown it is unafraid to use that power.  Furthermore, the public evidence indicates, ever
27  since the 2010 merger, Ticketmaster acted under Live Nation Entertainment's direction
28  and control, including Mr. Rapino in particular, with respect to the anticompetitive acts

COMPLAINT

1  alleged herein.  Live Nation Entertainment also provided substantial, independent
2  assistance to Ticketmaster's anticompetitive acts.  As the DOJ recently put it,
3  Defendants' anticompetitive acts mean that, today, "many venues are effectively
4  required to contract with Ticketmaster to obtain Live Nation concerts on reasonable
5  terms, limiting the ability of Ticketmaster's competitors to compete in the primary
6  ticketing market and harming venues that would benefit from increased competition."

7        11.    But the anticompetitive harm and costs from Defendants' acts are not
8  shouldered by concert venues; consumers have that unenviable privilege, simply
9  because they want to see their favorite artists perform live.  Fans nationwide have long
10 decried the extraordinarily high fees Ticketmaster imposes on the tickets it sells, a
11 practice consumers cannot avoid because of Ticketmaster's ubiquity and impregnable
12 market power.  As publicly-available evidence, including a recent report from the
13 United States Government Accountability Office ("GAO"), shows, markets that are not
14 encumbered by Ticketmaster's monopoly over ticketing services demonstrate much
15 lower prices for consumers.  The GAO noted, for example, that while service fees for
16 U.S. venues the GAO analyzed averaged 22% and could go as high as 38%, "[i]n the
17 United Kingdom, where the venue and promoter typically contract with multiple ticket
18 sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent
19 of the ticket's face value, according to a recent study."  Similarly, according to a report
20 from the New York Attorney General, at least as many as 65% of major concert venue
21 seats are now sold by Ticketmaster (and all with service fees far beyond what would be
22 paid in a competitive market).

23       12.    Despite the consumer harms they cause, Defendants have continued to
24 flourish by engaging in anticompetitive exclusive dealing with major concert venue
25 operators (which are bolstered by Ticketmaster's relationship with Live Nation
26 Entertainment), as well as numerous other unfair and anticompetitive acts discussed
27 herein that are aimed at eliminating and/or minimizing all competition, both in primary
28 ticketing services and, more recently, secondary ticketing services.

-7-

COMPLAINT

13.    Among those other predatory acts that collectively form its scheme, Defendants have improperly wielded the conditional copyright license Ticketmaster employs to grant access to its online platform as an anticompetitive weapon against all users on the site.  According to the license's terms, Ticketmaster website users cannot engage in a long list of practices aimed at purchasing a large number of primary tickets at once, including through the use of, *inter alia*, multiple user accounts and "bots."  If they do, then Ticketmaster states it may revoke the license to use its website and ban users, or put them toward the back of the line in terms of ticket purchasing priority (*i.e.*, electronically slow down their ability to purchase primary tickets).  Defendants claim this is a pro-consumer conditional license but, the truth is it shows the lengths to which Defendants will go to stifle competition.

14.    In reality, Ticketmaster's conditional license is a tool to maintain its monopoly power in primary ticketing services for major concert services, as well as extend and leverage Ticketmaster's monopoly power into secondary ticketing services for major concert venues, which it is attempting to monopolize just as it has already monopolized primary ticketing services for major concert venues.  Defendants were recently caught red-handed telling consumers they are fighting ticket brokers (via the conditional license and other means) when they were actually using the license as a bludgeon to force secondary ticket brokers into agreeing to exclusively use Ticketmaster's secondary ticketing platform, rather than other competing secondary ticket platforms, for their resales.

15.    In addition to using the conditional license as an anticompetitive bludgeon, Defendants have also begun using their dominance over primary ticketing services to limit primary purchasers' ability to transfer tickets, unless those purchasers resell their tickets through Ticketmaster's secondary ticketing platform.  Defendants do so through mobile ticket technology, which delivers a ticket to a purchaser's smartphone.  Historically, primary ticket purchasers have been able to transfer their tickets to whomever they want.  They could resell their tickets on a competing secondary

1   ticketing platform and then transfer their tickets to the secondary purchaser free of

2   charge.  Now, however, Defendants have implemented technology that prevents such

3   transfers, but still permits primary purchasers to resell their ticket on Ticketmaster's

4   platform.  Primary purchasers are unaware of these restrictions when purchasing their

5   tickets, and then have no choice in which platform to use if they wish to resell their

6   ticket.

7        16.    Competing secondary ticketing service providers offer lower fees to

8   secondary ticket purchasers than Defendants offer, which should create higher demand

9   for secondary tickets sold on those other platforms (thus benefiting the ticket resellers).

10  However, those secondary ticket competitors simply cannot compete with Defendants'

11  unique combination of concert promotion and ticketing services (and Defendants'

12  collective dominance).  Thus, competing secondary ticketing service providers are at a

13  distinct disadvantage in trying to simply compete on the merits.

14       17.    Given these problems, Defendants' use of the conditional license as an

15  anticompetitive weapon, as well as their limitations on primary ticket transferability,

16  have had anticompetitive effects for both primary and secondary ticketing services.

17  Among other effects, one effect is to grow Ticketmaster's secondary ticketing service

18  business at the expense of its rivals (which provide the competing secondary ticket

19  platforms on which brokers can opt to sell their purchased tickets), but not because

20  Ticketmaster offers a better or cheaper service.  Another effect is to dramatically

21  increase Ticketmaster's revenues by allowing it to levy fees on the second (and third,

22  etc.) sale of the same ticket(s) it sold in the primary sale.  Ticketmaster has leveraged

23  these effects into massive growth for its secondary ticketing service business, which has

24  come at the expense of consumers because it has led to ever more supracompetitive

25  ticketing fees for both primary and secondary ticketing services at major concert

26  venues.  That is a third effect of Defendants' conduct.  On information and belief,

27  Defendants' misuse of the conditional license alone has, like the recently-revealed

28  information from the DOJ's investigation, continued for years and had substantial

-9-

COMPLAINT

1   negative effects on competition in the markets for primary and secondary ticketing

2   services, which has led to higher prices for both secondary *and* primary ticket

3   purchasers on Ticketmaster's platform. When combined with the remainder of their

4   bad acts, the harm is even more substantial for all types of ticket purchases.

5        18.   Defendants' anticompetitive scheme has been wildly successful and today

6   threatens to put nearly all ticketing services for major concert venues (primary and

7   secondary) in the United States under Ticketmaster's monopolistic thumb.

8   Ticketmaster's dominance in primary ticketing services remains unchecked, and that

9   dominance becomes ever more impregnable with each passing year due to Defendants'

10   exclusive dealing, tying, and other anticompetitive conduct. Similarly, fed by the

11   anticompetitive acts described herein, Ticketmaster's secondary ticketing volume has

12   seen remarkable, double-digit year over year growth for multiple years now,

13   threatening to soon make Ticketmaster the largest secondary ticketing platform in the

14   nation. This is despite that Ticketmaster has clearly engaged in blatant, anti-consumer

15   behavior for years. In addition to its behind-the-scenes efforts to feed ticket brokers

16   huge amounts of supply if they sold on Ticketmaster's secondary platform, the DOJ

17   recently needed to move to extend the consent decree it originally crafted to permit the

18   Live Nation Entertainment-Ticketmaster merger, because Defendants—as has only

19   recently become public to ticket-buying consumers—shamelessly violated its terms for

20   years. The FTC also intervened in recent years to prevent Ticketmaster from moving

21   concert ticket buyers from its primary to secondary platform (*i.e.*, by implying tickets

22   offered at much higher prices than their face value were primary, as opposed to

23   secondary, ticket sales).

24        19.   Defendants' predatory acts have increased and today threaten the entirety

25   of competition within the primary and secondary ticketing services markets. Michael

26   Rapino, Live Nation Entertainment's CEO and President, has admitted that artists today

27   make 95% of their income from live music events and that Live Nation is now the

28   "largest single financer" of artists worldwide (more than record companies). Armed as

COMPLAINT

1  he is with this power over artists' careers, and fueled by Ticketmaster's outsized profits,

2  Mr. Rapino has used this position to intimidate the live music industry into using

3  Ticketmaster for primary ticketing services and, more and more, secondary ticketing

4  services.  He and the Live Nation monster he has helped create over the past decade-

5  plus must be stopped.

6      20.    This Complaint details Defendants' violations of the U.S. antitrust laws.

7  Defendants are dominant in three relevant markets – (1) primary ticketing services for

8  major concert venues (¶¶ 52-65, 70-72), (2) secondary ticketing services for major

9  concert venues (¶¶ 66-72), and (3) concert promotion for major concert venues (¶¶ 73-

10  79).    Defendants have engaged in predatory and exclusionary conduct (1) to

11  monopolize the primary ticketing services market (¶¶ 86-96) and (2) to extend their

12  dominance into the secondary ticketing services market (¶¶ 97-113).  Defendants'

13  anticompetitive conduct has lessened, if not eliminated, competition and harmed

14  consumers, including both the Primary and the Secondary Ticketing Services Consumer

15  Classes (¶¶ 114-123).  This lawsuit aims to put an end to Defendants' misconduct.

16                                    **PARTIES**

17  **A.    Defendants**

18      21.    Defendant Live Nation Entertainment, Inc. (formerly known as Live

19  Nation, Inc.) is a Delaware corporation with its principal place of business at 9348

20  Civic Center Drive, Beverly Hills, California 90210.  Live Nation is the largest live

21  entertainment company in the world, connecting over half a billion fans across all of its

22  platforms in 29 countries.  Live Nation states on its website that it "annually issues over

23  500 million tickets, promotes more than 35,000 events, partners with over 1,000

24  sponsors and manages the careers of 500+ artists."  Live Nation's 2019 revenues were

25  approximately $11.5 billion, but approximately 50% of its adjusted operating income is

26

27

28

                                        -11-
                                                                    COMPLAINT

1  attributable to its Ticketing division (*i.e.*, Ticketmaster), even though Ticketmaster

2  represented only 13.4% of Live Nation's revenues.[6]

3      22.    Defendant Ticketmaster LLC is a wholly-owned subsidiary of Live Nation

4  Entertainment, Inc.  Ticketmaster is a limited liability company organized and existing

5  under the laws of Virginia with its principal place of business at 7060 Hollywood

6  Boulevard, Hollywood, California, 90028.  Ticketmaster LLC is the successor in

7  interest to Ticketmaster Entertainment, Inc., a Delaware corporation, and is the largest

8  ticketing company in the United States, with 2019 revenues of approximately $1.54

9  billion.  As discussed herein, Ticketmaster's business includes two main arms:  its

10  legacy primary ticketing services business and a newer, but increasingly-dominant,

11  secondary ticketing service business.  On information and belief, Ticketmaster's share

12  of secondary ticketing services for major concert venues in the U.S. already exceeds

13  60%.  Ticketmaster also has several additional divisions that provide ancillary services

14  to these ticketing businesses.  In performing the anticompetitive acts herein alleged,

15  Ticketmaster acted under the direction and control of, and in coordination with,

16  Defendant Live Nation Entertainment, and its senior-most executives.

17      23.    Live Nation Entertainment and Ticketmaster merged in an all-stock

18  transaction in 2010.  Since then, the resulting conglomerate reorganized into the

19  following three segments:

20      (a)    In the Concerts segment, Live Nation Entertainment acts as a

21  promoter.  It and AEG Live are the only promoters that can operate on a United States

22  national and global scale; the remainder of its competitors are purely local in nature.

23  Live Nation Entertainment often serves as the exclusive promoter for artists on national

24  tours, and uses cross-collateralization across concerts and its deep pockets, including

25  operating profits from its Ticketmaster and sponsorship divisions, to routinely offer

26  _____

27  [6]  Live Nation's 2020 and 2021 revenues were different in part due to COVID-
    19, but the basic point remains the same:  historically, an enormous portion of Live
28  Nation's revenues have been attributed to its Ticketing division.

-12-

1    artists higher guaranteed compensation than its only other national competitor, a

2    company called AEG Live.[7]  Live Nation Entertainment has over 60% of the concert

3    promotion services market.  Revenue streams from this segment are numerous and

4    significant, but margins are below cost or very thin.  (Adjusted operating margins for

5    2019 were 2.6%.)  Live Nation Entertainment's promoted artists obtain the vast

6    majority of the Concerts segment's revenue.

7            (b)      By contrast, the Ticketing segment (*i.e.*, Ticketmaster) is highly

8    profitable with gross profit margins its own expert in a now-settled litigation stated

9    exceeded 80%.  This division primarily consists of the legacy Ticketmaster business,

10    which focuses on primary ticket sales, as well as a newer business focusing on

11    secondary ticket sales (*i.e.*, ticket resales).  Ticketmaster sells tickets to the public under

12    contract with the venues, and earns service and other ancillary fees on the sale of each

13    ticket.  Ticketmaster also has a growing secondary ticketing marketplace, with over $1

14    billion of gross transaction value in 2019 (more than 50% growth since 2013).  This

15    high-margin secondary ticketing business has provided an additional income stream for

16    Ticketmaster on the same shows for which it sells primary tickets.  This means

17    Ticketmaster can generate revenues two or more times on the exact same tickets.

18    Ticketmaster also maintains a database containing the contact information of over 130

19    million customers, a valuable resource that it has generally refused to provide to the

20    very artists who create the demand that drives ticket sales.

21            (c)      The Sponsorship & Advertising segment leverages the 93 million or

22    so fans Live Nation Entertainment draws to its shows, the 130 million-plus names in

23    the Ticketmaster database, their stable of managed and promoted artists, and the venues

24    they control to sell targeted advertising to major companies.  In 2019, this segment

25

---

26    [7]  The Anschutz Entertainment Group (AEG) is an American worldwide sporting
and music entertainment presenter and a subsidiary of The Anschutz Corporation.
27    AEG owns a variety of major concert venues throughout the U.S. that compete with
Live Nation- and third party-owned concert venues for major live music concerts.  AEG
28    Live is AEG's promotion arm for live music concerts.

-13-

1  generated adjusted operating income of $366 million on revenue of $590 million—a
2  62% operating margin.

3       24.    In 2019, the Ticketing and Sponsorship & Advertising segments
4  generated only 18.4% of Live Nation Entertainment's revenues, but over *100%* of its
5  adjusted operating income (reduced by its losses in Live Nation's concert promotion
6  business, and its general corporate costs).

7  **B.**    **Plaintiffs**

8       25.    Plaintiff Skot Heckman is a resident of San Bruno, California.  He
9  purchased primary and secondary tickets and paid associated fees for primary and
10 secondary ticketing services for events at major concert venues from Defendants'
11 online platform within the class period, including after Defendants adopted the New
12 Era agreement.

13      26.    Plaintiff Luis Ponce is a resident of Coral Springs, Florida.  He purchased
14 primary tickets and paid associated fees for primary ticketing services for events at
15 major concert venues from Defendants' online platform within the class period,
16 including after Defendants adopted the New Era agreement.

17      27.    Plaintiff Jeanene Popp is a resident of Clayton, Ohio.  She purchased
18 primary tickets and paid associated fees for primary ticketing services for events at
19 major concert venues from Defendants' online platform within the class period,
20 including after Defendants adopted the New Era agreement.

21      28.    Plaintiff Jacob Roberts is a resident of Fort Lauderdale, Florida.  He
22 purchased primary tickets and paid associated fees for primary ticketing services for
23 events at major concert venues from Defendants' online platform within the class
24 period, including after Defendants adopted the New Era agreement.

25                    **JURISDICTION AND VENUE**

26      29.    This Court has subject matter jurisdiction over this action pursuant to 28
27 U.S.C. §§ 1331 and 1337 because Plaintiffs bring this action under Sections 4 and
28

-14-

1  Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and

2  2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

3       30.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because

4  Defendants sell tickets throughout the State of California, including in this judicial

5  district.

6                          **ADDITIONAL FACTS**

7            **General Background on the Live Music Industry**

8       31.    At a high level, the components of the live music entertainment industry

9  include the following:

10
11  
12

13      32.    Artists are the draw for a live music event and drive demand for the

14  services of every subsequent link and participant in the live music industry chain.

15      33.    An artist manager serves as the "CEO" of an artist's business activities,

16  advising in some or all phases of the artist's professional life (tours, appearances,

17  recording deals, publicity, endorsements, etc.).  Managers often are compensated based

18  on a share of all of the artist's revenues or profit streams.  Defendant Live Nation is

19  currently the largest manager of artists in the music industry.

20      34.    The artist manager often hires booking agents to assist in arranging a

21  concert event or tour.  The manager or booking agent contracts with promoters, such as

22  Live Nation Entertainment, to secure payment terms for artists as compensation for

23  their live performances.  Agents are typically paid a portion of an artist's receipts from

24  live performances.

25      35.    The promoter is responsible for promoting the concert to the public, which

26  requires several different types of work.  The promoter typically receives the proceeds

27  from gross ticket receipts for each concert it promotes and is responsible for paying the

28  artist, venue, and other expenses associated with the event.  For example, the promoter

1   hires the artist for the performance (often guaranteeing more popular artists millions of

2   dollars for that performance or a national tour), generally contracts with the venue (or

3   uses its own venues), pays the concert venue operator a fixed fee (rental payment) to

4   host the concert at the venue, arranges for local production services, and advertises and

5   markets the concert.  The promoter bears the downside risk of an event if tickets sell

6   poorly and reaps the upside benefit with the artists if tickets sell well.  Put simply, the

7   more tickets a promoter is able to sell for a show, the more money the promoter (and

8   artist) should make.

9           36.     Today, artists planning to conduct a tour at major concert venues often use

10  a single company to provide and/or coordinate promotions for the entire tour.  SFX

11  Entertainment, Live Nation Entertainment's predecessor company, was the first to

12  achieve this feat at scale across the industry by acquiring multiple regional promoters

13  and integrating them into one national organization.  The unique, nation-spanning

14  services such a company provided to artists led them to view SFX (and, now, Live

15  Nation Entertainment) as their promoter of choice for concert tours, large and small,

16  particularly at major concert venues.  Although some artists still use multiple regional

17  concert promoters for a single national tour, the pre-SFX *status quo* has been reversed,

18  and this practice is now the exception, not the rule, for tours that include shows at

19  major concert venues.  Defendant Live Nation Entertainment is the largest promoter in

20  the United States, promoting over 60% of the shows at major concert venues in the

21  nation.

22          37.     Concert venue operators provide access to and maintain the facilities

23  where concerts are held and oversee the venue's associated services, such as

24  concessions, parking, and security.  Along with a rental fee received from the promoter,

25  venues generally take a share of the proceeds from concessions, parking, and artist

26  merchandise sales.  Concert venues that contract with Ticketmaster have also, in recent

27  years, begun to take a portion of the fees added to the face value of tickets for events at

28  the venue (discussed further below).  Thus, similar to the promoter, the more tickets

1  sold (and the more patrons that attend the venue), the more money the concert venue
2  operator makes.

3      38.    In terms of ticket sales, concert venue operators have two options: either
4  manage the sale of primary ticket inventory themselves or contract with a third party to
5  handle the sale process for them.  Managing and selling concert venue tickets is
6  technologically and operationally complex, so most concert venue operators choose the
7  latter option and contract with primary ticketing service providers (generally
8  Ticketmaster for major concert venues) for comprehensive ticketing solutions.  Of
9  particular note for this Complaint is that, on information and belief, Live Nation
10  Worldwide, along with other members of the Live Nation conglomerate, is the second-
11  largest concert venue operator/owner in the United States and exclusively utilizes
12  Ticketmaster for these services.[8]

13      39.    Primary ticketing service providers contract with venues to manage and
14  sell primary ticket inventory for events at that venue.  Primary ticketing service
15  providers create "back-end" inventory management systems and provide "front-end"
16  support, including customer service, shipping, and fulfillment services, as well as the
17  technology (and staff) to allow concert venue operators to sell tickets through their box
18  offices.  The primary ticketing service providers provide primary ticketing services to
19  primary ticket purchasers and sellers by acting as a distributor agent (distributing
20  primary tickets from primary ticket sellers to primary ticket purchasers), and sell the
21  primary ticket inventory made available to them through means such as the Internet,
22  call centers, and retail outlets and/or help the venue sell tickets at its box office.

23

24  _____
   [8]  Live Nation Worldwide, Inc. is a wholly-owned subsidiary of Live Nation
25  Entertainment.  In addition to the venues it owns and/or operates, Live Nation
Worldwide also runs the website livenation.com.  That website is separate and
26  distinct from Live Nation Entertainment's website, livenationentertainment.com,
and has a different purpose.  On livenation.com, Live Nation Worldwide sells
27  tickets to events at venues it owns or operates, as well as for shows promoted by
Live Nation Entertainment.  The only legal entity name actually listed on
28  livenation.com, however, is Live Nation Worldwide, Inc.

-17-

40.     Primary ticketing service providers generate profits by applying additional charges to the price of tickets sold to primary purchasers.  The overall price a consumer pays on a primary ticket purchase therefore generally includes the "face value" of the ticket (which is typically set by the artist and promoter),[9] as well as a variety of fees on top of/in addition to the face value of the ticket.  As noted, these fees are generally charged, received, and retained by the primary ticketing service provider, although they may be split with other parties, including the concert venue operator.  Typically described as "convenience," "processing," "service," "facility," and/or "delivery" fees, these fees can constitute a substantial portion of the overall cost of the ticket to the consumer.

41.     Substantially all of the nation's major concert venues have entered into long-term exclusive agreements with primary ticketing service providers—well over 70% with Ticketmaster, and growing each year—whereby the ticketing service provider contracts for the exclusive rights to the majority of all ticket sales for all events held at the venue.  By Defendants' own count, Ticketmaster provides primary ticketing services to over 12,000 venues and has a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these long-term exclusive dealing contracts expire.

42.     According to Ticketmaster, its agreements with concert venues have terms that may exceed ten or more years in length and are typically in the 5-7 year range.  In order to induce concert venue owners/managers to enter into such exclusive dealing agreements, Ticketmaster offers up-front payments and other subsidies that can run into the millions of dollars that are conditioned on such exclusivity.  Those up-front

---

[9]   In recent years, Ticketmaster has rolled out "dynamic pricing" services, which helps artists and promoters dynamically adjust ticket face values based on market demand for a particular show.  Thus, consumers attending the same show with roughly analogous seats may pay different face values for primary tickets based on when they purchase the ticket.

COMPLAINT

1  payments act as a barrier to entry for smaller competitors and act as an additional
2  mechanism to maintain Ticketmaster's dominance.

3        43.     Once there is a primary ticket sale, the primary ticket purchaser typically
4  may choose to resell their ticket.  Historically, such "secondary" ticket sales (*i.e.*,
5  resales) were challenging because it was logistically difficult to find a purchaser.
6  Ticket holders wanting to sell their tickets were therefore typically relegated to either
7  asking around to see if anyone they knew (or friends of friends) might want to purchase
8  the ticket(s), selling to local ticket brokers or putting tickets on commission there, or
9  heading to the event the day or evening of and selling to a scalper, who would then try
10  to resell the ticket to passersby.

11       44.     In recent years, however, a market for secondary ticketing service
12  providers also arose.  Such service providers typically offer online platforms connecting
13  ticket resellers to ticket purchasers, and providing services to both by acting as a
14  distributor agent (distributing secondary tickets from the former to the latter).  This
15  substantially reduces the logistical difficulties of reselling tickets.  Today, selling a
16  ticket is often as easy as posting the ticket on a secondary ticketing platform and
17  waiting for a purchaser to locate and buy the ticket.

18       45.     Like primary ticketing service providers, secondary ticketing service
19  providers do not set the price of the ticket; that decision is left up to the ticket seller.
20  Also like primary ticketing service providers, secondary ticketing service providers
21  generate revenues by levying fees on the sale transaction.  However, unlike primary
22  ticketing service providers, secondary ticketing service providers typically charges fees
23  on both sides of the transactions, as opposed to just on the ticket purchaser.  A ticket
24  seller therefore must pay a set fee (often a percentage of the "face value" they set for
25  the ticket sale), and the purchaser must also pay a set fee (often, also a percentage of the
26  sale price, as well as other assorted fees).

27       46.     Due to the conduct alleged herein, Ticketmaster's branded platform, as
28  well as its TicketExchange, TicketsNow, TM+, and Verified Tickets secondary

-19-

1    platforms have, on information and belief, obtained a market share exceeding 60% of

2    secondary ticketing services for major concert venues and are now threatening to obtain

3    (or have obtained) monopoly power in secondary ticketing services for major concert

4    venues just as it currently has in primary ticketing services for major concert venues,

5    where it has a market share exceeding 70%.

6    **Defendants Have Dominance in Multiple Relevant Services Markets**

7           47.    There are three relevant service markets applicable to this dispute.  They

8    are:  (1) primary ticketing services for major concert venues; (2) secondary ticketing

9    services for major concert venues; and (3) concert promotion services for major concert

10   venues.  Defendants are dominant in all three markets.

11   **C.    Primary and Secondary Ticketing Services**

12          **i.    Major concert venues constitute a distinct segment for**

13                  **ticketing services providers**

14          48.     A major concert venue is a facility suitable for hosting events of the most

15   successful artists and the largest concert tours.  Due to popular demand for events

16   featuring successful artists, major concert venues are likely to generate a larger volume

17   of commerce (*e.g.*, ticket sales, merchandise sales, concessions) than other venues.

18   Relative to other concert venues, major concert venues are also likely to have greater

19   seating capacity and to be located closer to major metropolitan areas.  In terms of

20   events, major concert venues must be suitable for hosting live music concerts, but may

21   also be used for non-music performances (*e.g.*, sports) or for other events requiring

22   large seating capacity.

23          49.    Ticketing service providers recognize that concerts require a specific type

24   of ticketing service, and that major concert venues in particular require even more

25   specialized ticketing services.  Regarding the former point, Ticketmaster internally

26   categorizes concerts as a specific type of ticketing.  For example, in a previous lawsuit,

27   Ticketmaster's Rule 30(b)(6) corporate representative testified that different types of

28   venues are treated separately within the organization, and that "concerts" were one such

category.  Ticketmaster's former CFO also testified that Ticketmaster breaks down tickets by category, one of which is "concerts."  Numerous Ticketmaster documents (made public in prior lawsuits) similarly note that concert ticketing is a category unto itself within Ticketmaster's broader ticketing services business including but not limited to the following:



Figure 1. Ticketmaster 2015 market shares by vertical segment

Source: Ticketmaster, "2015 NA Live Entertainment Market Sizing" (presentation, n.d.), 2 (TM0020328 at -332).

50.   Within the concerts ticketing services category, major concert venues constitute a distinct segment.  Major concert venues host the industry's biggest acts. Shows for super star artists sell out in minutes, bombarded by thousands of fans and ticket brokers struggling to scoop up seats for top-tier performances.  As the US Department of Justice discussed in its January 25, 2010 Competitive Impact Statement on the Ticketmaster-Live Nation Entertainment merger, "major concert venues require more sophisticated primary ticketing services than other venues."  The websites of ticketing service providers that service these venues need to be equipped to handle massive online traffic.  Such "high-demand events" have much higher requirements than other types of events and have been likened to a "denial of service attack" by industry insiders, meaning they receive heavy online traffic.

51.   Artists and their managers also recognize that major concert venues are a distinct category within the live music ticketing space.  In previous litigation involving

-21-

COMPLAINT

1   Ticketmaster, one third-party deponent manager made clear that major concert venues
2   were distinct from minor venues, from an artist's perspective, and that ticketing for
3   such venues was largely centralized in one place (Ticketmaster; discussed further
4   below). This view is echoed by industry publications, such as Pollstar, that distinguish
5   "major" concert venues from other venues within single categories, and even give out
6   awards based on whether a venue is "major" or not (*e.g.*, "Best Major Outdoor Concert
7   Venue").

8   ### ii.    Ticketmaster has long dominated primary ticketing services
9   for major concert venues

10      52.    As previously noted, Ticketmaster has dominated primary ticketing for
11  decades, dominance that has increased over the past four years in part because of the
12  merger with Live Nation Entertainment.  Other companies have sought to compete
13  against Ticketmaster for primary ticketing to concert venues over the years, but none
14  have been successful because Ticketmaster acquired them, drove them out of business,
15  or minimized their market share through a variety of tactics.  Indeed, as the DOJ
16  recently noted in moving to modify the Live Nation Entertainment-Ticketmaster
17  consent decree, "Ticketmaster has been the largest primary ticketing service provider
18  for major concert venues in the United States for at least three decades."  In 2017,
19  Ticketmaster's share of primary ticketing services in the United States exceeded 70%
20  among major concert venues and, as noted, its market power is growing as a result of
21  renewals and extensions of existing agreements.  Furthermore, Ticketmaster sells the
22  vast bulk of tickets for major concerts in the U.S. on an annual basis, because, as
23  detailed herein, Live Nation Entertainment promotes the great majority of major
24  concert tours each year and routes those tours through major concert venues for which
25  Ticketmaster is the primary ticketing service provider.

26      53.    High market shares are not the only indicators of Ticketmaster's market
27  power.  Ticketmaster's revenues are much greater than those of the next several largest
28  primary ticketing service competitors combined, as are, on information and belief, its

1    gross profit margins.  Moreover, although a small number of other primary ticketing
2    competitors attempt to compete against Ticketmaster for primary ticketing rights at
3    venues not controlled by Defendants, Defendants have admitted that Ticketmaster's net
4    renewal rate with venues on an annual basis has been "*over* 100%."  In other words,
5    since it merged with Live Nation Entertainment, Ticketmaster has steadily increased its
6    market share and dominance.

7         54.    Live Nation Entertainment has long been the world's largest promoter of
8    live concerts, boasting that it is "the global leader in live."  Live Nation Entertainment's
9    Concerts business segment principally involves the promotion of live music events at
10   concert venues throughout the world, although its largest footprint is in the United
11   States.  Live Nation Worldwide, combined with other members of the Live Nation
12   conglomerate, is also the second-largest owner or manager of concert venues and owns,
13   leases, operates, has booking rights for, or has equity interests in over 200 live
14   entertainment venues of various sizes in the United States.

15        55.    Before their merger, Live Nation Entertainment had been using
16   Ticketmaster as its primary ticketing service provider and was one of Ticketmaster's
17   largest customers.  In late 2006, Live Nation Entertainment (run then, as now, by Mr.
18   Rapino) concluded that it would be better served by entering the ticketing service
19   business itself.  It believed that, as the nation's foremost concert promoter, its
20   prominence would give it immediate access to the primary ticketing services market.

21        56.    That is exactly what happened.  Shortly after rolling out its primary
22   ticketing service strategy in 2008—which involved (a) licensing ticketing software
23   from CTS Eventim, the leading German primary ticketing service provider, for both
24   Live Nation and third party venues to use within the United States, and (b) engaging in
25   price competition with Ticketmaster on ticket service fees—Live Nation Entertainment
26   became the second-largest provider of primary ticketing services in the United States
27   almost overnight (by signing up both itself *and* the largest venue operator of the time,
28   SMG).

-23-

COMPLAINT

57.    In order to protect and preserve its monopoly power in primary ticketing services and to remove Live Nation Entertainment as a competitor, Ticketmaster decided to merge with Live Nation Entertainment.  The U.S. Department of Justice, California, and sixteen other states disagreed that this was permissible and, in January 2010, sued to block the merger between Ticketmaster and Live Nation Entertainment. The primary concern expressed in the complaint was that the merger would eliminate competition and innovation in the market for primary ticketing services (defined in the complaint as "primary ticketing services"), by eliminating Live Nation Entertainment as a competitor of Ticketmaster.  (Regulators did, however, also express concerns that the merger would also provide Ticketmaster with dominance in the secondary ticketing service provider market as well.)  To reduce the government's concerns, Defendants entered into a consent judgment with numerous requirements, including several behavioral remedies (*i.e.*, remedies meant to prevent certain anticompetitive behaviors). One of those behavioral remedies was that the merged entity was prohibited from conditioning or threatening to withhold artist tour stops (which Live Nation sets as an artist's concert promoter) based on whether a venue selects Ticketmaster as its primary ticketing service provider.  In other words, the merged companies could not punish or threaten to punish venues with less concerts if the venue decided not to use Ticketmaster as its ticketing service provider.

58.    The consent decree, including its behavioral remedies, was set to expire recently, but the DOJ moved to extend the consent decree by five-and-a-half years, because Defendants engaged in multiple violations of the consent decree's behavioral remedies.  Those acts are discussed in further detail below.  As relevant here, the DOJ noted its motion was necessary because Defendants' acts had led to *further* domination by Ticketmaster in primary ticketing services—and, therefore, consumer harm during the class period.

59.    Using a widely-recognized measure of market concentration called the Herfindahl-Hirschman  Index  ("HHI"),  the  post-Live  Nation  Entertainment  and

-24-

1   Ticketmaster merger HHI for primary ticketing services for major concert venues
2   increased by over 2,190 points, resulting in a post-merger HHI of over 6,900. The U.S.
3   Department of Justice considers any market with an HHI of more than 2,500 to be
4   highly concentrated. If Ticketmaster is successful in its quest to destroy competition in
5   the primary and secondary ticketing services markets, the HHI would rise even higher,
6   to nearly single-competitor—*i.e.*, pure monopoly—levels.

7        60.    As discussed above, Ticketmaster is the largest primary ticketing services
8   provider in the nation. Ticketmaster has historically possessed multiple competitive
9   advantages. As a result, smaller primary ticketing service providers (of all types) have
10  been limited in their ability to compete.

11       61.    The primary source of, and barrier surrounding, Ticketmaster's market
12  dominance is a nationwide web of long-term, exclusive dealing contracts with the vast
13  majority of major concert venues throughout the United States. General sales under
14  these contracts typically involve the sale of available tickets to the venue's shows,
15  excluding artist presale allocations. In exchange, Ticketmaster pays the venue a high
16  fixed fee (often including undisclosed rebates and other subsidies), which, depending
17  on the venue and the term of the contract, can be many millions of dollars. Given the
18  amounts at issue, this is a substantial barrier to entry and has allowed Ticketmaster to
19  steadily grow its venue contracts since its merger with Live Nation.

20       62.    The long-term exclusive dealing contracts with venues also create market
21  power and barriers to entry because of their length and ubiquity. Ticketmaster's
22  exclusive dealing arrangements with venues have terms that may range to ten or more
23  years in length and presumably much longer for Live Nation-controlled venues.
24  According to published industry data, Ticketmaster controls the distribution for over
25  70% of major concert venues and works with over 12,000 venues total. Published
26  industry data also indicates that approximately 70% of all online concert ticket sales are
27  completed through ticketmaster.com or Ticketmaster-run websites.

28

COMPLAINT

63.     Ticketmaster has also entered into long-term exclusive dealing arrangements with concert promoters, which is another barrier to entry and source of market power.  Live Nation Entertainment, the largest of these promoters, utilizes its subsidiary and agent, Ticketmaster, almost exclusively and actively seeks to dissuade its artists from using any other presale ticketing platform.

64.     In addition to Ticketmaster's exclusive contracts, new entry into the provision and sale of primary ticketing services is costly and time-consuming, thus constituting a substantial, additional barrier to entry.  A ticketing service provider must develop, maintain, and efficiently operate the required ticketing software and hardware computer systems, and possess the ability to demonstrate the reliability of its computer systems.  Moreover, for primary ticketing service providers in the current marketplace, the company must possess the ability to provide substantial up-front payments to customers.  Given these baseline requirements, no new entrant has developed or can develop the combination of comparable business characteristics and abilities in order to compete in primary ticketing services with the combination of Ticketmaster and Live Nation Entertainment.

65.     Ticketmaster's market power in primary ticketing services is evidenced by the high and supracompetitive fees that it charges for such services, and the restricted output those fees cause.  Ticketmaster's fees can collectively increase the price of a ticket to the consumer by 20-80% over the ticket's face value, which, in turn, generates gross profits (after all rebates and other payments) to Ticketmaster of over 80% according to Ticketmaster's own expert in an earlier case.  There are no effective constraints on Ticketmaster's ability to charge these supracompetitive fees because box office sales for most concerts and other events are minimal and are continuing to decrease.  This is because (a) in certain cases, Ticketmaster dictates that box office sales cannot begin until a specified time period following commencement of the online general sale (*e.g.*, for Madison Square Garden, box office sales are prohibited until one day after the general sale commences on ticketmaster.com), (b) consumers realize they

COMPLAINT

1   have a better chance of obtaining a better seat online, and (c) consumers continue to

2   increasingly prefer online purchases through mobile- or web-based applications.  As

3   noted above, these factors also lead to restricted output in overall ticket sales, as is

4   demonstrated by the fact that 40-50% of tickets to concerts at Ticketmaster-contracted

5   venues go unsold every year.

6           iii.    **Ticketmaster is attempting to extend, or has extended, its**

7                   **monopoly power to secondary ticketing services for major**

8                   **concert venues**

9           66.    As discussed above, secondary ticketing services help facilitate the resale

10  of tickets, and they provide a distinct role in the live music industry.  Similar to online

11  auction websites like eBay, a secondary ticketing service provider creates an online

12  platform that allows ticket holders to post their ticket(s) for sale.   The ticket

13  holder/seller determines the sale price for the ticket.  The secondary ticketing platform

14  then provides potential purchasers with search capabilities to locate tickets for events

15  they want to attend.  If a purchaser decides they want to buy one or more tickets for sale

16  on the platform, they fill in their purchase information and the platform completes the

17  sale.  Typically, the secondary ticketing service provider charges both the seller and

18  purchaser fees, usually based on the sale price of the ticket(s).

19          67.    Within the live music industry, and among concertgoers nationwide, there

20  is broad recognition that primary and secondary ticketing services are distinct.  Live

21  Nation Entertainment's CEO, Mr. Rapino, for example, has been repeatedly quoted

22  discussing the difference between the two types of service, including noting that

23  Ticketmaster has grown its secondary ticketing services substantially over the past

24  several years.[10]  Industry sources also regularly recognize the clear difference between

25  such services, and secondary ticketing service providers are listed and grouped as a

---

26          [10]  This growth has occurred *in addition to*, rather than instead of, growth in primary
27  ticketing services, because Defendants' goal is to maximize revenue from primary
    ticketing services and then grow revenue by *also* selling those same tickets via
28  Ticketmaster's secondary ticketing service platform.

-27-

1  distinct category of provider, although there is some overlap between the companies
2  that provide such services.

3      68.    Several other factors also demonstrate the unique and separate nature of
4  secondary ticketing services (as opposed to primary ticketing services) for major
5  concert venues:

6          (a)    *First*, customers for secondary ticketing services (*i.e.*, secondary
7  ticket sellers and purchasers) recognize the distinction between secondary ticketing
8  service providers and primary ticketing service providers.  In fact, primary ticketing
9  service providers themselves (including Ticketmaster) all view secondary ticketing
10 services as separate and distinct from primary ticketing services.  Defendants' own
11 public materials clearly make this distinction.   For example, in Live Nation
12 Entertainment's 2020 SEC Form 10-K disclosure statement, Live Nation Entertainment
13 repeatedly distinguishes between "ticketing services" and "ticketing resale services,"
14 noting that the former is for venues and the latter for resellers, and that the services they
15 each provide are different.  That same disclosure also distinguishes between "primary
16 ticketing companies" (also referred to as "primary ticketing service providers") and
17 "secondary ticketing companies."  So, too, does the disclosure repeatedly distinguish
18 between primary ticket sales and the "secondary ticket sales market."  Other public
19 analyses of the ticketing industry also regularly sort primary and secondary ticketing
20 service providers into different categories.

21         (b)    *Second*, all entities involved in the live music industry (including
22 Defendants themselves) recognize that secondary ticketing services have unique
23 purposes from primary ticketing services:  the latter are meant to facilitate and run the
24 original sale of tickets on a venue's behalf, and the former are meant to facilitate ticket
25 purchasers' resale of their ticket(s) at a later date.

26         (c)    *Third*, the customers for secondary ticketing services for events at
27 major concert venues are distinct from the customers for primary ticketing services for
28 events at major concert venues.  For primary ticketing services, major concert venue

-28-

Case 2:22-cv-00047-GW-GJS   Document 1   Filed 01/04/22   Page 31 of 76   Page ID #:31

1   operators are the ticket sellers who retain primary ticketing service providers to act as
2   their distributor agent and provide a number of back-end and front-end services to sell
3   tickets directly to fans wishing to attend an event.  For secondary ticketing services, the
4   ticket sellers are purchasers who bought a ticket and now wish to resell that ticket.  The
5   ticket buyers who utilize the two types of ticketing services are also distinct, in that the
6   secondary ticket buyers are purchasers who were unable to obtain the ticket they
7   wanted from the primary ticketing service provider, and therefore needed to look for
8   resale options instead.

9           (d)     *Fourth*, there are distinct pricing models between the two ticketing
10  service markets.  Primary ticketing service providers generate profits by levying fees on
11  top of a ticket's face value.  That face value is not established by the venue operator
12  (*i.e.*, the ticket provider), but rather by the artist and their promoter.  The venue operator
13  does not pay primary ticketing services fees—primary ticket purchasers do—and, due
14  to recent changes in Ticketmaster's business model, now often shares in a portion of the
15  levied fees, including by helping set the fee levels.  Secondary ticketing service
16  providers also generate profits by levying fees on secondary ticket sales, but that is
17  where the similarity ends.  Unlike in the primary market, secondary ticket prices are set
18  on a ticket-by-ticket basis by the ticket seller (as opposed to by the artist and the artist's
19  promoter).  Moreover, unlike in the primary market, a secondary ticketing service
20  provider typically charges the *ticket seller* a fee, often a percentage of the sale price of
21  the ticket.  However, secondary ticketing service providers *also* charge the purchaser
22  one or more fees on the sale, thus obtaining profits from both sides of the transaction.

23          (e)     *Fifth*, demand for secondary ticketing services is not sensitive to
24  changes in prices for primary ticketing services, because such changes do not cause
25  secondary purchasers to choose a different set of services.  It is irrelevant to secondary
26  ticket sellers and purchasers whether the prices primary purchasers pay for a venue's
27  primary ticketing service provider (*i.e.*, the fees those primary ticket purchasers pay on
28  top of a ticket's face value) change in any real way.  What matters for the secondary

-29-

2-ER-224

market customers is that they have a service available to post and potentially find (and purchase) a resale ticket.

(f)    *Sixth*, there are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different, depending on the ticketing service involved.  For primary ticketing service providers, the platform is venue-specific, and the services provided are aimed at facilitating a sale of primary tickets—which often includes the high-volume rush once tickets go on sale—as well as providing on-the-ground ticketing services at the actual event (*e.g.*, employees scanning tickets at the door).  For secondary ticketing service providers, the vendor must instead provide a platform with very different services and functionality.  A secondary platform focuses more on connecting sellers and purchasers, and also providing the necessary capabilities to complete their ticket transaction.  The secondary ticketing service provider takes a fee for its platform, but is not the one actually conducting and setting forth the terms of the sale.

69.    In the secondary ticketing services for major concert venues market, which is a distinct market for the same reason that primary ticketing services for major concert venues is a distinct market (*see supra* pages 27-29), Ticketmaster has a very small number of substantial competitors.   On information and belief, along with Ticketmaster, those few secondary ticketing service providers control the vast bulk of the secondary ticketing services for major concert venues market, such that eliminating them via the acts described herein would give Ticketmaster well over 70-80% of the market.

**iv.    Ticketmaster uniquely has substantial and increasingly dominant market share in both the primary and secondary ticketing services for major concert venues markets**

70.    As noted above, Ticketmaster provides both primary and secondary ticketing services for major concert venues. Ticketmaster is unique, however, in that it is the only ticketing services provider in the nation to have substantial share of both

-30-

1    markets.  Most of Ticketmaster's ticketing service competitors for major concert venues

2    operate in one or the other market, and only a very small handful operate in both.  For

3    the latter group, however, the few competitors in that category focus primarily on one

4    of the two relevant markets and have only a small presence in the other.

5        71.    Based on public information, Ticketmaster currently controls over 70% of

6    the primary ticketing services for major concert venues market, and, on information and

7    belief, over 60% of the secondary ticketing services for major concert venues market.

8    No other companies even remotely approach Ticketmaster's share of either market, and

9    the elimination of either would lead to Ticketmaster controlling nearly the entire

10   respective market.

11       72.    As the above indicates, Ticketmaster's unique dominance in both

12   categories of ticketing services has broad implications in the live music industry.  If one

13   were to assume, for example, that primary and secondary ticketing services for major

14   concert venues were simply part of a single ticketing services market, Ticketmaster

15   would *still* have monopoly power.  The GAO recently noted that the primary ticketing

16   services market in the United States is larger than the secondary ticketing services

17   market.  On information and belief, Ticketmaster's dominance in primary ticketing

18   services and its ever-growing share of secondary ticketing services therefore means that

19   it would still have well over 60% of a hypothetical combined ticketing service market

20   for major concert venues.  Furthermore, as Ticketmaster's pricing practices and

21   admitted growth strategies in both types of ticketing services shows (*i.e.*, it attempts to

22   maximize revenues in both types of services and does not view one type of service as

23   cannibalizing the other), it has monopoly power even if one assumes a combined

24   services market.  In that alternative view of the market, its actions alleged herein are

25   thus an example of anticompetitively obtaining and maintaining monopoly power, as

26   well as attempting monopolization, in a single market rather than two separate markets.

27   No matter how one views the markets, Defendants' conduct is inherently problematic

28   for competition.

COMPLAINT

**D.**     <u>**Concert Promotion Services**</u>

         **i.**      **Live Nation Entertainment is the unquestioned leader in**
                 **concert promotion services for major concert venues**

73.     On information and belief, Live Nation Entertainment controls at least 60% of concert promotion services for major concert venues. AEG Live is Live Nation Entertainment's closest competitor, with roughly 20% of the market. Live Nation Entertainment, however, promotes the vast majority of the top grossing touring acts in the world (who tour almost exclusively at major concert venues), and it is the only promoter, national or regional, that has a direct corporate relationship with the nation's most dominant concert venue and artist presale ticketing service provider, Ticketmaster.

74.     As discussed above, Live Nation Entertainment is the largest concert promoter in the nation and the world. Live Nation Entertainment has distinct competitive advantages as compared to AEG Live, the second largest concert promoter for major concert venues. Neither AEG Live nor any likely entrant to the concert promotion services market possesses the combination of attributes to prevent Live Nation Entertainment's selective exercise of market power over artists and major concert venues by the merged firm. New entry into the provision and sale of concert promotion services at the scale of Live Nation Entertainment is costly and time-consuming. Promoters for major concert venues must have the ability to provide substantial up-front payments to artists, and artists seeking to conduct a concert tour, particularly a national tour in the United States that includes major concert venues, require employees with the expertise, contacts, and business acumen to organize and promote such a tour (and with particularized knowledge of how to promote at such venues). Furthermore, given that a United States concert tour of major concert venues is specifically tied to the venues and regions in which it is conducted, and requires specialized knowledge and skills regarding those venues and regions (among other related factors), artists require that concert promotion services be provided in the United States by service personnel located in and throughout the United States. It

-32-

would take a prospective new entrant a substantial investment of money and over multiple years to develop the combination of comparable characteristics necessary to compete with the merged firm in concert promotion services and, even then, there is no assurance that it could in any way reduce Live Nation Entertainment's market power.

75.   For nearly two decades, Live Nation Entertainment has dominated concert promotion services overall.  It has maintained its dominance by virtue of its size and scope, and anticompetitive and unfair business tactics, including acquisitions of competing promoters, and incurring losses via significant overpayment to artists from tour revenues with the aim of reducing rival promoters' access to clients.

76.   Additional entry barriers to Live Nation Entertainment's concert promotion dominance have also emerged since it merged with Ticketmaster, because Ticketmaster provides the bulk of the merged firm's annual operating income.  With that income stream from Ticketmaster, Live Nation Entertainment is able to offer higher payments to artists than AEG Live and other concert promoters, and to use its promotion business as a loss leader to generate outsized profits for its ticketing and sponsorship businesses.  In 2019, for example, Live Nation Entertainment reported in SEC filings that its promotion business operated at a $53 million dollar loss.  In the same period, Ticketmaster generated nearly $232 million in operating income.

77.   Live Nation Entertainment's ability to price concert promotion services in this way—losing money year after year after year—yet nevertheless ensure massive profits for the overall company is one of the reasons why Live Nation Entertainment has durable market power over its smaller competitors.  Armed with that unique pricing ability, Live Nation Entertainment has only grown its market share and power without fear of serious competition.  Live Nation Entertainment has also recently acquired most of largest annual festivals in the United States, which provides the Live Nation conglomerate yet more leverage over the entire live music industry.

78.   Live Nation Entertainment's market power is also supported by current trends in the music industry.  Whereas, in previous decades, revenues from recorded

-33-

COMPLAINT

music were musicians' main source of income, with touring revenues providing a smaller income stream, those statistics have since reversed themselves. This reversal is largely due to the advent of modern music streaming and download technologies, and it requires artists to place much more emphasis on the touring portion of their careers. This reality has greatly increased Live Nation Entertainment's power and control over the shape of artists' careers, making them more reluctant than ever to defy Live Nation Entertainment more broadly, including by selecting a different promoter and/or planning tours that try to focus on non-Ticketmaster-controlled major concert venues (to the extent that is possible, which, for tours in the United States, it is not). Indeed, Mr. Rapino has admitted that artists today make "about 95%" of their income from live music events and that Live Nation is now the "largest single financer" of artists worldwide (more than record companies).

79. Live Nation Entertainment holds over 60% of the concert promotion services market and promotes at least 80% of the top-billing global touring acts, which tour the United States. Within the last four years, Live Nation Entertainment has used its market dominance to aid its subsidiary Ticketmaster in its efforts to destroy rivals (discussed further below).

### ii. Live Nation Entertainment and Ticketmaster's combined dominance is unique in the live music industry

80. Since they merged in 2010, Defendants have, both individually and as a conglomerate, acquired unparalleled dominance within the live music industry. Ticketmaster provides the vast bulk of primary ticketing services in the United States, just as it has for decades. Whereas, pre-merger, Ticketmaster needed to be cognizant of promoters and artists taking business away from Ticketmaster's contracted venues, that concern has now disappeared because the post-merger Live Nation Entertainment business promotes, manages, and/or hosts concerts for most of the biggest acts that tour in the United States—*i.e.*, the artists that Ticketmaster and its venue clients most care

-34-

1   about.  Indeed, as herein alleged, Live Nation Entertainment has directly participated in,
2   encouraged, aided, and facilitated Ticketmaster's anticompetitive activities.

3      81.   Defendants' unique position in the live music industry also creates
4   numerous entry barriers that protect and extend Ticketmaster's dominance.  Live
5   Nation Entertainment's promotion and artist management businesses, for example,
6   provide a steady stream of business to Ticketmaster and its venue clients that smaller
7   ticketing companies cannot overcome.  Over a decade ago (*i.e.*, pre-merger), Live
8   Nation Entertainment began to challenge Ticketmaster's dominance by using its stable
9   of artists as an inducement to venue operators to select its own primary ticketing
10  services over Ticketmaster's.  Without that constraint in the market—and with Live
11  Nation Entertainment's now decade-long, perfect alignment with the company against
12  which it previously sought to compete—Ticketmaster has only grown its market share
13  and ability to set prices without fear of serious competition from any new entrant.
14  Ticketmaster notably admits it is renewing over 100% of its long-term exclusive
15  dealing contracts each year, which necessarily occurs at the expense of rivals.
16  Ticketmaster has also, within the past four years, sought to extend this monopoly power
17  to secondary ticketing services.

18     82.   In addition to barriers to entry based on the current market structure and
19  conditions (including Defendants' corporate structure), Defendants' anticompetitive
20  practices, discussed herein, including but not limited to tying agreements, long-term
21  exclusive dealing contracts, vertically-arranged boycotts of various third parties against
22  Ticketmaster's competitors, and coercion of and threats against disloyal customers and
23  others, also act as a barrier to entry.

24  **E.    Relevant Geographic Market**

25     83.   The United States is the relevant geographic scope of both ticketing
26  service markets.  Concert venue operators purchase primary ticketing services from
27  their locations within the United States and look to United States-based service
28  providers to provide the primary ticketing services for their shows.  Similarly,

-35-

COMPLAINT

1   secondary ticketing service providers provide platforms connecting purchasers
2   throughout the United States.  Furthermore, only ticketing service providers with one or
3   more locations in the United States compete with each other for customers requiring
4   ticketing services at concert venues in the United States or for United States-based
5   concert tours.

6        84.   The geographic scope of the market for concert promotion services for
7   major concert venues is the United States.  Artists look to concert promotion service
8   providers that operate within the United States in order to put on any leg of a concert
9   tour stopping at a major concert venue in the United States.  Live Nation Entertainment
10   and AEG Live have promotion networks established throughout the country and are
11   considered viable alternatives to promoters with a more regional focus.  Accordingly,
12   even if an artist is focused on conducting a concert tour in only a limited region of the
13   United States, the alternatives from which they can choose for concert promotions
14   services for major concert venues are national.

15        85.   In the alternative, the relevant geographic markets of concert promotion
16   services for major concert venues are the sub-national regions in which artists require,
17   purchase, and look for promoters to provide promotion services for one or more legs of
18   a concert tour.  Although Plaintiffs have not yet had the discovery needed to finally
19   define these regions, on information and belief, they include at least the following
20   regions:

21       Pacific Northwest
22       Northern California
    Southern California
23       Intermountain West
    Southwest
24       Upper Midwest
    Lower Midwest
25       Texas
    Ohio Valley
26       New England
    Tri-State
27       Pennsylvania
28       D.C. Metropolitan

-36-

COMPLAINT

South
Southeast

### Defendants' Anticompetitive Practices Harm Competition in the Market for Primary Ticketing Services for Major Concert Venues

86.     Ticketmaster's original steps were as follows.  First, it shifted who paid the fees for a primary ticketing service provider's services.  Before Ticketmaster, venues typically paid such fees.  Since Ticketmaster, fans have paid those fees.  Second, Ticketmaster began paying venues large up-front fees to secure rights to service their primary ticketing, payments that Ticketmaster earned back (in multiples) over the life of its contract.  These twin steps fundamentally altered the market for primary ticketing services, because they created an economic misalignment between the venues and their fans.  Provided as they were with large up-front sums and drastically-reduced costs for ticketing services, venues were far more willing to enter primary ticketing service contracts—particularly long-term exclusive deals—with Ticketmaster, because they made more money and were not punished by their fans as a result.  Indeed, one reason Ticketmaster is today among the most disliked companies in the country is because, on information and belief, it willingly took on the role of the "bad guy" in fans' minds: Ticketmaster, not the venue, made them pay ever-higher ticketing fees.

87.     Because of the sea change it fomented when it first came to prominence in the late 1970s and early 1980s (particularly after it helped introduce electronic ticketing in 1982), Ticketmaster was able to quickly snap up a web of long-term exclusive dealing contracts with venues throughout the country.  Ticketmaster's share of primary ticketing services for major concert venues continued to grow and grow, and it soon became dominant in that market.  It has held that position of dominance ever since, despite multiple attempts by other primary ticketing services to take away market share and power.

88.     One of the problems that Ticketmaster's business practices—*i.e.*, up-front payments, plus kickbacks of a portion of fan-paid ticketing services fees, in exchange

-37-

1    for long-term exclusive dealing contracts—is that they reduced competition between
2    venues and incentivized those venues to enter into contracts with Ticketmaster to the
3    detriment of live music fans, *even though* competing venues had already entered
4    contracts with Ticketmaster.  The reason for this is straightforward.  Venues compete
5    with each other to attract artists, because artists pay to rent the venue and bring fans to
6    the venue, where they spend money on tickets, concessions, parking, etc.  Typically,
7    venues would compete on price in order to make themselves more attractive to artists,
8    such as by, among other things, offering lower ticketing fees for the artist's fans.  By
9    joining the Ticketmaster network of venues, however, the venue puts itself in the same
10   category as its competitors and need not compete on price for ticketing fees, because its
11   largest competitors (other comparable venues in the same region) are also part of
12   Ticketmaster's network.  Thus, Ticketmaster's web of long-term exclusive dealing
13   contracts is largely self-reinforcing; major concert venues are coopted by its dominance
14   and able to make the less consumer-friendly choice because they are sharing in
15   Ticketmaster's monopoly profits (especially since Ticketmaster began allowing venues
16   to help set ticketing fees for their shows).

17          89.    For this reason, Ticketmaster's claim that a portion of Ticketmaster's
18   contracts come up for bid each year has little to no effect on its continued dominance in
19   the primary ticketing services market, nor the anticompetitive harm consumers suffer
20   from Ticketmaster's exclusive dealing practices.  All up-front bidding (*i.e.*, bidding
21   between primary ticketing services providers) does in that scenario is transfer more of
22   the profits from the eventual ticket sales to the venue; the bidding does not change the
23   nature of the venues' incentives to join the Ticketmaster network, and does not create
24   the serious risk that Ticketmaster will lose any real share of the market.  After all, the
25   only way a competing primary ticketing service provider could take any substantial
26   market share away from Ticketmaster would be to be aware of every single instance in
27   which venues throughout the nation put a contract up for bid, convince those venues to
28   leave the Ticketmaster network, pay huge up-front fees to convince the venues to do so,

-38-

COMPLAINT

1   charge similarly-monopolistic ticketing fees as Ticketmaster without the market power
2   to do so, and then repeat this feat thousands upon thousands of times over the next five
3   years.  As Ticketmaster's over 100% annual renewal rate for exclusive venue deals
4   demonstrates, this is simply not competitively possible.

5       90.   Beyond the general self-reinforcing nature of Ticketmaster's exclusive
6   dealing practices in primary ticketing services (*i.e.*, the carrot offered by its monopoly
7   power), any venue contemplating a contract with Ticketmaster must also keep in mind
8   that Ticketmaster is part of the broader Live Nation Entertainment empire (*i.e.*, it wields
9   a very large stick to maintain that monopoly power).  Based on what the public now
10  knows, for the first time, were regular, behind-the-scenes statements from Live Nation
11  Entertainment's highest executives, as well as the merged companies' general business
12  practices, "venues throughout the United States have come to expect that refusing to
13  contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts
14  or none at all."  This fear is real and coercive, and it protects Ticketmaster's primary
15  ticketing services dominance, despite that venues ostensibly put up their contracts for
16  bid, because "[g]iven the paramount importance of live event revenues to a venue's
17  bottom line, this is a loss most venues can ill-afford to risk."  Thus, for those venues
18  that step out of line, Defendants have the ability to threaten and punish—and have
19  actually punished—venues with a loss of future revenues via lost Live Nation
20  Entertainment concerts.

21      91.   The evidence of this rampant intimidation and anticompetitive coercion
22  only recently came to light.  On August 27, 2019, Senators Richard Blumenthal and
23  Amy Klobuchar sent a letter to the head of the Department of Justice's Antitrust
24  Division regarding significant concerns they had related to the ticketing industry; in
25  particular, with Defendants.  Among other things, Senators Blumenthal and Klobuchar
26  noted that the DOJ's 2010 consent decree for the Live Nation Entertainment-
27  Ticketmaster merger "imposed behavioral conditions to prevent Ticketmaster from
28  using its dominance to stifle new competitors," including "prohibit[ing Defendants]

1  from withholding concerts that Live Nation promotes or concerts by artists that Live

2  Nation manages from venues that use a competitor's ticket platform."  The Senators

3  observed that, at the time of the merger, "many experts were skeptical that the merger

4  conditions were sufficient to create a competitive market," and, importantly for this

5  Complaint, recent evidence indicated that "the skeptics' fears have proven correct."

6  The letter then went on to report that the Senators were "deeply disturbed by reports

7  that Ticketmaster has violated the behavioral conditions by retaliating against venues

8  that use a competing ticket platform."

9       92.    Senators Blumenthal's and Klobuchar's letter echoed an April 2018

10  investigative piece from the New York Times that the Department of Justice had begun

11  investigating numerous complaints from Ticketmaster's competitors that Live Nation

12  Entertainment "has used its control over concert tours to pressure venues into

13  contracting with its subsidiary, Ticketmaster."   AEG, the second-largest primary

14  ticketing services provider in the United States, "told the [DOJ] officials that venues it

15  manages that serve Atlanta; Las Vegas; Minneapolis; Salt Lake City; Louisville, Ky.;

16  and Oakland, Calif., were told they would lose valuable shows if Ticketmaster was not

17  used as a vendor."  AEG backed up these complaints with emails from the venues,

18  including one in which a booking director asked Live Nation Entertainment to address

19  any issues regarding booking, to which the Live Nation representative replied, "Issue?

20  … Three letters.  Can you guess what they are?"  The following year, Live Nation

21  Entertainment then halved the number of Live Nation-promoted tours that stopped at

22  that venue.  AEG reportedly provided the Department of Justice with numerous other

23  examples.

24       93.    In late September 2019, the head of the Department of Justice's Antitrust

25  Division confirmed to the Senate Antitrust Subcommittee that the Department was

26  currently "examining allegations of violations" of the consent decree, although he did

27  not elaborate regarding specifics at that time.  Next, on December 13, 2019, the *Wall*

28  *Street Journal* reported that "[t]he Justice Department is preparing to take legal action

-40-

COMPLAINT

1  against Live Nation Entertainment Inc. on allegations the company has sought to

2  strong-arm concert venues into using its Ticketmaster subsidiary." As reported, "[t]he

3  department believes the concert-promotion giant's conduct has violated the merger

4  settlement Live Nation and the dominant ticket seller reached with the government in

5  2010." Then, on December 19, 2019, the DOJ itself issued a press release stating that

6  "[d]espite the prohibitions in the Final Judgment, Live Nation repeatedly and over the

7  course of several years engaged in conduct that, in the Department's view, violated the

8  Final Judgment." DOJ accordingly moved for an amendment to the consent decree that

9  extended the decree for five and a half years and clarified several acts that directly

10 violate its terms. As part of the deal resolving this enforcement action, Defendants also

11 agreed to an independent monitor and that any violation warranted an automatic

12 $1,000,000 per violation fine.

13      94.    In the DOJ's motion to amend Defendants' 2010 consent decree, it

14 included several examples of Defendants' wrongful, anticompetitive conduct. These

15 examples include:

16          (a)    In early 2012, the President of Live Nation Arenas threatened on

17 multiple occasions to divert Live Nation concerts away from a venue if it did not select

18 Ticketmaster as its primary ticketer. After that venue did not select Ticketmaster, two

19 Live Nation executives—the President of Live Nation Arenas and the local Live Nation

20 President in charge of placing concerts in the region—repeatedly threatened that the

21 venue would not get Live Nation shows unless it switched to Ticketmaster. When the

22 venue refused to switch to Ticketmaster despite these threats, Live Nation followed

23 through on its threats and retaliated against the venue by reducing the number of

24 concerts played there. Between 2011 and 2015, Live Nation shows playing at the

25 venue dropped by an average of almost fifty percent.

26          (b)    In another instance, an arena venue switched from Ticketmaster to a

27 competing ticketing service provider. Immediately after learning that the venue had

28 switched ticketing service provider, Ticketmaster's President contacted the local Live

-41-

COMPLAINT

1   Nation President responsible for placing concerts in the region to suggest that Live

2   Nation book more shows at the venue's nearby rival venue.  In the two years following

3   the venue's move to a Ticketmaster competitor for primary ticketing, Live Nation

4   significantly reduced the number of shows promoted at the venue in retaliation.

5           (c)    In 2017, Live Nation threatened to withhold concerts from a venue

6   if that venue did not contract with Ticketmaster, and then refused to book concerts at

7   Venue A for a year in retaliation for its selection of a competing ticketer.  In that

8   instance, the venue had issued a request for proposal ("RFP") only for ticketing services

9   and not for live content.  Nevertheless, when Ticketmaster met with the venue's

10  ticketing committee, a Live Nation promoter responsible for deciding where in the

11  region to place Live Nation concerts also attended the meeting.  At the meeting, the

12  Live Nation promoter explicitly threatened to withhold concerts from the venue if it did

13  not select Ticketmaster.  A few weeks later, when the venue informed the Live Nation

14  promoter that it planned to select a competing ticketer that had offered better financial

15  terms, the promoter responded that the competitor's offer would not be better than

16  Ticketmaster's if the venue did not receive as many Live Nation shows.  The Live

17  Nation promoter went on to specify that Live Nation would not book shows at the

18  venue unless it had no other options in the market.  Before the venue's decision not to

19  contract with Ticketmaster, Live Nation estimated that for the next several years it

20  would book three to four shows per year at the venue.  But in the year following the

21  venue's switch to Ticketmaster's competitor, Live Nation promoted zero shows at the

22  venue.  As described to the DOJ, that venue understood that Live Nation's decision to

23  book zero shows at the venue was retaliation for not selecting Ticketmaster as its

24  primary ticketer.

25          (d)    Also in 2017, another venue evaluated offers for primary ticketing

26  services from Ticketmaster and several competitors.  When the venue informed Live

27  Nation that it was planning to choose Ticketmaster's competitor, Ticketmaster's Vice

28  President for Client Development threatened to withhold all Live Nation concerts from

-42-

1    the venue if it did not renew its contract with Ticketmaster.  The Ticketmaster VP told

2    the venue that "if you move in that direction, you won't see any Live Nation shows."

3    Ticketmaster's Executive Vice President and Co-Head of Sports for NBA and NHL

4    Arenas made a similar threat to the venue, telling it that Live Nation's CEO would

5    never put one of his shows on sale through that particular Ticketmaster competitor.

6    Despite Defendants' threats, the venue initially selected a Ticketmaster competitor as

7    its primary ticketing provider.  Before that ticketing decision, Live Nation and the

8    venue discussed potential bookings approximately once per week.  But when the venue

9    opted to go with Ticketmaster's competitor, Live Nation stopped contacting the arena

10   about any possible concerts or booking shows at the venue.  For unrelated reasons, one

11   month later, the venue agreed to contract with Ticketmaster.  Immediately thereafter,

12   Live Nation began to get "geared back up" to bring concerts to the venue, because the

13   venue was "back in the family."

14          (e)    In September 2018, a different venue began evaluating primary

15   ticketing providers in advance of the expiration of its Ticketmaster contract.  When the

16   venue told Ticketmaster that it was considering other primary ticketers, Ticketmaster's

17   executive in charge of Sports for NBA and NHL Arenas told the venue that if it chose

18   another primary ticketer, its Live Nation concert volume would be put at risk because

19   Live Nation concerts would either skip the market altogether or play at another venue.

20   Later, that senior executive reiterated his threat that if the venue went with another

21   primary ticketing provider, Live Nation would pull concerts from the venue and reduce

22   the volume of shows held there.  Despite receiving a competitive bid from a

23   Ticketmaster competitor, the venue determined that the risk of contracting with a

24   ticketing service provider other than Ticketmaster was too great.  The venue renewed

25   its contract with Ticketmaster for primary ticketing services.

26          (f)    In yet another instance, Defendants threatened to blacklist a certain

27   venue from all future Live Nation shows after the venue decided to contract with

28   Ticketmaster's competitor for primary ticketing services.  According to the venue's

-43-

COMPLAINT

1  executive, Ticketmaster's President warned the executive that if the venue went with a

2  competing ticketing service provider, Ticketmaster's response "would be 'nuclear'" and

3  "though he would deny it if I repeated it, Live Nation would never do a show in our

4  building, that they would find other places for their content . . . ."  Following a

5  conversation with Ticketmaster's President, a second executive from the venue reported

6  that Ticketmaster and Live Nation "will not do any business whatsoever with our

7  stadium" and that Ticketmaster was "drawing a line in the sand and picking this as their

8  'hill to die on.'"  The venue executive went on to state his understanding that the venue

9  was "now on 'the black list.'"

10       95.    On information and belief, the above examples are not isolated instances

11  and instead reflect a widespread practice directed, encouraged, and mandated from and

12  also actively participated in and conducted by Live Nation Entertainment's highest

13  executives on down.  For this conclusion, one need not simply rely on the facts as

14  reported by the DOJ.  Instead, one can look to the company's own admissions.  As

15  previously noted, Mr. Rapino, Live Nation Entertainment's CEO and President,

16  publicly stated in September 2019—on information and belief, for the first time

17  publicly—that Live Nation Entertainment's concert promotion segment considers

18  whether a venue selected Ticketmaster as its primary ticketing service provider.  If the

19  venue did not, Mr. Rapino stated, then it "won't be the best economic place anymore"

20  for Live Nation-promoted tours "because we don't hold the revenue."  In these public

21  comments, Mr. Rapino claimed that this was not a "threat" to venues; however, his

22  description of how Defendants regularly practice their business was clearly one that, as

23  the DOJ's recent report makes clear, anyone in the live music industry was able to

24  understand.  Implicit threats are still threats, and Live Nation Entertainment did not

25  confine itself to implicit threats; it made explicit threats and backed up those threats

26  with reduced Live Nation concerts at disobedient venues.

27       96.    Regardless of any effects the DOJ's recent enforcement action and

28  extension to the consent decree *may* have on future competition in ticketing (which

-44-

COMPLAINT

1   unfortunately remains to be seen), the damage has already been done and Defendants

2   have, through their anticompetitive conduct, extended and maintained Ticketmaster's

3   monopoly power for years.  That conduct damaged Plaintiffs and the putative classes

4   through, *inter alia*, supracompetitive fees Ticketmaster has been able to charge on all

5   ticket purchases through its platforms since the two companies merged.

**Defendants Are Now Attempting to Monopolize (and Succeeding in
Monopolizing) Secondary Ticketing Services for Major Concert Venues**

97.     The rise of the internet ultimately helped create, for the first time, a truly
viable and robust secondary market for concert tickets in the U.S.  This is because the
internet's ability to connect individuals from all walks of life allowed secondary
ticketing service providers to create platforms where secondary ticket sellers and
purchasers could more easily congregate and consummate secondary ticket sales.
Whereas, pre-internet, a secondary ticket purchaser needed to affirmatively seek out
ticket brokers or find scalpers near the entrance of a show, now they could locate
secondary tickets with just the click of a button.  Similarly, ticket resellers suddenly had
a far broader reach via an easy-to-access electronic platform that dramatically lowered
the transaction costs for ticket resales.  These mutual conveniences allowed the market
to flourish, which created substantial benefits for ticket resellers and purchasers.

98.     The proliferation of the secondary market for concert tickets, however,
was not without negative effects.  Because a ticket reseller may charge more for
secondary tickets than their face value, opportunistic individuals and companies built
business models around buying up large amounts of primary tickets at the beginning of
a general sale and then selling those tickets at a markup on the secondary market.  They
could do so because they and other similar opportunists locked up the supply of the
tickets for a show, thereby driving up prices for fans that wanted to attend the concert.
These resellers (often, ticket brokers, but also just as often run-of-the-mill scalpers)
developed a number of different techniques to quickly purchase primary tickets,
including operating multiple accounts simultaneously, employing small armies of ticket

-45-

1  purchasers at the beginning of general sales, and by using "bots," programs that

2  automatically purchase tickets far faster than a human could.

3      99.    Many states have enacted laws ensuring that ticket purchasers may resell

4  their tickets, and secondary ticket sale platforms exist today because there is substantial

5  demand for secondary ticketing services.  Until Defendants' actions described herein,

6  there was robust competition between secondary ticketing services providers, which

7  benefited consumers to the extent they needed or wanted to purchase secondary tickets.

8      100.   As the dominant primary ticketing service provider for major concert

9  venues in the U.S., Ticketmaster hugely benefited from the growth of secondary

10  concert ticket sales.  The largest concerts in the U.S., which are typically held at major

11  concert venues, are also typically the most popular.  Given that demand is extremely

12  high for these shows, ticket brokers and scalpers are incentivized to quickly purchase as

13  many primary tickets as they can; the rest are then purchased by real fans.  All of this

14  frenzied purchasing during the general sale benefits the primary ticketing service

15  provider (typically, Ticketmaster) because, as discussed above, it generates revenues by

16  levying fees on primary ticket sales.  A robust secondary ticket market is thus a benefit

17  to primary ticketing service providers, because it maximizes primary ticket sales.

18      101.   Over the years, Ticketmaster has tread a narrow line by publicly decrying

19  ticket broker practices while privately encouraging them.  Defendants began a

20  concerted effort to grow their secondary ticketing services in addition to their dominant

21  primary ticketing service, so that Ticketmaster could make money off the initial

22  purchase *and* resales of the very same concert tickets.  This was a mandate from Mr.

23  Rapino on down.

24      102.   Ticketmaster first entered the secondary ticketing services market by

25  acquiring preexisting secondary ticketing service providers.  It then kept the platforms

26  separate from its primary ticket site for several years.  More recently, however,

27  Defendants integrated those secondary ticketing service providers into Ticketmaster's

28  broader online platform, such that consumers can now purchase primary *or* secondary

-46-

1    tickets off of Ticketmaster.com or the Ticketmaster mobile app, and may not even

2    know if they are purchasing a primary or secondary ticket at the time of sale.

3        103.   Given the PR problems from publicly embracing ticket brokers and other

4    entities whose business is purchasing and reselling tickets at a markup, Defendants

5    have claimed over the years that they are taking efforts to stifle broker behavior.  One

6    of the primary ways Defendants do so is through the "conditional license" Ticketmaster

7    grants to users of its website and/or mobile app.  The conditional license allows users to

8    view Ticketmaster's site and access its contents only if they agree to a bevy of

9    restrictions that prevent brokers from purchasing tickets from Ticketmaster and then

10   reselling them on rival secondary ticketing platforms.  As one example, the conditional

11   license prevents users from refreshing Ticketmaster's ticketing pages "more than once

12   during any three second interval."  The conditional license also restricts the use of

13   "ticket bot technology," which makes it more difficult for brokers to engage in bulk

14   purchases of tickets.  The conditional license contains many similar terms as well, and

15   Ticketmaster claims elsewhere that it will put brokers to the back of the electronic line

16   if it spots them in the queue.

17       104.   Defendants claim this conditional license is pro-consumer, but the truth is

18   that it is simply one more tool Defendants use to effectuate their broader

19   anticompetitive scheme.  As publicly reported earlier in 2019, Ticketmaster, with Live

20   Nation Entertainment's direction and support, regularly sets aside primary tickets for

21   ticket brokers, so those brokers can purchase and then resell those tickets.  Defendants

22   accomplish this goal through "ticket banks" that are ostensibly for presale tickets and

23   ticket "holds" (i.e., allotments of the total tickets "held" aside from the general sale for

24   industry insiders, such as artists, agents, venues, promoters, marketing departments,

25   record labels, and sponsors).  The ticket banks have neutral names so as not to trigger

26   fan suspicion, but the ticket banks (and the tickets placed into them) are really for the

27   brokers.  In this way, Ticketmaster is able to bolster its relationship with ticket brokers

28   and maximize primary ticket sales while also growing its secondary ticketing service

-47-

1   business.  As a recent investigation by the New York Attorney General revealed, tickets
2   set aside for holds and presales can often exceed 50% of the total tickets for a concert

3       105.   Ticketmaster's conditional license plays into this scheme by acting as the
4   sword Ticketmaster wields against ticket brokers if they do not agree to its
5   anticompetitive demands.  Put simply, Ticketmaster will allocate primary tickets for a
6   broker to a ticket bank *if* that broker agrees it will resell its tickets through
7   Ticketmaster's secondary ticket platform.   If the broker does not agree, then
8   Ticketmaster will use the conditional license to try to keep the broker off its platform.
9   It is able to do so with impunity because of the power Ticketmaster holds over the
10   supply of primary tickets at major concert venues, and because Live Nation
11   Entertainment, as the dominant concert promoter in the nation, controls the vast bulk of
12   major concert tours.  Faced with this potent combination, ticket brokers seeking to
13   resell major concert venue seats have no other choice but to use Ticketmaster's
14   secondary ticketing services, even though Ticketmaster is not as attractive a platform
15   for secondary sellers as Ticketmaster's competitors.   On information and belief,
16   examples of brokers that have agreed to this setup include DTI, Dynasty, and
17   Eventellect.

18       106.   Another tactic Ticketmaster employs to dominate secondary ticketing
19   services for major concert venues is to limit primary purchasers' ability to transfer their
20   tickets through any means other than Ticketmaster's secondary ticketing platform.
21   Defendants do so most prominently through a combination of mobile ticket and
22   Ticketmaster's branded "SafeTix" technology, although Defendants regularly attempt
23   to limit ticket transferability through other means as well.  The overall goal of these
24   efforts is to prevent primary ticket purchasers from using competing secondary
25   ticketing service platforms, to competitors' detriment and Defendants' benefit.  This
26   part of Defendants' scheme relies on utilizing their dominance over primary ticketing
27   services, their control over most major concert tours in the U.S., and their ability to
28   employ technological trickery for anticompetitive purposes.

-48-

COMPLAINT

1    107.   Due to the rise of smartphone usage, many primary ticketing service
2    providers (including, of course, Defendants) have developed electronic ticket
3    technology.[11] Primary purchasers receive an email with a link to their mobile ticket, or
4    receive the ticket directly on a smartphone application the primary ticketing service
5    provider creates and provides.  That mobile ticket usually includes a QR or other type
6    of electronic code that attendants at an event scan to permit the purchaser to enter.

7    108.   Historically, primary ticket purchasers have been able to transfer electronic
8    tickets easily.  Either as the result of a resale or simply in order to provide the ticket to a
9    friend or family member, primary purchasers could send their ticket electronically and
10   without cost.  As relevant to secondary ticketing services, a ticket reseller could either
11   upload their electronic ticket to the secondary ticketing platform of their choice, or send
12   it directly to a secondary purchaser after the completion of the resale.  Which option
13   they utilized depended on the secondary ticketing platform's procedures or, in some
14   instances, the ticket reseller's personal preference.

15   109.   Recently, however, Defendants have taken steps to prevent primary ticket
16   purchasers for events at major concert venues (the vast majority of which, due to
17   Defendants' dominance of primary ticketing services for major concert venues,
18   purchase tickets through Ticketmaster) from transferring their tickets, except through
19   Ticketmaster's secondary ticketing platform.    Defendants do so by utilizing
20   technological limits built into their primary ticketing platform that they and artists using
21   their concert promotion services can place on primary tickets sold at major concert
22   venues.  Ticketmaster has applied various names to these technological limits over the
23   years, including mobile tickets, Verified Fan tickets, and, more recently, SafeTix.
24   SafeTix, in particular, demonstrates the insidious competition problems Defendants'
25   transfer restrictions create (particularly in combination with its other technologies).

26   
27         [11]  In fact, many different industries now utilize electronic tickets.  One particularly
       notable example is the airline industry, which now offers passengers mobile tickets they
28     can present on their smartphones.

-49-

110.   Defendants ostensibly advertise SafeTix as "encrypted mobile tickets built with leading-edge technology" that "come standard with powerful fraud and counterfeit protection."   They "are powered by a new and unique barcode that automatically refreshes every few seconds so it cannot be stolen or copied, keeping your tickets safe and secure."  The tickets are only available on Ticketmaster's smartphone application. A SafeTix ticket holder supposedly can transfer some or all of their tickets to someone else "[i]n just a few taps" of their smartphone.  The technology also "ma[kes] it a snap to sell your tickets on the world's largest marketplace [*i.e.*, Ticketmaster's secondary ticketing platform] in a few taps."

111.   Similar to the conditional license, however, Defendants use SafeTix (and its functional predecessors) for anticompetitive, rather than procompetitive, purposes. Primary ticket purchasers typically purchaser their tickets with the understanding that they can resell their tickets wherever and however they want.  Using typical practices, they can transfer their tickets electronically after selling through a different secondary ticketing platform.  But SafeTix primary purchasers often find only after the fact that they cannot transfer their tickets in this manner.  As Defendants themselves admit, the only way to know if one can transfer their tickets is if they "look for the 'Transfer Tickets' button on your order [i.e., after the purchase].  If transfer is not available, the button will not be there."  As public reports demonstrate, in some instances, primary purchasers had no advance notice of this limitation on their transferability.[12]  In other instances, primary purchasers did receive advance notice of non-transferability, but they were conveniently only allowed to resell their tickets through Ticketmaster's secondary ticketing platform.[13]

---

[12]   *See*, *e.g.*, Sarah Pittman, *The Black Keys' Wiltern Snafu Thrusts SafeTix Into Spotlight*, Pollstar (Sept. 26, 2019), https://www.pollstar.com/News/the-black-keys-wiltern-snafu-thrusts-safetix-into-spotlight-141163.

[13]   *See, e.g., Pearl Jam Deploys TicketMaster's SafeTix Tech*, Ticketing Business News (Jan. 17, 2020), https://community.pearljam.com/discussion/283246/pearl-jam-deploys-ticketmaster-s-safetix-tech.

-50-

COMPLAINT

112.   Competing secondary ticketing service providers, as well as a competitive secondary ticketing marketplace, require a free-flowing supply of primary tickets. Without a supply of primary tickets to list on their platforms, such secondary ticketing service providers simply cannot compete.  Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits Defendants have increasingly placed on primary ticket transferability.

113.   Defendants' use of the conditional license to force secondary resellers to use Ticketmaster's platform, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services.  Among other effects, one effect is to grow Ticketmaster's secondary ticketing service business at the expense of its rivals (which provide the competing secondary ticket platforms on which brokers can opt to sell their purchased tickets). Another effect is to dramatically increase Ticketmaster's revenues by allowing it to levy fees on the second (and third, etc.) sale of the same ticket(s) it sold in the primary sale.  Ticketmaster has steadily grown its secondary ticketing service business for years and today processes well over a billion dollars annually of secondary concert ticket sales at major concert venues.  This growth has come at the expense of Ticketmaster's secondary ticketing service provider competitors, who have no ability to compete with Ticketmaster on the merits (although they struggle to do so).  It also has come at the expense of consumers because, despite the fact that Ticketmaster's secondary ticketing service competitors for major concert venues charge consumers lower fees, Defendants have steadily grown Ticketmaster's secondary ticketing market share through the practices described herein, leading to ever more supracompetitive secondary ticketing fees for both primary and secondary ticketing services at major concert venues.  That is a third effect of Defendants' conduct.  This is discussed in further detail in the following Section, pages 52-57.

-51-

**Defendants' Acts Have Had Far-Reaching Anticompetitive Effects That
Damaged Plaintiffs in Direct and Quantifiable Ways**

114.   As a result of Defendants' anticompetitive conduct, Plaintiffs have paid anticompetitively-high fees on primary ticket purchases for years.  Ticketmaster has reduced competition for such services through the anticompetitive conduct described above and therefore largely immunized itself from price competition on its ticketing fees.  Thus, consumers who would otherwise be able to obtain primary tickets at lower overall cost must pay supracompetitive prices to obtain tickets from Ticketmaster, or else not be able to obtain tickets at all in the primary market.

115.   For example, some major concert venues are also sport venues.  There are instances where Ticketmaster is the exclusive primary ticketing service provider for the live music events at a major concert venue, but is not the exclusive primary ticketing service provider for the sports events at the venue.  As of late 2017, one such venue was the American Airlines Arena, in Miami.  The following chart compares the ticketing fees for the live music events for which Ticketmaster was the exclusive primary ticketing service provider against the sports events for which it was not.  As is clear, the fees on live music events were markedly higher:



Source: Ticketmaster, "Licensed User Agreement," Oct. 28, 2014, 8–10 (TM00000362 at -369–371, -373).

-52-

COMPLAINT

116.   A similar pattern emerges at Philips Arena, Atlanta, which has a similar separation between Ticketmaster's exclusivity over primary ticketing for live music events, and its lack of exclusivity over sporting events:



Source: Ticketmaster, "Licensed User Agreement," Jul. 11, 2011, 50 (TM00000243 at -289–291).

These examples are indicative of the broader harm Plaintiffs (live music fans) suffered at Defendants' hand—systematic, anticompetitively-high ticketing fees that began long before the class period.

117.   But one need not only look to the United States for proof that Ticketmaster's exclusive dealing in primary ticketing services for major concert venues has anticompetitively raised fees for primary ticket purchasers.  The United Kingdom is an example of a geographic market in which no one provider has extensive exclusive deals for primary ticketing services.  In that country, it is very rare for a single provider to conduct all primary ticketing services at a venue; instead, the venue typically selects a provider for a portion of primary ticketing sales, and then others involved with the show (*e.g.*, the promoter, artist, etc.) each may select their own primary ticketing service provider(s) for a portion of the tickets.  Ticketing service providers therefore compete with each other, including by offering lower fees for fans.  As the data show,

-53-

1  ticketing fees in the U.S. (under Ticketmaster's exclusive dealing dominance) are

2  invariably higher than the fees for tickets with the same face value in the U.K.):



Note: Fees calculated on the basis of a purchase of two tickets at the given face value. Y-axis represents (service fee) / (total combined face value). Ticket face value is given in USD. UK ticket prices converted to USD at the exchange rate available at the time of data collection.

Note: Fees calculated on the basis of a purchase of two tickets at the given face value. Y-axis represents (total fees) / (total combined face value). Ticket face value is given in USD. UK ticket prices converted to USD at the exchange rate available at the time of data collection.

-54-

COMPLAINT

118.   As noted herein, however, Defendants' scheme does not just harm competition in primary ticketing services for major concert venues; they have also harmed (and continue to attempt to harm) competition in the secondary ticketing services market.  For those consumers in the Secondary Ticketing Services Consumer Class (defined below), they are harmed by having to pay inflated secondary ticketing fees when purchasing from Ticketmaster rather than competitors.   The fees Ticketmaster charges secondary ticket purchasers are, on average, significantly higher than its competitors' secondary ticketing fees.  This fact is important because, all else being equal, secondary ticket resellers would ordinarily be incentivized to resell tickets wherever consumers would incur the lowest fees, because that increases demand for ticket resales given that the platform in question is less expensive for purchasers.  In other words, if seller fees are either the same or roughly equivalent, then secondary ticket platforms that are cheaper for purchasers are better for the resellers.

119.   These economic incentives are important because Ticketmaster's secondary ticket reseller fees are either the same or *higher* than competitors' fees, making the secondary ticket transaction either neutral or *worse* for resellers if they use Ticketmaster's platforms as opposed to its competitors' platforms.  Given this fact, the focus then moves to purchasers.  Ticketmaster's competitors all charge *lower* fees to secondary ticket purchasers than Ticketmaster.  The following chart shows this fact; Ticketmaster's largest secondary ticketing service competitors all charge purchasers lower fees on each transaction:

COMPLAINT

| Secondary Ticketer | Buyer Fees[14] |
|---|---|
| TicketsNow | 15% |
| TicketExchange | 15% |
| StubHub | 10% |
| Vivid Seats | 10% |
| TickPick | 0% |

Source: Orbis Research Analysis, 2019

Given these comparative fees, a rational ticket reseller, unencumbered by Defendants' anticompetitive scheme, would choose Ticketmaster's competitors, *not* Ticketmaster, if they want to maximize the profits they make from ticket resales. This is because (a) there is no clear benefit in terms of lower fees from choosing Ticketmaster rather than its competitors, and (b) there will be more demand for resale tickets on competitors' platforms, because the tickets sold there are less expensive for consumers. Thus, in a competitive market, one would expect to see Ticketmaster either enjoy no (or very little) secondary ticketing service growth, or that it would lower its fees in order to compete with lower-priced competitors.

120. But that is not what happened. Instead, the evidence shows that Ticketmaster's secondary ticketing services growth exploded since it made that business a priority in the past few years. Ticketmaster did not lower fees in order to achieve this growth, and it did not come at the expense of Ticketmaster's dominant primary ticketing services. Instead, Ticketmaster grew its share (and, on information and belief, dominance) in secondary ticketing services for major concert venues by engaging in the anticompetitive practices alleged herein. Defendants thus steadily gained market share (and continue to do so today) in secondary ticketing services via anticompetitive conduct while maintaining supracompetitive prices charged to secondary ticket purchasers. That is the epitome of anticompetitive effects.

---

[14]   The fees listed in this chart reflect a percentage of the ticket price for the final sale (*e.g.*, TicketsNow charges ticket buyers fees equal to 15% of the ticket price). Ticketmaster's fees are higher than all fees depicted in the chart, and as noted previously, can exceed 30% of the total transaction, when seller fees are also included.

-56-

121.   Defendants' efforts to obtain market power in the secondary ticketing services for major concert venues market by surreptitiously feeding primary tickets to ticket brokers and limiting primary ticket transferability have also had the effect of anticompetitively raising prices for its primary ticketing service fees.  This is because, *inter alia*, fees levied on primary ticket sales are typically set as a percentage of, or set fee based on, the face value of the primary ticket.  By creating an artificial picture of demand for primary ticket sales through the anticompetitive conduct alleged herein, Defendants drive face values of tickets up overall, which leads to anticompetitively-higher ticketing fees.  Similarly, in situations where an artist uses Ticketmaster's dynamic ticket pricing services, Defendants' conduct artificially pushes up dynamic ticket prices and leads to both higher face values *and* higher fees on primary ticket purchases.  Defendants' power (and, on information and belief, dominance) over both primary and secondary ticketing services for major concert venues also permits them to maximize fees from the former while also growing fees from the latter.

122.   Again, a comparison to a geographic region in which Ticketmaster does not have dominance via exclusive deals demonstrates how its business practices anticompetitively push up ticketing fees.  In addition to the empirical evidence discussed above with respect to lower primary ticketing services fees in the United Kingdom, similar evidence from the same region shows that freer competition in secondary ticketing services has a similar downward effect on price.  The GAO, in its recent analysis of secondary ticketing fees in the United States, noted that, while service fees for U.S. venues the GAO analyzed averaged 22% and could go as high as 38%, "[i]n the United Kingdom, where the venue and promoter typically contract with multiple ticket sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent of the ticket's face value, according to a recent study."[15]

---

[15]   The referenced study is Michael Waterson, *Independent Review of Consumer Protection Measures Concerning Online Secondary Ticketing Facilities*, a report

COMPLAINT

123.   The result of Defendants' efforts, working in concert with venues and ticket brokers, is the substantial lessening of competition in the relevant markets for primary and secondary ticketing services for major concert venues, injuring both competitors and consumers alike.

**ACCRUAL OF CLAIM, CONTINUING VIOLATION,**
**EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT**

124.   Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the anticompetitive acts alleged herein prior to their disclosure in 2019 and 2020.

125.   Since the start of the class periods, Defendants have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs and class members.  These violations each constituted injurious acts.

126.   In addition, Defendants' violations of the antitrust laws were kept secret from Plaintiffs and putative Class members.  As a result, Plaintiffs and class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for ticketing fees in the United States throughout the class periods.  Defendants affirmatively and fraudulently concealed their unlawful conduct by, *inter alia*:

(a)   Agreeing to the consent decree, which forbade them from tying or conditioning primary ticketing contracts to access to Live Nation-promoted concerts, and making a public commitment to abide by its terms as a condition of the Live Nation Entertainment-Ticketmaster merger;

(b)   Maintaining in public, ever since the merger, that they were abiding by the consent decree's terms and competing on the merits, rather than by threatening the loss of Live Nation-promoted concerts in order to obtain ticketing contracts.  Examples of such public statements include:

---

prepared at the request of the United Kingdom Department for Business, Innovation and Skills and Department for Culture, Media and Sport (London: May 2016), 30-31.

-58-

1        • Stating in its SEC Form 10-Ks from 2015-2020 that, "Competition in the

2  live entertainment industry is intense.  We believe that we compete primarily on the

3  basis of our ability to deliver quality music events, sell tickets and provide enhanced

4  fan and artist experiences."

5        • Stating at multiple points in 2016 and 2017 in a recent antitrust litigation

6  against Defendants in this District Court, *Complete Entertainment Resources, LLC v.*

7  *Live Nation Entertainment, Inc.*, that Defendants had never tied or conditioned ticketing

8  contracts on access to Live Nation-promoted concerts, going so far as to convince the

9  Court to provide only limited discovery on that issue in the case.  Later in the case,

10  Defendants' representatives made multiple statements that there was no evidence of

11  such tying or conditioning, and attempted to excoriate the plaintiff for including such

12  allegations in the first place.  Such conduct echoed affirmative statements from

13  Defendants' employees, officers, and directors that they competed solely on the merits

14  in obtaining ticketing contracts.

15        • Implementing the "Verified Fan" program in 2017, which Ticketmaster

16  claimed—often through interviews from David Marcus, Ticketmaster's EVP of

17  Music—helped cut down scalping behavior by "90%" by putting tickets in the hands of

18  "real fans" rather than secondary ticket resellers.

19        • In September 2019, Mr. Rapino tried to downplay the ongoing DOJ

20  inquiries and suggest that Defendants' business practices were in keeping with the

21  consent decree's requirements.  He stated, "We educate all of our employees: 'This is

22  how you go to market [with] Ticketmaster versus Live Nation, this and this is what you

23  can't say.  Win the business straight: You can bundle the business, you can add value,

24  you can present together — it's great to have Ticketmaster ticketing your building and

25  have Live Nation as your content partner.  That's how we generally win a business:

26  because of the strong value proposition we provide."

27        (c)    By implementing and imposing the conditional license, which

28  ostensibly limited ticketing brokers' and/or other mass secondary ticket resellers'

COMPLAINT

1   access to Defendants' ticketing platforms, which indicated that Defendants were taking

2   lawful steps to prevent ticketing brokers from accessing their ticketing platforms

3   instead of primary ticket purchasers;

4           (d)     By publicly stating that they were taking steps to curtail abuses of

5   primary ticket purchases by ticket resellers.  Examples of such statements include the

6   following:

7         • In a 2012 blog post, Ticketmaster stated that "the impact BOTS have on

8   you, our fans, isn't fair.  We want them gone."  It went on, "We invest millions of

9   dollars in our technology to differentiate the real fans from the BOTS" and

10  "Ticketmaster actively works with lawmakers, law enforcement and with our clients to

11  combat BOTS – and we have done this for years."  It then—ironically—"challenge[d]

12  all in the industry to follow our lead and step up and take action against those who use

13  and profit from BOTS."

14        • In connection with a 2016 article for ampthemag, Mr. Rapino admitted

15  that "he remains focused on finding ways to curb secondary market ticket sales and put

16  the money back into the pockets of artists and promoters."  He further was quoted as

17  stating that "his business model isn't selling a ticket multiple times, it's selling the right

18  ticket to the right fan at the right price and that sale happens once, not multiple times,"

19  and he was quoted as saying, "We don't benefit on the $700 Beyonce ticket."  "The

20  scalper or the mom and pop seller get the uplift.  Our great motive is that $8 billion is in

21  the gross, and that we are splitting it with the artist, and we make our piece, and the

22  artist makes the $700.  Our number one motive is to get the 8 billion in the gross for the

23  content, not to be on the sidelines making a service fee on a secondary ticket."

24        • In connection with a 2017 article for *Vulture*, David Marcus,

25  Ticketmaster's EVP of Music, stated regarding secondary ticketing, "It feels like an

26  injustice.  It's the sense of, 'I don't know who's screwing me, but I feel screwed.'"  He

27  went on, "How do we make sure that the primary industry recaptures that value?

28  Because that's where the art is being created, that's where the risk is being taken, that's

where the fans are.  The extent that there's $8 billion in activity in a secondary marketplace?  Shame on us.  That's the primary industry's weakness and inefficiency and failure to do what we can do for artists and fans."

- Mr. Marcus also provided an interview to *The Verge* in 2018, in which he conveyed that "Scalpers and their bots are public enemy number one, to hear Marcus tell it, and he talks about battling them as a 'constant arms race,' one that Ticketmaster hopes to end by addressing 'the root causes' of the predatory resale market: 'Anonymous people buying tickets on a first-come-first-serve basis, at below market value.'" "Scalpers completely abuse artists and fans, not to accomplish anything but a profit," Marcus says.  "If you want to build a successful retail brand, you can't stand by and watch that happen.  You have to change the way you do business."

127.  Plaintiffs and the class members did not discover, nor could have discovered through reasonable diligence, that Defendants were violating the antitrust laws until less than four years before this litigation was initially commenced, because Defendants used deceptive methods to avoid detection and to affirmatively conceal their violations from the ticket-buying public.

128.  Defendants did not tell Plaintiffs or other class members that they were violating the consent decree, coercing disobedient venues into selecting Ticketmaster as their primary ticketing service provider, misusing the conditional copyright license for Ticketmaster, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, Defendants' anticompetitive conduct, because it was performed outside the sight and knowledge of the ticket-buying public, was inherently self-concealing.

129.  As detailed above, Defendants engaged in a successful anticompetitive scheme that they affirmatively concealed:

(a)     By meeting with venues, ticket brokers, and other parties that enabled the scheme out of sight from the ticket-buying public (including through the use of private telephonic and electronic communications);

-61-

(b)     By demanding and otherwise ensuring that the threats, back room deals, and other anticompetitive practices were not discussed publicly, or did not otherwise reveal the nature and substance of the acts and communications in furtherance of their alleged scheme; and

(c)     By publicly claiming (until only recently) that they were abiding by the consent decree's terms, were using their conditional license in a lawful way, and otherwise were competing on the merits rather than squashing competition through anticompetitive means.

130.    As a result, Plaintiffs did not discover Defendants' conspiracy, even with the exercise of reasonable diligence.  Plaintiffs' diligence included reviewing the terms of purchases on Ticketmaster.  Plaintiffs' review of these and other public materials was insufficient to put Plaintiffs on notice of Defendants' anticompetitive scheme.

## CLASS ACTION ALLEGATIONS

131.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of two sub-classes, defined as follows:

The **"Primary Ticketing Services Consumer Class"**:

All end-user purchasers in the United States who purchased a primary ticket and paid associated fees for primary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

The **"Secondary Ticketing Services Consumer Class"**:

All end-user purchasers in the United States who purchased a secondary ticket and paid associated fees for secondary ticketing services for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation Entertainment, Inc. at any point since 2010.

132.    Excluded from the classes are ticket brokers, Defendants; the officers, directors or employees of Defendants; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants. Also excluded from the classes are any professional ticket resellers.  Also excluded from the classes are any federal, state or local governmental entities, any judicial officer

-62-

COMPLAINT

1  presiding over this action and the members of his/her immediate family and judicial
2  staff, and any juror assigned to this action.

3      133.   Plaintiffs do not know the exact number of class members at the present
4  time.  However, due to the nature of the trade and commerce involved, there appear to
5  be hundreds of thousands if not millions of class members such that joinder of all class
6  members is impracticable.

7      134.   The classes are defined by objective criteria, and notice can be provided
8  through techniques similar to those customarily used in other antitrust cases and class
9  actions, including use of Defendants' records.

10     135.   There are questions of law and fact common to each of the classes,
11 including whether Defendants violated the antitrust laws through the actions alleged
12 herein.

13     136.   Plaintiffs assert claims that are typical of the classes.  Plaintiffs and all
14 class members in each class have been subjected to the same wrongful conduct because
15 they all have purchased primary and/or secondary tickets and paid higher associated
16 fees for primary and/or secondary ticketing services for events at major concert venues
17 from Ticketmaster than they otherwise would have paid.

18     137.   Plaintiffs will fairly and adequately represent and protect the interests of
19 the classes.  Plaintiffs are represented by counsel competent and experienced in both
20 antitrust and class action litigation.

21     138.   Class certification is appropriate because Defendants have acted on
22 grounds that apply generally to the class, so that final injunctive relief or corresponding
23 declaratory relief is appropriate respecting the class as a whole.

24     139.   Class certification is also appropriate because common questions of law
25 and fact predominate over any questions that may affect only individual members of the
26 classes, including, *inter alia*, the following:

27

28

COMPLAINT

1         (a)     whether Defendants in fact engaged in anticompetitive acts

2                  aimed at unreasonably restraining competition for primary

3                  and secondary ticketing services;

4         (b)     whether such conduct violates the Sherman Act;

5         (c)     whether such conduct injured the class members; and

6         (d)     whether monetary damages and injunctive relief should be

7                  provided to class members as a result of Defendants'

8                  wrongful conduct.

9    140.   A class action is superior to other available methods for the fair and

10 efficient adjudication of this controversy, since joinder of all the individual class

11 members is impracticable.  Furthermore, because the monetary injury suffered by each

12 individual class member may be relatively small, the expense and burden of individual

13 litigation would make it very difficult or impossible for individual class members to

14 redress the wrongs done to each of them individually and the burden imposed on the

15 judicial system would be enormous.

16    141.   The prosecution of separate actions by the individual class members would

17 create a risk of inconsistent or varying adjudications, which would establish

18 incompatible standards of conduct for Defendants.  In contrast, the conduct of this

19 action as a class action presents far fewer management difficulties, conserves judicial

20 resources and the parties' resources, and protects the rights of each class member.

21                    **INTERSTATE TRADE AND COMMERCE**

22    142.   Defendants' conduct has taken place in and affected the continuous flow

23 of interstate trade and commerce of the United States, in that, *inter alia*:

24         (a)     Defendants have provided primary and secondary ticketing services

25 for major concert venues throughout the United States;

26         (b)     Defendants have used instrumentalities of interstate commerce to

27 provide primary and secondary ticketing services for major concert venues throughout

28 the United States;

1         (c)     In furtherance of the anticompetitive scheme alleged herein,

2  Defendants have traveled between states and have exchanged communications through

3  interstate wire communications and via U.S. mail; and

4         (d)     The anticompetitive scheme alleged herein has affected billions of

5  dollars of commerce. Defendants have inflicted antitrust injury by artificially raising

6  prices paid by Plaintiffs and the class members.

7                  **CLAIMS FOR RELIEF**

8                 **FIRST CLAIM FOR RELIEF**

9      **(Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

10                **(against All Defendants)**

11      143.   Plaintiffs repeat and reallege each and every allegation of this Complaint

12  as if fully set forth herein.

13      144.   Defendants have willfully acquired and maintained monopoly power for

14  Ticketmaster in the relevant markets for primary ticketing services for major concert

15  venues and, on information and belief, for secondary ticketing services for major

16  concert venues.

17      145.   Ticketmaster possesses monopoly power in the relevant market for

18  primary ticketing services for major concert venues and, on information and belief, the

19  relevant market for secondary ticketing services for major concert venues.

20  Ticketmaster has the power to control prices or exclude competition in the relevant

21  markets.

22      146.   Ticketmaster has market share of at least 70% of the relevant market for

23  primary ticketing services for major concert venues and, on information and belief, at

24  least 60% of the relevant market for secondary ticketing services for major concert

25  venues.

26      147.   Defendants have willfully acquired and maintained monopoly power for

27  Ticketmaster in the relevant markets, by means of predatory, exclusionary, and

28  anticompetitive conduct, including but not limited to long-term exclusive dealing

COMPLAINT

1  arrangements, leveraging, coercion of disloyal customers, ticket brokers, and others,

2  tying arrangements, and vertically-arranged boycotts, as alleged herein.

3          Exclusive dealing arrangements

4          148.   Defendants have entered into long-term exclusive dealing arrangements

5  with venues with respect to the provision of primary and secondary ticketing services.

6          149.   Defendants' arrangements have had the effect of foreclosing competition

7  in a substantial share of the line of commerce affected and the relevant market for

8  primary and secondary ticketing services for major concert venues.

9          150.   Defendants' arrangements cannot be circumvented.

10         151.   Defendants' arrangements with major concert venues are of long duration

11  and not easily terminable as a matter of practical economics.

12         152.   Defendants have coerced major concert venues to enter into these

13  arrangements.

14         153.   Defendants' arrangements are not the product of competition.

15         154.   Defendants' arrangements have had the effect of substantially lessening

16  competition and tending to create a monopoly in the relevant market for primary and

17  secondary ticketing services for major concert venues.  Defendants have used that

18  monopoly power in a predatory, exclusionary, and anticompetitive manner to

19  monopolize, on information and belief, the relevant market for secondary ticketing

20  services for major concert venues.

21          Leveraging

22         155.   Defendants have monopoly power in the relevant market for primary

23  ticketing services for major concert venues and in the relevant market for concert

24  promotion services for major concert venues.

25         156.   Defendants have used their monopoly power in those relevant markets in a

26  predatory, exclusionary, and anticompetitive manner to monopolize the relevant market

27  for primary ticketing services for major concert venues and, on information and belief,

28  the relevant market for secondary ticketing services for major concert venues, and

COMPLAINT

exclude competitors from those markets, including but not limited to by means of coercion of disloyal customers, ticket brokers, and others, tying arrangements, long-term exclusive dealing arrangements, and vertically-arranged boycotts.

157.   Defendants have used their monopoly power to monopolize the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

<u>Coercion of and threats against disloyal customers, ticket brokers, and others</u>

158.   Defendants have also coerced major concert venue operators to enter into long-term exclusive deals with Ticketmaster.

159.   Defendants have coerced major concert venue operators not to work with other primary and secondary ticketing service providers.

160.   Defendants' threats and coercion have impeded competitors' ability to secure contracts for primary and secondary ticketing services with the majority of major concert venues in the United States.

161.   By way of, *inter alia*, the misuse of Ticketmaster's conditional license, Defendants have agreed with and/or coerced ticket brokers and other ticket resellers not to work with other secondary ticketing service providers.

162.   By way of, *inter alia*, building in and applying technological limitations on primary ticket transferability, Defendants have agreed with and/or coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers.

163.   Defendants' threats and coercion have impeded competitors' ability to attract resellers to their secondary ticket platform for secondary ticket sales.

<u>Tying arrangements – concert promotion and primary ticketing services</u>

164.   The provision of concert promotion services and primary ticketing services are two separate services or products.

-67-

165.   Defendants have conditioned the provision of concert promotion services on the use of primary ticketing services from Ticketmaster.

166.   Defendants have sufficient economic power in the relevant market for concert promotion services to enable them to restrain trade in the relevant market for primary ticketing services.

167.   Defendants' conduct has affected a not insubstantial amount of interstate commerce in the provision of primary ticketing services for major concert venues.

168.   Defendants' conduct has had an anticompetitive effect in the relevant market for primary ticketing services for major concert venues.

<u>Tying arrangements – primary and secondary ticketing services</u>

169.   The provision of primary ticketing services for major concert venues and secondary ticketing services for major concert venues are two separate services or products.

170.   By way of, *inter alia*, exclusive dealing contracts, the misuse of Ticketmaster's conditional license, and technological limitations on primary ticket transferability, Defendants have conditioned the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster.

171.   Defendants have sufficient economic power in the relevant market for primary ticketing services for major concert venues to enable them to restrain trade in the relevant market for secondary ticketing services for major concert venues.

172.   Defendants' conduct has affected a not insubstantial amount of interstate commerce in the provision of primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

173.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

-68-

COMPLAINT

<u>Vertically-arranged boycotts</u>

174.  Defendants have induced and coerced venues to boycott Ticketmaster's competitors for the provision of primary ticketing services.

175.  By way of, *inter alia*, exclusive dealing contracts with major concert venues and misuse of Ticketmaster's conditional license, Defendants have agreed with, induced, and/or coerced ticket brokers and other ticket resellers to boycott Ticketmaster's competitors for the provision of secondary ticketing services.

176.  By way of, *inter alia*, building in and applying technological limitations on primary ticket transferability, Defendants have agreed with and/or coerced artists into preventing primary ticket purchasers from working with other secondary ticketing service providers.

177.  Defendants' conduct has foreclosed access to the relevant market for primary ticketing services for major concert venues, which is necessary to enable Ticketmaster's primary ticketing service competitors to compete.

178.  Defendants' conduct has foreclosed access to the relevant market for secondary ticketing services for major concert venues, which is necessary to enable Ticketmaster's secondary ticketing service competitors to compete.

179.  Ticketmaster possesses a dominant position in the relevant markets for primary ticketing services for major concert venues and secondary ticketing services for major concert venues.

180.  Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the relevant markets more efficient.

181.  Defendants' conduct has had a substantial effect on interstate commerce.

182.  Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.  Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

183.  Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

-69-

COMPLAINT

184.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

## SECOND CLAIM FOR RELIEF

**(Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

**(against All Defendants)**

185.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

186.   With respect to the relevant market for primary ticketing services for major concert venues, Defendants have engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to leveraging, coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, and vertically-arranged boycotts.

187.   With respect to the relevant market for secondary ticketing services for major concert venues, Defendants have engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to exclusive dealing contracts with major concert venues that include the exclusive right to sell all tickets, including secondary tickets, for said concerts, misusing the conditional license granted to use Ticketmaster's online ticketing platform, limiting primary ticket transferability through technological means, agreeing with and/or coercing ticket brokers to agree to list primary tickets on Ticketmaster's secondary platform instead of competitors' secondary ticket platforms, and agreeing with and/or coercing artists into limiting primary ticket transferability except on Ticketmaster's secondary ticketing platform, as well as the types of anticompetitive conduct referenced in the prior paragraph.

188.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary and secondary ticketing services for major concert venues.

189.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

-70-

COMPLAINT

190.   Defendants have engaged in that conduct with the specific intent of monopolizing the relevant markets for primary and secondary ticketing services.

191.   Defendants have engaged in that conduct with a dangerous probability of monopolizing each of the relevant markets for primary and secondary ticketing services for major concert venues.

192.   Defendants' conduct has had a substantial effect on interstate commerce.

193.   Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.  Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

194.   Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

195.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

## THIRD CLAIM FOR RELIEF

### (Sherman Act, Section 1, 15 U.S.C. § 1)

### (against All Defendants)

196.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

197.   As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the relevant markets for primary and secondary ticketing services for major concert venues.

198.   As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for

COMPLAINT

Ticketmaster in the relevant markets for primary and secondary ticketing services for major concert venues.

199.   As alleged above, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing service providers for major concert venues and the use of Ticketmaster's secondary ticketing services for major concert venues.

200.   These contracts, combinations, or conspiracies include but are not limited to long-term exclusive dealing arrangements, tying arrangements, and vertically-arranged boycotts.

201.   Defendants' conduct has had an anticompetitive effect in the relevant markets for primary and secondary ticketing services for major concert venues.

202.   Defendants' conduct has no legitimate business purpose or procompetitive effect.

203.   There are less restrictive alternatives to the restraints Defendants imposed on the relevant markets for primary and secondary ticketing services for major concert venues.

204.   Defendants' conduct has had a substantial effect on interstate commerce.

205.   Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.   Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

206.   Plaintiffs have been or will be injured in their property as a result of Defendants' conduct.

207.   Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.   Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

COMPLAINT

1

**PRAYER FOR RELIEF**

2    208.   Wherefore, Plaintiffs request the following relief:

3         (a)    Damages in an amount to be determined;

4         (b)    Treble damages;

5         (c)    Attorneys' fees;

6         (d)    Costs;

7         (e)    Pre-judgment and post-judgment interest at the maximum rate

8    permitted under the law;

9         (f)    Punitive damages;

10        (g)    Injunctive relief, including but not limited to an injunction

11   barring Defendants' conduct alleged in the Complaint;

12        (h)    Declaratory relief, including but not limited to a declaration and

13   judgment that Defendants' conduct alleged in the Complaint violates the laws

14   alleged in the Complaint; and

15        (i)    Such other and further relief as the Court deems proper and just.

16

**DEMAND FOR JURY TRIAL**

17         Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs

18   demand a jury trial as to all issues triable by a jury.

19

20

21

22

23

24

25

26

27

28

-73-

COMPLAINT

1  DATED:  January 4, 2022                    Respectfully submitted,

2
                                              QUINN EMANUEL URQUHART &
3                                             SULLIVAN, LLP

4
                                              By  /s/ *Adam B. Wolfson*
5                                                 Frederick A. Lorig (Bar No. 057645)
                                                  fredlorig@quinnemanuel.com
6                                                 Kevin Y. Teruya (Bar No. 235916)
7                                                 kevinteruya@quinnemanuel.com
                                                  Adam B. Wolfson (Bar No. 262125)
8                                                 adamwolfson@quinnemanuel.com
9                                                 William R. Sears (Bar No. 330888)
                                                  willsears@quinnemanuel.com
10                                                865 South Figueroa Street, 10th Floor
11                                                Los Angeles, California 90017-2543
                                                  Telephone:  (213) 443-3000
12                                                Facsimile:   (213) 443-3100

13
                                                  *Attorneys for Plaintiffs* Skot Heckman,
14                                                Luis Ponce, Jeanene Popp, and Jacob
                                                  Roberts, on behalf of themselves and all
15                                                those similarly situated

16

17                                            KELLER LENKNER LLC

18
                                              By  /s/ *Warren D. Postman*
19                                                Warren Postman (Bar No. 33069)
20                                                wdp@kellerlenkner.com
                                                  Albert Pak (*pro hac vice* forthcoming)
21                                                albert.pak@kellerlenkner.com
22                                                1100 Vermont Avenue, N.W., 12th Floor
                                                  Washington, D.C. 20005
23                                                (202) 918-1123

24
                                                  *Attorneys for Plaintiffs* Skot Heckman,
25                                                Luis Ponce, Jeanene Popp, and Jacob
26                                                Roberts, on behalf of themselves and all
                                                  those similarly situated
27

28

                                              -74-
                                                                            COMPLAINT

| Name Timothy L. O'Mara (Bar No. 212731) | |
|---|---|
| Address 505 Montgomery Street, Suite 2000 | |
| City, State, Zip San Francisco, CA, 94111-6538 | |
| Phone 1.415.391.0600 | |
| Fax 1.415.395.8095 | |
| E-Mail tim.o'mara@lw.com | |
| ☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained | |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SKOT HECKMAN, LUIS PONCE, JEANENE POPP, & JACOB ROBERTS, on behalf of themselves and all those similarly situated, | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | 2:22-cv-00047-GW-GJS |
| v. | |
| LIVE NATION ENTERTAINMENT,  INC., and TICKETMASTER L.L.C., | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

LIVE NATION ENTERTAINMENT, INC., and

NOTICE IS HEREBY GIVEN that TICKETMASTER LLC _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
  (202) Denying Defendants' Motion to Compel Arbitration
☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on ____August 10, 2023____. Entered on the docket in this action on _August 10, 2023_____.

A copy of said judgment or order is attached hereto.

____September 8, 2023_____   /s/ Timothy L. O'Mara_____
Date                                 Signature
                                     ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

NOTICE OF APPEAL

**2-ER-270**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF** | CENTRAL DISTRICT OF CALIFORNIA |

**Form 1. Notice of Appeal from a Judgment or Order of a
United States District Court**

U.S. District Court case number: | 2:22-cv-00047-GW-GJS |

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: | 01/04/2022 |

Date of judgment or order you are appealing: | 08/10/2023 |

Docket entry number of judgment or order you are appealing: | 202 |

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List each party filing the appeal. Do not use "et al." or other abbreviations.)*

Live Nation Entertainment, Inc., and Ticketmaster LLC

Is this a cross-appeal?   ○ Yes   ◉ No

If yes, what is the first appeal case number? | |

Was there a previous appeal in this case?   ○ Yes   ◉ No

If yes, what is the prior appeal case number? | |

Your mailing address (if pro se):

| |

| |

City: | |   State: | |   Zip Code: | |

Prisoner Inmate or A Number (if applicable): | |

**Signature** | /s/ Timothy L. O'Mara |   **Date** | Sep 8, 2023 |

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 1                                                                 *Rev. 06/09/2022*

**2-ER-271**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

Live Nation Entertainment, Inc., and Ticketmaster LLC

Name(s) of counsel (if any):

Timothy L. O'Mara, Sadik Huseny, Andrew M. Gass; Latham & Watkins LLP

Address: 505 Montgomery Street, Suite 2000, San Francisco, CA, 94111-6538

Telephone number(s): 1.415.391.0600

Email(s): tim.o'mara@lw.com, sadik.huseny@lw.com, andrew.gass@lw.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ⦿ Yes   ◯ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

Skot Heckman, Luis Ponce, Jeanene Popp, & Jacob Roberts, on behalf of themselves and all those similarly situated

Name(s) of counsel (if any):

Kevin Y. Teruya, Adam B. Wolfson; Quinn Emanuel Urquhart & Sullivan, LLP

Address: 865 South Figueroa Street, 10th Floor, Los Angeles, CA, 90017-2543

Telephone number(s): 1.213.443.3000

Email(s): kevinteruya@quinnemanuel.com, adamwolfson@quinnemanuel.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

| Live Nation Entertainment, Inc., and Ticketmaster LLC |
|---|

Name(s) of counsel (if any):

| Alicia R. Jovais, Robin L. Gushman; Latham & Watkins LLP |
|---|

Address: | 505 Montgomery Street, Suite 2000, San Francisco, CA, 94111-6538 |

Telephone number(s): | 1.415.391.0600 |

Email(s): | alicia.jovais@lw.com, robin.gushman@lw.com |

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

**Appellees**

Name(s) of party/parties:

| Skot Heckman, Luis Ponce, Jeanene Popp, & Jacob Roberts, on behalf of themselves and all those similarly situated |
|---|

Name(s) of counsel (if any):

| William R. Sears; Quinn Emanuel Urquhart & Sullivan, LLP |
|---|

Address: | 865 South Figueroa Street, 10th Floor, Los Angeles, CA, 90017-2543 |

Telephone number(s): | 1.213.443.3000 |

Email(s): | willsears@quinnemanuel.com |

Name(s) of party/parties:

| Skot Heckman, Luis Ponce, Jeanene Popp, & Jacob Roberts, on behalf of themselves and all those similarly situated |
|---|

Name(s) of counsel (if any):

| Warren Postman, Albert Pak; Keller Postman LLC |
|---|

Address: | 1100 Vermont Avenue, N.W., 12th Floor, Washington, D.C., 20005 |

Telephone number(s): | 1.202.918.1123 |

Email(s): | wdp@kellerpostman.com, albert.pak@kellerpostman.com |

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                    *2*                          *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Live Nation Entertainment, Inc., and Ticketmaster LLC

Name(s) of counsel (if any):

Roman Martinez, Latham & Watkins, LLP

Address: 555 Eleventh Street, NW, Suite 1000, Washington, D.C., 20004

Telephone number(s): 1.202.637.2200

Email(s): roman.martinez@lw.com

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes   ○ No

**Appellees**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                    *3*                              *New 12/01/2018*

**2-ER-274**

ACCO,(GJSx),APPEAL,DISCOVERY,MANADR,PROTORD,RELATED-G,STAYED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00047-GW-GJS

Skot Heckman et al v. Live Nation Entertainment, Inc. et al
Assigned to: Judge George H. Wu
Referred to: Magistrate Judge Gail J. Standish
Related Case: 2:18-cv-09052-GW-GJS
Case in other court:  9th CCA, 23-55770
Cause: 15:0001 Antitrust Litigation

Date Filed: 01/04/2022
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Skot Heckman**
*on behalf of themselves and all those similarly
situated*

represented by **Adam B. Wolfson**
Quinn Emanuel Urquhart and Sullivan LLP
865 South Figueroa Street 10th Floor
Los Angeles, CA 90017
213-443-3000
Fax: 213-443-3100
Email: adamwolfson@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Albert Pak**
Keller Postman LLC
1101 Connecticut Avenue, NW, 11th Floor
Washington, DC 20036
202-918-1835
Email: albert.pak@kellerpostman.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Henry Ames**
Keller Postman LLC
150 North Riverside Plaza Suite 4100
Chicago, IL 60606
312-896-4848
Fax: 312-971-3502
Email: ethan.ames@kellerpostman.com
*ATTORNEY TO BE NOTICED*

**Frederick A. Lorig**
Quinn Emanuel Urquhart and Sullivan LLP
865 South Figueroa Street 10th Floor
Los Angeles, CA 90017
213-443-3000
Fax: 213-443-3100
Email: fredericklorig@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Kevin Y. Teruya**
Quinn Emanuel Urquhart and Sullivan LLP
865 South Figueroa Street 10th Floor
Los Angeles, CA 90017
213-443-3000
Fax: 213-443-3100
Email: kevinteruya@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Warren D Postman**

Keller Postman LLC
1100 Vermont Avenue, N.W. Suite 12th Floor
Washington, DC 20005
202-918-1870
Email: wdp@kellerpostman.com
*ATTORNEY TO BE NOTICED*

**William R. Sears**
Quinn Emanuel Urquhart and Sullivan LLP
865 South Figueroa Street 10th Floor
Los Angeles, CA 90017
213-443-3000
Fax: 213-443-3100
Email: willsears@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luis Ponce**
*on behalf of themselves and all those similarly situated*

represented by **Albert Pak**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Henry Ames**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Frederick A. Lorig**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Y. Teruya**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Warren D Postman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R. Sears**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam B. Wolfson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jeanene Popp**
*on behalf of themselves and all those similarly situated*

represented by **Albert Pak**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ethan Henry Ames**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Frederick A. Lorig**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Y. Teruya**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Warren D Postman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**William R. Sears**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam B. Wolfson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jacob Roberts**                                    represented by **Albert Pak**
*on behalf of themselves and all those similarly*                    (See above for address)
*situated*                                                           *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

**Ethan Henry Ames**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Frederick A. Lorig**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Y. Teruya**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Warren D Postman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R. Sears**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adam B. Wolfson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Live Nation Entertainment, Inc.**                  represented by **Timothy L O'Mara**
                                                                     Latham and Watkins LLP
                                                                     505 Montgomery Street Suite 2000
                                                                     San Francisco, CA 94111
                                                                     415-391-0600
                                                                     Fax: 415-395-8095
                                                                     Email: tim.omara@lw.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Alicia R Jovais**
Latham and Watkins LLP
505 Montgomery Street Suite 2000
San Francisco, CA 94111-6538
415-391-0600
Fax: 415-395-8095
Email: alicia.jovais@lw.com
*ATTORNEY TO BE NOTICED*

**Andrew Michael Gass**
Latham and Watkins LLP

**2-ER-277**

505 Montgomery Street Suite 2000
San Francisco, CA 94111-6538
415-391-0600
Fax: 415-395-8095
Email: andrew.gass@lw.com
*ATTORNEY TO BE NOTICED*

**Daniel M Wall**
Latham and Watkins LLP
505 Montgomery Street Suite 2000
San Francisco, CA 94111-6538
415-391-0600
Fax: 415-395-8095
Email: danielmwallesq@gmail.com
*TERMINATED: 01/31/2023*

**Kirsten M Ferguson**
Latham and Watkins LLP
505 Montgomery Street Suite 2000
San Francisco, CA 94111
415-391-0600
Fax: 415-395-8095
Email: kirsten.ferguson@lw.com
*TERMINATED: 08/11/2023*

**Robin L. Gushman**
Latham and Watkins LLP
505 Montgomery Street Suite 2000
San Francisco, CA 94111
415-6391-0600
Fax: 415-395-8095
Email: robin.gushman@lw.com
*ATTORNEY TO BE NOTICED*

**Sadik Harry Huseny**
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
415-391-0600
Fax: 415-395-8095
Email: sadik.huseny@lw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ticketmaster LLC**                  represented by   **Timothy L O'Mara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alicia R Jovais**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Michael Gass**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel M Wall**
(See above for address)
*TERMINATED: 01/31/2023*

**Kirsten M Ferguson**
(See above for address)
*TERMINATED: 08/11/2023*

**Robin L. Gushman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadik Harry Huseny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**New Era ADR, Inc.**          represented by   **Joshua Loren Roquemore**
Riley Safer Holmes and Cancila LLP
100 Spectrum Center Drive Suite 440
Irvine, CA 92618
949-359-5500
Fax: 949-359-5501
Email: jroquemore@rshc-law.com
*TERMINATED: 01/11/2023*
*ATTORNEY TO BE NOTICED*

**Rebecca J. Wahlquist**
Kelley Drye and Warren LLP
350 South Grand Avenue Suite 3800
Los Angeles, CA 90071
310-712-6100
Fax: 213-712-6199
Email: bwahlquist@kelleydrye.com
*ATTORNEY TO BE NOTICED*

**Sandra L. Musumeci**
Kelley Drye and Warren LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
212-808-7788
Email: SMusumeci@KelleyDrye.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/04/2022 | 1 | COMPLAINT Receipt No: ACACDC-32564118 - Fee: $402, filed by Plaintiffs Jacob Roberts, Skot Heckman, Jeanene Popp, Luis Ponce. (Attorney Adam B. Wolfson added to party Skot Heckman(pty:pla), Attorney Adam B. Wolfson added to party Luis Ponce(pty:pla), Attorney Adam B. Wolfson added to party Jeanene Popp(pty:pla), Attorney Adam B. Wolfson added to party Jacob Roberts(pty:pla))(Wolfson, Adam) (Entered: 01/04/2022) |
| 01/04/2022 | 2 | CIVIL COVER SHEET filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Wolfson, Adam) (Entered: 01/04/2022) |
| 01/04/2022 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Wolfson, Adam) (Entered: 01/04/2022) |
| 01/04/2022 | 4 | NOTICE of Interested Parties filed by Plaintiffs All Plaintiffs, (Wolfson, Adam) (Entered: 01/04/2022) |
| 01/04/2022 | 5 | NOTICE of Related Case(s) filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. Related Case(s): 20-cv-03888-GW-GJS, 2:18-cv-09052-GW-GJS (Wolfson, Adam) (Entered: 01/04/2022) |
| 01/04/2022 | 6 | NOTICE OF ASSIGNMENT to District Judge Dolly M. Gee and Magistrate Judge Margo A. Rocconi. (et) (Entered: 01/04/2022) |
| 01/04/2022 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 01/04/2022) |
| 01/04/2022 | 8 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (et) (Entered: 01/04/2022) |
| 01/04/2022 | 9 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (et) (Entered: 01/04/2022) |
| 01/04/2022 | 10 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Albert Pak on behalf of Plaintiffs. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application |

| | | |
|---|---|---|
| | | to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (et) (Entered: 01/04/2022) |
| 01/05/2022 | 11 | [DOCUMENT STRICKEN PER DOCKET ENTRY NO. 15] APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac VN PER DOCKET ENTRYice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32571957) filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order (Proposed) Order on Application of Non-resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wolfson, Adam) Modified on 1/10/2022 (mrgo). (Entered: 01/05/2022) |
| 01/06/2022 | 12 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac Vice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32571957) 11 . The following error(s) was/were found: Local Rule 5-4.3.4 Application not hand-signed. Other error(s) with document(s): Please note that electronic, image or stamp signatures are not allowed. (lt) (Entered: 01/06/2022) |
| 01/06/2022 | 13 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 21-01-Related Case- filed. Related Case No: 2:18-cv-09052 GW(GJSx). Case transferred from Judge Dolly M. Gee and Magistrate Judge Margo A. Rocconi to Judge George H. Wu and Magistrate Judge Gail J. Standish for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:22-cv-00047 GW(GJSx). Signed by Judge George H. Wu (rn) (Entered: 01/06/2022) |
| 01/10/2022 | 14 | STANDING ORDER RE FINAL PRE-TRIAL CONFERENCES FOR CIVIL JURY TRIALS by Judge George H. Wu. (lom) (Entered: 01/10/2022) |
| 01/10/2022 | 15 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac Vice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32571957) 11 by Clerk of Court. Docket No. 11 is stricken for the reason(s) stated in the Notice 12 filed on January 6, 2022. (mrgo) (Entered: 01/10/2022) |
| 01/11/2022 | 16 | APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac Vice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $402.00 Previously Paid on 1/4/2022, Receipt No. ACACDC-32564118) filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order (Proposed) Order on Application of Non-resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wolfson, Adam) (Entered: 01/11/2022) |
| 01/11/2022 | 17 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac Vice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $402.00 Previously Paid on 1/4/2022, Receipt No. ACACDC-32564118) 16 . The following error(s) was/were found: Incorrect DJ and MJ initials listed on proposed order. (lt) (Entered: 01/11/2022) |
| 01/11/2022 | 18 | APPLICATION of Non-Resident Attorney Albert Y. Pak to Appear Pro Hac Vice on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Pro Hac Vice Fee - $402.00 Previously Paid on 1/4/2022, Receipt No. ACACDC-32564118) filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order (Proposed) Order on Application of Non-resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wolfson, Adam) (Entered: 01/11/2022) |
| 01/11/2022 | 19 | NOTICE of Appearance filed by attorney Daniel M Wall on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Daniel M Wall added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Daniel M Wall added to party Ticketmaster LLC(pty:dft))(Wall, Daniel) (Entered: 01/11/2022) |
| 01/11/2022 | 20 | NOTICE of Appearance filed by attorney Timothy L O'Mara on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Timothy L O'Mara added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Timothy L O'Mara added to party Ticketmaster LLC(pty:dft))(O'Mara, Timothy) (Entered: 01/11/2022) |
| 01/11/2022 | 21 | NOTICE of Appearance filed by attorney Andrew Michael Gass on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Andrew Michael Gass added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Andrew Michael Gass added to party Ticketmaster LLC(pty:dft))(Gass, Andrew) (Entered: 01/11/2022) |
| 01/11/2022 | 22 | NOTICE of Appearance filed by attorney Kirsten M Ferguson on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Kirsten M Ferguson added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Kirsten M Ferguson added to party Ticketmaster LLC(pty:dft))(Ferguson, Kirsten) (Entered: 01/11/2022) |
| 01/11/2022 | 23 | NOTICE of Appearance filed by attorney Alicia R Jovais on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Alicia R Jovais added to party Live Nation Entertainment, Inc.(pty:dft), |

| | | Attorney Alicia R Jovais added to party Ticketmaster LLC(pty:dft))(Jovais, Alicia) (Entered: 01/11/2022) |
|---|---|---|
| 01/11/2022 | 24 | NOTICE of Interested Parties filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC, identifying Liberty Media Corporation. (O'Mara, Timothy) (Entered: 01/11/2022) |
| 01/11/2022 | 25 | CORPORATE DISCLOSURE STATEMENT filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (O'Mara, Timothy) (Entered: 01/11/2022) |
| 01/11/2022 | 26 | STIPULATION Extending Time to Answer the complaint as to Ticketmaster LLC answer now due 2/25/2022; Live Nation Entertainment, Inc. answer now due 2/25/2022, re Complaint (Attorney Civil Case Opening), 1 filed by Defendants Ticketmaster LLC; Live Nation Entertainment, Inc..(O'Mara, Timothy) (Entered: 01/11/2022) |
| 01/13/2022 | 27 | ORDER by Judge George H. Wu: granting 18 Non-Resident Attorney Albert Y. Pak APPLICATION to Appear Pro Hac Vice on behalf of plaintiffs Skot Heckman, et al., designating Adam B. Wolfson as local counsel. (mrgo) (Entered: 01/13/2022) |
| 01/31/2022 | 28 | Joint STIPULATION for Order Setting Briefing Schedule filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Declaration of Timothy L. O'Mara, # 2 Proposed Order)(O'Mara, Timothy) (Entered: 01/31/2022) |
| 01/31/2022 | 29 | ORDER ON JOINT STIPULATION SETTING BRIEFING SCHEDULE by Judge George H. Wu, re Stipulation 28 : Upon consideration of the parties' Joint Stipulation, and good cause appearing, IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The Court orders as follows: a. Defendants shall file their motion to compel arbitration on or before March 8, 2022. b. Plaintiffs shall file any opposition on or before April 15, 2022. c. Defendants shall file any reply on or before May 12, 2022. d. The hearing on Defendants' motion to compel arbitration shall be held on May 26, 2022 at 8:30 a.m. (see document for further details) (bm) (Entered: 02/01/2022) |
| 03/08/2022 | 30 | NOTICE OF MOTION AND MOTION to Compel Arbitration filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. Motion set for hearing on 5/26/2022 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Helene Green in Support of Motion to Compel Arbitration, # 3 Declaration of Timothy O'Mara in Support of Motion to Compel Arbitration, # 4 Exhibit A to O'Mara Declaration, # 5 Exhibit B to O'Mara Declaration, # 6 Exhibit C to O'Mara Declaration, # 7 Proposed Order) (O'Mara, Timothy) (Entered: 03/08/2022) |
| 03/08/2022 | 31 | DECLARATION of Kimberely Tobias in Support of NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Exhibit 1 to Tobias Declaration, # 2 Exhibit 2 to Tobias Declaration, # 3 Exhibit 3 to Tobias Declaration, # 4 Exhibit 4 to Tobias Declaration, # 5 Exhibit 5 to Tobias Declaration, # 6 Exhibit 6 to Tobias Declaration, # 7 Exhibit 7 to Tobias Declaration, # 8 Exhibit 8 to Tobias Declaration, # 9 Exhibit 9 to Tobias Declaration, # 10 Exhibit 10 to Tobias Declaration, # 11 Exhibit 11 to Tobias Declaration, # 12 Exhibit 12 to Tobias Declaration, # 13 Exhibit 13 to Tobias Declaration, # 14 Exhibit 14 to Tobias Declaration, # 15 Exhibit 15 to Tobias Declaration, # 16 Exhibit 16 to Tobias Declaration, # 17 Exhibit 17 to Tobias Declaration, # 18 Exhibit 18 to Tobias Declaration, # 19 Exhibit 19 to Tobias Declaration, # 20 Exhibit 20 to Tobias Declaration, # 21 Exhibit 21 to Tobias Declaration, # 22 Exhibit 22 to Tobias Declaration, # 23 Exhibit 23 to Tobias Declaration, # 24 Exhibit 24 to Tobias Declaration, # 25 Exhibit 25 to Tobias Declaration, # 26 Exhibit 26 to Tobias Declaration, # 27 Exhibit 27 to Tobias Declaration, # 28 Exhibit 28 to Tobias Declaration, # 29 Exhibit 29 to Tobias Declaration, # 30 Exhibit 30 to Tobias Declaration, # 31 Exhibit 31 to Tobias Declaration, # 32 Exhibit 32 to Tobias Declaration, # 33 Exhibit 33 to Tobias Declaration, # 34 Exhibit 34 to Tobias Declaration, # 35 Exhibit 35 to Tobias Declaration, # 36 Exhibit 36 to Tobias Declaration, # 37 Exhibit 37 to Tobias Declaration, # 38 Exhibit 38 to Tobias Declaration, # 39 Exhibit 39 to Tobias Declaration, # 40 Exhibit 40 to Tobias Declaration)(O'Mara, Timothy) (Entered: 03/08/2022) |
| 03/24/2022 | 32 | STIPULATION for Order Setting Briefing Schedule filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order)(Sears, William) (Entered: 03/24/2022) |
| 03/29/2022 | 33 | ORDER ON JOINT STIPULATION SETTING BRIEFING SCHEDULE by Judge George H. Wu, re Stipulation 32 : IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The court orders as follows: a. Plaintiffs shall file their Motion for Discovery on or before April 6, 2022. b. Defendants shall file any opposition on or before April 27, 2022. c. Plaintiffs shall file any reply on or before May 4, 2022. d. The Hearing on Plaintiffs' Motion for Discovery shall be held on May 19, 2022 at 8:30 a.m. e. The deadline for Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration shall be adjourned until Plaintiffs' Motion for Discovery is resolved. (see document for further details). (bm) (Entered: 03/29/2022) |
| 04/06/2022 | 34 | NOTICE OF MOTION AND MOTION for Discovery regarding Whether a Valid Arbitration Agreement Exists filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. Motion set for hearing on 5/19/2022 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Exhibit A, # 3 Proposed Order)(Sears, William) (Entered: 04/06/2022) |
| 04/06/2022 | 35 | DECLARATION of Albert Pak in Support of MOTION for Discovery regarding Whether a Valid Arbitration Agreement Exists 34 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) |

| | | |
|---|---|---|
| | | (Entered: 04/06/2022) |
| 04/27/2022 | 36 | OPPOSITION re: MOTION for Discovery regarding Whether a Valid Arbitration Agreement Exists 34 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Declaration of Timothy L. O'Mara, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H)(O'Mara, Timothy) (Entered: 04/27/2022) |
| 05/04/2022 | 37 | REPLY In Support Of MOTION for Discovery regarding Whether a Valid Arbitration Agreement Exists 34 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 05/04/2022) |
| 05/04/2022 | 38 | DECLARATION of Albert Pak In Support Of MOTION for Discovery regarding Whether a Valid Arbitration Agreement Exists 34 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Exhibit A)(Sears, William) (Entered: 05/04/2022) |
| 05/16/2022 | 39 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel are to appear telephonically for Thursday's 05/19/2022 Motion Hearing 34 at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 05/16/2022) |
| 05/19/2022 | 40 | MINUTES OF TELEPHONIC HEARING ON PLAINTIFFS' MOTION FOR DISCOVERY RELATED TO WHETHER A VALID ARBITRATION AGREEMENT EXISTS 34 held before Judge George H. Wu. Court hears oral argument. For reasons stated on the record, Plaintiffs' Motion is continued to June 9, 2022 at 8:30 a.m. A tentative ruling will be provided to the parties prior to the June 9 hearing. Court Reporter: Terri A. Hourigan. (aco) (Entered: 05/19/2022) |
| 05/19/2022 | 41 | TRANSCRIPT ORDER as to Non-party Requester for Court Reporter. Court will contact Tyrone Queen at Tyrone.Queen@skadden.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 05/19/2022) |
| 05/20/2022 | 42 | TRANSCRIPT ORDER as to Plaintiff Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 05/20/2022) |
| 05/23/2022 | 43 | MINUTES IN CHAMBERS - ORDER by Judge George H. Wu. Please take notice that the hearing set for May 26, 2022 addressing Defendants' Motion to Compel Arbitration 30 has been taken off-calendar. The Court will address the rescheduling of this motion at the June 9, 2022 hearing. (lom) (Entered: 05/23/2022) |
| 05/23/2022 | 44 | TRANSCRIPT for proceedings held on 5/19/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/13/2022. Redacted Transcript Deadline set for 6/23/2022. Release of Transcript Restriction set for 8/22/2022. (Hourigan, Terri) (Entered: 05/23/2022) |
| 05/23/2022 | 45 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/19/2022 8:30 a.m. re Transcript 44 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 05/23/2022) |
| 05/24/2022 | 46 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Dae Kim at dae.kim@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Jovais, Alicia) (Entered: 05/24/2022) |
| 06/01/2022 | 47 | TRANSCRIPT ORDER for Court Reporter. Court will contact Christopher Anguiano at canguiano@mayerbrown.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (aa) (Entered: 06/01/2022) |
| 06/07/2022 | 48 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel are to appear telephonically for Thursday's 06/09/2022 Motion Hearing 34 at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 06/07/2022) |
| 06/07/2022 | 49 | MINUTES IN CHAMBERS - TENTATIVE RULING ON PLAINTIFFS' MOTION FOR DISCOVERY RELATED TO WHETHER A VALID ARBITRATION AGREEMENT EXISTS 34 by Judge George H. Wu. Attached hereto is the Court's Tentative Ruling on Plaintiffs' Motion 34 , set for hearing on June 9, 2022 at 8:30 a.m. (aco) (Entered: 06/07/2022) |
| 06/09/2022 | 50 | MINUTES OF TELEPHONIC HEARING ON PLAINTIFFS' MOTION FOR DISCOVERY RELATED TO WHETHER A VALID ARBITRATION AGREEMENT EXISTS 34 Hearing held before Judge George H. Wu. The Court's Final Ruling is attached hereto. Court and counsel confer. The Tentative Ruling is adopted as the Court's Final Ruling. Plaintiffs' Motion is granted. A status conference is set for September 15, 2022 at 8:30 a.m. The |

| | | |
|---|---|---|
| | | parties are to file a joint status report by September 12, 2022.; granting 34 Motion for Discovery. Court Reporter: Terri A. Hourigan. (aco) (Entered: 06/09/2022) |
| 06/09/2022 | 51 | TRANSCRIPT ORDER as to Non-party Requester for Court Reporter. Court will contact Tyrone Queen at tyrone.queen@skadden.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 06/09/2022) |
| 06/10/2022 | 52 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Dae Kim at dae.kim@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Jovais, Alicia) (Entered: 06/10/2022) |
| 06/10/2022 | 53 | TRANSCRIPT ORDER as to Plaintiffs Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 06/10/2022) |
| 07/07/2022 | 54 | TRANSCRIPT for proceedings held on 5/19/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/28/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 10/5/2022. (Hourigan, Terri) (Entered: 07/07/2022) |
| 07/07/2022 | 55 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/19/2022 8:30 a.m. re Transcript 54 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 07/07/2022) |
| 07/07/2022 | 56 | TRANSCRIPT for proceedings held on 6/9/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/28/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 10/5/2022. (Hourigan, Terri) (Entered: 07/07/2022) |
| 07/07/2022 | 57 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/9/2022 8:30 a.m. re Transcript 56 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 07/07/2022) |
| 07/12/2022 | 58 | NOTICE of Appearance filed by attorney Sadik Harry Huseny on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Sadik Harry Huseny added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Sadik Harry Huseny added to party Ticketmaster LLC(pty:dft))(Huseny, Sadik) (Entered: 07/12/2022) |
| 08/03/2022 | 59 | STIPULATION for Order Regarding Discovery of Electronically Stored Information filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC.(O'Mara, Timothy) (Entered: 08/03/2022) |
| 08/03/2022 | 60 | STIPULATION for Protective Order filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 08/03/2022) |
| 08/04/2022 | 61 | ORDER RE: Discovery of Electronically Stored Information by Judge George H. Wu. Pursuant to Fed. R. Civ. P. 16 and 26(f), the parties have conferred regarding matters affecting the discovery of electronically stored information (ESI) and agreed on the following procedures and guidelines regarding the production of ESI in this case. (SEE DOCUMENT FOR FURTHER DETAILS.) (rolm) (Entered: 08/05/2022) |
| 08/05/2022 | 62 | STIPULATED PROTECTIVE ORDER1 by Magistrate Judge Gail J. Standish re Stipulation for Protective Order 60 . (SEE DOCUMENT FOR FURTHER DETAILS.) (et) (Entered: 08/10/2022) |
| 09/07/2022 | 63 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court, on its own motion, CONTINUES the STATUS CONFERENCE previously scheduled for 09/15/2022 to 9/26/2022 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 09/07/2022) |
| 09/12/2022 | 64 | STATUS REPORT filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Wolfson, Adam) (Entered: 09/12/2022) |
| 09/21/2022 | 65 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel are to appear telephonically for Monday's 09/26/2022 status conference at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 09/21/2022) |

| 09/22/2022 | 66 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court has received the parties Joint Status Report (ECF No. 64 ). Based thereon, the Court continues the September 26, 2022 status to one week after the motion to quash is scheduled to be heard on November 8, 2022, not November 7, 2022 as indicated in status report (i.e. November 15, 2022 at 8:30 a.m.). THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 09/22/2022) |
|---|---|---|
| 09/22/2022 | 67 | **AMENDED and CORRECTED** TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court has received the parties Joint Status Report (ECF No. 64 ). Based thereon, the Court continues the September 26, 2022 status to one week after the motion to quash is scheduled to be heard on November 7, 2022 (i.e. November 14, 2022 at 8:30 a.m.). THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 09/22/2022) |
| 09/23/2022 | 68 | Notice of Appearance or Withdrawal of Counsel: for attorney Joshua Loren Roquemore counsel for ThirdParty Defendant New Era ADR, Inc.. Adding Joshua L. Roquemore as counsel of record for New Era ADR, Inc. for the reason indicated in the G-123 Notice. Filed by Third-Party Defendant New Era ADR, Inc.. (Attorney Joshua Loren Roquemore added to party New Era ADR, Inc.(pty:3pd))(Roquemore, Joshua) (Entered: 09/23/2022) |
| 09/26/2022 | 69 | Joint STIPULATION to Clarify (Setting Briefing Schedule on New Era's Motion to Quash) filed by Nonparty New Era ADR, Inc..(Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/26/2022 | 70 | Joint STIPULATION to Clarify (Setting Briefing Schedule on New Era's Motion to Quash) filed by Nonparty New Era ADR, Inc.. (Attachments: # 1 Proposed Order)(Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/26/2022 | 71 | NOTICE OF MOTION AND MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas filed by Nonparty New Era ADR, Inc.. Motion set for hearing on 11/7/22 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order)(Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/26/2022 | 72 | MEMORANDUM in Support of MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by ThirdParty Defendant New Era ADR, Inc.. (Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/26/2022 | 73 | DECLARATION of Collin Williams in support of MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # 1 Exhibit A)(Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/26/2022 | 74 | DECLARATION of Sandra Musumeci in support of MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Roquemore, Joshua) (Entered: 09/26/2022) |
| 09/27/2022 | 75 | MINUTES IN CHAMBERS-ORDER by Judge George H. Wu. The Court refers the Joint Stipulation Between Plaintiffs and Nonparty New Era ADR, Inc. Setting Briefing Schedule 70 , and Nonparty New Era ADR, Inc.'s Motion to Quash Portions of Plaintiffs' Subpoenas 71 to the Honorable Gail J. Standish, U.S. Magistrate Judge for her determination. (aco) (Entered: 09/27/2022) |
| 09/27/2022 | 76 | ORDER ON JOINT STIPULATION BETWEEN PLAINTIFFS AND NONPARTY NEW ERA ADR, INC. SETTING BRIEFING SCHEDULE by Magistrate Judge Gail J. Standish, re Stipulation to Clarify 70 , IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The Court orders as follows: a. New Era shall file its motion to quash on or before September 26, 2022. b. Plaintiffs shall file any opposition on or before October 11, 2022. c. New Era shall file any reply on or before October 19, 2022. d. Any hearing on New Eras motion to quash shall take place on November 7, 2022, at 3:00 p.m., before Magistrate Judge Gail J. Standish. [See Order for further details.] (es) (Entered: 09/27/2022) |
| 10/11/2022 | 77 | APPLICATION to file document *(Plaintiffs' Opposition to New Era's Motion to Quash)* under seal filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order)(Sears, William) (Entered: 10/11/2022) |
| 10/11/2022 | 78 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *(Plaintiffs' Opposition to New Era's Motion to Quash)* under seal 77 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Memorandum In Opposition to New Era's Motion to Quash Portions of Plaintiffs' Subpoenas, # 2 Exhibit B)(Sears, William) (Entered: 10/11/2022) |
| 10/11/2022 | 79 | MEMORANDUM in Opposition to MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 10/11/2022) |
| 10/11/2022 | 80 | DECLARATION of William R. Sears In Opposition To MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sears, William) (Entered: 10/11/2022) |
| 10/12/2022 | 81 | APPLICATION of Non-Resident Attorney Sandra L. Musumeci to Appear Pro Hac Vice on behalf of ThirdParty Defendant New Era ADR, Inc. (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-34135777) filed by Non Party New Era ADR, Inc.. (Attachments: # 1 Proposed (proposed) Order on Application of Non-Resident Attorney to appear Pro Hac Vice) (Roquemore, Joshua) (Entered: 10/12/2022) |

| | | |
|---|---|---|
| 10/12/2022 | 82 | ORDER by Magistrate Judge Gail J. Standish: Denying 77 APPLICATION to Seal Document. Re: APPLICATION to file document *(Plaintiffs' Opposition to New Era's Motion to Quash)* under seal 77 . (et) (Entered: 10/12/2022) |
| 10/14/2022 | 83 | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge George H. Wu. APPLICATION of Attorney Sandra L. Musumeci to Appear Pro Hac Vice on behalf of ThirdParty Defendant New Era ADR, Inc., designating Joshua A. Roquemore as local counsel.; granting 81 Non-Resident Attorney Sandra L. Musumeci. (aco) (Entered: 10/17/2022) |
| 10/17/2022 | 84 | APPLICATION to file document *(Defendants' Application for Leave to Keep Sealed Certain Material Filed in Support of Plaintiffs' Opposition to New Era ADR, Inc.'s Motion to Quash Portions of Plaintiffs' Subpoenas)* under seal filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Proposed Order, # 2 Redacted Document (Exhibit B to the Declaration of William R. Sears))(O'Mara, Timothy) (Entered: 10/17/2022) |
| 10/17/2022 | 85 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *(Defendants' Application for Leave to Keep Sealed Certain Material Filed in Support of Plaintiffs' Opposition to New Era ADR, Inc.'s Motion to Quash Portions of Plaintiffs' Subpoenas)* under seal 84 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Unredacted Document (Exhibit B to the Declaration of William R. Sears)) (O'Mara, Timothy) (Entered: 10/17/2022) |
| 10/17/2022 | 86 | PROOF OF SERVICE filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC, re Sealed Declaration in SupportDeclaration, 85 served on Defendants. (O'Mara, Timothy) (Entered: 10/17/2022) |
| 10/19/2022 | 87 | ORDER GRANTING DEFENDANTS' APPLICATION FOR LEAVE TO KEEP SEALED CERTAIN MATERIAL FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO NEW ERA ADR, INC.'S MOTION TO QUASH PORTIONS OF PLAINTIFFS' SUBPOENAS by Magistrate Judge Gail J. Standish: Granting 84 APPLICATION to Seal Document, the Court hereby ORDERS that the following material shall remain under seal: Exhibit B to the Declaration of William R. Sears in Support of Plaintiffs' Opposition to New Era ADR, Inc.'s Motion to Quash Portions of Plaintiffs' Subpoenas (ECF No. 78-2) Redactions to pages 16 & 17. (es) (Entered: 10/19/2022) |
| 10/19/2022 | 88 | REPLY in support of MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 filed by ThirdParty Defendant New Era ADR, Inc.. (Roquemore, Joshua) (Entered: 10/19/2022) |
| 10/19/2022 | 89 | DECLARATION of Sandra Musumeci in support of MOTION to Quash Subpoena for Portions of Plaintiffs' Subpoenas 71 *(and in support of reply brief)* filed by ThirdParty Defendant New Era ADR, Inc.. (Roquemore, Joshua) (Entered: 10/19/2022) |
| 11/07/2022 | 90 | Notice Letter to Judge Standish requesting postponement of oral argument filed by Nonparty New Era ADR, Inc.. (Roquemore, Joshua) (Entered: 11/07/2022) |
| 11/07/2022 | 91 | SCHEDULING NOTICE by Magistrate Judge Gail J. Standish: The previously scheduled MOTION TO QUASH hearing set for 11/7/2022 at 3:00 p.m. has been continued and the matter will be rescheduled for a later date. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (eq) TEXT ONLY ENTRY (Entered: 11/07/2022) |
| 11/08/2022 | 92 | SCHEDULING NOTICE by Magistrate Judge Gail J. Standish, theMotion To Quash hearing is RESCHEDULED for 11/18/2022 at 03:00 PM via ZOOM before Magistrate Judge Gail J. Standish. ZOOM information has been provided to counsel by the clerk. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (eq) TEXT ONLY ENTRY (Entered: 11/08/2022) |
| 11/09/2022 | 93 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel are to appear telephonically for Monday's 11/14/2022 status conference at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 11/09/2022) |
| 11/10/2022 | 94 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court continues the November 14, 2022 status conference to December 1, 2022 at 8:30 a.m. Separate Order to issue. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 11/13/2022) |
| 11/14/2022 | 95 | MINUTE ORDER IN CHAMBERS - ORDER by Judge George H. Wu. In light of the above, the Court continues the November 14, 2022 status conference to December 1, 2022 at 8:30 a.m. The parties are to file a joint status report (including proposed schedule for briefing and hearing on the motion to compel arbitration) by November 28. See minute order for details. (lom) (Entered: 11/14/2022) |
| 11/18/2022 | 96 | NOTICE of Appearance filed by attorney Robin Lorraine Gushman on behalf of Defendants Live Nation Entertainment, Inc., Ticketmaster LLC (Attorney Robin Lorraine Gushman added to party Live Nation Entertainment, Inc.(pty:dft), Attorney Robin Lorraine Gushman added to party Ticketmaster LLC(pty:dft)) (Gushman, Robin) (Entered: 11/18/2022) |

| 11/18/2022 | 98 | MINUTES (IN CHAMBERS) Order GRANTING IN PART AND DENYING IN PART Non-Party New Era ADR's MOTION to Quash Portions of Plaintiffs' Subpoenas [Dkt. 71] Hearing held before Magistrate Judge Gail J. Standish: granting in part and denying in part 71 Motion to Quash Subpoena; Motion. [See document for further details] Court Reporter: CourtSmart. (et) (Entered: 11/21/2022) |
|---|---|---|
| 11/21/2022 | 97 | TRANSCRIPT ORDER as to Plaintiffs Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 11/21/2022) |
| 11/21/2022 | 99 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Hember Hidalgo at hember.hidalgo@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Gushman, Robin) (Entered: 11/21/2022) |
| 11/22/2022 | 100 | TRANSCRIPT ORDER as to Third-Party Defendant New Era ADR, Inc. for Court Smart (CS). Court will contact Maria Vecchione at mvecchione@rshc-law.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Roquemore, Joshua) (Entered: 11/22/2022) |
| 11/22/2022 | 101 | TRANSCRIPT for proceedings held on 11/18/22 3:00 p.m.. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC., phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/13/2022. Redacted Transcript Deadline set for 12/23/2022. Release of Transcript Restriction set for 2/21/2023. (ha) (Entered: 11/22/2022) |
| 11/22/2022 | 102 | NOTICE OF FILING TRANSCRIPT filed for proceedings 11/18/22 3:00 p.m. re Transcript 101 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 11/22/2022) |
| 11/28/2022 | 103 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel are to appear telephonically for Thursday's 12/01/2022 status conference at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 11/28/2022) |
| 11/28/2022 | 104 | STATUS REPORT filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 11/28/2022) |
| 12/01/2022 | 105 | TRANSCRIPT ORDER as to Plaintiffs Skot Heckman for Court Smart (CS). Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Sears, William) (Entered: 12/01/2022) |
| 12/01/2022 | 106 | TRANSCRIPT ORDER as to Third-Party Defendant New Era ADR, Inc. for Court Smart (CS). Court will contact Maria R. Vecchione at mvecchione@rshc-law.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Musumeci, Sandra) (Entered: 12/01/2022) |
| 12/01/2022 | 107 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Smart (CS). Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Gushman, Robin) (Entered: 12/01/2022) |
| 12/01/2022 | 108 | MINUTES OF TELEPHONIC CONFERENCE held before Judge George H. Wu. Court and counsel confer re discovery. Due to the unavailability of Judge Standish, any discovery motions will be held before this Court. Depositions are to be held by January 27, 2023. The Court continues the status conference to December 22, 2022 at 8:30 a.m. The parties are to file a joint submission re discovery by noon on December 14, 2022. Court Reporter: Terri A. Hourigan. (aco) (Entered: 12/01/2022) |
| 12/05/2022 | 109 | TRANSCRIPT for proceedings held on 12/1/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/27/2022. Redacted Transcript Deadline set for 1/5/2023. Release of Transcript Restriction set for 3/6/2023. (Hourigan, Terri) (Entered: 12/05/2022) |
| 12/05/2022 | 110 | NOTICE OF FILING TRANSCRIPT filed for proceedings 12/1/2022 8:30 a.m. re Transcript 109 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 12/05/2022) |

| | | |
|---|---|---|
| 12/14/2022 | 111 | APPLICATION to file document *Plaintiffs' and New Era's Joint Submission Regarding the Magistrate Judge's November 21, 2022 Order* under seal filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order)(Sears, William) (Entered: 12/14/2022) |
| 12/14/2022 | 112 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Plaintiffs' and New Era's Joint Submission Regarding the Magistrate Judge's November 21, 2022 Order* under seal 111 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Memorandum Plaintiffs' and New Era's Joint Submission Regarding the Magistrate Judge's November 21, 2022 Order, # 2 Exhibit M)(Sears, William) (Entered: 12/14/2022) |
| 12/14/2022 | 113 | APPLICATION for Relief from The Magistrate Judge's November 21, 2022 Order re Order on Motion to Quash Subpoena,, Motion Hearing, 98 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. Application set for hearing on 12/22/2022 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order, # 2 Declaration of William R. Sears, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Declaration of Sandra Musumeci) (Sears, William) (Entered: 12/14/2022) |
| 12/15/2022 | 114 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The time to appear at the STATUS CONFERENCE set for Thursday, December 22, 2022 is changed from 8:30 a.m. to 12:30 p.m. Counsel are to appear telephonically by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 12/15/2022) |
| 12/15/2022 | 115 | ORDER GRANTING APPLICATION TO FILE PLAINTIFFS AND NEW ERA ADR, INC.S JOINT SUBMISSION REGARDING THE MAGISTRATE JUDGES NOVEMBER 21, 2022 DISCOVERY ORDER UNDER SEAL by Judge George H. Wu. The Court GRANTS the Application, and, good cause appearing, hereby ORDERS that the following materials shall be filed under seal. (SEE DOCUMENT FOR FURTHER DETAILS).; granting 111 APPLICATION to file document *Plaintiffs' and New Era's Joint Submission Regarding the Magistrate Judge's November 21, 2022 Order* under seal. (aco) (Entered: 12/15/2022) |
| 12/22/2022 | 116 | MINUTES OF TELEPHONIC CONFERENCE held before Judge George H. Wu. Oral argument is held. The Court resolves issues raised in the Joint Submission Regarding the Magistrate Judge's November 21, 2022 Discovery Order 113 on the record. The Court will not overturn the Magistrate Judge's Order issued on November 18, 2022 98 . Court Reporter: Katie E. Thibodeaux. (aco) (Entered: 12/22/2022) |
| 12/22/2022 | 117 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Gushman, Robin) (Entered: 12/22/2022) |
| 12/23/2022 | 118 | TRANSCRIPT ORDER as to Third-Party Defendant New Era ADR, Inc. for Court Reporter. Court will contact Maria Vecchione at mvecchione@rshc-law.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Musumeci, Sandra) (Entered: 12/23/2022) |
| 12/23/2022 | 119 | TRANSCRIPT ORDER as to Plaintiffs Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 12/23/2022) |
| 01/03/2023 | 120 | TRANSCRIPT for proceedings held on 12/22/22 1:23 pm. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number ktbdx@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/24/2023. Redacted Transcript Deadline set for 2/3/2023. Release of Transcript Restriction set for 4/3/2023. (Thibodeaux, Elizabeth) (Entered: 01/03/2023) |
| 01/03/2023 | 121 | NOTICE OF FILING TRANSCRIPT filed for proceedings 12/22/22 1:23 pm re Transcript 120 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Elizabeth) TEXT ONLY ENTRY (Entered: 01/03/2023) |
| 01/04/2023 | 122 | Notice of Appearance or Withdrawal of Counsel: for attorney Rebecca J. Wahlquist counsel for ThirdParty Defendant New Era ADR, Inc.. Filed by ThirdParty Defendant New Era ADR, Inc.. (Attorney Rebecca J. Wahlquist added to party New Era ADR, Inc.(pty:3pd))(Wahlquist, Rebecca) (Entered: 01/04/2023) |
| 01/05/2023 | 123 | NOTICE of Change of Attorney Business or Contact Information: for attorney Sandra L. Musumeci counsel for ThirdParty Defendant New Era ADR, Inc.. Changing address and firm name to Kelley Drye and Warren LLP, 3 World Trade Center, 175 Greenwich Street, New York, New York 10007. Changing e-mail to |

| | | |
|---|---|---|
| | | SMusumeci@kelleydrye.com. Filed by ThirdParty Defendant New Era ADR, Inc.. (Musumeci, Sandra) (Entered: 01/05/2023) |
| 01/10/2023 | 124 | STRICKEN, see docket entry no. 126 - REQUEST TO WITHDRAW ATTORNEY Joshua L. Roquemore as counsel of record filed by Third-Party Defendant New Era ADR, Inc.. (Roquemore, Joshua) Modified on 1/10/2023 (lom). (Entered: 01/10/2023) |
| 01/10/2023 | 125 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: REQUEST TO WITHDRAW ATTORNEY Joshua L. Roquemore as counsel of record 124 . The following error(s) was/were found: Proposed document not submitted or was not submitted as a separate attachment. Other error(s) with document(s): No [Prop] Order attached. See court's website "forms" for [Prop] Order. Please efile a Notice of Lodging document and attach the [Prop] Order. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lom) (Entered: 01/10/2023) |
| 01/10/2023 | 126 | ORDER IN RESPONSE TO NOTICE OF FILER OF DEFICIENCIES IN FILED DOCUMENT RE: REQUEST TO WITHDRAW ATTORNEY Joshua L. Roquemore as counsel of record 124 by Judge George H. Wu. The document is stricken for the reason(s) stated in the Notice 125 filed on January 10, 2023.Pursuant to L.R. 5-4.4.2, email the proposed order in either Word or WordPerfect to Judge Wu's email address at GW_chambers@cacd.uscourts.gov. (lom) (Entered: 01/10/2023) |
| 01/10/2023 | 127 | FOR COURT USE ONLY: STATISTICAL CORRECTION striking 124 Request to Substitute Attorney re 126 . (lom) (Entered: 01/10/2023) |
| 01/11/2023 | 128 | REQUEST of Joshua L. Roquemore to Withdraw as Attorney filed by Third Party Defendant New Era ADR, Inc.. (Attachments: # 1 Proposed Order) (Roquemore, Joshua) (Entered: 01/11/2023) |
| 01/11/2023 | 129 | ORDER ON REQUEST FOR APPROVAL OF SUBSTITUTION OR WITHDRAWAL OF ATTORNEY by Judge George H. Wu. The Court hereby orders that the request of Third Party Defendant New Era ADR, Inc to substitute Rebecca J. Wahlquist as attorney of record is hereby GRANTED.; granting 128 REQUEST to Withdraw as Attorney. (aco) (Entered: 01/11/2023) |
| 01/31/2023 | 130 | Notice of Appearance or Withdrawal of Counsel: for attorney Daniel M Wall counsel for Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. Daniel M. Wall is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Ticketmaster L.L.C. and Live Nation Entertainment, Inc.. (Wall, Daniel) (Entered: 01/31/2023) |
| 02/14/2023 | 131 | Joint STIPULATION for Order Setting Briefing Schedule for Motion to Compel Arbitration 30 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Declaration of Timothy L. O'Mara, # 2 Proposed Order)(O'Mara, Timothy) (Entered: 02/14/2023) |
| 02/16/2023 | 132 | ORDER ON JOINT STIPULATION SETTING BRIEFING SCHEDULE by Judge George H. Wu. IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The Court orders as follows: a. Plaintiffs shall file their Opposition to Defendants' Motion to Compel Arbitration on or before March 17, 2023. b. Defendants shall file any Reply on or before April 14, 2023. c. The Hearing on Defendants' Motion to Compel Arbitration shall be held on May 1, 2023 at 8:30 a.m. RE: Joint STIPULATION for Order Setting Briefing Schedule, 131 . (aco) (Entered: 02/17/2023) |
| 03/17/2023 | 133 | APPLICATION to file document *Portions of Plaintiffs' Response in Opposition to Defendants' Motion to Compel Arbitration* under seal filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order, # 2 Redacted Document)(Sears, William) (Entered: 03/17/2023) |
| 03/17/2023 | 134 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Portions of Plaintiffs' Response in Opposition to Defendants' Motion to Compel Arbitration* under seal 133 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Unredacted Document, # 2 Unredacted Document, # 3 Unredacted Document, # 4 Unredacted Document, # 5 Unredacted Document, # 6 Unredacted Document, # 7 Unredacted Document, # 8 Unredacted Document, # 9 Unredacted Document, # 10 Unredacted Document, # 11 Unredacted Document, # 12 Unredacted Document, # 13 Unredacted Document)(Sears, William) (Entered: 03/17/2023) |
| 03/17/2023 | 135 | OPPOSITION to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Declaration of William R. Sears, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N)(Sears, William) (Entered: 03/17/2023) |
| 03/20/2023 | 141 | ORDER GRANTING PLAINTIFFS' APPLICATION TO FILE PORTIONS OF THEIR RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION UNDER SEAL by Judge George H. Wu. Having considered all papers filed in support of that Application, the Court GRANTS the Application, and, good cause appearing, hereby ORDERS that the following materials shall be filed under seal: (See document for |

| | | |
|---|---|---|
| | | further details).; granting <u>133</u> APPLICATION to file document *Portions of Plaintiffs' Response in Opposition to Defendants' Motion to Compel Arbitration* under seal. (aco) (Entered: 03/22/2023) |
| 03/21/2023 | <u>136</u> | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Portions of Plaintiffs' Response in Opposition to Defendants' Motion to Compel Arbitration* under seal <u>133</u> filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # <u>1</u> Response in Opposition to Motion to Compel - [Sealed], # <u>2</u> Exhibit C to Opposition - [Sealed], # <u>3</u> Exhibit D to Opposition - [Sealed], # <u>4</u> Exhibit E to Opposition - [Sealed])(O'Mara, Timothy) (Entered: 03/21/2023) |
| 03/21/2023 | <u>137</u> | PROOF OF SERVICE filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC, re Sealed Declaration in SupportDeclaration, <u>136</u> served on March 21, 2023. (O'Mara, Timothy) (Entered: 03/21/2023) |
| 03/21/2023 | <u>138</u> | APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendant's' Motion to Compel Arbitration and Exhibits)* under seal filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # <u>1</u> Proposed Order) (Musumeci, Sandra) (Entered: 03/21/2023) |
| 03/21/2023 | <u>139</u> | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendant's' Motion to Compel Arbitration and Exhibits)* under seal <u>138</u> filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # <u>1</u> Unredacted Document Exhibit 1, # <u>2</u> Unredacted Document Exhibit 2, # <u>3</u> Unredacted Document Exhibit 3)(Musumeci, Sandra) (Entered: 03/21/2023) |
| 03/22/2023 | <u>140</u> | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendant's' Motion to Compel Arbitration and Exhibits)* under seal <u>138</u> filed by ThirdParty Defendant New Era ADR, Inc..(Musumeci, Sandra) (Entered: 03/22/2023) |
| 03/22/2023 | <u>142</u> | Corrected APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendants' Motion to Compel Arbitration and Exhibits)* under seal filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # <u>1</u> Redacted Document, # <u>2</u> Redacted Document, # <u>3</u> Redacted Document, # <u>4</u> Proposed Order)(Musumeci, Sandra) (Entered: 03/22/2023) |
| 03/22/2023 | <u>143</u> | NOTICE OF ERRATA filed by ThirdParty Defendant New Era ADR, Inc.. correcting APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendant's' Motion to Compel Arbitration and Exhibits)* under seal <u>138</u> (Musumeci, Sandra) (Entered: 03/22/2023) |
| 03/22/2023 | <u>144</u> | SEALED DECLARATION IN SUPPORT OF Corrected APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendants' Motion to Compel Arbitration and Exhibits)* under seal <u>142</u> filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # <u>1</u> Unredacted Document - Exhibit 1, # <u>2</u> Unredacted Document - Exhibit 2, # <u>3</u> Unredacted Document - Exhibit 3)(Musumeci, Sandra) (Entered: 03/22/2023) |
| 03/22/2023 | <u>145</u> | NOTICE OF ERRATA filed by ThirdParty Defendant New Era ADR, Inc.. correcting Sealed Declaration in SupportDeclaration, <u>140</u> , Sealed Declaration in SupportDeclaration, <u>139</u> (Musumeci, Sandra) (Entered: 03/22/2023) |
| 03/22/2023 | <u>146</u> | SEALED OPPOSITION RE NOTICE OF MOTION AND MOTION to Compel Arbitration <u>30</u> , Order on Motion for Leave to File Document Under Seal,, <u>141</u> filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # <u>1</u> Declaration of William R. Sears, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C, # <u>5</u> Exhibit D, # <u>6</u> Exhibit E, # <u>7</u> Exhibit F, # <u>8</u> Exhibit G, # <u>9</u> Exhibit H, # <u>10</u> Exhibit I, # <u>11</u> Exhibit J, # <u>12</u> Exhibit K, # <u>13</u> Exhibit L, # <u>14</u> Exhibit M, # <u>15</u> Exhibit N)(Sears, William) (Entered: 03/22/2023) |
| 03/22/2023 | <u>147</u> | ORDER GRANTING NON-PARTY NEW ERA ADR, INC.'S APPLICATION FOR LEAVE TO KEEP SEALED CERTAIN MATERIALS FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION by Judge George H. Wu. The Court GRANTS the Application, and good cause appearing, hereby ORDERS that the following materials shall be filed under seal: (See document for further details).; granting <u>142</u> Corrected APPLICATION to file document *(Plaintiffs' Brief in Opposition to Defendants' Motion to Compel Arbitration and Exhibits)* under seal. (aco) (Entered: 03/22/2023) |
| 04/14/2023 | <u>148</u> | APPLICATION to file document *(Reply in Support of Motion to Compel Arbitration)* under seal filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # <u>1</u> Proposed Order, # <u>2</u> Reply in Support of Motion to Compel - [Redacted])(O'Mara, Timothy) (Entered: 04/14/2023) |
| 04/14/2023 | <u>149</u> | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *(Reply in Support of Motion to Compel Arbitration)* under seal <u>148</u> filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # <u>1</u> Reply in Support of Motion to Compel - [Sealed])(O'Mara, Timothy) (Entered: 04/14/2023) |
| 04/14/2023 | <u>150</u> | REPLY in Support of NOTICE OF MOTION AND MOTION to Compel Arbitration <u>30</u> filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # <u>1</u> Declaration of Timothy O'Mara, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C, # <u>5</u> Exhibit D, # <u>6</u> Exhibit E)(O'Mara, Timothy) (Entered: 04/14/2023) |
| 04/14/2023 | <u>151</u> | PROOF OF SERVICE filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC, re Sealed Declaration in SupportDeclaration, <u>149</u> served on April 14, 2023. (O'Mara, Timothy) (Entered: 04/14/2023) |

**2-ER-289**

| | | |
|---|---|---|
| 04/17/2023 | 152 | ORDER GRANTING DEFENDANTS' APPLICATION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION by Judge George H. Wu. The Court hereby ORDERS that the following material shall remain under seal: (See document for further details).; granting 148 APPLICATION to file document *(Reply in Support of Motion to Compel Arbitration)* under seal. (aco) (Entered: 04/17/2023) |
| 04/18/2023 | 153 | SEALED REPLY RE NOTICE OF MOTION AND MOTION to Compel Arbitration 30 , Order on Motion for Leave to File Document Under Seal, 152 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 04/18/2023) |
| 04/18/2023 | 154 | PROOF OF SERVICE filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC, re Sealed Reply 153 served on April 18, 2023. (O'Mara, Timothy) (Entered: 04/18/2023) |
| 04/28/2023 | 155 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The parties are advised that the Motion Hearing 30 , set for Monday, May 1, 2023 at 8:30 a.m. will be held in-person and not by telephone. Masks are required. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 04/28/2023) |
| 05/01/2023 | 156 | TRANSCRIPT ORDER as to Non-party Requestor for Court Reporter. Court will contact Paul Karl Lukacs, Esq. at pkl@hattislaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 05/01/2023) |
| 05/01/2023 | 157 | TRANSCRIPT ORDER as to PLAINTIFFS SKOT HECKMAN, LUIS PONCE, JEANENE POPP, JACOB ROBERTS, on behalf of themselves and all those similarly situated Skot Heckman for Court Reporter. Court will contact anastasiadrannikova@quinnemanuel.com at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 05/01/2023) |
| 05/01/2023 | 158 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Gushman, Robin) (Entered: 05/01/2023) |
| 05/01/2023 | 160 | SEALED - MINUTES OF DEFENDANTS' MOTION TO COMPEL ARBITRATION 30 (bm) (Entered: 05/02/2023) |
| 05/02/2023 | 159 | TRANSCRIPT ORDER as to Third-Party Defendant New Era ADR, Inc. for Court Reporter. Court will contact Sophia Schlesinger at managingattorney@kelleydrye.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Musumeci, Sandra) (Entered: 05/02/2023) |
| 05/17/2023 | 161 | STIPULATION for Order Regarding Supplemental Briefing Schedule filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order)(Sears, William) (Entered: 05/17/2023) |
| 05/17/2023 | 162 | ORDER ON JOINT STIPULATION SETTING MODIFIED BRIEFING SCHEDULE AND HEARING DATE by Judge George H. Wu. IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The court orders as follows: a. Plaintiffs and Defendants shall file their initial supplemental briefs on or before June 2, 2023. b. Plaintiffs and Defendants shall file any replies on June 19, 2023. c. The second Hearing on Defendants Motion to Compel Arbitration and the supplemental briefing shall be held on July 13, 2023 at 8:30 a.m. RE: Stipulation for Order Regarding Supplemental Briefing Schedule 161 . (aco) (Entered: 05/17/2023) |
| 06/01/2023 | 163 | DECLARATION of New Era ADR, Inc. in Response to Court's Tentative Ruling of May 1, 2023 on NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by ThirdParty Defendant New Era ADR, Inc.. (Musumeci, Sandra) (Entered: 06/01/2023) |
| 06/02/2023 | 164 | APPLICATION to file document *Plaintiffs' Supplemental Brief In Opposition to Defendants' Motion to Compel Arbitration* under seal filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order, # 2 Redacted Document)(Sears, William) (Entered: 06/02/2023) |
| 06/02/2023 | 165 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Plaintiffs' Supplemental Brief In Opposition to Defendants' Motion to Compel Arbitration* under seal 164 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Unredacted Document, # 2 Declaration, # 3 Exhibit 1, # 4 Exhibit 2)(Sears, William) (Entered: 06/02/2023) |
| 06/02/2023 | 166 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 06/02/2023) |
| 06/05/2023 | 167 | ORDER GRANTING PLAINTIFFS' APPLICATION TO FILE PORTIONS OF THEIR SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION UNDER SEAL by Judge George H. Wu. The Court GRANTS the Application, and, good cause appearing, hereby ORDERS that the following materials shall be filed under seal: (See document for further details).; granting 164 APPLICATION to |

| | | |
|---|---|---|
| | | file document *Plaintiffs' Supplemental Brief In Opposition to Defendants' Motion to Compel Arbitration* under seal. (aco) (Entered: 06/05/2023) |
| 06/06/2023 | 168 | SEALED DOCUMENT *Supplemental Brief* re Sealed Opposition,, 146 , Order on Motion for Leave to File Document Under Seal,, 167 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts.(Sears, William) (Entered: 06/06/2023) |
| 06/06/2023 | 169 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 *Supplemental Brief in Opposition* filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Declaration of William R. Sears, # 2 Exhibit 1, # 3 Exhibit 2)(Sears, William) (Entered: 06/06/2023) |
| 06/08/2023 | 170 | STIPULATION for Leave to Respond to New Era ADR Inc.'s June 1, 2023 Declaration filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order)(Sears, William) (Entered: 06/08/2023) |
| 06/12/2023 | 171 | ORDER ON JOINT STIPULATION PERMITTING PLAINTIFFS TO RESPOND TO THIRD PARTY NEW ERA'S JUNE 1, 2023 DECLARATION 170 by Judge George H. Wu. The court orders as follows: a. Plaintiffs may file a brief in response to New Era ADR Inc.'s June 1, 2023 declaration. b. Plaintiffs' response brief shall not exceed five pages. c. Plaintiffs shall file any response brief on or before June 19, 2023. (lom) (Entered: 06/12/2023) |
| 06/19/2023 | 172 | REPLY Supplemental Reply Brief in Opposition to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 06/19/2023) |
| 06/19/2023 | 173 | REPLY - Supplemental Reply Brief in Support of NOTICE OF MOTION AND MOTION to Compel Arbitration 30 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 06/19/2023) |
| 06/19/2023 | 174 | APPLICATION to file document *Plaintiffs' Supplemental Brief in Response to the Williams Declaration* under seal filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order, # 2 Redacted Document)(Sears, William) (Entered: 06/19/2023) |
| 06/19/2023 | 175 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Plaintiffs' Supplemental Brief in Response to the Williams Declaration* under seal 174 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Unredacted Document)(Sears, William) (Entered: 06/19/2023) |
| 06/20/2023 | 176 | ORDER GRANTING PLAINTIFFS' APPLICATION TO FILE PORTIONS OF THEIR SUPPLEMENTAL BRIEF IN RESPONSE TO THE WILLIAMS DECLARATION UNDER SEAL by Judge George H. Wu. Having considered all papers filed in support of that Application, the Court GRANTS the Application, and, good cause appearing, hereby ORDERS that the following materials shall be filed under seal: (See document for further details).; granting 174 APPLICATION to file document *Plaintiffs' Supplemental Brief in Response to the Williams Declaration* under seal. (aco) (Entered: 06/21/2023) |
| 06/21/2023 | 177 | SEALED DOCUMENT *Plaintiffs' Supplemental Brief in Response to the Williams Declaration* re Order on Motion for Leave to File Document Under Seal,, 176 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts.(Sears, William) (Entered: 06/21/2023) |
| 07/11/2023 | 178 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: Counsel may appear telephonically for the Motion Hearing 30 set on Thursday, July 13, 2023 at 8:30 a.m. by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov for dial-in information. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 07/11/2023) |
| 07/13/2023 | 179 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Jovais, Alicia) (Entered: 07/13/2023) |
| 07/13/2023 | 180 | TRANSCRIPT ORDER as to PLAINTIFFS SKOT HECKMAN, LUIS PONCE, JEANENE POPP, JACOB ROBERTS, on behalf of themselves and all those similarly situated Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 07/13/2023) |
| 07/13/2023 | 181 | TRANSCRIPT ORDER as to Third Party Defendant New Era ADR, Inc. for Court Reporter. Court will contact Sandra L. Musumeci at SMusumeci@KelleyDrye.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Musumeci, Sandra) (Entered: 07/13/2023) |
| 07/13/2023 | 182 | MINUTES OF DEFENDANTS' MOTION TO COMPEL ARBITRATION 30 held before Judge George H. Wu. Court hears further argument. For reasons stated on the record, Defendants' Motion is continued to August 10, |

| | | |
|---|---|---|
| | | 2023 at 8:30 a.m. The parties will have until July 27, 2023 to file a five-page brief on the topics raised by the Court today. Court Reporter: Terri A. Hourigan. (rolm) (Entered: 07/14/2023) |
| 07/14/2023 | 183 | TRANSCRIPT ORDER for Court Reporter. Court will contact Josephine Lu at josephine.lu@zimmereed.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ha) (Entered: 07/14/2023) |
| 07/14/2023 | 184 | TRANSCRIPT ORDER as to Non-party Requestor for Court Reporter. Court will contact Jenn Jackson at jennifer.jackson@cooley.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 07/14/2023) |
| 07/14/2023 | 185 | TRANSCRIPT for proceedings held on 7/13/2023 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 8/4/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/12/2023. (Hourigan, Terri) (Entered: 07/14/2023) |
| 07/14/2023 | 186 | NOTICE OF FILING TRANSCRIPT filed for proceedings 7/13/2023 8:30 a.m. re Transcript 185 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 07/14/2023) |
| 07/17/2023 | 187 | TRANSCRIPT ORDER for Court Reporter. Court will contact Paul Karl Lukacs at pkl@hattislaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (yja) (Entered: 07/17/2023) |
| 07/17/2023 | 188 | TRANSCRIPT ORDER for Court Reporter. Court will contact Stefano Congedo at scongedo@chumphreylaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (aa) (Entered: 07/17/2023) |
| 07/19/2023 | 189 | TRANSCRIPT ORDER for Court Reporter. Court will contact Krystal Gollogly at kgollogly@mcguirewoods.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (yja) (Entered: 07/19/2023) |
| 07/19/2023 | 190 | TRANSCRIPT for proceedings held on 5/1/2023 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 8/9/2023. Redacted Transcript Deadline set for 8/21/2023. Release of Transcript Restriction set for 10/17/2023. (Hourigan, Terri) (Entered: 07/19/2023) |
| 07/19/2023 | 191 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/1/2023 8:30 a.m. re Transcript 190 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 07/19/2023) |
| 07/25/2023 | 192 | APPLICATION for Leave to file Supplemental Declaration of Collin Williams filed by Non-Party New Era ADR, Inc.. (Attachments: # 1 Exhibit 1, # 2 Proposed Order) (Musumeci, Sandra) (Entered: 07/25/2023) |
| 07/26/2023 | 193 | ORDER GRANTING NON-PARTY NEW ERA ADR, INC.'S APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION OF COLLIN WILLIAMS by Judge George H. Wu. Having considered all papers filed in support of that Application, the Court GRANTS the Application. Plaintiffs may file a response to the Supplemental Declaration of Collin Williams, not to exceed two pages, by noon on August 3, 2023. The deadline for the parties to submit their five-page supplemental briefs remains July 27, 2023.; granting 192 APPLICATION for Leave to file Supplemental Declaration. (aco) (Entered: 07/26/2023) |
| 07/27/2023 | 194 | DECLARATION of Collin Williams *[Supplemental]* filed by ThirdParty Defendant New Era ADR, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Musumeci, Sandra) (Entered: 07/27/2023) |
| 07/27/2023 | 195 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 *Second Supplemental Brief* filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 07/27/2023) |
| 07/27/2023 | 196 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Compel Arbitration 30 *Plaintiffs' Second Supplemental Brief In Opposition to Defendants' Motion to Compel Arbitration* filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 07/27/2023) |
| 08/03/2023 | 197 | OPPOSITION to APPLICATION for Leave to file Supplemental Declaration of Collin Williams 192 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Exhibit A)(Sears, William) (Entered: 08/03/2023) |
| 08/07/2023 | 198 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The parties are advised that the Motion Hearing 30 , set for Thursday, August 10, 2023 at 8:30 a.m. will be held in-person and not by telephone. Masks are |

| | | |
|---|---|---|
| | | required. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/07/2023) |
| 08/10/2023 | 199 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Jovais, Alicia) (Entered: 08/10/2023) |
| 08/10/2023 | 200 | SEALED - MINUTES OF DEFENDANTS' MOTION TO COMPEL ARBITRATION 30 (bm) (Entered: 08/10/2023) |
| 08/10/2023 | 201 | TRANSCRIPT ORDER as to Non-Party New Era ADR, Inc. for Court Reporter. Court will contact Sandra Musumeci at smusumeci@kelleydrye.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Musumeci, Sandra) (Entered: 08/10/2023) |
| 08/10/2023 | 202 | MINUTES IN CHAMBERS - FINAL RULING ON DEFENDANTS' MOTION TO COMPEL ARBITRATION 30 by Judge George H. Wu. Attached hereto is the Court's Final Ruling on Defendants' Motion to Compel Arbitration. The Court DENIES the Motion.; DENYING 30 MOTION to Compel Arbitration. (aco) (Entered: 08/10/2023) |
| 08/10/2023 | 203 | TRANSCRIPT for proceedings held on 8/10/2023 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 8/31/2023. Redacted Transcript Deadline set for 9/11/2023. Release of Transcript Restriction set for 11/8/2023. (Hourigan, Terri) (Entered: 08/10/2023) |
| 08/10/2023 | 204 | NOTICE OF FILING TRANSCRIPT filed for proceedings 8/10/2023 8:30 a.m. re Transcript 203 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 08/10/2023) |
| 08/11/2023 | 205 | Notice of Appearance or Withdrawal of Counsel: for attorney Kirsten M Ferguson counsel for Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. Kirsten M. Ferguson is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Live Nation Entertainment, Inc. and Ticketmaster, LLC. (Ferguson, Kirsten) (Entered: 08/11/2023) |
| 08/11/2023 | 206 | TRANSCRIPT ORDER as to Non-party Requestor for Court Reporter. Court will contact Robert Fernandez at robert.fernandez@tr.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (ls) (Entered: 08/11/2023) |
| 08/14/2023 | 207 | TRANSCRIPT ORDER as to PLAINTIFFS SKOT HECKMAN, LUIS PONCE, JEANENE POPP, JACOB ROBERTS, on behalf of themselves and all those similarly situated Skot Heckman for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 08/14/2023) |
| 08/21/2023 | 208 | NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendants from Imposing a Modified Arbitration Clause on Antitrust Claims in this Case filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. Motion set for hearing on 9/21/2023 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion to Enjoin, # 2 Proposed Order) (Sears, William) (Entered: 08/21/2023) |
| 08/22/2023 | 209 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: PLAINTIFFS MOTION TO ENJOIN IMPOSING A MODIFIED ARBITRATION CLAUSE ON ANTITRUST CLAIMSIN THIS CASE 208 is set for hearing on 9/28/2023 at 08:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/22/2023) |
| 08/25/2023 | 210 | Joint STIPULATION to Continue Hearing Date for Plaintiffs' Motion to Enjoin from September 28, 2023 to October 12, 2023 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (Attachments: # 1 Declaration of Timothy L. O'Mara, # 2 Proposed Order)(O'Mara, Timothy) (Entered: 08/25/2023) |
| 08/28/2023 | 211 | ORDER ON JOINT STIPULATION TO CONTINUE HEARING DATE FOR PLAINTIFFS' MOTION TO ENJOIN (ECF NO. 208) by Judge George H. Wu. IT IS HEREBY ORDERED that the Joint Stipulation is GRANTED. The Court orders as follows: 1. Plaintiffs' Motion to Enjoin Imposing a Modified Arbitration Clause on Antitrust Claims in This Case (ECF No. 208) and the status conference shall be heard on October 12, 2023 at 8:30 a.m. 2. Defendants' Opposition to the Motion to Enjoin will be due on September 21, 2023, and Plaintiffs' Reply will be due on September 28, 2023. RE: Stipulation to Continue, 210 . (aco) (Entered: 08/29/2023) |
| 09/08/2023 | 212 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. Appeal of Order on Motion to Compel Arbitration, 202 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-36007475.) (Attachments: # 1 Exhibit A)(O'Mara, Timothy) (Entered: 09/08/2023) |

| 09/08/2023 | 213 | NOTICE OF MOTION AND MOTION to Stay Case pending Appeal filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. Motion set for hearing on 10/19/2023 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order) (O'Mara, Timothy) (Entered: 09/08/2023) |
|---|---|---|
| 09/12/2023 | 214 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 23-55770 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 212 as to defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (mat) (Entered: 09/14/2023) |
| 09/21/2023 | 215 | OPPOSITION to NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendants from Imposing a Modified Arbitration Clause on Antitrust Claims in this Case 208 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 09/21/2023) |
| 09/28/2023 | 216 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION to Stay Case pending Appeal 213 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 09/28/2023) |
| 09/28/2023 | 217 | REPLY Reply in Support of NOTICE OF MOTION AND MOTION for Preliminary Injunction re Enjoining Defendants from Imposing a Modified Arbitration Clause on Antitrust Claims in this Case 208 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Sears, William) (Entered: 09/28/2023) |
| 09/28/2023 | 218 | EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION to Stay Case pending Appeal 213 to October 12, 2023 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order) (Sears, William) (Entered: 09/28/2023) |
| 09/29/2023 | 219 | OPPOSITION to EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION to Stay Case pending Appeal 213 to October 12, 2023 218 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 09/29/2023) |
| 10/02/2023 | 220 | MINUTES IN CHAMBERS - ORDER by Judge George H. Wu. Having considered Plaintiffs' Ex Parte Application to Consolidate Hearing Dates 218 and Defendants' opposition thereto, and good cause appearing, the Court hereby continues the hearing on Plaintiffs' Motion to Enjoin 208 to October 19, 2023 at 08:30 a.m. Defendants will have until October 5, 2023 to file their reply in support of their Motion for a Stay Pending Appeal 213 . The status conference set for October 12, 2023 is taken off-calendar.; granting 218 EX PARTE APPLICATION to Shorten Time for Hearing. (aco) (Entered: 10/02/2023) |
| 10/05/2023 | 221 | REPLY in Support of NOTICE OF MOTION AND MOTION to Stay Case pending Appeal 213 filed by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC. (O'Mara, Timothy) (Entered: 10/05/2023) |
| 10/06/2023 | 222 | DESIGNATION of Record on Appeal by Defendants Live Nation Entertainment, Inc., Ticketmaster LLC re 212 (O'Mara, Timothy) (Entered: 10/06/2023) |
| 10/13/2023 | 223 | NOTICE of Appearance filed by attorney Ethan Henry Ames on behalf of Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts (Attorney Ethan Henry Ames added to party Skot Heckman(pty:pla), Attorney Ethan Henry Ames added to party Luis Ponce(pty:pla), Attorney Ethan Henry Ames added to party Jeanene Popp(pty:pla), Attorney Ethan Henry Ames added to party Jacob Roberts(pty:pla))(Ames, Ethan) (Entered: 10/13/2023) |
| 10/17/2023 | 224 | MINUTES IN CHAMBERS - TENTATIVE RULING ON PLAINTIFFS' MOTION TO ENJOIN IMPOSING A MODIFIED ARBITRATION CLAUSE ON ANTITRUST CLAIMS IN THIS CASE 208 ; and DEFENDANTS' MOTION FOR A STAY PENDING APPEAL 213 by Judge George H. Wu. Attached hereto is the Court's Tentative Ruling on the above-entitled Motions [208, 213], set for hearing on October 19, 2023 at 8:30 a.m. (aco) (Entered: 10/17/2023) |
| 10/17/2023 | 225 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The parties are advised that the Motions Hearing 208 213 , set for Thursday, October 19, 2023 at 8:30 a.m. will be held in-person and not by telephone. Masks are required. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 10/17/2023) |
| 10/17/2023 | 226 | MINUTES IN CHAMBERS - AMENDED TENTATIVE RULING ON PLAINTIFFS' MOTION TO ENJOIN IMPOSING A MODIFIED ARBITRATION CLAUSE ON ANTITRUST CLAIMS IN THIS CASE 208 ; and DEFENDANTS' MOTION FOR A STAY PENDING APPEAL 213 by Judge George H. Wu. Attached hereto is the Court's Amended Tentative Ruling on the above-entitled Motions [208, 213], set for hearing on October 19, 2023 at 8:30 a.m. (aco) (Entered: 10/18/2023) |
| 10/19/2023 | 227 | TRANSCRIPT ORDER as to Defendants Live Nation Entertainment, Inc., Ticketmaster LLC for Court Reporter. Court will contact Victor Cayanan at victor.cayanan@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Jovais, Alicia) (Entered: 10/19/2023) |
| 10/19/2023 | 228 | TRANSCRIPT ORDER as to PLAINTIFFS SKOT HECKMAN, LUIS PONCE, JEANENE POPP, JACOB ROBERTS, on behalf of themselves and all those similarly situated Skot Heckman, Luis Ponce, Jeanene Popp, |

| | | |
|---|---|---|
| | | Jacob Roberts for Court Reporter. Court will contact Anastasia Drannikova at anastasiadrannikova@quinnemanuel.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sears, William) (Entered: 10/19/2023) |
| 10/19/2023 | 229 | PLAINTIFFS' MOTION TO ENJOIN IMPOSING A MODIFIED ARBITRATION CLAUSE ON ANTITRUST CLAIMS IN THIS CASE 208 ; and DEFENDANTS' MOTION FOR A STAY PENDING APPEAL 213 by Judge George H. Wu. Having now heard the arguments of counsel and in light of the prior filings in this matter, the Court adopts the ATR as its final decision on the two motions. The Court sets a status conference for March 4, 2024 at 8:30 a.m. The parties are to file a joint status report by February 28, 2024. (See document for further details).; vacating 208 MOTION for Preliminary Injunction; granting 213 MOTION to Stay Case. (aco) (Entered: 10/20/2023) |
| 10/23/2023 | 230 | REQUEST to Correct Order on Motion for Preliminary Injunction,,, Order on Motion to Stay Case,, 229 filed by Plaintiffs Skot Heckman, Luis Ponce, Jeanene Popp, Jacob Roberts. (Attachments: # 1 Proposed Order) (Sears, William) (Entered: 10/23/2023) |
| 10/25/2023 | 231 | MINUTES IN CHAMBERS ORDER by Judge George H. Wu. Plaintiff's Request to Clarify (ECF No. 230) is granted in part. The Plaintiffs seek clarification because the Court's intentions in that regard appear to be unclear. The Court will clarify its ruling as follows. (See document for further details).; granting in part 230 REQUEST to Correct Order, 229 . (aco) (Entered: 10/25/2023) |