No. 23-55770

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SKOT HECKMAN, ET AL.,

*Plaintiffs-Appellees*,

v.

LIVE NATION ENTERTAINMENT, INC.; TICKETMASTER, LLC,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Central District of California, No. 2:22-cv-00047 (Hon. George H. Wu)

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

Jennifer B. Dickey
Jonathan D. Urick
U.S. CHAMBER LITIGATION
   CENTER
1615 H Street, N.W.
Washington, DC 20062

Andrew J. Pincus
Archis A. Parasharami
Daniel E. Jones
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
apincus@mayerbrown.com

*Counsel for* Amicus Curiae *the Chamber of Commerce of the United States of America*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF THE *AMICUS CURIAE* ................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 3

ARGUMENT ........................................................................................... 6

I.    Courts Should Recognize The Illegitimacy Of Extortionate Mass Arbitrations And Uphold Procedures That Reasonably Address That Threat. .................................................................... 6

    A.    Consumers and businesses benefit from individual arbitration. ...................................................................... 6

    B.    Mass arbitration has emerged as a vehicle for abusive gamesmanship. ...................................................................... 8

        1.    Leveraging fee-payment provisions to coerce settlements. ............................................................... 9

        2.    Abusive claimant recruitment practices ................... 15

    C.    The Court should not foreclose reasonable responses to abusive mass arbitrations, such as the use of bellwether arbitrations. ....................................................... 20

II.    The District Court Erred By Straining To Invalidate The Arbitration Agreement And Its Delegation Clause. ...................... 25

CONCLUSION ...................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ................................................ 18

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .................................................................................. 24

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ................................................................. 3, 24, 25

*Fishon v. Peloton Interactive, Inc.*,
  336 F.R.D. 67 (S.D.N.Y. 2020) ............................................................. 13

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000) ............................................................................. 28, 29

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  2020 WL 3513547 (D. Minn. June 29, 2020) ..................................... 18

*In re Chevron U.S.A., Inc.*,
  109 F.3d 1016 (5th Cir. 1997) ............................................................... 20

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*
  *Litig.*,
  2007 WL 1791258 (S.D.N.Y. June 15, 2007) ..................................... 21

*Lamps Plus, Inc. v. Varela*,
  139 S. Ct. 1407 (2019) ............................................................................. 26

*MacClelland v. Cellco P'Ship*,
  609 F. Supp. 3d 1024 (N.D. Cal. 2022) ............................................... 26

*Mohamed v. Uber Techs., Inc.*,
  848 F.3d 1201 (9th Cir. 2016) ............................................................... 27

*PacifiCare Health Sys., Inc. v. Book*,
  538 U.S. 401 (2003) .................................................................................. 28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Poublon v. C.H. Robinson Co.*,
  846 F.3d 1251 (9th Cir. 2017) ............................................................. 29

*Sanchez v. Valencia Holding Co.*,
  353 P.3d 741 (Cal. 2015) ...................................................................... 29

*Serpa v. Cal. Surety Investigations, Inc.*,
  215 Cal. App. 4th 695 (2013) ............................................................... 26

*Tompkins v. 23andMe, Inc.*,
  840 F.3d 1016 (9th Cir. 2016) ............................................................. 27

**Statutes**

Cal. Civ. Code § 1643 ............................................................................. 26

Cal. Civ. Proc. Code
  1281.97 ................................................................................................. 13
  1281.98 ................................................................................................. 13
  1281.99 ................................................................................................. 13

Federal Arbitration Act
  9 U.S.C. §§ 1-16 .................................................................................... 1

**Other Authorities**

AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Aug.
  1, 2023) .......................................................................................... 10, 11

AAA, *Consumer Arbitration Rules* (Sept. 1, 2014) ............................... 24

AAA, *Mass Arbitration Supplementary Rules* (Aug. 1, 2023) ......... 11, 23

ABA Model R. of Prof. Conduct
  1.4 ........................................................................................................ 16
  3.1 ........................................................................................................ 16
  3.1 cmt. 2 ............................................................................................. 16

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Alison Frankel, *Mass Consumer Arbitration Is On! Ed Tech Company Hit With 15,000 Data Breach Claims*, Reuters (May 12, 2020) ................................................................ 19

Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021)................ 12, 19

Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019)................................ 12

Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA Consumer Arbitrations*, 25 Ohio St. J. on Disp. Resol. 843 (2010) ........................................................ 7

Christopher R. Drahozal & Samantha Zyontz, *Creditor Claims in Arbitration and in Court*, 7 Hastings Bus. L.J. 77 (2011)........................................................................... 7

Ernst & Young, *Outcomes of Arbitration: An Empirical Study of Consumer Lending Cases* (2005)............................................ 7

Harry M. Reasoner, et al., *Business & Commercial Litigation in Federal Courts* (5th ed. Supp. 2021) ............................... 16

Henry J. Friendly, *Federal Jurisdiction: A General View* (1973)................................................................................. 14

Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ....................................... 20, 22

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283 (2022)................................................................................. 14, 15, 19

JAMS, *Arbitration Schedule of Fees and Costs* ................................ 10, 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

JAMS, *Consumer Arbitration Minimum Standards* (July 15, 2009) ................................................................................ 24

Matthew C. Helland, *Costs of Defense in Mass Individual Wage-and-Hour Arbitrations: A Case Study*, PLI Current Vol. 3, No. 1 (Winter 2019) ............................................... 22

McCune Wright Arevalo, PR NewsWire (Apr. 12, 2022) ...................... 19

Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer and Employment Arbitration* (Mar. 2022) .................................................. 6, 7

Rule 28(j) Letter, *Mosley v. Wells Fargo & Co.*, No. 23-55478, Dkt. No. 25-1 (9th Cir. Nov. 15, 2023) ....................... 17

Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29 (2017) ..................................................................... 8

Theodore Eisenberg et al., *Litigation Outcomes in State and Federal Courts: A Statistical Portrait*, 19 Seattle U. L. Rev. 433 (1996) ........................................................ 7

U.S. Chamber Inst. for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 2023) ................................................... 4, 7, 9, 17, 19

U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* (2021) ..................................... 21

## INTEREST OF THE *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, such as the enforceability of arbitration agreements and interpretation of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

Many of the Chamber's members and affiliates regularly rely on arbitration agreements. Arbitration is speedy, fair, inexpensive, and less adversarial than litigation. The Chamber's members and affiliates have

---

[1] No counsel for a party authored this brief in whole or in part, and no person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief.

entered into millions of contractual relationships providing for arbitration precisely to achieve those benefits.

The ruling below rests on legal errors that, if permitted to stand, would severely threaten the availability of arbitration's benefits for companies and consumers alike.

First, the district court failed to acknowledge critical context: the rise of abusive mass arbitrations. That phenomenon has compelled businesses to develop procedures that facilitate the orderly resolution of claims on the merits rather than through blackmail settlements based on threatened arbitration fees. Courts should recognize the importance of protecting and promoting merits-based resolutions and uphold reasonable procedures furthering that goal.

Second, at every turn the district court improperly construed the agreement in a manner that supported invalidation on substantive unconscionability grounds, rather than interpreting provisions it deemed ambiguous to provide for reasonable procedures. The court likewise failed to sever any allegedly offending provisions. This approach violates settled principles governing the interpretation of arbitration agreements (and contracts generally) requiring courts to preserve them if at all possible.

For these reasons, the Chamber has a strong interest in this case and in reversal of the decision below.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Federal Arbitration Act prohibits courts from disfavoring arbitration as a means of resolving disputes and, with narrow exceptions, directs courts to "enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).

Despite this requirement, the district court improperly allowed plaintiffs to circumvent their agreements for individual arbitration, primarily taking issue with the procedures specified in the arbitration agreement—which reflect one of several different attempts to develop a fair solution to the burgeoning mass arbitration abuse. The Chamber focuses here on two of the district court's key legal errors that have important implications for the broader business community.

First, the district court's decision did not adequately account for the legitimate justification for the challenged procedures: the rise of abusive mass arbitrations that undermine the purpose and benefit of individual arbitration—economical, fair, and efficient resolution of disputes on the

3

merits. A recent report by the Chamber's Institute for Legal Reform explains that mass arbitrations are subject to serious abuse. *See* U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 2023), https://bit.ly/3qTzu1q (*Mass Arbitration Shakedown*).[2]

Put simply, a number of plaintiffs' lawyers are leveraging the arbitration fees associated with threatened mass arbitration filings to, in effect, blackmail companies into agreeing to settle disputes for astronomical amounts, without regard to the merit of the underlying claims or whether the claimants are even customers of the defendant company.

In response to this abuse of arbitration, businesses have developed solutions—modeled on approaches used by MDL courts—that specify reasonable procedures for orderly resolution of mass arbitrations based on the merits of the underlying claims, rather than extortionate fee threats. It is hardly unconscionable for parties to agree to solutions of this kind, and this Court should avoid a ruling that would prevent parties

---

[2] Some of the lawyers submitting this brief authored the Chamber report.

from entering into agreements that reasonably prevent abuses of the arbitration process.

Second, faced with contractual terms that it viewed as ambiguous, the district court improperly stretched to interpret the arbitration agreement and its delegation clause as unconscionable and unenforceable. But under the FAA and general contract law, courts should lean in the opposite direction, resolving uncertainties in favor of an interpretation that preserves the parties' agreement to arbitrate. Relatedly, the district court improperly assumed that arbitrators would not appropriately exercise their considerable discretion over the arbitration process. And the district court erred in refusing to give effect to the parties' severability provision and selection of alternative arbitrators.

The district court's order denying arbitration should be reversed.

# ARGUMENT

## I. Courts Should Recognize The Illegitimacy Of Extortionate Mass Arbitrations And Uphold Procedures That Reasonably Address That Threat.

### A. Consumers and businesses benefit from individual arbitration.

Multiple studies confirm that consumers and workers who arbitrate fare at least as well, if not better, than ones who litigate in court. A recent study released by the Chamber's Institute for Legal Reform surveyed more than 41,000 consumer arbitration cases and 90,000 consumer litigation cases resolved between 2014 to 2021 and found that:

- Consumers who initiate cases were over 12% more likely to win in arbitration than in court;[3]

- The median monetary award for consumers who prevailed in arbitration was *more than triple* the award that consumers received in cases won in court;[4] and

---

[3] Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer and Employment Arbitration* 4-5 (Mar. 2022), https://bit.ly/3SK7QwA (41.7% in arbitration compared to 29.3% in court).

[4] *Id.* at 4-5 ($20,356 in arbitration compared to $6,669 in court).

- On average, arbitration of consumer disputes is more than 25% faster than litigation in court.[5]

Prior studies of consumer arbitration similarly report that consumers in arbitration fare at least as well as consumers in court.[6]

The use of arbitration also provides businesses with significant incentives to invest in robust pre-arbitration dispute resolution practices to address consumers' concerns *before* any arbitration is initiated. Companies heavily subsidize most or all costs of arbitration, and it is thus in their interest to make claimants with legitimate concerns whole—or more than whole—before a demand is filed and the business incurs the associated arbitration fees. And companies frequently do just that. *See Mass Arbitration Shakedown*, *supra*, at 9.

---

[5] *Id.* at 4-5 (321 days in arbitration compared to 439 days in court).

[6] *See, e.g.*, Christopher R. Drahozal & Samantha Zyontz, *Creditor Claims in Arbitration and in Court*, 7 Hastings Bus. L.J. 77, 80 (2011); Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA Consumer Arbitrations*, 25 Ohio St. J. on Disp. Resol. 843, 896-904 (2010); Ernst & Young, *Outcomes of Arbitration: An Empirical Study of Consumer Lending Cases* (2005); Theodore Eisenberg et al., *Litigation Outcomes in State and Federal Courts: A Statistical Portrait*, 19 Seattle U. L. Rev. 433, 437 (1996).

Consumers who have a dispute with a business are not the only beneficiaries of arbitration. Because arbitration reduces the cost of dispute resolution, it also reduces the company's overall cost of doing business. The forces of market competition then cause those savings to be passed along to consumers in the form of lower prices and to employees in the form of higher wages.[7] Without arbitration, there are no savings, and the result is higher prices and lower wages. And the ripple effects of these changes are felt throughout the economy.

## B. Mass arbitration has emerged as a vehicle for abusive gamesmanship.

The critical context for this appeal is the recent phenomenon of mass arbitrations, in which plaintiffs' attorneys purport to enroll thousands of clients, often through a minimal online process, to prosecute the same or similar claims against a business. The lawyers then threaten to file tens of thousands of arbitrations at the same time, which would trigger the target company's immediate obligation to pay tens or

---

[7] Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29, 85, 113 (2017) ("[S]tandard economic analysis suggests that enforcement of adhesive consumer arbitration agreements tends over time to lower the prices of the goods and services consumers buy.").

hundreds of millions of dollars in arbitration fees. The goal is to coerce a settlement, regardless of the underlying merits, through the extortionate timing of arbitration fees that prevents companies from verifying that each claim properly belongs in arbitration before the nonrefundable fees must be paid. *See Mass Arbitration Shakedown*, *supra*, at 18-19; Live Nation Br. 7-8.

This abusive tactic rests on two factors: exploiting unfairly companies' obligation to pay arbitration fees and the use of questionable claimant-recruiting practices.

### 1. Leveraging fee-payment provisions to coerce settlements.

Many arbitration agreements select the American Arbitration Association ("AAA") or JAMS as the third-party administrator for consumer arbitrations. These providers are generally recognized to employ fair procedures for the selection of arbitrators, and each has a strong roster of experienced, neutral lawyers, including former judges, who serve as arbitrators.

In this case, the prior versions of the parties' arbitration agreements selected JAMS. Under the JAMS fee schedule, if a consumer initiates arbitration against a company, the company must pay a filing

fee of at least $1,750 ($2,000 if the company agrees to pay the consumer's $250 filing fee).[8] After paying the initial filing fee, the company then must pay substantial additional fees, including uncapped hourly fees for the arbitrator's services and a 13% case management fee.

The American Arbitration Association (AAA) consumer fee schedule results in more certain but still considerable fees: if a customer requests a hearing (even a telephonic or Zoom hearing), a company must pay $4,775 in AAA fees per case, win or lose.[9] And the lion's share of these fees must be paid almost immediately after the arbitration is filed.[10] In a mass arbitration, the AAA only slightly reduces the initial filing fees and leaves the other fees unchanged, gradually lowering the business's cost

---

[8] *See* JAMS, *Arbitration Schedule of Fees and Costs*, https://bit.ly/3FVt1aB (last visited Nov. 20, 2023). Many companies agree to pay the entire arbitration fee for small claims to make the arbitration process accessible for consumers seeking to assert such claims.

[9] *See* AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Aug. 1, 2023), https://adr.org/sites/default/files/Consumer-Fee_Schedule.pdf. Specifically, the business would pay the business's $375 filing fee, a $1,400 case-management fee, a $500 hearing fee, and an arbitrator fee of $2,500 per day of hearing. *Id.* at 1. If a business agrees to pay the consumer's $225 filing fee, the total goes up to $5,000 per case.

[10] The filing fees and arbitrator fees are charged as soon as the case is accepted for administration, and the case-management fee is charged as soon as the AAA deems the case ready for arbitrator selection. AAA, *Consumer Arbitration Rules: Costs of Arbitration*, *supra*.

per case to \$4,500—or \$3,000 if the consumer requests to dispense with hearings.[11]

Importantly, companies have little choice in paying these fees. To ensure that invoking arbitration is not burdensome to consumers, the AAA rules limit the consumer's share of arbitration fees to \$225 and the JAMS rules limit the consumer's share of arbitration fees to \$250.[12]

These fees imposed on companies become astronomical when aggregated to threaten a mass arbitration filing of tens of thousands of claims at once. The looming gigantic payment obligation—which the business must pay before it can verify whether the claimant is a bona fide party to an arbitration agreement with the business, much less offer any defense to the claims—creates leverage to force blackmail settlements.

---

[11] The AAA has adopted procedural rules governing mass arbitrations, but those rules do not address or reduce the fees that a business owes for each arbitration. *See* AAA, *Mass Arbitration Supplementary Rules* (Aug. 1, 2023), https://www.adr.org/sites/default/files/Supplementary_Rules_Mass_Arbitration.pdf.

[12] *See* AAA, *Consumer Arbitration Rules: Costs of Arbitration*, *supra*; JAMS, *Arbitration Schedule of Fees and Costs*, *supra*.

Consider a business threatened with 50,000 mass arbitrations—fewer than the number that Uber (60,000)[13] and Amazon (75,000)[14] faced. Under the AAA's current fee schedule, if the claimants request telephonic or Zoom hearings, the business's immediate upfront cost would be well over $200 million. And the business would be required to pay this amount *even if it later won every case* (and even if the claimants were not in fact customers of the company or failed to show up to the hearing).

Plaintiffs' lawyers know that tens of thousands of arbitrations will not be conducted immediately and simultaneously. They could not appear in each of those cases, and arbitration providers could not process them or provide arbitrators to decide them. The sole reason for the threat of simultaneous filing is to coerce a settlement.

Businesses face substantial risks if they refuse to pay the fees or seek to delay payment until after verifying the claims' legitimacy. The AAA, for example, warns that if a business fails to timely pay an invoice, the AAA "may decline to administer future consumer arbitrations with

---

[13] Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/3z5E0LD.

[14] Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj.

that business." The nonpayment of fees could end the company's arbitration program.[15] And in California, Civil Code Sections 1281.97-99 threaten businesses with harsh sanctions if they fail to pay arbitration fees within 30 days.[16]

Plaintiffs' law firms have exploited these dynamics to try to achieve quick and lucrative settlements. After all, a business facing the threat of $200 million in AAA fees may find it difficult to reject a $20 million settlement demand, even if the underlying claims are meritless.

---

[15] AAA, *Consumer Arbitration Rules*, *supra. See Fishon v. Peloton Interactive, Inc.*, 336 F.R.D. 67, 68 (S.D.N.Y. 2020) (after more than 2,700 Peloton consumers filed individual arbitration demands with AAA, Peloton failed to pay required fees and AAA refused to accept any more demands against Peloton).

[16] If a business does not pay the fees within 30 days, the plaintiff consumer or employee can either (1) "[w]ithdraw the claim from arbitration and proceed in a court of appropriate jurisdiction," in which case "the court shall impose sanctions on the drafting party"; or (2) "[c]ompel arbitration in which [case] the drafting party shall pay reasonable attorney's fees and costs related to the arbitration." Cal. Civ. Proc. Code § 1281.97; *see also id.* §§ 1281.98 & 1281.99.

The Chamber has elsewhere explained why this rule, which imposes special penalties on arbitration agreements as compared to other contractual agreements, violates the FAA. *See* Amicus Curiae Br. of the Chamber of Commerce of the United States in Supp. of Pls.-Appellants 15-30, *Intuit Inc. v. 9,933 Individuals*, No. B308417 (Cal. Ct. App. Mar. 19, 2021).

The economic pressure of mass arbitrations is even greater than the pressure imposed by class actions, which Judge Friendly famously recognized can lead to "blackmail settlements."[17]

Today, for plaintiffs' firms threatening mass arbitrations, blackmail settlements are the entire point. "[A]busive mass arbitrations are the 21st-century equivalent of the abusive class actions that characterized the last part of the 20th century—claims that can be brought solely for the purpose of extracting a settlement unrelated to the merits by leveraging the threat of huge costs."[18]

Georgetown Professor J. Maria Glover has stated candidly—after interviewing plaintiffs' lawyers who originated the mass-arbitration strategy—that "[t]he mass-arbitration model operates on its ability to impose significant *in terrorem* settlement pressure" through the imposition of "astounding" fees that "can spell financial catastrophe for a potential defendant."[19] Professor Glover concluded that the settlement pressure imposed by a mass arbitration—even one asserting "more

---

[17] Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973).

[18] *Mass Arbitration Shakedown*, *supra*, at 5.

[19] J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1345, 1349, 1380 (2022).

dubious claims"—can be *greater* than that imposed by a certified class action.[20]

### 2. Abusive claimant recruitment practices.

The coercive leverage from a threatened mass arbitration stems from the amount of arbitration fees that the target company will be obligated to pay—and that turns entirely on the number of claims the plaintiff's lawyer is able to threaten. The more claims, the greater the threat. Because arbitration providers require payment without any vetting of the legitimacy of the claim—without even proof that the claimant is a customer of the target company—plaintiffs' lawyers have a powerful incentive to focus on the quantity of claims without regard to their quality. That reality is spawning disturbing abuses in the claimant-recruitment process.

Unlike class actions, where plaintiffs' lawyers predominantly communicate with a few named plaintiffs to initiate a case, and the subsequent court-supervised class-certification process provides certain

---

[20] *Id.* at 1350; *see also id.* at 1352 ("Simply put, mass arbitration shows that when it comes to *in terrorem* effects[,]" "the leverage of a large number of individual arbitrations can sometimes *exceed* the leverage created by aggregate proceedings.").

guarantees about the characteristics of unnamed class members, mass arbitrations require individualized vetting and attention from plaintiffs' lawyers for each arbitration claim that they file (or threaten to file).

Plaintiffs' lawyers *should* be vetting their clients to ensure that they have a basis for presenting a claim for resolution by arbitration and communicating with their clients throughout the process—indeed, those steps are mandated by the rules of professional conduct.

For example, lawyers may not "bring or defend a proceeding, or assert or controversy an issue therein, unless there is a basis in law and fact for doing so." ABA Model R. of Prof. Conduct 3.1. And to comply with that requirement, they must "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." ABA Model R. of Prof. Conduct 3.1 cmt. 2; *see also*, *e.g.*, Harry M. Reasoner, et al., *Business & Commercial Litigation in Federal Courts* § 85.14 (5th ed. Supp. 2021) ("Like Fed. R. Civ. P. 11, Model Rule 3.1 and analogous state rules generally impose a duty of investigation on the lawyer."). The rules also require communication between lawyers and their clients. *See*, *e.g.*, ABA Model R. of Prof. Conduct 1.4.

But recent experience suggests that at least some plaintiffs' lawyers are not following these requirements. *See Mass Arbitration Shakedown*, *supra,* at 30-40. For example, in a recent mass arbitration against Wells Fargo over overdraft fees, only about 11 percent of nearly 4,000 claimants could provide basic information required to confirm that they had a legitimate claim—an account number and confirmation of having incurred the challenged fee.[21] Over 1,600 claimants (around *45 percent*) admitted that they were not charged that fee, and the rest have not responded.[22]

In another mass arbitration involving Intuit, the maker of TurboTax, plaintiffs' counsel had to drop thousands of arbitration claims because, according to Intuit's counsel, it turns out their clients were not in fact customers of Intuit or had never incurred the disputed charge.[23]

Nor are the Wells Fargo and Intuit incidents unique; even the limited publicly available information about filed or threatened mass

---

[21] *See* Rule 28(j) Letter at 1, *Mosley v. Wells Fargo & Co.*, No. 23-55478, Dkt. No. 25-1 (9th Cir. Nov. 15, 2023).

[22] *See id.*

[23] *See* Decl. of Roger Cole ¶¶ 21-22, *In re Intuit Free File Litig.*, No. 3:19-cv-2546-CRB, Dkt. 192 (N.D. Cal. Dec. 7, 2020).

arbitrations shows that other companies facing mass arbitrations have had similar experiences.[24] This pattern confirms that lawyers cannot blindly trust the unverified information typed into online forms by strangers recruited to be arbitration claimants. And the failure to engage in appropriate verification harms everyone: not just businesses but consumers as well—and the integrity of the legal system.

*　*　*　*　*

In sum, mass arbitrations routinely involve questionable practices. Plaintiffs' counsel seek to create coercive settlement leverage based not on the merits of the claims but on the fact that many businesses agree to pay the costs of arbitration. And the need to recruit large numbers of claimants to create a sufficient level of coercion provides an incentive for abusive recruiting practices.

---

[24] *See, e.g.*, *In re CenturyLink Sales Pracs. & Sec. Litig.*, 2020 WL 3513547, at *2-3 (D. Minn. June 29, 2020) (after mass arbitration claimants were selected solely "based on their responses to questionnaires," defendant found that it "could not identify any potential customer account that could be connected with some" claimants, with some even "claim[ing] to receive services at addresses in states in which [the defendant] does not provide services"); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065 (N.D. Cal. 2020) (869 arbitration claimants failed to provide sufficient evidence to allow the court to find that they had arbitration agreements with defendant).

But the process of coercing settlements by threatening a mass arbitration has worked—and mass arbitrations have proliferated in recent years. *See Mass Arbitration Shakedown*, *supra*, at 18-19.[25]

Companies dealing with a mass arbitration face a Hobson's choice: either pay the overwhelming bill for arbitration fees in order to have an opportunity to investigate and defend against the claims on the merits, or accept under duress a settlement that reflects the threatened fees rather than the merits of the claims.

Some companies, like Amazon, which faced more than 75,000 arbitration demands in 2021, abandoned their consumer arbitration clauses and thus the mutual benefits of arbitration for dispute resolution.[26] Other businesses have had to pass along the cost of blackmail settlements to their customers in the form of higher prices and

---

[25] Public reports indicate that large mass arbitrations also have been pursued against Uber, DoorDash, Postmates, FanDuel, DraftKings, Chegg, Chipotle, CenturyLink, Dollar Tree, Wells Fargo, and many other companies. *See, e.g.*, *Mass Arbitration Shakedown*, *supra*, at 19-21; Glover, 74 STAN. L. REV. at 1387-90; McCune Wright Arevalo, PR NewsWire (Apr. 12, 2022), https://bit.ly/47RvVt1; Alison Frankel, *Mass Consumer Arbitration Is On! Ed Tech Company Hit With 15,000 Data Breach Claims*, Reuters (May 12, 2020), https://reut.rs/3z1uwAU.

[26] *See* Robert, *supra* note 14.

to workers in the form of lower wages or fewer jobs. Still others have likewise had to pass along the costs of gigantic arbitration fees and the cost of resolving mass arbitrations. None of these results is desirable.

**C.  The Court should not foreclose reasonable responses to abusive mass arbitrations, such as the use of bellwether arbitrations.**

Faced with the threat of abusive efforts to coerce settlements, businesses have sought to devise reasonable solutions that preserve merits-based decision-making while protecting the right of legitimate claimants to obtain relief through arbitration.

One such solution is modeled on MDL courts' use of bellwether proceedings to resolve large numbers of individual lawsuits. Although bellwether trials are not impervious to abuse, one federal judge has described them as "one of the most innovative and useful techniques for the resolution of complex cases." Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2323 (2008).

As the Fifth Circuit has explained, "If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts." *In re Chevron*

*U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2007 WL 1791258, at *2-3 (S.D.N.Y. June 15, 2007).

MDLs—and the judges overseeing them—have proven to be remarkably effective at achieving settlement. Since 1968, when Congress passed the MDL statute, MDL judges to whom cases were transferred terminated 97 percent of cases themselves, sending fewer than 3 percent back to the originating courts.[27]

The MDL approach is an excellent fit for the mass-arbitration problem. As in the MDL context, the question is how to fairly resolve a large number of individualized actions.

An appropriately structured bellwether approach protects all parties. It preserves the benefits of individualized arbitration discussed above by ensuring that parties can feasibly be heard on the merits while encouraging an orderly settlement process. And it encourages reasonable settlements by requiring litigants to seriously assess their case as they

---

[27] *See* U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021*, 3 (2021), https://bit.ly/3feso28 ("Since the creation of the Panel in 1968, . . . a total of 17,357 actions have been remanded for trial and 647,396 actions have been terminated in the transferee court.").

prepare and by providing "real-world evaluations of the" claims through their adjudication. Hon. Eldon E. Fallon, *supra*, 82 Tul. L. Rev. at 2325.

The fact that a bellwethering process defers most fees until claims are ready to be decided makes it feasible to obtain merits-based decisions that can guide settlement decisions. And some of the money saved in arbitration fees can be used to fund a settlement with real value for claimants, if appropriate. A bellwether process thus promotes resolution based on the merits, rather than based only on the threatened amount of aggregated arbitration fees.

In addition, bellwether proceedings do not result in delay; they encourage resolution of the vast majority of claims in a reasonable time frame—as evidenced by the disposition of cases consolidated into MDLs. Mass arbitrations can follow the same pattern.[28]

Moreover, not even the largest arbitration providers can simultaneously arbitrate tens of thousands of cases. For example, the AAA assigns all cases to a small roster of arbitrators, who then adjudicate

---

[28] *See* Matthew C. Helland, *Costs of Defense in Mass Individual Wage-and-Hour Arbitrations: A Case Study*, PLI Current Vol. 3, No. 1 at 215-16 (Winter 2019) (reporting that mass arbitration settled following arbitration of five test cases).

each claim individually.[29] That means they are resolved seriatim, just as they would be under the more orderly bellwether process.

Recent arbitration agreements employ a range of different approaches in adapting the bellwether model:

- Some provide for bellwethers—separate arbitration of claims in tranches (*e.g.*, 25, 30, or 50 test cases at a time).[30]

- Some additionally require a mediation process for remaining claims after each bellwether tranche is completed.[31]

- Others batch multiple arbitrations (*e.g.*, 50 or 100) into a single case before a single arbitrator.[32]

- And still others use both batching and bellwethers.[33]

---

[29] *See* AAA, *Mass Arbitration Supplementary Rules*, *supra*, at 7-8.

[30] *See*, *e.g.*, Best Buy Terms and Conditions, https://bit.ly/3sFawEj; Wayfair Terms of Use, https://terms.wayfair.io/en-US#terms.

[31] *See*, *e.g.*, AT&T Consumer Service Agreement § 1.3.2.7, https://www.att.com/legal/terms.consumerServiceAgreement.html; Discord Terms of Service § 15, https://discord.com/terms; Nordstrom Terms and Conditions § 16, https://bit.ly/3MLCOUs.

[32] *See*, *e.g.*, Doordash Consumer Terms and Conditions § 14(g), https://bit.ly/3ujOwiG; Grubhub Terms of Use, https://www.grubhub.com/legal/terms-of-use.

[33] *See*, *e.g.*, Bath & Body Works Terms of Use § 11(D), https://bit.ly/3R0AD1U; Uber U.S. Terms of Use § 2(3)(c), https://bit.ly/3SMGjh8.

- Many agreements leave in place the arbitrator's discretion, specified in the AAA and JAMS rules, to determine the appropriate amount of discovery, process for written and oral submissions to the arbitrator, and other procedural matters.[34]

There is value in this experimentation. The FAA affords "parties discretion in designing arbitration processes" that are "tailored to the type of dispute." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011); *see also Epic Sys.*, 138 S. Ct. at 1621 (FAA protects parties' ability to fashion appropriate "rules under which th[eir] arbitration will be conducted") (emphasis omitted); Live Nation Br. 5.

Especially given the wide variety of procedures businesses have adopted and are continuing to adopt, this Court should not stifle bellwethering and other forms of reasonable solutions to the very real abuses posed by some mass arbitrations and threatened mass arbitrations.

---

[34] *See* AAA, *Consumer Arbitration Rules* (Sept. 1, 2014), https://adr.org/sites/default/files/Consumer-Rules-Web_0.pdf; JAMS, *Consumer Arbitration Minimum Standards* (July 15, 2009), https://www.jamsadr.com/consumer-minimum-standards/.

## II. The District Court Erred By Straining To Invalidate The Arbitration Agreement And Its Delegation Clause.

In light of the genuine problems posed by mass arbitration, the district court should have sought to preserve an arbitration process designed to protect against those abuses. Instead, the district court at every turn failed to give the arbitration provision and its delegation clause a reading that would preserve the parties' core agreement to arbitrate and effectuate the FAA's policy favoring the resolution of disputes by arbitration. As set forth in Live Nation's brief (at 21-62), there are several reasons why the district court incorrectly applied the FAA and California law.[35]

To begin, the district court's overall approach to interpreting the agreement is troubling. The district court gave short shrift to the FAA's "liberal federal policy favoring arbitration agreements." *Epic Sys.*, 138 S. Ct. at 1621 (quotation marks omitted). For example, when the issue is whether an arbitration clause covers the parties' dispute, the FAA, as a

---

[35] The Chamber addresses only the district court's discussion of substantive unconscionability because the court's errors on that issue alone require reversal, as both procedural and substantive unconscionability are required to invalidate a contract or a specific contract term.

matter of substantive federal law, requires resolving any uncertainty about the scope of an arbitration agreement "*in favor* of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019) (emphasis added).

The district court's tilt towards invalidation also runs afoul of the general contract principle that contracts should be interpreted whenever possible to make them "'lawful, operative, definite, reasonable and capable of being carried into effect.'" *Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal. App. 4th 695, 708 (2013) (quoting Cal. Civ. Code § 1643).

The district court assumed that any uncertainties—such as the effect of bellwether cases on future arbitrations or whether the arbitrators would exercise their discretion to allow for sufficient discovery and briefing—would be resolved in a way that results in an unfair arbitration.[36] That approach was doubly problematic.

---

[36] The district court here also relied on the opinion in *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022), *appeal pending*, No. 22-16020 (9th Cir. filed July 13, 2022). While the parties in *MacClelland* have indicated that the case has been settled, the Chamber previously explained in its *amicus* brief in that case why the *MacClelland* opinion is wrong. *See* No. 22-16020, Dkt. Nos. 20, 74.

For starters, it runs afoul of this Court's holding that courts should not consider challenges to contractual terms whose applicability has been waived. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1212 (9th Cir. 2016) (declining to consider plaintiffs' objection to a fee term in an arbitration agreement because "Uber has committed to paying the full costs of arbitration"); *see also Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) (Watford, J., concurring) (noting "no need to address whether the fee-shifting clause is substantively unconscionable because 23andMe has waived its right to enforce that clause"). The district court at minimum should have treated New Era's clarifications of its arbitral process as sufficient to constitute a waiver by Live Nation of any attempt to enforce the arbitration procedures in a way that the district court found troubling.

It also was inappropriate for the district court to assume that the arbitration process would not unfold fairly. The district court acknowledged that plaintiffs had not shown that the arbitrators would be biased. 1-ER-17-18. And given the absence of evidence to support the district court's fears of how a neutral arbitrator might apply the rules, that mere "'risk' . . . is too speculative to justify the invalidation of an

27

arbitration agreement." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). Instead, the Supreme Court has held that when there is "uncertainty" about how arbitration might unfold, "the proper course is to compel arbitration"—not to deny it "on the basis of 'mere speculation'" about how "an arbitrator might" act. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406-07 (2003) (holding that the lower courts should not have presumed that an arbitrator would interpret the arbitration agreement's prohibition on awarding punitive damages to foreclose awarding statutory treble damages).

Finally, the district court's refusal to address its concerns about the parties' choice of New Era by severing that provision and enforcing the remainder of the arbitration agreement, or enforcing the parties' prior arbitration agreement, was wrong for the reasons explained by Live Nation (Br. at 55-62).

The district court acknowledged that, as a backup to New Era, the clause expressly allowed for arbitration by either FairClaims or another arbitration provider agreed to by the parties. 1-ER-30. Yet the district court declined to consider whether these alternatives would satisfy its concerns because the parties had not briefed the issue. But the court's

implicit holding that Live Nation was required to defend the validity of these backup processes turns the burden of proof on its head: it was *plaintiffs'* burden to demonstrate that the agreement and its delegation clause were unconscionable and unenforceable. *See Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (under California law, "the party opposing arbitration must demonstrate that the contract [for arbitration] as a whole or a specific clause in the contract is both procedurally and substantively unconscionable") (citing *Sanchez v. Valencia Holding Co.*, 353 P.3d 741, 748 (Cal. 2015)); *see also Green Tree*, 531 U.S. at 91 ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."). Accordingly, the absence of a briefed challenge to these backup procedures should have been a reason to enforce the arbitration clause, not invalidate it—or at minimum, to call for supplemental briefing on the issue.

## CONCLUSION

The district court's order denying arbitration should be reversed.

29

Dated: November 20, 2023          Respectfully submitted,

                                  /s/ *Andrew J. Pincus*

Jennifer B. Dickey               Andrew J. Pincus
Jonathan D. Urick                Archis A. Parasharami
U.S. CHAMBER LITIGATION          Daniel E. Jones
    CENTER                       Wajdi C. Mallat
1615 H Street, N.W.              MAYER BROWN LLP
Washington, DC 20062            1999 K Street, N.W.
                                 Washington, DC 20006
                                 (202) 263-3000
                                 apincus@mayerbrown.com

*Counsel for* Amicus Curiae *the Chamber of Commerce
of the United States of America*

## CERTIFICATE OF COMPLIANCE

1.   **9th Cir. Case Number(s)**   No. 23-55770

I am the attorney or self-represented party.

**This brief contains** 5,631 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ *Andrew J. Pincus* **Date** November 20, 2023

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 20, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Andrew J. Pincus*
Andrew J. Pincus
*Counsel for* Amicus Curiae