No. 23-55770

# In the United States Court of Appeals for the Ninth Circuit

---

SKOT HECKMAN; LOUIS PONCE; JEANENE POPP; JACOB ROBERTS, ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED

*Plaintiffs-Appellees,*

v.

LIVE NATION ENTERTAINMENT, INC.; TICKETMASTER, LLC,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for Central California, Los Angeles
Case No. 2:22-cv-00047-GW-GJC (The Hon. George H. Wu)

---

## BRIEF OF AMERICAN ASSOCIATION FOR JUSTICE AND PUBLIC JUSTICE AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

---

MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSIE GARLAND
GUPTA WESSLER LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

December 20, 2023                    *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae the American Association for Justice and Public Justice both state that they are non-profit organizations. Neither has any parent corporation or publicly owned corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate disclosure statement ................................................................. i

Table of authorities ............................................................................... iii

Interest of amici curiae ........................................................................... 1

Introduction ........................................................................................... 2

Argument ............................................................................................... 3

    I.    There is a long history of industry groups developing biased
           arbitration forums—and of courts policing the practice. ...................... 3

        A.    NAF: A dispute resolution forum for debt collectors, by
              debt collectors. ............................................................................ 3

        B.    EDSI: A "fundamentally unfair" forum in a "symbiotic
              relationship" with employers. ..................................................... 6

        C.    Hooters: "[A] dispute resolution process utterly lacking in
              the rudiments of even-handedness." ........................................... 9

        D.    Western Sky: A "tribal arbitration" scheme that is a "sham
              from stem to stern." ..................................................................12

        E.    Verizon: An arbitral procedure that rejects the
              "paramount consideration" of "mutuality." .............................. 13

    II.    New Era is of a piece with those efforts. ............................................... 16

Conclusion ........................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Achey v. Cellco Partnership,*
   293 A.3d 558 (N.J. App. Div. 2023) ................................................................ 14, 16

*Adir International, LLC v. Starr Indemnity & Liability Co.,*
   994 F.3d 1032 (9th Cir. 2021) .......................................................................15

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011)........................................................................................2

*Beachler v. Ryan's Family Steak Houses, Inc.,*
   2007 WL 2773832 (N.D. W. Va. Sept. 21, 2007)........................................7

*Dietrich v. Boeing Co.,*
   14 F.4th 1089 (9th Cir. 2021) ...................................................................... 14

*Falous v. Ryan's Restaurant Group, Inc.,*
   2005 WL 8162787 (D.S.C. Aug. 17, 2005) ................................................7

*Geiger v. Ryan's Family Steak Houses, Inc.,*
   134 F. Supp. 2d 985 (S.D. Ind. 2001) ........................................................7

*Hayes v. Delbert Services Corp.,*
   811 F.3d 666 (4th Cir. 2016).................................................................12, 13

*Heckman v. Live Nation Entertainment, Inc.,*
   2023 WL 5505999 (C.D. Cal. Aug. 10, 2023) ...........................16, 17, 18, 19

*Hooters of America, Inc. v. Phillips,*
   173 F.3d 933 (4th Cir. 1999) ...........................................................*passim*

*Huffman v. Sticky Fingers, Inc.,*
   2005 WL 8165097 (D.S.C. Dec. 20, 2005) ................................................7

*Inetianbor v. CashCall, Inc.,*
   962 F. Supp. 2d 1303 (S.D. Fla. 2013) ................................................12, 13

*Jackson v. Payday Financial, LLC,*
   764 F.3d 765 (7th Cir. 2014) ..............................................................12, 13

*MacClelland v. Cellco Partnership,*
    609 F. Supp. 3d 1024 (N.D. Cal. 2022) ................................................... 14, 15, 16, 19

*Minnesota v. National Arbitration Forum,*
    2009 WL 2029918 (Minn. Dist. Ct. July 14, 2009) .................................................... 4

*Parm v. National Bank of California, N.A.,*
    835 F.3d 1331 (11th Cir. 2016) ................................................................... 13

*Penn v. Ryan's Family Steak Houses, Inc.,*
    269 F.3d 753 (7th Cir. 2001) ............................................................... 8, 9

*Picha et al. v. Gemini Trust Company, LLC et al.,*
    No. 1:22-cv-10922-NRB (S.D.N.Y. Mar. 17, 2023) ................................................ 16

*Pokorny v. Quixtar, Inc.,*
    601 F.3d 987 (9th Cir. 2010) ................................................................... 16

*Reyes v. Experian Information Solutions Inc.,*
    2019 WL 4854849 (C.D. Cal. Oct. 1, 2019) ..................................................... 12

*State ex rel. Saylor v. Wilkes,*
    613 S.E.2d 914 (W. Va. 2005) .................................................................. 7

*Walker v. Ryan's Family Steak Houses, Inc.,*
    400 F.3d 370 (6th Cir. 2005) ........................................................... *passim*

*Williams v. CashCall, Inc.,*
    92 F. Supp. 3d 847 (E.D. Wis. 2015) .......................................................... 13

## Other Authorities

*Arbitration or Arbitrary: The Misuse of Mandatory Arbitration to Collect Consumer
    Debts: Hearing Before the H. Subcomm. on Domestic Policy of the Comm. on
    Oversight and Gov. Reform,* 111th Cong. (2009) ............................................... 5

*Courting Big Business: The Supreme Court's Recent Decisions on Corporate Misconduct
    and Laws Regulating Corporations: Hearing Before the S. Comm. on the Judiciary,* 110th
    Cong. (2008) ............................................................................. 5

John O'Donnell,
*The Arbitration Trap: How Credit Card Companies Ensnare Consumers,* Public Citizen
(Sept. 2007)...........................................................................................................5

Nancy A. Welsh,
*What Is '(Im)Partial Enough' in a World of Embedded Neutrals*, 52 Ariz. L. Rev. 395
(2010) ............................................................................................................. 3, 5

Press Release,
Minn. Office of the Att'y Gen., National Arbitration Forum Barred from Credit
Card and Consumer Arbitrations Under Agreement with Attorney General
Swanson (July 19, 2009) .........................................................................................6

## INTEREST OF AMICI CURIAE[1]

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal-injury actions, employment rights cases, consumer cases, and other civil actions. Throughout its 77-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

Public Justice is a national public-interest legal advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting corporate and governmental misconduct. Public Justice has long maintained an Access to Justice Project, which seeks to ensure that the civil courts are an effective tool that people with less societal power can use to win just and equitable outcomes and hold to account those with more power.

AAJ and Public Justice file this brief to demonstrate that Live Nation's attempt to force consumers into biased arbitration procedures is not a one-off attempt to rig the system. Over the past decades, numerous corporations have attempted similar

---

[1] All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from amici curiae, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

schemes. But courts have, time and time again, refused to enforce dispute resolution procedures that give repeat-player corporations a leg up. This Court should do the same. Based on amici curiae's expertise in both arbitration and litigation—and their organizational concern for the development of the law on those issues—AAJ and Public Justice are well positioned to offer a unique perspective on this issue.

## INTRODUCTION

Corporations like Live Nation and Ticketmaster (together, "Live Nation") fought for years to close the courts to consumers and restrict claims brought against them to strictly individual arbitrations. They were ultimately successful. *See, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Forced arbitration requirements—including class-action bans—are now ubiquitous, a part of most consumer contracts. As a result, corporations left many consumers with only one remaining pathway to pursue claims—individual arbitration.

But now, as thousands of consumers pursue individual arbitrations, some corporations are getting cold feet. Faced with the consequences of adjudicating large numbers of claims in the forums they themselves selected, corporations are trying to prevent consumers from accessing *any* fair forum. Through biased arbitration procedures, these companies are turning what was supposed to be a fair alternative to the American court system into forums that are "unworthy even of the name of arbitration." *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999). Live

Nation's use of New Era is just the latest iteration in a long tradition of corporations turning to biased forums to avoid adjudicating claims with consumers and workers on equal footing. Courts rightfully policed these practices in the past, and this Court should do so now.

## ARGUMENT

### I. There is a long history of industry groups developing biased arbitration forums—and of courts policing the practice.

The modern history of arbitration is full of examples of companies using biased arbitration forums to rig the game against consumers and workers. Time and time again, companies leveraged the language of arbitration—appealing to the benefits of fast, inexpensive, and informal dispute resolution—to force claimants into a biased forum. But courts have recognized these practices for what they are and refused to enforce so-called "arbitration" agreements where the rules of the underlying forum "present[ed] a stacked deck" against workers and consumers. *Hooters*, 173 F.3d at 940. These "sham systems," courts have explained, are not arbitration "in any meaningful sense of the word." *Id.* at 940–41.

#### A. NAF: A dispute resolution forum for debt collectors, by debt collectors.

The history of industry-led arbitral forums goes back decades. The National Arbitration Forum, known as NAF, helped pioneer this trend in the late 1980s. *See* Nancy A. Welsh, *What Is '(Im)Partial Enough' in a World of Embedded Neutrals*, 52 Ariz. L. Rev. 395, 427 (2010). By the early 2000s, NAF was the arbitral forum of choice for

3

holders of consumer debt—like credit card companies, mortgage lenders, and debt buyers. *Id.* at 428. It achieved market dominance by helping companies lock consumers into the forum and then guaranteeing those companies good results when they brought claims there.

*First*, NAF aggressively marketed itself to its customers—debt-collection companies—as the most efficient way to collect on their consumer debts, while holding itself out to consumers—and the public—as a neutral forum. In its marketing materials to debt collectors, NAF bragged about the "marked increase in recovery rates" that debt collectors could realize by bringing their collection actions in the forum. *Id.* at 427. And it reassured its debt-collector customers that they would have "all the leverage," leaving consumers with "little choice but to take care of [their] account[s]." *Id.* at 428. But to the public, NAF struck a different tone, describing itself as "an independent administrator of alternative dispute resolution services" that was "not affiliated with any party." Complaint ¶¶ 21–22, *Minnesota v. Nat'l Arb. F.*, 2009 WL 2029918 (Minn. Dist. Ct. July 14, 2009) [hereinafter NAF Complaint].

*Second*, NAF guaranteed itself a revenue stream by helping companies lock consumers into its forum. It persuaded companies to include mandatory arbitration clauses in their consumer contracts that required resolution of disputes in NAF— sometimes even drafting the arbitration clauses itself. *Id.* ¶¶ 91–92, 99. These efforts

worked, and by 2006, NAF was the country's largest provider of consumer-debt arbitration services. Welsh, *supra*, at 428.

*Third*, NAF maintained its customer base by employing arbitrators that systematically favored debt collectors—and by ensuring the debt collectors could arbitrate before those arbitrators. As one congressman remarked during a hearing about NAF's practices: "Who wins or loses an NAF arbitration seems to depend solely on which arbitrator reviews the claim." *Arbitration or Arbitrary: The Misuse of Mandatory Arbitration to Collect Consumer Debts: Hearing Before the H. Subcomm. on Domestic Pol'y of the Comm. on Oversight & Gov. Reform*, 111th Cong. 2 (2009) (statement of Dennis J. Kucinich, Member, H. Comm. on Oversight & Gov. Reform). And debt collectors—repeat players before the forum—could ensure they never arbitrated before an arbitrator who had been too friendly to consumers in the past. *See* John O'Donnell, Pub. Citizen, *The Arbitration Trap: How Credit Card Companies Ensnare Consumers* 15–17 (2007), https://perma.cc/7W3Q-9XFX. Indeed, one former NAF arbitrator told Congress that, after she ruled for a consumer in a case, she "was not allowed to decide" a single subsequent case that she was assigned. *See Courting Big Business: The Supreme Court's Recent Decisions on Corporate Misconduct and Laws Regulating Corporations: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 8 (2008) (statement of Elizabeth Bartholet, Prof. of Law, Harv. L. Sch.). The debt collectors removed

her in some cases and moved to dismiss—while retaining the ability to refile and draw a different arbitrator—in others. *See id.*

*Finally*, NAF wasn't only an arbitral forum *for* the debt-collection industry—it was a forum run *by* the debt-collection industry. A 2009 complaint filed by the Minnesota Attorney General revealed that one of NAF's largest shareholders—a New York hedge fund—was also the majority owner of one of the country's largest debt-collection enterprises. NAF Complaint ¶¶ 2, 34, 70–71. In fact, in 2006, nearly 60% of the consumer-debt cases adjudicated by NAF were brought by that NAF-affiliated debt collector. *Id.* ¶¶ 3, 30. Just days after Minnesota filed its lawsuit, NAF settled. *See* Press Release, Minn. Off. of the Att'y Gen., National Arbitration Forum Barred from Credit Card and Consumer Arbitrations Under Agreement with Attorney General Swanson (July 19, 2009). Once its biased practices faced public scrutiny and the threat of judicial oversight, NAF agreed to stop administering arbitrations involving consumer debt immediately. *Id.*

## B. EDSI: A "fundamentally unfair" forum in a "symbiotic relationship" with employers.

In the 1990s and early 2000s, chain restaurants throughout the southeast—like Golden Corral Steak Houses, Sticky Fingers Restaurants, and Ryan's Family Steak Houses—turned to a third-party dispute resolution service to adjudicate their claims with their employees. *See Walker v. Ryan's Fam. Steak Houses, Inc.*, 400 F.3d 370, 387 (6th Cir. 2005). The service was called Employment Dispute Services, Inc., or EDSI, and

it operated on a subscription model: In exchange for an annual fee, EDSI provided restaurants with an arbitral forum for all employment disputes. *See id.* at 380, 387.

EDSI was a for-profit business, and its subscription model rendered it dependent on contracts with employers to survive. *See id.* at 386. Indeed, one employer—Ryan's Family Steak Houses—"accounted for over 42% of EDSI's gross income." *Id.* So it developed slanted protocols that placed a heavy thumb on the scale in favor of employers. But EDSI's bias didn't escape notice. Numerous courts determined that its rules were "fundamentally unfair," rendering its arbitration agreements unenforceable. *Id.* at 386; *see also Geiger v. Ryan's Fam. Steak Houses, Inc.*, 134 F. Supp. 2d 985, 994–97 (S.D. Ind. 2001); *State ex rel. Saylor v. Wilkes*, 613 S.E.2d 914, 922 (W. Va. 2005); *Falous v. Ryan's Rest. Grp., Inc.*, 2005 WL 8162787, at *3–5 (D.S.C. Aug. 17, 2005); *Huffman v. Sticky Fingers, Inc.*, 2005 WL 8165097, at *10 (D.S.C. Dec. 20, 2005), *adopted in* 2006 WL 895029 (D.S.C. Mar. 31, 2006); *Beachler v. Ryan's Fam. Steak Houses, Inc.*, 2007 WL 2773832, at *5 (N.D. W. Va. Sept. 21, 2007). These decisions identified three unconscionable features of EDSI's arbitration rules.

*First*, courts recognized that EDSI's financial model created a strong incentive for biased results, because EDSI had a "financial interest" in appeasing its employer customers. *Walker*, 400 F.3d at 386; *see also Geiger*, 134 F. Supp. 2d at 995 ("EDSI . . . clearly has an incentive to maintain its contractual relationship with [employers]," while employees "have no leverage, having been presented with the arrangement on

a take-it-or-leave-it basis."). This "symbiotic relationship" between EDSI and employers, the Sixth Circuit recognized, rendered the forum "fundamentally unfair" to employees. *Walker*, 400 F.3d at 386.

*Second*, the rules gave EDSI—and hence, the employers on whom it financially depended—too much control over the selection of arbitrators. Under EDSI's rules, each case was heard by three arbitrators, selected from three separate categories: one manager from a company that used EDSI's services (but not the company involved in the dispute), one employee from such a company, and one legal professional. *See Penn v. Ryan's Fam. Steak Houses, Inc.*, 269 F.3d 753, 755–56 (7th Cir. 2001). At the beginning of each case, EDSI would give the parties a list of three arbitrators in each category, and the parties had the opportunity to strike one from each. *Id.* at 756. But the strikes did not provide employees with any real power because EDSI retained "complete control" over the arbitrators who appeared on the list in the first place. *Id.*[2] To make matters worse, the rules lacked "any criteria" governing who was eligible to serve as an arbitrator, failed to require the arbitrators to have any "knowledge of dispute resolution" or "employment law issues," and contained "no explicit requirement" that a potential arbitrator actually be "unbiased." *Walker*, 400 F.3d at 387.

---

[2] The rules also permitted strikes "for cause," but EDSI retained complete "discretion" to approve a for-cause strike. *Penn*, 269 F.3d at 756.

*Third*, the rules provided for exceedingly limited discovery. The rules allowed just one deposition "as of right," and additional depositions were permitted only at the "discretion" of the panel. *Id.* Even then, the rules disfavored discovery, adopting the "express policy" that depositions were "not encouraged" and were to be granted only in "extraordinary fact situations" and "for good cause shown." *Id.* In holding that these rules were unfair, the Sixth Circuit explained that to "stymie a party's attempt to marshal the evidence to prove or defend a claim, can be just as prejudicial as arbitral bias in the final decision on the merits." *Id.* at 388; *see also Penn*, 269 F.3d at 757 (noting that "a single deposition [was] likely to be inadequate" because "employment disputes are often extremely fact-intensive battles between witnesses with sharply different recollections of events").

Any of these factors on its own would have injected considerable unfairness into the arbitration proceedings. But together, there was no question: EDSI's forum did "not allow" employees to "effective[ly] vindicat[e]" their claims. *Walker*, 400 F.3d at 388. The Sixth Circuit—alongside a range of other courts—accordingly held that employers could not require their employees to resolve their claims in that forum. *Id.* at 388.

## C.   Hooters: "[A] dispute resolution process utterly lacking in the rudiments of even-handedness."

Rather than rely on third parties, some businesses have attempted to provide their own arbitral forums. One notable example is Hooters, which developed a self-

9

run dispute resolution program in the 1990s. When an employee claimed that her manager violated Title VII by failing to address sexual harassment she faced at work, Hooters moved to compel arbitration. But in an opinion by Judge Wilkinson, the Fourth Circuit declined to enforce the arbitration agreement, holding that Hooters's dispute resolution procedures were "so one-sided that their only possible purpose" could be "to undermine the neutrality of the proceeding." *Hooters*, 173 F.3d at 938.

Under Hooters's rules, an employee was required to provide the company with notice of her claim at the outset, including "the nature of the Claim" and the specific acts that formed "the basis of the Claim." *Id.* But Hooters was not required to file anything in response. An employee was also required to provide Hooters with a list of "all fact witnesses" and a "brief summary of the facts known to each." *Id.* Again, Hooters was not required to reciprocate. *Id.*

Each claim was heard by a panel of three arbitrators—all of whom were "selected from a list of arbitrators created exclusively by Hooters." *Id.* at 938–39. This rule gave Hooters "control over the entire panel" and placed "no limits whatsoever" on whom Hooters could select. *Id.* at 939. In fact, under the rules, Hooters was "free to devise lists of panel arbitrators who ha[d] existing relationships, financial or familial, with Hooters and its management." *Id.* The rules did not even prohibit Hooters from placing an employee's own manager on the list—meaning that an employee's sexual harassment claim could theoretically be heard by the manager she

was accusing. *See id.* "Given the unrestricted control that one party (Hooters) has over the panel," Judge Wilkinson observed, "the selection of an impartial decision maker would be a surprising result." *Id.*

Things didn't improve once the proceedings began. Although Hooters was permitted to "expand the scope of arbitration to any matter, whether related or not to the Employee's Claim," an employee was forbidden from raising "any matter not included in the Notice of Claim." *Id.* at 939. And Hooters was permitted to move for summary dismissal before a hearing, but an employee was not permitted to seek summary judgment. *Id.* The list goes on: Hooters (but not its employees) could record the hearing; Hooters (but not its employees) could seek to vacate or modify an arbitral award; Hooters (but not its employees) could cancel the agreement to arbitrate or change the rules of arbitration. *Id.*

Because these procedures were "egregiously unfair," the Fourth Circuit held the contractual provision requiring the employee to resolve her dispute in that forum unenforceable. *Id.* at 938. "By agreeing to settle disputes in arbitration," the employee had "agreed to the prompt and economical resolution of her claims." *Id.* at 940. But she had not agreed to "procedures so wholly one-sided as to present a stacked deck." *Id.* The "sham system" that Hooters had set up, Judge Wilkinson held, was not arbitration "in any meaningful sense of the word." *Id.* at 940–41.

11

### D. Western Sky: A "tribal arbitration" scheme that is a "sham from stem to stern."

Like Hooters, Western Sky also attempted to design its own arbitral forum. And like Hooters, its forum too was a sham. Western Sky had created a system of predatory payday loans that, without "dispute," "violated a host of state and federal lending laws." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016). So Western Sky sought to avoid liability by cloaking its activities in tribal immunity through association with the Cheyenne River Sioux Tribe—a tactic known as "rent-a-tribe." *See, e.g.*, *Reyes v. Experian Info. Sols., Inc.*, 2019 WL 4854849, at *1 (C.D. Cal. Oct. 1, 2019). Western Sky's required dispute resolution process "disavow[ed] the authority of all state or federal law," instead directing that only an "authorized representative" from the Tribe could conduct arbitrations. *Hayes*, 811 F.3d at 669–72. Except the Tribe itself publicly disclaimed any role in a Western Sky arbitration, stating that its "governing authority does not authorize Arbitration." *Id.* at 672. And although the agreement required arbitration under the Tribe's "consumer dispute rules," the company also eventually admitted these rules "do not exist." *See Inetianbor v. CashCall, Inc.*, 962 F. Supp. 2d 1303, 1309 (S.D. Fla. 2013), *aff'd*, 768 F.3d 1346 (11th Cir. 2014).

In sum, Western Sky crafted an arbitration process that, by design, had no oversight, allowing it to choose the arbitrator "in a manner to ensure partiality." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 779 (7th Cir. 2014). In fact, in one of the only reported Western Sky disputes that made it to arbitration, the appointed arbitrator

admitted that he was hand-picked by Western Sky's owner and that his daughter worked at Western Sky. *See Inetianbor*, 962 F. Supp. 2d at 1306; *Hayes*, 811 F.3d at 672.

And when consumers appealed this scheme to the courts, courts quickly recognized it for what it was—"a process that is a sham from stem to stern"—and refused to enforce it. *Jackson*, 764 F.3d at 779; *see Hayes*, 811 F.3d at 674–75 (rejecting the attempt of Western Sky's third-party debt collection agent to force consumers into this sham "arbitration"); *Williams v. CashCall, Inc.*, 92 F. Supp. 3d 847, 851–52 (E.D. Wis. 2015) ("CashCall [another Western Sky debt collection agent] acknowledges that the arbitral forum and associated procedural rules set forth in Ms. Walker's loan agreement are not available."). The Fourth Circuit also rejected the company's attempt to "patch[] up" the agreement by adding a provision allowing AAA or JAMS to nominally "administer"—but not actually conduct—the arbitration. *Hayes*, 811 F.3d at 673; *see Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1336–37 (11th Cir. 2016) (similar). The court explained that the nominal association with a long-standing arbitration provider did not "compensate for the fact that the tribal arbitration mechanism set out in the agreement proved in practice to be illusory" or make that "farce" somehow enforceable. *Hayes*, 811 F.3d at 670–74.

### E. Verizon: An arbitral procedure that rejects the "paramount consideration" of "mutuality."

Other corporations have also tried to nominally invoke the AAA rules despite the fact that they rigged their arbitration procedures. For example, Verizon's form

arbitration agreement states it uses the AAA rules, but it also inserts barriers to any fair adjudication, leading multiple courts to find the agreement unconscionable. *See, e.g.*, *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040–44 (N.D. Cal. 2022); *Achey v. Cellco P'ship*, 293 A.3d 551, 558 (N.J. App. Div. 2023).

When thousands of consumers attempted to pursue individual arbitrations in response to Verizon's fraudulent conduct, the corporation imposed a set of "mass arbitration" procedural requirements to force its consumers to wait years before filing their claims. *MacClelland*, 609 F. Supp. 3d at 1040. Under Verizon's rules, if twenty-five customers brought similar individual claims against Verizon in arbitration and retained the same counsel, only ten of their claims could be heard at once. *Id.* The eleventh customer's claim could not even "be filed in arbitration until the first ten have been resolved." *Id.* And sure enough, when 2,712 Verizon customers retained the same law firm to bring similar claims through arbitration, the earliest some consumers were expected to be permitted to file their claims was the year 2179— over 160 years from now. *See id.* at 1040.

Such delay "conflict[s] with one of the basic principles of our legal system— justice delayed is justice denied." *Id.* at 1042 (quoting *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021)). That's why two courts have already found Verizon's arbitration procedures unconscionable. *Id.*; *Achey*, 293 A.3d at 558. What's more, although the delay itself rendered the contract unconscionable, by coupling a forced-

delay requirement with the applicable statutes of limitations, Verizon's contract also guaranteed that many claims would be time-barred. *See MacClelland*, 609 F. Supp. 3d at 1040–42. For example, the average disposition time for an arbitration proceeding is about seven months, and the statutes of limitations for the claims against Verizon in *MacClelland* were 3 to 4 years, so only about 3 percent of the *MacClelland* claimants would have had a chance of getting a hearing. *Id.*

Nevertheless, Verizon tried to assert that its procedures weren't unfair because they allowed consumers to proceed without delay—just so long as the consumers gave up their right to being represented by a lawyer of their choice. But the right to counsel of one's choice is fundamental. *See Adir Int'l, LLC v. Starr Indem. & Liab. Co.*, 994 F.3d 1032, 1038–39 (9th Cir. 2021). Making plaintiffs choose between two unconscionable options is still unconscionable. And to avoid a claim-killing delay, the 2,712 *MacClelland* claimants would have needed to find 113 separate firms to represent them. Moreover, Verizon's mass-arbitration provision only imposed this condition on *consumers*; Verizon remained free to use the same lawyer of its choice for all individual arbitrations brought against it. *See MacClelland*, 609 F. Supp. 3d at 1040–42. So courts easily found that this one-sided "option" to forgo counsel of choice did not change the fact that the contract was unconscionable. As they explained, "mutuality [] is [the] 'paramount' consideration in assessing substantive

unconscionability." *MacClelland*, 609 F. Supp. 3d at 1043 (quoting *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (9th Cir. 2010)); *see Achey*, 293 A.3d at 556, 558.

\* \* \*

These are only some of the many examples of companies forcing consumers to arbitrate and then crafting unequal arbitration procedures to ensure they always have a leg up. *See* Brief for AAJ, National Consumer Law Center, and Center for Responsible Lending as Amici Curiae in Support of Plaintiff-Appellee, *Bielski v. Coinbase, Inc.*, No. 22-15566 (9th Cir. Oct. 3, 2022); Complaint, *Picha et al. v. Gemini Tr. Co., LLC et al.*, No. 22-cv-10922-NRB (S.D.N.Y. Mar. 17, 2023).

## II.    New Era is of a piece with those efforts.

Live Nation's use of New Era is just a repackaging of old tricks.

*First*, just like EDSI and NAF, there are considerable financial entanglements between the forum and the company. New Era uses a subscription-based revenue model that renders it fully dependent on companies like Live Nation. *Compare Heckman v. Live Nation Ent., Inc.*, 2023 WL 5505999, at \*2 (C.D. Cal. Aug. 10, 2023), *with Walker*, 400 F.3d at 386, *and* NAF Complaint ¶¶ 2, 3, 30, 34, 70–71. Indeed, Live Nation "provided nearly all of New Era's revenue during its first year of operations." *Heckman*, 2023 WL 5505999, at \*9. This financial dependence creates a "strong potential for bias." *Walker*, 400 F.3d at 386. New Era has also created special rules to benefit corporations that require consumers to pay 100% of the marginal cost of an

16

arbitration. *See Heckman*, 2023 WL 5505999, at *2 (explaining how, in addition to a standard pricing option, "New Era offers a subscription option whereby the company pays an annual subscription fee and the claimant pays a $300 filing fee").

*Second*, New Era—like the corrupt arbitration forums described above—eschews the guardrails necessary to ensure the decision maker is neutral. Although consumers can attempt to disqualify a biased arbitrator, "New Era has the power to override" such an attempt. *Heckman*, 2023 WL 5505999, at *15. New Era rules specify that, even if a party objects to an arbitrator, he can nonetheless serve "after a New Era ADR determination that the neutral can still maintain impartiality notwithstanding the disclosed matter." 2-ER-172; *see also id.* ("New Era ADR shall make the final determination whether, in its sole discretion, the objection to a neutral's impartiality requires replacement of the neutral."). And in practice, Live Nation has considerably more control over the arbitrator-selection process than consumers, because only "each *side*, rather than each individual *party*, has a right to disqualify an arbitrator." *Heckman*, 2023 WL 5505999, at *15 (emphases added). This means that, in a mass arbitration, thousands of claimants could be forced to agree on whether or not to attempt to disqualify an arbitrator, even though concerns of bias could be party-specific. These provisions contravene the California Arbitration Act's protections to ensure an unbiased decision. *See id.*

17

*Third*, like EDSI, New Era also severely limits discovery. Indeed, New Era is even worse—whereas EDSI allowed claimants one deposition "as of right," *Walker*, 400 F.3d at 387, New Era's rules "provide for *no* discovery as a right." *Heckman*, 2023 WL 5505999, at *14. The fact that New Era's rules permit additional discovery "at the discretion of the arbitrator," *id.*, cannot save the forum. As the district court recognized, the rules "constrain[]" arbitrators from "expand[ing] discovery to the extent necessary to vindicate [claimants'] statutory rights"—which is particularly unfair here, considering the "notoriously complex and fact-intensive" antitrust claims at issue. *Id.* at *14 & n.19.

*Fourth*, New Era adopts a similar strategy to Verizon of banning consumers from joining collectively to vindicate common rights while also forcing consumers into batched arbitration proceedings of its own making. Live Nation requires consumers "to submit to batched arbitration proceedings" based on whatever criteria New Era decides and then forces that outcome on "thousands of claim[ants]" without ever giving them an opportunity to be heard. *Id.* at *12. New Era's rules thus grant the arbitrator—who lacks state-required protections against bias—"unchecked power" to override claimants' due-process rights. *Id.*

*Finally*, like Hooters and Verizon, New Era hands defendants procedural rights that it withholds from plaintiffs. *See, e.g.*, *Hooters*, 173 F.3d at 938 (unconscionable arbitration procedure permitting the corporation to move for summary dismissal but

18

not allowing the claimant to move for summary judgment); *MacClelland*, 609 F. Supp. 3d at 1040–42 (unconscionable arbitration procedure restricting only the plaintiff's right to counsel). New Era only allows a "right to appeal a grant, but not a denial, of injunctive relief." *Heckman*, 2023 WL 5505999 at *16. Although New Era's "appeal provision nominally applies" to both parties, only plaintiffs seek a grant of injunctive relief. *Id.* So, in practice, the rules ensure that while "any adverse decision against Defendants" can "be rigorously reviewed by a panel of experienced arbitrators," claimants will "have no recourse at all." *Id.* at *17. The "only possible purpose" of such a "one-sided" rule "is to undermine the neutrality of the proceeding." *Hooters*, 173 F.3d at 938.

At their core, these procedures ensure that Live Nation can avoid adjudicating disputes with consumers on equal footing. That's why courts around the country have rightfully rejected practices similar to New Era's that undermine an arbitral forum's equity. This Court should do so again here.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

*matt@guptawessler.com*

JESSIE GARLAND
GUPTA WESSLER LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

December 20, 2023                    *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,627 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this reply brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler