Case No. 23-55770

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SKOT HECKMAN, LUIS PONCE,
JEANENE POPP, JACOB
ROBERTS, on behalf of themselves
and all those similarly situated,
Plaintiffs-Appellees,

v.

LIVE NATION ENTERTAINMENT,
INC., TICKETMASTER, LLC,
Defendants-Appellants.

Appeal from the United States District Court
for the Central District of California
The Honorable George H. Wu Presiding
Case No. 2:22-cv-00047-GW-GJS

## ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES
## REDACTED

Kevin Teruya
Adam Wolfson
William R. Sears, IV
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
865 S Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Warren D. Postman
  *Counsel of Record*
Albert Young Pak
Noah Heinz
Ethan H. Ames
KELLER POSTMAN LLC
1101 Connecticut Avenue, N.W.,
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Introduction ........................................................................... 1

Statement of the Issues ........................................................... 4

Statutory Authorities .............................................................. 4

Statement of the Case ............................................................. 4

    A.  Companies Impose Arbitration Clauses To Avoid Class Actions
        But Then Fear Individual Arbitrations. ........................................ 5

    B.  Live Nation Foresees Numerous Arbitrations And Negotiates
        A "Prophylactic Measure." ....................................................... 9

    C.  New Era's Kafkaesque Rules. ................................................. 11

    D.  The District Court Holds Live Nation's Arbitration Clause
        Unconscionable. .................................................................... 15

Summary of Argument ........................................................... 18

Standard of Review ............................................................... 20

Argument ............................................................................. 20

I.   The Delegation Clause Is Unconscionable. ......................... 21

    A.  The Delegation Clause Is Procedurally Unconscionable To A
        High Degree. ........................................................................ 21

        1.  The Terms were a contract of adhesion. ................................ 22
        2.  The Terms were surprising. ................................................. 24
        3.  The Terms were oppressive. ................................................. 28
        4.  All aspects of procedural unconscionability run to the
            delegation clause. ............................................................. 33

    B.  The Delegation Clause Is Substantively Unconscionable For
        The Reasons The District Court Found. .................................... 34

        1.  The group arbitration procedure is grossly unfair. ................ 35
        2.  The extreme limitations on discovery, evidence, and legal
            argument are unconscionable. ............................................ 43
        3.  The one-sided appeal right is unconscionable. ...................... 48
        4.  New Era's arbitrator selection provisions violates California
            law. .................................................................................. 50

i

5. The delegation clause is unconscionable in the extreme. ...... 55

C. The Delegation Clause Is Independently Unconscionable Because New Era Is Aligned With Live Nation And Group Arbitration Is Not Protected By *Concepcion*. ............................ 56

1. New Era lacks minimum levels of integrity. ......................... 57
2. The Discover Bank rule renders the Terms unconscionable, and is not preempted. ............................................. 59

II. The District Court Acted Within Its Discretion In Declining To Sever The Arbitration Clause. ....................................... 66

A. Unconscionability Permeates The Arbitration Clause. .............. 67
B. Live Nation Never Requested Arbitration With JAMS, And Its Novel Argument Is Meritless. ...................................... 71

Conclusion ................................................................. 73

Certificate of Compliance for Briefs ....................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020)....................................................8

*Arbitech, LLC v. Hackney*,
  No. G053744, 2017 WL 4296101 (Cal. Ct. App. Sept. 28,
  2017) .......................................................................................................72

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  6 P.3d 669 (Cal. 2000).........................................21, 43, 46, 56, 67, 68

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)..................................6, 8, 38, 43, 60, 61, 62, 63, 65

*Azteca Constr., Inc. v. ADR Consulting, Inc.*,
  121 Cal. App. 4th 1156 (2004).................................................51, 52, 54

*Badie v. Bank of Am.*,
  67 Cal. App. 4th 779 (1998).....................................................................29

*Baxter v. Genworth N. Am. Corp.*,
  16 Cal. App. 5th 713 (2017).............................................................46, 47

*Beynon v. Garden Grove Med. Grp.*,
  100 Cal. App. 3d 698 (1980).....................................................................67

*Bielski v. Coinbase, Inc.*,
  No. 22-15566, 2023 WL 8408123 (9th Cir. Dec. 5, 2023) .............21, 55

*Capili v. Finish Line, Inc.*,
  116 F. Supp. 3d 1000 (N.D. Cal. 2015)...................................................70

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004).....................................................................6

*Cheng-Canindin v. Renaissance Hotel Assocs.*,
  50 Cal. App. 4th 676 (1996).............................................................57, 58

iii

*Davis v. Kozak*,
  53 Cal. App. 5th 897 (2020) .................................................... 45, 46, 47

*Discover Bank v. Super. Ct.*,
  113 P.3d 1100 (Cal. 2005) ............................................................... 59

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) .................................................................... 66

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019) .............................................. 29

*Flores v. Transamerica HomeFirst, Inc.*,
  93 Cal. App. 4th 846 (2001) ............................................................ 24

*Fuentes v. Empire Nissan, Inc.*,
  90 Cal. App. 5th 919 (2023) ............................................................ 27

*Graham v. Scissor-Tail, Inc.*,
  623 P.2d 165 (Cal. 1981) ........................................................... 22, 57

*Harper v. Ultimo*,
  113 Cal. App. 4th 1402 (2003) .................................. 24, 26, 27, 28, 48

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) ........................................................... 61

*In re Holl*,
  925 F.3d 1076 (9th Cir. 2019) ......................................................... 27

*Holley-Gallegly v. TA Operating, LLC*,
  74 F.4th 997 (9th Cir. 2023) ........................................................... 20

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
  59 F.4th 55 (3d Cir. 2023) .......................................................... 40, 41

*Kalasho v. BMW of N. Am., LLC*,
  520 F. Supp. 3d 1288 (S.D. Cal. 2021) ............................................. 54

*Lee v. Ticketmaster L.L.C.*,
  817 F. App'x 393 (9th Cir. 2020) ..................................................... 27

iv

*Lhotka v. Geographic Expeditions, Inc.*,
  181 Cal. App. 4th 816 (2010) .................................................. 23, 33, 68

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ................................................................. 20

*Little v. Auto Stiegler, Inc.*,
  63 P.3d 979 (Cal. 2003) .................................................................. 34, 48

*Lona v. Citibank, N.A.*,
  202 Cal. App. 4th 89 (2011) ................................................................ 24

*Maas v. Super. Ct.*,
  383 P.3d 637 (Cal. 2016) .................................................................... 53

*Mercuro v. Super. Ct.*,
  96 Cal. App. 4th 167 (2002) ................................................................ 45

*In re Mercury Interactive Corp. Secs. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ............................................................... 71

*Modiano v. BMW of N. Am.*,
  No. 21-cv-00040, 2021 WL 5750460 (S.D. Cal. June 29,
  2021) ................................................................................................. 54

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022) ........................................................................... 70

*Nguyen v. BMW of N. Am.*,
  No. 20-cv-2432, 2022 WL 102203 (S.D. Cal. Jan. 11, 2022) .............. 54

*Oberstein v. Live Nation Ent., Inc.*,
  2021 WL 4772885 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60
  F.4th 505 (9th Cir. 2023) ..................................................................... 5

*OTO, L.L.C. v. Kho*,
  447 P.3d 680 (Cal. 2019) ................................................................ 21, 34

*Ovitz v. Schulman*,
  133 Cal. App. 4th 830 (2005) .............................................................. 54

*Patterson v. ITT Consumer Fin. Corp.*,
14 Cal. App. 4th 1659 (1993) ............................................................ 22

*Peleg v. Neiman Marcus Grp., Inc.*,
204 Cal. App. 4th 1425 (2012) ................................................... 28, 29

*Peng v. First Republic Bank*,
219 Cal. App. 4th 1462 (2013) ............................................. 28, 29, 30

*Phillips Petrol. Co. v. Shutts*,
472 U.S. 797 (1985) ............................................................... 35, 38

*Pinela v. Neiman Marcus Grp., Inc.*,
238 Cal. App. 4th 227 (2015) .................................................... 66, 68

*Poublon v. C.H. Robinson Co.*,
846 F.3d 1251 (9th Cir. 2017) .................................................. 45, 69

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967) ............................................................... 70, 72

*Richards v. Jefferson Cnty., Ala.*,
517 U.S. 793 (1996) ............................................................... 35, 36

*Roussos v. Roussos*,
60 Cal. App. 5th 962 (2021) ............................................................ 52

*Sanchez v. Valencia Holding Co.*,
353 P.3d 741 (Cal. 2015) ...................................................... 21, 49

*Serpa v. Cal. Sur. Investigations, Inc.*,
215 Cal. App. 4th 695 (2013) .................................................... 29, 31

*Sonic-Calabasas A, Inc. v. Moreno*,
311 P.3d 184 (Cal. 2013) ................................................................ 62

*Szetela v. Discover Bank*,
97 Cal. App. 4th 1094 (2002) .................................................... 32, 33

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ............................................................... 36, 46

*Thiele v. Merrill Lynch, Pierce, Fenner & Smith,*
    59 F. Supp. 2d 1067 (S.D. Cal. 1999) ................................................. 72

*Viking River Cruises, Inc. v. Moriana,*
    596 U.S. 639 (2022) ............................................................. 61, 62, 63

*Villanueva v. California,*
    986 F.3d 1158 (9th Cir. 2021) ............................................................. 71

*Volt Info. Scis., Inc. v. Bd. of Trs.,*
    489 U.S. 468 (1989) ............................................................................. 52

**Statutes**

9 U.S.C. § 2 ......................................................................................... 59

Cal. Civ. Code §1670.5(a) ..................................................................... 67

Cal. Civ. Proc. Code §170.1(a)(8) ........................................................ 53

Cal. Civ. Proc. Code §170.6 ................................................................. 53

Cal. Civ. Proc. Code §1281.9 ............................................................... 51

Cal. Civ. Proc. Code §1281.9(a)(1) ...................................................... 53

Cal. Civ. Proc. Code §1281.91(b)(1) ............................................... 51, 53

Cal. Civ. Proc. Code §1281.91(d) ........................................................ 53

**Rules**

Fed. R. Civ. P. Rule 30(b)(6) ................................................................. 9

**Other Authorities**

Ben Sisario, *Live Nation Settles Suit With Ticketing Start-
    Up, Buying Its Assets*, N.Y. Times (Jan. 12, 2018).
    https://www.nytimes.com/2018/01/12/business/media/live-
    nation-songkick.html ......................................................................... 5

Br. of the Chamber of Comm., *Am. Express Co. v. Italian
    Colors Rest.*, No. 12-133 (2012) .......................................................... 6

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283
(2022) ............................................................................... 7, 8

Kate Conger, *Uber and Lyft Drivers in California Will
Remain Contractors*, New York Times (Nov. 7, 2020)
https://www.nytimes.com/2020/11/04/technology/california
-uber-lyft-prop-22.html ......................................................... 7

## INTRODUCTION

Live Nation and Ticketmaster charge exorbitant fees to consumers, have spent the last decade stifling competition in the markets for ticketing services, and have admitted to violating a consent decree with the DOJ meant to curb their long-running anticompetitive conduct. Unsurprisingly, then, many consumers wish to bring antitrust suits. Live Nation avoided facing these claims in a class action by compelling each named plaintiff to individual, bilateral arbitration with JAMS, a well-established arbitration provider. But despite winning this battle, Live Nation grew worried that not just a few consumers, but thousands of them, would seek to arbitrate their antitrust claims at JAMS, forcing Live Nation to face what it had long avoided: the consequences of its anticompetitive conduct.

So Live Nation turned to a start-up called New Era ADR. New Era had never administered arbitrations before, and had no procedures, but was eager to try something radical. New Era and Live Nation's litigation counsel (Latham) spoke with each other for weeks over Zoom and struck a deal. New Era offered Live Nation an unlimited arbitration subscription plan for an upfront annual fee. Within a day of Live Nation's

signing the subscription, New Era posted its arbitration rules. The rules-plus-subscription aspired to be a "critical prophylactic measure for client's mass arbitration risk." 1-ER-23.

And so they are. The rules provide for online-only arbitration with a class-action waiver, no discovery, an evidentiary record limit of 10 documents, and a legal argument limit of 15,000 characters (roughly five pages). If, somehow, a claimant manages to win injunctive relief, Live Nation can take a *de novo* appeal, but a claimant cannot appeal if Live Nation prevails.

When an arbitrator determines that at least five arbitrations have similar facts, evidence, or law, he invokes the "mass arbitration" protocol, consolidating *every* arbitration with that similarity. Under the "mass arbitration" protocol, three bellwethers proceed under the ordinary rules (10 documents, 15,000 characters, no discovery, etc.). The arbitrator decides those bellwethers, and the decisions become "precedent" on any shared issues. Then, the arbitrator *applies* the "precedent" not only to every other case in the mass arbitration, but also to every case that is filed later. Because the process is confidential, later claimants would

have had no role in litigating "precedents"—and would have no idea they apply to them.

Live Nation quickly updated its Terms of Use ("Terms"). The new Terms selected New Era as the arbitral forum for all disputes, effective immediately. Not only that, Live Nation changed its Terms to say that the new arbitration clause applied retroactively to known, accrued claims. Indeed, that was the point—to bind the antitrust class to New Era's Rules, hoping to defeat the upcoming mass arbitration. And the new Terms on their face stated that arbitration would be individual, when in fact Live Nation was imposing a novel group arbitration process.

Faced with these facts, the district court properly concluded that Live Nation's Terms were unconscionable under California law. The procedural unconscionability was extreme, since Live Nation changed the Terms unilaterally, with no notice, to undermine known claims, in a way that was affirmatively misleading. Substantive unconscionability too was high, since so many of New Era's Rules fell below the minimum unconscionability standard in California, and even denied claimants basic notice and due process. Each aspect of unconscionability affected the delegation clause because it applied to threshold issues. After finding

multiple independent sources of unconscionability, the district court found that unconscionability permeated the Terms, holding the arbitration clause unenforceable, and not severable.

Those rulings were not only well-within the court's discretion; they were entirely correct.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that the delegation clause selecting New Era was unconscionable under California law.

2.    Whether the district court acted within its discretion in finding that the multiple unconscionable aspects of the delegation clause (and arbitration clause) were not severable.

## STATUTORY AUTHORITIES

The following provisions are included in a statutory addendum: Cal. Civ. Proc. Code §§ 170.1(a)(8), 170.6, and 1281.91(d).  All other applicable statutes are included in addendum included in Appellants' opening brief.

## STATEMENT OF THE CASE

Live Nation and Ticketmaster (together, "Live Nation") run a ticketing and event-promotion conglomerate that has faced antitrust scrutiny since their 2010 merger.  2-ER-198-99.  They have profound market power, have violated a DOJ consent decree, and engage in

4

exclusive dealing. *E.g.*, 2-ER-203-5, 236. A competitor sued, achieving a $110 million settlement just before trial.[1] Mr. Oberstein filed a class-action suit in 2020, seeking to represent a class of consumers who pay supra-competitive fees to Live Nation. Following a well-worn playbook, Live Nation successfully moved to compel arbitration at JAMS. *See Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *1 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023). A decade ago, defendants could compel class actions to arbitration and be done with litigation, since few plaintiffs would actually arbitrate. But, more recently, large numbers of consumers have pursued individual arbitration, so defendants like Live Nation are looking for new ways to avoid facing legal claims on the merits.

## A. Companies Impose Arbitration Clauses To Avoid Class Actions But Then Fear Individual Arbitrations.

Class actions are orders of magnitude more efficient than any individualized way to resolve disputes. But efficiency does not benefit everyone. Companies have long expected that "[t]he *realistic* alternative

---

[1] *See* Ben Sisario, *Live Nation Settles Suit With Ticketing Start-Up, Buying Its Assets*, N.Y. Times (Jan. 12, 2018). https://www.nytimes.com/2018/01/12/business/media/live-nation-songkick.html.

to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). They therefore imposed agreements requiring arbitration, especially after the Supreme Court held that states could not require companies to use class arbitration. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).

In selling these arrangements to the U.S. Supreme Court, defendants held out the theoretical possibility that large numbers of individual plaintiffs could pool resources to make individual arbitration more efficient. For example, in an amicus brief the Chamber of Commerce cited the example of attorneys' representing "over 1,000 claimants—each making virtually identical allegations" against AT&T. *See* Br. of the Chamber of Commerce, *American Express Co. v. Italian Colors Restaurant*, at 29 No. 12-133 (2012).[2] It lauded how the "Internet and social media can be used effectively to reach out to potential claimants … [and to] identify other businesses or individuals with similar claims." *Id.* at 30. The naysayers were "mistaken in concluding that

---

[2] Notably, the authors, Andrew Pincus and Archis Parasharami, filed a brief in this case.

class actions … are the only effective means … of proving small claims." *Id.*

However, for the better part of a decade, the practical consequence for companies with an arbitration clause was the elimination of claims that were too hard to coordinate. "Elimination of those claims would tend to be due to the economics of claiming, not due to their underlying merits." J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1307 (2022).

Eventually, plaintiffs' lawyers began using technology and capital to arbitrate meritorious claims. Keller Postman filed tens of thousands of arbitration demands against Uber, Postmates, Doordash, Lyft, and others for misclassifying gig economy workers—cases so strong on the merits that companies spent $200 million dollars to change California law.[3] Live Nation claims that mass arbitration is about "leverage" and "settlement pressure" "even when the claims are meritless," Op.Br. 8, but its source states that "the claims studied here" (*i.e.*, those by Keller

---

[3] Kate Conger, *Uber and Lyft Drivers in California Will Remain Contractors*, New York Times (Nov. 7, 2020) https://www.nytimes.com/2020/11/04/technology/california-uber-lyft-prop-22.html.

Postman) "appear quite colorable." Glover, *Mass Arbitration*, 74 Stan. L. Rev. at 1349; *compare* Op.Br. 8 (citing this page).

And no court has accepted these complaints about mass arbitration. Most have reacted like Judge Alsup, who blasted the "irony" that a company "faced with having to actually honor its side of the bargain, now blanches at the cost" because it "never expected that so many would actually seek arbitration.… This hypocrisy will not be blessed…." *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067-68 (N.D. Cal. 2020).

Rather than the result of gamesmanship by plaintiff's lawyers, the high costs of mass individual arbitration are an inescapable feature of companies' decision to deny consumers the option of a class action and instead impose individual arbitration of many low-value claims. As Justice Scalia explained in *Concepcion*, bilateral arbitration is fundamentally informal, low-cost, and fast, and cannot—consistent with that native form—bind absent class members (which "*requires* procedural formality"), impose issue preclusion, or otherwise resolve many cases at one stroke. 563 U.S. at 349.

### B. Live Nation Foresees Numerous Arbitrations And Negotiates A "Prophylactic Measure."

While litigating the motion to compel arbitration in *Oberstein*, Live Nation foresaw a pyrrhic victory: if its motion were granted, it could then face thousands of arbitration demands. New Era offered a solution. Its founders approached Live Nation's counsel Latham & Watkins, before even launching, to pitch "highly customized" subscription solutions for "mass arbitrations." 4-SER-563. Unlike traditional arbitration fora (like JAMS and AAA), New Era advertised that it "brings qualities to litigation that have long been desired by businesses, in-house counsel, and their attorneys." 4-SER-560. New Era had never administered an arbitration and had no *arbitral rules*; but it was open to suggestions. 3-SER-219. Latham's antitrust team filled in the gaps, speaking with New Era repeatedly, in multi-hour Zoom calls. The videocalls resulted in essentially no discoverable documents or notes, and New Era's founder and Rule 30(b)(6) witness claimed not to recall what they discussed. 3-SER-215-16. After the calls, Live Nation signed the first subscription agreement, and within 24 hours New Era published its rules. 3-SER-256-58.

Live Nation paid New Era ███████ for its 2021 subscription, and ███████ for 2022.  3-SER-395-96.  In 2021, that was the "vast majority of New Era's annual revenues"—98%.  4-SER-550; 3-SER-133-34.  The ability to renew or terminate the subscription gives Live Nation substantial leverage.  4-SER-516.  New Era was eager to please.  As its 30(b)(6) witness explained, that leverage gave New Era "a strong incentive to retain" Live Nation—after all, Live Nation "w[as]n't happy with JAMS, so we want to make sure that they're happy with us."  3-SER-295.  To sharpen its value proposition, New Era bragged that it provided Live Nation a "critical prophylactic measure for … **mass arbitration** risk." 4-SER-563; 3-SER-176.  New Era administered just one arbitration in 2021-22 in exchange for that ███████. 3-SER-143-44.

What did Live Nation get for its money?  The "prophylactic measure."  New Era's real subscription service is not administering mass arbitrations but deterring them.  Its "platform has never been used by an arbitrator to render a verdict in any consumer arbitration."  3-SER-145.  The subscription aligns Live Nation's and New Era's incentives: the fewer consumers arbitrate, the more profit for both.  As New Era's founder agreed, the subscription money is "pure revenue … New Era

10

doesn't have to do anything if there's no mass arbitrations filed." 3-SER-184.

## C.   New Era's Kafkaesque Rules.

A tour of the rules reveals a system designed to handicap claimants.

New Era offers two forms of arbitration, "Standard" and "Expedited." The "Standard" arbitration is "for complex and/or more evidence-intensive disputes," 2-ER-165. Expedited arbitration is for "consumer, employment, or certain commercial disputes" that can be "even more streamlined." 2-ER-165. Under Live Nation's Terms (and its subscription) all arbitrations *must* be "Expedited" arbitration, not "Standard." *See* 2-ER-124.

For "Expedited" arbitrations, "[c]omplaints are limited to 10 total pages" but must set forth the "nature of the dispute, including applicable dates and times, parties involved, as well as the facts." 2-ER-187 (§6(a)(ii)(1)(a)-(d)). "New Era is not a notice pleading platform," and so "[g]eneralized or generic facts are not sufficient." 2-ER-187 (§6(a)(ii)(1)(a)-(b)). For perspective, the complaint in this case took 74 pages to lay out Live Nation's market dominance across multiple

markets, its exclusive dealing, the market definition, antitrust injury, and other material facts under federal notice-pleading. 2-ER-194.

After pleadings, there is **no** right to discovery. To obtain discovery, a party would need to "make a request to be upgraded to New Era ADR's Standard Arbitration process," 2-ER-174 (§2(o)(ii)), but that would require *Live Nation's* agreement. 2-ER-183 (§5(a)(i)); 2-ER-187 (§6(a)(i)) ("New Era ADR will respect [] contractual agreements" to the "Expedited" rules). Notably, the district court allowed Consumers to take discovery from both Live Nation and New Era on unconscionability, recognizing that discovery was necessary to a fair litigation of threshold issues.

Without discovery, both parties "upload the relevant documents," which are the entire record, within 14 days. 2-ER-189 (§6(a)(vii)). All "[u]ploads are limited to the lesser of 10 total files, 25 total pages for each file, or 25MB of aggregate uncompressed uploads." 2-ER-189 (§6(a)(vii)); 2-ER-174 (§2(p)(ii)(2)). Here, the "neutral has discretion to allow evidence in excess of stated limits as necessary to ensure a fundamentally fair process." 2-ER-189 (§6(a)(vii)). After uploading all ten documents, the parties exchange them, and the arbitrator may hold a hearing. 2-ER-

189 (§6(a)(viii)-(ix)). The parties file briefs "limited to 15K characters," which is approximately five pages. 2-ER-189 (§6(a)(x)); 3-SER-234. This limitation is so absurd that New Era's 30(b)(6) witness initially denied it is "correct" before conceding it is. 3-SER-234-35; 4-SER-470-71. There is no separate hearing or briefing for threshold issues such as "arbitrability, governing law, jurisdiction," and the like—those issues "shall be argued and decided at … hearings on the merits of the case, and not through any preliminary hearings or motion practice." 2-ER-178 (§2(z)(ii)). By contrast, just on threshold issues, the Consumers submitted 18 documents, and briefs exceeding 55 pages.

If a claimant manages to prove liability, damages, and an entitlement to injunctive relief, Live Nation has the unilateral right to a de novo appeal to JAMS. 2-ER-125. Claimants cannot appeal the denial of injunctive relief.

Mass arbitration rules apply if "more than five" claims "arise out of Common Issues of Law and Fact." 2-ER-190 (§6(b)(ii)(1)). Common Issues of Law and Fact exist "when cases or proceedings present the same, or similar, evidence; present the same, or similar, witnesses; and/or rely on determination of the same, or similar, facts and issues of

law" as determined by the arbitrator. 2-ER-177 (§2(x)(i)). Until the arbitrator decides, New Era itself "may group similar cases" for mass arbitration. 2-ER-178 (§2(x)(ii)(1)). At that point, there is a rank-and-strike process to pick the arbitrator.

Once an arbitrator finds Common Issues of Law and Fact (*i.e.*, any "similar" "evidence" or "witnesses" or "facts and issues of law"), three bellwethers proceed under the expedited rules (10-page complaint, no discovery, 10 documents, and 15,000 characters of argument). 2-ER-191 (§6(b)(iii)(3)). After the arbitrator renders bellwether decisions, the arbitrator applies the "factual findings and legal determinations" from the bellwethers to "all" similar cases, "even if later filed." 2-ER-193 (§§2(y); 6(b)(iii)(5)). Notably, the proceedings are confidential, and later-filed individuals do not participate in selecting the arbitrator or litigating the bellwethers. All claimants must wait to be heard by the same arbitrator, who "will create a process for handling and resolving individualized issues of law and fact" (since the *common* issues of law and fact were already resolved). 2-ER-193 (§6(b)(iii)(6)).

Even if claimants win on common issues, they must arbitrate every individualized issue (such as damages) through the bottleneck of a single arbitrator.

## D.    The District Court Holds Live Nation's Arbitration Clause Unconscionable.

Consumers (Appellees here) filed a class-action suit, arguing the arbitration clause is unenforceable.  Over the course of the briefing, Live Nation apparently realized the flaws with the New Era process and began to run from its own descriptions of it.  For example, Live Nation initially stated that an arbitrator would preside over a mass arbitration with *all* cases presenting a similar issue of law or fact.  But once Consumers pointed out the grave due process issues that would result given the lack of notice and participation for later claimants, Live Nation changed positions and argued that only cases from the same law firms would be combined.  As the court explained, that newfound "requirement did not exist anywhere in the Rules at the time Defendants made those representations, and Defendants' earlier filings made no mention of it." 1-ER-22.  Similarly, Live Nation initially understood "precedent" as Consumers do—a binding determination of common issues.  But later, it argued that precedent is wholly discretionary.

15

Amazingly, New Era engaged in *ex parte* coordination during the briefing in the district court, seeking to assist Live Nation in prevailing on the very dispute that Live Nation claimed should be decided before New Era. To support Live Nation's arguments, New Era's founder, in coordination with Live Nation, submitted a declaration and then even revised New Era's Rules and filed a second declaration. *See* 2-ER-73-82; 2-ER-34-36. His new position contradicted his deposition testimony, where he analogized mass arbitration precedent to court-of-appeals precedent: "Q. So if the arbitrator decided that that was a case with a common issue of law and fact, they would be bound by the prior decision? A. Well, it would be the arbitrator's decision, just like it would be for a judge if they were bound by the Second Circuit Court of Appeals." 4-SER-465; *see also* 4-SER-467 ("It would be the same thing that would happen in court if the judge applied precedent."); 4-SER-468-69.

The district court dismissed these midstream reversals. The "changed … Rules" were immaterial because the Motion to Compel must be decided based on the Rules in force when it was filed. 1-ER-19. But the court raised an eyebrow at the "joint defense efforts between Latham and New Era in connection with this Motion," and at the "remarkable

16

degree of coordination between Latham and New Era in terms of their interpretation and the evolution of New Era's Rules." 1-ER-18 n.13.

The district court found procedural unconscionability to a high degree. Live Nation presented its Terms "on a take-it-or-leave-it basis," it had higher bargaining power, and it left Consumers no ability to negotiate. 1-ER-11. Beyond that, Live Nation acted strategically by unilaterally—and materially—changing its arbitration rules with no notice to gain a litigation advantage with respect to known, accrued claims. 1-ER-12-16.

The district court also found substantive unconscionability. The district court found unconscionable the page and evidence limitations, the lack of any right to discovery, 1-ER-25, the arbitrator selection-process (which was not preempted), 1-ER-26-27, and the one-sided right of appeal, 1-ER-27-28. The district court further concluded that the rules created an untenable risk that an arbitrator could choose to resolve thousands of cases with no notice or opportunity to be heard ,which would be "fundamentally unfair to claimants." 1-ER-21-24. The court did not find it necessary to resolve the Consumers' charge that New Era's interests were improperly aligned with Live Nation's, finding the Terms

themselves dispositive. 1-ER-18-19. The district court then explained again why each aspect of unconscionability applied to the delegation clause. 1-ER-29-30.

The numerous unconscionable features of the Terms meant that "unconscionability permeates the arbitration clause" and so the district court exercised its discretion under California law to "decline to sever the offending provisions." 1-ER-31.

## SUMMARY OF ARGUMENT

The district court properly applied California law to conclude that the delegation clause is unconscionable both procedurally and substantively.

Beginning with procedural unconscionability, Live Nation concedes that the Terms were an adhesion contract. The Terms were surprising because Live Nation changed the arbitration provision seven-pages down its Terms with no notice and no practical way to tell what changed. The group arbitration provisions were hidden in New Era's Rules, which the Terms only referenced. The Terms are affirmatively misleading, promising individual (not representative) arbitration, but also selecting New Era's Rules, which involve group arbitration. Live Nation

oppressively changed its terms by unilaterally posting new Terms to its website and did so to give itself an advantage in arbitrating known, accrued claims.

The Terms are substantively unconscionable in six ways. First, New Era's confidential group arbitration procedures bind third parties without notice or any opportunity to be heard by stating that arbitrators should apply bellwether rulings to all similar cases. Second, the limitations on discovery (none), evidence (ten documents), and legal argument (about five pages) deprive Consumers of a meaningful opportunity to arbitrate. Third, Live Nation's right to appeal any grant of injunctive relief lacks mutuality. Fourth, the Terms violate California ethics disclosure and disqualification rules, which are not preempted because they are generally applicable. Fifth, New Era lacks minimum levels of integrity due to its alignment with Live Nation. Sixth, New Era's group arbitration rules are not arbitration as contemplated by the FAA, which protects traditional, informal, bilateral arbitration. Accordingly, the *Discover Bank* rule against class-action waivers is not preempted, and independently invalidates the New Era Rules. Each

unconscionable provision applies to threshold issues, infecting the delegation clause.

The district court correctly exercised its discretion to decline to sever the many unconscionable provisions. California courts find no abuse of discretion where more than one provision is unconscionable, and here there are six, making this an easy case.

## STANDARD OF REVIEW

This Court reviews legal questions de novo, but "review[s] for clear error any factual findings underlying the district court's order." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023). This Court "review[s] a district court's decision not to sever unconscionable portions of an arbitration agreement for abuse of discretion." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021).

## ARGUMENT

The district court properly found a plethora of procedurally and substantively unconscionable provisions. Armed with those findings, the court had wide discretion to find that unconscionability permeated the arbitration clause, requiring that it not be enforced. In truth, the answer on appeal is over-determined.

**I.     The Delegation Clause Is Unconscionable.**

The district court correctly found the delegation clause unconscionable.  Where the challenged arbitration clause contains a delegation clause, unconscionability arguments must be "directed at the delegation clause."  1-ER-10.  As this Court recently confirmed, "a party may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable."  *Bielski v. Coinbase, Inc.*, No. 22-15566, 2023 WL 8408123, at *4 (9th Cir. Dec. 5, 2023).  Consumers did so here.

California law follows a sliding scale approach to unconscionability: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Sanchez v. Valencia Holding Co.*, 353 P.3d 741, 748 (Cal. 2015) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 689-90 (Cal. 2000)).

**A.     The Delegation Clause Is Procedurally Unconscionable To A High Degree.**

Procedural unconscionability "begins with an inquiry into whether the contract is one of adhesion."  *OTO, L.L.C. v. Kho*, 447 P.3d 680, 690

21

(Cal. 2019). A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 171 (Cal. 1981). Next, courts "focus[] on the factors of oppression and surprise." *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal. App. 4th 1659, 1664 (1993). "Oppression results where there is no real negotiation of contract terms because of unequal bargaining power." *Id.* "'Surprise' involves the extent to which the supposedly agreed upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.*

### 1. *The Terms were a contract of adhesion.*

The district court held that "[t]he agreement is certainly contained within a contract of adhesion presented to ticket purchasers on a take-it-or-leave-it basis, as there was no opportunity for consumers to negotiate individual terms. As to unequal bargaining power, it is hard to imagine a relationship with a greater power imbalance than that between Defendants and its consumers, given Defendants' market dominance in the ticket services industries." 1-ER-11. Though admitting every fact

underlying this finding, Live Nation disputes the implications. It emphasizes that Consumers "all affirmatively assented" by "clicking a 'Sign in' button'" which agreed to the Terms. Op.Br. 25. This argument is irrelevant since it "confuses assent with unconscionability." 1-ER-14.

Live Nation also argues that California law has an exception for "recreational" activities like live music. Op.Br. 25, 30. But California courts have rejected the argument "that contracts for recreational activities can never be unconscionabl[e]," and have declined to "hold that contracts for recreational activities are immune from analysis for procedural unconscionability." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 822-23 (2010). Rather, the "option" not to purchase, "like any availability of market alternatives, is relevant to the existence, and degree, of oppression." *Id.* at 823-24. Here, Consumers allege there *were* no market alternatives, given Live Nation's market dominance. The recreational activities line of cases "concern[s] challenges to release of liability clauses under the rule that invalidates exculpatory provisions that affect the public interest," *id.* at 823, not arbitration of antitrust claims in which the underlying market is recreational.

The district court correctly held that "evidence that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-or-leave-it basis is sufficient to demonstrate procedural unconscionability and require the court to reach the question of substantive unconscionability, even if the other party has market alternatives." 3-ER-304-05 (quoting *Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89, 109 (2011)); 1-ER-11 (incorporating the Tentative on this point).

### 2. *The Terms were surprising.*

"Surprise" is a "function of the disappointed reasonable expectations of the weaker party," *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003), such as when "the supposedly agreed-upon terms are hidden in a prolix printed form." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001). Three aspects of surprise produce procedural unconscionability here.

*First*, the key changes were "hidden" in the Terms. Live Nation required Consumers to agree to its Terms every time they used the website, but changed the arbitration provision on page seven, 2-ER-123, without flagging the changes. Page seven now named a new arbitration

provider (New Era rather than JAMS), and a new temporal scope applied the updated clause to "any dispute … irrespective of when that dispute, claim, or controversy arose." 2-ER-123. There was no email, no redline, and no explanation for these changes. "[E]ven if a consumer were to discover that the terms had been recently updated, she would have no way of knowing *which* … provisions had been changed. To discover that fact, she would need to do a line-by-line comparison of the prior multi-page T[erms], which … are not available on Defendants' websites." 1-ER-12. A no-notice change to a clause seven-pages down is just as hidden as terms "hidden in a prolix printed form"—and likely better-hidden.

*Second*, even if Consumers caught the changes in the Terms, more surprises were "hidden" in New Era's Rules. The shocking (and substantively unconscionable) arbitration procedures are not described in the Terms, but are hidden in the separate New Era Rules. Consumers would be surprised by the extreme limitations on briefing, discovery, and evidence, or the arbitrator selection process (in which an arbitrator may be picked *already* in your case before it commences). The Terms "make[] no mention of mass arbitration whatsoever." 1-ER-16. Yet, surprisingly, each of these features applies to disputes, even to threshold issues

25

governed by the delegation clause: "issues … [of] arbitrability, governing law, jurisdiction, or otherwise, shall be argued and decided at the regularly-scheduled hearings on the merits of the case." 2-ER-178 (§2(ii)(z)).

*Third*, the Terms affirmatively misled Consumers. They prominently guarantee "individual arbitration," as contrasted with "class-wide arbitration" or "any purported class or representative proceeding." 2-ER-117, 123. The Terms *never* mention bellwethers, mass arbitration, consolidation, or anything of the sort. Consumers who read the Terms would reasonably expect that they were signing up for traditional, bilateral arbitration. New Era Rules "disappointed" the "reasonable expectations" that Consumers would develop from Live Nation's Terms, *Harper*, 113 Cal. App. 4th at 1406, by imposing "a novel mass arbitration procedure." 1-ER-16. These novel procedures apply to threshold issues no less than merits issues. Procedural unconscionability is especially clear "where, as here, the hidden terms effect a fundamental change to the bilateral nature of the individual arbitration process to which users initially agreed." 1-ER-16. These sharp changes, at

26

minimum, "disappointed reasonable expectations of the weaker party." *Harper*, 113 Cal. App. 4th at 1406.[4]

Live Nation's briefing on surprise misses the mark by arguing that under precedent addressing *contract formation*, the *Terms* are clear enough. *See* Op.Br. 24, 32. Contract formation precedents are irrelevant because the surprise of procedural unconscionability *always* applies to otherwise-valid contracts.[5] Confirming as much, Live Nation's primary authorities, like *In re Holl*, 925 F.3d 1076, 1083 (9th Cir. 2019) and *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020) do not even mention unconscionability. *See* Op.Br. 32.

Next, Live Nation posits that Consumers should not have been surprised because "it was foreseeable that Live Nation might respond to the proliferation of mass arbitration filings." Op.Br. 33. Apart from the absurdity of presuming Consumers are up-to-date on mass arbitration

---

[4] Live Nation argues that the district court "'double count[ed]' a purported 'problem of substantive unconscionability,'" Op.Br. 33, but cites a case involving "tiny and unreadable print" with *no* substantive problem. *Fuentes v. Empire Nissan, Inc.*, 90 Cal. App. 5th 919, 930 (2023). Unlike in *Fuentes*, New Era's Rules are both *surprising* (procedurally unconscionable), and substantively unconscionable (discussed below).

[5] The district court also distinguished Live Nation's cases on their facts. *See* 1-ER-12-13, nn. 8-10.

developments, this theory defies credulity because Live Nation's Terms studiously avoided mentioning mass arbitration, even insisting that arbitration would be individual, not representative. In truth, Live Nation placed dramatic changes in the New Era Rules, then "artfully hid[]" them "by merely referencing the … arbitration rules, and not attaching those rules to the contract for the customer to review." *Harper*, 113 Cal. App. 4th at 1406. *See also id.* at 1407 (flagging the further problem that "the clause pegs … procedure of the arbitration to rules which might change," just as happened here).

### 3. *The Terms were oppressive.*

*First*, Live Nation acted oppressively by changing its Terms unilaterally to gain an upper hand in arbitrating known, accrued claims. Under settled California law an "implied covenant" "prevents [a party] from modifying an arbitration agreement once a claim has accrued or become known to it." *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (2013). That is because "an arbitration contract containing a modification provision is illusory"—and so unenforceable—"if … a contract change[] applies to claims that have accrued or are known." *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1433 (2012).

28

This rule prevents the drafter from "amend[ing] the contract in anticipation of a specific claim, altering the arbitration process to the [plaintiff's] detriment and making it more likely the [defendant] would prevail." *Id.*

Live Nation's Terms allow unilateral modification, so the implied covenant applies. Live Nation had the unilateral power to "make changes to these TERMS at any time" which would "be effective immediately when we post a revised version of these Terms on the Site." 2-ER-144. That unilateral power triggers an implied duty not to modify the arbitration clause in a way that affects the accrued or known antitrust claims. *See Serpa v. California Sur. Investigations, Inc.*, 215 Cal. App. 4th 695, 707 (2013); *Peleg*, 204 Cal. App. 4th, at 1465; *Peng*, 219 Cal. App. 4th at 1474; *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 793 (N.D. Cal. 2019); *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998).

Live Nation blatantly breached its duty by unilaterally changing its arbitration provision to gain a litigation advantage over known claims. It unilaterally posted new Terms on July 2, 2021, 2-ER-117, when it *knew* about accrued claims. Worse, it designed the procedures to cover them,

and drafted the new Terms to apply retrospectively to "any dispute …
irrespective of when that dispute, claim, or controversy arose." 2-ER-123.
This conduct is fatally at odds with California case law.

Moreover, Live Nation's *current Terms* allow it to unilaterally
amend the arbitration clause. 2-ER-117. That makes the current
arbitration agreement illusory (and so unconscionable), unless Live
Nation is bound by the implied duty of good faith and fair dealing not to
affect known or accrued claims. Previous cases have upheld terms
allowing modification *because* the drafter had not "modified the
Agreement in any way" that violated the implied duty. *Peng*, 219 Cal.
App. 4th at 1474. Surely Live Nation can no longer invoke the implied
duty when it flagrantly violated it in posting its Terms.[6] *See* 1-ER-15
("The implicit protections of the covenant of good faith and fair dealing
will not save a unilateral contract modification.").

Live Nation's principal response is that the switch to New Era was
not unilateral—rather, Consumers agreed. But Live Nation unilaterally

---

[6] Live Nation notes that "retroactive application to accrued claims …
bears … on substantive, not procedural, unconscionability." Op.Br. 38.
Recategorizing arguments would make no difference under the sliding
scale approach.

posted the Terms on July 21, 2021, they were "effective immediately," even as to accrued claims, and Consumers used the site (or signed in) *after* that.[7] California law is irreconcilable with any claim that improper unilateral changes can be cured later through an adhesion contract.

Consider *Serpa*, an employment case in which an employee handbook required arbitration, allowed the employer to modify it, and provided that by "continuing in employment with the Company, every employee agrees" to the handbook. 215 Cal. App. 4th at 699. The court held that the "implied covenant of good faith and fair dealing limits the employer's authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable." *Id.* at 708. If Live Nation were right, the employer in *Serpa* could simply change the arbitration clause, then wait a day—if the employees show up, the contract change is no longer "unilateral," but cured, since continued employment constitutes agreement. That workaround would

---

[7] Live Nation claims that "Plaintiffs repeatedly assented to the revised Terms, and the change *was not binding* until they did." Op.Br. 37 (emphasis added). But the Terms' text, not Live Nation's arguments in litigation, determine when they became binding, and the text states the Terms are "effective immediately," and that merely "continuing to use this Site" constitutes "agreement." 2-ER-144 (old Terms), 117 (current Terms).

31

be absurd, but it perfectly tracks what Live Nation attempted. Live Nation *unilaterally* changed its Terms in violation of the implied covenant of good faith and fair dealing, then it waited for Consumers to use the site (or login), relying on the provision that "[b]y continuing to use this Site after that date, you agree to the changes," 2-ER-117. Because Consumers showed up, it argues that the changes were not unilateral, and so never subject to an implied covenant. That absurd workaround is unprecedented and unpersuasive.

*Second*, even if the change was not unilateral, the way it changed the contract was oppressive. The most analogous California case is *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094 (2002), which involved litigation over a contract related to recreation, and an arbitration clause with a delegation provision. In *Szetela*, the consumer received an "amendment to the Cardholder Agreement in a bill stuffer," with the "option, if he did not wish to accept the amendment," of "closing his account." *Id.* at 1100. The "oppressive nature in which the amendment was imposed"—a minimal-notice, take-it-or-leave-it change in the middle of an ongoing contractual relationship—"establishe[d] the necessary

32

element of procedural unconscionability." *Id. See also Lhotka*, 181 Cal. App. 4th 816 (applying *Szetela*).

Here, Live Nation's amendment that switched to New Era was "effective immediately," applied "irrespective of when [the] dispute … arose," and each Consumer "agree[d]" merely "[b]y continuing to use this Site after that date." 2-ER-123. The oppression is even clearer than in *Szetela*, since Live Nation changed the terms while in the middle of an ongoing antitrust suit, for the purpose of gaining an advantage over Consumers.

> ### 4. All aspects of procedural unconscionability run to the delegation clause.

Each and every element of procedural unconscionability applies to the delegation clause itself. Live Nation contends otherwise by suggesting that "all that changed was the arbitration provider," Op.Br. 29, missing the obvious fact that the *changed* arbitration provider would decide any delegated questions. The New Era Rules apply to threshold issues. That means the delegation clause itself was (1) a contract of adhesion; (2) surprising because the change was hidden on page 7 of the Terms; (3) surprising because the New Era Rules were in a separate document and impose a novel mass arbitration rule system never

33

discussed in the Terms, which insist that arbitration would be individual, not representative; (4) oppressive because it applied to known, accrued claims; (5) oppressive because it could be changed at Live Nation's option; and (6) forced on Consumers without alternatives.

### B. The Delegation Clause Is Substantively Unconscionable For The Reasons The District Court Found.

Under California's "sliding scale" approach, the "more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required." *OTO*, 447 P.3d at 690. "[G]iven the substantial procedural unconscionability here, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *Id.* at 693.

Live Nation attempts to raise the standard by quoting shock-the-conscience language, but the California Supreme Court has noted that "shocks the conscience" is simply one of various "formulations [that] point to the central idea" of "terms that are 'unreasonably favorable to the more powerful party.'" *Id.* (citations omitted); *see also Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 984 (Cal. 2003) ("[s]ubstantively unconscionable terms

34

may take various forms, but may generally be described as unfairly one-sided").  Many provisions meet that test here.

### 1. The group arbitration procedure is grossly unfair.

The mass arbitration protocol violates basic notions of fairness by applying prior arbitral decisions (the "precedents" in "bellwethers") to future claimants without notice or an opportunity to be heard.

#### a. Any proceeding affecting the rights of third parties must have minimum procedures.

The mass arbitration rules unfairly impose the consequences of class or representative proceedings without the attendant procedural protections.  Before a plaintiff may be bound by a class proceeding, he "must receive notice plus an opportunity to be heard," "an opportunity to remove himself," and "adequate[] represent[ion]" by the class representative. *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985). Building on *Phillips*, the Supreme Court reversed application of *res judicata*, explaining that where plaintiffs "received neither notice of, nor sufficient representation," "that adjudication, as a matter of federal due process, may not bind them." *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 805 (1996).  The Supreme Court has invoked these principles to reject "virtual representation" even when a party has "identity of

interest," "adequate representation," "a close relationship" with the virtual representative, "substantial participation … in the first case," "the same attorney," or even when there is "tactical maneuvering on the part of the present party." *Taylor v. Sturgell*, 553 U.S. 880, 889-90 (2008).

> b.    *New Era's mass arbitration rules lack necessary protections.*

New Era's Rules violate these basic principles. Consider a case in which an arbitrator has ruled in a "precedent" that a claimant's antitrust theory fails as a matter of law.[8] Under the Terms, "the arbitration proceeding … as well as the hearing and the arbitration award" are "confidential and will not be disclosed to any third party." 2-ER-124; *see also* 2-ER-168. Live Nation would know what happened—but no potential claimants would.

Suppose a consumer files suit *after* that ruling. She had no notice of the earlier suit and no opportunity to be heard. No one in the bellwether "represented [her] in a constitutionally adequate manner," *Richards*, 517 U.S. at 802, since the bellwethers were selected by strangers to her, under no obligation to her, and without any special

---

[8] The arbitrator could equally well decide a threshold issue such as the unconscionability of New Era's Rules.

procedures or criteria to guarantee adequacy. Nevertheless: "the determinations made from the Lead Decisions in the Bellwether Cases will act as Precedent on subsequent cases …. [E]ven if later filed, the Precedent(s) shall be applied …." 2-ER-193 (§6(b)(iii)(5)).

New Era's own witness believed that the precedent would apply:

> Q. The plaintiffs have sued Live Nation for antitrust violations, and they lose, for example, because they couldn't adduce evidence that there was a conspiracy.... And so anyone that's deemed to have a case that has common issues of law and fact is bound by that ruling, correct?
> A. If they can't demonstrate that anything is different, then, yes….
> Q. They have no right to seek additional evidence somehow or seek reconsideration? ....
> A. Under New Era's rules, correct ....
> Q. There's no right to seek additional evidence after the fact?
> A. No.
> Q. No right to move for reconsideration?
> A. No.

4-SER-460-62. He described precedent under New Era's Rules as binding, like a court-of-appeals precedent:

> Q. So if the arbitrator decided that that was a case with a common issue of law and fact, they would be bound by the prior decision?
> A. Well, it would be the arbitrator's decision, just like it would be for a judge if they were bound by the Second Circuit Court of Appeals.

4-SER-465.

    *c.*    *Deciding large numbers of similar claims at once is the sine qua non of the mass arbitration rules.*

This conception of how precedents work should not be surprising, since the entire point of New Era's Rules is providing "special rules for adjudicating large numbers of virtually identical cases." Op.Br. 9. Since the mass claims process applies to all cases deemed related ("even if later filed"), the result of these "special rules" is that later-filed cases are bound by rulings without due process.

The problem is not group arbitration *per se*, but group arbitration without procedural protections. The Supreme Court has emphasized that representative arbitration "requires procedural formality." *Concepcion*, 563 U.S. at 349. In representative litigation, "absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class," and this same process "would presumably be required for absent parties to be bound by the results of arbitration." *Id.* (citing *Phillips*). The Supreme Court underscored this requirement even though absent parties would already have consented to a representative process in the arbitration contract. Arbitration can modify a vast range of procedural rules but cannot change the constitutional minimum to be bound by an adjudication.

        d.    *The way the Rules would work practically harms*
            *claimants.*

Beyond the notice problems, the process is unfair in practical ways. Claimants receive no relief until after they win on common issues, *and also* in one-by-one resolutions of individualized issues (such as damages) before a single arbitrator. Multidistrict litigation (MDL) solves this problem either with consolidation (which is barred by the Terms) or the option of remand to hundreds of different courts for trial. Otherwise, defendants would gladly try individualized issues for decades before the same judge. Unsurprisingly, New Era took everything defendants like about MDLs (the potential for cross-cutting dispositive rulings), but removed procedural safeguards for plaintiffs, and added a perpetual bottleneck that allows Live Nation to leverage delay to extract discounted settlements. Under New Era's Rules, the same arbitrator must address every case with any similar issue of law or fact (and Live Nation has an unlimited-duration arbitration subscription). As Live Nation noted, mass arbitrations involve many thousands of claimants—how long would that take before one arbitrator? The last 20,000 claims would never be heard on their merits.

> ### e. *Live Nation cannot run away from its group arbitration rules.*

Live Nation responds in three ways. First, it calls precedent "mutual," since an arbitrator could rule for a claimant. This is not practically important, since Live Nation—unlike future claimants— would know the result and would simply change its arbitration contract to select a different forum, *again*. Beyond that, the bellwethers are not symmetric because Live Nation *litigated* the bellwether, while future claimants did not. That is why non-mutual issue preclusion is permissible against a party involved in an earlier case, but impermissible against a new party. To say that issue preclusion should apply to both a party and a non-party is simply to say that notice and an opportunity to be heard are not important.

Second, Live Nation claims that the procedures are like an MDL, but there are dramatic differences. In MDLs, all cases are consolidated, the decisions—and any evidence—are public, the court appoints adequate lead counsel that represents all plaintiffs, and any plaintiff has the opportunity to be heard. Beyond that, MDLs do not use precedent in this way. Live Nation cited *Home Depot USA, Inc. v. Lafarge North America, Inc.*, 59 F.4th 55 (3d Cir. 2023), but ignored the holding of that

40

case. The MDL judge applied issue preclusion and law-of-the-case, concluding that "Home Depot [was] bound by rulings issued in this MDL before Home Depot joined it." *Id.* at 61. The Third Circuit *reversed*, holding that law-of-the-case cannot apply because each case in an MDL retains its separate identity. Issue preclusion could not apply because Home Depot lacked a "full and fair opportunity to litigate" and was neither a "party" in a prior adjudication, nor "in privity" with one. *Id.* at 63.

Third, Live Nation claims that precedent is fully discretionary, but that is not true, and would not help if it were. *Home Depot* noted that "a court may rely on its prior decisions as persuasive," *id.* at 65, but must decide issues "without reference to issue preclusion and law of the case. It should allow … new arguments based on new or preexisting evidence, and it should consider … arguments that rulings in other cases in this MDL should not be followed." *Id.* at 68. This process is nothing like New Era's Rules, which state that "Decisions in the Bellwether Cases will act as Precedent on subsequent cases … solely as determined by" the arbitrator. 2-ER-193. The arbitrator "will create a process for handling

41

and resolving individualized issues of law and fact" but "Precedent will still apply to all Common Issues." 2-ER-193.

Live Nation, at most, argues that an arbitrator *could* decide that the "process" for "handling and resolving individualized issues" should match what *Home Depot* requires for *common* issues. That is not what the Rules say. And there is no reason to believe an arbitrator would use the process for "individualized" issues to allow repeated litigation of identical, common issues.

Even if it *could* happen, pure discretion simply is not enough. As the district court explained, "[e]ven assuming" Live Nation were entirely right, that would mean arbitrators have "unfettered discretion" to apply precedent "to thousands of claims at once"—with no guardrails. 1-ER-22. They could allow new argument or evidence, or not. They could provide "a fair arbitration process where each claimant is provided a sufficient opportunity to be heard" or, just as easily, "a mechanical process for summarily disposing of an entire class of claimants based on an earlier proceeding to which they were not a party." 1-ER-22-23. The Supreme Court deemed it "odd to think that an arbitrator would be entrusted with ensuring that third parties' due process rights are

42

satisfied." *Concepcion*, 563 U.S. at 349-50. Here, it is more than odd—it is unconscionable.

>    2.   *The extreme limitations on discovery, evidence, and legal argument are unconscionable.*

The restrictions on discovery, evidence, and legal argument are so stringent that they would be unconscionable for one case, much less a bellwether affecting thousands of cases. Under California law, arbitral fora must provide "such procedures as are necessary to vindicate th[e] claim." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 684 (Cal. 2000). Fundamentally, these complex claims are not suitable for "Expedited" arbitration. *See* 2-ER-166 ("Standard" is "for complex and/or more evidence intensive disputes," while "Expedited" is for "consumer, employment, or certain commercial disputes" that are "more streamlined."). But Live Nation imposed that inadequate process by requiring the "Expedited" rules in its Terms and subscription agreement. 2-ER-124. No arbitrator can remedy that problem because Live Nation's subscription does not cover "Standard" arbitrations, and "***New Era ADR will respect***" the choice of rules that the "***parties may contractually determine.***" 2-ER-183 (§5(a)(i)) (emphasis in original).

43

Under the "Expedited" rules, all evidence is limited to "10 total files" which must be "the *lesser* of … 25 total pages for each file, or 25 MB of aggregate uncompressed uploads." 2-ER-189 (§6(a)(vii)) (emphasis added). Any legal argument is "limited to 15K characters." 2-ER-189 (§6(a)(x)). As for discovery, the district court correctly found that "the Rules governing expedited arbitrations (including mass arbitrations) provide for no formal process of discovery as a right." 1-ER-24. The Rules specifically say that there *is* discovery for standard arbitrations, but *no* discovery for expedited arbitrations (without upgrading to a standard arbitration, which Live Nation would have to agree to). *See* 2-ER-174 (§2(o)(ii)); 2-ER-183 (§5(a)(i)); 2-ER-187 (§6(a)(i)).

One provision, which probably does not apply to Expedited arbitrations, says that "if a party believes an opposing party has relevant or necessary evidence that they are not disclosing, they can make a request to the neutral that such evidence be provided or disclosed," which can only be granted "upon a finding [of] good cause." 2-ER-175 (§2(q)). Even if this provision applies to Expedited arbitrations (and a claimant can show good cause), note the limitations. It applies only to the "opposing party," not any third parties. And it applies only to "relevant

44

evidence" that can be "provided or disclosed"—meaning only requests for production, not depositions, requests for admission, or interrogatories.

Every California case invoked by Live Nation as upholding limitations on arbitration discovery involved procedures that gave claimants a baseline right to adequate discovery—which is missing here—and arbitrator discretion to grant *additional* discovery. The rules in *Mercuro v. Superior Ct.* allowed "three depositions and an aggregate of 30 discovery requests of any kind," plus additional discovery "upon a showing of good cause." 96 Cal. App. 4th 167, 182 (2002). *See also Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1269 (9th Cir. 2017) (providing for "exchange of relevant documents and three depositions per side," plus more upon a "showing of good cause").

Relying on *Armendariz*, *Davis v. Kozak* rejected the argument that a "good cause" failsafe can cure otherwise insufficient discovery rights. 53 Cal. App. 5th 897, 911 (2020). The rules in *Davis* allowed two depositions, with a "'sufficient cause' standard for obtaining additional discovery." *Id.* at 912. After concluding that the "default limitations on discovery are almost certainly inadequate," *id.*, the court ruled that "the particular terms of the arbitration agreement appear to constrain an

45

arbitrator's efforts to expand discovery to the extent necessary to vindicate [the plaintiff's] statutory rights." *Id.* at 914. The rationale followed from *Baxter v. Genworth N. Am. Corp.*, which explained that "a reasonable arbitrator would feel constrained" by the default rules, notwithstanding discretion to depart from them. 16 Cal. App. 5th 713, 730 (1st Dist. 2017). The Rules here are even more unconscionable, since, even with "good cause," the arbitrator can only allow requests for production from the opposing party.

Applying *Armendariz* to the evidence and argument limitations, no one can doubt that 10 documents and 15,000 characters of argument are insufficient "to vindicate [the consumer's] claim." 6 P.3d at 684. An antitrust plaintiff bears the burden of proof, must define the market, demonstrate anticompetitive conduct, prove damages, and more—an impossible task with 15,000 characters and 10 files. These procedures are inadequate to arbitrate a single Consumer's case, let alone sufficient "to protect the nonparties' interests," in a representative proceeding. *Sturgell*, 553 U.S. at 897.

As with discovery, Live Nation argues that the arbitrator could allow more documents and characters. That is doubtful, since the Rules

specifically provide that arbitrators may adjust the number of documents, but conspicuously do not say the same about brief length. Even if it were true, California law rejects that failsafe, just as it does for discovery. *See, e.g., Davis*, 53 Cal. App. 5th at 913 ("sufficient cause" or "good cause" not enough); *Baxter*, 16 Cal. App. 5th at 730 (same, because "a reasonable arbitrator would feel constrained" by the default rules).

Live Nation claims that limitations on evidence, discovery, and briefs are irrelevant to the delegation clause—but "each applies to threshold issues of arbitrability." 1-ER-29.[9] The district court *in this case* deemed discovery necessary to fairly resolve unconscionability (a threshold issue). *See* 1-SER-4-6. It allowed, for each side, briefing of more than 50 pages and more than 15 documents. Discovery included not only document requests from Live Nation (which might be allowed with "good cause" under New Era's Rules), but also document requests from *New Era*, and depositions from both New Era and Live Nation— which are not allowed even with good cause under New Era's Rules. The

---

[9] Live Nation selectively quoted the underlined portion from the district court's opinion: "The Court's Tentative found that these limitations would <u>not, standing alone, rise to the level of unconscionability</u>." 1-ER-24 (underlining added); *see* Op.Br. 52. The difference is that the tentative did not discuss *Baxter*, but the final did. *See* 1-ER-23, 25.

unconscionability challenge by itself could not be vindicated under New Era's Rules.

### 3. The one-sided appeal right is unconscionable.

California courts have long held that a right of appeal that mostly benefits one side is substantively unconscionable. Under the Terms, an appeal is only allowed where "the arbitrator *awards* injunctive relief." 2-ER-124 (emphasis added).

California courts examine the substance of appeal rights to assess mutuality. If "[t]he odds were far more likely" that a rule allowing appeal would benefit the company (not the plaintiff), that rule is unconscionable. *Harper*, 113 Cal. App. 4th at 1408. In *Little v. Auto Stiegler, Inc.*, the arbitration clause provided that "awards exceeding $50,000" were appealable. 63 P.3d 979, 983 (Cal. 2003). The California Supreme Court noted that the right to appeal would be valuable for the defendant when the award is high (above $50,000), but valuable for the plaintiff when "the arbitrator rules that the plaintiff takes nothing." *Id.* at 985. So, "the $50,000 threshold inordinately benefits defendants," and was substantively unconscionable despite formal mutuality. *Id.* The same

rule applies here, because there is no realistic chance Live Nation would get "injunctive relief" against the Consumers.

Live Nation rests its argument on *Sanchez v. Valencia Holding Co., LLC*, but the appeal clause there was quite different. 353 P.3d 741, 753 (Cal. 2015). It allowed appeal if the award was (1) $0, (2) over $100,000, or (3) granted injunctive relief. *Id.* Unlike this case, *Sanchez* was mutual in substance, since it allowed either side to appeal large losses—a take-nothing defense verdict, a high plaintiff's verdict, or an onerous injunction. Here, there is no realistic chance that Consumers would want to appeal the grant of injunctive relief against them, and they cannot appeal a take-nothing defense verdict.

Besides that factual difference, *Sanchez* involved traditional, bilateral arbitration in which many people could request the same injunctive relief. With bilateral arbitration, a defendant is vulnerable to repeated attempts to get injunctive relief. The denial of injunctive relief affects a single plaintiff, while granting it provides victory for *all* plaintiffs. In that context, the California Supreme Court noted the asymmetry and "far-reaching [impact] of an injunctive relief remedy," which warranted appellate protection. *Sanchez*, 353 P.3d at 753. Here,

49

by contrast, the denial of injunctive relief for a bellwether plaintiff would result in the denial for all plaintiffs. Because the risks of injunctive relief here are equally high-stakes for both sides (not asymmetric for Live Nation), there is no justification for one-sided appellate protection.

This argument applies to the delegation clause because Consumers would seek an injunction barring the application of the unconscionable arbitration clause. *See* 1-ER-29 & n.21.

### 4. New Era's arbitrator selection provisions violates California law.

The New Era Rules are unconscionable because they attempt to override California's decades-old arbitrator ethics rules. These rules build public trust in arbitration, are routinely followed by reputable arbitration providers such as AAA and JAMS, and contrary to Live Nation's arguments, easily survive preemption under the FAA.

As a threshold matter, Live Nation forfeited its now-prominent preemption argument by failing to brief it below. Live Nation made a choice-of-law argument below that California law could not apply if the contract invokes the FAA: "Because the Terms select the FAA, the CAA— including Section 1281.91(b)(1)—does not apply." 2-SER-73 (Reply). Their supplemental reply similarly argued "the FAA governs" because

the contract selects it.  2-SER-27 (Def. Supp. Reply).[10]  But no brief *ever* argued that the disclosure provisions are "state laws applicable *only* to arbitration," or anything like that.  Op.Br. 41.  That is why the district court said, "Defendants *have not pointed to any conflict* between California's arbitrator disclosure and disqualification rules that would indicate the existence of a conflict with the FAA in this case."  1-ER-27 (emphasis added).  The district court cannot be reversed on preemption grounds that Live Nation did not put forward.

If this Court considers it, Live Nation's preemption argument fails.  The district court noted three ways in which New Era's Rules violate California law: "(1) New Era has the power to override a claimant's decision to disqualify an arbitrator; (2) each side, rather than each individual party, has a right to disqualify an arbitrator; and (3) a single arbitrator presides over several cases at one time."  1-ER-26; *see also* Cal. Civ. Proc. Code §§1281.9, 1281.91(b)(1); Ethics Standards for Neutral Arbitrators in Contractual Arbitration ("Cal. R. Ct. RB Ethics

---

[10] The district court rejected this opt-in model of California law because the "provisions for arbitrator disqualification established by the California Legislature may not be waived or superseded by a private contract."  1-ER-26 (quoting *Azteca Constr., Inc. v. ADR Consulting, Inc.*, 121 Cal. App. 4th 1156, 1167 (2004)).

Standards"), Standards 7, 12; *Roussos v. Roussos*, 60 Cal. App. 5th 962, 967 (2021) (applying these rules); *Azteca Constr., Inc. v. ADR Consulting, Inc.*, 121 Cal. App. 4th 1156, 1164 (2004) (same).

Live Nation now appears to concede that New Era's Rules are unconscionable under California law. Its sole argument on appeal is that the FAA preempts California's decades-old arbitrator ethics rules whenever a contract does not expressly adopt those rules. The argument goes that Section 2 of the FAA preserves only "generally applicable contract defenses," and so preempts arbitrator ethics rules *per se*, since ethics rules are for *arbitrators*, not all contracts. This *per se* argument fails because the FAA does not "reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 477 (1989). No case has held that the FAA preempts *all* regulation of arbitration. And for good reason—such a rule would sweep away a host of innocuous rules, such as the rule requiring out-of-state lawyers appearing in arbitrations to register with the State Bar, or the rule requiring fee waivers for indigent arbitration claimants. Rather, the Supreme Court has held that the FAA preempts regulation that is *hostile*. The California rules are not hostile to arbitration; rather they "promote

public confidence in the arbitration process." Cal. R. Ct. RB Ethics Standards, Standard 1.

Even assuming that the ethics rules undermined arbitration, they would *still* survive preemption because they are generally applicable to litigation and arbitration. Under California law, a *judge* may be disqualified if in the past two years he worked, or in the future he plans to work—or had "discussions" about working—as an arbitrator in a dispute involving "a party to the proceeding." Cal. Civ. Proc. Code §170.1(a)(8). An *arbitrator* must disclose the same thing, *id.* §1281.9(a)(1) ("any ground specified in Section 170.1"), and if "any ground specified in Section 170.1 exists, a neutral arbitrator shall disqualify himself or herself upon the demand of any party." *Id.* §1281.91(d).

Moreover, Section 170.6 gives any party "an extraordinary right to peremptorily challenge a judge," which is "automatic" and "mandatory." *Maas v. Superior Ct.*, 383 P.3d 637, 640 (Cal. 2016); Cal. Civ. Proc. Code §170.6. Again, California law provides the same right to disqualify an arbitrator. *E.g.*, Cal. Civ. Proc. Code §1281.91(b)(1) (related to disclosures), (b)(2) ("without cause"). California courts have expressly analogized the arbitrator rules to judicial rules: the "demand for

53

disqualification of a proposed neutral arbitrator therefore had the same practical effect as a timely peremptory challenge to a superior court judge under section 170.6—disqualification is automatic, the disqualified judge loses jurisdiction over the case and any subsequent orders or judgments made by him or her are void." *Azteca*, 121 Cal. App. 4th at 1169-70.

The burden was on Live Nation to identify conflicts between the FAA and California law. It failed to do so before the district court, and its belated attempt here is highly abstract, with no real analysis of the California rules. That is not enough to show conflict preemption.

Live Nation does not help its case by invoking a single, unpublished district court case with no analysis. *See Modiano v. BMW of N. Am.*, No. 21-cv-00040, 2021 WL 5750460 (S.D. Cal. June 29, 2021). The district court's holding is supported by multiple district court cases and a California Court of Appeals holding. *See Ovitz v. Schulman*, 133 Cal. App. 4th 830, 849 (2005); *Kalasho v. BMW of N. Am., LLC*, 520 F. Supp. 3d 1288, 1295 (S.D. Cal. 2021) ("the CAA provisions at issue are not preempted by the FAA because the two statutes do not conflict"); *Nguyen v. BMW of N. Am.*, No. 20-cv-2432, 2022 WL 102203, at *6 (S.D. Cal. Jan. 11, 2022) (following *Kalasho*, not *Modiano*).

54

5. *The delegation clause is unconscionable in the extreme.*

The many unconscionable provisions render the delegation clause unconscionable. The mass arbitration protocol provides no notice and opportunity to be heard *with respect to threshold issues*. The preposterous limitations on pleadings, discovery, evidence, and briefing directly make litigating threshold issues unconscionably difficult. The appeal right implicates an injunction against enforcing the arbitration clause (or rescission), or, if the arbitrator enforces the terms, an injunction to prevent Live Nation from defanging any bellwether cases it loses. The arbitrator disclosure and disqualification rules obviously target the delegation clause, since a different arbitrator would decide threshold issues. All these reasons clearly target the delegation clause. *See Bielski*, 2023 WL 8408123, at *4.

The delegation clause is infirm in another respect: compliance with the clause would force Consumers to imperil their underlying claim. Recall that threshold issues "shall be argued and decided at … hearings on the merits of the case, and not through any preliminary hearings or motion practice." 2-ER-178 (§2(z)(ii)). A claimant would have to raise any threshold challenges to arbitrability, discovery, briefing,

55

evidence, the group arbitration procedures, etc. before the arbitrator, but under New Era Rules, could only do so at the final hearing, using some of the precious ten documents of evidence and 15,000 characters of legal argument. Worse still, the arbitrator would then apply the ruling as precedent to every other case.

Compressing any threshold issues into a facially inadequate merits hearing renders the delegation clause even more oppressive—there is no genuine way to challenge *anything* in arbitration without detracting from efforts to pursue the merits of the case. Or, to use the California Supreme Court's words, the procedures required for threshold issues are insufficient to "vindicate" the threshold issues that would arise under the delegation clause. *Armendariz*, 6 P.3d at 684.

## C. The Delegation Clause Is Independently Unconscionable Because New Era Is Aligned With Live Nation And Group Arbitration Is Not Protected By *Concepcion*.

For all of the reasons above, the district court's decision was correct and this Court should affirm. That said, there are two independent grounds on which the Court could affirm. *First*, New Era is structurally aligned with Live Nation and against claimants, and *second*, the class waiver in the Terms is inconsistent with the *Discover Bank* rule. While

the *Discover Bank* rule is concededly preempted by the FAA when it interferes with *individual* arbitration, it is *not* preempted where, as here, it interferes with group arbitration, as group arbitration is not protected by the FAA.

### 1. New Era lacks minimum levels of integrity.

Although the district court did not resolve this issue, the close relationship between New Era, Live Nation, and its outside counsel exacerbates substantive unconscionability and further supports the district court's conclusion.

"[A] dispute resolution procedure is not an arbitration unless there is a third party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision." *Cheng-Canindin v. Renaissance Hotel Assocs.*, 50 Cal. App. 4th 676, 687-88 (1996). An arbitral forum cannot have "interests [] so allied with those of the party that, for all practical purposes, [it] is subject to the same disabilities which prevent the party [itself] from serving." *Graham*, 623 P.2d at 177.

Yet that is precisely the case here. Live Nation provided 98% of New Era's revenues in its first year of operation; helped it write its Rules;

and coordinated with New Era throughout the district court proceedings to enhance Live Nation's position. 1-ER-18. The district court noted a "remarkable degree of coordination between Latham and New Era in terms of their interpretation and the evolution of New Era's Rules." 1-ER-18 n.13.

This comes as little surprise, since New Era actively seeks business from Live Nation's outside counsel, uses those lawyers as a "Reference," and has strong incentives to appease them. 4-SER-573-93; 3-SER-274-75 ("You really think if Latham had 50 arbitrations with New Era and if New Era's arbitrators ruled against it in all of them that they would keep using New Era, or do you think they would look for someone else, like they did with JAMS? A. I think they would probably look for somebody else."). New Era's founder agreed that compliments it showered on Latham could give rise to "an appearance of bias." 3-SER-251-54.

These facts provide an independent basis to affirm, or, at a minimum, heighten the other unconscionable aspects of the Terms. *See Cheng-Canindin*, 50 Cal. App. 4th at 692-93 (denial of motion to compel appropriate where "procedure totally lacks impartiality").

2. *The Discover Bank rule renders the Terms unconscionable, and is not preempted.*

The California Supreme Court fashioned an unconscionability rule that applies to class-action waivers, called the *Discover Bank* rule. Under that rule, "when [a class-action] waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money" "such waivers are unconscionable under California law." *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1110 (Cal. 2005).

That rule independently invalidates the Terms and is not preempted by the FAA in this case.

a. *The Discover Bank rule is preempted to the extent it applies to traditional, bilateral arbitration.*

The Supreme Court held that the FAA preempts the *Discover Bank* rule, but under implied, not express, preemption. The FAA provides that agreements to arbitrate are "enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. In *Concepcion*, the Supreme Court acknowledged that the *Discover Bank*

59

rule was based on "unconscionability," which is a doctrine "normally thought to be generally applicable." 563 U.S. at 341. It therefore fell within the protection of the so-called "saving clause." After ruling out express preemption, the Court turned to obstacles and purposes preemption. A generally applicable law might be "applied in a fashion that disfavors arbitration." *Id.* at 341. Following this reasoning, the Court concluded that a generally applicable defense "creates a scheme inconsistent with the FAA" where it "interferes with fundamental attributes of arbitration." *Id.* at 344. When that occurs, obstacles and purposes preemption applies.

The Court next outlined the fundamental attributes of arbitration, contrasting those attributes with class arbitration. Requiring class arbitration interfered with traditional arbitration because "[c]lasswide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes." *Id.* at 347-48. The "switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality" because "class arbitration requires procedural formality." *Id.* at 348-49. Only bilateral arbitration was "envisioned by Congress when it passed the FAA in 1925," *id.* at 349,

and nontraditional, aggregate arbitration procedures "is not arbitration as envisioned by the FAA," *id.* at 351.

The upshot of *Concepcion* was straightforward. States cannot enforce generally applicable contract defenses if they would interfere with parties' access to traditional, bilateral arbitration. Later cases extended this principle. In *Viking River Cruises, Inc. v. Moriana*, the Court examined California's PAGA statute, which "impos[ed] an expansive rule of joinder in the arbitral context." 596 U.S. 639, 660 (2022). Mass joinder arbitration is not individualized or informal, and so a rule requiring it was preempted: "States cannot coerce individuals into … taking the individualized and informal procedures characteristic of traditional arbitration off the table." *Id.* at 656. As in *Concepcion*, the inquiry is whether the challenged law "contains any procedural mechanism at odds with arbitration's basic form," *id.*, because parties cannot be "compelled to arbitrate using procedures at odds with arbitration's traditional form," *id.* at 651. The Ninth Circuit has extended that logic, explaining that requiring injunctive relief on behalf of a broad group of individuals would conflict with the FAA. *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 543 (9th Cir. 2021).

61

    *b.*    *The Discover Bank rule is not preempted where it*
        *interferes with representative or group arbitration.*

The Supreme Court's reasoning makes the outer limit of FAA preemption clear. On one side is "the prototype of the individualized and informal form of arbitration protected from undue state interference by the FAA." *Viking River Cruises*, 596 U.S. at 656. That side gets preemption to protect it from interference. On the other side is representative arbitration, which "is not arbitration as envisioned by the FAA." *Concepcion*, 563 U.S. at 351. Thus, the FAA prohibits states from interfering with fundamental attributes of arbitration, but does *not* prohibit states from interfering with novel representative arbitration rules that deviate markedly from the traditional arbitration envisioned by the FAA. Or, put differently, "state-law rules that do not 'interfere[] with fundamental attributes of arbitration' do not implicate *Concepcion's* limits on state unconscionability." *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 201 (Cal. 2013).

The *Discover Bank* rule applies to this case, and the FAA only preempts that rule to the extent applying the rule would interfere with the fundamental attributes of arbitration that exist in the New Era Rules. If the New Era Rules provided for traditional, bilateral

arbitration, preemption would apply. But New Era's mass arbitration rules lack the fundamental attributes "of arbitration protected from undue state interference by the FAA." *Viking River Cruises*, 596 U.S. at 656. That is hardly surprising. New Era's mass arbitration protocol was invented nearly 100 years after the FAA was passed. Under New Era's Rules, arbitration implicates the due process rights of third-parties, is procedurally complex, and is *not* bilateral. Interfering with New Era's rules, then, would not interfere with *any* fundamental attributes of arbitration, and so the *Discover Bank* rule survives preemption here. The class-action waiver runs to the delegation clause because it prevents class-wide adjudication of threshold issues.

State regulation of representative arbitration rules is not only permitted, but necessary. Justice Scalia recognized that "class arbitration requires procedural formality." *Concepcion*, 563 U.S. at 349. Arbitration providers like New Era have wide leeway in designing informal procedures for low-stakes arbitration, but must meet a higher standard to adjudicate high-stakes mass claims.

*c.     Counterarguments are unpersuasive.*

The district court rejected this argument because it found "no clear indication that once the Supreme Court considers the creation and use of mass arbitrations, it will reconsider its ruling." 1-ER-29. The Supreme Court does not need to reconsider anything, because the logic of *Concepcion* wholly supports the argument. *Concepcion* did not hold that the *Discover Bank* rule as an abstract principle of law was inoperative. *Concepcion* held that the FAA preempts the rule *to the extent* it interfered with fundamental attributes of arbitration.

To illustrate this point, consider an adhesive contract with a class-action waiver, but no arbitration clause. The FAA's command to enforce arbitration clauses cannot preempt state-law doctrines applicable to contracts *without arbitration clauses*. And so, the *Discover Bank* rule would apply. The same is true here. *Concepcion* preempted the *Discover Bank* rule as applied to traditional, bilateral arbitrations, but not as applied to novel, representative arbitrations. It has vitality against the latter.

Live Nation may argue that the policy of the FAA is to enforce parties' contracts, and therefore ask the Court to enforce the arbitration

clause simply because it bears the label "arbitration." That argument proves too much. The FAA *expressly* rejects the idea that *all* contracts to arbitrate must be enforced by their terms by including the saving clause. If the "purpose" of applying every term in every arbitration contract were enough to trump generally applicable state law rules, that purpose would swallow Section 2's saving clause.

The proper logic is that Section 2 requires enforcement of arbitration clauses unless a generally applicable contract defense applies. If one applies, *Concepcion* further protects traditional, bilateral arbitration from any contract defense that interferes with a fundamental attribute of arbitration. *Concepcion* does *not* protect every arbitration contract, no matter its terms and does not protect novel representative or group arbitration that, as confirmed in *Viking River Cruises*, is antithetical to the goals of the FAA. After all, parties can "agree to aggregation," to class arbitration, or to "arbitrate pursuant to the Federal Rules of Civil Procedure," but "what the parties in the aforementioned examples would have agreed to is not arbitration as envisioned by the FAA." 563 U.S. at 351. The FAA privileges agreements to "traditionally

individualized" arbitration, not agreements to all kinds of arbitration. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018).

\* \* \*

Live Nation's Terms are profoundly unconscionable, both procedurally, and substantively. The district court had strong grounds to so find. This Court could also affirm because New Era is structurally aligned with Live Nation and Live Nation's Terms include a class-action waiver in violation of the *Discover Bank* rule.

## II. The District Court Acted Within Its Discretion In Declining To Sever The Arbitration Clause.

After deciding the "delegation clause" is unconscionable, the next step is "to consider the enforceability of the … Arbitration Agreement as a whole." *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227, 250 (2015). Under California law, a key factor in severability is whether the arbitration agreement suffers from one flaw, or multiple. Once a court finds unconscionability in a delegation clause, it should also consider any unconscionable provisions in the arbitration agreement overall in deciding severability. Here, that includes the unfairness of the mass arbitration rules *on the merits*; the inadequacy of the limited discovery, evidence, and briefing for complex antitrust claims; and the substantive

one-sidedness of the right to appeal *grants* of injunctive relief (but not denials), in the context of antitrust claims seeking injunctive relief.

## A.    Unconscionability Permeates The Arbitration Clause.

Live Nation cannot meet its heavy burden to show an abuse of discretion in declining to sever the many unconscionable elements of the arbitration clause.  California law grants broad leeway to district courts to remedy unconscionable contracts: "the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ. Code §1670.5(a).

California precedent supports finding no abuse of discretion where, as here, multiple provisions are unconscionable.  That precedent starts with *Armendariz*, which held that the "overarching inquiry is whether 'the interests of justice ... would be furthered' by severance."  6 P.3d at 669 (quoting *Beynon v. Garden Grove Med. Grp.*, 100 Cal. App. 3d 698, 713 (1980)).  Severance of unconscionable material is "the correct solution … where only one clause in an arbitration agreement was found to be substantively unconscionable, but … [where] multiple provisions … are

67

substantively unconscionable … severance of the offending provisions is not appropriate." *Pinela*, 238 Cal. App. 4th at 256.

The "interests of justice" are not "furthered" by enforcing a contract where the drafter has evinced an intent to advantage itself. "[I]f the agreement is 'permeated' by unconscionability," meaning "it 'contains more than one unlawful provision," courts will not sever, because "'multiple defects indicate a systematic effort to impose arbitration … not simply as an alternative to litigation, but as an inferior forum that works to the [stronger party's] advantage." *Lhotka*, 181 Cal. App. 4th at 826 (quoting *Armendariz*, 6 P.3d at 697) (alterations in original).

Here, there are multiple independent substantively unconscionable provisions. The New Era Rules have the mass arbitration protocol, the disclosure and disqualification provisions, and the limitations on discovery, briefing, and evidence. The Live Nation Terms incorporate the New Era Rules, but also have the one-sided appeal right and the class-action waiver. Even if this Court ultimately disagrees with the district court on some of these, it was well-within its discretion to conclude that unconscionability permeated the agreement. The factual context is relevant too. Live Nation knew about the claims in drafting the Terms,

and intentionally crafted the rules to aid its defense. That context illuminates Live Nation's plan: to impose arbitration as an inferior forum for antitrust claims to advantage the stronger party—exactly the situation in which California courts hold that severance is not warranted. 1-ER-31.

Live Nation attempts to shift away from the straightforward severability standard described above, but fails. Its brief relies heavily on *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251 (9th Cir. 2017), for several points that are either dicta or bad law. For example, *Poublon* concluded that there was only "one unconscionable clause in the dispute resolution provision." 846 F.3d at 1273. Given that conclusion, it was plainly dicta to opine on whether there is a "'per se rule' that an agreement is permeated by unconscionability 'if more than one clause in the agreement is unconscionable or illegal.'" Op.Br. 59 (quoting *Poublon*, 846 F.3d at 1273).

More substantively, it is no longer correct—if it ever was—to say that "[t]he FAA puts another thumb on the scale, requiring doubts about severability 'to be resolved in favor of arbitration.'" *Poublon*, 846 F.3d at 1259. Just last year, the unanimous Supreme Court rejected this

atextual reading in rejecting a pro-arbitration waiver rule. As the Court explained, the "FAA's 'policy favoring arbitration'" is simply "to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n.12 (1967)). "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* Treating arbitration contracts *the same* as others means *not* "put[ting] another thumb on the scale." Op.Br. 57.

The existence of the clause designating FairClaims (or another arbitrator) does not change the severability analysis. Either way, the inquiry is whether the arbitration clause is permeated with unconscionability, and the answer is yes. The law does not permit defendants to pepper unconscionable provisions into a contract with a contingency plan. "Were that the law, [companies] would have every incentive to pack their arbitration agreements with unenforceable provisions designed to chill [plaintiffs'] pursuit of … claims," then arbitrate in their second-favorite venue if that fails. *Capili v. Finish*

*Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015). The law does not countenance salami tactics.

## B. Live Nation Never Requested Arbitration With JAMS, And Its Novel Argument Is Meritless.

Live Nation clearly forfeited its argument that the parties should arbitrate using JAMS. This Court has "a 'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." *Villanueva v. California*, 986 F.3d 1158, 1164 (9th Cir. 2021) (quoting *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010)) (internal quotations omitted).

The forfeiture here is blatant. The arbitrate-with-JAMS argument Live Nation presses on appeal did not appear, even in inchoate form, in any of the *five* briefs Live Nation filed.[11] Quite the opposite. Live Nation shifted away from JAMS because "JAMS and AAA cannot individually arbitrate thousands of claims on the merits." 2-SER-14. Avoiding mass arbitration under JAMS rules was the "'central purpose' of replacing JAMS with other arbitrators." Op.Br. 59. Given that representation, it

---

[11] *See generally* 2-SER-79-108 (Motion); 2-SER-51-78 (Reply); 2-SER-31-50 (Def. Supp. Br.); 2-SER-18-30 (Def. Supp. Reply); 2-SER-8-17 (Def. Sec. Supp. Br.). *See also* 1-ER-3 (coining these abbreviations).

would be bizarre for the district court to *sua sponte* compel arbitration before JAMS.

Forfeiture aside, the argument fails because the new contract was entered by both sides, and "supersedes" the prior version, 2-ER-117. The arbitration clause is unconscionable, but arbitration agreements are separate from the rest of the contract (which remains). *See Prima Paint*, 388 U.S. at 404.

The cases Live Nation cites are not binding, but support the consumers anyway. For example, in *Thiele v. Merrill Lynch, Pierce, Fenner & Smith*, 59 F. Supp. 2d 1067, 1072 (S.D. Cal. 1999), the court held that a new contract "supersedes" an old one, and that the unenforceability of the new arbitration clause *did not mean* that the old arbitration clause sprung back into being. And in the unpublished case *Arbitech, LLC v. Hackney*, No. G053744, 2017 WL 4296101, at *7 (Cal. Ct. App. Sept. 28, 2017), the court *affirmed* an order denying a motion to compel arbitration. It determined that when "a later contract is not void but merely voidable due to unconsionability [*sic*] … the novation is effective if the parties intended rescission of the first contract to be unconditional." *Id.* That is precisely the case here.

72

## CONCLUSION

The district court's order should be affirmed.


Dated: December 13, 2023          Respectfully submitted,


|   | By: | */s/ Warren D. Postman* |

Kevin Teruya

Adam Wolfson

William R. Sears, IV

QUINN EMANUEL

URQUHART & SULLIVAN,

LLP

865 S Figueroa Street, 10th

Floor

Los Angeles, CA 90017

(213) 443-3000

Warren D. Postman

   *Counsel of Record*

Albert Young Pak

Noah Heinz

Ethan H. Ames

KELLER POSTMAN LLC

1101 Connecticut Avenue, N.W.,

Suite 1100

Washington, DC 20036

(202) 918-1123

wdp@kellerpostman.com


*Attorneys for*
*Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55770

I am the attorney or self-represented party.

**This brief contains** 13,721 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Warren D. Postman **Date** 12/13/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# ADDENDUM

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| Cal. Civ. Proc. Code §170.1(a)(8) | ADD-1 |
| Cal. Civ. Proc. Code §170.6 | ADD-3 |
| Cal. Civ. Proc. Code §1281.91(d) | ADD-7 |

# Cal. Civ. Proc. Code §170.1(a)(8)

## Grounds for disqualification

(a) A judge shall be disqualified if any one or more of the following are true:

...

(8)(A) The judge has a current arrangement concerning prospective employment or other compensated service as a dispute resolution neutral or is participating in, or, within the last two years has participated in, discussions regarding prospective employment or service as a dispute resolution neutral, or has been engaged in that employment or service, and any of the following applies:

(i) The arrangement is, or the prior employment or discussion was, with a party to the proceeding.

(ii) The matter before the judge includes issues relating to the enforcement of either an agreement to submit a dispute to an alternative dispute resolution process or an award or other final decision by a dispute resolution neutral.

(iii) The judge directs the parties to participate in an alternative dispute resolution process in which the dispute resolution neutral will be an individual or entity with whom the judge has the arrangement, has previously been employed or served, or is discussing or has discussed the employment or service.

(iv) The judge will select a dispute resolution neutral or entity to conduct an alternative dispute resolution process in the matter before the judge, and among those available for selection is an individual or entity with whom the judge has the arrangement, with whom the judge has previously been employed or served, or with whom the judge is discussing or has discussed the employment or service.

(B) For the purposes of this paragraph, all of the following apply:

(i) "Participating in discussions" or "has participated in discussion" means that the judge solicited or otherwise indicated an interest in accepting or negotiating possible employment or service as an alternative dispute resolution neutral, or responded to an unsolicited statement regarding, or an offer of, that employment or service by expressing an interest in that employment or service, making an inquiry regarding the employment or service, or encouraging the person making the statement or offer to provide additional information about that possible employment or service. If a judge's response to an unsolicited statement regarding, a question about, or offer of, prospective employment or other compensated service as a dispute resolution neutral is limited to responding negatively, declining the offer, or declining to discuss that employment or service, that response does not constitute participating in discussions.

(ii) "Party" includes the parent, subsidiary, or other legal affiliate of any entity that is a party and is involved in the transaction, contract, or facts that gave rise to the issues subject to the proceeding.

(iii) "Dispute resolution neutral" means an arbitrator, mediator, temporary judge appointed under Section 21 of Article VI of the California Constitution, referee appointed under Section 638 or 639, special master, neutral evaluator, settlement officer, or settlement facilitator.

## Cal. Civ. Proc. Code §170.6

### Prejudice against party, attorney or interest thereof; motion and affidavit; assignment of another judge, court commissioner or referee; number of motions; continuance; cumulative remedy; severability

(a)(1) A judge, court commissioner, or referee of a superior court of the State of California shall not try a civil or criminal action or special proceeding of any kind or character nor hear any matter therein that involves a contested issue of law or fact when it is established as provided in this section that the judge or court commissioner is prejudiced against a party or attorney or the interest of a party or attorney appearing in the action or proceeding.

(2) A party to, or an attorney appearing in, an action or proceeding may establish this prejudice by an oral or written motion without prior notice supported by affidavit or declaration under penalty of perjury, or an oral statement under oath, that the judge, court commissioner, or referee before whom the action or proceeding is pending, or to whom it is assigned, is prejudiced against a party or attorney, or the interest of the party or attorney, so that the party or attorney cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judge, court commissioner, or referee. If the judge, other than a judge assigned to the case for all purposes, court commissioner, or referee assigned to, or who is scheduled to try, the cause or hear the matter is known at least 10 days before the date set for trial or hearing, the motion shall be made at least 5 days before that date. If directed to the trial of a cause with a master calendar, the motion shall be made to the judge supervising the master calendar not later than the time the cause is assigned for trial. If directed to the trial of a criminal cause that has been assigned to a judge for all purposes, the motion shall be made to the assigned judge or to the presiding judge by a party within 10 days after notice of the all purpose assignment, or if the party has not yet appeared in the action, then within 10 days after the appearance. If directed to the trial of a civil cause that has been assigned to a judge for all purposes, the motion shall be made to the assigned judge or to the presiding judge

ADD-3

by a party within 15 days after notice of the all purpose assignment, or if the party has not yet appeared in the action, then within 15 days after the appearance. If the court in which the action is pending is authorized to have no more than one judge, and the motion claims that the duly elected or appointed judge of that court is prejudiced, the motion shall be made before the expiration of 30 days from the date of the first appearance in the action of the party who is making the motion or whose attorney is making the motion. In no event shall a judge, court commissioner, or referee entertain the motion if it is made after the drawing of the name of the first juror, or if there is no jury, after the making of an opening statement by counsel for plaintiff, or if there is no opening statement by counsel for plaintiff, then after swearing in the first witness or the giving of any evidence or after trial of the cause has otherwise commenced. If the motion is directed to a hearing, other than the trial of a cause, the motion shall be made not later than the commencement of the hearing. In the case of trials or hearings not specifically provided for in this paragraph, the procedure specified herein shall be followed as nearly as possible. The fact that a judge, court commissioner, or referee has presided at, or acted in connection with, a pretrial conference or other hearing, proceeding, or motion prior to trial, and not involving a determination of contested fact issues relating to the merits, shall not preclude the later making of the motion provided for in this paragraph at the time and in the manner herein provided. A motion under this paragraph may be made following reversal on appeal of a trial court's decision, or following reversal on appeal of a trial court's final judgment, if the trial judge in the prior proceeding is assigned to conduct a new trial on the matter. Notwithstanding paragraph (4), the party who filed the appeal that resulted in the reversal of a final judgment of a trial court may make a motion under this section regardless of whether that party or side has previously done so. The motion shall be made within 60 days after the party or the party's attorney has been notified of the assignment.

(3) A party to a civil action making that motion under this section shall serve notice on all parties no later than five days after making the motion.

(4) If the motion is duly presented, and the affidavit or declaration under penalty of perjury is duly filed or an oral statement under oath is duly

made, thereupon and without any further act or proof, the judge supervising the master calendar, if any, shall assign some other judge, court commissioner, or referee to try the cause or hear the matter. In other cases, the trial of the cause or the hearing of the matter shall be assigned or transferred to another judge, court commissioner, or referee of the court in which the trial or matter is pending or, if there is no other judge, court commissioner, or referee of the court in which the trial or matter is pending, the Chair of the Judicial Council shall assign some other judge, court commissioner, or referee to try the cause or hear the matter as promptly as possible. Except as provided in this section, no party or attorney shall be permitted to make more than one such motion in any one action or special proceeding pursuant to this section. In actions or special proceedings where there may be more than one plaintiff or similar party or more than one defendant or similar party appearing in the action or special proceeding, only one motion for each side may be made in any one action or special proceeding.

(5) Unless required for the convenience of the court or unless good cause is shown, a continuance of the trial or hearing shall not be granted by reason of the making of a motion under this section. If a continuance is granted, the cause or matter shall be continued from day to day or for other limited periods upon the trial or other calendar and shall be reassigned or transferred for trial or hearing as promptly as possible.

(6) Any affidavit filed pursuant to this section shall be in substantially the following form:

(Here set forth court and cause)

State of California,     ss.     PEREMPTORY CHALLENGE

County of _____

_____, being duly sworn, deposes and says: That he or she is a party (or attorney for a party) to the within action (or special proceeding). That ____ the judge, court commissioner, or referee before whom the trial of the (or a hearing in the) action (or special proceeding) is pending (or to whom it is assigned) is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney) so that

affiant cannot or believes that he or she cannot have a fair and impartial trial or hearing before the judge, court commissioner, or referee.

Subscribed and sworn to before me this

_____ day of _____, 20___.
(Clerk or notary public or other officer administering oath)

(7) Any oral statement under oath or declaration under penalty of perjury made pursuant to this section shall include substantially the same contents as the affidavit above.

(b) Nothing in this section shall affect or limit Section 170 or Title 4 (commencing with Section 392) of Part 2, and this section shall be construed as cumulative thereto.

(c) If any provision of this section or the application to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of the section that can be given effect without the invalid provision or application and, to this end, the provisions of this section are declared to be severable.

## Cal. Civ. Proc. Code §1281.91(d)

## Disqualification of neutral arbitrator

(d) If any ground specified in Section 170.1 exists, a neutral arbitrator shall disqualify himself or herself upon the demand of any party made before the conclusion of the arbitration proceeding. However, this subdivision does not apply to arbitration proceedings conducted under a collective bargaining agreement between employers and employees or their respective representatives.