Case No. 23-55770

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SKOT HECKMAN, LUIS PONCE,
JEANENE POPP, JACOB
ROBERTS, on behalf of themselves
and all those similarly situated,
Plaintiffs-Appellees,

v.

LIVE NATION ENTERTAINMENT,
INC., TICKETMASTER, LLC,
Defendants-Appellants.

Appeal from the United States District Court
for the Central District of California
The Honorable George H. Wu Presiding
Case No. 2:22-cv-00047-GW-GJS

## SUPPLEMENTAL EXCERPTS OF RECORD FOR
## PLAINTIFFS-APPELLEES
## Volume III of IV (3-SER-109 to 3-SER-408) REDACTED

Kevin Teruya
Adam Wolfson
William R. Sears, IV
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
865 S Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Warren D. Postman
  *Counsel of Record*
Albert Young Pak
Noah Heinz
Ethan H. Ames
KELLER POSTMAN LLC
1101 Connecticut Avenue, N.W.,
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com

*Attorneys for Plaintiffs-Appellees*

# EXHIBIT C

Page 1

1              UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3     SKOT HECKMAN, LUIS PONCE,        )
      JEANENE POPP, and JACOB ROBERTS,)
4     on behalf of themselves and all )
      those similarly situated,        )
5                                      )
                    Plaintiffs,        )
6                                      ) Case No.
              vs.                      ) 2:22-cv-00047-GW-GJ
7                                      )
      LIVE NATION ENTERTAINMENT, INC.,)
8     and TICKETMASTER L.L.C.,         )
                                       )
9                   Defendants.        )
      -------------------------------x

10

11    REMOTE VIDEOTAPED DEPOSITION OF COLLIN WILLIAMS

12            30(b)(6): NEW ERA ADR, INC.

13               January 24, 2023

14

15

16

17

18

19

20

21

22    Reported by:

23    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

24    JOB NO. 221378

25

Page 2

1                    January 24, 2023

2

3        REMOTE videotaped deposition of

4    COLLIN WILLIAMS, before Kathy S. Klepfer,

5    a Registered Professional Reporter,

6    Registered Merit Reporter, Certified

7    Realtime Reporter, Certified Livenote

8    Reporter, and Notary Public of the State

9    of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1              A P P E A R A N C E S:

 2

 3    Quinn Emanuel Urquhart & Sullivan

 4    Attorneys for Plaintiffs

 5          865 S. Figueroa Street

 6          Los Angeles, CA 90017

 7    BY:  William Sears, Esq.

 8

 9    Kelley Drye & Warren

10    Attorneys for the Witness and New Era ADR Inc.

11          175 Greenwich Street

12          New York, NY 10007

13    BY:  Sandra Musumeci, Esq.

14

15

16    Latham & Watkins

17    Attorneys for Defendants

18          505 Montgomery Street

19          San Francisco, CA 94111

20    BY:  Robin Gushman, Esq.

21

22

23

24

25
```

Page 4

```
 1   COLLIN WILLIAMS,  called as a

 2       witness, having been duly sworn by a Notary

 3       Public, was examined and testified as

 4       follows:

 5   EXAMINATION BY

 6   MR. SEARS:

 7       Q.    Mr. Williams, thanks for joining us

 8   today.  My name is Will Sears.  I'm an attorney

 9   at Quinn Emanuel.  I'm representing the proposed

10   class of plaintiffs in this case.

11           I understand you are a lawyer by

12   training, so am I correct that you have some

13   experience with the deposition process?

14       A.    I do.

15       Q.    You generally know the ground rules?

16       A.    I do.

17       Q.    Okay.  I will dispense with reciting

18   them then.  I'll just ask, if any of my

19   questions are unclear or confusing, will you let

20   me know?

21       A.    Sure will.

22       Q.    Have you ever been deposed before?

23       A.    I have.

24       Q.    How many times?

25       A.    Once.
```

Page 5

```
 1       Q.    What were the circumstances?

 2       A.    My old employer.  Some of the

 3  executives are under indictment for fraud.

 4       Q.    And which employer is that?

 5       A.    Outcome Health.

 6       Q.    How, if at all, are you involved in

 7  that dispute?

 8       A.    I'm a government witness.

 9       Q.    Okay.  Have you ever taken a

10  deposition before?

11       A.    I have.

12       Q.    How many?

13       A.    Probably close to a hundred.

14       Q.    And that was when you were in private

15  practice as an attorney?

16       A.    It was.

17       Q.    How long were you in private practice

18  as an attorney?

19       A.    For about 11 years.

20       Q.    And can you just give me a brief

21  chronology of your time in private practice?

22  Where you worked?  What sorts of matters you

23  worked on?

24       A.    Sure.  I spent my first year at Butler

25  Snow, O'Mara, Stevens & Cannada -- I'm happy to
```

Page 6

1    offer spelling, if I can do that -- down in

2    Jackson, Mississippi, doing mostly diet drug and

3    tobacco defense.

4              And then I came back to Chicago, or

5    went back the Chicago, where I'm originally

6    from, and worked for Greenberg Traurig for about

7    nine years and change, nine years and eight

8    months, doing mostly commericial litigation,

9    labor and employment litigation, and bankruptcy

10   litigation.

11       Q.    And what was your last position that

12   you held at Greenberg Traurig before you left?

13       A.    Associate.

14       Q.    And what did you do after that?

15       A.    I went to Oracle.

16       Q.    Okay.  And how long were you there?

17       A.    I was at Oracle for two years.

18       Q.    And can you give me the chronology,

19   just briefly, between Oracle and how you got to

20   New Era?

21       A.    Sure.  I was at Oracle in the Cloud

22   Computing Department for two years.  Then I left

23   for ContextMedia, which became Outcome Health.

24   I was there for about a year.

25              Then I left for Reverb, my last

Page 7

1    company.  I was at Reverb for close to five

2    years.  We sold the company to Etsy, so I spent

3    a year working for Etsy, and then I jumped to

4    New Era.

5        Q.    Okay.  I'll ask you more about that in

6    a bit, obviously, but first I want to introduce

7    our first exhibit, which will be the one I have

8    dropped in the chat.  It's a 30(b)(6) deposition

9    notice to New Era.

10            (Williams Exhibit 1, 30(b)(6) Notice

11       of Deposition to New Era, marked for

12       identification, as of this date.)

13   BY MR. SEARS:

14       Q.    Mr. Williams, I understand you are

15   able to access that?

16       A.    I am.

17       Q.    And have you seen this notice before?

18       A.    I have.

19       Q.    And you have reviewed it?

20       A.    Yes, I read it.

21       Q.    And you understand that you are here

22   today as a Rule 30(b)(6) witness in your

23   capacity as a corporate representative?

24       A.    I do.

25       Q.    Do you have an understanding of what

Page 8

1    that means?

2         A.    I do.

3         Q.    What is that understanding?

4         A.    That I am supposed to be informed on

5    most of the business matters within the

6    organization and able to speak intelligently, if

7    not microscopically, about most of those topics.

8         Q.    And I understand that there have been

9    objections and briefing on some of these topics,

10   so I certainly understand that New Era has

11   objections to some of them, but, in general, as

12   to the topics that you have looked over and

13   prepared on with your lawyers, are you ready to

14   testify?

15        A.    I am.

16        Q.    And what did you do to prepare for

17   this deposition?

18        A.    I went through all the documents that

19   have been produced.

20        Q.    So you have reviewed each and every

21   one of the documents that's been produced in

22   this case?

23        A.    I have.

24        Q.    Did you review them before they were

25   produced or after or both?

Page 9

```
 1      A.    Well, I was familiar with them before,

 2   but I have reviewed them after they have been

 3   produced.

 4      Q.    And how long with your attorneys did

 5   you spend preparing for this deposition?

 6      A.    An hour or two.

 7      Q.    When was that?

 8      A.    Over the past week or two.

 9      Q.    And when you say "over the past week

10   or two," was it one prep session that was an

11   hour or two, or was it spread out over multiple

12   prep sessions?

13      A.    It was two prep sessions.

14      Q.    And approximately how long was each

15   one?

16      A.    Less than an hour.

17      Q.    And who was in attendance?

18      A.    Sandy was, and my CEO, Rich.

19      Q.    And what's Rich's last name?

20      A.    Lee.

21      Q.    Okay.  Have you spoken to Rich about

22   this deposition?

23      A.    Very little.

24      Q.    Now, you mentioned a couple of things

25   you did to prepare for the deposition.  You
```

Page 10

1    mentioned looking at documents.  You mentioned

2    talking to your lawyers.

3           Did you also speak with other

4    individuals at New Era to prepare for the

5    deposition?

6       A.    I did not.

7       Q.    You didn't talk to a single other

8    person at New Era in the course of your

9    preparation for this 30(b)(6) deposition?

10      A.    No; not to prepare.

11      Q.    Okay.  So the only thing you did was

12   meet with your lawyers for two hours and review

13   the documents that have been produced in the

14   case?

15      A.    Correct.

16      Q.    Okay.  And am I correct that New Era

17   was founded in 2020?

18      A.    Yes.

19      Q.    It was founded by you, right?

20      A.    There were four of us that are

21   co-founders.

22      Q.    Who are the other co-founders?

23      A.    Rich Lee, Shane Mulrooney, and

24   Michelle Tyler.

25      Q.    And if it was one person's idea, whose

Page 11

1    idea was it?

2         A.    It was my idea.

3         Q.    Okay.  And it was founded in 2020, but

4    it was launched in 2021, am I right about that?

5         A.    We publicly launched in 2021, yes.

6         Q.    What did the period between the

7    founding and launch look like?  What sort of

8    work, if any, was New Era doing?

9         A.    We were building a platform.

10        Q.    Okay.  When you say "building a

11   platform," which platform and what does that

12   mean?

13        A.    Well, we're a technology company, so

14   we were building the arbitration platform and

15   mediation platform and working on the rules and

16   procedures.

17        Q.    Now, you understand that the

18   defendants in this case are Live Nation

19   Entertainment, Inc. and Ticketmaster L.L.C.?

20        A.    I do.

21        Q.    I'm just going to refer to them as

22   "Live Nation" and "Ticketmaster" at the

23   deposition, but I presume you'll understand what

24   I'm talking about?

25        A.    I will.

Page 12

1        Q.     And now they are separate corporate

2   entities.  For shorthand, I may just say "Live

3   Nation" or "Ticketmaster."

4              Is that okay going forward?

5        A.     That's fine.

6        Q.     If at any point you feel the need to

7   differentiate, for example, if you want your

8   answer to be about just Live Nation or just

9   Ticketmaster, or some other level of

10  specificity, just let me know, okay?

11       A.     That's fine.

12             I will tell you I don't know that I've

13  every dealt with -- I don't fully understand the

14  corporate structure of Live Nation and

15  Ticketmaster.  I don't know that I've ever dealt

16  with anybody from Ticketmaster.  So I can just

17  make the clear upfront.

18       Q.     Sure.  I just want to make sure if

19  there is a point where you need to specify, feel

20  free to do it.  Otherwise, we'll probably just

21  say things like "Live Nation" and

22  "Ticketmaster," and we'll both know that we're

23  talking about the defendants in this case.

24             Does that sound good?

25       A.     That sounds great.

Page 13

```
 1      Q.    By the way, when did you learn about
 2   the filing of this lawsuit?
 3      A.    God.  I can't even tell you exactly
 4   when it was filed.  It was within a couple days
 5   of it being filed.
 6      Q.    So early 2022?
 7      A.    Yes.
 8      Q.    And did you understand when you
 9   learned about it that there were allegations
10   about New Era in the lawsuit?
11      A.    I believe the first three pages were
12   dedicated to us.
13      Q.    And so you understood that there was a
14   possibility New Era would be involved somehow
15   through a third-party subpoena or otherwise?
16      A.    Sure.
17      Q.    Because you practiced law for a long
18   time, you know how this works, you realize that
19   there was a pretty decent likelihood New Era
20   would get a subpoena down the road?
21      A.    I understood that, yes.
22      Q.    Okay.  Now, Live Nation was one of New
23   Era's earliest clients going back to 2021, am I
24   right?
25      A.    Correct.
```

Page 14

1          Q.     Live Nation was New Era's first major

2    client, right?

3          A.     I don't know what you mean by "major."

4          Q.     Well, was it the first client to sign

5    a subscription agreement?

6          A.     It was the first client to sign a

7    subscription agreement.

8          Q.     I'll just make my question a little

9    cleaner:  Live Nation Entertainment, Inc. was

10   the first client to sign a subscription

11   agreement with New Era, right?

12         A.     Correct.

13         Q.     Live Nation Entertainment, Inc. was

14   also New Era's first Fortune 500 client, right?

15         A.     Yes.

16         Q.     Live Nation Entertainment, Inc. was

17   New Era's --

18         A.     I'd actually like to correct that.

19                When we signed Live Nation, I don't

20   believe they were in the Fortune 500.

21         Q.     Fair enough.

22                Well, Live Nation Entertainment, Inc.

23   was the first client New Era signed that had

24   over a billion in annual revenue, right?

25         A.     I'm not sure what their revenue was.

Page 15

1    Q.    Do you have any reason not to believe

2  it's over a billion dollars?

3    A.    I don't.

4    Q.    When New Era signed Live Nation, did

5  it have any other clients with revenues over a

6  billion dollars?

7    A.    No.

8    Q.    Live Nation Entertainment, Inc. was

9  also New Era's first publicly traded client,

10 right?

11   A.    Correct.

12   Q.    Was it New Era's first high-profile

13 client, meaning the type of client that's

14 frequently mentioned in news articles or media

15 stories?

16   A.    Sure.

17   Q.    How many clients did New Era have

18 before it signed Live Nation?

19   A.    We probably had five or six.

20   Q.    Who were they?

21   A.    ClearEdge Marketing.  McCann Partners.

22 Oh, God.  Pilot Project Brewing.

23        I don't -- there's two more.  I can

24 get you the names if -- two or three more,

25 but...

Page 16

```
 1      Q.    I may take it up with your lawyers

 2   later, but let me ask you, you've given me a

 3   couple examples here:  McCann Partners, Pilot

 4   Project Brewing.

 5           Fair to say those are smaller

 6   companies both in terms of just the size of

 7   their operations, their stature, and their

 8   revenue than Live Nation?

 9      A.    Yes.

10      Q.    Much smaller, right?

11      A.    Yes.

12      Q.    If you talked to a person on the

13   street, they might recognize Live Nation, but

14   they might not recognize Pilot Project Brewing?

15      A.    I have no idea.

16           MS. MUSUMECI:  Objection to form.

17      Q.    How many clients does New Era have

18   now?

19      A.    We have six subscription clients and

20   probably upwards of 20 to 30 clients that have

21   just put us in contracts.  Maybe more.

22      Q.    When you say "just put you in

23   contracts," they have added New Era to online

24   terms of use?

25      A.    Not necessarily online terms.  It
```

Page 17

1    could be just in commercial contracts.

2         Q.    Okay.  And of those six subscription

3    clients, how many are Fortune 500 companies?

4         A.    At least one other.

5         Q.    Which one is that?

6              MS. MUSUMECI:  Objection.

7              Will, I think that Judge Standish was,

8         in her ruling, limited the amount that you

9         could probe the identity of other clients,

10        particularly other subscription clients.

11             I'm going to allow you some leeway,

12        but I don't want to get into a lot of detail

13        regarding who the clients are, how much they

14        paid, etcetera.  That, I believe, runs afoul

15        of her ruling.

16             I'm not going to be obstructionist in

17        this deposition, but I did want to just

18        raise that point because I see where you're

19        going.

20             MR. SEARS:  I understand.

21        Respectfully, I disagree.  I'm going to ask

22        the questions.  If at some point you want to

23        instruct him not to answer, that's your

24        prerogative and we'll take it up later, but

25        we'll limit the cross-talk.  Fair enough?

Page 18

```
1              MS. MUSUMECI:  Absolutely.

2    BY MR. SEARS:

3        Q.    Okay.  Let me repeat the question.

4              What's the other Fortune 500 client

5    that has a subscription agreement with New Era?

6        A.    Zinga.

7        Q.    Okay.  Now, are any of the other

8    clients that have signed subscription agreements

9    with New Era publicly traded?

10       A.    To be dead honest to you, I'm not sure

11   whether or not the companies are publicly

12   traded.

13       Q.    Was Live Nation the first New Era

14   client to require mandatory arbitration with New

15   Era vis-a-vis consumers?

16       A.    I don't know that Live Nation requires

17   it, but I'm not trying to be obstructionist

18   here, so I will answer yes.

19       Q.    All right.  I mean, is there a caveat

20   that you need to give?

21             I'm asking because my understanding is

22   that there are terms of use on Live Nation and

23   Ticketmaster's website that reference New Era.

24             Do you have a different understanding?

25       A.    No, I don't have a different
```

Page 19

1    understanding than that.  I'm not sure if New

2    Era is absolutely required as the arbitral

3    forum.  We may be.

4        Q.    Okay.  Are you aware that before Live

5    Nation and Ticketmaster started referencing New

6    Era in their terms of use, that the previous

7    terms of use referenced JAMS?

8        A.    I am.

9        Q.    And what is JAMS?

10       A.    It's another arbitration ADR forum.

11       Q.    It's an established forum, right?

12       A.    I don't know what that means, but they

13   have been around a long time.

14       Q.    Well, New Era's been around for two or

15   three years.  JAMS has been around for much

16   longer, right?

17       A.    Yes.

18       Q.    Lots of companies have used JAMS?

19       A.    I don't know.  I don't know how many

20   companies use JAMS.

21       Q.    Well, you told me you were a litigator

22   for many years.

23             Based on that experience, you know

24   that there are companies that used JAMS, even

25   when you were practicing, right?

Page 20

1          A.     Yes.  The majority of the companies I

2    saw used AAA.

3          Q.     Okay.  Which is another established

4    arbitration provider, right?

5          A.     Correct.

6          Q.     So JAMS and AAA have been around for

7    many years?

8          A.     AAA, I think for over a hundred.

9          Q.     Yep.

10                Are you aware of Live Nation ever

11   having a problem with JAMS?

12         A.     I believe when Live Nation first came

13   to us, they told us they were unhappy with jams.

14         Q.     What was the reason that they were

15   unhappy with JAMS?

16         A.     I believe that it was the expense.

17         Q.     Okay.  Was it related to a specific

18   matter or was it more of a general concern?

19         A.     I think most of the times that we have

20   heard things about JAMS it's been a general

21   concern about the expense.

22         Q.     Now, was it the expense generally, or

23   was the expense with respect to certain types of

24   litigation like mass arbitration?

25         A.     It was just the general expenses, as I

Page 21

1    recall.

2         Q.    Okay.  When you say "the general

3    expense," is that the fees that they would pay

4    to JAMS mediators?  Was it the upfront cost of

5    filing?  Something else?

6         A.    I think it was all of the above.

7         Q.    Okay.  But it was more of a general

8    concern about the fees; it wasn't like there was

9    a specific case that they thought JAMS had

10   botched or something like that?

11        A.    I don't recall them mentioning that.

12        Q.    Okay.  It was really more of

13   prospective concerns about fees they might incur

14   in the future; is that fair?

15        A.    That sounds fair, yes.

16        Q.    Okay.  What were New Era's total

17   revenues in the year 2020?

18        A.    Zero.

19        Q.    Okay.  Now, you told me that New Era

20   was building a platform.

21             What money was it using to build the

22   platform that year?

23        A.    We had raised a pre-seed round of

24   financing.  That was raised in -- it might have

25   been 2021.  I mean, in 2020, basically, we were

Page 22

1   working for free.

2       Q.    I'm going to introduce our next

3   exhibit, which I believe is Exhibit 2.

4           Let me know when you have it.

5           (Williams Exhibit 2, Declaration of

6       Collin Williams on Behalf of New Era ADR,

7       Inc., marked for identification, as of this

8       date.)

9           THE WITNESS:  I've got it.  I just

10      need to download it.

11          Yep.

12          MS. MUSUMECI:  Just one moment.

13          MR. SEARS:  Let me know when --

14          MS. MUSUMECI:  Thank you.  Ready.

15          MR. SEARS:  Great.

16  BY MR. SEARS:

17      Q.    Is this a declaration that you

18  submitted in this case?

19      A.    It is.

20      Q.    And this declaration describes New

21  Era's revenues over the past couple of years?

22      A.    Correct.

23      Q.    And so one of the things you say here

24  is, "In 2020, zero percent of New Era's business

25  was comprised of subscription payments or other

Page 23

1    remuneration from Live Nation and/or

2    Ticketmaster," right?

3         A.    Correct.

4         Q.    You told me earlier that New Era just

5    had no revenues in 2020.  So here, when you say

6    that zero percent of New Era's business came

7    from Live Nation or Ticketmaster, that's just

8    because New Era had no business that year,

9    right?

10        A.    Correct.

11        Q.    Zero percent of zero is zero?

12        A.    Correct.

13        Q.    Okay.  Now, another thing you say in

14   your declaration is that, in 2021, 98 percent of

15   New Era's revenues were from Live Nation.

16              Is that right?

17        A.    Correct.

18        Q.    So the vast majority of New Era's

19   revenues in 2021 were from Live Nation?

20        A.    Correct.

21        Q.    They were attributable to a

22   subscription agreement that New Era and Live

23   Nation signed in June 2021?

24        A.    Yes.

25        Q.    What were the other 2 percent of New

Page 24

1    Era's revenues that year?

2        A.    We had some one-off cases that came

3    in.  Who they were for, I couldn't remember.

4        Q.    What was the dollar value of those

5    cases to New Era in revenue?

6        A.    It was 2 percent of our total revenue.

7    So if you added 2 percent onto the subscription

8    agreement, that's what it would be.

9        Q.    I see.

10            And how did you come up with this

11   number?  Did you or someone else just look at

12   the subscription agreement, look at the other

13   revenues, and kind of tally them up?

14       A.    Yes.

15       Q.    Okay.  In 2022, am I right that

16   approximately ▮ percent of New Era's revenues

17   were attributable to Live Nation and

18   Ticketmaster?

19       A.    Correct.

20       Q.    Now, were the revenues from Live

21   Nation and Ticketmaster the largest revenue

22   source by client?

23       A.    They were not.

24       Q.    Okay.  What was the largest revenue

25   source by client?

Page 25

```
 1               If you just want to give me a number

 2   for now, that's okay.

 3        A.    I believe it was about 1.1 million.

 4        Q.    And can you translate to that percents

 5   to me?  How does that compare to the ██ percent

 6   from Ticketmaster and Live Nation?

 7        A.    I went to law school because I'm

 8   terrible at math.  I could do it if you give me

 9   some time here, but it is whatever the

10   percentage is.  Right?

11               I don't know off the top of my head,

12   but I would guess that if ██ percent was Live

13   Nation, it was probably around 40 percent.

14        Q.    Okay.  Well, I don't want you to guess

15   and, frankly, I have the same problem with math,

16   but the problem is I don't think I have the

17   bottom-line number.  So I actually can't figure

18   it out if you just told me it's 1.1 million.

19               So is 40 percent your best

20   approximation sitting here today?

21        A.    It's my best.  In the declaration, we

22   included the total revenue of ██.

23        Q.    I see.

24               Could you give me an approximation of

25   how the other clients break down in that 100
```

Case 2:22-cv-00047-GW-GJS   Document 146-4 (Ex Parte)   Filed 03/22/23   Page 27 of 379
Page ID #:3252

Page 26

1   percent?

2           So Live Nation and Ticketmaster is ██.

3   There's another one that's 40.

4           How about the other three or four?

5   How much are they each?

6     A.   Yeah, I'm doing the math in my head.

7   40 doesn't work out if it's 1.1 of ██, but the

8   other ones would break down then about four of

9   them sitting, you know, anywhere between $50,000

10  and, you know, $200,000, something to that

11  effect.

12          I don't -- my math is going to be

13  terrible here.  I'm just admitting it.

14    Q.   No worries, and I appreciate your

15  candor.  I'm just trying to get kind of a

16  ranking of how much each of these clients gives

17  in revenue.

18          So, based on what you told me, it

19  sounds like Ticketmaster and Live Nation aren't

20  the largest, but they're the second largest; is

21  that right?

22    A.   Yes.

23    Q.   And that's because their revenues from

24  their subscription agreement?

25    A.   Correct.

Page 27

```
 1      Q.    And the other 40 percent, is that also

 2   a subscription agreement?

 3      A.    It is.

 4      Q.    And is the reason that it's 40 percent

 5   and Live Nation and Ticketmaster is ██ percent

 6   that there is a larger annual payment in that

 7   subscription agreement?

 8      A.    I don't recall exactly what the

 9   subscription payment is in the other one.

10            I just want to be clear the 40 percent

11   doesn't seem to be right, but you are correct

12   that there is a larger client, and then Live

13   Nation is probably second.

14      Q.    And what I'm just trying to get here

15   is I just want to know if the subscription

16   payment ballpark is bigger than the Live

17   Nation/Ticketmaster one, or if it's like a

18   similar subscription agreement payment and then

19   you did a bunch of work for them and that sort

20   of added up the additional revenue.

21      A.    I get the question.

22            The subscription payment is generally

23   the same ballpark, yes.

24      Q.    So it sounds like what happened -- and

25   you can tell me if I'm misunderstanding -- is
```

Page 28

1    you have got two subscription agreements from

2    Live Nation and this other client.  They're

3    about the same amount, but you did more work for

4    the other client than you did for Live Nation,

5    and that's why they were more of the revenues in

6    2022?

7        A.    I don't know if that's correct.  I

8    don't know just off the top of my head whether

9    there was a one-off revenue that came in from

10   that client that would have pushed them higher

11   than Live Nation.

12           What I can tell you is that the

13   subscription payments are in the ballpark of

14   each other.

15       Q.    Okay.  I understand the caveats you

16   have given.  I'm just trying to understand.  If

17   the subscription payments are in the ballpark,

18   how is it that the other one is larger than Live

19   Nation?  Like what, if anything, is the cause of

20   those extra revenues?

21       A.    They have -- I know they paid forward

22   some of the subscription.

23       Q.    What do you mean by that?

24       A.    What I mean is that they have actually

25   paid more than one year.

Page 29

1    Q.    Help me understand.  So we'll talk

2  about this in a bit, but I've seen the Live

3  Nation subscription agreement.

4          I gather you have too, right?

5    A.    I have.

6    Q.    We'll look at it later, but basically

7  the way it works is you pay an annual fee, and

8  then the next year you pay another one and it's

9  a little bit higher, correct?

10   A.    Correct.

11   Q.    How is it with this other client that

12 they're paying it forward?  Is the structure

13 just different?

14   A.    Yes.

15   Q.    Is the structure different such that

16 they are paying, for example, a subscription

17 payment for a future year in 2022?

18   A.    I believe that's correct.

19   Q.    I see.  So, in this other contract,

20 essentially 2022 reflects subscription payments

21 for more than one year?  It's not that they are

22 paying a higher fee per year than Live Nation,

23 it's that you have negotiated something with

24 them whereby they pay forward future years?

25   A.    Correct.

Page 30

```
1      Q.     Now let me ask you this, and I realize

2   I'm testing your math skills here, but bear with

3   me, okay?

4             If Live Nation's contract had a

5   similar structure and they were to pay forward

6   future revenues, would that make their payment

7   in 2022 about the same, larger, or smaller than

8   this other company?

9             MS. MUSUMECI:  Objection.  Object.

10            Collin give me a moment.

11            Objection to the form.

12            You can answer.

13     A.     The answer is I don't know.

14     Q.     Can you ballpark it?

15     A.     I can't.  Not without the other

16  contract in front of me.

17     Q.     Okay.  So you don't know sitting here

18  today whether if the Live Nation contract had

19  the same structure as this other one, whether

20  Live Nation would make up more than ███ percent

21  of New Era's revenues and be its largest revenue

22  source for 2022?

23            MS. MUSUMECI:  Same objection.

24            THE WITNESS:  Sorry.

25            MS. MUSUMECI:  Same objection.
```

Page 31

```
 1              THE WITNESS:  I don't know off the ton

 2      of my head.

 3   BY MR. SEARS:

 4      Q.    I didn't remind you of this at the

 5   beginning because I know you're an experienced

 6   lawyer, but you should pause a second so that

 7   Sandy can object.

 8      A.    I know.  I know.

 9              THE WITNESS:  Sorry, Sandy.

10      Q.    I know you know.

11              MS. MUSUMECI:  No problem.

12      Q.    Now, okay, let's talk about 2023.

13              So, for 2023, what percentage of New

14   Era's revenues do you anticipate will be

15   attributable to Live Nation and Ticketmaster,

16   best of your ability to predict?

17      A.    Oh, I mean, that's going into

18   forecasting.  So, like I said, I am not trying

19   to be difficult here, but if you looked at our

20   forecast, I would imagine that Live Nation will

21   be less than 10 percent.

22      Q.    Okay.  That's the best estimate you

23   can give sitting here today?

24      A.    That's the best estimate.  We have a

25   lot of work to do.
```

Page 32

```
 1        Q.    Now, is that because you have signed

 2   new subscription clients in addition to the ones

 3   we talked about before, because you're doing a

 4   higher volume of work for other clients, or

 5   what?

 6              MS. MUSUMECI:  Objection to form.

 7        A.    I mean, that's a pipeline discussion.

 8        Q.    I'm not sure what that means.

 9              What do you mean by, "that's a

10   pipeline discussion"?

11        A.    Well, you're talking about what our

12   sales will be in 2023, and I don't know, but...

13        Q.    So you're not sure one way or the

14   other what the total revenue for 2023 is?

15        A.    Correct.

16        Q.    Okay.  Has New Era secured any seed

17   investment in 2023?

18        A.    We secured a seed investment in 2022.

19        Q.    How about 2023?

20        A.    It would be an "A" round if we did

21   one.  We have not secured anything right now.

22        Q.    Are you seeking funding now?

23        A.    That's a question -- I don't want to

24   object here, but that's a question that I think

25   is outside the scope of the --
```

Page 33

```
 1              MS. MUSUMECI:  Yeah, I object to that.

 2              MR. SEARS:  Are you instructing him

 3       not to answer?

 4              MS. MUSUMECI:  @Yes, I'm objecting,

 5       and I'm instructing him not to answer as

 6       that is outside of the scope of issues that

 7       Judge Standish specifically ruled on with

 8       respect to investors.

 9              MR. SEARS:  Okay.  Fine.  I'm going to

10       keep asking my questions and make my record.

11       You proceed as you like.

12  BY MR. SEARS:

13       Q.   Does New Era have funding commitments

14  for anyone for 2023?

15              MS. MUSUMECI:  Same objection.

16              MR. SEARS:  Are you instructing not to

17       answer again?

18              MS. MUSUMECI:  @Yes.  I'm sorry.  So

19       if this is going to continue, I will just --

20       "same objection" will be the instruction not

21       to answer.  I'll just say "same objection"

22       for the interest of time.

23  BY MR. SEARS:

24       Q.   Okay.  How many consumer arbitrations,

25  total, has New Era administered?
```

Page 34

1        A.      One.

2        Q.      Who was it for?

3        A.      Live Nation.

4        Q.      What year?

5        A.      It would have been 2022.

6        Q.      And just generally, without disclosing

7    the names of the parties, what type of claim was

8    it?

9        A.      To be totally honest with you, I do

10   not recall.  I wasn't involved in the

11   granularity of the case.

12       Q.      So in the entire time New Era has been

13   in existence, it has only administered one

14   consumer arbitration, and that was for Live

15   Nation?

16       A.      That's the platform.

17               Our arbitrators have done thousands.

18       Q.      I understand, but in terms of the New

19   Era platform, it has only been used to

20   administer one consumer arbitration in New Era's

21   entire existence, and that was for Live Nation?

22       A.      Correct.

23       Q.      And what was the outcome in that

24   arbitration?

25       A.      I believe it settled.

Page 35

```
 1      Q.    So New Era's platform has never
 2 actually been used to render a verdict for any
 3 consumer arbitration?
 4      A.    We don't render verdicts.  We are a
 5 technology platform.
 6      Q.    New Era's platform has never been used
 7 by an arbitrator to render a verdict since New
 8 Era's founding?
 9            MS. MUSUMECI:  Objection to form.
10      Q.    In a consumer arbitration?
11      A.    In a consumer arbitration, correct.
12      Q.    That got a little messy, so let me
13 just ask it again.
14            New Era's platform has never been used
15 by an arbitrator to render a verdict in any
16 consumer arbitration since New Era's founding?
17      A.    Correct.
18      Q.    And the only consumer arbitration New
19 Era has administered involved Live Nation?
20      A.    Correct.
21      Q.    And that was in 2021?
22      A.    It was in 2022.
23      Q.    2022.
24            When in 2022?
25      A.    I believe it was the summer of 2022.
```

Page 36

1    I'm not -- I don't know specifically the dates.

2        Q.    So it's been a few months since New

3    Era has administered a consumer arbitration?

4        A.    Correct.

5        Q.    Am I correct that New Era reached out

6    to the law firm of Latham & Watkins after New

7    Era had launched?

8              MS. MUSUMECI:  Objection to form.

9              You can answer, Collin, if you

10       understand.

11       Q.    Let me ask a better question.  I'm

12   just table-setting here.

13             I'm going to ask you some questions

14   about New Era's relationship with Latham &

15   Watkins.  My question is whether, when that

16   relationship started, was it because New Era

17   reached out to someone at Latham or did someone

18   at Latham reach out to New Era?

19       A.    I believe Shane Mulrooney reached out

20   to somebody at Latham.

21       Q.    Let's mark our next exhibit here.

22       A.    Just curious, are we done with these

23   or can I close them, or do you want me to leave

24   stuff open?

25       Q.    Yeah, you can close them.  I may ask

Page 37

1   you to refer back, but I'll try to minimize

2   that.

3        A.    Sure.

4        Q.    So I'm now introducing Exhibit 3,

5   which should be a document produced in discovery

6   bearing Bates stamp NEWERA_000227.

7             (Williams Exhibit 3, E-mail with

8        attachment Bates-stamped NEWERA_000227,

9        marked for identification, as of this date.)

10       A.    It's fairly large so it's taking a bit

11  to download.

12       Q.    That's fine.  We'll just give it a

13  moment.  Just let me know when you've had it.

14  And you know the drill.  Take a moment to leaf

15  through.

16       A.    Sure.

17       Q.    It's got some attachments.  I'll walk

18  you through them, so I don't think you need to

19  read every page, but make yourself comfortable

20  and then we'll talk.

21       A.    Yep.

22             Okay.  I'm familiar with this.  Yep.

23       Q.    So this is an e-mail from you to

24  someone named Cathy Birkeland at Latham, right?

25       A.    Yes.

Page 38

1      Q.     Who is Ms. Birkeland?

2      A.     She's a friend of mine.

3      Q.     Am I pronouncing that right?

4      A.     Yes, you are.

5      Q.     And what are the circumstances of your

6   friendship?  How did you meet?  How long does it

7   go back?

8      A.     She was outside counsel at one of my

9   prior companies.  Our relationship goes back --

10  now it goes back at least seven years.

11     Q.     And so you, as New Era's founder,

12  reached out to Latham it looks like February

13  2021, right?

14     A.     Correct.

15     Q.     And that's about the time New Era

16  launched -- not founded, but launched?

17     A.     It's a few months before, yes.

18     Q.     It's a few months before it launched?

19     A.     Yes.

20     Q.     So you had reached out to a friend at

21  Latham & Watkins even before New Era had

22  launched?

23     A.     Yes.

24     Q.     And it looks like from this e-mail,

25  which is entitled "New Era Materials," you had

Page 39

1    reached out to tell her about your new company,

2    right?

3         A.    Correct.

4               I believe at some point she had asked

5    what I was going to do after Reverb.

6         Q.    And you reached out because she was a

7    friend, right?

8         A.    Yep.

9         Q.    And you reached out because Latham is

10   a large, respectable law firm, right?

11        A.    Sure.

12        Q.    And they were a potential source of

13   clients for New Era, correct?

14        A.    Correct.

15        Q.    I mean, they're a big, what could be

16   characterized as a defense firm, right?

17        A.    I have no idea what kind of work they

18   do.  I mean, I know they do defense work.  I

19   don't -- like Quinn Emanuel, I don't know if

20   they do a bunch of plaintiffs work too.

21        Q.    I mean, is it really accurate that you

22   have no idea what work they have done?

23              We're going to look at some e-mails

24   where you have talked to them.  You're friends

25   with Ms. Birkeland.

Page 40

```
 1                  You have a sense of the work they do,
 2     don't you?
 3          A.    Ms. Birkeland is an M&A attorney.
 4          Q.    And you were commercial litigator for
 5     eight years, right?
 6          A.    Yeah, I mean, I'm not trying to be
 7     difficult here.  I understand what Latham does.
 8                  I also thought Quinn Emanuel was
 9     always a defense firm.
10          Q.    Well, you said you understand what
11     Latham does.
12                  What do they do?
13          A.    They're a law firm.
14          Q.    And what type of litigation work do
15     they do?
16          A.    I don't know.  I've never worked for
17     them.
18          Q.    Well, I mean, does Latham & Watkins
19     usually represent consumers in plaintiffs' side
20     class actions?
21          A.    Honestly, I have no idea.  I didn't
22     know Quinn Emanuel did this type of work.  So I
23     don't know.
24          Q.    Have you ever seen Latham do what you
25     just called "this type of work"?
```

Page 41

1        A.     I don't recall it, but I don't know

2   how I would know what kind of work Latham is

3   doing.

4        Q.     Can you think of a single case in

5   which Latham has represented a class of

6   consumers against a big company?

7        A.     I can't.

8        Q.     Let's scroll through some of the

9   attachments.

10              Why don't you look at the first one.

11  Do you see a document that says "Tell Your

12  Story.  Get a Decision.  Get Back to Growth"?

13       A.     Yes.

14       Q.     Now, there's a paragraph here under

15  that heading that starts "court litigation."

16              Do you see that?

17       A.     Yes.

18       Q.     Now, do you see the last two

19  sentences, it says, "Clients want better, new

20  solutions that resolve their problems quickly,

21  but they haven't existed until how.  We know, we

22  were those clients"?

23       A.     Yes.

24       Q.     When you say "we were those clients,"

25  like what kind of clients are you referring to?

Page 42

1      A.     Three of us were in-house counsel.

2      Q.     And you told me what companies you

3    worked for, but what about the other folks that

4    you just mentioned?

5      A.     Shane was in-house at Home Chef, and

6    Rich was in-house at a FinTech company and a

7    company called CivisAnalytics.

8      Q.     And down here you've got kind of a

9    checklist that compares New Era to other dispute

10   resolution options.

11            Do you see that?

12     A.     Yes.

13     Q.     And one of the things it says is,

14   "Legally binding decision in under 100 days"?

15     A.     Uh-huh.

16     Q.     Now, earlier you were telling me that

17   Latham, you know, approached New Era in part

18   because they wanted to cut down on costs.

19            Do you remember that?

20     A.     Yes.

21     Q.     One of the ways that New Era cuts down

22   on costs is by delivering legally binding

23   decisions in under a hundred days, right?

24     A.     That is a goal.

25     Q.     It's a goal because if you get a

Page 43

```
 1   legally binding decision in under a hundred
 2   days, it can reduce costs for a company that's
 3   being sued, right?
 4       A.   It could also reduce costs for a
 5   consumer.
 6       Q.   And for a company being sued?
 7       A.   And for a consumer.
 8       Q.   But the answer to me my question is
 9   "yes," right?
10       A.   The answer to your question is "yes."
11       Q.   Just checking.
12            Let's look at the next attachment.
13       A.   We're having fun.  We're having fun.
14       Q.   I hope so.  I mean, you can tell I
15   kind of enjoy this.  Hopefully it's okay for you
16   too.
17       A.   Look, I take no offense to anything,
18   so it's all good.
19       Q.   Good.
20            So are you on the next attachment
21   called "Advanced Dispute Resolution"?
22       A.   Let's see.
23            Yes, you're talking about the
24   beginning of the deck?
25       Q.   Yes.
```

Page 44

```
 1      A.    Okay.  Yes.

 2      Q.    I will just tell you -- you haven't

 3  mentioned it.  These documents, you'll see the

 4  Bates numbers are not always consecutive.  They

 5  were produced this way.  Our understanding is

 6  that these are all the families, and we've tried

 7  very, very hard to put them together.  If

 8  anything looks amiss to you, let me know, but

 9  otherwise, you know, assume that these are how

10  these were sent out and how the families exist.

11            Does that make sense?

12      A.    That's fair, yeah.

13      Q.    So if you look at slide 3, it's called

14  "There is A Disconnect About What Clients Really

15  Want From Litigation."

16            Do you see that?

17      A.    I do.

18      Q.    The second paragraph here says,

19  "However, if it were up to the clients, they

20  will choose to forgo some of the so-called 'due

21  process' in favor of a solution that focuses on

22  the actual business needs of the parties and a

23  speedy timeframe in order to get back to

24  business."

25            Do you see that?
```

Page 45

1      A.     I do.

2      Q.     That's attributed to an "SVP,

3   Litigation at Fortune Global 200 Manufacturer,"

4   right?

5      A.     Correct.

6      Q.     That's a big company, right?

7      A.     It -- it is.  I'm -- I'm going to

8   circumvent the question, which is who -- what

9   the company is.  I don't know.  I was not the

10  one who got this quote.

11     Q.     I actually wasn't going to ask because

12  I thought Sandy was going to object.

13     A.     There you go.

14     Q.     But I appreciate you volunteering.

15            Look, it's a Fortune 200 Global

16  Manufacturer.  That's a big company, it's a

17  major company, whatever word we want to use.

18            We can agree on that?

19     A.     Correct.

20     Q.     Now, did any consumers tell New Era

21  that they would be okay giving up so-called due

22  process in favor of a speedy timeframe to get

23  back to business?

24     A.     They did not use -- we have not spoken

25  to any consumers who said that they would give

Page 46

```
1    up due process, but I do want to be clear this

2    is not a New Era quote.

3         Q.    Right.  I understand.  My question is

4    you put this quote from a SVP, Litigation at a

5    Fortune Global 200 Manufacturer.

6              You didn't talk to any consumers that

7    said they would be okay giving up due process

8    for a speedy resolution, did you?

9         A.    Well, in any dispute, there's two

10   parties, right?  A plaintiff and a defendant.

11             The defendant tends to be there all

12   the time.  That's the one that gets sued.  You

13   don't know who the plaintiff is until they show

14   up.  So I'm not sure what consumer we would go

15   talk to until there was a case pending.

16        Q.    Right.  Well, even after a case was

17   pending, for example, in the one case that New

18   Era has done, you didn't talk to the consumer

19   and have them tell you that they were excited to

20   give up due process in favor of a speedy

21   resolution, did they?

22        A.    We didn't talk to them, but they

23   settled so I'm assuming they were content with

24   whatever the outcome was.

25        Q.    Did they tell you that?
```

Page 47

1      A.      I didn't speak to them.

2      Q.      Did they tell anyone that?

3      A.      I don't know.

4      Q.      I mean, so this quote says that, you

5   know, clients would forgo due process in favor

6   of a solution that focuses on actual business

7   needs of the parties.

8              Does New Era's platform do that?

9      A.      Our goal is to get to a more expedient

10  resolution.  This quote is coming from some of

11  the background that we have as general counsel,

12  which was we were never interested in spending

13  tons and tons of money to defeat a consumer.

14  That wasn't our goal.

15             Our goal was to make sure, if we had

16  done something wrong, to right the wrong and

17  move on.  The whole purpose was not to spend

18  years and years and millions of dollars to try

19  and win.  And I think that's what this quote

20  reflects.

21     Q.      Okay.  But so do you agree that New

22  Era's platform forgoes so-called due process in

23  favor of a solution that focuses on the actual

24  business needs of the parties and a speedy

25  timeframe to get back to business?

Page 48

```
 1       A.    I do not agree that we forgo due

 2   process for anybody.

 3       Q.    You don't think New Era's platform

 4   foregoes any aspect of due process for anyone?

 5       A.    We do not.

 6       Q.    Let's look at the next slide.

 7             You see it says, "Businesses Want

 8   Change... They Need Change"?

 9       A.    Yes.

10       Q.    Now, again, this slide is speaking

11   from a business perspective, not a consumer

12   perspective, right?

13       A.    Correct.

14       Q.    You see on the bottom right it says,

15   "75 percent of corporations want new

16   preventative dispute mitigation procedures"?

17       A.    Yes.

18       Q.    Okay.  What are these new preventative

19   dispute mitigation procedures that 75 percent of

20   corporations want?

21       A.    This is actually from Norton Rose, and

22   I think the general idea was, once again,

23   corporations and in-house legal departments,

24   which is where the three of us came from, are

25   looking for better ways to resolve disputes:
```

Page 49

1    Faster, more efficient, less expensive.  The

2    goal is not win at all costs.

3         Q.    You mentioned resolving disputes, but

4    this quote is about how 75 percent of

5    corporations want preventative dispute

6    mitigation procedures.

7              I mean, that sounds different than

8    resolving a case that's already filed, doesn't

9    it?

10        A.    Not necessarily.

11        Q.    Well, what's your best understanding

12   of what this quote means when it says

13   "preventative dispute mitigation procedures"?

14             How are they preventing disputes?

15        A.    Well, if something comes in the door,

16   if a consumer comes in the door to a business

17   and says, I was wronged, the company could

18   actually look internally, which we did at

19   Reverb, and said, Hey, did something bad

20   actually happen here?  If it did, let's fix the

21   problem.  Let's not go to litigation because

22   it's a waste of time and money.

23             So that would be a preventative

24   dispute mitigation procedure.

25        Q.    That sounds like an internal

Page 50

1   investigation.

2            Is that basically what you're

3   describing?

4        A.   It could be.

5        Q.   I guess what I'm having trouble

6   understanding is how is this bullet about

7   preventative dispute mitigation procedures a

8   selling point for New Era?

9            You just described an investigation

10  that a company can do itself.  How does New Era

11  fit into these dispute mitigation procedures?

12       A.   Well, we have a mediation platform.

13       Q.   So you think that this quote about 75

14  percent of corporations wanting preventative

15  dispute mitigation procedures, that's about New

16  Era's mediation platform?

17       A.   I don't think any of this is about

18  specifically New Era's platform.  This is a

19  Norton Rose survey.

20       Q.   Does New Era offer preventative

21  dispute mitigation procedures?

22       A.   Sure; we offer a mediation platform.

23       Q.   Does it offer any other preventative

24  dispute mitigation procedures?

25       A.   We do med/arbs as well.

Page 51

```
1       Q.    I'm sorry.  I think I missed that.

2             You do what?

3       A.    Mediation/arbitrations.

4       Q.    Okay.  And you also have mass

5  arbitration rules, right?

6       A.    We do.

7       Q.    We'll talk about those in a bit, but

8  are those a form of preventative dispute

9  mitigation procedure?

10      A.    Absolutely not.

11      Q.    Okay.  So you believe New Era's

12  preventative dispute mitigation procedures

13  consist of its mediation platform and its

14  mediation and arbitration procedures?

15            MS. MUSUMECI:  Objection to form.

16      A.    I think what you're doing is taking

17  the Norton Rose survey and applying it to us

18  directly, which it did not.  What this slide

19  shows is what corporations were complaining of,

20  problems that they felt that they had, and

21  things that they were seeking.

22            None of this applies directly to New

23  Era.  The Norton Rose survey did not survey us.

24      Q.    Well, I hope you understand the reason

25  I'm asking is that this is a deck called "New
```

Page 52

1    Era ADR Advanced Dispute Resolution."  So I had

2    assumed that these bullets related to New Era,

3    but it sounds like you're telling me that this

4    75 percent quote is not about New Era at all, is

5    that your understanding?

6         A.    No, this -- these were statistics

7    taken from the Norton Rose survey.

8         Q.    Okay.  Let's look at the next page.

9               So this is called "Digital ADR

10   Platform - A True Alternative to Courts &

11   Traditional Arbitration."

12              You see that?

13        A.    Yes.

14        Q.    You have got the big New Era logo

15   under that?

16        A.    Yes.

17        Q.    This slide is about New Era, right?

18        A.    Correct.

19        Q.    And it says, "New Era brings qualities

20   to litigation that have long been desired by

21   businesses, in-house counsel, and their

22   attorneys," right?

23        A.    Yes.

24        Q.    Is that true?

25        A.    Yeah, I think it's true, and I think

Page 53

1    it would be desired by consumers as well.

2         Q.    You didn't mention consumers here, did

3    you?

4         A.    We didn't.

5         Q.    Then it says, "Resulting in a finite,

6    predictable process that achieves companies'

7    business and litigation objectives," do you see

8    that?

9         A.    I do.

10        Q.    Now, does New Era result in a finite,

11   predictable process?

12        A.    I believe we do.

13        Q.    One of the reasons it's finite is

14   because you try to resolve arbitrations in a

15   hundred days, right?

16        A.    Yes.

17        Q.    And it's also predictable because you

18   try to resolve arbitrations within a hundred

19   days?

20        A.    I think that's part of it.  I believe

21   flat fees are part of the predictability as

22   well.

23        Q.    Flat fees like the subscription

24   agreement with Live Nation?

25        A.    That could be, yes.

Page 54

1        Q.    And does New Era achieve companies'

2   business and litigation objectives?

3        A.    You would have to ask the companies.

4        Q.    I mean, Mr. Williams, you're the

5   30(b)(6) for New Era.  It's a slide deck

6   prepared by New Era.  You told me the slide is

7   about New Era.

8             The quote is, "Resulting in a finite,

9   predictable process that achieves companies'

10  business and litigation objectives."

11             MS. MUSUMECI:  Objection to the form.

12             MR. SEARS:  I would appreciate it if

13        you would let me finish my question first,

14        but my question was going to be:

15  BY MR. SEARS:

16        Q.    Based on that, do you agree that New

17  Era achieves companies' business and litigation

18  objectives?

19        A.    I believe you would have to ask the

20  businesses.

21        Q.    Well, New Era certainly seeks to

22  achieve companies' business and litigation

23  objectives, right?

24        A.    Yeah, we're definitely seeking to make

25  things more predictable, less expensive, and

Page 55

1    that would be passed on to consumers as well.

2         Q.   Again, there's no mention of consumers

3    in this slide, right?

4         A.   Correct.

5         Q.   You put a lot of thought and effort

6    into making these marketing materials, right?

7         A.   This is a really early one.  This is

8    before we even launched, but, yes, we put effort

9    into these.

10        Q.   Right.  If you're going to send it to

11   your friend who's a partner at Latham & Watkins,

12   a respectable law firm, you want to make sure

13   they're accurate and fully vetted, don't you?

14        A.   Sure.

15        Q.   For example, you have a lot of details

16   about this one bullet point about 75 percent of

17   corporations.

18             A lot of thought went into the wording

19   choice in the presentation here, didn't it?

20        A.   The wording actually came, I believe,

21   from the Norton Rose survey.  So the answer is

22   no.

23        Q.   To be clear, the deck overall, a lot

24   of thought went into the presentation and

25   wording, meaning someone deliberately chose to

Page 56

1    use the words that are here and present the

2    quotes that are here?

3         A.    Correct.

4         Q.    Because it was important for New Era's

5    business development, right?

6         A.    Correct.

7         Q.    Turn to page 7.

8         A.    I'm there.  Yep.

9         Q.    This slide is called "Streamlined,

10   Predictable Procedures for a Digital World"?

11        A.    Yes.

12        Q.    Now, this one's about New Era, right?

13        A.    Yes.

14        Q.    Just making sure.

15              So it compares the status quo on the

16   left and New Era on the right, right?

17        A.    Yes.

18        Q.    So, on the right, one of the things it

19   says about New Era ADR is that it has

20   reduced/simplified recovery.

21              You see that?

22              MS. MUSUMECI:  Sorry.  You misread.

23              "Discovery."  You said "recovery,"

24        Will.

25              MR. SEARS:  Okay.  Okay.  Let me ask

Page 57

 1        it again.

 2   BY MR. SEARS:

 3        Q.    One of the things it says on the side

 4   is that New Era ADR has reduced/simplified

 5   discovery?

 6        A.    Correct.

 7        Q.    That's true; New Era does have reduced

 8   and simplified discovery?

 9        A.    Correct.

10        Q.    Compared to federal courts, certainly?

11        A.    I would say state court is worse, but,

12   sure.

13        Q.    We're getting there.

14              There are other ADR providers too,

15   right?

16        A.    Yes.

17        Q.    It's a benefit, in your perspective,

18   of New Era over its competitors?

19        A.    Yes.

20        Q.    That it has more reduced and

21   simplified discovery than, say, JAMS?

22        A.    Yes.

23        Q.    Or AAA?

24        A.    Yes.

25        Q.    And it's one of New Era's selling

Page 58

1    points to businesses, right?

2         A.    Yes and no.

3               Yeah, I -- I believe it's a selling

4    point.  I'm going to be very clear about that.

5    I do think there are a lot of businesses that

6    would view reduced and simplified discovery as a

7    negative.

8         Q.    Understood, but let me ask it a little

9    differently.

10              These are marketing materials New Era

11   prepared.  You think it's a benefit, and it's

12   certainly one of the things that New Era touts

13   to businesses as a differentiator between its

14   platform and others?

15        A.    Correct.

16        Q.    That New Era has reduced and

17   simplified discovery even compared to other ADR

18   providers?

19        A.    Yes.

20        Q.    Because that can cut down costs for

21   businesses?

22        A.    And consumers.

23        Q.    And it can also shorten the timeline

24   for resolution of cases?

25        A.    Yes.

Page 59

```
 1      Q.    Let's turn to the next page.

 2            You see this one says "Two Primary

 3   Solutions"?

 4      A.    Yes.

 5      Q.    Okay.  And then, on the left, it's

 6   talking about on-demand arbitrations and

 7   mediations, right?

 8      A.    Yes.

 9      Q.    I mean, we talked about that earlier.

10            You told me a little about New Era's

11   mediation platform?

12      A.    Yes.

13      Q.    On the right, it says "Customized

14   Subscription Solutions."

15            You see that?

16      A.    Yes.

17      Q.    And it says that, "New Era creates

18   highly customized pricing and protections

19   tailored to the specific risk of each

20   organization," right?

21      A.    Yes.

22      Q.    Then it says "mass arbitrations" in

23   bold?

24      A.    Yes.

25      Q.    So New Era did a subscription
```

Page 60

```
 1   agreement with Live Nation, we've established
 2   that?
 3        A.   Yes.
 4        Q.   So, when it did that, New Era created
 5   highly customized pricing and protections that
 6   were tailored to the specific risks faced by
 7   Live Nation, right?
 8        A.   With respect to economic leverage.
 9        Q.   What do you mean by that?
10        A.   What I mean is that there is a risk
11   associated with having JAMS and AAA where the
12   filings fees can be used to leverage a
13   settlement against the company without the
14   merits of the case ever being heard.
15        Q.   Are you talking about mass
16   arbitrations?
17        A.   I'm talking about the economic model
18   with respect to mass arbitrations.  I'm not
19   talking about hearing mass arbitrations on their
20   merits.
21        Q.   I see, but that's what -- you're
22   talking about mass arbitrations.  That's why
23   "mass arbitrations" is bolded under here?
24        A.   Correct.
25        Q.   Because mass arbitrations are one of
```

Page 61

1    the specific risks that some corporations face,

2    right?

3          A.    The economic leverage is a risk that

4    corporations face, yes.

5          Q.    It was a risk that Live Nation faced,

6    right?

7          A.    You'd have to ask Live Nation.

8          Q.    Well, you had many discussions with

9    their counsel, and we'll talk about this, but

10   while negotiating a subscription agreement,

11   didn't you?

12         A.    Yeah, we did.

13         Q.    Didn't you learn that one of the risks

14   they faced was mass arbitration?

15         A.    I know they were concerned about it.

16   I don't know if that qualifies as a risk.

17         Q.    Live Nation was concerned about mass

18   arbitrations, right?

19         A.    I don't know.  You'll have to ask

20   them.

21         Q.    You just said, "I know they were

22   concerned about that."

23               Is that true?

24         A.    I did say that, yes.

25         Q.    Okay.  Just making sure.

Page 62

```
 1                    And what New Era did with its

 2     subscription agreement was to create highly

 3     customized pricing and protections that were

 4     tailored to Live Nation, right?

 5         A.    I believe that we reduced the economic

 6     leverage that could be used against Live Nation.

 7         Q.    You reduced the risk of mass

 8     arbitrations, right?

 9         A.    I don't know if we reduced a risk of

10     mass arbitrations.

11                    We're fully capable and ready to

12     handle as many mass arbitrations as come in the

13     door.

14         Q.    Has anyone initiated a mass

15     arbitration since Live Nation has switched to

16     New Era?

17         A.    No; but as I understand, there wasn't

18     a mass arbitration before New Era.

19         Q.    Has anyone initiated a mass

20     arbitration against any company that has a

21     subscription agreement with New Era?

22         A.    No.

23         Q.    Has anyone initiated an arbitration

24     against any company that incorporates New Era in

25     online terms of use?
```

Page 63

1      A.    Yes.

2      Q.    What company is that?

3            MS. MUSUMECI:  Objection.  Objection

4      to the identification of specific clients.

5      Q.    When was the mass arbitration

6  initiated?

7      A.    You didn't say "mass arbitration."

8  You said has there been an arbitration.

9      Q.    Oh, well, I meant to say "mass

10  arbitration."

11           Has there been a mass arbitration

12  against any company that incorporates New Era in

13  its online terms of use?

14     A.    No.

15     Q.    If we can go to slide 10.

16           This is another slide about New Era,

17  right?

18     A.    Yes.

19     Q.    It says "New Era Adds Immense Value to

20  Law Firms," right?

21     A.    Yes.

22     Q.    And in this slide, you're

23  communicating the value that New Era can bring

24  to law firms like Latham & Watkins, fair?

25     A.    Fair.

Page 64

```
 1        Q.    And one of the things you say is
 2   "refer out fewer cases," right?
 3        A.    Yes.
 4        Q.    The bullet talks about how firms
 5   sometimes refer away smaller cases, right?
 6        A.    Correct.
 7        Q.    And I mean, am I correct that that's
 8   really a benefit for large firms like Latham &
 9   Watkins that do a lot of defense work?  That
10   doesn't seem like a benefit for firms that do
11   plaintiffs work; does it?
12        A.    I think that's fair.
13            MR. SEARS:  Sorry.  Did you have an
14       objection, Sandy?
15            MS. MUSUMECI:  No.
16   BY MR. SEARS:
17        Q.    Then if you look at the next slide, it
18   says "Law Firms and Businesses Are Already
19   Adopting New Era"?
20        A.    Yes.
21        Q.    And it details some highlights from
22   New Era's first five months, right?
23        A.    Correct.
24        Q.    And on the left it says, AmLaw 20 Firm
25   Diligence + Approval," right?
```

Page 65

 1      A.    Yes.

 2      Q.    And it says, "New Era was contacted by

 3  AmLaw 20 litigation partners on behalf of their

 4  client"?

 5      A.    Correct.

 6      Q.    What's the AmLaw 20 litigation firm

 7  referred to here?

 8      A.    I believe it's Latham & Watkins.

 9      Q.    They contacted New Era about their

10  client Live Nation, right?

11      A.    Yes.

12      Q.    And Ticketmaster?

13      A.    Yes.

14      Q.    And, "Three litigation partners

15  conducted seven weeks of intense diligence"?

16      A.    Correct.

17      Q.    Who were those litigation partners?

18      A.    Oh, God.  Kirsten.  Alicia Jovais.

19  Kirsten Ferguson.  And the last one's name is

20  going to escape me.  It was a partner out of

21  Washington.

22      Q.    Okay.  And what was the seven weeks of

23  intense diligence that they did?

24      A.    They had a lot of questions about our

25  business.  Who we were.

Page 66

1        Q.     Like what kind of questions?

2        A.     Well, I think it begins with:  Who are

3    you guys and what have you done?  What's your

4    experience?  Why would you be in ADR?

5        Q.     Did New Era provide them with

6    materials about itself in the course of the due

7    diligence?

8        A.     I think we did.  I'm sure you have --

9    if we did, you have the e-mails.

10             We had Zoom calls with them.

11       Q.     Okay.  That was going to be my next

12   question, was:  Have any materials that New Era

13   provided to Latham & Watkins been produced in

14   this case?

15       A.     If we produced anything to Latham &

16   Watkins beyond what I sent to Cathy, it's been

17   produced, absolutely.

18       Q.     Okay.  And then the bottom bullet here

19   says, "Approved New Era subscription solution as

20   critical prophylactic measure for client's mass

21   arbitration risk," right?

22       A.     Correct.

23       Q.     And we've established that the client

24   here is Live Nation?

25       A.     Yes.

Page 67

```
 1        Q.    New Era is a critical prophylactic

 2   measure for Live Nation's mass arbitration risk,

 3   correct?

 4        A.    Only for the economic leverage.

 5        Q.    It doesn't say economic leverage here,

 6   does it?

 7        A.    It doesn't, but that's exactly what it

 8   means.

 9        Q.    But someone chose to call it mass

10   arbitration instead of economic leverage when

11   making this deck, right?

12        A.    Sure.

13        Q.    Okay.  So New Era is a critical

14   prophylactic measure for defendant's mass

15   arbitration risk whether in terms of economic

16   leverage or otherwise?

17        A.    Only --

18              MS. MUSUMECI:  Sorry, Collin.

19              Objection to form.

20              You can answer, Collin.

21        A.    I was just saying, it's a prophylactic

22   measure for the economic leverage that exists.

23        Q.    How is New Era a critical prophylactic

24   measure for the economic leverage that Live

25   Nation faces?
```

3-SER-177

Page 68

1      A.     Because we don't have massive filing

2   fees.

3      Q.     Is that the only reason?

4      A.     Pretty much.

5      Q.     Because they're 300 a pop?

6      A.     Well, it depends.

7      Q.     Well, we'll look at it later, but

8   isn't the filing fee $300 for an arbitration

9   involving defendants?

10     A.     The filing fee for Live Nation is,

11  yes.

12     Q.     And as we discussed, New Era appears

13  to have done a good job being a critical

14  prophylactic measure for economic leverage

15  because no one has initiated a mass arbitration

16  against Live Nation, right?

17            MS. MUSUMECI:  Objection to form.

18            You can answer.

19     A.     I've only been around for a year and a

20  half.

21     Q.     No one's done it in that time?

22     A.     Nobody's done in it that time, no.

23     Q.     There have been other mass

24  arbitrations that have proceeded in that time

25  against other companies, right?

Page 69

```
 1       A.    I don't know.

 2       Q.    You're not aware that there are other

 3   mass arbitrations against other companies in the

 4   past two years?

 5       A.    I'm certain there are.

 6             If you're asking me if I track mass

 7   arbitrations, I do not.

 8       Q.    The next bubble here talks about a

 9   "Fortune 500 Multi-Year Subscription."

10             Do you see that?

11       A.    Yes.

12       Q.    And it says New Era is the "primary

13   ADR provider for Fortune 500 consumer-facing

14   company," right?

15       A.    Yes.

16       Q.    Live Nation?

17       A.    Correct.

18             Although, once again, I believe,

19   because of the pandemic, Live Nation dropped out

20   of the Fortune 500.

21       Q.    And then it says, "Multi-year

22   subscription tailored to reduce risk or

23   gamesmanship in mass arbitrations," right?

24       A.    Correct.

25       Q.    And how is the multi-year subscription
```

Page 70

1    tailored to reduce risk or gamesmanship in mass

2    arbitrations?

3        A.    Well, once again, it reduces the

4    economic leverage.  Gamesmanship also applies

5    the other way.

6              You talked about simplified discovery.

7    So defense firms like to pull up semi-trucks of

8    documents and dump them on plaintiffs firms.  We

9    don't allow that either.

10       Q.    Now, it mentions here the subscription

11   specifically.

12             Is your testimony that this is just

13   referring to a $300 filing fee and nothing else?

14             MS. MUSUMECI:  Objection to the form.

15             You can answer.

16       A.    I'm not sure I can answer.  I don't

17   understand that question.

18       Q.    Well, earlier I was asking you how New

19   Era was a critical prophylactic measure for Live

20   Nation's mass arbitration risk.

21             Do you remember that?

22       A.    Yes.

23       Q.    You mentioned the $300 filing fee,

24   right?

25       A.    I believe you mentioned it.

Page 71

1        Q.   Well, if I understand correctly, you

2   were telling me that the way that New Era

3   reduces economic leverage is because it has a

4   $300 filing fee.  I mean, if I'm

5   misunderstanding you, just tell me.  I'm not

6   trying to put words in your mouth.

7        A.   Well, I think the answer is more

8   complex, because if you look at AAA and JAMS,

9   they also don't have flat fees.  So, as you

10  continue your litigation, the expense increases,

11  right?

12           So, but, yes, with respect to the

13  filing fees, JAMS and AAA have very expensive

14  filing fees in addition to arbitrator deposits.

15  We don't have that.

16           So if the question is, is $300 less

17  and does that reduce the leverage point, the

18  answer to that is yes.

19       Q.   Right.  My question is really -- I'm

20  trying to get at what you think it is about New

21  Era that reduces the leverage point.

22           So you have mentioned the filing fees.

23  You mentioned some other factors just now.

24           Is there anything else?

25       A.   No.

Page 72

1       Q.     Okay.   Now, going back to this one, so
2   now my question is:   There's language here about
3   how the subscription is tailored to reduce risk
4   or gamesmanship in mass arbitrations, right?
5          My question is, how is the
6   subscription tailored to do that?   Is it just
7   because its sets a $300 filing fee, or is there
8   some other aspect?
9       A.     No, the subscription subsidizes the
10  cost of the case.   So, by subsidizing the cost
11  of the case and reducing the costs across the
12  case, including the consumers, you remove the
13  economic leverage.
14      Q.     When you say "the subscription
15  subsidizes the cost of the case," what does that
16  mean?
17      A.     So if we get a mass arbitration in, we
18  have to pay an arbitrator, right?   And there are
19  costs associated with that.
20          So the reason we can reduce the filing
21  fee is because Live Nation has said we're going
22  to subsidize the cost of a lot of this
23  litigation.   That's how the subscription fee is
24  actually beneficial to consumers as well.
25          And I apologize my dog is barking -- a

Page 73

 1    lot.

 2        Q.    Do you need a break?  I'd like to

 3    finish with this document, but if you need to

 4    take a break, that's fine.

 5        A.    Sure.  I'm good.  I just told you

 6    because I heard him.

 7            MS. MUSUMECI:  Will, I was going to

 8        propose, when you finish this particular

 9        exhibit, if we could take a break.

10            MR. SEARS:  That's fine.  Let's just

11        finish with that one.

12    BY MR. SEARS:

13        Q.    So if I'm understanding correctly, the

14    Live Nation subscription fee basically

15    subsidizes the mass arbitration process and

16    allows New Era to put in place the system that

17    you believe is better for businesses and

18    consumers; is that right?

19        A.    That is absolutely correct.  You said

20    it better than I can.

21        Q.    And the way that works is because they

22    pay a very large fee upfront, right?

23        A.    Well, I'm not going to sit here and

24    say that it is not a large fee, but when you

25    compare it to generalized litigation costs, I

Page 74

```
 1   would say it's nominal.

 2       Q.    Right, but it's ████████████

 3   █████████?  ██████████ per year, right?

 4       A.    Yes, and I'm not trying to minimize

 5   that.  That's not the purpose of this.

 6       Q.    And New Era gets that money even if no

 7   mass arbitrations are filed, right?

 8       A.    Correct.

 9       Q.    Now, you mentioned how it can

10   subsidize litigation, but it can also just be

11   pure revenue from New Era where New Era doesn't

12   have to do anything if there's no mass

13   arbitrations filed?

14       A.    Hypothetically, correct, yes.

15       Q.    I mean, it's not really just

16   hypothetical because there were no mass

17   arbitrations, and New Era's only done one

18   consumer arbitration for Live Nation, right?

19       A.    Sure.

20       Q.    Let me ask you this:  How quickly did

21   that one consumer arbitration settle?

22       A.    I don't recall.

23       Q.    Do you recall approximately how long

24   the case lasted?

25       A.    It was under a hundred days.
```

Page 75

1     Q.     I mean, ▓▓▓▓▓▓▓▓  for a case that

2    settled in under a hundred days is probably more

3    than you would pay just to litigate, right?

4     A.     I would strongly disagree with that.

5     Q.     Based on your experience in commercial

6    litigation, you think it would cost more than

7    ▓▓▓▓▓▓▓  to litigate a case that settled in

8    under a hundred days?

9     A.     I routinely remember cases we were

10   spending upwards of a million dollars a month.

11    Q.     At the beginning of the case, before

12   any discovery?

13    A.     Absolutely.

14    Q.     And do you remember what kind of case

15   this was again?

16    A.     That I had?

17    Q.     No, not --

18    A.     I don't.  I don't recall exactly what

19   the case was, no.

20    Q.     So you don't actually know what the

21   out-of-pocket fees were or would have been if it

22   was litigated in court?

23    A.     I don't.

24    Q.     Now, if we look at the same bullet

25   here, it says, "'I can't begin to tell you how

Page 76

1    excited our global executive team is and how

2    grateful we are to [AmLaw 20 firm] that we found

3    a solution to mass arbitrations in New Era,'"

4    right?

5         A.    Yes.

6         Q.    Attributed to a Legal Department VP,

7    right?

8         A.    Correct.

9         Q.    Who is that?

10        A.    I'm not entirely sure.

11        Q.    Is it Kim Tobias from Live Nation?

12        A.    That's possible, but I can't attribute

13   it to her.  I didn't do this slide.

14        Q.    Is it from someone at Live Nation?

15        A.    I would think so, yes.

16        Q.    Right, because they were the only

17   subscription client that year?

18        A.    Correct.

19        Q.    It basically has to be or it would

20   make no sense?

21        A.    Fair.

22              MS. MUSUMECI:  Objection to form.

23        Q.    I mean, who made this slide?

24        A.    I don't recall.  I mean, it would

25   have -- at the time, there was I think six of us

Page 77

1    on the team.  So it could have been Rich, it

2    could have been Shane, but I don't recall.

3         Q.    Did you look at this slide when you

4    were preparing for this deposition?

5         A.    Yes.

6         Q.    And do you know how this quote was

7    communicated to New Era from whoever got it?

8    Was it sent by e-mail?  Was it over the phone?

9         A.    I don't believe it was sent by e-mail.

10        Q.    How was it transmitted?

11        A.    Probably by phone.

12        Q.    Okay.  But you're not sure?

13        A.    I'm not sure.

14        Q.    You weren't the direct recipient of

15   it?

16        A.    I was not, no.

17        Q.    You don't know who put it there?

18        A.    No.  I've only spoken to Kim Tobias, I

19   believe.  If that was her, I've only spoken to

20   her once in my life.

21        Q.    You don't actually know what she meant

22   by, "We found a solution to mass arbitrations in

23   New Era"?

24        A.    I do not.

25        Q.    All right.  Flip through a couple more

Page 78

1    pages.

2              You see the slide 15?  It's called

3    "Early Investors and Evangelists"?

4        A.    Yes.

5        Q.    I see you have got Latham & Watkins

6    there, and I'm sure you're going to point out

7    that Quinn Emanuel is there too.

8              We will get to that, but Latham &

9    Watkins is here?

10       A.    Yes.

11       Q.    And Latham & Watkins is one of the

12   early evangelists for New Era, right?

13       A.    Not the firm.  I would say, when you

14   look at this, it says "Evangelists From."  So

15   we're not sitting here saying that Latham &

16   Watkins is endorsing us, as we're not saying

17   Quinn Emanuel is, but there are people from

18   these places.

19       Q.    Including --

20             I didn't mean to interrupt.

21       A.    There are people from these

22   organizations that agree with what we're trying

23   to do.

24       Q.    And those people from Latham include

25   the folks that represent Live Nation, right?

Page 79

1      A.    Sure.

2      Q.    And those are the people and their

3  litigation team that are defending in this case,

4  right?

5      A.    I don't actually know who's defending

6  them in this case, to be totally honest with

7  you.

8      Q.    And who's the lawyer from Quinn

9  Emanuel that you are referencing here?

10     A.    That has to do with an investor, so

11  I'm not going to mention that name.

12     Q.    Okay.  A couple more questions on

13  this.

14          Can you go to page 17, please.

15     A.    Sure.  Yeah.

16     Q.    And this slide is called "Sample

17  Pricing:  Flat Fees = Cost Certainty"?

18     A.    Yes.

19     Q.    And I'm going to ask you about the --

20  do you see the box on the right called

21  "Subscription Solutions"?

22     A.    Yes.

23     Q.    It says that subscription solutions

24  are "customized and calibrated to each company's

25  risk profile and budget"?

Page 80

1     A.    Yes.

2     Q.    The description solution that New Era

3  presented to Live Nation was customized to Live

4  Nation's risk profile, right?

5     A.    Yes.

6           MR. SEARS:  Okay.  Let's take a break.

7           Do you want to take ten?

8           THE WITNESS:  Sure.  It's up to you

9     guys.

10          (Discussion off the record.)

11          (Recess; Time Noted:  10:10 a.m.)

12          (Time Noted:  10:22 a.m.)

13  BY MR. SEARS:

14     Q.    Mr. Williams, are you ready to resume

15  your deposition?

16     A.    I am.

17     Q.    Did you talk to anyone on the break?

18     A.    Just Sandy.

19     Q.    Okay.  About this deposition?

20     A.    Yes.

21     Q.    Okay.  And I should ask you this:

22  Where are you taking this deposition from?

23     A.    I'm in Breckenridge, Colorado.

24     Q.    Okay.  And are you at your -- I really

25  meant like your home?  Your office?

Page 81

1      A.    Yes.  It's my house, yes.

2      Q.    Breckenridge is very nice.  I did my

3 bachelor party there, actually.

4      A.    There you go.  Good stuff.

5      Q.    I'm glad you didn't run into me.

6      A.    I'm a dad now.  You wouldn't have seen

7 me out.

8      Q.    I'm going to introduce our next

9 exhibit, if you'll give me a moment.

10           (Williams Exhibit 4, E-mail chain

11     Bates-stamped NEWERA_000780 through 782,

12     marked for identification, as of this date.)

13 BY MR. SEARS:

14     Q.    So I have dropped Exhibit 4 into the

15 chat and I'm going to introduce it.  It's a

16 document produced by New Era bearing Bates

17 number NEWERA_000780.

18     A.    Got it.

19     Q.    I don't know if you're on this, so

20 just let me know when you've had a moment to

21 review.

22     A.    I am.  Yep.  I'm good.

23     Q.    So, in this e-mail, someone from New

24 Era, it looks like Shane Mulrooney, is reaching

25 out to someone named people Nima Mohebbi from

Page 82

1    Latham, right?

2         A.    Correct.

3         Q.    And it's about the New Era ADR launch

4    with an exclamation mark?

5         A.    Yes.

6         Q.    And who is Mr. Mulrooney?

7         A.    He is one of our co-founders.

8         Q.    And one of the things he says, if you

9    look at the second page of the e-mail, is he

10   describes some of the benefits of New Era,

11   right?

12        A.    Yes.  Yep.

13        Q.    And he says, "...there are several

14   other use cases for law firms as well, allowing

15   them to hold onto more cases, moot arguments,

16   train associates, develop creative fee

17   structures, and ultimately earn additional

18   revenue while increasing client loyalty,"

19   correct?

20        A.    Correct.

21        Q.    How would New Era allow a firm like

22   Latham & Watkins to hold onto more cases?

23        A.    The idea is that, if New Era is the

24   dispute resolution provision, then you could --

25   because you have cost certainty, you could hold

Page 83

1    onto a case that otherwise you would get rid of

2    because you're going to bill so many hours to

3    it.

4              So if you have a case that's going to

5    cost $500,000 in legal fees and it's only worth

6    $250,000, and you're a large law firm, maybe

7    you're going to refer that out because it just

8    doesn't make any sense economically.  But if

9    there's reduced costs through flat fees and

10   things like that, then maybe you hang onto that

11   case and you let a younger associate run it.

12       Q.    And how does a New Era law firm like

13   Latham earn additional revenue while increasing

14   client loyalty?

15       A.    Well, the idea would be that if you

16   held onto cases you were otherwise getting rid

17   of or farming out, then you would earn

18   additional revenue off those cases, and you

19   would probably increase client loyalty by

20   saying, hey, you guys didn't ship me out to some

21   smaller firm because it made more economic

22   sense.

23       Q.    Okay.  And these are really benefits

24   to larger firms that do hourly payed defense

25   work.  They're not really benefits that would

Page 84

1    translate to law firms that do plaintiffs' side

2    contingency class actions, are they?

3         A.    We have actually had some inquiries

4    from plaintiffs' firms about whether or not a

5    subscription agreement would make sense for

6    them, and we absolutely believe it would, but

7    this is particular to Latham & Watkins,

8    obviously.

9         Q.    Right.  I mean, these really -- and I

10   understand you have had some inquiries, but you

11   don't actually have plaintiff firms that have

12   done subscription agreement with New Era, right?

13        A.    We don't as of right now, no.

14        Q.    Even if some plaintiff firms reached

15   out, these type of benefits, like holding onto

16   more cases by reducing costs or increasing

17   client loyalty, I mean, correct me if I'm wrong,

18   they don't seem to translate to a scenario where

19   a plaintiffs' firm is doing a contingency case

20   on behalf of many consumers who are not repeat

21   litigants that pay out of pocket but are you

22   acting as class representatives?

23        A.    I think that's fair.

24              When I discussed earlier that there's

25   the two parties to the case, right, the

Page 85

1    plaintiffs, which may change, and the

2    defendants, which is always static.  This is

3    obviously a benefit for defendants.

4         Q.    Okay.  I'm going to introduce our next

5    exhibit.

6              (Williams Exhibit 5, E-mail chain

7         Bates-stamped NEWERA_000220 through 223,

8         marked for identification, as of this date.)

9              THE WITNESS:  Sorry.  I wasn't sure --

10        it's Tab 8 is the one that's coming up,

11        right?

12   BY MR. SEARS:

13        Q.    Yes, it is.

14              That's how they are in my binder.

15   That's why they're called that.

16        A.    I got it.

17        Q.    So this is Exhibit 5.  It's a document

18   that's produced by New Era, bearing Bates number

19   NEWERA_000220.

20              You see that?

21        A.    I got it.  Yep.

22        Q.    Okay.  And you are on this e-mail,

23   right?

24        A.    I am, yes.

25        Q.    Now, this is from May 4, 2021?

Page 86

```
 1        A.    Correct.

 2        Q.    And this e-mail, it's among you and

 3   some of the folks at Latham & Watkins that

 4   represent Live Nation, right?

 5        A.    Correct.

 6        Q.    And if you look at the very beginning

 7   of the chain, it looks like Mr. Mohebbi

 8   introduced to Mr. Mulrooney these folks at

 9   Latham & Watkins, right?

10        A.    I think that's correct, yes.

11        Q.    And so, based on the e-mail we just

12   saw, the chronology here was that Mr. Mulrooney

13   reached out to Mr. Mohebbi at Latham, he then

14   put New Era in touch with the lawyers

15   representing Live Nation, fair?

16        A.    I believe that's correct.

17        Q.    And Mr. Mohebbi says, "As I previewed,

18   I copied my colleague Alicia Jovais from our Bay

19   Area offices.  Her team has a few questions she

20   wants to run by you and the New Era folks,"

21   right?

22        A.    Yes.

23        Q.    And so am I correct that there is the

24   first time that you and the New Era team were

25   introduced to the Live Nation litigation team?
```

Page 87

1       A.      It appears to be, yes.

2       Q.      And when I say "Live Nation litigation

3    team," I'm colloquially referring to the lawyers

4    at Latham that represent them.

5               I know you said you don't know who's

6    in the case, but you know what I'm talking

7    about?

8       A.      I know what you're talking about, yes.

9       Q.      This is the first interaction between

10   New Era and Live Nation's outside counsel,

11   Latham?

12      A.      Yes, with -- with respect to, I

13   believe, Live Nation, yes.

14              The only reason I'm hedging there is

15   because you presented me with, obviously, an

16   e-mail from Cathy, so -- but, yes, this is --

17   this is the first time we were introduced.

18              I'll be very clear about this.  I

19   believe this is the first time we were

20   introduced to Alicia and Kirsten.

21      Q.      Okay.  It was certainly the first time

22   that you spoke with lawyers representing Live

23   Nation about New Era?

24      A.      Yes.

25      Q.      And to the best of your knowledge, the

Page 88

1    first time anyone on your team did as well?

2        A.    To the best of my knowledge, yes.

3        Q.    Now, were you aware at this time that

4    there was a pending lawsuit in California

5    federal court against Live Nation filed by Quinn

6    Emanuel?

7        A.    I was not aware at this time, no.

8        Q.    Were you aware after you talked to

9    their lawyers?

10       A.    I don't recall them mentioning a case

11   in California.  That's not to say it wasn't

12   mentioned, but, to be honest, it's not ringing a

13   huge bell for me.

14       Q.    Are you aware now, you know, either

15   from the work that you have done in preparing

16   for this case, that there was a prior lawsuit

17   against Live Nation called Oberstein?

18       A.    Yes.  I am aware now, yes.

19       Q.    And if I call it "Oberstein," will you

20   know what I'm talking about?

21       A.    I sure will.

22       Q.    This is the Heckman case, so that's

23   how we'll distinguish them.  Fair enough?

24       A.    Fair enough.

25       Q.    Now, did you know that this date, May

Page 89

1    4, 2021, was about a week before a hearing

2    scheduled for the motion to compel arbitration

3    in Oberstein?

4         A.    I had no idea.

5         Q.    That didn't come up on your call with

6    Latham & Watkins?

7         A.    Not that I recall, no.

8         Q.    It didn't come up at any point after?

9         A.    I mean, I know about the Oberstein

10   case now, so I guess what I'm telling you is I

11   don't know exactly when I learned about it.  I

12   don't recall discussing Oberstein on these

13   calls.

14        Q.    Okay.  Let's start with this call.

15              I mean, what do you recall discussing?

16        A.    Not a whole bunch.  I mean, I know

17   they had questions just about our backgrounds

18   and things like that.  It was very introductory.

19        Q.    You don't recall them mentioning that

20   there was a pending class action against Live

21   Nation?

22        A.    I really don't, and like I said, I'm

23   not -- I can't tell you for certain that was not

24   mentioned, but it's really not ringing a bell

25   for me.

Page 90

1      Q.    How is your memory of this call

2   generally?  I'm asking because you say you're

3   not sure whether it was mentioned, and I'm

4   cognizant that this is coming up on almost two

5   years ago.

6            Is it possible that they mentioned it

7   and you just don't remember?

8      A.    That is possible, yes.  I'm definitely

9   not going to deny that.

10     Q.    Fair to say you don't have a firm

11  recollection of everything that was said on the

12  call?

13     A.    That is very fair.

14     Q.    Possible they said things you forgot?

15     A.    Possible, yes.

16     Q.    Is there anything else you remember

17  about this call that you can tell me?

18     A.    Not specifically, no.

19     Q.    Okay.  I'm going to introduce our next

20  exhibit.

21            (Williams Exhibit 6, E-mail

22        Bates-stamped NEWERA_000212, marked for

23        identification, as of this date.)

24  BY MR. SEARS:

25     Q.    This is Exhibit 6, and it's a document

Page 91

1    produced by New Era in discovery bearing Bates

2    number NEWERA_000212.

3         A.    Yes.

4         Q.    And this is a calendar invite for a

5    call involving you and some of the folks at

6    Latham, right?

7         A.    Correct.

8         Q.    Is this the same calendar invite for

9    the same call we just talked about?

10        A.    I don't -- I can't be certain.  It

11   could be.

12        Q.    But it also could be for a different

13   one?

14        A.    It could be.  My guess is it's the

15   same one, but I don't -- I can't be absolutely

16   certain.

17        Q.    Let me ask you this:  I mean, looking

18   at this calendar invite, does it jog your memory

19   as to this discussion that we were just talking

20   about or any other discussions that you had with

21   Latham?

22        A.    No, not the substance of them.  I

23   mean, I remember generally the substance of

24   conversations with Latham, but I don't

25   remember -- like you said, this is, you know,

Page 92

1    come up on two years ago.  I don't remember the

2    call from May 6, 2021.

3         Q.    You said you remember generally the

4    substance of the conversations with Latham, and

5    what was the substance, generally?

6         A.    Generally, they just had a lot of

7    questions about us, and that includes our

8    backgrounds and, once again, why we were doing

9    this and, you know, what we had done in the past

10   that made us qualified to do it and things like

11   that.

12        Q.    Did they ask about mass arbitrations?

13        A.    Yes.

14        Q.    And what was the tenor of the

15   questions?

16        A.    I think the tenor was, how would we

17   handle them?  Were we capable of handling them?

18        Q.    Based on your discussions with them, I

19   mean, was that the predominant concern, or were

20   there others as well?

21        A.    I think there was -- I think when

22   Latham came in, there was a healthy level of

23   skepticism about who we were and whether or not

24   we could do the job, and I think the majority of

25   these conversations were along those lines --

Page 93

1    essentially, vetting us:  Who are you guys and

2    why?

3            Certainly mass arbitrations came up.

4    I'm not denying that in any way.

5        Q.    And when you said there was skepticism

6    about whether you could quote/unquote "do the

7    job," I mean, is that -- we've talked about how

8    New Era can do different things.  So what was

9    the job here?  Was it traditional bilateral

10   arbitration?  Mass arbitration?  Something else?

11       A.    All of the above.

12            I think that the essential tenor of it

13   was:  Are you capable of replacing JAMS and all

14   the things that JAMS can do?

15       Q.    We talked --

16            Go ahead.

17       A.    No.  No.  I'm sorry.  I'm clearing my

18   voice.  I'm losing my voice.  Of course, it's

19   Murphy's Law, right?  But I'm pretty sure it'll

20   make it through this dep.

21       Q.    Look, if you need a break to get some

22   tea or something, let me know.  I don't want you

23   to be uncomfortable.

24       A.    No worries at all.  I've got my awful

25   smoothie, so we're in good shape.

Page 94

 1      Q.    I'm going to introduce our next

 2   exhibit.

 3            (Williams Exhibit 7, E-mail chain

 4        Bates-stamped NEWERA_000215 through 216,

 5        marked for identification, as of this date.)

 6   BY MR. SEARS:

 7      Q.    This will be, I believe, Exhibit 7.

 8   It's a document bearing Bates number NEW

 9   ERA_000215.

10      A.    Yep.  All good.  I'm ready.

11      Q.    And this is another e-mail that

12   involves you, Mr. Mulrooney, and the Live Nation

13   litigation team?

14      A.    Correct.

15      Q.    And there's a discussion here about a

16   call with them.  You say, "Thank you very much

17   for the time today."

18            Do you see that?

19      A.    Yes.

20      Q.    This is the same call referenced in

21   the documents we just looked at, or a different

22   one?

23      A.    I think -- I mean, I'm just -- this

24   says May 5.  I thought the other one said May 6.

25   The dates are confusing me a bit.  We had a fair

Page 95

1    amount of calls with Latham.

2        Q.    Well, that's one of the reasons I'm

3    asking.

4              Ballpark, how many calls did you have

5    with Latham & Watkins?

6        A.    I want to say we had at least five or

7    six.

8        Q.    In this period of time, May/June 2021?

9        A.    Correct.

10       Q.    And it was the folks that are on this

11   e-mail?  It was Alicia Jovais, Kirsten Ferguson,

12   and it looks like someone named Andrew Prins?

13       A.    Yes.  Andrew is the one from

14   Washington.  And I apologize on the record for

15   forgetting his name.

16       Q.    I'm sure he won't hold it against you.

17             And those were the lawyers that you

18   talked to that were representing Live Nation?

19       A.    Correct.

20       Q.    That you ultimately negotiated the

21   subscription agreement with?

22       A.    Correct.

23       Q.    Can you give me just the total amount

24   of time for the call?  You said it was five or

25   six calls.

Page 96

1          Like how many hours did that add up

2    to?

3      A.    I would say none of the calls lasted

4    more than two hours.  Probably most of them

5    closer to one.  So if you said a total number of

6    hours, I would say eight to ten.

7      Q.    Did you have a call that lasted two

8    hours?

9      A.    I believe we did, yeah.

10     Q.    And, I mean, that sounds a little

11   longer than the others.

12          What was the subject that was

13   discussed on that call?

14     A.    I mean, they had a lot of questions

15   about our procedures and how we came up with

16   them.

17     Q.    Did they provide feedback on those

18   procedures?

19     A.    I wouldn't say they provided feedback.

20   I would say that they had a lot of questions.

21     Q.    Did they have an opportunity to

22   provide comments on them or discuss them with

23   you?

24     A.    I mean, they discussed them on the

25   calls, yeah, but at the end of the day, the

Page 97

 1   procedures were the decision of me, Shane, and

 2   Rich.

 3       Q.   Now, at this point, New Era had no

 4   clients, right?

 5       A.   Correct.  Well, we had no subscription

 6   clients.

 7       Q.   Right.  But it had no revenues for

 8   2020, right?

 9       A.   Other than those, like, that 2 percent

10   that we were talking about, the one-off cases,

11   no.

12       Q.   Sorry.  I asked 2020.  I'll get to

13   2021.

14       A.   Oh, 2020.  No.  I'm sorry.  Yeah, no

15   revenues in 2020.

16       Q.   Now we'll get to 2021.

17            At the time New Era was having these

18   discussions with Latham, had it had those other

19   2 percent revenues yet or did those come later?

20       A.   I don't recall specifically.

21       Q.   You just don't remember if they were

22   before or after you signed the subscription

23   agreement?

24       A.   Right.

25       Q.   Is it possible they were after?

Page 98

1        A.    It's possible.

2        Q.    So certainly no big client had signed

3     an agreement with New Era as of this time?

4        A.    Correct.

5        Q.    So, I mean, this was an important

6     business development opportunity for New Era,

7     wasn't it?

8        A.    Every single deal was important to us.

9        Q.    This was the first major deal that New

10    Era had the possibility of closing this year,

11    wasn't it?

12       A.    Correct.

13       Q.    It was the first one that they did

14    close this year?

15       A.    Correct.

16       Q.    It was the biggest source of revenue

17    for 2021?

18       A.    Correct.

19       Q.    And landing one of Latham's clients

20    would be a big win for New Era, wouldn't it?

21       A.    Sure.

22       Q.    Because Latham is a large respectable

23    firm, right?

24       A.    They are.

25       Q.    They have lots of top-tier clients,

Page 99

```
 1    blue chip companies and Fortune 500 companies,

 2    right?

 3        A.    I don't know who their clients are,

 4    but I would guess that's correct.

 5        Q.    I mean, you know that Latham & Watkins

 6    is a -- they're what's known as a white shoe law

 7    firm; they're very established; they have a

 8    great roster of big clients, don't they?

 9        A.    They have a great roster of attorneys.

10    I'm not sure entirely who they represent.

11            I'm not trying to fight with you.

12    I -- I am sure they have got a roster of

13    tremendous clients.  I can't tell you who they

14    are.

15        Q.    I mean, let me just cut through it.

16            This was a big deal for New Era,

17    right?  I mean, this was a very important

18    development for the company?

19        A.    Everything that comes in our door is a

20    big deal for us.  We're a start-up.

21        Q.    Of course, but that was the first

22    thing that came in the door?

23        A.    It's one of the first.

24        Q.    I mean, what came in the door before

25    this?
```

Page 100

1        A.    Well, like I said, we had six -- five

2    or six or seven clients before this.

3              Every single thing that comes in the

4    door for us is big.  If a consumer arbitration

5    comes in the door, that's big.  Everything that

6    comes in the door is big.

7              We're new.  I make no bones about

8    that.  We're very capable, but we're new.  So

9    everything that comes in the door is important

10   to us, and we treat it as such.

11       Q.    I understand, but I need to understand

12   this a little better because I thought you said

13   you couldn't tell me if the other 2 percent of

14   revenues came before or after this.

15             So what clients did New Era have at

16   this point in time, May 2021?

17       A.    Well, anybody who puts us under their

18   contracts or their terms of use is a client.

19       Q.    What paying clients did New Era have?

20       A.    It doesn't -- that's not how we view

21   it.  If you put us in your terms and conditions

22   or your contracts, we expect a nine- to

23   twelve-month lead time of revenue.

24             That makes you just as important as

25   somebody who is paying us now.  Because we have

Page 101

1    raised money, we're not dependent on the money

2    that comes in the door.  So we're looking to

3    play the long game.

4             So even if you're not paying us now,

5    you're important to us.

6        Q.    Understood, but you're really telling

7    me that Pilot Project Brewing putting you in the

8    terms of use but not paying any upfront revenue

9    was the same as landing a big company

10   represented by Latham & Watkins that signed a

11   subscription agreement?

12       A.    I will tell you Pilot Project Brewing

13   is as important as Live Nation or Latham &

14   Watkins, absolutely.  I will not explain why,

15   but absolutely, they're as important.

16       Q.    I mean, they don't generate the same

17   amount of revenue, do they?

18       A.    I'm not going to comment on that.

19       Q.    This is a deposition, Mr. Williams.

20   You have got to answer unless your attorney

21   tells you not to.

22       A.    I would say that Pilot Project has

23   ever bit of the revenue potential that any other

24   client has.

25       Q.    And they haven't realized that

Page 102

```
 1   potential and paid New Era ███████████████

 2   ████████, have they?

 3       A.    Not as of right now.

 4       Q.    I mean, do you really expect them to

 5   do that this year?

 6             MS. MUSUMECI:  Objection to form.

 7       A.    I would -- I would just say you are

 8   underestimating the potential of Pilot Projects.

 9       Q.    Well, I don't think I -- they sound

10   like a great company.  I'm trying to diss them.

11   I'm just trying to cut through this.

12             This looks to me like a big

13   breakthrough for New Era.  It was a start-up

14   company.  That was a major client for them, but

15   that's all I'm trying to get at.

16             Is that true or not?

17       A.    That is absolutely true, and all I'm

18   telling you is that every client is important to

19   us.

20             Live Nation is an important customer.

21   Absolutely.  I'm not denying that.

22       Q.    And this was a breakthrough

23   development for New Era, wasn't it?

24       A.    Sure.

25       Q.    Okay.  I'll mark our next exhibit.
```

Page 103

```
1              (Williams Exhibit 8, E-mail chain

2        Bates-stamped NEWERA_000168 through 172,

3        marked for identification, as of this date.)

4    BY MR. SEARS:

5        Q.    I'm introducing our next exhibit,

6    which is a document produced by New Era in

7    discovery bearing Bates number NEWERA_000168.

8        A.    Okay.

9        Q.    I apologize.  I need one minute for a

10   technical issue, so just bear with me.

11       A.    No worries.

12       Q.    Okay.  So this is an e-mail dated May

13   14, 2021, starting with the top one called "New

14   Era Mass Arb Subscription Agreement."

15             Right?

16             Mr. Williams, you may be mooted.  I'm

17   not sure if you answered the question.

18       A.    Oh.  Sorry about that.  I don't know

19   how that happened.

20             But, yes, correct.

21       Q.    Okay.  So, I mean, based on this

22   e-mail chain, one of the concerns that Live

23   Nation's counsel was getting at here was with

24   mass arbitrations, right?

25       A.    Yes.  The ability to handle them, yes.
```

Page 104

```
1        Q.    And one of the purposes of the

2   subscription agreement was, as you put it, to

3   handle mass arbitrations?

4        A.    Yes.

5        Q.    That was one of the reasons they went

6   with New Era and not JAMS?

7        A.    Correct.

8        Q.    Now, I want you to kind of skip

9   through to the third page of this where there's

10  an e-mail dated May 12 from Mr. Mulrooney.

11       A.    Okay.

12       Q.    And he's responding to Ms. Jovais, and

13  he says, "Hi, Alicia.  Just saw your e-mail on

14  historical data -- thank you for that."

15             See that?

16       A.    Yes.

17       Q.    What is the historical data referred

18  to there?

19       A.    When we price subscription agreements,

20  what we want to see is generally the litigation

21  history of the company so we have some idea what

22  volume is.

23       Q.    Did Live Nation send New Era

24  historical data on that?

25       A.    I don't recall them ever sending it.
```

Page 105

1    I remember seeing it on a phone call.

2        Q.    Was it presented on Zoom via

3    screen-share?

4        A.    I believe so, yes.

5        Q.    Did they communicate to you that there

6    was a -- that they would prefer to share

7    information that way versus e-mailing it?

8        A.    I don't recall why they did it that

9    way, to be totally honest with you, but that's

10   how I recall it happening.

11       Q.    Did they express a preference at any

12   point for doing conversations over the phone or

13   Zoom rather than in writing?

14       A.    I don't recall them ever saying let's

15   do things over Zoom or in writing.  When you're

16   our size of company and you don't have a

17   corporate office, you do a lot of Zoom calls

18   because it's the only way to make things happen

19   in real time.

20       Q.    As a practical matter, then, much of

21   the negotiations about the subscription

22   agreement happened over Zoom?

23       A.    Absolutely.

24       Q.    Many things were said that were not

25   written down?

Page 106

```
 1      A.    Correct.

 2      Q.    And you don't remember all of them?

 3      A.    I do not, no.

 4      Q.    Now, if you drop down to the

 5   second-to-last paragraph of Mr. Mulrooney's

 6   e-mail, the one that starts "speaking"?

 7      A.    Yes.

 8      Q.    So one thing he says is, "Speaking of

 9   procedures, we're also attaching a draft visual

10   procedure document so we can see how we're

11   generally thinking these mass arbs would work,

12   should P decide to move forward with filing of

13   all claims."

14      A.    Yeah.

15      Q.    Right?

16      A.    Yep.

17      Q.    Then he says, "These are simplified on

18   purpose and would be subject to a more general

19   'New Era arbitration rules' framework that is in

20   the process of being drafted."

21            Right?

22      A.    Yes.

23      Q.    I assume "P" here stands for

24   plaintiffs?

25      A.    I think so.  I don't know what else it
```

Page 107

1    would stand for.

2        Q.    Does it refer to plaintiffs in the

3    Oberstein case that was pending at this time?

4        A.    I highly doubt it.

5        Q.    Well, what does it refer to then?  It

6    says "should P decide to move forward with

7    filing all claims."

8             Which P is it talking about?

9        A.    This is a generalized reference to

10   plaintiffs.  So the idea is I was in the process

11   of drafting mass arbitration rules.  Latham &

12   Watkins had a lot of questions about them.  They

13   weren't complete when we started having these

14   conversations.  I was still working on them.

15            I created a draft visual procedure so

16   generally people could see how I was thinking

17   about this whole process, and I think what Shane

18   is saying is that these visual procedures are if

19   plaintiffs, generally -- not related to

20   Oberstein, but if plaintiffs came along and

21   filed all these claims, this is how we were

22   thinking about it.

23       Q.    The reason I ask is -- I'll just tell

24   you -- my understanding is this is two days

25   after the motion to compel arbitration hearing

Page 108

```
 1   in Oberstein, so I -- but you think this is not

 2   a reference to that case that had an arbitration

 3   hearing two days before, but it was just a

 4   reference to plaintiffs generally?

 5        A.    Not from Shane's side.

 6              I'm sure this was very prevalent on

 7   the minds of Latham & Watkins, but from our

 8   perspective, that wasn't an issue.  We were just

 9   trying to make sure that we could complete the

10   procedures and demonstrate that we could

11   effectively handle this type of case.

12        Q.    I see.  And you mentioned you wrote

13   the mass arbitrations rules; is that right?

14        A.    I took the initial draft, yes, and

15   Rich and Shane -- we all worked on them

16   together.

17        Q.    Did you save that initial draft?

18        A.    I mean, everything we've given to you.

19   The initial draft of the procedures, like, is

20   published.  So when we finished them, we

21   published them.  They haven't been changed --

22   I'm 99 percent sure they haven't been changed

23   since this lawsuit was filed.

24        Q.    Okay.  I'll ask you some more

25   questions about that later.
```

Page 109

```
 1                I just want to clarify something.  So

 2    at the time of this e-mail, you know, May 12,

 3    New Era's mass arbitration procedures were not

 4    finalized?

 5        A.    Correct.

 6        Q.    You were still working on them at the

 7    time that New Era was negotiating the

 8    subscription agreement with Latham & Watkins?

 9        A.    Yes.

10        Q.    And the same is true of New Era's more

11    general arbitration rules framework; that wasn't

12    finished at the time either?

13        A.    No, we had published the -- the

14    expedited and standard arbitration stuff had

15    been published.

16        Q.    Okay.  Well, this e-mail says that,

17    "These are simplified on purpose and would be

18    subject to a more general 'New Era arbitration

19    rules' framework that is in the process of being

20    drafted now."

21                Do you see that?

22        A.    Yes.

23        Q.    So is that not correct, or am I

24    misunderstanding?

25        A.    I think Shane is just being a little
```

Page 110

```
 1   too general.

 2       Q.    So it sounds like he's just wrong if

 3   you said that they were done and published, and

 4   he's saying that they're in the process of being

 5   drafted now?

 6       A.    I think he's just being a little too

 7   general.

 8       Q.    Okay.  So the general rules were done

 9   then, but the mass arb rules weren't?

10       A.    Correct.

11       Q.    And Mr. Mulrooney did not communicate

12   that they were done.  He, instead, said that

13   they were in the process of being drafted?

14       A.    Well, I think what he's referring to

15   is the mass arbitration rules.

16       Q.    But doesn't he say here the more

17   general new arbitration rules framework?

18       A.    Once again, I think he's just being

19   too general.

20       Q.    Maybe not entirely accurate?

21             MS. MUSUMECI:  Objection to form.

22   Asked and answered.

23       Q.    Mr. Williams, do your best to answer

24   it.

25       A.    I think I did.  I think he was just
```

Page 111

```
 1    being too general.  I think he's referring to

 2    the mass arbitration rules and not the general

 3    arbitration rules.

 4         Q.    Okay.  If you flip back to the first

 5    page, you'll see that Ms. Jovais, which I hope

 6    I'm pronouncing correctly, responds to the

 7    e-mail?

 8         A.    Yes.

 9         Q.    And she says, "Thanks again for

10    sending over the contract and the draft visual

11    arbitration rules.  When do you expect to send

12    us the complete written rules, including the

13    mass arbitration rules," right?

14         A.    Yes.

15         Q.    So Latham hadn't seen the complete

16    rules at that point?

17         A.    I'm guessing from her response, no.

18         Q.    If you look at the top e-mail from

19    there, it looks like she responds to an e-mail

20    from you and says, "Thanks, Collin.  It probably

21    makes sense to talk after you've sent us the

22    complete arbitration rules," right?

23         A.    Correct.

24         Q.    They had not been sent by that point

25    either?
```

Page 112

```
 1      A.    Not by May 14, I guess.

 2      Q.    Even though you believed they were

 3   done and published at the time?

 4      A.    I believe, yes.

 5      Q.    Are you positive?

 6      A.    I'm not positive, no.

 7      Q.    Let me ask you this:  Was Latham the

 8   first outside law firm that New Era shared its

 9   general arbitration rules and procedures with?

10      A.    As a customer?

11      Q.    Yes.

12      A.    I'm not entirely sure.  I don't think

13   so.

14      Q.    But you don't know one way or the

15   other?

16      A.    I cannot remember, no.

17      Q.    What about the mass arb rules, I mean,

18   from my read of this e-mail chain, it looks like

19   Latham was probably the first firm that saw

20   them.

21            Is that correct, or was there another

22   firm that saw them first?

23      A.    I can't be entirely certain, and the

24   only reason I say that -- once again, I'm not

25   trying to be combative here -- is because each
```

Page 113

1  of us -- at this stage of the business,

2  particularly with six people, each of us had a

3  hand in selling.  So I'm not entirely sure what

4  conversations Rich might have had, Shane might

5  have had, maybe they send stuff on.  I don't

6  know.  So I can't tell you for sure.

7      Q.    Well, I mean, we talked about how the

8  subject of the e-mail is "New Era Mass Arb

9  Subscription Agreement," right?

10     A.    Yes.

11     Q.    This is obviously a topic that Latham

12 was focused on just based on the name of that

13 e-mail, right?

14     A.    Correct.

15     Q.    They were, if not the first, certainly

16 one of the first to see the mass arbitration

17 rules, right?

18     A.    I think that's fair.

19     Q.    Because the rules were being drafted

20 right now, right?

21     A.    Correct.

22     Q.    And so New Era had an incentive to do

23 a good job on those mass arbitration rules,

24 didn't it?

25     A.    We had an incentive to do good on

Page 114

1    everything we do.

2        Q.    Right.  I mean, you wanted to present

3    rules to Latham that were appealing to Latham,

4    didn't you?

5        A.    We want to present rules that

6    demonstrated that we could handle mass

7    arbitrations efficiently.

8        Q.    Right.  Because if you didn't

9    demonstrate that you could handle mass

10   arbitrations efficiently, you might not land

11   Latham or their client Live Nation?

12       A.    I don't think we would land any

13   clients if we had rules that didn't work

14   efficiently.

15       Q.    Well, you could land clients even if

16   you didn't have mass arbitration rules, couldn't

17   you?

18       A.    Sure.

19       Q.    I mean, you told me earlier that New

20   Era has a mediation platform, right?

21       A.    Yes.

22       Q.    It doesn't have to do with mass

23   arbitration, does it?

24       A.    It does not.

25       Q.    They are other ways New Era could

Page 115

1    market its platform?

2        A.    There are.

3        Q.    But in this e-mail chain, it looks

4    like the focus was on mass arbitration, right?

5        A.    It is, but if you can't do mass

6    arbitrations, you're not really a fulsome ADR

7    platform.

8        Q.    And one of the things New Era does,

9    based on materials we've seen, is it tailors its

10   services to the specific risks faced by a

11   company, right?

12            MS. MUSUMECI:   Objection to form.

13       A.    We tailor the economic model based on

14   the risks that the company demonstrates.

15       Q.    You tailor the subscription

16   agreements, certainly?

17       A.    Yes.  Yes.

18       Q.    And one of those risks here was mass

19   arbitration?

20       A.    Correct.

21            Every subscription agreement is a

22   negotiation between us and the other side.

23       Q.    And here it was negotiated with and

24   one of the goals was to reduce the risk of mass

25   arbitration, right?

Page 116

1       A.    The economic leverage of mass

2    arbitrations.

3       Q.    Right.  And that economic leverage

4    created risks to Live Nation, right?

5       A.    Economic risks, yes.

6       Q.    And the subscription agreement helped

7    ameliorate those, didn't it?

8       A.    It helps to relieve the economic

9    leverage, yes.

10      Q.    I'll use a word we've seen before:

11   The subscription agreement helps mitigate the

12   risk associated with the economic leverage from

13   mass arbitration for Live Nation, right?

14      A.    Yes.

15            That's a long sentence, but that

16   sounds correct.

17      Q.    All right.  I'm going to produce our

18   next exhibit.  So I'm introducing Exhibit 9.

19   It's a document produced by New Era in discovery

20   bearing Bates number NEWERA_000160.

21            (Williams Exhibit 9, E-mail chain

22        Bates-stamped NEWERA_000160 through 165,

23        with attachment, marked for identification,

24        as of this date.)

25            THE WITNESS:  Correct.

Page 117

1    BY MR. SEARS:

2        Q.    And do you recognize this as an e-mail

3    chain involving Mr. Mulrooney, yourself, and the

4    Live Nation litigation team from May 2021?

5        A.    Yes.

6        Q.    And it looks like Mr. Mulrooney is

7    sending some e-mails to Ms. Jovais in

8    anticipation of a call, right?

9        A.    Correct.

10       Q.    Do you remember this call?

11       A.    Not specifically.

12       Q.    Anything you can tell me about it

13   other than what we've already discussed?

14       A.    No.

15       Q.    Okay.  And there's a few attachments

16   here that are materials about New Era, right?

17       A.    Yes.

18       Q.    Okay.  So I'm going to ask you to turn

19   to what I believe is the second attachment.

20             It's called "New Era ADR General Rules

21   and Procedures."

22       A.    Okay.  Yes.

23       Q.    And this is a document that you

24   created?

25       A.    Probably, yes.

Page 118

1     Q.     You at least edited it, right?

2     A.     Yeah.  Sure.

3     Q.     Certainly reviewed it before it went

4  to Latham?

5     A.     Yes.

6     Q.     That's true of all the documents that

7  are attached to this e-mail?

8     A.     I'll have to look at them one by one.

9     Q.     And if you looked under "Deadlines"

10  here, the text is kind of small, but it talks

11  about how "all proceedings at New Era ADR are

12  time-limited with the following as standards."

13          Do you see that?

14     A.     Yes.

15     Q.     And its commercial arbitration is

16  under a hundred days?

17     A.     Yes.

18     Q.     And that's a standard that New Era

19  tries to observe, right?

20     A.     Yeah, it's one that we expect that our

21  arbitrators will attempt to stick to.  It is not

22  a hard and fast line, but we always encourage

23  our arbitrators to try to stay under a hundred

24  days because the intent is that, if you have

25  that as a baseline to begin with, then people

Page 119

1    will act in an expedited manner.

2        Q.    I understand.  So it's not a hard and

3    fast rule, but it's certainly something you

4    encourage the arbitrators to adhere to?

5        A.    Correct.

6        Q.    And it's also -- we've seen it here a

7    lot.  I think we've seen it in other marketing

8    materials.

9             It's part of New Era's pitch, right?

10       A.    Yes.

11            I think the important thing to note is

12   that what we were doing is creating a finish

13   line, and it's our opinion that a lot of

14   litigation drags out and is extensive and takes

15   tons of time and tons money because there is no

16   finish line.

17       Q.    And that's a differentiator between

18   New Era and JAMS, for example?

19       A.    Correct.

20       Q.    And New Era and AAA?

21       A.    Correct.

22       Q.    In your view, it's an advantage to New

23   Era over all what I would call the incumbent

24   arbitration providers, right?

25       A.    Sure.

Page 120

1      Q.     There's also a note here about

2    witnesses.

3             Do you see that?

4      A.     Yes.

5      Q.     And if you read the last sentence

6    there, it says, "The parties are allowed a

7    maximum of two witnesses at a hearing, unless

8    the neutral specially allows additional

9    witnesses."

10            Do you see that?

11     A.     Yes.

12     Q.     That's in New Era's rules?

13     A.     It is.  I believe, yes.

14     Q.     That's one of the ways that New Era

15   helps get these cases done under a hundred days,

16   by eliminating witnesses?

17     A.     Well, the discretion always lies with

18   the arbitrator.

19            So if you look at our rules, the

20   general purpose of this when we were creating

21   the rules, we didn't feel that arbitrators --

22   and this applies, in my humble opinion, to

23   judges as well -- have the ability to run cases

24   the way they want.

25            And at the end of the day, as the

Page 121

1   decider of fact and the person who makes the

2   judgment, we think it's most important that they

3   hear what they believe they need to hear.

4            So there is a lot of discretion given

5   to the arbitrator.  We provide guardrails,

6   unlike AAA and JAMS, where it's very specific.

7   And there are only certain things an arbitrator

8   can do.

9            So what we're saying is, this is what

10  we would like to adhere to, but at the end of

11  the day, we're relying on your experience to

12  actually run this case the way that you think it

13  should be run.

14       Q.    I see.  So, unlike AAA and JAMS, New

15  Era provides guardrails for its arbitrators,

16  right?

17       A.    Yes.

18       Q.    And to try to keep proceedings short

19  and resolved in a hundred days, right?

20       A.    We're trying to make sure everything

21  is efficient.

22       Q.    Right.  To make sure things are

23  resolved with lower costs to companies that get

24  sued, right?

25       A.    And more efficient for all the

Page 122

```
 1   litigants.

 2       Q.    And that's a benefit, in your view,

 3   from New Era compared to these other arbitration

 4   providers?

 5       A.    It is.

 6       Q.    Certainly a difference?

 7       A.    Certainly different, yes.

 8       Q.    Let's look at the next attachment.

 9             This is called "New Era ADR Expedited

10   Digital Arbitration Rules and Procedures."

11             You see that?

12       A.    Yes.

13       Q.    How about this slide, did you prepare

14   this one?

15       A.    I probably did.  At least had input on

16   it, definitely.

17       Q.    And it walks through New Era's ADR

18   process, right?

19       A.    Correct.

20       Q.    It goes through the arbitration

21   process, not the mediation process?

22       A.    Correct.

23       Q.    And if you look kind of till the end,

24   it talks about when final arguments are

25   submitted.
```

Page 123

```
 1                  Do you see that?

 2        A.    Yes.

 3        Q.    One of the things -- well, let me make

 4   sure I understand.

 5              Earlier we were looking at how there's

 6   two witnesses at the hearing, remember that?

 7        A.    Yes.

 8        Q.    But that's the hearing on the merits?

 9   It's the arbitration analogy to a trial that

10   would resolve the case, correct?

11        A.    Correct.

12        Q.    Okay.  And so here, when it says

13   "final arguments are submitted," this is what

14   happens 14 days after the hearing?

15        A.    Yes.

16        Q.    It's analogous to post-trial briefing,

17   though obviously there are differences?

18        A.    Correct.

19        Q.    One of those differences is that,

20   under New Era's rules, final arguments are

21   limited to 15K characters, right?

22        A.    Correct.  Once again, as a guideline.

23        Q.    Right.

24              And "15K," means 15,000, right?

25        A.    Yes.  Yep.
```

Page 124

```
 1        Q.     That's not words, it's characters,

 2   right?

 3        A.     Yes.   That's characters, yes.

 4        Q.     Being an individual letter?

 5        A.     I think.   To be honest with you, Rich

 6   was the one who did a lot of the characters

 7   should be X and the characters should be Y.

 8        Q.     But, to the best of your

 9   understanding, that means like an individual

10   letter or an exclamation point.  It doesn't mean

11   a word?

12        A.     That -- yeah, to the best of my

13   understanding.  That may be a misprint on this,

14   but I'm not -- I don't know.

15        Q.     I mean, do you know how many words 15K

16   characters is?

17        A.     Well, that's why I'm thinking 15,000

18   characters seems extraordinarily small.  So...

19        Q.     I'll tell you I Googled it, and Google

20   tells me it's between 2,142 words and 3,750

21   words.

22               Does that sound about right?

23        A.     I have no idea.  If you Googled it, I

24   don't deny Google's capability of figuring out

25   how much that is.
```

Page 125

1      Q.    I mean, it certainly seems

2   extraordinarily small, by any metric, for a

3   post-trial argument?

4      A.    That does seem small, yes.

5      Q.    Tell me, what does it mean when it

6   seems small?  It seems, like, less you would get

7   in other forums?  Less than what you would

8   consider in New Era?

9            MS. MUSUMECI:  Objection to the form

10       of the question, but you can answer.

11     A.    Yeah, I mean, it seems small.  Coming

12  from a litigation background, you know, there

13  was times where we would submit 45-page final

14  briefs, 50-page final briefs.  So it seems small

15  in comparison to that.

16     Q.    I mean, it's not a lot of space for

17  final arguments, is it?

18     A.    It is not.

19     Q.    Especially in an antitrust case,

20  right?

21     A.    Yes, but once again, this is -- number

22  one, I will say I'm not sure characters is

23  correct.  Number two, it's a guideline.  It's

24  not a mandate.

25            So, in an antitrust case, I would

Page 126

 1    assume that a skilled arbitrator who's done lots

 2    of antitrust cases would say you need to submit

 3    a 40-page brief because, otherwise, I'm not

 4    going to understand it.

 5         Q.    I mean, I'll just -- we're going to

 6    look at them later.  I just went on your website

 7    to make sure.

 8              It does say that final argument briefs

 9    shall not exceed 15K characters.

10         A.    Sure.

11         Q.    To the best of your knowledge, is that

12    correct?

13         A.    Once again, it's a guideline.

14         Q.    Okay.  And you think it may actually

15    be more in practice or that may be a mistype?

16         A.    Well, I think that -- I think the

17    arbitrator has discretion to allow anything that

18    they want.

19         Q.    Okay.  We'll look at the actual rules

20    later and we'll talk about it a little more

21    then.

22              You did mention arbitrators was

23    antitrust experience, and let me ask you, did

24    you do any antitrust litigation when you were in

25    private practice?

Page 127

1      A.    I did not.

2      Q.    Do you have a familiarity with it?

3      A.    I do.

4      Q.    How did you develop that?

5      A.    I actually took antitrust in law

6   school.

7      Q.    Me too.

8            Do New Era's arbitrators, do they have

9   anyone that's specialized in the antitrust

10  litigation?

11     A.    I would have to look.  I know we have

12  people who have done antitrust, but we have 46

13  signed ICAs and access to hundreds more.  So,

14  off the top of my head, I can't tell you who

15  they are and what their experience is.

16           I also would just like to note:  This

17  is expedited digital arbitration, not standard.

18  Everything can be converted to standard, but

19  once again, these are guidelines.

20           Antitrust, we certainly have

21  arbitrators with antitrust experience.

22     Q.    Okay.

23     A.    But I'm not going to challenge you.

24  You're an antitrust lawyer, so I'm not going to

25  tell you that I know a bunch about antitrust

Page 128

1    compared to you.

2         Q.   Oh, no.  I wasn't trying to create an

3    awkward silence.  I'm second chair.  There's a

4    little bit of a lag here, so just bear with me.

5              I'm going to introduce our next

6    exhibit.  I'm introducing a document produced by

7    New Era.  It's bearing Bates number

8    NEWERA_001985.

9         A.   Yes.

10             (Williams Exhibit 10, Document titled

11        "New Era ADR Mass Arbitration Risk

12        Mitigation," Bates-stamped NEWERA_001985,

13        marked for identification, as of this date.)

14   BY MR. SEARS:

15        Q.   Okay.  Now, I will just represent to

16   you I believe this is actually part of the

17   family of the prior document, and if you look at

18   the prior e-mail, you will see that the fourth

19   attachment is a mass arbitration one-pager.

20             Does that sound right to you?

21        A.   Sure.  Yes.

22             MS. MUSUMECI:  I'm sorry.  It's

23        loading slowly.  Apologies.

24             MR. SEARS:  Yeah.  Sure.

25             MS. MUSUMECI:  Okay.  I'm fine.  Thank

Page 129

1        you.

2    BY MR. SEARS:

3        Q.    Now, do you see this is a document

4    entitled "New Era ADR Mass Arbitration Risk

5    Mitigation"?

6        A.    Yes.

7        Q.    Did you prepare this one?

8        A.    I did not.

9        Q.    Who did?

10        A.    I believe Shane created this.

11        Q.    Did you edit it?

12        A.    I don't even know if I edited it, but

13    I certainly saw it and looked over it.

14        Q.    I'll tell you my understanding is we

15    have gotten multiple versions of this document.

16            Is it something that went through a

17    series of edits?

18        A.    I don't know.  Shane created this

19    thing.  I would assume he iterated on it, but I

20    don't know for certain.

21        Q.    And if you look back at the e-mail,

22    you will see that Mr. Mulrooney describes it as

23    a marketing document?

24        A.    Uh-huh.

25        Q.    It also says, "It looks substantive,

Page 130

1    but we thought we would share it as part of this

2    package," right?

3         A.    Yes.

4         Q.    So you're sending it to Latham for

5    marketing purposes, right?

6         A.    Yes.

7         Q.    This is a document that New Era sends

8    to law firms or potential clients to show some

9    of the things New Era can do?

10        A.    Yes.

11        Q.    And one of the things New Era can do

12   is that it can provide mass arbitration risk

13   mitigation, right?

14        A.    Yes.  With respect to the economic

15   leverage.

16        Q.    That's what it says here, right?

17        A.    Yep.

18        Q.    And maybe I missed it.  I don't think

19   it says "economic leverage."

20              Do you see that language somewhere?

21        A.    No, but if you look at the actual

22   diagrams, that's exactly what it demonstrates.

23        Q.    Let me ask you this:  You have used

24   the phrase "economic leverage" a few times

25   during the deposition.

Page 131

1              Are there any documents in which New

2    Era actually uses that term?

3        A.    I'm using that phrase.

4        Q.    Okay.  But it's not something that New

5    Era ever put in its marketing materials, as far

6    as you know?

7        A.    Not that I recall.  It's exactly what

8    this demonstrates.

9        Q.    But is it a phrase that you started

10   using recently?  I mean, is it something that

11   just entered the New Era vernacular?  I'm just

12   asking because you keep using it, and I'm not

13   seeing it in the documents.

14            MS. MUSUMECI:  Objection to the form

15       of the question.

16       A.    It's my explanation for what all this

17   stuff demonstrates.  So it's not a New Era term.

18   It's one that I'm using as a 30(b)(6).

19       Q.    Okay.  So, going back to this

20   document, I mean, one of the things it's

21   communicating is how New Era's rules and

22   procedures can mitigate the risks that are

23   associated with mass arbitration, right?

24       A.    Where does it say that?

25       Q.    Well, it talks about -- it's called

Page 132

1    "New Era ADR Mass Arbitration Risk Mitigation,"

2    right?  Talked about that?

3         A.    Yes.  I don't see any reference to our

4    rules, though.

5         Q.    Oh, well, then it goes down and says,

6    "How does New Era ADR address mass

7    arbitrations?"

8              Do you see that?

9         A.    I do.

10        Q.    And then it talks about how New Era

11   uses a subscription approach to make mass

12   arbitrations affordable.

13             Do you see that?

14        A.    I do.

15        Q.    So is what this is communicating that

16   New Era's subscription solution addresses the

17   risk of mass arbitration?

18        A.    Just with respect to the economic

19   leverage.

20             If you see:  What should the goal in

21   any mass arbitration be?  As with litigation,

22   the goal should be that both parties, all

23   litigants, have an opportunity to be heard.

24             It's always been my experience that

25   any client I had wanted to be heard.  So one of

Page 133

1    our biggest concerns is that, when a client

2    isn't heard, they don't feel like they actually

3    got the resolution that they want out of

4    litigation.

5         Q.    Right.  So you agree it's important

6    for both sides to be heard, right?

7         A.    I do.

8         Q.    Plaintiffs and defendants?

9         A.    Yes.

10        Q.    And being heard, I mean, it's not just

11   a pro forma thing.  It requires having a

12   meaningful opportunity to present your case,

13   doesn't it?

14        A.    It does.

15        Q.    Do you think someone can have a

16   meaningful opportunity to be heard if final

17   arguments are limited to 15,000 characters?

18        A.    They're not limited to 15,000

19   characters.  It's a guideline.

20        Q.    Okay.  If an arbitrator were to follow

21   those guidelines and say, I'm limiting final

22   arguments to 15,000 words, would you consider

23   that enough of an opportunity for either side to

24   be heard?

25        A.    I don't think that imposing an

Page 134

```
 1    arbitrary 15,000 characters is enough or it's

 2    too little makes any sense.

 3         Q.    Well, let me try and be more specific.

 4              For an antitrust case like this one

 5    that challenges a decade of alleged

 6    anti-competitive conduct, do you believe that a

 7    final argument limited to 15,000 characters

 8    would be sufficient for either side to be heard?

 9              MS. MUSUMECI:  Objection to the form.

10         A.    I really don't know.

11         Q.    You can't tell me whether it's

12    sufficient or not to be heard sitting here

13    today?

14         A.    I can't.  I just explained I'm not an

15    antitrust lawyer.

16         Q.    Okay.  So, going back to this

17    document, what you were telling me was that it's

18    not so much New Era's rules and procedures that

19    mitigate the mass arbitration risk, it's the

20    subscription agreements; is that accurate?

21         A.    I think it's a combination of

22    everything that we do that makes it a more

23    efficient process.

24              So you're talking about mitigating the

25    mass arbitration risk.  We don't mitigate mass
```

Page 135

1    arbitrations.  The only thing we mitigate is the

2    economic leverage that's currently associated

3    with them.

4         Q.    What I'm trying to get at is what is

5    it about New Era that does that?  Because

6    before, if you recall, I asked you if New Era's

7    rules and procedures did that, and I think you

8    told me you didn't see that in the document.

9              So is it the subscription agreement,

10   is it the rules and procedures, or some

11   combination of them?

12        A.    I think it's a combination of all of

13   them, but certainly the pricing is what reduces

14   the economic leverage.

15        Q.    Which rules and procedures reduce the

16   risk of mass arbitration?

17        A.    I don't know that they -- I'm not

18   saying that they reduce the risk of mass

19   arbitration.  I think our rules make mass

20   arbitrations more efficient.

21        Q.    Which rules address mass arbitrations

22   and make them more efficient, in your view?

23        A.    We have an entire set of mass

24   arbitration rules.

25        Q.    Okay.  So it's that section of the

Page 136

1   rules.  That's just what I'm getting at here.

2   I'm trying to figure out what you're referring

3   to when you talk about New Era.

4            So it's the mass arbitration --

5            Go ahead.

6        A.   I was going to say, I just need to be

7   clear.  We're talking about this particular

8   document that does not refer to the rules and

9   procedures.

10       Q.   You would agree that, overall, the

11  combination of factors that you mentioned -- the

12  specific mass arbitration rules and procedures,

13  the possibility of subscription pricing -- that

14  does mitigate the risk of mass arbitrations?

15       A.   I think that everything we present

16  makes litigation more efficient and more

17  affordable for all the litigants involved.

18       Q.   And one of the ways it does that is by

19  mitigating the risk of mass arbitrations, right?

20       A.   I'm not going to agree with that.

21  Because you keep saying mitigating the risk of

22  mass arbitrations in general.

23            The only thing we do is mitigate the

24  risk of the economic leverage that's currently

25  associated with mass arbitrations.

Page 137

```
1        Q.     And that is one of New Era's selling

2   points, that it mitigates the risks of economic

3   leverage associated with mass arbitrations?

4        A.     Absolutely.  It makes everything more

5   affordable and more efficient for all the

6   parties involved.

7        Q.     That's why New Era puts it in

8   marketing documents like this?

9        A.     Absolutely.

10       Q.     It's a differentiator between New Era

11  and JAMS?

12       A.     Absolutely.

13       Q.     And it's a big draw for companies

14  worried a mass arbitration, isn't it?

15       A.     You would have to ask the companies.

16       Q.     Well, you landed Live Nation as a

17  client based, in part, on addressing mass

18  arbitration, didn't you?

19       A.     We did.

20              MS. MUSUMECI:  Objection to the form.

21       A.     We did, and I know you're deposing

22  them in a couple of days, so they can certainly

23  answer that question.

24       Q.     But from your perspective, I mean,

25  just based on the e-mails we've seen, they had
```

Page 138

```
 1    e-mail headers about mass arbitration, didn't
 2    they?
 3        A.    Yes.
 4        Q.    And you sent them marketing documents
 5    about mass arbitration risk mitigation, right?
 6        A.    Yes.
 7        Q.    Because New Era knew that was a
 8    concern for Live Nation?
 9        A.    Yes.
10        Q.    And New Era believed it could address
11    that concern?
12        A.    We believed we could definitely
13    address the economic leverage associated with
14    mass arbitrations.
15        Q.    And that other arbitration providers
16    could not?
17        A.    I certainly think they can, but they
18    don't seem inclined to.
19        Q.    I understand.  I shouldn't have used
20    the word "can."
21              Their rules currently don't do that?
22        A.    Correct.
23        Q.    New Era's the only one?
24        A.    I actually believe -- and I don't want
25    to speak for other organizations -- that there
```

Page 139

1    are other organizations that have now come out

2    with -- and I don't know if it's AAA or JAMS --

3    there are other organizations that have now come

4    out with their own mass arbitration procedures.

5        Q.    But do you believe New Era's are more

6    effective?

7        A.    Of course I think we're the most

8    effective.

9        Q.    I mean, let's be real.  That's one of

10   the reasons that New Era got Live Nation as a

11   client:  Because of its mass arbitration risk

12   mitigation?

13           MS. MUSUMECI:  Objection to the form.

14       A.    I think -- I think certainly that Live

15   Nation was concerned about the economic

16   leverage.  I also like to believe -- and once

17   again, this is a question better posed to

18   them -- that they're interested in a

19   technology-forward young company that was

20   thinking about litigation in a different way.

21       Q.    Is that something that they told you?

22       A.    Not specifically, no.

23       Q.    Okay.

24           MS. MUSUMECI:  Will, it's fine to keep

25       going, but we're coming up on about an hour.

Page 140

1       So I just want to check in to see if we are

2       going to be taking another break in the next

3       10 or 15 minutes.

4              MR. SEARS:  Mr. Williams, how are you

5       doing?  I'm fine to take a break now, if you

6       want to take one.  We can do a couple more

7       docs, whatever you want.

8              THE WITNESS:  Let's do a couple more

9       docs.  I'm good.  Maybe, I don't know, 11:30

10      or so?  I can check in on the dogs and make

11      sure they haven't killed each other.

12             MR. SEARS:  The dogs are the second

13      most important here.

14             THE WITNESS:  Yeah, I don't know, my

15      wife is questioning the decision of the

16      second dog, so...

17             MR. SEARS:  All right.  I'm

18      introducing as our next exhibit a document

19      bearing Bates number NEWERA_000239.

20             (Williams Exhibit 11, E-mail chain

21      Bates-stamped NEWERA_000239, marked for

22      identification, as of this date.)

23             THE WITNESS:  This is Tab 14?

24   BY MR. SEARS:

25      Q.    Yep.

Page 141

1       A.      Okay.  Yes.

2       Q.      This is another one with you and Ms.

3   Birkeland?

4       A.      Correct.

5       Q.      You say, "We just did a deal with some

6   of your team out of DC and San Fran.  They were,

7   and are, awesome."

8       A.      Yes.

9       Q.      And that's the Live Nation litigation

10  team we just talked about?

11      A.      Correct.

12      Q.      And that includes some of the lawyers

13  that are representing Live Nation in this case?

14      A.      Once again, I don't know, but that --

15  this absolutely refers to the team that did the

16  negotiation with us.

17      Q.      And it could also refer to -- I mean,

18  those are lawyers that could conceivably

19  represent them in proceedings before New Era,

20  right?

21      A.      It could, yeah.  Sure.

22      Q.      I mean, if a consumer was litigating

23  against Live Nation before a New Era arbitrator,

24  do you think they would be comfortable knowing

25  that New Era's founder had called the lawyers

Page 142

1    "awesome"?

2        A.    Yeah, I think they would.  Will, you

3    seem like a nice guy to me.  I have nothing

4    against you.  So, to me, this is -- do I think

5    that they're good, honest people?  That was

6    definitely my impression of them.  Cathy's a

7    friend.  I was colloquial in this statement.

8            Does it mean that we are biased in any

9    way towards them?  Absolutely not.  No chance.

10       Q.    Well, first of all, it's very nice of

11   you to say, but flattery will get you nowhere,

12   Mr. Williams.

13       A.    I get it.  I'm just trying to say,

14   like, look, I take everything in two tranches,

15   which is professional and personal.

16           On a personal level, I thought they

17   were very pleasant people.  I could be wrong,

18   they could be terrible, but the reality is, does

19   that influence how I treat them professionally?

20   Absolutely not.

21       Q.    I understand.

22           Do you see how it could give rise to

23   concerns about an appearance of bias, even if

24   you firmly believe -- and I hear that you do --

25   that there's no bias here?

Page 143

```
 1        A.     I can see that, but I think it also

 2   has to be taken into context that Cathy and I

 3   are good friends, so...

 4        Q.     I understand, but you do see that

 5   there could be an appearance of bias if there

 6   was a consumer litigating against Live Nation,

 7   and they learned that the founder had called the

 8   lawyers representing the other side "awesome"?

 9        A.     Yes.

10        Q.     Okay.  Mark our next document.

11        A.     I also -- but I do think it's also

12   important to note we're the platform.  We're not

13   making decisions about anything.  The arbitrator

14   is the one making decisions.

15        Q.     We'll talk about this a little more

16   later, but those arbitrators, they're retained

17   by New Era, they sign agreements with New Era,

18   right?

19        A.     They are not retained by New Era.

20   They're independent contractors.  We have ICAs

21   with some of them, they're not employees, and

22   they're not retained.

23        Q.     I see.  Let me ask you this:  They get

24   paid for their work with New Era, right?

25        A.     Yes.
```

Page 144

1        Q.     And does that money come from New Era?

2        A.     No.  Now, we do -- the money comes in

3   the door, right?  And we do handle payments to

4   them, but it is not New Era paying.  It's

5   essentially a passthrough.

6        Q.     I understand, but they get a 1099, I

7   guess?

8        A.     Yes.  They probably would, yes.

9        Q.     They get a 1099 from New Era?

10       A.     You had to bring up taxes.

11              Yeah, I mean, I believe they would.

12   I'm definitely no tax expert.

13       Q.     Understood, but the entity that's

14   cutting the paycheck is New Era, even though the

15   money is coming in the door from somewhere else?

16       A.     Correct.  Correct.

17       Q.     And New Era has the discretion whether

18   it's going to use them.  I mean, if they had a

19   really bad experience with an arbitrator, it

20   could stop including them on its roster, right?

21       A.     Absolutely.

22       Q.     Okay.  So I'm going to mark our next

23   exhibit.  It's a document bearing Bates number

24   NEWERA_000327.

25              Let me know when you have it.

Page 145

```
 1              (Williams Exhibit 12, E-mail chain

 2         Bates-stamped NEWERA_000327 through 328,

 3         marked for identification, as of this date.)

 4              THE WITNESS:  Okay.

 5  BY MR. SEARS:

 6     Q.    Okay.  So this is an e-mail dated June

 7  21, 2021 from Mr. Mulrooney, and it's the same

 8  cast of characters we've seen before, Live

 9  Nation litigation team and New Era, right?

10     A.    Yes.

11     Q.    And you're on this e-mail too?

12     A.    Yes.

13     Q.    This is about the Live Nation

14  contract, the subscription agreement?

15     A.    Correct.

16     Q.    And in the top e-mail, Mr. Mulrooney

17  says, on June 21, "Just wanted to let you know

18  that we published our New Era ADR Rules and

19  Procedures on our website -- you can find them

20  here:  Rules and Procedures," right?

21     A.    Yes.

22     Q.    Is this the first time that New Era

23  published them on its website?

24     A.    I don't recall.

25     Q.    I'm just asking, before you seemed to
```

Page 146

1    think --

2        A.    Yeah.

3        Q.    -- the rules were done in May, but

4    this e-mail, doesn't it seem to suggest that

5    they weren't published until June?

6        A.    Yeah, I completely get what you're

7    saying, and I'm not entirely sure.

8              Shane could be -- this absolutely

9    could be right.  They could have been published

10   for the first time in June.  I just don't

11   recall.

12       Q.    You are the 30(b)(6) witness on the

13   rules and procedures, right?

14       A.    I am.

15       Q.    But you didn't review documents or in

16   your prep encounter anything that told you when

17   they were actually published?

18       A.    Not that I recall.

19       Q.    Now, June 21, 2021, is also the day

20   the subscription agreement was executed, right?

21       A.    That sounds correct, yes.

22       Q.    We'll look at it later.  It's not a

23   trick question, but that sounds about right to

24   you?

25       A.    That sounds about right, yes.

Page 147

1        Q.      So, based on this e-mail, the

2    subscription agreement was signed the same day

3    that New Era published its ADR rules and

4    procedures.  I mean; is that right?

5        A.      That could be correct, yes.

6        Q.      So the rules were potentially

7    finalized and published literally the same day

8    the Live Nation contract was signed?

9        A.      Possibly.

10       Q.      I mean, is that a coincidence?

11       A.      I don't know that it's a coincidence.

12   I don't know that it's not a coincidence.

13       Q.      It seems like they're potentially

14   related, right?  That the day New Era signed its

15   first subscription agreement was also the day

16   that it published its rules?

17               MS. MUSUMECI:  Objection to the form.

18       A.      I mean, I get what you're getting at.

19               We did not publish rules and

20   procedures to satisfy Live Nation or Latham &

21   Watkins.  That did not occur.

22       Q.      That wasn't my question.  I'm asking:

23   There was some kind of relation between the two,

24   right?  I mean, it seems unlikely that it is a

25   coincidence that the rules were published the

Page 148

1    same day the contract was signed?

2         A.    I don't -- I don't know.

3         Q.    You just don't know one way or

4    another?

5         A.    I don't know one way or the other, no.

6         Q.    It's possible the two events were

7    related?

8         A.    It's possible.

9         Q.    It's possible that New Era's decision

10   to publish its rules and procedures on June 21

11   was related to the fact that New Era signed the

12   subscription agreement with Live Nation the same

13   day?

14        A.    It's possible.

15             MR. SEARS:   Okay.   Now is a good time

16        for a break.

17             Let's go off the record.

18             (Recess; Time Noted:  11:25 a.m.)

19             (Time Noted:  11:35 a.m.)

20   BY MR. SEARS:

21        Q.    All right.   Mr. Williams, are you

22   ready to resume your deposition?

23        A.    I am.

24        Q.    Great.

25             MR. SEARS:   I'm sorry.   Can we just go

Page 149

 1      off the record for one second?

 2              (Pause in the proceedings.)

 3   BY MR. SEARS:

 4      Q.    Mr. Williams, did you talk to anyone

 5   on the break?

 6      A.    Just Sandy.

 7      Q.    Okay.  I'm going to introduce our next

 8   exhibit.  This is a document produced by New Era

 9   bearing Bates number NEWERA_000241.

10              (Williams Exhibit 13, E-mail chain

11         Bates-stamped NEWERA_000241 through 242,

12         marked for identification, as of this date.)

13              THE WITNESS:  Got it.

14   BY MR. SEARS:

15      Q.    All right.  So this is an e-mail --

16   another e-mail from Mr. Mulrooney in the

17   Latham/Live Nation team?

18      A.    Yes.

19      Q.    It's dated June 29, so eight days

20   after they signed the subscription agreement?

21      A.    Correct.

22      Q.    And one of the things that Mr.

23   Mulrooney says is, "We wanted to follow up here

24   now that the Live Nation contract is signed to

25   see if we could continue the conversation in

Page 150

1    regards to some of the other clients you have

2    mentioned that would be interested in the same

3    type of contract."

4             See that?

5        A.    I do.

6        Q.    He says, "I believe, for example,

7    Andrew mentioned another consumer-facing company

8    client of his."

9             See that?

10       A.    I do.

11       Q.    Do you have an understanding of what

12   he means by "consumer-facing company client"

13   here?

14       A.    Yeah, I mean, I think it's basically a

15   B to C company.

16       Q.    What do you mean by that?

17       A.    A business to consumer.

18       Q.    I see.

19             Live Nation is a B to C company,

20   right?

21       A.    Correct.

22       Q.    Okay.  And why would a consumer-facing

23   company be interested in the same type of

24   contract as Live Nation?

25       A.    Because consumer-facing companies tend

Page 151

1    to face -- it feels like tend to face more

2    voluminous litigation.

3         Q.    And they also face mass arbitration

4    risk, right?

5         A.    Potentially.

6               He mentions one that doesn't seem to

7    face that risk.

8         Q.    In general, consumer-facing companies

9    can be the -- can face a larger risk of mass

10   arbitration than other types of companies?

11        A.    Possibly.

12        Q.    And that's one of the reasons they

13   might be interested in New Era, right?

14        A.    Possibly.

15        Q.    Because, as we've discussed, New Era's

16   rules and its subscription pricing can mitigate

17   the risk associated with mass arbitration?

18        A.    Just the economic leverage.

19        Q.    The risk created by the economic

20   leverage associated with mass arbitration?

21        A.    Correct.

22        Q.    And then I think you mentioned this,

23   but Andrew Prins at Latham responds, right?

24        A.    Yes.

25        Q.    He says he has two clients that may be

Page 152

1    interested, right?

2        A.    Yes.

3        Q.    One with very low risk of mass arbs

4    and one with a greater risk of mass arbs, right?

5        A.    Yes.

6        Q.    Why would a company with a greater

7    risk of mass arb be interested in New Era?

8        A.    Because if you have a greater risk of

9    mass aves, you're more susceptible to the

10   economic leverage.

11       Q.    Which is what New Era can help

12   address?

13       A.    Yes.  Our pricing model addresses it,

14   yes.

15       Q.    Unlike incumbent ADR providers like

16   JAMS?

17       A.    Correct.

18       Q.    That's one of the ways New Era markets

19   itself, right?

20       A.    Yes.

21       Q.    To law firms like Latham?

22       A.    Yes.

23       Q.    And to companies like Live Nation?

24       A.    Yes.

25       Q.    I'm going to introduce our next

Page 153

1    exhibit.  It's a document produced by New Era in

2    discovery bearing Bates number NEWERA_000004.

3              (Williams Exhibit 14, E-mail chain

4         Bates-stamped NEWERA_000004 through 7,

5         marked for identification, as of this date.)

6    BY MR. SEARS:

7         Q.    See that?

8         A.    Yes.

9         Q.    Now, this is another e-mail that

10   you're on, right?

11        A.    Correct.

12        Q.    And this involves Kim Tobias at Live

13   Nation, right?

14        A.    Yes.

15        Q.    And do you know what her position is?

16        A.    I don't recall it specifically.  I

17   think assistant general counsel or something to

18   that effect.

19        Q.    She's an in-house lawyer there, right?

20        A.    Yes.

21        Q.    She does litigation work?

22        A.    I believe that's correct, yeah.

23        Q.    Now, this is from July 15, 2021,

24   right?

25        A.    Yes.

Page 154

```
 1        Q.    Is this the first time you were
 2   introduced to Ms. Tobias?
 3        A.    It's the first time that I recall,
 4   yes.
 5        Q.    And if you skip to the back of -- or,
 6   the last e-mail here, there's discussion about
 7   scheduling an intro call, right?
 8        A.    Yes.
 9        Q.    And so that intro call, that's the
10   first time you ever talked to Ms. Tobias?
11        A.    Yes.
12        Q.    Is it the first time you talked to
13   anyone in-house or business side at Live Nation?
14        A.    Yes.
15        Q.    Prior to that, all the discussions
16   were with Latham & Watkins?
17        A.    Correct.
18        Q.    And they were over Zoom?
19        A.    Yes.
20        Q.    You don't remember everything that was
21   said?
22        A.    Not everything that was said, no.
23        Q.    And the way this e-mail starts is that
24   Mr. Mulrooney reaches out and he says, "I wanted
25   to reach out to introduce myself and the rest of
```

Page 155

1    the founding team of New Era ADR," right?

2         A.    Yes.

3         Q.    And in the next paragraph, he says,

4    "First, we are obviously very excited to have

5    Live Nation onboard as a customer, and we look

6    forward to working with you," right?

7         A.    Correct.

8         Q.    That was true; New Era was very

9    excited to have Live Nation onboard as a

10   customer, wasn't it?

11        A.    We're excited about every customer

12   that comes onboard.

13        Q.    Including Live Nation?

14        A.    Yes.

15        Q.    And we discussed this was a big one

16   because this was the first subscription

17   agreement?

18        A.    Yes.

19        Q.    And this was a major new revenue

20   stream that, in a way, validated the

21   subscription pricing model because no one had

22   ever done it before, right?

23             MS. MUSUMECI:  Objection to form.

24        A.    It was a new subscription client, and

25   it was revenue and that was important to us.

Page 156

1     Q.    Let me ask you this:  Are you aware of

2   other ADR providers before New Era doing

3   subscription pricing?

4     A.    No.

5     Q.    So, as far as you know, this was not

6   just New Era's first subscription contract; it

7   was the first subscription ADR contract ever?

8     A.    As far as I know.  I mean, I don't

9   have any idea if that's actually true, but as

10  far as I know, yes.

11    Q.    But when you worked on this contract,

12  which we'll look at in a little bit, it wasn't

13  like there was some template or some prototype;

14  this was new for New Era, right?

15    A.    Yes.

16    Q.    And as far as you know, it was new for

17  arbitration?

18    A.    As far as I know, yes.

19    Q.    And that was a selling point for New

20  Era?  A way to differentiate itself from every

21  other ADR provider?

22    A.    Yes.

23    Q.    And so if you go back to the top of

24  this e-mail, you know, one of the things Mr. Lee

25  says is, "All of us thoroughly enjoyed meeting

Page 157

1    you," do you see that?

2         A.    I do.

3         Q.    And that's directed to Ms. Tobias?

4         A.    Correct.

5         Q.    And was this an in-person meeting or

6    Zoom?

7         A.    Zoom.

8         Q.    And how long was it?

9         A.    It was not very long.  I want to say

10   maybe 30 minutes.

11        Q.    And what was discussed?

12        A.    The primary purpose of it was to talk

13   about logistics if cases came through and how

14   they would be handled.  A really important part

15   of it was making sure they had the correct

16   e-mail address and how that would all function

17   as it got passed through the system if somebody

18   filed a case.

19        Q.    Was mass arbitration discussed?

20        A.    Not that I recall, no.

21        Q.    Was any current or impending

22   litigation against Live Nation discussed, like

23   specific lawsuits?

24        A.    Not that I recall, no.

25        Q.    I just want to be clear:  Is it

Page 158

1    possible it was discussed and you don't

2    remember, or you don't think it was?

3         A.    I really don't recall any pending

4    litigation being discussed.

5         Q.    How is your recollection of the call?

6    I mean, is it possible it was discussed and you

7    forgot?

8         A.    I feel like I recall this call pretty

9    well because it was really more of a:  Hello.

10   Nice to meet you.  This is our team and this is

11   when we need you to implement to make sure we

12   can run cases.

13        Q.    Okay.  You can put that one aside.

14   I'm going to introduce our next exhibit.

15            I'm introducing as our next exhibit a

16   document produced by New Era bearing Bates

17   number NEWERA_000122.

18            (Williams Exhibit 15, E-mail chain

19        Bates-stamped NEWERA_000122 through 124,

20        marked for identification, as of this date.)

21            THE WITNESS:  Yep.

22   BY MR. SEARS:

23        Q.    So this is from July 14, right?

24        A.    Yes.

25        Q.    This is another e-mail with Ms. Tobias

Page 159

1    about a call?

2         A.    Yes.

3         Q.    And is this the same call that we just

4    talked about?

5         A.    It could be.  I'll be honest with you,

6    I only recall ever being on one phone call with

7    Kim Tobias.

8               So that's not to say that there wasn't

9    another call that maybe Shane had with her, but

10   I've only been on one call with Kim.

11        Q.    That's really what I'm getting at with

12   these questions.

13              You've only been on one call with her?

14        A.    Yes.

15        Q.    It's possible Shane was an another

16   one?

17        A.    It's possible.

18        Q.    Ballpark, how many calls did New Era

19   have with Live Nation directly?

20        A.    I think only one.  I can't imagine

21   more than two.

22        Q.    Okay.  The vast majority of the

23   communications went through Latham?

24        A.    Yes.

25        Q.    And were over Zoom?

Page 160

```
 1      A.    Yes.

 2      Q.    I'm going to introduce our next

 3   exhibit.

 4            This is a document produced by New Era

 5   in discovery bearing Bates number NEWERA_000593.

 6            Let me know when you have it.

 7            (Williams Exhibit 16, E-mail chain

 8      bearing Bates-stamps NEWERA_000593 through

 9      594, marked for identification, as of this

10      date.)

11            THE WITNESS:  I do.

12   BY MR. SEARS:

13      Q.    So this is from August 18, 2021, and

14   this is an e-mail involving Mr. Lee, yourself,

15   Ms. Mulrooney, and someone named Elizabeth

16   Deeley, right?

17      A.    Correct.

18      Q.    Who is Ms. Deeley?

19      A.    She's another partner at Latham.

20      Q.    She's pretty senior, right?

21      A.    I have no idea.

22      Q.    I mean, I looked her up, and it looks

23   like she's the Global Vice Chair of the Complex

24   Commercial Litigation Practice.

25            Does that sound right?
```

Page 161

```
 1      A.     I have no idea.

 2      Q.     It sounds like a fairly senior

 3   position?

 4      A.     That would sound like a senior

 5   position, but I don't -- I don't know anything

 6   about her resume.

 7      Q.     And basically, it looks like what

 8   happened here is, about six weeks after signing

 9   a subscription agreement, Live Nation's counsel

10   at Latham introduced New Era to Ms. Deeley?

11      A.     Yes.

12      Q.     And Mr. Lee says, "We would love to

13   share more and discuss your clients' needs"?

14      A.     Yep.

15      Q.     Meaning their arbitration-related

16   needs, right?

17      A.     Arbitration/mediation, I would guess,

18   yes.

19      Q.     As we've talked about, you know, I

20   know you don't know their whole client roster,

21   but Latham tends to represent big companies.

22   They don't do a lot of plaintiffs' side class

23   action with consumers, as far as you know?

24      A.     As far as I know.

25      Q.     So when you're talking about Latham's
```

Page 162

1    clients' needs, you're really talking about the

2    needs of companies like Live Nation?

3         A.    I don't have any idea what clients are

4    being talked about here.

5         Q.    Well, I mean, you're the 30(b)(6) on

6    communications with Latham, aren't you?

7         A.    Yep, and I can tell you about this

8    call.

9         Q.    Okay.  Well, we'll get there in a

10   second, but I'm just focused on the language

11   here, "Discuss your clients' needs."

12              I mean, that's referring to Latham's

13   roster of clients, which tend to be businesses,

14   right?  It's fairly uncontroversial?

15        A.    Yes.

16              Sorry.

17              MS. MUSUMECI:  Objection.  Just I have

18        an objection to the form.  That was

19        compound, but go ahead.

20              MR. SEARS:  Compound?

21   BY MR. SEARS:

22        Q.    And one of the things that you were

23   hoping for here is that Latham would refer you

24   more clients like Live Nation, right?

25        A.    Sure.

Page 163

1       Q.      Because that would be good for New

2    Era?

3       A.      Absolutely, it would.

4       Q.      More clients means more revenue?

5       A.      You got it.

6       Q.      Potentially more subscription

7    agreements?

8       A.      Sure.

9       Q.      You certainly wouldn't want to do

10   anything to burn the bridge with Latham, would

11   you?

12      A.      Look, our relationship with Latham was

13   professional, so I don't know what we would do

14   to burn a bridge.  I don't want to burn a bridge

15   with anybody.

16      Q.      And certainly not Latham & Watkins,

17   that represented Live Nation which was New Era's

18   first subscription agreement client?

19      A.      Certainly not anybody.

20      Q.      Right.

21              Because you were hoping that Latham

22   would do the opposite:  They would refer New Era

23   more clients, right?

24      A.      Yes.

25      Q.      If New Era had a bunch of arbitrations

Page 164

1   where it ruled against Latham every time, do you

2   think they would be more or less likely to refer

3   you new clients?

4           MS. MUSUMECI:  Objection.

5       A.   We don't rule against anybody.

6       Q.   If New Era had a bunch of arbitrations

7   where New Era arbitrators ruled against them

8   over and over again, do you think they would be

9   more or less likely to refer New Era clients?

10          MS. MUSUMECI:  Objection.

11      A.   That's their decision.  There's

12  nothing that goes in favor of Live Nation

13  whatsoever.  I don't -- I don't root for Latham

14  & Watkins.  I don't root for Live Nation.  I

15  don't root for Latham & Watkins' clients.

16          We think we provide a service that's

17  better than the existing services.  If Latham &

18  Watkins agrees with that and refers us clients,

19  that's fantastic.  They don't get anything out

20  of that.

21      Q.   I understand, but my question is

22  simpler.  I mean, you've been in this business a

23  long time.  You really think if Latham had 50

24  arbitrations with New Era and if New Era's

25  arbitrators ruled against it in all of them,

Page 165

1    that they would keep using New Era, or do you

2    think they would look for someone else, like

3    they did with JAMS?

4        A.    I think they would probably look for

5    somebody else.

6        Q.    Because Latham likes to win cases,

7    right?

8        A.    I think all you guys like to win

9    cases, so it doesn't -- that's kind of

10   irrelevant to us.

11           We do what we do in an unbiased

12   manner.  If that means that Latham clients lose

13   a bunch of cases, then that's what happens.  If

14   that means that Latham & Watkins is going to

15   pull clients from us because they lost cases,

16   then that's what's going to happen.

17           We're not going to provide any sort of

18   ancillary benefit to Latham & Watkins to get

19   them to give us clients.  We're going to do the

20   best job we can possibly do.

21       Q.    I understand.  The question is simple:

22   Latham & Watkins is not in the business of

23   losing cases, and if they lost a bunch of cases

24   with New Era-appointed arbitrators, all things

25   equal, they're more likely to go somewhere else,

Page 166

1    right?

2              MS. MUSUMECI:  Objection.

3         A.    I think that's probably correct.

4              And if they were looking for anything

5    more out of us, they would be better off going

6    to someplace else.

7         Q.    Okay.  I'm going to mark our next

8    exhibit.

9         A.    Incidentally, on that exhibit,

10   Elizabeth Deeley never referred us to any new

11   clients.

12        Q.    Okay.  I'm marking as our next exhibit

13   a document produced in discovery bearing Bates

14   number NEWERA_000020.  Let me know when you have

15   it.

16             (Williams Exhibit 17, E-mail chain

17        with attachments Bates-stamped

18        NEWERA_000020, marked for identification, as

19        of this date.)

20   BY MR. SEARS:

21        Q.    This one has some attachments, so let

22   me know when you have it.

23        A.    This one's big, so it's going slow --

24   like really slow.

25             MS. MUSUMECI:  Really slow, yeah.

Page 167

```
 1       Q.    Well, I'm mostly going to ask you
 2   about the e-mail, so let me know if, I guess,
 3   the whole thing loads at once, but just let me
 4   know when you have it.
 5       A.    Yeah, it's about halfway there.
 6             Okay.
 7       Q.    You got it?
 8       A.    I've got it.  Yes.
 9       Q.    So another e-mail involving you, the
10   New Era team, and some folks at Latham?
11       A.    Yes.
12       Q.    One of them is Ms. Deeley, who we have
13   talked about, right?
14       A.    Correct.
15       Q.    You also got a Mr. Virani.
16             Do you know who that is?
17       A.    I don't recall him at all.
18       Q.    Okay.  This e-mail refers to a meeting
19   that was had with Latham & Watkins.
20             Were you at the meeting?
21       A.    I was at a meeting.  I was at a call
22   with Beth Deeley.  I don't know if Aamir was
23   there or not.  I don't recall him.
24       Q.    Okay.  Was this a Zoom meeting or an
25   in-person meeting?
```

Page 168

```
 1      A.     No; Zoom.

 2      Q.     Okay.  But you don't remember if you

 3 were on the one that's being referred to here?

 4      A.     I don't.  Aamir Virani does not ring a

 5 bell to me at all, but that doesn't mean he

 6 wasn't on the call and was quiet.

 7      Q.     Okay.  Sorry to interrupt.

 8             So one of the things it does here is

 9 it attaches some materials that you're sending

10 to Latham?

11      A.     Correct.

12      Q.     And these are marketing materials

13 about New Era?

14      A.     Some of them.  One's a template

15 agreement.

16      Q.     Right.  For example, it's the mass

17 arbitration one-pager which we have looked at?

18      A.     Yes.

19      Q.     And there's an overview of the

20 arbitration process?

21      A.     Yes.

22      Q.     The first thing attached here is the

23 template agreement for Latham clients, right?

24      A.     Yes.

25      Q.     And it also says, "We value our
```

Page 169

```
 1   relationship with Latham, and we truly

 2   appreciate that your firm shares our vision for

 3   pragmatic and efficient dispute resolution."

 4        A.    Yes.

 5        Q.    That's true; New Era values its

 6   relationship with Latham, right?

 7        A.    Yeah, we do.

 8        Q.    And you also say -- excuse me.  Mr.

 9   Lee says in this e-mail, "For this reason, the

10   subscription agreement we would offer to all

11   Latham clients includes all of the terms that

12   Kirsten and Alicia negotiated for Live Nation,"

13   right?

14        A.    Correct.

15        Q.    That's the template agreement?

16        A.    Yes.

17        Q.    So, if I'm understanding correctly,

18   the subscription agreement that New Era

19   negotiated with Live Nation then became a

20   template agreement that you offered to use with

21   other Latham clients, right?

22        A.    Yes; the general business terms, but

23   the reason that Rich did this was that, you

24   know, we spent several weeks doing an arm's

25   length business deal with Latham & Watkins over
```

Page 170

```
 1    the terms of the MSA, and if this could

 2    circumvent us needing to do that with every

 3    single Latham client by saying Latham actually

 4    negotiated these terms, that's what we wanted to

 5    do.

 6              Whether or not Latham would agree to

 7    that or whether or not they would negotiate

 8    every single agreement pursuant to whatever that

 9    client is, I don't know, but I know that's what

10    Rich was trying to circumvent.

11        Q.    You say MSA.  What are you talking

12    about?

13        A.    Master services agreement.

14        Q.    Is that what you call the subscription

15    agreement?

16        A.    Yes.

17        Q.    Okay.  Will you understand what I'm

18    talking about if I call it a subscription

19    agreement?

20        A.    Of course.

21        Q.    New, you mentioned, I know in 2021

22    there were no other subscription clients, right?

23        A.    Correct.

24        Q.    In 2022, there were some others?

25        A.    Yes.
```

Page 171

1      Q.      Right?

2      A.      Yes.

3      Q.      Did they use this template agreement

4    as the basis for their agreement?

5      A.      I think we've started with this

6    template for every single subscription client.

7      Q.      So the subscription agreement between

8    Live Nation and New Era became the template for

9    all of New Era's subscription agreements going

10   forward?

11     A.      Well, once again, it's an MSA.  It's a

12   master services agreement.  So it's very general

13   terms.

14             The statement of work is different for

15   every client.

16     Q.      Is the statement of work what you

17   think of as the subscription agreement?

18     A.      It's a portion of it, but it's not --

19   the template agreement is the master services

20   agreement, not the statement of work.

21     Q.      I see.  But the agreement you

22   negotiated with Latham becomes the basis for

23   these future agreements even if there's terms

24   that are altered or negotiated?

25     A.      The MSA -- we work from one base MSA.

Page 172

```
 1                We do not necessarily send any changes

 2      that Latham made to it to other clients.  We

 3      work from our base MSA.

 4          Q.    That's the template agreement that's

 5      attached here?

 6          A.    Correct.  No.  No.  This is the one --

 7      this is a template agreement that was negotiated

 8      by Latham on behalf of Live Nation.  So, once

 9      again, the purpose was:  Latham has already

10      reviewed these terms, they have made changes to

11      certain portions of it, so if you feel

12      comfortable that, you know, the co- -- your

13      partners at the firm have negotiated this, and

14      you don't need to renegotiate it, that benefits

15      us all.  Because we're fine with the terms in

16      this agreement.  But that's not to say that

17      other Latham partners wouldn't come and say,

18      yeah, that's great, but maybe I don't like

19      Alicia or Kirsten, so I'm going to renegotiate

20      this.

21                We were trying to circumvent that

22      happening, but that's not to say it wouldn't.

23                We do not use this agreement as a

24      basis for other customers.

25          Q.    Okay.  Maybe I'm just not following
```

Page 173

 1    you.  Maybe I'm misunderstanding.

 2              I thought you told me earlier that

 3    this template agreement is kind of a basic

 4    document and then obviously gets marked up and

 5    made for specific to other clients.

 6              Is that not the case?

 7         A.   We have a general template agreement

 8    that we start from with all of our clients.

 9         Q.   Okay.

10         A.   That does get marked up.

11              Latham & Watkins took that template

12    agreement, marked it up, made changes, made

13    changes that we could live with, so we then sent

14    that base agreement to Latham & Watkins and

15    said:  Hey, your partners have already looked at

16    this, so we can use this as a Latham template.

17    But that did not become our general template.

18         Q.   I see.  Let me ask you this then.  So

19    my -- I was going to ask you about this later,

20    but I'll just ask now:  So did New Era do the

21    first draft of the MSA or the subscription

22    agreement that it ended up signing with Live

23    Nation?

24         A.   Absolutely.

25         Q.   Okay.  Now, did it write that draft,

Page 174

1    that basic template, before it started working

2    with Latham or after?

3         A.    I was working on that agreement once

4    we started talking about the subscription model.

5         Q.    When did you start talking about the

6    description model?

7         A.    We started talking about subscription

8    models probably back in December of 2020.

9         Q.    And whose idea was it to do a

10   description model?

11        A.    I'll give credit where credit's due.

12   It was more Shane and Rich.  Definitely was not

13   my first idea.

14        Q.    So it was something that you proposed

15   to Latham & Watkins?

16        A.    Yes.

17        Q.    On the first call back in May 2021?

18        A.    I don't believe we proposed it on the

19   first call, no.  Our first call or two was just

20   about Latham & Watkins figuring out who we were.

21        Q.    I see.

22              What was the context in which it was

23   proposed?

24        A.    The subscription?  I don't recall.  It

25   was probably Shane proposing it.  I don't know

Page 175

1    if he mentioned it to -- God -- Mohebbi.  I

2    don't know.

3              Once again, the subscription -- it was

4    not my idea.  I'm not going to take credit where

5    it's not due.

6        Q.    Was it proposed by New Era in response

7    to concerns about mass arbitration?

8        A.    It was certainly proposed to us as a

9    solution to the economic leverage in mass

10   arbitrations, I would think, yeah.

11       Q.    So, just to make sure I have it

12   correct, New Era proposed a subscription pricing

13   model as a solution to the economic leverage in

14   mass arbitrations, right?

15       A.    I think we proposed a subscription

16   model, period, because, before we knew the

17   volume of litigation, the whole purpose behind

18   the subscription was not to actually handle mass

19   arbitrations.  The whole purpose behind the

20   subscription, initially, was if you have

21   voluminous litigation so that you can set costs.

22             A big theme you will see through our

23   business, flat fees, whatever it is, is cost

24   certainty.  So when we were in-house counsel, we

25   always said, look, I would pay more if I had

Page 176

1    cost certainty.

2              So the idea behind the subscription

3    was, if you have voluminous litigation and you

4    don't know what each of those things can cost, a

5    subscription allows you to go to your CFO and

6    say, hey, I now have a line item that you can

7    plug into your budget.  CFOs tend to be very

8    happy about that.  So that was the purpose

9    behind the subscription model.

10    Q.    You mentioned that that was initially

11   the purpose behind it.

12              When did the purpose start to

13   encompass addressing mass arbitration?

14    A.    I think the purpose behind it is still

15   if you have voluminous litigation, period.

16    Q.    I see, but at some point that was a

17   conversation with Latham & Watkins about how

18   subscription pricing model could also address

19   mass arbitration?

20    A.    It could address the economic leverage

21   of mass arbitrations.

22    Q.    That was something New Era

23   communicated to Latham & Watkins?

24    A.    Sure.

25    Q.    And it was one of the reasons they

Page 177

1    ended up signing the subscription agreement?

2              MS. MUSUMECI:  Objection.

3        A.    You'll have to ask them.

4        Q.    Let me ask a better question.

5              It was one of the reasons why Live

6    Nation ended up signing the subscription

7    agreement?

8              MS. MUSUMECI:  Objection.

9        A.    I don't know.

10             I think we proposed a better

11   alternative across the board.  So it's up to

12   Live Nation why they decided to go with us.

13   We're happy that they did, but we do see

14   ourselves as a better solution across the board.

15       Q.    Understood, but you also had

16   conversations with them.

17             Did they communicate that that was one

18   of the reasons that they signed it?

19       A.    I don't think they communicated that

20   that was one of the reasons that they signed it.

21   I think, at the end of the day, they

22   communicated that we think you're a much better

23   alternative to JAMS.

24       Q.    Let me ask you this.  I was a little

25   unclear in my prior question.

Page 178

1          You had conversations with Latham as

2    well.  Did Latham ever communicate that

3    subscription pricing being a solution to mass

4    arbitration was one of the reasons that Live

5    Nation signed the contract?

6        A.    I don't recall them ever saying that.

7        Q.    Did they ever say anything to the

8    contrary?

9        A.    No.

10       Q.    Right.  And you don't remember

11   everything they said, so it's possible they said

12   it and you forgot?

13           MS. MUSUMECI:  Objection.

14       A.    It's possible.

15       Q.    I'm going to mark our next exhibit.

16           Introducing as our next exhibit a

17   document bearing Bates number NEWERA_000742.

18           Let me know when you have it.

19           (Williams Exhibit 18, E-mail chain

20       Bates-stamped NEWERA_000742 through 743,

21       marked for identification, as of this date.)

22           THE WITNESS:  Yep.

23   BY MR. SEARS:

24       Q.    This is a September 2021 e-mail with

25   Mr. Lee, Ms. Jovais, and Ms. Ferguson?

Page 179

```
 1        A.    Correct.

 2        Q.    It doesn't look like you're on the

 3   e-mail, but you're familiar with it?

 4        A.    I've read it, yes.

 5        Q.    In this e-mail, Mr. Lee is connecting

 6   Latham with some lawyers at Cozen O'Connor?

 7        A.    Yes.

 8        Q.    And Mr. Lee is using Latham as a

 9   reference for New Era?

10        A.    Correct.

11        Q.    And new Era viewed Latham as a

12   possible reference for other law firms, right?

13        A.    Sure.

14        Q.    And the reason New Era talked with

15   those other law firms is to help sign up clients

16   from those law firms, right?

17        A.    Yeah, I think that's fair.

18        Q.    And Latham's one of the references

19   that New Era uses when it does that?

20        A.    I don't know that it's ever happened

21   outside of this referral.

22        Q.    I mean, certainly you like having

23   Latham as a possible reference, right?

24        A.    I think if we do a good job, I would

25   be happy with anybody who gives us a positive
```

Page 180

1    reference.  But, yes, we're happy to have Latham

2    as a reference.

3         Q.    Especially an AmLaw 20 firm, as they

4    are referred to in the deck?  I mean, they're

5    not just any law firm.

6               They're very reputable, right?

7         A.    They're a good law firm, yeah.  I'm

8    not -- I'm not discounting that at all.

9         Q.    You would rather have Latham & Watkins

10   as a reference than a solo practitioner that

11   just hung their own shingle in South Dakota?

12               MS. MUSUMECI:  Objection.

13        A.    Yeah.

14        Q.    That's a great question.

15        A.    Yeah.  The answer to your question is,

16   yes, probably so.  But would I be excited about

17   the solo practitioner in South Dakota referring

18   us to other clients too, particularly if they

19   were a plaintiffs' firm?  I would be ecstatic

20   about that.

21        Q.    Of course, but Latham is more likely,

22   all things equal, to able to refer you to

23   clients than that extreme example or even a much

24   smaller client?

25        A.    Once again, if you go back to my

Page 181

1    explanation of there being two sides and the

2    plaintiffs change and the defendant doesn't, so

3    who is more likely to subsidize litigation?  The

4    defendant is.

5          So that's the model, right?  If the

6    plaintiffs were getting -- suing tons of people

7    and they wanted to subsidize litigation, we

8    would being ecstatic about that.

9    Q.    Okay.  I'm going to introduce our next

10   exhibit.  It's a document produced by New Era

11   bearing Bates number NEWERA_000074.

12          (Williams Exhibit 19, E-mail chain

13       Bates-stamped NEWERA_000074 through 75,

14       marked for identification, as of this date.)

15          THE WITNESS:  Got it.

16   BY MR. SEARS:

17   Q.    My questions on this are pretty

18   simple.

19          This is a calendar invite from October

20   2021 involving you, Mr. Mulrooney, and Mr.

21   Mohebbi from Latham?

22   A.    Correct.

23   Q.    What was the purpose of this call, if

24   you recall?

25   A.    To be totally honest with you, we just

Page 182

1  never met Nima.

2          I believe Nima is Shane's brother's

3  friend.  He's a nice guy, and it was just we had

4  heard his name, Shane had talked about him, Rich

5  and I had never met him, so it was basically to

6  say, "This is Nima."

7      Q.    Okay.  Anything else you remember

8  about the call?

9      A.    No.  I -- honestly, I don't think we

10 even talked about business.  He's just a nice

11 guy.

12     Q.    Okay.  I'm going to introduce our next

13 exhibit.  It's a document bearing Bates number

14 NEWERA_000106.

15          (Williams Exhibit 20, E-mail chain

16     Bates-stamped NEWERA_000106, marked for

17     identification, as of this date.)

18          THE WITNESS:  Sure.

19 BY MR. SEARS:

20     Q.    This is another e-mail between you and

21 Ms. Birkeland, right?

22     A.    Yes.

23     Q.    November 2021?

24     A.    Yep.

25     Q.    And you say, "Just checking in again"?

Page 183

```
1       A.     Correct.

2       Q.     And this is something you do; you

3   periodically check in with Latham & Watkins?

4       A.     Well, this is Cathy.

5              So, to give a little bit of back story

6   on Cathy, I mentioned at the beginning of this

7   deposition that I'm a government witness against

8   my former employer.  Cathy was outside counsel

9   for that company.  And we, together, without

10  getting into gory details, saw all sorts of

11  crazy things.

12             So Cathy and I -- that case is

13  obviously still pending.  Cathy and I like to

14  get together and actually talk about what's

15  going on in that case.  So I hadn't talked to

16  her in a while, and it's -- it's always

17  interesting to catch up about that matter.

18      Q.     Did you end up having a call with her

19  around this time?

20      A.     I think I did.  I think I did.  She's

21  tough to get ahold of, but I believe we did

22  catch up, yeah.

23      Q.     Did you talk about mostly that other

24  case, or did you also talk about New Era's

25  business or other topics?
```

Page 184

```
 1        A.     We might have chatted about New Era a

 2    little bit, but most of Cathy and my

 3    conversations go towards that other case.

 4        Q.     Okay.  I'm going to introduce our next

 5    exhibit.  It's a document bearing Bates number

 6    NEWERA_000734.

 7               (Williams Exhibit 21, E-mail chain

 8         Bates-stamped NEWERA_000734 through 735,

 9         marked for identification, as of this date.)

10    BY MR. SEARS:

11        Q.     Let me know when you have it.

12        A.     I do.

13        Q.     So if you look at the first e-mail in

14    the chain at the bottom, this is an e-mail from

15    Mr. Lee to Ms. Tobias?

16        A.     I see it.

17        Q.     From December 2021?

18        A.     Yep.

19        Q.     And he says he's just checking in?

20        A.     Yes.

21        Q.     Then he says, "I like to personally

22    check in with clients and law firms on a regular

23    basis," right?

24        A.     Yes.

25        Q.     As we've discussed, Live Nation is a
```

Page 185

```
 1   New Era client?

 2       A.    Yes.

 3       Q.    New Era likes to personally check in

 4   with clients like Live Nation?

 5       A.    Sure.

 6       Q.    To ensure they're happy with New Era's

 7   services, right?

 8       A.    Absolutely.  They weren't happy with

 9   JAMS, so we want to make sure that they're happy

10   with us.

11       Q.    New Era has a strong incentive to

12   retain them as a client, right?

13       A.    We have a strong incentive to retain

14   anybody who comes under our platform.

15       Q.    Right; because if not, they might not

16   renew their subscription agreement?

17       A.    Sure.

18       Q.    And New Era would lose a major source

19   of revenue?

20       A.    Sure.

21       Q.    ███████████████████████████████  a

22   year?

23       A.    Yes.

24       Q.    I asked you a little about this

25   before.  Do you think a consumer that was
```

Page 186

1    arbitrating against Live Nation before a New Era

2    arbitrator could be concerned about the

3    possibility of bias if they knew that New Era's

4    CEO and co-founder personally checked in with

5    Live Nation's in-house lawyer?

6        A.    I don't think so.

7        Q.    You don't think anyone would have any

8    trouble with that at all?

9        A.    I can't say what somebody would have a

10   problem with or not.

11            We have hired a customer engagement

12   manager, and a lot of her purpose is that, as

13   things come in, to check in with the plaintiffs

14   and the cases and make sure they had a good

15   experience too.

16       Q.    You said you hired a customer

17   relations manager to do that?

18       A.    Yes.

19       Q.    That's not something that you did?

20       A.    No, but that's the whole purpose of

21   this.  Like we didn't have staff at this point.

22       Q.    I understand.

23            Sorry.  Go ahead.

24       A.    At the end of the day, we all engaged

25   in activities, whether that was checking in with

Page 187

1   clients, whether that was selling, whether that

2   was helping our developers with code, whether or

3   not it was draftings rules, that was the

4   experience of a December 14, 2021 New Era.

5           Now we have a larger team, and I would

6   be happy to talk to -- to check in with a

7   plaintiff and make sure they had a good

8   experience, but we have now hired somebody who

9   has a dedicated portion of their

10  responsibilities to do that.

11      Q.   Does that person sit below you and Mr.

12  Lee in the New Era org. chart?

13      A.   We're a pretty flat org.  I don't

14  consider anybody sitting below me.

15      Q.   Well, sure, but you're the co-founder,

16  right?

17      A.   Sure.

18      Q.   Mr. Lee is the CEO and also the

19  co-founder?

20      A.   Yes.

21      Q.   You're two of the most senior people

22  at the company, right?

23      A.   Yeah.  We've been around the longest,

24  but what I put Anthea below us?  I absolutely

25  would not.

Page 188

1      Q.    Maybe "below" is the wrong term, but

2    just in terms of who's been there the longest

3    and who founded the company, you all occupy a

4    somewhat different position than this manager,

5    don't you?

6      A.    Correct.

7      Q.    And it's not Mr. Lee or you that goes

8    and talks to plaintiffs in these cases; it's

9    this person that you hired to do that?

10     A.    Well, and it would probably be Anthea

11   who would talk to Live Nation at this point.

12     Q.    Right, but not back them?

13     A.    Not back then.

14     Q.    All right.  I'm introducing our next

15   exhibit.  This is a document bearing Bates label

16   NEWERA_000701.

17          Let me know when you have it.

18          (Williams Exhibit 22, E-mail chain

19      Bates-stamped NEWERA_000701 through 703,

20      marked for identification, as of this date.)

21          THE WITNESS:  Got it.

22   BY MR. SEARS:

23     Q.    Is this a December 2021 e-mail

24   entitled "Re:  New Era ADR Reference//General

25   Counsel @ Wayfair"?

Page 189

1      A.    Yes.

2      Q.    It's another one with Mr. Lee, and

3   you're not on it, right?

4      A.    I'm not on it.

5      Q.    Have you seen this one?

6      A.    I have seen it, and I actually know

7   Enrique.

8      Q.    Okay.  Who is Enrique?

9      A.    He's the Wayfair GC.

10      Q.    And the context here is Latham served

11   as a reference for Wayfair, right?

12      A.    Actually, Wayfair never asked for a

13   reference, and I don't believe Wayfair -- as a

14   matter of fact, I'm 99.9 percent certain that

15   Wayfair and Enrique never spoke to Latham &

16   Watkins.

17      Q.    Okay.  Well, let's go down to the

18   beginning of the e-mail chain.

19            It starts with Mr. Lee reaching out to

20   the Live Nation litigation team, right?

21      A.    Yes.

22      Q.    And he says, "We spoke with the GC at

23   Wayfair recently who's been thinking a lot about

24   the mass arbitration issue along with a number

25   of other tech company GCs.  He's hoping to hear

Page 190

```
 1    your perspective on this and New Era," right?
 2         A.    Yes.
 3         Q.    So this is a conversation that didn't
 4    happen, but the purpose of him reaching out was
 5    to see if Latham would serve as a reference for
 6    Wayfair?
 7         A.    I think that's the purpose, but the
 8    reality is Enrique is my contact, and Rich may
 9    be -- was probably trying to get ahead of the
10    ball here, but I never asked that Latham be a
11    reference for Enrique.
12         Q.    Well, regardless, it looks like they
13    agreed to serve as a reference, right?
14         A.    Sure.
15         Q.    Mr. Lee thanked them for their
16    willingness to connect with the Wayfair GC?
17         A.    That's what Rich wrote, yes.
18         Q.    All things equal, you would rather
19    have Latham as a reference that you could refer
20    to potential clients than not, right?
21         A.    I would rather have Keller Postman as
22    somebody who would refer us to clients, so...
23         Q.    It doesn't hurt my feelings that you
24    didn't say Quinn Emanuel.
25         A.    I was about to add Quinn as a referral
```

Page 191

1    source.

2              I mean, I think at the end of the day,

3    you know, we're a neutral platform, and anybody

4    who thinks that we provide them good service,

5    I'm happy to have them refer us -- and that's

6    defense counsel, that's plaintiff's counsel,

7    that's consumers, other kind of litigants.  We

8    want everybody to have a good experience on our

9    platform.  That's the goal.

10        Q.    Of course, because if someone doesn't

11   have a good experience, however they define it,

12   they're less likely to refer you clients?

13        A.    Well, I think they're less likely to

14   come back to us, period.  I think if a litigant,

15   if a consumer, if a plaintiff has a good

16   experience on our platform, and they are somehow

17   wronged again, I think they're much more likely

18   to come back to us and say, hey, you guys helped

19   me out the last time.

20              So, at the end of the day, my last

21   company was a marketplace, and buyers and

22   sellers in the marketplace, it didn't matter, we

23   wanted them all to have good experiences, and

24   this is no different.

25        Q.    Let me ask you about that.  You said

Page 192

1    if a litigant, if a consumer, or a plaintiff has

2    a good experience with New Era, they're more

3    likely to come back, right?

4         A.    Well, I would think so.  I mean, I

5    think the difference is if you have a good

6    experience and you achieve some sort of

7    resolution that you're content with, then you're

8    far less likely to come back and say, I want to

9    fight an arbitration clause and go to court,

10   because if you had a bad experience, you're

11   probably more likely to think, well, court is

12   going to be a better way to go.

13            And we don't want anybody to think

14   that.  We want everybody to think that we're the

15   right platform to resolve disputes, period.

16        Q.    Let me ask you about that.  In terms

17   of consumer plaintiffs, what opportunity do they

18   have to choose New Era?

19            Let me see if you can answer that, and

20   I'll be more specific if you can't.

21        A.    Well, at the end of the day, as you

22   well know, getting an arbitral forum requires

23   consent of some kind.  Right?  And that doesn't

24   actually -- it actually has very little to do

25   with us.

Page 193

```
 1              So there has to be somebody who comes
 2    along -- usually a company -- that says we're
 3    going to use New Era and we're going to insert
 4    them in the terms of use, and we're going to
 5    assume that that's a binding contract.  And, you
 6    know, courts, for the most part, seem to have
 7    upheld that.
 8              But, at the end of the day, I hate to
 9    say it this way, but we kind of just sit there.
10    It requires two parties to actually agree to use
11    us.
12              So the answer to your question is I
13    don't know how a consumer can say I'm going to
14    choose New Era, but if they're choosing to use a
15    company, and they actually read the terms of
16    use, they would be choosing to use New Era.
17              And quite frankly, as the case law
18    says, even if they don't read the terms of use,
19    they may be choosing to use New Era.  But we're
20    trying to constantly think of ways that
21    consumers can use us and be more proactive in
22    using the platform so they can get efficient
23    resolutions.
24    Q.   But as you just told me, I mean,
25    there's not really -- that doesn't happen in
```

Page 194

```
1    practice, right?  I mean, it just does not occur
2    that consumer plaintiffs say, I'm thinking about
3    filing a lawsuit in federal court, but I'm going
4    to reach out to this company proactively and see
5    if they will just stipulate to use New Era.
6              I understand in theory that can
7    happen, but it doesn't happen in practice, does
8    it?
9        A.    I mean, I don't know if it happens.  I
10   would certainly say it's probably very unlikely
11   that it happens very often.
12             I don't know if it ever happens.  We
13   wish it would, and it's definitely something
14   that we're thinking about, how can we make that
15   happen?  How can we make this a platform that
16   you don't necessarily have to agree to
17   beforehand, and you can just come to us and say
18   I have a problem.  It's something that we
19   constantly think about.
20       Q.    I understand it's something you think
21   about, but in practice today, the way it works
22   is what you described, right?  Realistically,
23   companies have online terms of use, they
24   designate New Era, and if a plaintiff is deemed
25   to have agreed to those, they end up using New
```

Page 195

1    Era, right?

2         A.    I mean, I think, yeah, in practice,

3    that's usually how it happens right now, yes.

4         Q.    As we talked about --

5               Sorry.  Did you finish?

6         A.    No.  No.  I did.

7         Q.    As we talked about, the companies that

8    use New Era have time to do diligence and look

9    into it, right?

10        A.    That I don't know.

11        Q.    Well, you do know because we looked at

12   a quote that says Latham & Watkins had three

13   partners do seven weeks of diligence on New Era,

14   right?

15        A.    That's -- but that's Live Nation.

16              Do I know whether or not every client

17   or customer or potential customer that has

18   online terms of use has the time to do due

19   diligence?  I have no idea.

20              I can imagine -- I can tell you from

21   this standpoint:  When I was general counsel at

22   Reverb, did I have time to go do due diligence

23   on an ADR platform?  Absolutely I did not.  I

24   absolutely did not.

25              So, but I can tell you I was not happy

Page 196

1    if we had to go to AAA or JAMS.  So I can't make

2    that blanket statement.  Live Nation has a lot

3    of resources, obviously.

4        Q.    Understood, but companies with large

5    resources, with the wherewithal, and the

6    incentive can do that kind of diligence on an

7    arbitration provider ex post before they decide

8    to put them in terms of use, right?

9        A.    I think that's correct, yes.

10        Q.    And that is what you saw with Live

11    Nation?  That's what they did?

12        A.    Yes.

13        Q.    Extensive vetting.  I mean, you put it

14    in marketing materials:  Seven weeks of due

15    diligence by three partners?

16        A.    Absolutely.

17        Q.    And we've also seen e-mails where

18    people are asking for referrals:  Wayfair GC,

19    Cozen O'Connor.

20            These are other things companies can

21    do.  They can ask outside counsel or reach out

22    to contacts to vet an arbitration provider?

23        A.    The Wayfair GC never asked for a

24    referral.

25        Q.    Understood, but it's something that

Page 197

1  they can do and it's something that you have

2  seen happen?

3       A.    If the company has the resources.  I

4  think this is 100 percent a case-by-case basis.

5       Q.    Right, but you've actually seen

6  scenarios in which companies have done this kind

7  of due diligence on New Era, right?

8       A.    Sure.

9       Q.    But there's really no comparable

10  process for consumers, right?  I mean there's

11  just -- there's no one that you're aware of and

12  you certainly haven't, when you have used a

13  product, spent a bunch of time researching the

14  ADR firm that's mentioned in the terms of use,

15  right?

16       A.    I always look, but maybe I'm a little

17  bit of a different animal, right?

18       Q.    You're an ADR firm.

19             Do you think the average consumer does

20  that?

21       A.    No, I don't think they do.

22       Q.    Do you think they even read terms of

23  use?

24       A.    I mean, it's hard for me to say.

25             MS. MUSUMECI:  Objection.

Page 198

```
 1      A.    Yeah, at this -- that's a very blanket

 2   statement.  I think -- do I think most people

 3   do?  No.  Do I think people are becoming more

 4   concerned about it and being more proactive?

 5   Yes.

 6      Q.    Do you think most consumers that are

 7   deemed to have agreed to online terms of use

 8   have any idea what they say or what the

 9   arbitration provider is?

10           MS. MUSUMECI:  Objection.

11      A.    I can't speak to that.

12      Q.    You just don't know?

13      A.    I don't know.  Yeah.

14      Q.    I'm only asking because you mentioned

15   earlier people reading terms of use and case law

16   about it, so it seems like something you might

17   have knowledge on.

18      A.    I mean, it's something -- look, I'm an

19   attorney.  I work for, run, whatever it is, help

20   run an ADR company.

21           Am I more in tuned with this?  Yes, I

22   am.

23      Q.    I'm going to introduce our next

24   exhibit.  It's a document bearing Bates number

25   NEWERA_000111.
```

Page 199

```
 1              (Williams Exhibit 23, E-mail

 2         Bates-stamped NEWERA_000111, marked for

 3         identification, as of this date.)

 4              THE WITNESS:  Got it.

 5    BY MR. SEARS:

 6         Q.    So this is a meeting invitation about

 7    a call with you and Ms. Birkeland?

 8         A.    Uh-huh.

 9         Q.    Just a couple questions.

10              Did you have the call?

11         A.    Sorry.  Yes.  For the court reporter,

12    I know it drives you crazy when people say

13    "uh-huh."

14              What was the question?  I apologize.

15         Q.    Did you have the call?

16         A.    I probably did.

17         Q.    Do you remember what was discussed?

18         A.    I am certain we discussed Outcome

19    Health.

20         Q.    Okay.  I'm going to introduce as our

21    next exhibit a really long document, so bear

22    with me.

23              Bates number NEWERA_000529.

24              (Williams Exhibit 24, E-mail chain

25         with attachments Bates-stamped
```

Page 200

```
 1        NEWERA_000529, marked for identification, as
 2        of this date.)
 3              THE WITNESS:  Yeah, this is going to
 4        take a while, it looks like.
 5              MS. MUSUMECI:  I'm sorry.  Just for
 6        the record, we're now up to Exhibit 24; is
 7        that right?
 8              That's what I have.
 9              MR. SEARS:  Sounds right to me.
10   BY MR. SEARS:
11      Q.   Mr. Williams, let me know when you've
12   had a chance to look at this.
13      A.   Yes.
14      Q.   Okay.  So this is from February 2,
15   2022?
16      A.   Yes.  Sorry, it's to -- I misspoke.
17   It's still downloading, but it's almost there.
18              Okay.  Got it.
19      Q.   Okay.  So this is an e-mail from
20   February 2, 2022, from Mr. Mulrooney?
21      A.   Yes.  Yes.
22      Q.   This is to a couple folks we've seen
23   before, Ms. Deeley and Mr. Virani at Latham?
24      A.   Correct.
25      Q.   This is after this current lawsuit was
```

Page 201

1    filed, right?

2         A.    Yes.

3         Q.    Okay.

4         A.    What was the date -- just so I'm

5    clear, what was the date that this lawsuit was

6    filed?

7         Q.    I want to say January 5, 2022.  It's

8    something around then.

9         A.    That sounds -- that sounds right.  I

10   knew it was in that general ballpark, but I

11   didn't know the exact date, and I didn't go on

12   Pacer and check.

13        Q.    Mr. Mulrooney mentions that they have

14   a few updates they would love to share with

15   Latham?

16        A.    Yes.

17        Q.    You know what those were?

18        A.    I don't.  And I'm 95 percent sure this

19   call never happened.

20        Q.    Okay.  And he also attaches some

21   documents here?

22        A.    Yes.  I'm just looking.

23              Yep.

24        Q.    Some marketing materials and some

25   materials about New Era's ADR process?

Page 202

1        A.    Yeah, it looks like a lot of it is,

2   like, screen captures and stuff like that.

3        Q.    Yeah, I'm actually -- I'm just going

4   to ask you about one of these for now.  I

5   believe it is the first attachment called "New

6   Era ADR Mass Arbitration Process."

7        A.    Yep.

8        Q.    And so it's dealing with the

9   arbitration process for two things, right?

10       A.    Sorry.  I'm not sure I understand that

11  question.

12       Q.    Okay.  Well, there are two flowcharts

13  here, and one is called "New Era ADR Mass

14  Arbitration Process," right?

15       A.    Yes.  Yes.

16       Q.    There's another one called "New Era

17  ADR Expedited Arbitration Process," right?

18       A.    Correct.

19       Q.    And it says that, "This applies to

20  bellwethers and removal cases," do you see that?

21       A.    Yes.

22       Q.    And that refers to bellwethers in the

23  mass arbitration rules?

24       A.    Correct.

25       Q.    I'm going to ask you more about this

Page 203

```
 1    later, but I just want to make sure I understand
 2    how these two processes relate, okay?
 3         A.    Yeah.
 4         Q.    So the first timeline, I mean, what is
 5    that?  That's just for mass arbitration,
 6    generally?
 7         A.    Yes.  Yep.
 8               So, yeah, there's an administrative
 9    way of doing this, where it basically needs to
10    be categorized into a mass arbitration, and then
11    once -- and that's, I believe, what this first
12    flowchart is explaining.
13               And then once it's a categorized into
14    a mass arbitration, bellwethers have been chosen
15    and/or removal cases have been removed from the
16    mass arbitration.
17               Then those proceed under the expedited
18    arbitration process, generally.  They can be
19    converted to standard arbitration, all sorts of
20    different things like that.
21               But, in order to even have mass
22    arbitration, there are certain steps that need
23    to be determined to make sure that it is a mass
24    arbitration.
25         Q.    I see.
```

Page 204

 1            And the second flowchart is talking

 2    about, once you've decided you have a mass

 3    arbitration, this is what happens to the

 4    bellwether cases?

 5        A.    Correct.

 6        Q.    And it's showing a timeline for the

 7    bellwether cases, among other things, right?

 8        A.    Once again, it's a timeline, it's a

 9    general timeline, but we want to make sure our

10    arbitrators are working within a constrained

11    period.  So they're not just saying, doesn't

12    matter, I can take three weeks of vacation,

13    because that's how ordinarily litigation works.

14        Q.    Understood.

15            As you put it earlier, it's a

16    guardrail?

17        A.    Guardrail.

18        Q.    And if you just tally up the times

19    here, it looks like the guardrail for the New

20    Era ADR expedited arbitration process has them

21    being done in about 60, 75 days, right?

22        A.    Right.  That could be right, if you do

23    the math.

24        Q.    And that's consistent with New Era's

25    goal of resolving arbitrations in under a

Page 205

1    hundred days?

2         A.    Yes, as a goal.

3         Q.    That's the goal for mass arbitration

4    bellwether cases, resolution in under a hundred

5    days?

6         A.    That's the goal.

7         Q.    Based on this, 60 to 75?

8         A.    The goal is a hundred, but once again,

9    we're creating guardrails.

10        Q.    Okay.  I may ask you about this one

11   later, so just make sure you have this one saved

12   if we want to come back to it, okay?

13        A.    Okay.

14        Q.    I'll mark as our next exhibit a

15   document bearing Bates number NEWERA_000001.

16             (Williams Exhibit 25, E-mail chain

17        Bates-stamped NEWERA_000001 through 003,

18        marked for identification, as of this date.)

19   BY MR. SEARS:

20        Q.    I will just give the court reporter a

21   second to pause.

22             Let me know when you have it.

23        A.    Got it.

24        Q.    Now, we've talked about the

25   subscription agreement with Live Nation and New

Page 206

```
 1    Era, right?

 2         A.    Correct.

 3         Q.    We talked about the terms of use for

 4    Ticketmaster and Live Nation to designate New

 5    Era as an ADR provider?

 6         A.    Yes.

 7         Q.    But those terms of use are not the

 8    only place that Live Nation and Ticketmaster

 9    designate New Era as an arbitration provider,

10    right?

11         A.    I do not know.

12         Q.    Well, does Live Nation use New Era for

13    ERISA claims?

14         A.    I do not know.

15               I believe that's what this e-mail

16    chain was about.  Whether or not we had the

17    experience to handle ERISA claims and whether or

18    not they would consider putting us in the 401-K,

19    whether or not that happened or whether or not

20    they have included us in other commercial

21    agreements or other terms of use, I have no

22    idea.

23         Q.    Do you see the second e-mail down here

24    is from Ms. Tobias?

25         A.    Yes.  Yes.
```

Page 207

1      Q.    And she's talking about whether to use

2    New Era for ERISA claims, right?

3      A.    Yes.

4      Q.    And she says, "I was just asking

5    because we are changing our 401-K restatements

6    to require arbitration with New Era, and I

7    wanted to be sure before making that change."

8      A.    Correct.

9      Q.    I mean, based on this, doesn't Live

10   Nation use New Era for ERISA claims?

11     A.    I do not know.  I don't know if she

12   ever made the change.  We have not gotten an

13   ERISA or a 401-K dispute.

14     Q.    But do you have any reason to believe

15   they didn't make the change?

16     A.    I don't have any reason to believe

17   they didn't make the change, but I do not know.

18     Q.    I mean, you're the 30(b)(6) witness

19   on -- I can pull up the topics if we need to,

20   but in general, New Era's relationship with Live

21   Nation and Ticketmaster, right?

22     A.    Yeah, absolutely, but my 30(b)(6)

23   responsibilities don't require me to know what

24   Live Nation is doing internally.

25     Q.    I'm just asking:  Did you, in the

Page 208

1    course of your preparation, did you try to

2    determine what aspects of its business Live

3    Nation and Ticketmaster used New Era for?

4            MS. MUSUMECI:  Objection to the form

5        of this question.

6            You can answer, Collin.

7    A.    I mean, I think the problem is I can't

8    answer.

9            So my responsibilities were to know

10   everything as -- as much as I possibly can about

11   our business and what happens.

12           This is an e-mail where Kim indicates

13   that she's going to change her 401-K

14   restatements.  Whether or not she did that, I do

15   not know, and I don't believe that's part of my

16   30(b)(6) responsibilities.  I don't know how I

17   would know that unless I wrote Kim and asked

18   her.

19           What I can tell you from our side of

20   the business is that we have not received one of

21   these.  So whether or not Live Nation changed

22   their 401-K restatements, I do not know.

23   Q.    I mean, is there someone at New Era

24   that would know?

25   A.    I don't think so, and the reality is

Page 209

```
 1    there are people who -- I mean, there are
 2    customers who have inserted us into their
 3    agreements.  I can't think of -- there's one off
 4    the top of my head.  It's a SoHo House in
 5    California that changed all their terms of use
 6    to include us.  We had no idea it happened.  I
 7    think you guys actually mentioned it in the
 8    complaint.
 9            So there are customers out there who
10    decide they no longer want to use JAMS or AAA or
11    whoever it is and insert us into their
12    agreements, and we won't know that until a
13    dispute comes down the pipe.
14            This is not a heck of a lot different.
15        Q.   Okay.  Are there any other types of
16    claims besides the online terms of use for the
17    Live Nation/Ticketmaster websites or potentially
18    ERISA claims that Live Nation uses New Era for?
19        A.   I do not know.  The -- the claims
20    would be covered -- or, a certain amount of them
21    would be covered under the subscription
22    agreement, and that's fine.  Whatever they may
23    be, if it's a commercial agreement, that's fine,
24    we'll handle it.  If it's an ERISA claim, that's
25    fine, we'll handle it.  But we do not have a
```

Page 210

1    running tab on what agreements we are in.

2             That would be -- it's something we

3    actually would love to do, but, quite frankly,

4    it's untenable.

5        Q.    Okay.  I'm going to introduce our next

6    exhibit.  It's a document bearing Bates number

7    NEWERA_000008.

8             (Williams Exhibit 26, E-mail chain

9        Bates-stamped NEWERA_000008, marked for

10       identification, as of this date.)

11            THE WITNESS:  Got it.

12   BY MR. SEARS:

13       Q.    All right.  Have you seen this

14   document before?

15       A.    I have.

16       Q.    You're on this e-mail, right?

17       A.    I am.

18       Q.    I mean, the subject of the discussion

19   here is whether Live Nation will use New Era for

20   an employment arbitration, right?

21       A.    Correct.

22       Q.    And Ms. Tobias reaches out to Shane

23   and she mentions that there's an employment

24   matter filed in court, right?

25       A.    Correct.

Page 211

```
 1       Q.    Then she says, "If the plaintiff
 2    agrees, we would love to use New Era for the
 3    arbitration," right?
 4       A.    Yes.
 5       Q.    I mean, based on this e-mail, does
 6    Live Nation use New Era for some of its
 7    employment claims?
 8       A.    Actually, I'm not certain of that at
 9    all.  I believe they went to the plaintiff and
10    asked whether or not the plaintiff would consent
11    to the use of New Era, and it's my understanding
12    that the plaintiff said no.  So this case never
13    came you to us.
14       Q.    Right.  It actually mentions that.  I
15    think later in time, she reveals that opposing
16    counsel refused to stipulate to use the
17    platform, right?
18       A.    Correct.
19             So had it been in the employment
20    agreement, I would think that Live Nation would
21    have pushed harder for the arbitration.  I don't
22    think there would have been any issue of
23    consent.
24       Q.    How many instances is New Era aware of
25    in which one party requested New Era as the ADR
```

Page 212

1    provider, but the other side refused to

2    stipulate to it?

3        A.    This is the only one that I can

4    remember.

5        Q.    Do you know what reasons were given,

6    if any?

7        A.    For not stipulating?  I do not know.

8        Q.    Now, this is from August 2021, right?

9        A.    Correct.

10       Q.    And the prior e-mail was from January

11   2022, right?

12       A.    I think so.

13       Q.    And so these are both from after the

14   time the subscription agreement was signed,

15   right?

16       A.    Correct.

17       Q.    And that was how you met Ms. Tobias

18   personally, right?  You signed the subscription

19   agreement and then you met her?

20       A.    Yes.

21       Q.    So, after you met her, there were a

22   couple of instances where Live Nation reached

23   out to New Era about potentially arbitrating

24   other cases, right?

25       A.    Yes.

Page 213

1      Q.    In one case, ERISA; in one case,

2    employment, right?

3      A.    Correct.

4      Q.    I understand you don't know what

5    happened with ERISA, and New Era didn't do this

6    employment case, right?

7      A.    Correct.

8      Q.    But Live Nation was interested in

9    using New Era for them, right?

10     A.    Yes.

11     Q.    If they did, that would be business

12   for New Era?

13     A.    Sure, but it would be covered under

14   the subscription agreement.  So it would have

15   been incremental revenue to the tune of maybe

16   $300.

17     Q.    All things equal, New Era would rather

18   do more business, not less?

19     A.    Oh, absolutely.

20     Q.    Especially for a start-up, right?  I

21   mean, it's good to arbitrate cases to a

22   conclusion, right?

23     A.    Absolutely.

24     Q.    Actually, it's very important since

25   New Era has only done one consumer arbitration.

Page 214

1    You would love to get more under your belt?

2        A.    Sure.  I mean, we have got pretty good

3    deal flow right now, but we would to -- volume

4    is something we're always interested in because

5    it helps us learn.  It helps us make the

6    platform better.  It helps us make the

7    experience better.  If you're not doing cases,

8    then you're not learning.

9        Q.    Right, and I gather it's something

10   that law firms and clients ask about when they

11   vet New Era, right?

12       A.    Sure.

13       Q.    Because they want to know if it's

14   established and if it has the chops to handle

15   arbitrations?

16       A.    Absolutely.

17       Q.    And I mean, that's a difference

18   between New Era and JAMS, right?  New Era has

19   just done much less cases than JAMS?

20       A.    I think there's a lot of differences

21   between us and JAMS, but, yes, we've definitely

22   done far less -- far fewer cases than JAMS.

23       Q.    All things equal, it's a benefit to

24   have a client that refers New Era potential new

25   cases that it can arbitrate?

Page 215

1        A.     Sure.

2        Q.     If Live Nation didn't have a

3   subscription agreement with New Era, all things

4   equal, it might be less likely to refer other

5   types of cases to New Era?

6               MS. MUSUMECI:  Objection.

7        A.     Yeah, I mean, I don't -- that's a

8   question for Live Nation.

9               My opinion is, yes.  The reality is

10  the reason I believe that Live Nation is

11  referring these is because they're covered under

12  the subscription agreement.  So, economically,

13  it makes a ton of sense.

14              As you stated, they have paid a large

15  six-figure fee to us.  They want to realize

16  value out of it.  We want to provide value to

17  them.  So the more cases they can send to us

18  that are already covered by a prepaid amount,

19  it's just logic.

20       Q.     We'll talk about this more in a bit,

21  but the subscription agreement, it has to be

22  renewed every year, right?

23       A.     I believe they have a three-year term.

24       Q.     Okay.  Well, we'll talk about that in

25  a little bit.

Page 216

```
 1          MR. SEARS:  So I'm at a decent

 2   stopping point now.  Can we go off the

 3   record for a second?

 4          (Luncheon Recess; Time Noted: 12:36

 5   p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 217

1              AFTERNOON SESSION

2              (Time Noted:  1:07 p.m.)

3    COLLIN WILLIAMS, resumed and

4        testified further as follows:

5    EXAMINATION BY (Cont'd.)

6    MR. SEARS:

7        Q.    Mr. Williams, are you ready to resume

8    your deposition?

9        A.    I am.

10       Q.    Did you talk to anyone on the break?

11       A.    No.

12             Well, the lovely woman who's watching

13   my dogs I talked to.

14       Q.    But not Sandy?

15       A.    No.

16       Q.    Okay.  So I'm going to introduce as

17   our next exhibit, which I believe is 27 -- it's

18   actually going to be three documents because I

19   printed them separately, but they're part of a

20   family.  I'm going to try to do them in order,

21   so just bear with me while they load.

22             (Williams Exhibit 27, Document

23        Bates-stamped NEWERA_000184, marked for

24        identification, as of this date.)

25   BY MR. SEARS:

Page 218

1      Q.    Just let me know when you have these,

2   Mr. Williams.

3      A.    I got one open.  The other two are --

4      Q.    And I'll just tell you I'm going to

5   ask you about the subscription agreement here.

6   I just wanted you to have the full context.

7      A.    Yes.  I'm good.

8      Q.    Okay.  So do you see that the top part

9   of the family in this e-mail from Mr. Mulrooney

10  on May 12, 2021 is attaching a draft of a

11  subscription agreement?

12     A.    I do.  I -- oh, I see it.  I see it.

13  Yes.  Okay.  I'm sorry.  Yep, I see is it.

14     Q.    And the e-mail is actually called "New

15  Era Mass Arb Subscription Agreement," right?

16     A.    Well, it's subscription agreement and

17  mass arbitration rules, and below -- yeah, I see

18  New Era Mass Arbitration Subscription

19  Agreement," yep.

20     Q.    The subject is "New Era Mass

21  Arbitration Subscription Agreement"?

22     A.    Yes.  Got it.

23     Q.    And then if you look at the first

24  attachment, that is the draft of the

25  subscription agreement, correct?

Page 219

 1      A.    Correct.

 2      Q.    And I believe you told me this

 3  earlier, but New Era prepared the first draft of

 4  this?

 5      A.    Correct.

 6      Q.    It did so after it had at least one

 7  call with Latham & Watkins, right?

 8      A.    I was building this before.

 9      Q.    Understand.  But this specific draft

10  was obviously -- excuse me -- something you

11  updated after that call and sent to New Era --

12  to Latham?

13      A.    Yes, that's correct.

14      Q.    Let me just ask it again.  I

15  interrupted myself.

16            So this specific draft was something

17  that New Era had updated after it discussed with

18  Latham and then sent to them?

19      A.    I don't know that we updated it, but

20  we sent it after the first call.

21            I guess what I'm saying is there was

22  no changes made to the subscription agreement

23  that I was drafting prior to us sending it.  We

24  didn't make any changes to it because of some

25  conversation with Latham.

Page 220

1              Does that make sense?  I'm not trying

2   to be, like, confusing here at all.  I'm just

3   saying we had a conversation with Latham.  I

4   believe they asked if you -- if we had a

5   subscription agreement or some sort of agreement

6   that would govern this, we said yes, and then

7   sent over this draft of it.

8       Q.    Got it.

9              So you actually hadn't made any edits

10  to the one you had been working on that were

11  specific to Live Nation?

12      A.    Correct.  Exactly.

13      Q.    You just sent them what you had in the

14  hopper?

15      A.    You got it.

16      Q.    So then you could discuss it with them

17  and make any appropriate edits?

18      A.    Precisely.

19      Q.    And I just want to make sure that

20  that's this draft.

21              So this is the first draft that went

22  to Latham?

23      A.    It sure looks like it.

24      Q.    I'm just going to ask you a couple

25  questions about it.

Page 221

```
 1                If you flip down to the page Bates
 2    number ending in 191, Section 10 of the
 3    agreement.
 4        A.    Yes.
 5        Q.    And do you see where there's a "Term"
 6    and "Termination" section?
 7        A.    Yes.
 8        Q.    And under "Term," the way this draft
 9    is written is that the agreement may renew for
10    up to ten additional successive one-year terms,
11    right?
12        A.    Correct.
13        Q.    So this agreement was drafted
14    initially that there would be a one-year term
15    and that it would renew up to ten times?
16        A.    That's how we had the template
17    drafted, yes, I believe.
18        Q.    Okay.  And now were there discussions
19    at New Era internally about this draft
20    agreement?
21        A.    I mean, I did the laboring ore on the
22    first draft.  Shane and Rich definitely reviewed
23    it and probably provided me some input.  I don't
24    really recall what that input was, but I'm sure
25    I sent it to them to look at.
```

Page 222

```
1      Q.    I mean, did you have discussions about

2  subscription pricing in general with Shane and

3  Rich or anyone else?

4      A.    After we had some information from

5  Latham & Watkins, we did, yes.

6      Q.    Internal discussions?

7      A.    Yes.

8      Q.    And how did you have those

9  discussions?

10     A.    We do it always by Zoom.

11     Q.    Okay.  You didn't write anything down?

12     A.    Not that I recall, no.

13           Since we're so small, once again,

14  without having -- this is the type of thing that

15  in my previous businesses we would have gone and

16  sat in a conference room and hashed it out, but

17  we're tiny and we're all located all over --

18  across the country.

19           So the way we did basically everything

20  was just to hop on a Zoom because, otherwise,

21  the lag time was just too long.

22     Q.    So you didn't exchange any e-mails

23  with Shane or Rich or anyone else about

24  subscription pricing for Live Nation?

25     A.    Not that I recall, no.
```

Page 223

```
 1       Q.    You didn't exchange any text messages
 2   with Shane or Rich or anyone else at New Era
 3   about subscription pricing for Live Nation?
 4       A.    We don't communicate by text message.
 5       Q.    What are the other forms of
 6   communication that you would use for others at
 7   New Era?
 8       A.    The only things we would use is Slack
 9   and Signal.
10       Q.    Signal, that's like an encrypted
11   messaging app.?
12       A.    It is.
13       Q.    It auto-deletes or it can be set to
14   auto-delete, right?
15       A.    Correct.
16       Q.    What are your Signal settings right
17   now?
18       A.    They're at four weeks.
19       Q.    Okay.  So, and the way that works is
20   that every four weeks, messages that you sent
21   over Signal are deleted?
22       A.    That's correct, but we put in a
23   litigation hold, so anything that was discussed
24   about Live Nation would have been retained, but
25   nothing is discussed about Live Nation on
```

Page 224

```
 1    Signal.  It's really much more of a social thing
 2    for us.
 3         Q.    When did you put in place the
 4    litigation hold?
 5         A.    January of 2022.
 6         Q.    When you learned about the lawsuit?
 7         A.    Yep.
 8         Q.    Did you do it international or with
 9    input from counsel?
10         A.    We did it -- I got -- I received a
11    standard litigation hold set of language from my
12    old boss, and then I crafted that further and
13    sent it to the entire team.
14         Q.    All right.  So it wasn't only your
15    boss issued you the litigation hold; you took
16    the language from him and sent it to your team?
17         A.    Exactly.  Yes.
18         Q.    Okay.  There wasn't an outside law
19    firm involved at that point?
20         A.    There was not.
21         Q.    Without going into the substance of
22    the discussions, when did you retain outside
23    counsel in connection with this case?
24         A.    Shit.  Sorry.
25               Honestly, I don't remember, Sandy.
```

Page 225

1    We've been together now for a long time.

2              It probably would have been February

3    or March of that year.

4         Q.   Was it before the document and

5    deposition subpoenas were served?

6         A.   I believe it was, yeah.

7         Q.   Okay.  So it wasn't like you got the

8    subpoena and then you hired someone.  You

9    already had someone?

10        A.   Yes.

11        Q.   Did they make any edits to the

12   litigation hold?

13        A.   No.

14             MS. MUSUMECI:  Objection.  That would

15   be --

16             Objection.

17        A.   It would be privileged.

18             MS. MUSUMECI:  Privilege grounds.

19        A.   That timeline lines up, though.  The

20   litigation hold was issued before we hired

21   Sandy.

22        Q.   Okay.  I don't want to get too far

23   into this, but I think I'm allowed to ask if

24   outside counsel commented on the litigation

25   hold.  I'm not asking the substance.  I'm just

Page 226

1    asking yes or no.

2            Can you answer that?

3        A.    Our current counsel did not comment on

4    the litigation hold.

5        Q.    Okay.  And so we talked about Signal

6    and you also mentioned Slack, right?

7        A.    Yes.

8        Q.    All right.  Did you have discussions

9    about subscription pricing for Live Nation over

10   Slack?

11       A.    No.

12       Q.    Did you have any discussions about

13   Live Nation over Slack?

14       A.    Not that I recall.

15       Q.    You had no discussions over e-mails,

16   Slack, or Signal about Live Nation?

17       A.    Yeah, you've seen -- there's stuff

18   going back and forth on e-mail, but when you're

19   talking about pricing and changes to the

20   subscription agreement, no, we hopped on calls

21   to do that stuff.

22       Q.    Well, the reason I ask is I have seen

23   documents.  I will tell you I only think I've

24   seen one document that is an internal New Era

25   document that talks about Latham or Live Nation

Page 227

1    or Ticketmaster.

2              I mean, does that comport with your

3    understanding?  Is there only one internal

4    document, whether e-mail, text, Slack or Signal,

5    about Live Nation and Ticketmaster or Latham, or

6    were there others?

7         A.    I would say that that's extremely

8    possible.  Because, once again, you have to take

9    into account the size of our organization at the

10   time.

11             So I get that it doesn't make sense in

12   the context of being a really, really large

13   organization, where you have to send e-mails and

14   wait for responses and things like that, but

15   we're all hands on deck.

16             So if we had a customer or somebody

17   who was interested in doing something, we got on

18   a Zoom call because we needed immediacy, and

19   there's not immediacy in any of those other

20   forms.

21        Q.    So I just want to be clear, because as

22   you know -- let me ask you:  Do you understand

23   the magistrate judge has said that you have to

24   testify about the search process here?

25        A.    Yes.

Page 228

1      Q.    Okay.  So, sitting here today, your

2   testimony is that there were -- other than the

3   one that's been produced -- no e-mails, texts,

4   Slacks, or Signals internal at New Era about

5   Live Nation, Ticketmaster, or Latham?

6      A.    My testimony is that we put a

7   litigation hold in place.  We have searched

8   every ounce of our systems, all of our

9   systems -- including Slack, including Signal,

10   including Google Drive -- for everything that we

11   could possibly find with any derivation of

12   Ticketmaster, Live Nation, LN, anything that we

13   could think of, any custodian, any person that

14   you have seen, and we have produced every

15   document that we found.

16      Q.    So only one or -- possible I'm

17   forgetting one, but it's less than five

18   documents?

19      A.    That's very, very possible, because,

20   once again, I'm saying that's not how we did

21   business.

22      Q.    Okay.  And when you say you searched

23   every ounce of your systems, how was the search

24   done?

25      A.    I mean, it depends on which system.

Page 229

```
 1        Q.    Well, let's take them one at a time.

 2              E-mail.  How was the search done?  Can

 3    you walk me through it?

 4        A.    Yes.  So it's on Google Drive.  There

 5    is actually a system in the back of Google Drive

 6    where you can do those searches.

 7        Q.    And what searches did you run?

 8        A.    I would have to get you a list.

 9        Q.    Can you get me the list?

10        A.    I --

11              Sandy --

12              MS. MUSUMECI:  Objection.  Yeah, we

13        can discuss that after.

14              MR. SEARS:  We're going to have to,

15        Sandy, because I have asked you for the

16        list, you didn't give it to me, and the

17        magistrate judge said we would have a depo

18        about this, and the witness is now saying he

19        doesn't have it.  So we will need that

20        information, but we can take it up after.

21              MS. MUSUMECI:  You can ask your

22        questions about what he knows, and then we

23        can take it up afterwards if there's

24        anything remaining.

25    BY MR. SEARS:
```

Page 230

```
 1       Q.    What can you tell me about the search
 2   terms that were run?
 3       A.    I can tell you that we ran every
 4   single derivation that we can possibly think of
 5   Live Nation, any acronym that's associated with
 6   that.  The same for Ticketmaster.  We ran it on
 7   all of our custodians.  We ran the names of
 8   every single person that we had ever talked to
 9   at Latham & Watkins or Live Nation, and any
10   derivation we could think of thereof.
11       Q.    And you mentioned the custodians.  I
12   mean, that's a set list of people.  I believe
13   that has been disclosed to us.
14             It's five or six folks?
15       A.    Correct.  At the time, there was six
16   employees.
17       Q.    Okay.
18       A.    There was six employees at the time.
19       Q.    And all them were custodians?
20       A.    All of them are custodians, yes.
21       Q.    When you say something to the effect
22   that you searched every derivation of these
23   terms you can think of, did you and your team
24   come up with the terms, or did outside counsel?
25       A.    Oh, we came up with -- no.  Well, I
```

Page 231

```
 1   don't want to get into conversations with
 2   outside counsel, but we -- we discussed at
 3   length what the terms should be.
 4        Q.    Okay.  And outside counsel had a
 5   chance to review them?
 6        A.    I believe so.
 7        Q.    Now, was outside counsel involved in
 8   the search process?  Was it someone at New Era
 9   running the searches, or was it a lawyer or a
10   vendor working for the lawyer?
11             MS. MUSUMECI:  Objection.
12             Sorry.  I'm just going to object to
13        the form, but you can answer the question.
14        A.    Yeah, the primary search -- the
15   primary searches were engaged in by Rich Lee.
16        Q.    He's the CEO and co-founder of New
17   Era?
18        A.    Correct.
19        Q.    So the search for documents responsive
20   to the subpoena was primarily conducted by New
21   Era's CEO and co-founder?
22        A.    Yes.
23        Q.    Was a lawyer conducting the searches
24   with him?
25        A.    He is a lawyer.
```

Page 232

1       Q.    But outside counsel?

2       A.    No.

3       Q.    Now, you have retained counsel at this

4    point, right?

5       A.    We have.

6       Q.    I want to be sensitive to privilege.

7    I don't want you to get into substance of what

8    was discussed with outside counsel.

9             Let me ask you this:  Mr. Lee was

10   acting in his capacity as a businessperson.  He

11   was not representing the company in the case,

12   was he?

13            MS. MUSUMECI:  I'm going to object to

14       that question because it calls for a legal

15       conclusion.

16       Q.    As best you can understand, I mean,

17   it's relevant to some of the questions I'm about

18   to ask so I think I need to know.

19       A.    Well, I think it's a difficult

20   question to answer because Rich, me, and Shane

21   are lawyers.

22            So, was he acting as a representative

23   of the company?  Yes, he was.  Is he also acting

24   as an attorney for the company?  I would say,

25   yes, he is.

Page 233

```
1        Q.    Okay.  But it was him running the

2   searches, right?

3        A.    Yes.  Rich is by far the most fluent

4   in all of our technical systems.

5        Q.    There was no one else that worked on

6   it with him?

7        A.    I mean, we all worked on it, but Rich

8   is the one who actually went in and did the

9   searches.

10       Q.    And what happened after he did the

11  searches?

12       A.    He would produce everything that he

13  could probably produce and send it to our

14  attorneys.

15       Q.    So the review of documents were

16  returned by the search that Mr. Lee ran was

17  conducted by Mr. Lee?

18       A.    No, we all looked at it.

19       Q.    Oh, okay.  I'm sorry.  I thought you

20  told me it was Mr. Lee.

21       A.    No, he was the one running the

22  searches and certainly did the preliminary

23  review of the stuff that was found.

24       Q.    So what does the preliminary review

25  mean?  Does that mean he decided which documents
```

Page 234

1   would go to the rest of the team for

2   consideration, or something else?

3        A.    He didn't cut anything.

4        Q.    Okay.  So what was the purpose of the

5   preliminary review?

6        A.    Well, because you don't just find

7   documents and send them.

8        Q.    Okay.  I'm trying to understand the

9   process here.

10            So Mr. Lee conducted a preliminary

11   review, but he didn't make any determinations as

12   to what was responsive or not?

13        A.    No, he absolutely did.  The question

14   is -- the issue is he did a preliminary review

15   because you also have to make sure that there's

16   nothing that's privileged, which we didn't claim

17   any privilege for.  There's no privilege log.

18            So you also have to make sure that

19   something's responsive.  So you're not hunting

20   down something that, for some reason, contains

21   "LN" that has nothing to do with Live Nation.

22            So Rich reviewed that stuff.  It's my

23   understanding he didn't cut a single document,

24   and so everything that he found we have

25   produced.

Page 235

1       Q.    I see.  So Rich -- excuse me.  Mr. Lee

2   ran search terms --

3             Well, let me ask you:  We're still

4   talking about e-mail, right?

5       A.    We're talking about everything.

6       Q.    Okay.  So, for everything, Mr. Lee ran

7   the search terms.

8             That was the first step?

9       A.    Correct.

10      Q.    He then conducted what you called a

11  preliminary review where he made determinations

12  about responsiveness, right?

13      A.    Correct, but didn't remove anything.

14      Q.    That was my next question.

15            So nothing was culled out in that

16  responsiveness review?

17      A.    Not that I recall, no.

18      Q.    What do you mean, not that you -- can

19  you tell me definitively whether or not anything

20  was culled out?

21      A.    I don't remember Rich saying a single

22  time that he had pulled a document.  And I'm

23  certain I asked him.

24      Q.    Okay.  Do you remember him telling you

25  he did not cull out any documents?

Page 236

1      A.    No.

2      Q.    I mean, is it possible he did?

3      A.    No.

4      Q.    Okay.  So you're positive that he

5   didn't cull out a single one?

6      A.    No.

7      Q.    Sorry.  You are or are not positive?

8      A.    I'm positive that Rich produced

9   everything he found.

10      Q.    Okay.  And that was a preliminary

11   review, and then it went to you and who else?

12      A.    I'm trying to think if Shane reviewed

13   it.  It certainly went to me, and I reviewed it

14   just for purposes of being the 30(b)(6)

15   deponent.  I did not pull anything.

16      Q.    Did Shane pull anything?

17      A.    No.

18      Q.    Okay.  So I'm just trying to make sure

19   I understand the facts here.  Okay?

20            So Rich did the preliminary search,

21   didn't cull anything out; you and Mr. Mulrooney

22   also looked at it, didn't cull anything out,

23   right?

24      A.    Correct.

25      Q.    So if we were to get the list of

Page 237

```
 1   search terms from your counsel, every document

 2   that hit on one of those search terms was

 3   produced to because nothing was withheld for

 4   responsiveness and nothing was withheld for

 5   privilege?

 6        A.    Correct.

 7        Q.    And those searches were run over

 8   e-mail, Slack, Signal, and text messages?

 9        A.    We did not run text messages because

10   we don't communicate via text.

11        Q.    Okay.  Well, let's put that aside now

12   then.

13              I had thought we were talking about

14   e-mails.  So this prior discussion was about

15   e-mail, Slack, and Signal?

16        A.    Correct.

17        Q.    And it sounds like, per e-mail, you

18   did the search in Google Drive, right?

19        A.    Yeah, it's actually, I think, Google

20   Workspace now.

21        Q.    Okay.  And how did the search work for

22   Slack?

23        A.    There's some back-end thing where you

24   can search Slack as well.

25        Q.    And when you did the searches on
```

Page 238

1    Google, now, did that encompass both e-mails and

2    documents like decks, for example, that might

3    have been saved on Google Drive or exchanged

4    among people at New Era?

5         A.    Correct, so it's the entirety --

6               Sorry, Sandy.

7               MS. MUSUMECI:  I was just going to

8         object to the form, but if you understood,

9         please answer.

10        A.    Yeah, so it's the entirety of Google

11   Workspace, which includes e-mail, Google Sheets,

12   Google Docs.  There's a whole slew of different

13   things that's within the Google Workspace.

14        Q.    Okay.  And when e-mails were reviewed,

15   were they sort of reviewed in their native form

16   as they exist in that workspace, or did Mr. Lee

17   download them or save them as PDFs such that you

18   could review?  How did that work?

19        A.    He downloaded them.

20        Q.    Okay.  What format were they in when

21   you reviewed them?

22        A.    PDF, I believe.

23        Q.    Was that before or after they were

24   produced in this case?

25        A.    We reviewed them before we produced

Page 239

1    them, yes.

2        Q.    Okay.  So Mr. Lee went through, ran

3    search terms, downloaded everything as PDFs, and

4    then you and Mr. Mulrooney looked at them?

5        A.    I'm not entirely sure Shane looked at

6    them, but I did.

7        Q.    Was there anyone else that looked at

8    them or weighed in on what documents to produce?

9        A.    No.

10       Q.    So how did the process work for

11   Signal?

12             I mean, I have it on my phone right

13   now.  It's an app.  I'll be honest.  I don't

14   know how to search Signal, so how did you all do

15   that?

16       A.    Yeah, Rich knows how to do that, but

17   once again, so our -- our retention policy was

18   four weeks.  There was no discussion about Live

19   Nation on Signal, so it's not surprising that

20   nothing showed up, but I know Rich searched it

21   because we had to and should.

22       Q.    When you say "Rich searched it," I

23   mean, did you give him your phone, for example?

24       A.    No.  He has access -- so there's

25   actually admins on the system.  So he has access

Page 240

1    to it.

2         Q.    I see.

3              Is this a Signal app. on people's

4    phones or is this something they use on their

5    computer, or how does it work?

6         A.    You can use it both ways.  They mirror

7    each other.

8         Q.    Sorry.  I didn't mean to talk over

9    you.  I do that sometimes.

10             Did you get everything out?

11        A.    Yeah, yeah, I'm just saying they

12   mirror each other.

13             You can do Signal on your desktop or

14   you can do it on your phone.

15        Q.    How does it work that he has

16   administrative access?  Is the account somehow

17   linked to New Era?

18        A.    Yes.  I mean, he set the mole thing up

19   for us.

20        Q.    I see.  So it's like he set up, like,

21   a Signal group where you could all message?

22        A.    Yes.

23        Q.    What about bilateral communications?

24             MS. MUSUMECI:  Objection to form.

25             Can you just rephrase what you mean by

Page 241

1      that?

2            MR. SEARS:  Yeah.

3    BY MR. SEARS:

4      Q.    If I'm understanding you correctly,

5    Mr. Lee set up basically a group chat on Signal,

6    right?

7      A.    Yes.

8      Q.    And that's what we were talking about,

9    right?

10     A.    Correct.

11     Q.    What about one-on-one messages, I

12   mean, did you search messages where you had just

13   sent a message to Mr. Lee that wasn't on that

14   group?

15     A.    I mean, I have looked at my messages.

16   I don't talk -- once again, Signal is a group

17   thing within our business, but it's more of a

18   social thing.  It's not something that business

19   communications are used on.

20     Q.    Okay.  But my question is, just for

21   the six custodians, were bilateral or one-on-one

22   Signals searched?

23     A.    It's my understanding that Rich

24   searched everything.

25     Q.    Does he have access to bilateral

Page 242

1   signals?

2       A.    I believe he does.

3       Q.    I mean, so if you messaged me right

4   now, that's something he would have access to?

5       A.    I would think so.

6       Q.    Okay.  And your understanding is that

7   he searched those messages for all six of the

8   custodians?

9       A.    That's my understanding, yes.

10      Q.    I mean, I'm not trying to characterize

11  it.  You seem a little unsure.

12            Is there any uncertainty about this?

13      A.    I have absolutely no uncertainty

14  because what you're asking me is, was there

15  communications about Live Nation and

16  Ticketmaster and Latham & Watkins on Signal?

17  And my absolute recollection is no, because it's

18  not the type of stuff that we talk about on

19  Signal.

20      Q.    My question is actually a little

21  different because I understand that there's a

22  group chat that you were a party to, but, I

23  mean, for example, you would not necessarily

24  know what Mr. Mulrooney sent to Mr. Lee on

25  Signal unless they told you about it, right?

Page 243

```
 1        A.     I understand, yes.

 2        Q.     Okay.  And are you positive that those

 3   type of one-on-one messages were searched?

 4        A.     It is my understanding that those were

 5   searched.

 6        Q.     Based on what?

 7        A.     This is what Rich told me.

 8        Q.     And he told you that he searched every

 9   one's Signal, all of their "to/from's" from

10   anyone?

11        A.     He did not say it in those words.

12        Q.     What did he tell you?

13        A.     He told me that he searched Signal.

14   Everything that he could possibly search on

15   Signal.

16        Q.     Okay. anything else that he mentioned

17   about the search?

18        A.     No.

19        Q.     Okay.  Now, how about text messages,

20   can you walk me through the search process for

21   those?

22        A.     We don't communicate on text message.

23        Q.     Was there a search process for text

24   messages or not?

25        A.     No; we don't use text messages for the
```

Page 244

1   business.

2       Q.    So you, for example, your text

3   messages were not searched?

4       A.    No.

5       Q.    Mr. Mulrooney's text messages were not

6   searched?

7       A.    No.  We don't communicate for the

8   business on text message.

9       Q.    None of the six custodians' text

10  messages were searched?

11      A.    No.

12      Q.    What about other messaging apps,

13  LinkedIn messages, were those searched?

14      A.    Yes, I believe they were.  I believe

15  we produced a couple of messages that Shane had

16  sent maybe to Nima.

17            I mean, I know we searched LinkedIn,

18  and I -- but I believe there was only one or two

19  things, and those were produced.

20      Q.    Now, you didn't mention LinkedIn

21  before.  I just want to make sure we're

22  comprehensive.

23            Is there any source of information

24  that was searched that we haven't talked about

25  yet?

Case 2:22-cv-00047-GW-GJS   Document 146-4 (Ex Parte)   Filed 03/22/23   Page 246 of 379
Page ID #:3471

Page 245

1       A.    No, there's nothing else we used.

2       Q.    And it's remote tech company, so no

3    hard copy documents?

4       A.    No.  No, we have -- we have Box as

5    well, which is only a repository for like --

6    well, it's not even really use, to be honest.

7    It was initially a good intention to maintain

8    executed documents.  That was searched as well.

9       Q.    Okay.  Was anything produced from

10   that?

11      A.    I don't think so.  I don't think -- to

12   be totally honest with you, I don't know that

13   we've ever really used Box.  It was an idea and

14   the account was opened, but I don't know that

15   there's anything in there.

16      Q.    Okay.  Anything else we haven't

17   covered so far?

18      A.    No.

19      Q.    Now, one of the issues that we've seen

20   here and that I've seen with Google is that

21   sometimes if you have, you know, a linked

22   attachment, the attachment can get overwritten

23   if someone makes edits to it.

24            Do you understand what I'm talking

25   about?

Page 246

1      A.    It's not an attachment.  If you're

2   talking about drafting documents in Google, then

3   that is generally correct.

4      Q.    I mean, just explain to me the

5   phenomenon as understand it.  I don't want to

6   put words in your mouth.

7      A.    So it's not like -- it's very

8   different from, say, Microsoft Word, where

9   you're drafting a document and then you save it

10  and Word -- you actively save it and Word

11  creates a version of that document.

12         Microsoft -- I mean, Google,

13  essentially what it does is, as you're drafting,

14  it saves in perpetuity.  So it's, basically,

15  there isn't versions of the document.  As you

16  make changes, those changes are saved, and it's

17  just a continuously running document.

18     Q.    I understand.  I even understand you

19  have worked with your lawyers to produce

20  different versions of some of those documents,

21  right?

22     A.    Correct.

23     Q.    Now, because of that process, is it

24  possible that there are versions that may have

25  been distributed at one point that no longer

Page 247

1    exist?

2         A.    It would have shown up in the

3    searches.

4         Q.    Well, I mean, explain that to me.

5    Well, just explain that to me.  Then I'll ask my

6    question.

7         A.    Well, because even in Google, if

8    you're going to share something, you can provide

9    somebody access to the document where they're in

10   there -- they're essentially a user on it and

11   they can make changes and things like that, they

12   can see the document.

13        If you save it as an attachment,

14   essentially what you have to do is download it

15   to Word.  There's no real way to attach -- you

16   can attach a link, but you can't attach a Google

17   document to an e-mail.

18        So but if we had sent a link to the

19   document or if we had downloaded it as Word,

20   that would have been included in the production.

21        Q.    Okay.  I want to ask you a question

22   and I want to be sensitive to privilege.

23        So I really don't want you to disclose

24   the substance of any communications with

25   lawyers, okay?  So I do want to understand this.

Page 248

1          You said that there was a search run

2    for terms like "Live Nation" and "Ticketmaster"

3    and whatnot, and you also told me nothing was

4    withheld for privilege.  So am I correct that

5    there were just no written communications

6    talking about the defendants in this case with

7    your outside counsel?

8        A.    I mean, every -- I can't remember -- I

9    mean, we've had communications, certainly, with

10   our counsel, but once again, most of the -- most

11   of the communicating that we do is on Zoom

12   calls.

13       Q.    Did you have written communications

14   about this case with your outside counsel?

15          Again, I don't want to know the

16   substance, just whether it happened.

17       A.    Yes, we've had written communications,

18   I believe.

19       Q.    But you didn't withhold any for

20   privilege?

21       A.    Correct.

22       Q.    And just help me understand.  The

23   reason I'm struggling is, even if Sandy had just

24   sent you an e-mail that forwarded the lawsuit,

25   presumably that would hit on a term like "Live

Page 249

1    Nation," but you're saying that no documents

2    like that came up in the search, and none were

3    withheld for privilege.

4           So did the -- I mean, can you explain

5    how that's possible?

6           MS. MUSUMECI:  I'm going to object to

7       this line of questioning, and I might ask,

8       actually, if we could go offline for a

9       second so I can talk to you, Will, I guess.

10      I'm --

11          MR. SEARS:  Sure.  Let's go off the

12      record.

13          (Recess; Time Noted:  1:36 p.m.)

14          (Time Noted:  1:41 p.m.)

15   BY MR. SEARS:

16      Q.   So, welcome back, Mr. Williams.

17          Just a couple more questions on this.

18   So I just -- I want to be clear about what you

19   told me earlier.  Because I had understood you

20   were saying the search terms like "Live Nation"

21   were run.

22          You remember that?

23      A.   Yes.

24      Q.   And I had understood you as saying

25   that everything that resulted was turned over,

Page 250

1    do you remember that?

2         A.    Yes.

3         Q.    Was there a subset of those that you

4    didn't mention that were set aside for privilege

5    because they were outside counsel, or did those

6    just not come up in that search?

7         A.    Well, I mean, I think there was also

8    the ruling by the judge that said these are the

9    responsive documents that we need to produce,

10   but we ran every search.

11            I cannot tell you for certain right

12   now whether or not a bunch of stuff with Sandy

13   popped up and Rich did somehow withhold that

14   because it wasn't responsive to the subpoena or

15   whatever it is.  I'm happy to get to the bottom

16   of that, but, you know, we produced everything

17   that was responsive to the subpoena.

18        Q.    Right.  I mean, I will ask you to get

19   to the bottom of that with your lawyers and get

20   back to us.

21            Do you understand why I'm asking you?

22   You told me that there were no documents that

23   hit on --

24        A.    I get it, yeah.  I understand, and I'm

25   not trying to be -- I'm not trying to hide

Page 251

1   anything here, and I will say maybe I was too

2   macroscopic in my view of what was produced by

3   saying everything that connotes that everything

4   under the sun is absolutely produced.

5           I think the more -- the better way to

6   put it is that everything that was run -- all

7   the searches were run and everything that was

8   responsive to the subpoena in accordance with

9   what the judge said, in addition to his

10  verbal -- or, the magistrate, her verbal ruling,

11  we produced all of it.

12  Q.    Okay.  Now, you mentioned the

13  magistrate's verbal ruling.  You know that was

14  November 2022.

15          Does that sound about right?

16  A.    It does.  It was right around my

17  birthday, I think, so happy birthday.

18  Q.    Happy birthday indeed.

19          And when did Mr. Lee run the searches

20  that you were describing?

21  A.    Rich has actually run them, I think,

22  as we've gone.  So it wasn't that he did this

23  all in one lump sum.

24          I think, as you well know, the case

25  has evolved with the magistrate rulings and all

Page 252

1    those different things, so I know Rich has been

2    running those as we learned certain things and

3    figured out what he needed to do.

4          Q.    Did the certain terms change over

5    time?

6          A.    I think he added some based on things

7    that we learned, yeah.  I mean, certainly like

8    having to produce additional marketing materials

9    and things like that.

10         Q.    Were the searches at any point limited

11   in the timeframe of materials that they covered?

12         A.    I know that there was a limit within

13   the magistrate's ruling.  I will tell you I

14   believe that we produced stuff that was even

15   beyond that time limit.

16         Q.    Let me ask you this:  You mentioned

17   search terms like "Live Nation," right?

18         A.    Yes.

19         Q.    Did Mr. Lee do at least one round of

20   searches involving the word "Live Nation" before

21   the magistrate judge's ruling in November?

22         A.    I believe he did.

23         Q.    And you believe that all the materials

24   responsive to the subpoena were returned from

25   that search?

Page 253

```
 1        A.      I believe so, yes.

 2        Q.      Okay.  The subject or the caveat you

 3   had, that some of them may have been withheld

 4   for privilege?

 5              MS. MUSUMECI:  Objection.  Objection

 6        to that characterization.

 7              You can answer.

 8        Q.      If you want to characterize it

 9   differently, that's fine.  I'm just trying to

10   get -- figure this out.

11        A.      Yeah, I mean, subject to us not

12   producing any direct communications with Sandy

13   and her team.

14        Q.      Let me ask you this.  I mean, you

15   mentioned a timeframe ruling by the magistrate.

16              Were there documents you encountered

17   that would have been responsive but for that

18   ruling?

19        A.      But for the time?

20        Q.      Yes.

21        A.      I believe we produced everything

22   regardless of that time limitation.

23        Q.      Okay.  You did not actually use a

24   timeframe cutoff to withhold materials?

25        A.      I don't -- I do not -- I recall having
```

Page 254

1    this conversation and saying that -- Rich ran

2    the searches and said, hey, there's really

3    nothing beyond that timeframe either.  So I

4    said, well, let's just send everything.

5        Q.    Was there a vendor involved with the

6    collection or searches at all?

7        A.    No.

8        Q.    So, basically, once Rich had culled

9    the materials and you all looked at them, they

10   were sent over to counsel to make the

11   production?

12       A.    Correct.

13       Q.    Okay.  So there was no vendor that

14   came in and double-checked the search or did

15   anything like that?

16       A.    Not -- not on the New Era side.

17             I don't know if a vendor was used by

18   Sandy and the team.

19       Q.    So, on the New Era side, then, the

20   search was conducted by New Era?

21       A.    Correct.

22       Q.    And the responsiveness review was done

23   by New Era?

24       A.    I mean, once again, without getting

25   into privileged conversations, I believe that

Page 255

1    Sandy and her team reviewed the documents too.

2         Q.    But they reviewed the documents when

3    New Era sent them?

4         A.    Yes.

5         Q.    Did they have access to New Era's

6    systems?

7         A.    No.

8         Q.    They didn't have the ability to run

9    their own searches in New Era's systems?

10        A.    I don't believe so that Sandy's team

11   uses Google Workspace, nor do most law firms.

12   So I think we really would have gummed up the

13   works had we attempted that.

14        Q.    Okay, but from your earlier litigation

15   experience, you understand that law firms can

16   hire vendors to work on that type of issue,

17   right.

18        A.    I do.

19        Q.    Your counsel's firm did not, as far as

20   you know, have a vendor that had access to your

21   systems and ran searches?

22        A.    No.

23        Q.    New Era conducted the searches and

24   then sent them the documents?

25        A.    Correct.

Page 256

1      Q.    All right.  Do you still have the

2   document in front of you?

3      A.    I do.

4      Q.    Okay.  Can you go to --

5            MS. MUSUMECI:  I'm sorry.  Which

6      document are we referring to right now?

7            MR. SEARS:  It's the one in the chat

8      called Tab 32.

9            MS. MUSUMECI:  Thank you.

10            MR. SEARS:  Subscription agreement.

11   BY MR. SEARS:

12      Q.    So if you flip over to the next page

13   from what we were on, the one ending in Bates

14   193.

15            Let me know when you're there.

16      A.    193.

17            Yeah, I'm here.

18      Q.    You see there's a "Governing Law"

19   section?

20      A.    Yes.

21      Q.    And one of the things that's in here

22   is that, in the draft agreement, is that

23   disputes regarding the agreement will be

24   resolved using New Era, right?

25      A.    Correct.

Page 257

```
1        Q.    Okay.  Now, can you flip to Exhibit A,
2   the statement of work.
3        A.    Yes.
4        Q.    Now, this is the -- the part that
5   is -- that really makes up the subscription fee
6   part, right?
7        A.    Correct.
8        Q.    And this is what addresses mass
9   arbitrations?
10       A.    Correct.
11             MR. SEARS:  Do you need a break?
12       A.    No.  No.  I don't at all.  It's just a
13   friend calling, and I can't seem to turn it off.
14             MR. SEARS:  You want to go off the
15       record for a moment?
16             THE WITNESS:  No, it's fine.  It's
17       fine.  I'm sure it's not colossally
18       important, so...
19   BY MR. SEARS:
20       Q.    Okay.  And just briefly, I mean, if
21   you look here, it looks like there's some
22   placeholders, some key terms have not been
23   filled in?
24       A.    Yes.
25       Q.    For example, coverage of mass
```

Page 258

1    arbitrations, the number of non-mass arbitration

2    New Era proceedings is blank?

3         A.    Correct.

4         Q.    What's the significance, if any, of

5    that number?

6         A.    When we do the pricing, there's

7    typically -- you can do -- you can do it a bunch

8    of different ways.  You can say it's all in one,

9    and if there's a non-mass arbitration case,

10   that's included.

11            You know, we've had customers who have

12   come to us and said, you know, we want to reduce

13   the cost, so went to limit the number of

14   non-mass arbitration proceedings to five or ten.

15   So that's what this is.

16            You can -- everything's bespoke to

17   what we're trying to accomplish and what we need

18   to cover as far as costs and what the customer

19   is trying to make sure is paid for.  So that's

20   what a non-mass arbitration proceeding is.

21   That's what this blank is for.

22        Q.    Okay.  And if you flip to the last

23   page, do you see that there's a Section 5 called

24   "Pricing"?

25        A.    Yes.

Page 259

1      Q.    And this is a placeholder for now as

2  well?

3      A.    Yes.

4      Q.    Have you discussed pricing with Latham

5  & Watkins at this point?

6      A.    As far as --

7            MS. MUSUMECI:  I'm sorry.

8            Objection to form.

9            At what point?

10     Q.    As of May 12, 2021?

11           MS. MUSUMECI:  Thank you.

12     A.    I don't recall if we had discussed

13  pricing at this point or not.

14     Q.    I'm going to introduce our next

15  exhibit, if I can successfully drag it into the

16  chat?

17     A.    I've got these three open.  Can I

18  close these?

19     Q.    You can.

20     A.    Okay.

21     Q.    I'm introducing our next exhibit.

22  It's a document bearing Bates number

23  NEWERA_000432.

24           (Williams Exhibit 28, E-mail chain

25           Bates-stamped NEWERA_000432 through 447,

Page 260

1      marked for identification, as of this date.)

2   BY MR. SEARS:

3      Q.    Let me know when you have it.

4      A.    Got it.  Yep.  Okay.

5      Q.    Okay.  So this is an e-mail from June

6   2, 2021?

7      A.    Correct.

8      Q.    It's from Mr. Mulrooney to the Live

9   Nation litigation team at Latham?

10     A.    Yes.

11           Sorry.  Didn't mean to talk over you.

12     Q.    That's okay.

13           And he's attaching an updated

14  subscription agreement?

15     A.    Correct.

16     Q.    And now, do you recall the edits that

17  were made between the prior one from May 12 and

18  this one?

19     A.    I don't recall them specifically.  I

20  mean, obviously on the statement of work you can

21  see the obvious edits, which has to do with

22  pricing, and that was, as I recall, primarily

23  what was being discussed.

24           There might have been some edits to

25  some of the other provisions of the MSA.  I

Page 261

1    don't recall specifically what they were.

2        Q.    And that's the thrust of my question.

3    It's a little hard to piece together because the

4    redlines, as you'll see, don't always show up in

5    these documents.

6              So is it directionally right that the

7    main edits and discussion were around pricing at

8    this point?

9        A.    Oh, yes.  Yeah.  I mean, we

10   definitely -- there was some deal points around

11   the language in certain parts of the MSA, but

12   there was a lot of discussion about pricing and

13   how many cases want to be included and why that

14   type of price and things like that.

15       Q.    And when you say there were deal

16   points around the MSA, do you recall what they

17   were?

18       A.    I don't recall off the top of my head,

19   no.

20       Q.    Do you remember any that were a

21   particular stumbling block or required extensive

22   edits?

23       A.    No.  I mean, we certainly had some

24   conversations about some of them, but there

25   was -- there was nothing that, having done SAS

Page 262

```
 1   contracts for two years of my life, there was
 2   nothing that made me incredibly uncomfortable,
 3   no.
 4        Q.    And I think you mentioned the renewal
 5   term.
 6              Do I have that right?
 7        A.    I did, yes.
 8        Q.    And it looks like the renewal term
 9   goes from ten years to five years in this one;
10   is that correct?
11        A.    Correct.
12        Q.    And who wanted to change it from ten
13   years to five years?
14        A.    Ten years was really just something
15   that we had placed as a standard placeholder
16   with the assumption that most clients would not
17   agree to a ten-year contract.  So it was Live
18   Nation that wanted it shorter.
19        Q.    Okay.  It was Live Nation?
20        A.    Yes.
21        Q.    What was the reason that they gave?
22        A.    I mean, I don't recall there being a
23   specific reason other than a ten-year contract
24   is a long contract.
25        Q.    All things equal, a five-year contract
```

Page 263

```
1   gives them a little more leverage than a

2   ten-year contract because, as you put it, a

3   ten-year contract is a little bit longer, it's a

4   little easier to renew multiple times.  A

5   five-year contract is a little bit harder?

6        A.    I think that's correct to an extent.

7              I think, from our standpoint, too, we

8   did have some concern that there would be an

9   incredible volume of litigation and we would be

10  locked into a certain price, which essentially

11  could make us lose our shirt, right?

12             So what we wanted to do is make sure

13  that there was a time period where we could

14  learn what the litigation volume looked like

15  and, if necessary, then the contract could be

16  renegotiated.

17       Q.    So New Era -- let me ask it a

18  different way.

19             New Era expected that there might be a

20  high volume of litigation involving Live Nation?

21       A.    I think even with clients that aren't

22  necessarily super litigious, and as I recall --

23  I don't remember numbers, but as I recall, Live

24  Nation did not have a ton of litigation.  But

25  the reality is any company can go from no
```

Page 264

1    litigation to tons of litigation in a 365-day

2    period.

3            So we're always cognizant of that and

4    the fact that, you know, circumstances can

5    change very, very quickly.

6        Q.    New Era wanted the option, if the

7    volume of litigation went up, to charge more?

8        A.    I think we would want the optionality

9    to be able to revisit the agreement.

10       Q.    Because in a scenario where they have

11   a relatively higher degree of litigation, you

12   might be able to get them to pay more?

13       A.    Maybe, but it also depends on, you

14   know, what the litigation costs.

15           So I think that the significance of

16   going back and forth on this is that they didn't

17   necessarily want to be completely locked into an

18   incredibly long-term, and really neither did we

19   because we wanted to learn as this whole thing

20   built out.

21       Q.    And let's take a look at the statement

22   of work.

23           Are you there?

24       A.    I am.   Yep.

25       Q.    So it looks like one of the terms here

Page 265

1    that's being still negotiated is the number of

2    non-mass arbitration New Era proceedings.

3            Do you see that?

4    A.    Right.  Correct.

5    Q.    But it looks like, at this point, both

6    parties agreed that there would be full coverage

7    of mass arbitrations?

8    A.    Yes.

9    Q.    And that was a big motivator for this

10   deal, was having full coverage for mass

11   arbitrations, right?

12   A.    Honestly, that's a question for Live

13   Nation.

14   Q.    Right.  It was certainly one of the

15   issues that came up?

16   A.    It was an issue that came up, yes, but

17   from our perspective, you know, it's just a

18   pricing issue.  So it's not necessarily good,

19   bad, or indifferent to have full coverage as it

20   relates to us, but for a customer, that very

21   well could be a breakpoint.

22   Q.    When you say it's a pricing issue, you

23   mean because full coverage is going to cost you

24   more than something less?

25   A.    Correct.

Page 266

1      Q.    And was that full coverage one of the

2   main drivers of pricing for the subscription

3   agreement?

4      A.    It goes into our model, yes.

5      Q.    And when you say "a model," is there

6   literally like an Excel model that you use to

7   calculate fees based on a number of factors, or

8   is it more qualitative?

9      A.    There is literally a model.

10     Q.    Okay.  And what are the inputs into

11  that model?

12          MS. MUSUMECI:  Objection.  Objection.

13          This is outside of the scope of the

14      deposition topics.

15          MR. SEARS:  It's absolutely not.  It

16      goes directly to the subscription agreement,

17      which is encompassed by it.

18          If you want to instruct him not to

19      answer, you can do that, but I think it's a

20      fair question.

21          MS. MUSUMECI:  You can ask him about

22      some of the process, but the actual formulas

23      involved we would submit are outside of the

24      scope and are trade secrets.

25          And so he's not going to answer that,

Page 267

1          but you can ask him a little bit more

2          broadly about the process by which they

3          priced.

4                  MR. SEARS:  Well, let's see how it

5          goes.  Look, I have no problem if you want

6          to designate it highly confidential, but I

7          am going to ask.

8     BY MR. SEARS:

9          Q.    I mean, he's -- does one of the inputs

10    have to do with mass arbitration risk?

11         A.    I wouldn't even know exactly what that

12    means.  So I'll answer that as "no" because you

13    can't quantify that.

14                If you said what's your mass

15    arbitration risk, it's one thing if you had 20

16    mass arbitrations filed against you.  Live

17    Nation didn't have that.  So there's nothing for

18    us to input into the model that is mass

19    arbitration risk.

20         Q.    Does the model account for litigation

21    risk in some capacity?

22         A.    Sure.  I mean, that's why we asked for

23    prior litigation history.

24         Q.    That goes into the model then?

25         A.    Sure.

Page 268

1      Q.    The more high risk a company the more

2   expensive pricing will be, all things equal?

3      A.    Yes, I think that's fair.

4      Q.    Does it distinguish being different

5   types of litigation risk, or is it just sort of

6   one input?

7      A.    I don't want to get into a ton of

8   that.

9      Q.    So you're not going to answer the

10  question?

11         MS. MUSUMECI:  Yeah, I'm going to

12      object as that's getting into details beyond

13      the scope of the subpoena.

14      Q.    When Mr. Lee was conducting the

15  search, did he run search terms like "mass

16  arbitration"?

17      A.    Yes, I believe he did, yeah.

18      Q.    And all of those documents were

19  produced?

20      A.    Well, we would have produced anything

21  that had to do with Live Nation, Ticketmaster,

22  Latham & Watkins.

23      Q.    So there may have been mass

24  arbitration documents or documents about mass

25  arbitration that you did not produce because

Page 269

1   someone at New Era determined they did not

2   relate to Live Nation or Latham & Watkins?

3            MS. MUSUMECI:  I'm going to object.

4            Let me just -- I'm going to object to

5        the form of that question, and that also --

6        I'm going to object in that if you're asking

7        him to -- whether they produced documents

8        beyond the scope of what Judge Standish

9        ordered.

10           MR. SEARS:  I'm not sure I understand

11       the objection, but why don't you try to

12       answer.

13           THE WITNESS:  I mean, we produced

14       anything that had to do with mass

15       arbitrations in the context of what was

16       ordered by the magistrate judge.

17           And there were a bunch of marketing

18       materials that were sent over that you

19       actually asked me some about some of them.

20   BY MR. SEARS:

21       Q.    And the reason you're asking is, do

22   you remember when we discussed earlier the

23   review process?

24       A.    Yep.

25       Q.    And do you remember when you told me

Page 270

```
 1    that all -- as I understood it, all of the

 2    documents that hit on the search terms were

 3    produced, correct?

 4         A.    Correct.

 5         Q.    Except for maybe privilege, but we're

 6    not sure about that?

 7         A.    Correct.

 8         Q.    Putting aside the privilege thing, are

 9    you now saying something different, which is

10    that there are materials mentioning mass

11    arbitration that someone decided were not

12    responsive?

13         A.    I don't have the subpoena or the

14    actual order of the judge in front of me.

15              What I can tell is we searched

16    everything and did it within accordance of what

17    was required by the judge for us to produce.

18         Q.    I understand, but that's,

19    respectfully, not a lot of detail.

20              I thought you had told me earlier that

21    all the documents that hit on search terms were

22    produced.

23              Is that true or not?

24         A.    We produced everything in accordance

25    with the subpoena.
```

Page 271

1      Q.     Can you answer my question?

2             Were all the documents that hit on the

3      search terms that New Era ran produced, or did

4      New Era decide to withhold some?

5      A.     We have not withheld anything.

6      Q.     So there are no documents that someone

7      at New Era looked at and said, this mentions

8      mass arbitration, but it's not responsive

9      because it does not mention Live Nation?

10            MS. MUSUMECI:  Objection.  Objection

11         to the question.

12            You're asking him to draw legal

13         conclusions about interpreting the Court's

14         order, and to the extent your response is

15         privileged, I'm instructing you not to

16         answer.

17            MR. SEARS:  It's not privileged and he

18         can answer.

19            THE WITNESS:  What was the question?

20    BY MR. SEARS:

21      Q.     So there are no documents where

22    someone at New Era looked at them and said, this

23    mentioned arbitration, but I'm determining that

24    it is not responsive to the subpoena because it

25    does not mention Live Nation?

Page 272

1      A.    No.

2      Q.    The answer is no?

3      A.    The answer is no.

4      Q.    No documents were held because someone

5  at New Era deemed them nonresponsive?

6      A.    Not that I'm aware of.  It was not me.

7  And no, the answer is no.

8      Q.    So, just to be clear, if we were to

9  hire a vendor and they were to run the term

10  "mass arbitration" over all the sources that we

11  have discussed, every document that that search

12  hit upon would -- has already been produced?

13            MS. MUSUMECI:  Objection.  That is not

14       what was required of them, and you are

15       mischaracterizing his prior testimony.

16            MR. SEARS:  I'm not charactering

17       anything, not a court order, not his prior

18       testimony.  I'm asking simple questions.

19       I'm just looking for an answer.

20            THE WITNESS:  The answer is no.

21  BY MR. SEARS:

22      Q.    Okay.  Nothing was withheld?

23      A.    No.

24      Q.    Okay.  I'll mark as our next exhibit a

25  document bearing Bates number NEWERA_000398.

Page 273

```
 1                (Williams Exhibit 29, E-mail chain

 2        with attachments Bates-stamped NEWERA_000398

 3        through 419, marked for identification, as

 4        of this date.)

 5   BY MR. SEARS:

 6        Q.    Let me know when it loads.  This is

 7   another one with some attachments.

 8        A.    I can close these other ones?

 9        Q.    Yes.

10        A.    Okay.

11        Q.    So this is an e-mail from Latham to

12   looks like Mr. Mulrooney, and you and Mr. Lee

13   are copied there.

14              Do you see that?

15        A.    I do.

16        Q.    And it's called "New Era Contract -

17   Redline for New Era," right?

18        A.    Correct.

19        Q.    So this is their response to the June

20   2 e-mail that we looked at?

21        A.    That looks correct, yes.

22        Q.    And they sent along some edits to the

23   subscription agreement?

24        A.    I assume so, yes.

25        Q.    In the form of a redline?
```

Page 274

1       A.    That's what they said, yes.

2       Q.    Can you just leaf through?

3             My question is pretty simple.  When I

4    look at it, I don't see any redlines.

5             Do you?

6       A.    I'm looking right now.

7             It looks like there's an input for the

8    non-mass arbitration proceedings.  It looks like

9    the subscription fee has changed.  There's a

10   change in pricing.  5(i), "State whatever the

11   default allocation will be under New Era's Rules

12   and Procedures."

13            So there are some redlines.

14      Q.    I see.  Are they showing up as

15   redlines for you?

16            I see the changes.  I just am not

17   seeing them literally as redlines.  So I'm

18   trying to figure out what the changes were.

19      A.    Yeah, I mean, it looks like they -- to

20   me, they're bolded, and some of them are -- it

21   looks like -- because this is black and white,

22   so I really can't tell -- looks like some of

23   them are in yellow, which would have made some

24   sense, but it does not look like they are what I

25   would think of standard Microsoft Word redlines.

Page 275

```
 1       Q.    Got it.

 2             I'm not trying to be pedantic or play

 3    games about colors.  I just need to understand

 4    what the changes were.

 5             As far as you know, is it the ones you

 6    just identified?

 7       A.    Yeah.  And given the date of this,

 8    which is June 9, we're getting close to the end

 9    of the negotiation.

10       Q.    Right.  Now, if you recall from the

11    last one, I don't know if I asked you about

12    this, but the subscription fee, as you noted,

13    was not filled in on the prior one or wasn't

14    completed yet?

15       A.    Correct.

16       Q.    The other one had a range.  It was

17    ████████  to  ████████?

18       A.    Correct.

19       Q.    And now it's been filled in as

20    ████████?

21       A.    Yes.

22       Q.    Which is below the range that was in

23    the other one?

24       A.    It was -- wasn't -- the other range

25    was ████ to ████, I thought.
```

Case 2:22-cv-00047-GW-GJS   Document 146-4 (Ex Parte)   Filed 03/22/23   Page 277 of 379
Page ID #:3502

Page 276

```
 1      Q.    You can look if you want.  It's ███ to

 2   ███.

 3      A.    Okay.  Okay, sir.

 4      Q.    So, basically, tell me if I have this

 5   right:  New Era proposed a range of ███ to ███ ,

 6   and Latham came back at ██████ , so a little bit

 7   less than the range?

 8      A.    Yes, they were negotiating down.

 9      Q.    And it looks like another change is

10   that, in the section about jurisdiction and

11   dispute resolution, they dropped New Era as the

12   ADR provider, do you see that?

13      A.    Yeah.  Yes.

14      Q.    Was that change discussed?

15      A.    I don't think we had a big discussion

16   about it.  I mean, there is the -- there was the

17   concern that you're the provider and you're also

18   the dispute resolution mechanism.

19            Our thought was our arbitrators and

20   mediators are totally neutral.  We're just a

21   platform, but easy change.  We had no problem

22   changing it to State of Illinois.

23      Q.    So that was something that Latham

24   proposed as an edit?

25      A.    Yes.
```

Page 277

```
 1      Q.     You weren't concerned that New Era

 2   might be biased or appear to be biased if it was

 3   arbitrating a dispute involving New Era?

 4      A.     Yeah, I think they just thought that

 5   that was a little odd.  For us, it actually

 6   makes a lot of sense, but it's not something

 7   that we put up a big fight about.

 8      Q.     And do you recall discussions about

 9   the pricing term around this time?

10      A.     I mean, pricing was discussed the

11   entire time, yes.

12      Q.     I mean, what do you recall about those

13   discussions?

14      A.     I mean, I do -- I remember when they

15   came back at ████████, below ███.  And, you know,

16   I believe at some point on one of the calls we

17   came up from that and, you know, we eventually

18   agreed on price.  But I do recall this being

19   sort of their:  Hey, we want a lower price and,

20   you know, having conversations about that.  Just

21   as any commercial attorney would do.

22      Q.     I see.  And in this draft, at least --

23   and it may have been in the prior one -- the

24   mass arbitration per case filing fee is up to --

25   or, is $300?
```

Page 278

1      A.     That looks correct, yes.

2      Q.     Who proposed that?  Was it Latham or

3   New Era?

4      A.     We proposed I believe the $300 filing

5   fee.  So that's another thing that fluctuates on

6   pricing.

7             So if you want a lower subscription

8   fee, you can increase the per-case price, or if

9   you want to completely subsidize, you can drop

10  that to zero.  It's a pricing discussion.

11     Q.     Explain to me a little more how the

12  interaction between that and the subscription

13  pricing fee works?  I want to make sure I

14  understand what you're saying.

15     A.     So everything is a bit of a sliding

16  scale.  So if you decide as the company you have

17  very little litigation, but you're concerned

18  about it, you want to subsidize all the

19  litigation, not pass on any costs or not keep

20  any per-case cost, you can pay more in a

21  subscription fee and say, We're done.

22             Cases come in.  You guys handle them.

23  There's no price being.  There's no per-case

24  price.  That's it.  We're all in one, and we're

25  just paying one set fee.

Page 279

1           If you're concerned about the initial

2   expenditure of the fee and you don't know what

3   your litigation is going to look like, so you

4   say, look, I want to reduce the per-case price,

5   but I don't want to pay as much in the

6   description.  We can do that too.  We can say,

7   all right, you'll pay less in the subscription,

8   but we still need to subsidize the cost so we

9   have to increase your per-case price to $500.

10          So it's a sliding scale depending on

11  what the customer is looking to do.

12     Q.    I see.  So that, all things equal, the

13  higher the subscription fee, the lower the

14  filing fee; lower the subscription fee, the

15  higher the filing fee?

16     A.    Correct.

17     Q.    That's to make sure New Era can make

18  money on these?

19     A.    It's not even to make money because

20  there's also a sliding scale on how many cases

21  come in.  It's to make sure that we can cover

22  our costs and don't get absolutely annihilated.

23          MR. SEARS:  I'm going to mark our next

24     exhibit.

25          Introducing as our next exhibit a

Page 280

```
 1        document bearing Bates number NEWERA_000375.

 2             (Williams Exhibit 30, E-mail with

 3        attachments Bates-stamped NEWERA_000375

 4        through 392, marked for identification, as

 5        of this date.)

 6   BY MR. SEARS:

 7        Q.    Let me know when you have it.

 8        A.    Got it.

 9        Q.    So this is another e-mail between New

10   Era and Latham from a couple days after the one

11   we just looked at?

12        A.    Correct.

13        Q.    And Mr. Mulrooney is sending back

14   another draft of the subscription agreement?

15        A.    Yes, that looks correct.  Yep.

16        Q.    And as we discussed at this point, the

17   negotiations was -- a lot of the terms were

18   filled, in largely going back and forth on

19   price?

20        A.    Correct.

21        Q.    And he concludes here "a quick issues

22   list of the remaining open items"?

23        A.    Yes.

24        Q.    And one is renewal?

25        A.    Yes.
```

Page 281

```
 1        Q.     He says, "We would like to discuss our

 2   rationale behind our changes and potential

 3   alternative options," right?

 4        A.     Yes.

 5        Q.     Okay.  What were the changes?

 6        A.     I think this gets back to the duration

 7   of the contract.  I'm just looking at it.

 8               Oh.  So, yeah, the renewal -- this is

 9   where you get the increasing price, and then --

10   yeah, I mean, that's what the discussion was

11   about.

12        Q.     So New Era proposed a system by which

13   every time Live Nation renews, they pay more?

14        A.     Yes.

15        Q.     What was the rationale for that

16   proposal?

17        A.     Once again, it was just coverage

18   depending on if litigation increased

19   significantly.  So we were trying to build in

20   multiple mechanisms, which is duration, in

21   addition to a standardized increasing price.  So

22   if litigation jumped, that there was at least

23   some protection for that so we could cover

24   costs.

25        Q.     And we were talking about the term of
```

Page 282

1    the agreement earlier.

2              Do you remember that?

3        A.    Yes.

4        Q.    I think you said it might have been

5    three years.

6              Do you see here it's one under Section

7    10?

8        A.    Why am I missing this?  Is that in the

9    MSA that you're referring to?

10       Q.    Yes.  It's Bates 383.

11       A.    Yes, I see that.

12       Q.    All right.  Does that refresh your

13   recollection that it's one year and not three?

14       A.    Yes, although I would have to look

15   at -- the statement of work always governs, so I

16   just have to look through it again, but that's

17   what it says in the MSA, yes.

18       Q.    All right.  I know this is a draft,

19   but do you have any reason to believe that that

20   changed between this and the final?

21       A.    I don't.  I mean, I'd have to see the

22   final one again, but...

23       Q.    So there's also a note in this e-mail

24   about potential alternative options.

25              Do you know what that refers to?

Page 283

```
 1      A.    I don't.  I don't off the top of my

 2  head.  I mean, we had a lot of discussions about

 3  renewal and, you know, the increasing price and

 4  things like that.

 5      Q.    Do you see in Mr. Mulrooney's numbered

 6  list, number 3 is price?

 7      A.    Yes.

 8      Q.    And he says, "Price -- again to

 9  discuss rationale, break-even, and Latham

10  discount points"?

11      A.    Yes.

12      Q.    What does "break-even" refer to here?

13      A.    So, once again, if you look at the

14  model, if a certain number of cases come in,

15  when we go from underwater, even including the

16  subscription price, to back to making money.

17  And there's a friction point that's in there.

18      Q.    What are Latham discount points?

19      A.    I think, as an early mover -- you

20  know, any customer that comes in the door is an

21  early mover.  We were willing to discuss

22  discount from what the model actually said the

23  pricing should be.

24      Q.    Did Latham get a discount from what

25  the model said the pricing should be?
```

Page 284

```
 1        A.     It did.

 2        Q.     What did the model say the pricing

 3   should be?

 4        A.     I believe the discount was about ▉

 5   percent.

 6        Q.     Okay.  So about ▉▉▉▉?

 7        A.     Sounds about right.

 8        Q.     And you mentioned a first mover.

 9               In what sense was Latham a first mover

10   here?

11        A.     I mean, they were -- as you've

12   reiterated throughout this dep, they were one of

13   the first people who came to the table.

14        Q.     Did New Era see them as a first mover?

15        A.     Yeah.  I mean, we still see most of

16   our customers, even though we have a base now,

17   we see most of them as first movers.

18        Q.     Live Nation was the first first mover

19   then, right?

20        A.     They were the first subscription

21   client first mover.

22        Q.     I got one more and then let's take a

23   break.

24        A.     One more document?

25        Q.     Yes.  Not one more question.  Sorry.
```

Page 285

```
 1      A.    Oh, yeah.

 2      Q.    Let me just ask you this:  Now, when

 3   the agreement was finalized, the pricing term

 4   for the first year ended up being █████?

 5      A.    That sounds right.

 6      Q.    It was a little bit above what Latham

 7   proposed in the last one we looked at, █████?

 8      A.    Correct.

 9      Q.    New Era negotiated a little bit more?

10      A.    Yes.

11      Q.    And it was executed on June 21, 2021,

12   right?

13      A.    I think it might have been the 22nd,

14   but I'm -- the contract says what it says.

15   Whatever date it was executed it was executed.

16      Q.    A couple weeks after this e-mail?

17      A.    Yeah.  That's right, yeah.

18      Q.    And this draft is near final, right?

19      A.    Yeah; it's close to final, I would

20   guess, yeah.

21      Q.    And so, after Live Nation executed the

22   subscription agreement, it did in fact pay New

23   Era █████?

24      A.    Correct.

25      Q.    And that year, New Era did one
```

Page 286

```
 1    arbitration for them, right?

 2         A.     Yes.

 3         Q.     And Live Nation renewed it in 2022,

 4    correct?

 5         A.     They did.

 6         Q.     So I'm introducing as our next exhibit

 7    a document bearing Bates number NEWERA_001093.

 8                (Williams Exhibit 31, Document

 9         Bates-stamped NEWERA_001093, marked for

10         identification, as of this date.)

11    BY MR. SEARS:

12         Q.     Let me know when you have it.

13         A.     Got it.

14         Q.     And do you see that this is an invoice

15    from New Era to Live Nation?

16         A.     I do.

17         Q.     From 2022?

18         A.     I do.

19         Q.     For ███████?

20         A.     Correct.

21         Q.     That reflects the renewal for the

22    second year of the contract, right?

23         A.     Yes.

24         Q.     Now, in that year, 2022, New Era

25    administered zero arbitrations involving Live
```

Page 287

 1   Nation?

 2        A.    I actually believe the arbitration

 3   that you talked about, I think it was in 2022.

 4   I could be losing my mind, but...

 5        Q.    I hope you're not losing your mind.

 6              It was either 2021 or 2022?

 7        A.    One of those years, correct.

 8        Q.    There was a year where Live Nation

 9   paid a subscription fee and New Era administered

10   zero arbitrations for it?

11        A.    Correct.

12        Q.    But there was a year, whichever one it

13   was, where Live Nation paid New Era ▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and New Era

15   administered no arbitrations for it?

16        A.    That was -- that's the question you

17   just asked.

18              Tell me if I'm wrong.  The question

19   is, there was a year that they paid a

20   subscription fee and we administered zero, and

21   then there was a year that they paid a

22   subscription fee and we administered one.

23        Q.    What was the value to Live Nation in

24   the year when they paid New Era ▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮   and it had administered zero

Page 288

```
 1   arbitrations?

 2       A.    I think that's 2021.

 3       Q.    Right.  My question is what is the

 4   value to Live Nation that year from New Era?

 5       A.    You would have to ask them.

 6       Q.    You don't know?

 7       A.    I don't -- I don't know -- are you

 8   asking me subjectively what the value is or

 9   objectively for a dollar value?

10             I don't know what the question is.

11       Q.    I'm not sure.  Whichever one makes

12   sense to you.

13             I'm just trying to figure out how it

14   makes sense that they paid ███████████████

15   ████████████████ to an ADR provider that

16   performs no services in a year.

17             MS. MUSUMECI:  Objection to the form.

18       A.    I mean, I think that's a question for

19   Live Nation.

20             MR. SEARS:  Okay.  Why don't we take a

21       break.

22             Can we take 15 minutes?  I badly need

23       to return a couple of calls, but I'll be as

24       fast as I can.

25             (Recess; Time Noted:  2:19 p.m.)
```

Page 289

1                    (Time Noted:  2:30 p.m.)

2     BY MR. SEARS:

3         Q.    Mr. Williams, you ready to resume your

4     deposition?

5         A.    I am.

6         Q.    Did you talk to anyone over the break?

7         A.    I did not.

8         Q.    Okay.  I want to ask you a little bit

9     about Ticketmaster and Live Nation's terms of

10    use.

11               Do you remember we talked about those

12    a little?

13        A.    Yes.

14        Q.    You're familiar with them generally?

15        A.    Very generally.

16        Q.    And I'll just tell you, Ticketmaster

17    and Live Nation, they both have websites with

18    terms of use.  My understanding is that the

19    terms themselves are very similar.

20               So when I talk about the

21    "Ticketmaster/Live Nation terms of use," will

22    you understand that I mean them interchangeably

23    unless I otherwise specify?

24        A.    Fair enough.

25        Q.    Now, do you remember when we talked

Page 290

1    about the $300 filing fee for New Era?

2         A.    Yes.

3         Q.    Now, that's something that's actually

4    in the contract between New Era and Live Nation?

5         A.    Yes.

6         Q.    And it's also mentioned in the terms

7    of use.

8               I can show you them if you need to see

9    them, but do you know that?

10        A.    Yes, I'm aware that it's in there,

11   yes.

12        Q.    Are you aware that there's also

13   language that says, "If New Era ADR determines

14   that you are unable to pay any part of the

15   filing fee, we will pay that part too"?

16        A.    Yes.

17        Q.    So the entity that determines if a

18   consumer is unable to pay any part of the filing

19   fee is New Era, do I have that right?

20        A.    Correct.

21        Q.    It's not the arbitrator, because this

22   would be a decision made before an arbitrator is

23   appointed?

24        A.    Correct.

25        Q.    And New Era's rules actually specify

Page 291

```
1    that, under all circumstances, all fees are paid

2    upfront, right?

3        A.    Correct.

4        Q.    And they also say that commencing

5    proceedings requires payment by credit card,

6    right?

7        A.    I'm not entirely sure if it says

8    payment by credit card, but, yes, it says

9    payment in advance.

10       Q.    The gist of it is that you got to pay

11   if you want to start your proceeding?

12       A.    Yes.

13       Q.    Even before an arbitrator is selected?

14       A.    Correct.

15       Q.    Okay.  So who at New Era decides

16   whether someone's unable to pay for an

17   arbitration?

18       A.    There's just an affidavit that we

19   have, and if that's filled out and everything's

20   included on it, there's really no judgment call

21   to be made because it's a legal document saying

22   that you can't pay.

23             So if you're willing to incur the

24   ramifications of saying that you're destitute,

25   and you're not, then there could be
```

Page 292

```
 1   ramifications that come out of that, but it's
 2   really just about filling out the affidavit.
 3        Q.    Where is the affidavit located?
 4        A.    We send it if you contact us and say I
 5   can't pay.
 6        Q.    I see.  So someone has to raise with
 7   New Era that they think they can't pay, and they
 8   are then sent the affidavit?
 9        A.    Correct.
10        Q.    It's not, like, something you can
11   download on the website?
12        A.    Not right now, I don't believe.  We
13   will certainly have it up there at some point.
14        Q.    It's not mentioned in New Era's rules?
15        A.    It is.
16        Q.    It is?
17        A.    I don't know if the affidavit is
18   mentioned, but --
19              Let me just look.
20              "Financial hardship affidavits are
21   available."
22        Q.    Okay.  I see.
23              So it's mentioned in -- there's a
24   reference to the affidavit in the rules?
25        A.    Yes.
```

Page 293

```
 1       Q.    Okay.  Under Live Nation and
 2   Ticketmaster's rules or terms of use, you
 3   understand that claims have to be brought
 4   individually, not in a class action?
 5       A.    I'm not, you know, that familiar with
 6   the rules.  If that's what it says, that's what
 7   it says.
 8       Q.    I'll just tell you.  I mean, there's a
 9   reference to resolving claims through binding
10   individual arbitration rather than in court.
11            Does that sound right?
12       A.    That sounds right.
13            I mean, just for the record, we did
14   not take any part in drafting the terms of use
15   for Ticketmaster or Live Nation.
16       Q.    I'm just asking if you're familiar
17   with some of these provisions, because I'm going
18   to ask you about them.
19       A.    Yeah.  Yeah.  Generally, yes, but
20   there's some minutia I'm sure I'm not familiar
21   with.
22       Q.    And the gist of that is that you got
23   to do an individual arbitration.  I mean, maybe
24   a bunch of people can do them, but you can't do
25   a class action at New Era against Live Nation
```

Page 294

1    and Ticketmaster?

2        A.    I would guess that that's the standard

3    class action waiver.

4        Q.    And as we've discussed, the $300

5    filing fee, that's something specified in the

6    subscription agreement that New Era and Live

7    Nation negotiated?

8        A.    The $300 -- and it's per-case fee,

9    yes.

10       Q.    And it was something that New Era

11   suggested as part of its pricing matrix to

12   balance out the subscription fee?

13       A.    Correct.

14       Q.    Did the one consumer that did an

15   arbitration against Live Nation pay the fee?

16       A.    I don't -- I'm not certain.

17       Q.    You don't know if they did the

18   financial hardship affidavit?

19       A.    I don't recall, no.

20       Q.    Has any consumer ever done the

21   financial hardship affidavit for New Era?

22       A.    Not that I recall.

23       Q.    Does New Era proactively tell people

24   it's an option when they initiate arbitration?

25       A.    Well, we're a platform, so if there

Page 295

1    was a conversation with, you know, Customer

2    Service or something like that and the person

3    said, "I don't have money," then we would

4    discuss it, absolutely.

5           But most people, unlike a AAA other

6    JAMS where you're going to go talk to a bunch of

7    people to initiate a case, ours is a platform

8    that allows you to do it virtually from start to

9    finish.  So what you would really do is log onto

10   the app. and just start proceeding, and if you

11   get to that point, there are contacts where you

12   say, "Hey, I can't pay this fee."

13       Q.    Okay.  I'm going to go mark our next

14   exhibit here.

15           (Williams Exhibit 32, New Era ADR

16       Current Rules and Procedures, marked for

17       identification, as of this date.)

18   BY MR. SEARS:

19       Q.    I'm introducing a copy of New Era's

20   Current Rules and Procedures.  It doesn't have a

21   Bates number, but I'll tell you that I pulled it

22   off the website, and I believe it's the current

23   one.

24       A.    Okay.

25       Q.    Take a moment and look through and,

Page 296

```
 1    you know, make sure you agree and tell me if you

 2    think it's the wrong one, but it appears to be

 3    the most recent from what I can tell.

 4        A.    Yeah, I mean, if you pulled it off

 5    recently, it's definitely the correct one, but

 6    the reality is we haven't changed anything

 7    recently at all.  So, even if you pulled it off

 8    several weeks ago, it would still be the correct

 9    one.

10        Q.    When was the last time they were

11    updated, do you know?

12        A.    I want to say last probably Q1 of

13    2022.

14        Q.    Do you know what update was made then?

15        A.    I don't recall, no.

16        Q.    Who updates the rules?

17        A.    Shane, Rich, and I talk about them.

18             Shane handles sort of the logistics of

19    getting things updated, but, for obvious

20    reasons, we're not making a ton of changes to

21    this right now because of the litigation.

22             It's our intention to do a quarterly

23    update and make sure we're online with

24    everything.

25        Q.    There was at least one update after
```

Page 297

1    the lawsuit was filed.

2              Do you remember that?

3        A.    I don't remember that.

4        Q.    Well, I'll just represent the last

5    time I went to the website, it said they were

6    update in March 2022, which was a couple months

7    after the case was filed.

8        A.    Okay.

9        Q.    You mentioned the lawsuit, so I'll

10   just ask:  Did that change have anything to do

11   with the lawsuit?

12       A.    No.

13       Q.    Okay.  But you're not sure what the

14   change was?

15       A.    I don't recall the change, but I know

16   we wouldn't have made a single change that was

17   related to the lawsuit, no.

18       Q.    Okay.  Why don't you flip to page 11.

19       A.    Yep.

20       Q.    And this is under the General Rules

21   and Procedures, if I'm correct; is that right?

22       A.    Yes.

23       Q.    And just to table-set, the way it

24   works is there's general rules and procedures,

25    there's expedited rules and procedures, and

Page 298

1   there's mass arb rules and procedures, right?

2       A.    There's general rules and procedures,

3   there's mediation procedures, I believe there's

4   med/arb procedures, there's standard arbitration

5   procedures, there's expedited arbitration

6   procedures, and there's mass arb procedures.

7       Q.    Different sets of rules, but there are

8   some common threads and themes throughout; is

9   that fair?

10      A.    That's fair.

11      Q.    Now, we're still in the general rules,

12  but do you see at the top of page 11 it says,

13  "All proceedings at New Era ADR are time-limited

14  with the following is expected timelines as set

15  forth above"?

16      A.    Yes.

17      Q.    And that includes the expected

18  timelines?

19      A.    Yes.

20      Q.    And expedited arbitration is 45 to 60

21  days from the appointment/selection of a

22  neutral?

23      A.    Correct.

24      Q.    Standard arbitration is under a

25  hundred days from selection/appointment of a