Case No. 23-55770

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

SKOT HECKMAN, LUIS PONCE,
JEANENE POPP, JACOB
ROBERTS, on behalf of themselves
and all those similarly situated,
Plaintiffs-Appellees,

v.

LIVE NATION ENTERTAINMENT,
INC., TICKETMASTER, LLC,
Defendants-Appellants.

---

Appeal from the United States District Court
for the Central District of California
The Honorable George H. Wu Presiding
Case No. 2:22-cv-00047-GW-GJS

---

## SUPPLEMENTAL EXCERPTS OF RECORD FOR
## PLAINTIFFS-APPELLEES
## Volume IV of IV (4-SER-409 to 4-SER-593) REDACTED

---

Kevin Teruya
Adam Wolfson
William R. Sears, IV
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
865 S Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Warren D. Postman
  *Counsel of Record*
Albert Young Pak
Noah Heinz
Ethan H. Ames
KELLER POSTMAN LLC
1101 Connecticut Avenue, N.W.,
Suite 1100
Washington, DC 20036
(202) 918-1123
wdp@kellerpostman.com

*Attorneys for Plaintiffs-Appellees*

Page 299

1    neutral?

2         A.    Yes.

3         Q.    And then in Section 2(m)(v), it says,

4    "Neutrals are also expected to maintain these

5    timeframes," do you see that?

6         A.    Yes.

7         Q.    Is that accurate?

8         A.    Yeah, once again, they're guidelines.

9    So if you are a neutral and you did 20 cases for

10   us, and every single one of them took three

11   years, we're going to have a conversation with

12   you about how quickly you're moving cases.

13        Q.    So the guidelines are that neutrals

14   are expected to resolve expedited arbitration

15   within 45 to 60 days from the appointment of a

16   neutral?

17        A.    Once again, it's a guardrail.  So we

18   want the neutral to work in an expedited

19   fashion.  We don't want there to be -- we don't

20   want them to feel like they can relax and take

21   vacation in the middle of a case because we want

22   them to move the case forward.

23             Whether or not that happens within 60

24   days is not a disqualifying factor, but --

25        Q.    Please continue.

Page 300

```
1        A.      No, I was just going to say, but, like

2    I said, if you do 20 cases for us, and every

3    single one of them takes three years, we're

4    going to have a conversation about how long it's

5    taking.

6        Q.      Right, and that's why it says here

7    that neutrals are also expected to maintain

8    these timeframes, right?

9        A.      Correct.

10       Q.      And they are expected to maintain

11   these timeframes?

12       A.      Yes; they're expected to operate as

13   much as possible within these timeframes.

14       Q.      Now, do you recall -- and we can look

15   at them if you need to, it's not a memory test,

16   but do you recall the defendants' terms of use

17   state that the expedited rules govern

18   arbitrations involving defendants?

19       A.      I will accept that as a

20   representation.

21       Q.      Why don't I just introduce them so

22   that you can see it, because I want to make sure

23   we're on the same page.

24               So keep this tab out, and then I'm

25   going to introduce our next exhibit, which is
```

Page 301

1    the Ticketmaster Terms of Use.

2              (Williams Exhibit 33, Ticketmaster

3         Terms of Use, marked for identification, as

4         of this date.)

5    BY MR. SEARS:

6         Q.    Let me know when you have it.

7         A.    Okay.

8         Q.    Now, if you go down to sixth page of

9    the PDF, do you see that there's section called

10   "Mandatory Arbitration Agreement and Class

11   Action Waiver"?

12        A.    Yes, I see it.  Yep.

13        Q.    Very bottom there, it says

14   "Arbitration Proceedings and Rules," right?

15        A.    Yes.

16        Q.    That's where it mentions New Era?

17        A.    Yes.

18        Q.    It says, "Any arbitration will be

19   administered by New Era ADR in accordance with

20   our Virtual Expedited Arbitration Rules and

21   Procedures, as well as any applicable General

22   Rules and Procedures, except as modified by the

23   Terms"?

24        A.    Correct.

25        Q.    Okay.  So we're on the same page,

Page 302

1    then, that the New Era Expedited Rules would

2    govern an arbitration involving Live Nation or

3    Ticketmaster?

4         A.    That's the default.

5         Q.    But by the default, you mean that's

6    what the rules say, right?

7         A.    That's what these rules say, yes.

8         Q.    Okay.  And so if the expedited rules

9    govern, then under the guidelines, neutrals are

10   expected to resolve arbitrations involving Live

11   Nation or Ticketmaster in 45 to 60 days?

12        A.    It's a guardrail.

13        Q.    And we've talked about this a little,

14   but you're aware this is an antitrust case?

15        A.    I am.

16        Q.    Do you have an understanding of the

17   allegations as they relate to Live Nation and

18   Ticketmaster?

19        A.    I do.

20        Q.    You've read the complaint?

21        A.    I've read the complaint.

22        Q.    So you understand that the allegations

23   span over a decade of alleged misconduct?

24        A.    I am not aware of that, but, I mean, I

25   have a general understanding of the allegations,

Page 303

1    yes.

2        Q.    Do you understand that some of the

3    allegations involve the 2010 merger of Live

4    Nation and Ticketmaster?

5        A.    I do.

6        Q.    You're also aware that there have been

7    DOJ antitrust investigations involving Live

8    Nation and Ticketmaster?

9            MS. MUSUMECI:  I'm going to object

10       that this is going beyond.  I'll give you a

11       little bit of leeway, but it seems like

12       you're going beyond the scope of the topics.

13           MR. SEARS:  Absolutely not.  I'm

14       asking about New Era's rules and procedures.

15   BY MR. SEARS:

16       Q.    So I'll ask it again:  You're aware

17   that there have been DOJ antitrust

18   investigations involving Live Nation and

19   Ticketmaster?

20       A.    Very vaguely.

21       Q.    I know you weren't an antitrust

22   lawyer, but you have some understanding of

23   antitrust because you took the class?

24       A.    Yes; a very, very limited

25   understanding.

Page 304

1       Q.     So you understand that antitrust cases

2   can involve complex economic issues, right?

3       A.     Yes.

4       Q.     And they can also involve issues such

5   as geographic and product market definition?

6       A.     Yes.

7       Q.     And those, you know, in the spectrum

8   of legal issues, those can range, you know,

9   towards the very complicated end of the

10  spectrum?

11      A.     To me, that's a subjective

12  determination.

13      Q.     I mean, an antitrust case can also

14  often be more complex than a slip and fall or a

15  breach in contract case about an employment

16  agreement?

17      A.     It could be, but I wouldn't say it

18  necessarily has to be.

19      Q.     Are you aware that antitrust cases

20  almost always involve expert testimony?

21      A.     I am.

22      Q.     Do New Era's rules discuss expert

23  testimony at all?

24      A.     We don't discuss it explicitly, but an

25  arbitrator could absolutely allow it.

Page 305

1      Q.     And would that be one of the two

2   witnesses that are allowed at the final hearing?

3      A.     They could allow ten witnesses.

4      Q.     But the guidelines say two, right?

5      A.     The guidelines say two, but every

6   conversation we have with an arbitrator says,

7   "Run this case the way you need to run it."

8           The goal is efficiency.  The goal is

9   speed.  The goal is making sure people get

10  resolutions in an efficient manner.  If that

11  requires that the case take two years and have

12  ten expert witnesses, the arbitrator has the

13  discretion to do that.

14          If it's a slip and fall, and that's

15  what comes to the platform, then, sure, the

16  arbitrator should try to run it in 60 days.

17  That's the goal.

18     Q.    I mean, let me just ask you:  Do you

19  agree that it would not be feasible to resolve

20  an antitrust case against Live Nation spanning a

21  decade of alleged misconduct in 60 days?

22          MS. MUSUMECI:  Objection.

23     A.    I don't agree.  I don't know.  I'm not

24  an antitrust lawyer.

25          If we provide an arbitrator that's the

Page 306

```
 1   most skilled arbitrator you can find in

 2   antitrust, maybe there are efficiencies that can

 3   be created.  Maybe the arbitrator has to extend

 4   it and maybe the arbitrator has to allow

 5   additional expert testimony.

 6            The arbitrator has discretion to do

 7   that.

 8      Q.   Okay.  But the arbitrator is also

 9   expected to maintain the timeframe in the rules,

10   right?

11      A.   The arbitrator is expected to do the

12   most efficient job they can possibly do.

13      Q.   I mean, earlier you were telling me

14   that if an arbitrator routinely had cases that

15   took years, that you would probably not renew

16   their agreement, right?

17      A.   I didn't say that.

18            I said if you had an arbitrator that

19   had 20 cases that extended three years, we would

20   have a conversation with the arbitrator about

21   it.

22      Q.   Okay.  So, I mean, if there was an

23   arbitrator that got a bunch of antitrust cases

24   against Live Nation, and they all took years to

25   resolve, you would have a conversation with them
```

**4-SER-417**

Page 307

1   about that, right?

2       A.    Well, we would probably have a

3   conversation.  They would say, "Well, I've got

4   20 antitrust cases," and we would say, "Wow.

5   Well, that's probably more complex, so continue

6   what you're doing."

7       Q.    You agree it seems implausible that an

8   antitrust case against Live Nation involving

9   expert testimony, ten years of alleged

10  misconduct could be done in 60 days?

11          MS. MUSUMECI:  Objection.

12      A.    I believe I've answered the question.

13  I'm hot agreeing to that.  I don't know.

14      Q.    So you think it could?  You think an

15  arbitrator at New Era could get this case

16  resolved in 60 days?

17          MS. MUSUMECI:  Objection.

18      A.    I'm not saying they could or couldn't.

19  I'm saying I don't know.

20      Q.    You're not --

21      A.    What I'm saying is that there would

22  not be punitive measures against them if they

23  had to take more than 60 days to resolve it.

24      Q.    Has New Era ever resolved an antitrust

25  case in 60 days?

Page 308

```
 1      A.    No.

 2      Q.    I mean, are you aware of an antitrust

 3  case that went into discovery that was resolved

 4  in any forum in 60 days?

 5            MS. MUSUMECI:  Objection.  Beyond the

 6      scope.

 7      A.    I haven't done that research.

 8      Q.    You don't know?

 9      A.    I don't know.

10      Q.    Let's look at Section 2(o),

11  "Discovery."  It's the bottom of page 11.

12            Let me know when you're there.

13      A.    Yes.

14      Q.    Okay.  Do you see that it says, "New

15  Era ADR operates on the premise that limitations

16  on discovery are one of the primary ways

17  efficiencies are achieved in arbitration, and

18  discovery must be narrowly tailored only to the

19  information necessary to advancing a neutral's

20  understanding of the case"?

21      A.    Yes.

22      Q.    That's an accurate statement of New

23  Era's premise as it relates to discovery?

24      A.    Absolutely.  I think this is a

25  protection based on, primarily, a consumer or a
```

Page 309

1    litigant, a plaintiff.  The purpose behind this

2    is to not have a defense firm back up a

3    semi-truck, dump a bunch of superfluous

4    documents on the plaintiff, and say, "Figure it

5    out."  So that's why this was drafted in this

6    way.

7         Q.    I see that you believe there are

8    benefits to plaintiffs here.

9              Do you see that there could also be

10   potential benefits to defendants from

11   limitations on discovery?

12        A.    Yes.  I see it both ways, yes.

13        Q.    Are you aware that, in consumer

14   antitrust cases, typically, the discovery from

15   the defendants is much greater than the

16   discovery from the plaintiffs?

17             MS. MUSUMECI:  Objection.

18        A.    I'm going tell you, once again, I'm

19   not an antitrust lawyer.  So when you're talking

20   about the specifics of an antitrust case, my

21   answer for almost all of it is going to be, "I

22   don't know," "I'm not certain."

23        Q.    Just as a matter of logic, do you see

24   how it's implausible that an individual like Mr.

25   Oberstein or Mr. Heckman in this case would

Page 310

1    produce anywhere near as many documents as a

2    company like Ticketmaster or Live Nation?

3            MS. MUSUMECI:   Objection.

4    A.    I really have no idea.

5    Q.    So, under New Era's rules, a formal

6    discovery process exists solely in New Era ADR's

7    standard arbitration process, right?

8    A.    Correct.

9    Q.    That's what it says here?

10   A.    Yes.

11   Q.    The only formal discovery under New

12   Era's rules is for standard arbitration, not

13   expedited?

14   A.    Correct.  There's a formal process

15   under standard, but discovery is still

16   contemplated under expedited if the arbitrator

17   needs to allow it.

18   Q.    It's contemplated, but there's no

19   formal discovery process in place like there is

20   for standard?

21   A.    Correct.

22   Q.    That's why this says that a formal

23   discovery process exists solely in New Era's

24   standard arbitration process?

25   A.    Correct.

Page 311

```
 1        Q.    So for the expedited arbitration

 2   process, there's no guarantee the parties will

 3   get any discovery?

 4        A.    If it's necessary to the case, the

 5   arbitrator should provide for some sort of

 6   discovery process.

 7        Q.    You said the arbitrator should, but

 8   there's no formal process or formal entitlement

 9   to it, is there?

10        A.    No.

11        Q.    It actually says that discovery is

12   only at the election of the neutral in the

13   rules?

14        A.    Correct.

15        Q.    And it actually says, if you go down

16   farther in the rules, that even under the

17   standard rules, there's no, quote/unquote,

18   "plenary right to discovery," right?

19        A.    We do not use the term "plenary," I'm

20   certain.

21        Q.    Why don't you look at page 23.

22        A.    Okay.

23        Q.    Do you see that little number ix?

24        A.    Yes.

25              Oh, we did use "plenary."  My bad.
```

Page 312

1          That definitely wasn't my word.

2     Q.    Okay.  So, I mean, is that an accurate

3     statement of New Era's standard rules?

4     A.    Yeah, that sounds much -- very much

5     like a Shane word.  So, that's my bad.

6     Q.    That's okay.

7          What does "plenary" mean?

8     A.    I got to be honest with you, I'm not

9     entirely sure.  That's why I said, like, we

10    couldn't have used "plenary" because I'm not

11    entirely sure what it means, but that looks like

12    a change that Shane would have made; and I'm

13    certain Shane knows exactly what it means.

14    Q.    So, to cut through it, a plaintiff

15    bringing claims against Live Nation or

16    Ticketmaster under New Era's expedited rules

17    could ask for discovery, right?

18    A.    Yes.

19    Q.    But they wouldn't have any guarantee

20    they would get any discovery?

21    A.    Under the rules, no.  I'm not going to

22    sit here and fight that.

23         I do think an arbitrator would look at

24    it and say, "This is an antitrust case, I need

25    discovery," and would act appropriately.

Page 313

1       Q.    I understand that you think that's how

2   an arbitrator would do it, but if you just look

3   at the rules, it says that there is no formal

4   process for discovery for expedited proceedings?

5       A.    Correct.

6       Q.    And it even says that there's no

7   plenary right -- whatever that means -- for a

8   standard arbitration?

9       A.    Correct.

10      Q.    Someone just reading the rules that's

11  deciding whether or not to initiate a claim

12  against Live Nation or Ticketmaster wouldn't

13  know that they were likely or guaranteed to get

14  discovery, because the rules don't say that?

15          MS. MUSUMECI:   Objection to form.

16      A.    Correct.

17      Q.    Now, another thing it says is,

18  "Virtual Expedited Arbitration typically applies

19  to consumer, employment, and other commercial

20  disputes that are not document- or

21  discovery-intensive," does that sound right?

22      A.    Yes.

23      Q.    I mean, that's not describing

24  antitrust cases, is it?

25      A.    It's not; and you could convert an

Page 314

1    antitrust to standard.

2        Q.    I mean, let me just ask you:  These

3    expedited rules are not designed for antitrust

4    litigation, are they?

5            MS. MUSUMECI:  Objection to form.

6        A.    Yeah, the expedited rules are -- no,

7    would I say they are designed for antitrust

8    cases?  No, because our rules aren't

9    particularly designed for any type of case.

10           We do make the statement that the

11   expedited arbitration rules fit very well for

12   employment and basic consumer cases, sure.  But

13   are they designed for antitrust cases?  No.

14       Q.    They don't fit very well for antitrust

15   cases, do they?

16       A.    I don't really have an opinion on

17   that.

18       Q.    Well, you think they fit very well for

19   consumer, employment, and other commercial

20   disputes, right?

21       A.    Yes, we do.  We absolutely do.

22           Could they work for antitrust?  Yes,

23   my limited understanding of antitrust cases, I

24   do believe they could.  If they didn't, I think

25   we built in enough off-ramps here that you can

Page 315

1    convert it to standard arbitration, you could

2    implement discovery for it.

3            The whole purpose of our rules is to

4    give the discretion to our arbitrators.  That's

5    why we require arbitrators to be experienced.

6            What we don't want to do is be the

7    platform that is telling an arbitrator how to

8    run a case.  We think that's actually where JAMS

9    and AAA have made mistakes.

10    Q.    So let me make sure.  You don't think

11    an arbitrator actually would apply the expedited

12    rules as they're written to this case, for

13    example, if it was initiated with New Era?

14    A.    I think they would apply what they

15    could apply, and I think they would do what they

16    needed to do to run an efficient case.

17    Q.    But it sounds like you think that that

18    might involve departing from the expedited

19    rules, which, you know, typically apply to

20    consumer, employment, and other commercial

21    disputes, not antitrust cases?

22    A.    It very well could, and that's within

23    their discretion to do.

24    Q.    Even though the rules say that they're

25    expected to observe the timelines set forth in

Page 316

1    the expedited rules?

2        A.    Yeah, once again, these are

3    guardrails.  As I mentioned, there's no punitive

4    measures taken against arbitrators who have to

5    change and do things differently.

6        Q.    I'm going to show you another exhibit,

7    but I want you to keep this open because I've

8    got a couple more questions about it later.

9        A.    I've got a lot of exhibits open.  Can

10   I close the Ticketmaster Terms of Use?

11       Q.    Keep open Tab 37.  There was one

12   earlier that I told you to keep open, but it's

13   fine now.

14       A.    Yeah, I've got Tab 29 open.  I still

15   have 36 open.  That's the Ticketmaster Terms of

16   Use.

17       Q.    Keep 29 and 37.  Everything else you

18   can close.

19       A.    Okay.  Okay.

20             I'm going to shut my door.  My wife

21   got home and she's on some phone calls.

22       Q.    We can go off the record if you need a

23   moment.

24       A.    No, no, it's totally fine.

25       Q.    Introducing as our next exhibit a

Page 317

1    document bearing Bates number NEWERA_000104.

2            (Williams Exhibit 34, E-mail with

3        attachment Bates-stamped NEWERA_000104,

4        marked for identification, as of this date.)

5            THE WITNESS:  Yep.

6    BY mr.l:

7        Q.   You see it's another e-mail from you

8    to Ms. Birkeland?

9        A.   Yes.

10       Q.   And there's a reference here to

11   talking to Mike and Matt again?

12       A.   Mike and Madigan?

13       Q.   Matt again.

14       A.   Oh.  "I would love to talk to Mike and

15   Matt again."

16           Oh.  Yeah, they were -- so when Cathy

17   chatted -- or, "chatted" -- when Cathy and I had

18   a call and caught up, Mike and Matt were two

19   attorneys who had done work for us at Outcome

20   Health, so they were also acquaintances.

21           They both, I think -- I believe, since

22   left Latham and done other things, and she

23   basically just said, Had you caught up with Mike

24   and Matt?  And I said, I haven't talked to them

25   in ages.  Would love to talk to them.

Page 318

```
 1        Q.    Okay.  And one of the things you say
 2   here is that New Era wants to "make this a fair
 3   and equal platform for everyone, while
 4   eliminating the gamesmanship on both sides of
 5   the aisle"?
 6        A.    Correct.
 7        Q.    You've talked about that on the
 8   defense side, it's the document dump?
 9        A.    Yeah, I mean, I think that's the one
10   that pops into my mind.
11             When I was a defense attorney, I had a
12   very different stance about how you handled
13   cases, which was you did what you needed to do
14   and nothing more.
15             I do not pretend that a lot of defense
16   firms take that same tact.  So I think the
17   purpose is, yes, what we've always wanted is an
18   equal playing field and value provided to both
19   sides and efficiencies, because at the end of
20   the day, I do believe that plaintiffs want to be
21   heard, and I think our system does not
22   necessarily allow for that to happen.
23        Q.    What's the gamesmanship on the
24   plaintiff's side of the aisle that New Era is
25   trying to eliminate?
```

Page 319

```
 1      A.      I think the economic leverage of mass

 2   arbitrations is the one that pops to mind.

 3      Q.      That's something New Era is trying to

 4   protect its clients against?

 5      A.      It's not something that we're trying

 6   to protect clients against.  I would say it's

 7   something that we would like to see eliminated.

 8      Q.      Do you believe New Era's combination

 9   of upfront fees and subscription pricing helps

10   eliminate it?

11      A.      I don't know.  What I think it does is

12   it equalizes the playing field.

13              Once again, our goal is to get people

14   get their claims heard, and if people have a

15   legitimate claim, they have been harmed, I do

16   think a big part of the healing process is being

17   able to tell somebody what happened.  And even

18   if the decision doesn't go your way, you will

19   see some sort of remediation from the fact that

20   somebody listened to you and said, "I get it,

21   and I may not rule in your favor, but I

22   understand that something bad happened to you,

23   and I would like to fix it in some way."

24              And this comes from my experience

25   being an attorney.  Right?  You've probably seen
```

Page 320

```
 1   on the website I had a client that spent a

 2   million-plus dollars to settle something for

 3   30,000 bucks, and it took him six years of his

 4   life.  And at the end of the day, his biggest

 5   complaint to me was, "Collin, nobody ever

 6   actually asked me what happened."

 7           So our goal is for people to be able

 8   to tell somebody what happened and get that

 9   healing process going.

10       Q.   Okay.  Now, we'll talk about this a

11   little more in a minute, but the way it works

12   for mass arbitration is that you have batch

13   bellwether proceedings, right?

14       A.   We have bellwethers, yes.

15       Q.   The bellwether cases are selected,

16   those are resolved, and then the decision

17   applies to other claimants with claims that

18   arise from common issues of law and fact, right?

19       A.   Correct.

20       Q.   So those other claimants do not get a

21   chance to tell their story to an arbitrator, do

22   they?

23       A.   Incorrect.

24           If you have a case that does not fit

25   within the common set of law and facts, if you
```

Page 321

1    have something that's different, you have the

2    opportunity to raise your hand, just as you

3    would in an MDL, and say, "Hold on a second.  I

4    shouldn't be batched with these cases."

5            And that's your opportunity to say

6    this gets removed and run through its own

7    proceeding.  So the whole goal is to make sure,

8    if you have got something to say and be heard,

9    that you have the opportunity to do that.

10           If you are a plaintiff who knows

11   nothing about the case and has been batched in

12   and just -- you're part of the group, then your

13   concern probably is not actually being heard,

14   but if there is somebody who desperately wants

15   to be heard, we provide -- and has something to

16   say that's different, then we provide a

17   mechanism to do that.

18    Q.    You added a qualifier at the end:  If

19   they have something to say that's different.

20           If there's a plaintiff who wants to be

21   heard, and their claims are deemed to be part of

22   those batch proceedings because they arise from

23   the same issues of law and fact, they do not

24   have an opportunity to be heard, do they?

25    A.    I would say they have absolutely do,

Page 322

1   because if everything is exactly the same, and

2   if the complaint from plaintiff 1 to plaintiff

3   100 is exactly the same, then what is it that

4   that plaintiff needs to say?

5          If that plaintiff is engaged and has

6   something to say, then they're going to say,

7   "Wait a second.  This common complaint doesn't

8   fit the facts of me."  So it's got to be a

9   different complaint.  "I've got something to

10  say," and we do have the mechanism for that.

11     Q.    You only think that they have a chance

12  to be heard if they have something different to

13  say.  If New Era deems them to have the same

14  claims as someone else, it also decides that

15  they don't get a chance to tell anyone their

16  story in court or before an arbitrator, right?

17     A.    That's not how I believe it works.  I

18  mean, I think if you have something to say, if

19  there's something that is different from

20  everything that's -- and I know your latching

21  onto "different," that's fine, but if your case

22  is just thrown in and you're just a number, and

23  you're not engaged in the case, then you're

24  probably not very concerned about saying

25  something.  But if you are engaged in the case,

Page 323

```
 1   you're going to want that complaint to express
 2   whatever actually applied to you, right?
 3           So that's what we're trying to account
 4   for.  We're trying to say:  You've got an
 5   engaged plaintiff who says, "I was harmed."
 6   Then we have absolutely every opportunity for
 7   you to say, "Hold on a second.  I've got
 8   something to say."
 9   Q.    Let's look at some of the attachments
10   here.
11           Why don't you turn to the second one
12   called "New Era ADR Saves You Time and Money."
13           Do you see that?
14   A.    Yes.
15   Q.    And then this slide is showing some of
16   the efficiencies that can be gained by New Era,
17   right?
18   A.    Correct.
19   Q.    It says that New Era is 90 percent
20   more efficient, right?
21   A.    Yes.
22   Q.    And one of the ways it's more
23   efficient is limited discovery, right?
24   A.    Correct.
25   Q.    And discovery is limited in some of
```

Page 324

1    the ways we talked about.  There's no plenary

2    right under the standard rules and no formal

3    process under the expedited rules, correct?

4        A.    Correct.

5        Q.    And this is something that New Era

6    used to market itself to Ms. Birkeland at Latham

7    and potential clients, right?

8        A.    Yes.

9        Q.    Let me go back to --

10       A.    Yeah, I just want to note:  We based

11   this on an MDL model, so we didn't just pull

12   this out of thin air and say, what makes sense?

13   We based this generally on what federal courts

14   do.

15       Q.    You based what generally?

16       A.    How we operate with a mass

17   arbitration -- a bellwether case, application of

18   common issues of law and fact, precedent -- all

19   that stuff.  It wasn't just something that we

20   came up with out of thin air.  We thought the

21   MDL model actually works pretty well, so that's

22   what the basis of it was.

23       Q.    You would agree there are very

24   significant differences between New Era and

25   federal court?

Page 325

1      A.    Yes.

2      Q.    Federal judges don't have a guideline

3  that they're expected to observe that has them

4  resolving cases in a hundred days, do they?

5      A.    No.

6      Q.    And people do have a plenary --

7  whatever it means -- right to discovery in

8  federal court, don't they?

9      A.    Yes.

10     Q.    They have appeal rights?

11     A.    Correct.

12     Q.    Absent class members do have

13  opportunities to participate in cases?

14     A.    Absent class members have

15  opportunities to -- I think that depends on --

16  that's a case-by-case determination.

17     Q.    Let's look at the next attachment.

18           Do you see it's call "New Era ADR

19  Comparison Chart"?

20     A.    Yes.

21     Q.    And this chart is doing what it says:

22  It's comparing New Era to other ADR providers?

23     A.    Yes.

24     Q.    And one of the major points of

25  comparison is that New Era provides a legally

Page 326

1   binding decision in under a hundred days?

2       A.    Yes.

3       Q.    As this slide notes, traditional

4   arbitration doesn't do that?

5       A.    No.

6       Q.    Neither do neutral groups?

7       A.    No.

8       Q.    The only one that does Other Tech

9   Products, right?

10      A.    Yes, and I can't recall -- I know

11  Shane built this slide.  I can't recall what

12  exactly other tech products are.

13      Q.    Yeah, I was going to ask what other

14  tech products are there that don't fall into

15  traditional arbitration or neutral groups?

16      A.    Yeah, I apologize.  I'm not entirely

17  certain, but I could figure that out just by

18  asking Shane.

19      Q.    No need to apologize, but just sitting

20  here today, you can't think of a single other

21  entity that delivers a legally binding decision

22  in under a hundred days like New Era?

23      A.    No.

24      Q.    This also shows that New Era's

25  distinct from all these comparators because it

Page 327

```
 1   has a true mass arbitration pricing solution,

 2   right?

 3        A.    Yes.

 4        Q.    And we've talked about that.  It's the

 5   subscription fee combined with the upfront

 6   payments, right?

 7        A.    Correct.

 8        Q.    New Era is the only ADR provider that

 9   has this type of approach to mass arbitration?

10        A.    I don't know if that's true anymore.

11        Q.    At the time, it was?

12        A.    At the time of this, as of 11/23/21, I

13   believe that's correct.

14              Actually, and I don't want to -- I

15   don't want to guess here.  I believe FedArb has

16   created something like this, but I could be

17   losing my mind.

18        Q.    Again, I hope you're not losing your

19   mind.

20              Is it similar to New Era's model?  Are

21   they doing something that's different or is

22   something you looked at and you said, hey, that

23   looks like kind of a ripoff of what we did?

24        A.    It seemed, and I think it's FedArb --

25   I could be mistaken on which of the
```

Page 328

```
 1   organizations it is, but it seemed awfully

 2   similar to what we were doing.

 3        Q.    New Era was a pioneer here.  That's

 4   why your name is "New Era," right?

 5        A.    Look, flattery will get you nowhere.

 6   How's that?

 7              I don't know that we're -- I don't

 8   think of us as a pioneer.  I think we're just

 9   trying to do things differently.  I think we are

10   trying to take the experiences that we had as

11   both outside counsel and in-house counsel and

12   solve some of the problems.

13              Does that make us a pioneer?  I

14   wouldn't say that.  I think it just means that

15   we're thinking about things differently.

16        Q.    Right.  And I mean, I know you said

17   that the mass arbitration proceedings are based

18   on MDL, but as this chart shows, as of this

19   time, what New Era was doing with respect to

20   mass arbitration was unique?

21        A.    I would say that that's fair, yes.

22        Q.    You just don't like the word

23   "pioneer," huh?

24        A.    Yeah.  I'm no pioneer, right?  I'm

25   just -- I'm just a guy.  That's what I am.
```

Page 329

```
 1        Q.     And this was not just a unique

 2   approach by New Era, but it was a selling point

 3   for New Era with respect to law firms like

 4   Latham and companies like Live Nation?

 5        A.     Sure.  Yeah.

 6               I think I would expand a little bit on

 7   that and say that there are a lot of people out

 8   there that are tired of the status quo.

 9        Q.     I mean, is that a selling point for

10   consumers too?  Do you have any consumers that,

11   you know, you talked to that said I really wish

12   we had an ADR provider with a true mass

13   arbitration pricing solution?

14        A.     I don't know if the pricing -- well, I

15   will say yes, and the reason I say that is

16   because the pricing solution means that the

17   company is subsidizing a tremendous amount of

18   the cost.  There's also efficiencies created by

19   the rules and procedures.

20               So the goal, once again, is to create

21   an efficient process where a consumer has, or a

22   litigant has, an ability to be heard and get a

23   decision and move on with their life.  The

24   reality is I have never met, never spoken to

25   anybody who's been embroiled in litigation for
```

Page 330

1    months, years, longer, and said, "This is really

2    cool.  I really hope I can do this again."

3             So the goal is to say, look, we all

4    acknowledge that this is a painful process.  Can

5    we make it better?

6        Q.    And I understand you believe there are

7    benefits to consumers, but, I mean, to be fair,

8    these marketing materials are not really

9    designed for consumers, right?  They're designed

10   for law firms and businesses?

11       A.    No, and I would agree with you there,

12   but I think that the benefit is is you're

13   looking at a business that, once again, in the

14   plaintiff and defendant portion of this, the

15   defendant is always there.

16            So if you say, who's going to

17   subsidize the cost of this case?  You have to go

18   to the one that's always a party to the case,

19   and I think there are ancillary benefits to that

20   that accrue to the consumer.

21            So if there was a way for us to go

22   market to the consumers, we would do that, but

23   we can't because we don't know who they are

24   until a case is filed.

25            Like I said, we've had conversations

Page 331

1    with plaintiffs' firms.  We would love to do

2    this in a model that works for plaintiffs'

3    firms.

4             So, yes, I'm not denying that these

5    are marketing materials to the defense side,

6    because we're saying you're the party who's

7    always involved.  Do you want to subsidize a

8    bunch of the cost of this, and they're saying

9    yes, that benefit accrues to everybody.

10    Q.    And I think you mentioned this before.

11   You may have had discussions with plaintiffs'

12   firms, but you haven't signed any with

13   subscription agreements, have you?

14    A.    We're working on it.

15             You guys want to sign up?

16    Q.    We'll talk after the depo.

17             (Laughter.)

18    Q.    You say you're working on it.  I mean,

19   is there -- I'd like to know.  I mean, is there

20   someone in the pipeline that you have got a

21   draft statement of work out to that you're like,

22   hey, we don't have it yet, but it's going to be

23   a few weeks?

24    A.    So, without getting too in-depth into

25   our pipeline and stuff like that, I will say we

Page 332

```
 1   have several plaintiffs' attorneys working at

 2   plaintiffs' firms that do see value in this

 3   model, and we are working with them to try and

 4   figure out the best way to do it.

 5             Do we have an SOW out there?  No, we

 6   don't.  It's certainly more complex than the

 7   defense side.

 8             Do we want to make it work?

 9   Absolutely we want to make it work, and we are

10   working on that.

11        Q.   Okay.  When you say "make it work," I

12   mean, is it fair to say that it's not so much

13   they're interested in the current rules that you

14   have, because, otherwise, presumably they would

15   sign up, it's you're trying to develop a

16   solution that works for them?

17             MS. MUSUMECI:  Objection to form.

18             Go ahead.

19        A.   Yeah, but I would say that that's

20   fair, yes.  I mean, I do think we will have to

21   make tweaks and changes that will, you know, fit

22   for that type of model.  What those are, I don't

23   know.

24             But I do enjoy talking about this

25   because I think it's something that's necessary,
```

Page 333

1    I think it's something that we can do, and we

2    would like more buy-in and we would like more

3    firms and plaintiffs' attorneys to come to us

4    and tell us how we can help.

5         Q.    What changes do you think you need to

6    make for it to work for plaintiffs' firms and

7    attorneys?

8         A.    I don't know.  I mean, look, like I

9    said, these are discussions that are ongoing,

10   but I -- what I'm saying is that I'm not sitting

11   here saying it's impossible, and I think, you

12   know, in a year or two, could we have tons of

13   marketing materials that are directed at

14   plaintiffs' firms?  I think that that's

15   possible, yes.

16        Q.    But you don't have them now, right?

17        A.    Correct.

18        Q.    You don't have plaintiffs' firms

19   signed up now, right?

20        A.    No.

21        Q.    And although you think it's not

22   impossible that you could work with them in the

23   future and come up with a solution, that

24   solution doesn't exist presently, correct?

25        A.    It does not.

Page 334

 1              MS. MUSUMECI:   Object to form.

 2       A.    And that's why these marketing

 3  materials are directed at defense firms:

 4  Because they're always a party to the

 5  litigation.  And we're having customers who have

 6  come and said, yeah, I would like to subsidize

 7  the cost of the litigation because it gives me

 8  cost certainty.

 9       Q.    Can you go back to the current rules,

10  which I think is Tab 37?

11       A.    Yes.  Yep.

12       Q.    Now, another thing that the rules

13  discuss is limits on evidence that can be used

14  in a case that's heard by New Era; is that

15  correct?

16       A.    Are you looking at a specific

17  provision?

18       Q.    I will in a second, but, generally,

19  that's right?

20       A.    Ask the question again.  I'm sorry.

21       Q.    Yeah.  Another thing the rules discuss

22  is limits on evidence in a case that's heard by

23  New Era?

24       A.    Generally, I think that's correct.

25       Q.    Just why don't you go to page 12.

Page 335

```
1              Do you see --
2     A.     Yes.
3     Q.     Do you see the heading
4  "Evidence/Hearings"?
5     A.     Yes.  Yes.  Yes.
6     Q.     I believe we're still in the general
7  rules; is that right?
8     A.     Correct.
9     Q.     But as we talked about, there are kind
10 of general themes that run throughout the rules?
11    A.     Yes.
12    Q.     One of them is limits on evidence,
13 fair?
14    A.     Yes.  I see what you're saying.
15 You're talking about like the page limits and
16 things like that.
17    Q.     Right.  Exactly.  I'm not trying to
18 trick you.  It says here the, "Limits are
19 generally:  The lesser of 10 total files, 25
20 pages across all files or 25 megabytes of
21 aggregate uncompressed uploads for expedited
22 arbitrations"?
23    A.     I get it.  Yes.
24    Q.     Tell me how those limits work.  That's
25 a limit on the size you can upload for the
```

Page 336

1    hearing?

2        A.    Yes, generally.  Once again,

3    guardrails.  So this is -- this gets to, also,

4    the defense side, once again, of like dumping

5    every single page.  Because, quite frankly,

6    arbitrators need a limited amount of documents

7    so they can make decisions, right?

8            So this is -- once again, it's

9    guardrails.  It's not hard and fast rules.

10       Q.    Okay.  And the guardrails are "the

11   lesser of 10 total files, 25 pages across all

12   files or 25 megabytes of aggregate uncompressed

13   uploads"?

14       A.    Correct.

15       Q.    And this is repeated in the expedited

16   rules, which makes sense because this is talking

17   about expedited arbitrations, right?

18       A.    Right.

19       Q.    So it's possible that if an arbitrator

20   followed the guardrails -- I understand that the

21   arbitrator has discretion not to do that, but

22   let's assume the arbitrator follows the

23   guardrails.  Okay?

24       A.    Yes.

25       Q.    It's possible that, in an expedited

Page 337

```
1    arbitration against Live Nation, the plaintiff

2    would only be able to upload 10 files totaling

3    25 pages?

4         A.    I mean, that's possible, yes.

5         Q.    I mean, are you aware of a single

6    antitrust case that's gone to trial with only 10

7    total files with 25 pages across those files?

8         A.    Once again, these are guardrails, not

9    mandates.  Number two, I'm not familiar with

10   antitrust cases.

11        Q.    Well, I mean, just help me understand

12   the rules as they're written or the guardrails,

13   if you will, okay?

14             I mean, if a document is longer than

15   25 pages, like if Live Nation produced a 50-page

16   agreement with a venue, that technically would

17   be prohibited by the guardrails and the

18   arbitrator would have to exercise discretion

19   even to look at it, right?

20        A.    Well, once again, because it's

21   guardrails, no, they're not prohibited from

22   doing anything.

23        Q.    If an arbitrator observed the

24   guardrails, someone wouldn't even be allowed to

25   upload a 50-page contract with Live Nation?
```

Page 338

1       A.    If this was a mandate, yes.

2       Q.    I mean, isn't the purpose of these

3    rules to provide guidance for arbitrators?

4       A.    Yes, it's to provide guardrails.

5       Q.    Right.  I mean, the guardrails aren't

6    there so people can ignore them, are they?

7       A.    I mean, the overarching purpose of the

8    rules is that the arbitrator does what they need

9    to do to create an efficient resolution to the

10   case.

11      Q.    I mean, do you believe that it would

12   be possible to have a fair hearing for both

13   sides in an antitrust case against Live Nation

14   if an arbitrator observed these guardrails?

15           MS. MUSUMECI:  Objection.

16      A.    I know you want me to say that an

17   antitrust case can't be done within these

18   guardrails, and my answer is going to

19   consistently be I do not know.

20      Q.    Well, just help me understand how they

21   apply in practice.

22           I mean, if the alleged conspiracy is

23   over ten years, I mean, the plaintiff, if

24   someone observed these guardrails, would have

25   one file per year of the conspiracy, right?

Page 339

```
 1                    MS. MUSUMECI:  Objection again.

 2         A.     Yes, I guess.

 3                I mean, look, I could sit here and

 4    pontificate on how an antitrust case should go

 5    and what the vertical and horizontal restraints

 6    are and what the, you know -- but I don't know

 7    because I haven't litigated antitrust.

 8         Q.     Let me ask you a more general

 9    question:  Do the normal burdens of proof in

10    civil litigation apply in New Era?

11         A.     Yes, but -- well, that's a difficult

12    question because we do not apply the Rules of

13    Civil Procedure or the Federal Rules of

14    Evidence, that type of thing.  But, once again,

15    we rely on the arbitrator's experience.

16                So would it be a preponderance of the

17    evidence standard?  Yes, it would be.

18         Q.     Okay.  That's my question.  So, in a

19    case like this one where the plaintiffs bring

20    antitrust claims against Live Nation, they would

21    have to prove these claims by a preponderance of

22    the evidence?

23         A.     Correct.

24         Q.     I mean, you agree that, all things

25    equal, it's harder to have the burden of proof
```

Page 340

1    than not to have the burden of proof, right?

2              MS. MUSUMECI:   Objection.

3        A.    I don't know.  Yeah, I don't know if

4    that's true or not.

5        Q.    I mean, how is it harder to not have

6    the burden of proof?

7        A.    Because defending cases is pretty

8    difficult.

9        Q.    I mean, I understand that there are

10   difficulties in defending a case, but if you

11   have the burden of proof, isn't that harder than

12   not having it, all things equal?

13       A.    I mean, I think it depends on the

14   facts of the case.

15       Q.    And talk --

16       A.    Let me put it this way:  If you have

17   an e-mail between Live Nation and Ticketmaster

18   saying, "Let's fix all pricing," the defense of

19   that case is more difficult than having the

20   burden of proof.

21       Q.    I understand, but I'm just asking

22   about the burden of proof.

23             I mean, do you really think that

24   having 60 days and 10 files or 25 pages is

25   enough to prove your case by the preponderance

Page 341

1    of the evidence?

2         A.    I think that depends on the case.

3              MS. MUSUMECI:  Objection.

4         Q.    You can answer.

5              What does it depend on?

6         A.    I said I think it depends on the facts

7    of the case.

8              I just gave you an example where I

9    think having the burden of proof is lesser than

10   defending the case.

11        Q.    Let me ask it this way:  Do you think

12   it's fair to have guardrails that state that

13   cases should be resolved in 60 days, and that

14   you can only upload 25 pages or 10 documents for

15   an antitrust case alleging a decade of

16   anticompetitive misconduct?

17             MS. MUSUMECI:  Objection.  Asked and

18        answered.

19        A.    I mean, I think when you have an

20   arbitrator who can think critically about what

21   they would need to do to resolve the case

22   efficiently, then the guardrails -- they're not

23   mandates.  I've said that repeatedly.  The

24   guardrails are there to help, and if the case

25   doesn't fit, then the arbitrator has discretion

Page 342

1    to do what they need to do.

2        Q.    To resolve this case fairly, it's

3    likely an arbitrator would have to modify the

4    guardrails?

5        A.    Yeah, I think that that's a fair

6    statement.  They have every right to do that.

7        Q.    We talked about this a little bit, but

8    New Era also has rules for mass arbitrations?

9        A.    Yes.

10       Q.    And I've asked you this a little bit

11   before, and I'm trying to be efficient, but I

12   just need to table-set, okay?

13       A.    Sure.

14       Q.    The rules are laid out in the Rules

15   and Procedures, but the gist of it is there's

16   three bellwether cases that are selected, right?

17       A.    Which can be expanded, but, yes.

18       Q.    There are a few bellwether cases.

19   Starts with three, but it can be expanded?

20       A.    Correct.

21       Q.    And those have been revolved in

22   something called a lead decision, right?

23       A.    Yes.

24       Q.    What's a lead decision?

25       A.    So, basically, what you have is the

Page 343

1    three bellwethers, and a decision made in any of

2    those can act as precedent on subsequent cases.

3        Q.    All right.  So the cases don't settle,

4    and the lead decisions are used as precedent to

5    resolve the cases, absent individualized issues,

6    as we talked about?

7        A.    Correct.

8        Q.    Now, I want to ask a little bit about

9    the timeline for bellwether cases, so I'm going

10   to start looking at Section 6 of the rules.

11       A.    Okay.  Do you have a page?  You're

12   saying Section 6?

13             I got it.  I got it.  Okay.

14       Q.    So one of the things it mentions under

15   here, I have it as 6(b) -- let me make sure I

16   have this correct.  It's 6(b)(3) is "Process and

17   Rules at Each Stage."

18             Do you see that?

19       A.    Yes.

20       Q.    One of the things it says here is that

21   the bellwether cases must be selected within 14

22   days of selection of the neutrals?

23       A.    Yes.

24       Q.    So that is an mandate, right?  It says

25   "must"?

Page 344

1        A.      Yes.

2        Q.      They have to do it; they have to

3    select the bellwether cases in 14 days?

4        A.      Correct.

5        Q.      Now, the rules also say that, "The

6    Bellwether Cases will proceed individually, but

7    parallel to the extent possible, through New

8    Era's ADR's Virtual Expedited Arbitration

9    Process with the exception that document

10   uploading must be done within 14 days of the

11   selection of the Bellwether Cases," see that?

12       A.      Correct.

13       Q.      And that's another mandatory, "must,"

14   right?

15       A.      Yeah.

16       Q.      So document uploading has to be done

17   within 14 days of the selection of bellwether

18   cases; cannot be extended?

19       A.      I mean, a neutral always has the

20   ability to extend, yes.

21               Is this more of a mandate?  Yes, it's

22   more of a mandate than just a pure guardrail,

23   but the purpose of these rules, is always -- and

24   I will come back to it repeatedly -- is the

25   arbitrator runs the case how they see fit.

Page 345

```
 1       Q.    Okay.  I just want to make sure I have
 2  the timing right.
 3             So it's 14 days to select the
 4  bellwether case and then 14 to upload documents?
 5       A.    Yes.
 6       Q.    So 28 days from when you start
 7  selecting the bellwether cases to documents are
 8  uploaded?
 9       A.    Yes.
10             Well, isn't it 28?  Did you say 21 or
11  28?
12       Q.    I said 28.
13       A.    Okay.  Sorry.  I thought you said 21.
14       Q.    That's okay.
15             So, under the mass arbitration rules,
16  a document uploading for any hearing has to be
17  done 28 days after neutrals are selected?  28,
18  not 14?
19       A.    Correct, but document uploading would
20  mean -- I'm going to use a very basic instance,
21  but let's say that this is Skot Heckman
22  uploading his ticket that demonstrates that he
23  bought a ticket from Live Nation/Ticketmaster.
24             So that doesn't necessarily encompass
25  what -- if there's a discovery process that's
```

Page 346

1   included because the arbitrator needs that,

2   that -- this is not sort of the end all, be all

3   of document uploading.  It's kind of the basics.

4        Q.    Okay.  But as we've discussed, there's

5   no formal process for that discovery.  As you

6   said, it's something the arbitrator has to

7   authorize?

8        A.    Correct.

9        Q.    And it doesn't spell out in the rules

10  any of that?  I mean, I understand you think

11  it's implicit or there are references to their

12  discretion, but there's nothing -- there's no

13  process for how to do that?

14       A.    Correct.

15       Q.    So if it's followed by the arbitrator

16  by the book, 14 days after bellwether cases are

17  selected, all of the documents are uploaded and

18  the parties proceed to a hearing, right?

19       A.    Correct.

20       Q.    And those hearings are then used to

21  decide all cases that arise out of common issues

22  of law and fact, as they're defined in the

23  rules?

24       A.    Well, those hearings are used to

25  decide bellwether cases.  So you could have

Page 347

1    disparate decisions in the bellwethers, for

2    whatever reason, and the arbitrator could say we

3    need more bellwethers.  There's also the

4    settlement conference to discuss what comes out

5    of the bellwethers.

6              So it's a little bit more complex than

7    that.

8        Q.    I see.  The way it's a little more

9    complex is an arbitrator could, in theory, do

10   another bellwether if they wanted to, and there

11   could be a settlement conference, right?

12       A.    Yes.

13       Q.    But if those don't happen, basically,

14   the way the process works, documents are

15   uploaded; 14 days after the bellwether cases are

16   selected, there's a hearing; that creates a

17   precedent; and then that's applied to all the

18   other decisions with common issues of law and

19   fact?

20       A.    Yes.  I mean, I think that that is

21   definitely simplifying the process and saying

22   that, if everything is equal, you have three

23   decisions that are made in the bellwethers that

24   are all identical, that nobody raises their hand

25   and says that there's something different, that

Page 348

1    the settlement conference goes nowhere, then,

2    yes, that could be how it happened.

3        Q.    Under the rules, who decides if a case

4    is different such that it's not a case that

5    involves common issues of law and fact?

6        A.    The arbitrator.

7        Q.    Okay.  Is there any appeal process for

8    that decision?

9        A.    There is not.

10       Q.    So the arbitrator could, even if a

11   bunch of people put their hands up and said,

12   look, we think our case is really different, if

13   an arbitrator decided not, they're stuck with

14   the precedent generated by the bellwether cases?

15       A.    Correct.

16       Q.    And so, to make sure I understand, so

17   that precedent is then used to decide all cases

18   that are determined to arise out of common

19   issues of law and fact?

20       A.    Yes.

21       Q.    So that would include even later filed

22   arbitrations that were not filed as of the time

23   of the bellwether cases?

24       A.    It could.  You would still -- so,

25   essentially, what you would have to have in

Page 349

1    later filed cases is, basically, an identical

2    complaint that asserts nothing else.

3              And the idea would be to assign the

4    same arbitrator to that and say:  "This is an

5    identical complaint.  It's raised no new issues.

6    Nobody has raised their hand and said that this

7    is different," which I have a hard time seeing

8    that occurring.

9         Q.    Well, let me ask you this.  So let's

10   go back to the bellwether process.

11             Let's assume we have plaintiffs that

12   have gone through the bellwether process.

13   Bellwethers cases are selected, and they loose.

14   Okay?  You with me?

15        A.    Yes.

16        Q.    The plaintiffs have sued Live Nation

17   for antitrust violations, and they lose, for

18   example, because they couldn't adduce evidence

19   that there was a conspiracy.

20             You with me?

21        A.    I'm with you.

22        Q.    And so anyone that's deemed to have a

23   case that has common issues of law and fact is

24   bound by that ruling, correct?

25        A.    If they can't demonstrate that

Page 350

1    anything is different, then, yes.

2         Q.    They don't have opt-out rights, right?

3         A.    That depends on the terms of use with

4    the company, I believe.

5         Q.    We're talking about Live Nation.

6               Do they have opt-out rights under

7    those terms?

8               MS. MUSUMECI:  Objection.

9         A.    I don't know.  I'm not that familiar

10   with the terms of use.

11        Q.    They have no appeal rights, as far as

12   you know, right?

13        A.    I don't know.

14        Q.    They have no right to seek additional

15   evidence somehow or seek reconsideration?

16        A.    I do not know.

17        Q.    Well, I mean, let me make sure I'm

18   being clear here.  I'm asking about under New

19   Era's rules.

20        A.    Under New Era's rules, correct,

21   there's no right of appeal.

22        Q.    There's no opt-out right?

23        A.    There's no opt-out right, no.

24        Q.    There's no right to seek additional

25   evidence after the fact?

Page 351

1       A.    No.

2       Q.    No right to move for reconsideration?

3       A.    No.

4       Q.    No right to move to set aside the

5    judgment?

6       A.    I mean, you can always file a court

7    case and say set aside the judgment.

8       Q.    But the New Era rules don't

9    contemplate that?  There's no mechanism, short

10   of what you just said, filing a lawsuit in court

11   and then, you know, presumably having Live

12   Nation tell them to go to arbitration?

13      A.    Right now, correct.

14      Q.    And so that's true even for cases that

15   arise after the lead decisions are resolved,

16   right?

17      A.    Once again, it would basically have to

18   be the identical complaint.

19            So the scenario that I'm thinking of

20   that you're explaining is one plaintiffs' firm

21   files a bunch of cases, loses the bellwethers,

22   precedent applies, another firm comes along and

23   files the exact same complaint and says, we're

24   different, and I think the arbitrator would look

25   at it and say, how?  And if you couldn't explain

Page 352

1    how you were different, then, yes, the precedent

2    would apply.

3         Q.    What if they say the difference is

4    this:  What if a plaintiff comes along and says,

5    look, I bought tickets from Ticketmaster a year

6    after this lead decision was rendered.

7              You with me?

8         A.    I'm with you.

9         Q.    Look, I hadn't suffered any injury at

10   the time the decision was rendered.  I didn't

11   know about this case, but I think the lawyers in

12   that case did a crappy job.  I've got a good

13   claim.  It's the same antitrust claim, but I had

14   no injury and no notice of the prior case, and

15   I'm here, I want to be heard.

16             Under New Era's rules, the lead

17   decision applies for that person, correct?

18        A.    No, not necessarily, because you

19   would -- just as you said, you came along and

20   said:  Things are different.  I wasn't here when

21   this happened before.  I bought my ticket, and

22   things had changed because of XYZ.  And all you

23   would have to do is raise your hand and say

24   these are the differences.

25             If you can't say anything -- nothing

Page 353

1    has changed, right?  If you had an arbitrator

2    who said, I made a decision and this is the

3    decision that governs, and you come along and

4    literally nothing has changed, then, yes,

5    precedent would apply.

6        Q.    What if the only thing that's changed

7    is their injury?  What if they say, look, I have

8    the same antitrust claims.  I'm complaining

9    about the exact same conduct.  It's the same

10   complaint.  What's different is I think the

11   lawyers that did it before did a crappy job.

12   They didn't make the right arguments.  I have my

13   lawyers.  I want a chance to be heard because I

14   overpaid for a ticket.

15           Are they bound by the lead decision or

16   not?

17           MS. MUSUMECI:  I'm going to object.

18       You know, I've given a lot of leeway with

19       these hypotheticals.  I'm going to object to

20       the hypotheticals.

21           MR. SEARS:  They're not hypotheticals.

22       I'm trying to understand how the rules work.

23       This is the only way that I can ask these

24       questions, Sandy.  I would like the witness

25       to answer.

Page 354

```
 1              THE WITNESS:  I think the answer is
 2       that would be up to the arbitrator.
 3    BY MR. SEARS:
 4       Q.    So if the arbitrator decided that that
 5    was a case with a common issue of law and fact,
 6    they would be bound by the prior decision?
 7       A.    Well, it would be the arbitrator's
 8    decision, just like it would be for a judge if
 9    they were bound by the Second Circuit Court of
10    Appeals.
11       Q.    Are New Era's arbitrations
12    confidential?
13       A.    Yes.
14       Q.    Okay.  So, in theory, someone that
15    hasn't bought any tickets from Ticketmaster
16    right now wouldn't even know that there was an
17    arbitration going on involving allegations of
18    anticompetitive conduct by Ticketmaster, right?
19       A.    Then it would seem to make no sense
20    that they would file the exact same complaint
21    that was filed before.
22       Q.    Well, my question is this:  I mean, is
23    there a scenario in which people could
24    potentially have claims that are resolved by
25    lead decisions without even knowing that that
```

Page 355

1    had occurred?

2            MS. MUSUMECI:  Objection to the

3       hypothetical.

4       Q.    You can answer.

5       A.    I'm trying to think of how to answer.

6            I mean, in my mind, the way that this

7    works is, if you had no idea that those

8    decisions were made before, then your complaint

9    would be completely different.

10      Q.    What if it's the same complaint, you

11   just didn't know.  You say, look, I would have

12   filed this earlier, but I had no idea it was

13   going on and now I'm stuck with this lead

14   decision.

15           Do they get another shot or are they

16   bound by the lead decision if they have the same

17   claims?

18           MS. MUSUMECI:  Same objections.

19      A.    That would be the most amazing

20   coincidence in history.

21      Q.    How would it be an amazing

22   coincidence?  This happens a lot in litigation.

23   People file similar claims, one after another.

24      A.    "Similar" is different than "exactly

25   the same."

Page 356

```
1        Q.    I mean, how different does it have to

2   be?  I'm really not trying to pester you with

3   hypotheticals.  I'm just trying to understand,

4   if someone files a complaint and says Live

5   Nation and Ticketmaster are monopolizing the

6   market for concert tickets, and I overpaid for

7   concert tickets, it's basically the same claims

8   that have already been heard by New Era, but I

9   didn't suffer any injury when that claim was

10  resolved and I didn't know about it, is that the

11  same claim such that a lead decision would apply

12  or not?

13       A.    It would be up to the arbitrator.

14       Q.    And if the arbitrator decided it's the

15  same claim, that person would have no

16  opportunity under the claim?

17       A.    It would be the same thing that would

18  happen in court if the judge applied precedent.

19       Q.    Except that court decisions are

20  public, aren't they?

21       A.    Yes.

22       Q.    If you are a class member in a federal

23  court class action, you have a right to notice

24  and to opt-out, don't you?

25       A.    Yes.
```

Page 357

```
 1       Q.     There's no analogue for New Era, is
 2   there?
 3       A.     No.
 4       Q.     It is possible, given the way the mass
 5   arbitration rules worked, that consumers that
 6   have cases resolved that affect their rights
 7   without even knowing it?
 8              MS. MUSUMECI:  Objection.
 9       Hypothetical.
10       A.     Yeah, once again, I don't -- it would
11   be at the discretion of the arbitrator.
12       Q.     There's a scenario in which a consumer
13   could have a claim resolved that affects their
14   rights by New Era, and they wouldn't even know
15   it until after it had happened?
16       A.     It would be up to the discretion of
17   the arbitrator.
18       Q.     It's something that could happen under
19   the mass arbitration rules by New Era?
20       A.     It would be up to the discretion of
21   the arbitrator.
22       Q.     And it could happen, couldn't it?
23       A.     I mean, I don't know.  I don't know.
24       Q.     I mean, what more facts do you need to
25   know to know it?  I'm telling you it's the same
```

Page 358

1    claims.  The only thing that happened is that

2    this second plaintiff doesn't know about the

3    proceeding and didn't suffer any injury until

4    after the first case was resolved.

5         A.    I understand the hypothetical.  I

6    think I've covered my answer.

7         Q.    I mean, there's a definition of

8    "common issues of law and fact" in the rules,

9    isn't there?

10        A.    Yes.

11        Q.    You wrote it, didn't you?

12        A.    I certainly had a hand in it, yes.

13        Q.    So does this situation I presented to

14   you fall within common issues of law and fact,

15   as you understand it, or not?

16        A.    It would be up to the arbitrator.

17        Q.    You can't tell me?

18        A.    I just told you.

19        Q.    You can't tell me?

20        A.    You can ask this question a million

21   different times in a million different ways.  My

22   answer is:  It would be up to the arbitrator.

23             If you want to ask it a hundred times,

24   I'll answer it a hundred times.  That's

25   absolutely your right, but I'm telling you it's

Page 359

1    up to the arbitrator.

2         Q.    Collin Williams, the founder of New

3    Era, can't tell me?

4              MS. MUSUMECI:   Objection.

5    Argumentative.

6         Q.    You can answer.

7         A.    I believe I did.

8         Q.    Okay.  I'm going to introduce our next

9    exhibit.

10             Actually, before we do that, stay on

11   this one.

12             Earlier, you told me that the 15K

13   characters for final arguments, that may have

14   not been accurate.

15             Do you remember that?

16        A.    Yes.

17        Q.    Look at page 27.  You see under where

18   it says "Final Arguments Are Submitted"?

19        A.    Yes.

20        Q.    You see where it says, "Final

21   arguments are limited to 15K characters"?

22        A.    I do.

23        Q.    That's in New Era's current rules?

24        A.    It is.

25        Q.    That's the guardrail that would apply

Page 360

1    to mass arbitrations?

2         A.    Correct.

3         Q.    15K characters for final arguments?

4         A.    Correct.

5         Q.    Now, you mentioned before that might

6    be a mistake.

7               Are you going to change that rule?

8         A.    I am happy to change it.

9               MS. MUSUMECI:  Objection.

10        Q.    I didn't hear your answer.

11              Oh.  You said, "I'm happy to change

12   it"?

13        A.    I'm happy to change it.  I mean, it is

14   written as there.  It's a guardrail.  It is not

15   a mandate.  It certainly could be larger.

16        Q.    I mean, I'm only asking.  I am not

17   trying to badger you.  I'm asking because,

18   before, you sounded like you thought that that

19   was not even correct.

20              Do you think that that's the right

21   rule to have for final arguments?

22        A.    It is in the current rules.

23        Q.    Do you agree with it?

24              MS. MUSUMECI:  Objection.

25        A.    It's in the current rules.

Page 361

1       Q.     Do you think it's a good rule?

2              MS. MUSUMECI:  Same objection.

3       A.     That's subjective.  Once again, it's a

4    guardrail.  It's not a mandate.

5       Q.     Does New Era think it's a good rule?

6       A.     I'm not sure.  What does "New Era"

7    mean?

8       Q.     I mean, you're the corporate

9    representative for New Era.  One of the topics

10   is the current rules.  I'm just asking you, do

11   you think it's a fair rule for mass arbitrations

12   to have final arguments limited to 15K

13   characters?

14      A.     I think it's a guardrail, and it can

15   be exceeded.

16      Q.     You think it probably would be

17   exceeding, don't you?

18      A.     Probably.

19      Q.     It's not realistic, is it?

20      A.     I don't know what the answer to that

21   is.

22      Q.     It's not a rule that you think would

23   actually be followed by most arbitrators?

24      A.     I think it could be if it was a simple

25   case.

Page 362

```
1      Q.     Not for a complex case?

2      A.     I don't know.  It depends on the facts

3    of the case.

4      Q.     All right.  Let's mark our next

5    exhibit.

6      A.     Can I close out of this stuff?

7      Q.     Yes.

8             All right.  I'm introducing a document

9    bearing Bates number NEWERA_002114.

10            (Williams Exhibit 35, Document

11         Bates-stamped NEWERA_002114, marked for

12         identification, as of this date.)

13   BY MR. SEARS:

14     Q.     See this?

15     A.     I do.

16     Q.     Just a couple questions on this.

17            So this is talking about the pricing

18   for a subscription agreement, right?

19     A.     Yes.

20     Q.     It says, "All pricing is dependent on

21   factors such as litigation history plus

22   anticipated risk"?

23     A.     Yes.

24     Q.     Is this kind of like the model we were

25   talking about earlier?
```

**4-SER-473**

Page 363

```
 1      A.      It's an example of the model, yes.

 2              So we talked a lot about economic

 3    leverage.  This demonstrates the economic

 4    leverage issue.

 5      Q.      And one of the things here is it shows

 6    different tiers for pricing.

 7              Do you see this?

 8      A.      You're talking about like,yeah, the

 9    coverage tiers, yes.

10      Q.      Yeah.

11              And they range from an all-in cost of

12    ▓▓▓▓▓▓  to  ▓▓▓▓▓▓ , right?

13      A.      Yes.

14      Q.      It's all less than Live Nation paid?

15      A.      Yeah, but these -- as it says, all

16    pricing is dependent on factors such as

17    litigation history and anticipated risk.

18      Q.      You have anticipated my next question,

19    which is:  Are those the reasons that Live

20    Nation paid more?

21      A.      Yes.

22      Q.      And that was, in part, based on the

23    data that they showed you over Zoom?

24      A.      Correct.

25      Q.      Can you just describe what that data
```

Page 364

```
 1   was?

 2        A.    I believe it was the number of cases

 3   by year for the past seven or so years.

 4        Q.    Do you remember the number?

 5        A.    I don't remember the numbers, no.  I

 6   mean, the reality is I think you could pull it

 7   from public data if they weren't arbitrations,

 8   or even if some of them were because that stuff

 9   is disclosed depending on the type of

10   arbitration.

11             But doing that kind of research would

12   have taken us a lot of time when it was very

13   simple for Live Nation to pull it.

14             MR. SEARS:  Okay.  Let's do this.  Can

15        we take a break?

16             Let's go off the record.

17             (Recess; Time Noted:  3:39 p.m.)

18             (Time Noted: 3:56 p.m.)

19   BY MR. SEARS:

20        Q.    Welcome back, Mr. Williams.

21             Did you talk to anyone on the break?

22        A.    I did.  I talked to Sandy, and with

23   respect to this one point, I think we're in

24   agreement we'll waive attorney-client privilege,

25   but she just wanted me to correct something when
```

Page 365

1    I was talking about solutions for plaintiffs'

2    firms.  We were talking about financial

3    solutions, and that we basically build rules

4    based on what's fair, and that's how we do it.

5            So when we're talking about working

6    with plaintiffs' firms, it would be about

7    finding financial solutions that make sense for

8    them.  So I just wanted to clarify that.

9        Q.    Okay.  That was based on a discussion

10   you just had with Sandy?

11       A.    Yes.  Sandy was, basically, what do

12   you mean by "solutions"?  And that's a fair

13   question because what I really meant is

14   financial solutions, not changing the rules to

15   benefit one side or the other.

16       Q.    But I want to ask you about New Era's

17   arbitrators.  Okay?

18       A.    Yes.

19       Q.    So your lawyers have represented that

20   New Era has two arbitrators on its list of

21   approved neutrals who have small equity stakes

22   in New Era?

23       A.    I believe it's three.

24       Q.    Okay.  So there are three arbitrators

25   on its list of neutrals who have equity stakes

Page 366

1    in New Era?

2         A.    Correct.

3         Q.    Now, previously, your lawyers told us

4    that those two arbitrators are listed as

5    advisors on New Era's webpage?

6         A.    Correct.

7         Q.    Is the third person an advisor too?

8         A.    Yes.

9         Q.    And are those the agreements that have

10   been produced?

11        A.    Yes.

12              I do believe that there was a

13   mistake -- and I think you guys have talked

14   about this -- a mistake in production of Ed

15   Sohn, who is an advisor but is not an

16   arbitrator, but the three are Chris Shulman,

17   Shawn Aiken, and Justin Steffen.

18        Q.    Who are they?  Where do they come

19   from?

20        A.    So Chris and Shawn are just

21   arbitrators that we've kind of met through the

22   process of creating the company and saying

23   they're guys that -- I believe both of them are

24   NADN.  So we have a relationship with the NADN,

25   but they were just interested in what we were

Page 367

1    doing and wanted to take a little bit more of an

2    active role in helping us craft rules and do

3    things like that.

4           Justin is a FinTech attorney at Barack

5    Ferrazzano who has a specialty in crypto

6    currency.  He's friends with Rich.  And to be

7    honest, I'm not sure that we have any immediate

8    need, but his expertise in crypto currency was

9    interesting to us from the standpoint of being

10   an arbitrator and mediator.

11       Q.    What's NADN?

12       A.    NADN is the National Academy of

13   Distinguished Neutrals.

14       Q.    Okay.  And what were the circumstances

15   under which they acquired their equity?

16       A.    When we decided -- I mean, quite

17   frankly, Shawn and Chris were putting in a lot

18   of time just having conversations with us before

19   launch.  So we decided that it made sense for

20   them to be advisors.  But when you're an

21   advisor, we do have at least nominal

22   expectations of how you will help us and what

23   you will do, and we didn't think it was fair to

24   do that without some sort of remun- -- you know

25   what I'm saying -- remuneration.

Page 368

1              It's been a long day.

2    Q.    I get it.

3              Now, do all of them have the same

4    equity interests, which is 0.01 percent?

5    A.    They do.

6    Q.    And what's the approximate dollar

7    value today of that equity?

8    A.    Oh.  A little over a thousand bucks.

9    Q.    Okay.  And who holds the rest of New

10   Era's equity?

11   A.    There's various stakeholders.  We have

12   a bunch of shareholders, including, you know,

13   the VC funds that you can find on CrunchSpace.

14   Q.    Do you have equity in New Era?

15   A.    I do.

16   Q.    What percentage, approximately?

17             MS. MUSUMECI:  I'm going to object

18        that this is beyond the scope of the

19        30(b)(6) topics.

20   A.    Yeah, that's not public information.

21   I'm not going to answer that.

22   Q.    All right.  You're just not going to

23   tell me?

24   A.    I'm not going to tell you.

25   Q.    Does Mr. Lee have equity in New Era?

Page 369

1      A.      He does.  All of our employees have

2    equity.

3      Q.      Okay.  But you won't tell me how much?

4      A.      No.

5      Q.      More than half?

6              MS. MUSUMECI:  I'm going to object

7      again.

8      A.      I'm not going to answer that.

9      Q.      Could these three arbitrators that

10   hold equity oversee an arbitration involving

11   Ticketmaster and Live Nation?

12     A.      Yeah, they could.

13     Q.      It doesn't prevent them from doing

14   that?

15     A.      No.  They would have to -- well, I

16   take that back.  There's always disclosures that

17   have to be made, so if there's some sort of

18   conflict of interest, they would have to

19   disclose it and they could be conflicted out.

20            But the equity, just as in JAMS, I

21   believe that JAMS has over 40 arbitrators that

22   have much more substantial stakes in the

23   business than we do, that are -- than our

24   advisors do.  There's nothing that conflicts

25   them out because of their equity interest.

Page 370

```
 1        Q.     And these are -- their equity interest
 2   is governed by advisory board agreements?
 3        A.     Yes.
 4        Q.     And those are what has been produced
 5   to us?
 6        A.     Yes.
 7        Q.     Substantially the same for all three
 8   of these gentlemen?
 9        A.     Yeah, I don't recall any of them
10   making any changes.  Maybe Chris did, I don't
11   know, but they're all substantially the same.
12        Q.     And the reasoning for selecting them
13   was that they were a little bit more involved in
14   the process and had more input into the business
15   of New Era than others?
16        A.     Yeah, I think they were just very
17   interested in what we were doing and why we were
18   doing it.
19        Q.     Just a couple more.  I know we talked
20   about this, but I want to make sure I covered
21   the ground here.
22               So a litigation hold was put in place
23   in January 2022?
24        A.     Correct.
25        Q.     To the best of your knowledge, were
```

Page 371

1    any documents responsive to the subpoena lost or

2    destroyed or not preserved?

3         A.    The answer is no, and I would be

4    pissed if I found out that they were.

5              MR. SEARS:  Okay.  I have no further

6         questions at this time.  I have a little

7         over an hour and a half left.

8              Sandy, I'm going to hold the balance

9         of my time open because you had some

10        objections and instructions not to answer.

11        I need to look at the transcript.  We may

12        have followup questions about documents.

13             I expect that you will object if we

14        try to call Mr. Williams back, but I'm just

15        noting that for the record to preserve the

16        option.

17             MS. MUSUMECI:  Okay.  And you're right

18        I would object, but I understand, and so we

19        both preserve our rights.

20             MR. SEARS:  Okay.  Nothing else from

21        me.

22             Thank you for your time, Mr. Williams.

23             MS. MUSUMECI:  And I just want to make

24        sure:  So we'll get a copy of the transcript

25        to review, right?

Page 372

1          MR. SEARS:  Yes.

2          (Whereupon, the deposition of Collin

3     Williams concluded at 4:03 Mountain Time.)

4                    oOo

5                    _____

                     COLLIN WILLIAMS

6

7     Subscribed and sworn to
      before me this    day
8     of        2023.

9

      _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 373

```
 1                    J U R A T

 2

 3    I,            , do hereby certify under

 4    penalty of perjury that I have read the foregoing

 5    transcript of my deposition taken on            ;

 6    that I have made such corrections as appear noted

 7    herein in ink, initialed by me; that my testimony as

 8    contained herein, as corrected, is true and correct.

 9

10    DATED this ____ day of _____,2023,

11    at _____,         .

12

13

14

15

16

17    _____

18              SIGNATURE OF WITNESS

19

20

21

22

23

24

25
```

Page 374

1                    CERTIFICATE

2     STATE OF NEW YORK )
                               :  ss
3     COUNTY OF NEW YORK)

4          I, Kathy S. Klepfer, a Registered

5     Merit Reporter and Notary Public within and

6     for the State of New York, do hereby

7     certify:

8          That COLLIN WILLIAMS, the witness

9     whose deposition is herein before set forth,

10    was duly sworn by me and that such

11    deposition is a true record of the testimony

12    given by such witness.

13         I further certify that I am not

14    related to any of the parties to this action

15    by blood or marriage and that I am in no way

16    interested in the outcome of this matter.

17         In witness whereof, I have hereunto

18    set my hand this 25th day of January, 2023.

19

20    _____
           KATHY S. KLEPFER, RPR, RMR, CRR, CLR
21

22

23

24

25

```
                                                          Page 375
1                       ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads      Should Read  Reason

6   ____ ____ _____    _____  _____

7   ____ ____ _____    _____  _____

8   ____ ____ _____    _____  _____

9   ____ ____ _____    _____  _____

10  ____ ____ _____    _____  _____

11  ____ ____ _____    _____  _____

12  ____ ____ _____    _____  _____

13  ____ ____ _____    _____  _____

14  ____ ____ _____    _____  _____

15  ____ ____ _____    _____  _____

16  ____ ____ _____    _____  _____

17  ____ ____ _____    _____  _____

18  ____ ____ _____    _____  _____

19  ____ ____ _____    _____  _____

20                                       _____

21                                       Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS _____ DAY OF _____, 2023.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

```
                                                       Page 376
1   EXAMINATION OF C. WILLIAMS:                      PAGE

2   By Mr. Sears                                       4

3

4

5   WILLIAMS EXHIBITS:                               PAGE

6   Exhibit 1, 30(b)(6) Notice of Deposition to New    7
    Era
7
    Exhibit 2, Declaration of Collin Williams on      22
8   Behalf of New Era ADR, Inc.

9   Exhibit 3, E-mail with attachment Bates-stamped   37
    NEWERA_000227
10
    Exhibit 4, E-mail chain Bates-stamped      81 is that
11  NEWERA_000780 through 782

12  Exhibit 5, E-mail chain Bates-stamped            85
    NEWERA_000220 through 223
13
    Exhibit 6, E-mail Bates-stamped NEWERA_000212    90
14
    Exhibit 7, E-mail chain Bates-stamped            94
15  NEWERA_000215 through 216

16  Exhibit 8, E-mail chain Bates-stamped           103
    NEWERA_000168 through 172
17
    Exhibit 9, E-mail chain Bates-stamped           116
18  NEWERA_000160 through 165, with attachment

19  Exhibit 10, Document titled "New Era ADR Mass   128
    Arbitration Risk Mitigation," Bates-stamped
20  NEWERA_001985

21  Exhibit 11, E-mail chain Bates-stamped          140
    NEWERA_000239
22
    Exhibit 12, E-mail chain Bates-stamped          145
23  NEWERA_000327 through 328

24  Exhibit 13, E-mail chain Bates-stamped          149
    NEWERA_000241 through 242
25
```

Page 377

1

2                    INDEX (Cont'd.)

3    WILLIAMS EXHIBITS:                              PAGE

4    Exhibit 14, E-mail chain Bates-stamped        153
     NEWERA_000004 through 7
5
     Exhibit 15, E-mail chain Bates-stamped        158
6    NEWERA_000122 through 124

7    Exhibit 16, E-mail chain bearing Bates-stamps  160
     NEWERA_000593 through 594
8
     Exhibit 17, E-mail chain with attachments      166
9    Bates-stamped NEWERA_000020

10   Exhibit 18, E-mail chain Bates-stamped        178
     NEWERA_000742 through 743
11
     Exhibit 19, E-mail chain Bates-staped         181.
12   NEWERA_000074 through 75

13   Exhibit 20, E-mail chain Bates-stamped        182
     NEWERA_000106
14
     Exhibit 21, E-mail chain Bates-stamped        184
15   NEWERA_000734 through 735

16   Exhibit 22, E-mail chain Bates-stamped        188
     NEWERA_000701 through 703
17
     Exhibit 23, E-mail Bates-stamped NEWERA_000111  199
18
     Exhibit 24, E-mail chain with attachments      200
19   Bates-stamped NEWERA_000529

20   Exhibit 25, E-mail chain Bates-stamped        205
     NEWERA_000001 through 003
21
     Exhibit 26, E-mail chain Bates-stamped        210
22   NEWERA_000008

23   Exhibit 27, Document Bates-stamped            217
     NEWERA_000184
24
     Exhibit 28, E-mail chain Bates-stamped        260
25   NEWERA_000432 through 447

Page 378

```
 1                     INDEX (Cont'd.)

 2     WILLIAMS EXHIBITS:                              PAGE

 3     Exhibit 29, E-mail chain with attachments       273
       Bate-stamped NEWERA_000398 through 419
 4
       Exhibit 30, E-mail with attachments             280
 5     Bates-stamped NEWERA_000375 through 392

 6     Exhibit 31, Document Bates-stamped              286
       NEWERA_001093
 7
       Exhibit 32, New Era ADR Current Rules and       295
 8     Procedures

 9     Exhibit 33, Ticketmaster Terms of Use           301

10     Exhibit 34, E-mail with attachment             317
       Bates-stamped NEWERA_000104
11
       Exhibit 35, Document Bates-stamped             362
12     NEWERA_002114

13

14

15     DIRECTIONS NOT TO ANSWER:

16     Page 33:4

17     Page 33:18

18

19

20

21

22

23

24

25
```

# EXHIBIT D

Page 1

1                  UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              CASE NO. 2:22-cv-00047-GW-GJS

4

5   SKOT HECKMAN, LUIS PONCE, JEANENE

6   POPP, and JACOB ROBERTS, on behalf

7   of themselves and all those

8   similarly situated,

9                          Plaintiffs,

10      v.

11   ,

12   and TICKETMASTER LLC,

13                      Defendants.

14

15

16          REMOTE DEPOSITION OF KIMBERLY TOBIAS

17            PURSUANT TO FEDERAL RULE 30(B)(6)

18                LIVE NATION ENTERTAINMENT, INC.

19                THURSDAY, JANUARY 26, 2023

20                 PALOS VERDES, CALIFORNIA

21

22

23   TSG Job No.:  221381

24   Reported by:  Marilynn Hoover, RPR

25                 California CSR No. 8841

Page 2

```
 1        BE IT REMEMBERED THAT, pursuant to Rule 30(b)(6)
 2   the Federal Rules of Civil Procedure, the remote
 3   deposition of KIMBERLY TOBIAS was taken before
 4   Marilynn Hoover, California CSR No. 8841; on Thursday,
 5   January 26, 2023, commencing at the hour of 9:35 a.m.;
 6   the witness testifying from Palos Verdes, California.
 7
 8                     APPEARANCES
 9   QUINN EMANUEL URQUHART & SULLIVAN
10     BY WILLIAM SEARS, ESQ.
11     865 South Figueroa Street
12     Los Angeles, California 90017
13     On behalf of Plaintiffs
14
15
16
17   LATHAM & WATKINS
18     BY SADIK HUSENY, ESQ.
19        ROBIN GUSHMAN, ESQ.
20     505 Montgomery Street
21     San Francisco, California 94111
22     On behalf of Defendants
23
24
25
```

Page 3

```
 1                  EXAMINATION INDEX
 2                                              PAGE
 3   Examination by Mr. Sears                     5
 4
 5
 6                   *   *   *
 7
 8
 9                   EXHIBIT INDEX
10   EXHIBIT NO.   DESCRIPTION               PAGE
11   Exhibit 1    Plaintiffs' first rule 30(b)(6)
12                deposition notice to Live Nation
13                Entertainment Inc.               6
14   Exhibit 2    Plaintiffs' amended first rule
15                30(b)(6) deposition notice to
16                Ticketmaster                     6
17   Exhibit 3    E-mail string (NEWERA_000160 to
18                NEWERA_000165, and NEWERA_001957
19                to NEWERA_001961)               27
20   Exhibit 4    Defendants' supplemental privilege
21                log - January 6, 2023           59
22   Exhibit 5    Defendants' privilege log -
23                October 3, 2022                 59
24   Exhibit 6    E-mail string (NEWERA_000220 to
25                NEWERA_000223)                  69
```

Page 4

```
 1              EXHIBIT INDEX (CONT.)
 2   EXHIBIT NO.   DESCRIPTION               PAGE
 3   Exhibit 7    E-mail string (NEWERA_000004 to
 4                NEWERA_000007)                  78
 5   Exhibit 8    E-mail string (NEWERA_000327 to
 6                NEWERA_000328)                  93
 7   Exhibit 9    Subscription agreement
 8                (NEWERA_000184 to 000183, and
 9                NEWERA_000198)                  95
10   Exhibit 10   E-mail string (NEWERA_000432 to
11                NEWERA_000447)                 111
12   Exhibit 11   E-mail string (NEWERA_000398 to
13                NEWERA_000419)                 129
14   Exhibit 12   E-mail string (NEWERA_000375 to
15                NEWERA_000392)                 133
16   Exhibit 13   Subscription agreement
17                (TM00000032 to TM00000048)     135
18   Exhibit 14   New Era ADR Rules and Procedures 138
19   Exhibit 15   Terms of Use - last updated
20                July 2, 2021                   145
21
22
23
24
25
```

Page 5

```
 1   THURSDAY, JANUARY 26, 2023; PALOS VERDES, CALIFORNIA
 2                  KIMBERLY TOBIAS,
 3   called as a witness, being duly sworn on oath, was
 4   examined and did testify as follows:
 5        THE STENOGRAPHIC REPORTER:  Thank you.  You
 6   may begin, counsel.
 7                    EXAMINATION
 8   BY MR. SEARS:
 9     Q.  Good morning, Ms. Tobias.  I'm Will Sears.
10   I'm one of the attorneys representing the proposed
11   class in this case.
12         I understand you've been deposed before?
13     A.  I have.
14     Q.  And you're a lawyer by training?
15     A.  Yes.
16     Q.  You're currently in-house counsel at Live
17   Nation?
18     A.  Correct.
19     Q.  So you understand the deposition process?
20     A.  Very much so.
21     Q.  Okay.  I'll dispense with the ground rules,
22   then; but will you just -- if any of my questions are
23   unclear or confusing, will you let me know?
24     A.  Yes.
25     Q.  Do you understand that you're here as a rule
```

Page 6

1   30(b)(6) witness for both Live Nation Entertainment
2   Inc. and Ticketmaster LLC?
3       A.   Yes.
4       Q.   Do you have an understanding of what that
5   means?
6       A.   Yes.
7       Q.   What is that understanding?
8       A.   My understanding is that I'm here testifying
9   as a corporate representative as to the corporation's
10  knowledge of the topics in the deposition notice.
11      Q.   And if I just refer to "Live Nation" or
12  "Ticketmaster," will you understand that I'm referring
13  to the specific corporate entities that I just
14  referenced?
15      A.   Yes.
16      Q.   Now, many of my questions will cover both
17  Live Nation and Ticketmaster.  So will you do me a
18  favor:  If at some point you need to differentiate
19  between the two entities, you'll let me know?
20      A.   Sure.
21           MR. SEARS:  So let's mark our first two
22  exhibits.  They'll be Exhibits 1 and 2.
23           (Exhibit 1 and Exhibit 2 marked.)
24      Q.   BY MR. SEARS:  I've introduced them to the
25  chat, and they are deposition notices for Live Nation

Page 7

1   and Ticketmaster.
2           Let me know when you have them.
3       A.   I have -- Yep, I have it open.
4       Q.   Now, have you seen these notices before?
5       A.   I have.
6       Q.   And I'll just note:  These are the ones that
7   I served on your counsel yesterday.  I don't know if
8   you've seen those specifically; but do you understand
9   that, in substance, these are essentially the same as
10  the ones that were served a few months ago?
11      A.   Let me take a quick look to make sure.  Yes.
12      Q.   Now, what did you do to prepare for this
13  deposition?
14      A.   I had two phone calls with counsel, my
15  counsel -- with our counsel, Latham & Watkins.  I
16  reviewed documents that were produced by us, Live
17  Nation and Ticketmaster, and by New Era, and reviewed
18  our subscription agreement with New Era.
19      Q.   Is that the subscription agreement that was
20  executed in June 2021?
21      A.   Correct.
22      Q.   You said you had two calls with your
23  counsel.
24           When did those take place?
25      A.   One was last week; I can't recall the

Page 8

1   specific day.  And we had a call yesterday as well.
2       Q.   And how long were each of the calls,
3   approximately?
4       A.   A couple of hours.
5       Q.   And who all was on them?
6       A.   Sadik Huseny, Robin Gushman, and Kirsten
7   Ferguson, of Latham.
8       Q.   Were you aware there was a deposition of a
9   New Era witness this week?
10      A.   I am aware of that, yes.
11      Q.   Have you seen the transcript of that
12  deposition?
13      A.   No.
14      Q.   Have you discussed that deposition with
15  anyone?
16      A.   Very vaguely.  Just I know it took place.
17      Q.   I'm trying to be careful about privileged
18  conversations --
19      A.   Right.
20      Q.   -- with your lawyers, but do you have an
21  understanding of the testimony that was given in that
22  deposition?
23           MR. HUSENY:  I object.  I'm not sure that
24  she can answer that question, on privilege grounds.
25           Will, I know you're trying to be careful,

Page 9

1   but I think she just testified that there was some
2   discussion about that.
3           MR. SEARS:  Well, why don't you let her
4   answer yes or no, and we'll see where it goes.
5           THE WITNESS:  I'll tell you that --
6           MR. HUSENY:  I still object.  Okay.
7           THE WITNESS:  Sorry.
8           I'll tell you that the only discussion that
9   I've had with anyone about the New Era deposition was
10  with my counsel; so I'm not going to disclose what
11  I've learned in that conversation.
12      Q.   BY MR. SEARS:  Okay.  Understood.  Let me --
13  Let me just ask this, and I think this is fair game:
14  To the extent you have an understanding of the
15  testimony that was given, the factual testimony that
16  was given, that was derived from a discussion with
17  your lawyers?  Yes or no.
18      A.   To the extent I have any knowledge of the
19  factual testimony, it would have come in a
20  conversation with my lawyers, yeah.
21      Q.   Okay.  Now, let's look at some of the topics
22  in the deposition notice.
23           And the topics are the same in both, so
24  let's just do -- let's just pick Ticketmaster, if that
25  works for you.

Page 10

1    A.   Let's see which one I have open.
2    Q.   Even better.
3    A.   Yeah, I have Ticketmaster open.  Okay.
4    Q.   Even better.
5         So I understand that some of these topics,
6  there have been discussions about; but -- and whether
7  you'll have to testify; but, in general, are you
8  prepared to testify to the six topics that are listed
9  here?
10   A.   I'm prepared to testify to five of them, the
11 first five.
12   Q.   Okay.  And just as an example, you know, do
13 you see topic 1?
14   A.   Yes.
15   Q.   Did you do anything different to prepare for
16 that topic than the other topics or what you've
17 already described to me in terms of your preparation?
18   A.   Anything different, no.  All of my
19 preparation that I've already described applies the
20 same for all five topics that are at issue.
21   Q.   I see.  So what you described to me -- two
22 calls with your lawyers, a couple hours each,
23 reviewing documents -- that was how you prepared for
24 all five of the topics on which you're prepared to
25 testify?

Page 11

1    A.   Yes.
2    Q.   Now, you mentioned reviewing documents;
3  right?
4    A.   Right.
5    Q.   Did you review all the documents that were
6  produced in the case, or just a subset?
7    A.   I actually don't know the answer to that
8  question.  I reviewed some documents.  I highly doubt
9  it's all documents that were produced in the case.
10   Q.   Approximately how many did you review?
11   A.   I couldn't tell you.
12   Q.   More or less than a hundred?
13   A.   Oh, way less than a hundred.  Yes.
14   Q.   Less than 50?
15   A.   Yes.
16   Q.   Okay.  Were those documents selected by
17 counsel for your review or did you select them
18 yourself?
19   A.   Selected by counsel.
20   Q.   Were there any -- Oh, strike that.
21        Were there any documents that refreshed your
22 recollection?
23   A.   Yes.
24   Q.   Which documents were those?
25   A.   Frankly, all of them refreshed my

Page 12

1  recollection.
2    Q.   About what?
3    A.   The topics at issue in the notice, the
4  topics in the notice.
5    Q.   Could you be a little more specific?  I
6  mean, could you give me an example of a document that
7  you looked at that refreshed your recollection as to
8  something?
9    A.   I couldn't tell you a specific document, but
10 they were -- most of the documents were documents that
11 came from Live Nation that I had seen at some point,
12 so they refreshed my recollection as to the content of
13 the documents and the timing of when they were created
14 and sent and received.
15   Q.   I mean, can you be a little more specific?
16 Like what subjects were the documents about?  What
17 were the things that you remembered when you saw the
18 documents?
19   A.   I can't be more specific than that.  Sorry.
20   Q.   Now, how about the New Era documents?  Can
21 you describe the documents produced by New Era that
22 you reviewed?
23   A.   I'm sorry.  I'm having a hard time
24 remembering what I reviewed that was produced by
25 New Era versus produced by us, so I can't answer that.

Page 13

1    Q.   Well, let me ask it this way:  The New Era
2  documents, I assume you hadn't seen before you
3  reviewed them for this depo; is that fair?
4    A.   Yes.
5    Q.   And, in general, what were they about?
6    A.   In general, if I recall correctly, they were
7  communications between myself and New Era.
8    Q.   So they were documents that you had seen
9  before.  They may have been produced by New Era, but
10 they were inbound or outbound e-mails on which you
11 were copied?
12   A.   Correct.
13   Q.   Let me ask you this:  Did you review any
14 documents by New Era that you had never seen before,
15 for example, because you weren't copied on them?
16   A.   I don't recall.
17   Q.   Did you review any marketing materials or
18 decks that New Era created?
19   A.   Not that I recall.  I don't remember.
20   Q.   And can you look at appendix A, the
21 definitions in the subpoena.
22        Just let me know when you're there.
23   A.   I'm here.
24   Q.   Okay.  So do you see that there's a term,
25 "Live Nation," that's defined?

Page 14

1    A.   Yes.

2    Q.   Do you see that "Live Nation" is defined to

3 include not only Live Nation Entertainment Inc. but

4 any of its parents, subsidiaries, affiliates,

5 representatives, or agents?

6    A.   I do see that it says that, yes.

7    Q.   So Latham & Watkins is a representative for

8 Live Nation in this case; right?

9    A.   I wouldn't -- I don't have an understanding

10 of what that means in this context, if it's -- They're

11 not -- They're not a corporate affiliate of Live

12 Nation, no.  I'm not able to opine on that legal

13 definition.

14   Q.   Okay.  Sorry.  I didn't mean to talk over

15 you.  Were you done?

16   A.   I am, yeah.

17   Q.   Well, I mean, it is true that Latham &

18 Watkins is representing Live Nation Entertainment Inc.

19 in this lawsuit; right?

20   A.   Correct.

21   Q.   They -- They filed an appearance in this

22 case; right?

23   A.   Correct.

24   Q.   They prepared you for your deposition?

25   A.   Yes.

Page 15

1    Q.   They're on this Zoom right now?

2    A.   Yes.

3    Q.   In that sense, Latham & Watkins is a

4 representative of Live Nation?

5    A.   In the sense that you just described, that

6 they represent us in this litigation, yes; but I'm not

7 going to guess or speculate as to what your firm meant

8 when they defined the term -- when they added the term

9 "representatives" to the definition of Live Nation.

10 That was a word you put in a document that I have not

11 -- I don't know what you were thinking when you

12 drafted that.

13   Q.   Sure.  That's not what I'm asking.

14        I mean, to cut through it, what I'm trying

15 to figure out, Ms. Tobias, is this -- and we'll go

16 into this a little bit more later -- but you're aware

17 that there were conversations between New Era and

18 Latham; right?

19   A.   Yes.

20   Q.   And you weren't involved in all those

21 conversations, were you, not personally?

22   A.   No, I was not.

23   Q.   For example, there were Zoom calls between

24 New Era and Latham that you were not on?

25   A.   I don't know if there were Zoom calls.  I

Page 16

1 know there were conversations, that were not

2 in-person, between Live Nation and New Era.  I have no

3 idea what, you know, sort of platform they used.

4        Did I say Live Nation?  I meant Latham &

5 Watkins.

6    Q.   All good.  So let me ask you this:  As part

7 of your preparation for the deposition, did you

8 prepare to testify about the discussions that were had

9 between Latham and New Era?

10   A.   Yes.

11   Q.   Okay.  And how did you prepare to do that?

12   A.   Through conversations with my counsel.

13   Q.   And, Sadik, I think I'm entitled to ask yes

14 or no to this.

15        During those conversations, did they relay

16 to you the substance of their discussions with

17 New Era?

18   A.   They did not.  I am not aware of all of the

19 substance, what was said in every conversation; but I

20 know generally the topics, generally what was

21 discussed in those conversations.

22   Q.   I see.  So, I mean, let me ask it this way:

23 If I were to ask you to give me a stenographic record

24 of everything that was said between New Era and Latham

25 & Watkins, you couldn't do that, could you?

Page 17

1    A.   No.

2    Q.   But you are prepared to tell me generally

3 what was discussed between them?

4    A.   Yes.

5    Q.   And we'll do this with documents in a bit,

6 but I just need to get an understanding, so bear with

7 me for a second.  Okay?

8    A.   Okay.

9    Q.   I mean, how granular does your understanding

10 go?  Like do you have an understanding of what was

11 discussed on specific calls?  Like a call in May 2021

12 was for this purpose and June 2021 was for that

13 purpose, or is it more general?

14   A.   I was in close contact with Latham during

15 this time that they were having discussions with

16 New Era, so I was certainly kept up to speed and

17 appraised of generally the topics of the conversation,

18 the conversations between the two entities.

19        As far as what was specifically discussed on

20 May 1st versus any other particular day in May, I

21 couldn't tell you; but I'm absolutely aware of the

22 general topics of discussion over the one and a half

23 month period that they had five or six conversations,

24 yes.

25   Q.   Let me ask you this:  Is this an

Page 18

1  understanding that you also developed in real-time
2  when Latham was talking to New Era, or is this an
3  understanding that you developed when preparing for
4  this deposition?
5      A.   In real-time.  Latham was acting at my
6  direction in their conversations with New Era.
7      Q.   Okay.  So when Latham & Watkins talked to
8  New Era, they were acting at Live Nation and
9  Ticketmaster's direction?
10     A.   As our counsel representing us, yes, they
11 act at our direction when performing work on behalf of
12 Live Nation and Ticketmaster.
13     Q.   And that's true for both Live Nation and
14 Ticketmaster, just to confirm?
15     A.   They represent, yes, Live Nation and
16 Ticketmaster and all of its subsidiaries.
17     Q.   All right.  And so Live Nation and
18 Ticketmaster would give Latham marching orders ahead
19 of these calls?
20     A.   Live Nation and Ticketmaster being me.
21 Marching orders?  No, I would not put it that way;
22 that's not how our relationship works.  But we have --
23 we were in close contact, as we are with all legal
24 work that Latham does for the company, about what
25 Latham is doing on our behalf.

Page 19

1      Q.   When you say you were in close contact with
2  Latham, who was it at Latham?  Just names.
3      A.   If memory serves, it was Kirsten Ferguson
4  and Alicia Jovais.
5      Q.   Okay.  So New Era was founded in 2020; is
6  that right?
7      A.   I actually don't know when they were
8  founded.
9      Q.   Is that something you knew at one point and
10 you're just not sure, or you just never -- never knew
11 it?
12     A.   I know that they are a startup from the last
13 couple of years.  I don't recall ever knowing what
14 year or date they technically were founded.
15     Q.   But they're a -- they're a new company, as
16 the name New Era would imply?
17     A.   I don't know that that's what the name
18 implies; but, yes, they are a new company.
19     Q.   Now, we'll talk about this a little more
20 later, but -- and I think you mentioned, but Live
21 Nation signed the subscription agreement with New Era
22 in about June 2021?
23     A.   Yes.
24     Q.   So fairly soon after New Era was founded?
25     A.   Correct.

Page 20

1      Q.   As a result of that subscription agreement,
2  Live Nation and Ticketmaster switched from using JAMS
3  to New Era in their online terms of use; is that
4  right?
5      A.   Correct.
6      Q.   And just so the record's clear:  When I say
7  "terms of use," do you understand that I'm referring
8  to the online terms of use for both Ticketmaster and
9  Live Nation?
10     A.   Yes.
11     Q.   You're familiar with those; right?
12     A.   Very.
13     Q.   You've had a hand in drafting them?
14     A.   Solely responsible for it, yes.
15     Q.   You've issued many declarations and lawsuits
16 about them?
17     A.   Yes.
18     Q.   Testified for --
19     A.   I'm sorry.  I'm going to correct -- Sorry.
20 Can you clarify.  What was the question?
21     Q.   You've issued many declarations in lawsuits
22 about them?
23     A.   Okay.  In lawsuits.  Yes.  Correct.
24     Q.   Do you have a real-time feed going, by the
25 way?

Page 21

1      A.   A what?
2      Q.   Oh, a real-time feed.
3      A.   I do not, no.
4      Q.   I was asking because they're -- It doesn't
5  matter.  Strike that.
6           And you actually testified about the terms
7  of use at least once, right, in a deposition?
8      A.   Yes.  Your law firm deposed me last year on
9  this topic.
10     Q.   Yeah, I remember.
11          How many times have you been deposed, by the
12 way?
13     A.   Only twice.  Both by -- Both by Quinn
14 Emanuel.
15     Q.   This is only number 2?
16     A.   Yeah.
17     Q.   Did you ever take a deposition in private
18 practice?
19     A.   I did.
20     Q.   About how many?
21     A.   Oh, not many.  I was a junior lawyer at a
22 big firm.  Maybe two or three.
23     Q.   Okay.  So going back to the questions about
24 the terms of use:  Remember, we were talking about
25 those?

Page 22

1    A.   I remember.
2    Q.   So after Live Nation signed the subscription
3  agreement with New Era, Ticketmaster and Live Nation
4  replaced JAMS with New Era in their terms of use;
5  right?
6    A.   Among other changes, yes.
7    Q.   Right.  And by "replaced JAMS with New Era,"
8  I mean they switched from JAMS to New Era as the
9  default ADR provider in the terms of use; correct?
10   A.   Correct.
11   Q.   Live Nation and Ticketmaster were some of
12 the first big companies to do that, to put New Era in
13 their terms of use, as far as you know; right?
14   A.   I don't know who -- whether -- how many
15 other companies had signed on with New Era.  I don't
16 track that.
17   Q.   As far as you know, at the time Live Nation
18 and Ticketmaster began using New Era in their terms of
19 use, there were few, if any, other big companies that
20 did so; right?
21   A.   Again, I -- I don't know.
22   Q.   Did you do diligence on New Era before
23 deciding to switch from JAMS to New Era in the terms
24 of use?
25   A.   Yes.  My counsel did the diligence.

Page 23

1    Q.   As part of that diligence, did you learn how
2  many other companies used New Era in online terms of
3  use?
4        MR. HUSENY:  Objection.  Asked and answered.
5        THE WITNESS:  Yeah, again, I don't know the
6  answer to the question.
7    Q.   BY MR. SEARS:  Was that a question that you
8  raised in due diligence?
9        MR. HUSENY:  Objection.  Calls for
10 privileged information to the extent it's talking
11 about conversations between Ms. Tobias and counsel.
12       MR. SEARS:  Are you instructing her not to
13 answer, or not?
14       MR. HUSENY:  I'm instructing her not to
15 answer because it's privileged, Will.
16       I mean, do you want me to say that every
17 time?  I can.
18       MR. SEARS:  Yeah, you know, you need to be
19 clear; so rather, instead of these what are starting
20 to be speaking objections, you should say "privilege"
21 and "instruct not to answer," and we'll limit the
22 cross-talk.  Okay?
23       MR. HUSENY:  I'll repeat my objection.
24       Calls for privileged information to the
25 extent of conversations between Ms. Tobias and

Page 24

1  counsel.  I instruct the witness not to answer.
2        That is not a speaking objection.  That is
3  an objection with now an instruction.
4        MR. SEARS:  All right.  This is gratuitous:
5  Please, you know, tone it down going forward; but I'm
6  going to continue.
7    Q.   BY MR. SEARS:  As far as you know,
8  Ms. Tobias, Live Nation was New -- one of New Era's
9  earliest clients or customers; right?
10   A.   I believe that's the case.  I don't know.
11   Q.   Was that a topic you explored in due
12 diligence?
13   A.   I really -- If I answered that question --
14       MR. HUSENY:  Objection to the extent it
15 calls for privileged information.
16       THE WITNESS:  -- I'd be divulging privileged
17 information.  I'm not going to answer.
18   Q.   BY MR. SEARS:  Let me ask you this:  Without
19 getting into communications with your lawyers, what
20 was the purpose of conducting due diligence into
21 New Era, from Live Nation's perspective?
22   A.   To understand the rules, procedures, the
23 credentials of the neutrals, how the platform worked,
24 among other things.
25   Q.   And why, if at all, was that important to

Page 25

1  Live Nation?
2        MR. HUSENY:  Objection.  Calls for
3  privileged information.
4    Q.   BY MR. SEARS:  Why, if at all, was that
5  important to Ticketmaster?
6        MR. HUSENY:  Objection.  Calls for
7  privileged information.
8        You're asking about the mental impressions
9  of the attorney.
10   Q.   BY MR. SEARS:  You testified, Ms. Tobias,
11 that Live Nation conducted diligence into New Era to
12 understand the rules, the procedures, the credentials
13 of the neutrals, how the platform worked, among other
14 things; is that right?
15   A.   Correct.
16   Q.   Was there any business purpose for doing
17 that, or was it purely a legal purpose?
18   A.   I think you're asking me why, which is --
19 why we did diligence; and I think Sadik just said that
20 was encroaching on privileged information.  I'm not
21 going to answer.
22   Q.   All right.  So just to be clear:  You're not
23 going to tell me why Live Nation did --
24       (Reporter request.)
25   Q.   BY MR. SEARS:  Just to be clear:  You're not

Page 26

1  going to tell me why Live Nation and Ticketmaster did
2  due diligence into New Era?
3        MR. HUSENY:  Objection.  Calls for
4  privileged information.
5        Q.  BY MR. SEARS:  Okay.  So before switching to
6  New Era, Live Nation and Ticketmaster both used JAMS;
7  right?
8        A.  Correct.
9        Q.  JAMS is an ADR provider; correct?
10       A.  Correct.
11       Q.  It's an established ADR provider; right?
12       A.  Yes.
13       Q.  It's been around for many years?
14       A.  I know it's been around for at least ten
15  years.  I don't know longer than that.
16       Q.  It's administered many arbitrations; right?
17       A.  I mean, I would assume so.  I don't know.
18       Q.  Well, let me ask you this:  How many
19  arbitrations has JAMS administered for Live Nation and
20  Ticketmaster?
21       A.  I don't know.
22       Q.  Is it more than ten?
23       A.  I don't know.
24       Q.  Is that something that Live Nation and
25  Ticketmaster track?

Page 27

1        A.  It certainly is, but it's not something I
2  looked into in preparation for this deposition.
3        MR. SEARS:  Okay.  Let's mark our next
4  exhibit.
5            (Exhibit 3 marked.)
6        Q.  BY MR. SEARS:  Let me know when you have it,
7  Ms. Tobias.
8        THE STENOGRAPHIC REPORTER:  Exhibit 3,
9  counsel?
10       MR. SEARS:  Yes, thank you.  And thank you
11  for keeping track, because I'm going to forget to do
12  that.
13       THE WITNESS:  I have it.  I'm just trying to
14  download that.
15       Q.  BY MR. SEARS:  While you do that:  Just for
16  the record, Exhibit 3 is a document produced by New
17  Era bearing Bates number NEWERA_000160.
18       A.  Hmm.  It's saying it's downloaded, but I'm
19  not seeing it appear for some reason.
20       Do I have to -- Sorry.  Do I have to remove
21  the other exhibits before viewing it?  Because it's
22  not coming up.
23       MR. SEARS:  Can we go off the record?
24       THE WITNESS:  Oh, I have it now.  Sorry.
25       Q.  BY MR. SEARS:  Okay.  Perfect.

Page 28

1            Now, let me ask you this:  Ms. Tobias, have
2  you seen -- Well, strike that.
3        Do you see this is an e-mail with some
4  attachments?
5        A.  That's what it appears.  It appears to have
6  attachments.  I see it's an e-mail, yes.
7        Q.  Okay.  I mean, if you -- if you scroll
8  through the PDF, you'll see some attachments.
9        Do you see those?
10       A.  Yes.  I see some documents at the end that
11  are not part of the e-mail, so I assume those are
12  attachments.  Yeah.
13       Q.  Have you seen this e-mail or the attachments
14  before?
15       A.  I don't recall this specific -- Let me read
16  it through.
17       MR. HUSENY:  Will, while the witness does
18  this, could I just ask about the Bates numbering that
19  jumps from 165 at the end of e-mail to 1957, the
20  attachment?  Is there a reason for the jump?  I just
21  want to make sure the attachment is what was actually
22  attached to the e-mail.
23       MR. SEARS:  The reason -- The reason for the
24  jump is that, after much back-and-forth with New Era,
25  which initially failed to produce the attachments to

Page 29

1  e-mails like this, they sent us a mapping document and
2  represented that these are the attachments to the
3  e-mail.
4        To the best of our knowledge, these are the
5  correct attachments based on information provided by
6  New Era.  And I will note that we have spent countless
7  hours going back and forth and involved with the court
8  on this dispute, so I certainly hope it's correct.
9        MR. HUSENY:  Well, I won't comment on that.
10       The fact that even within the attachments
11  there's a jump from 1957 to 1960, I just want to make
12  sure that the record is clear on that.
13       You're saying that the mapping document
14  provided by New Era is such that these three
15  attachments or these three pages in the attachments
16  were the correct attachments to this e-mail.
17       Is that -- Is that fair?
18       MR. SEARS:  Yes.  That's our best
19  understanding.
20       MR. HUSENY:  Okay.
21       MR. SEARS:  And, in the future, for these
22  administrative issues, can we go off the record?  I
23  really want to limit the cross-talk between us.
24       You're entitled to object and ask questions,
25  but I don't want to muddy the record with this.  I

Page 30

1 really don't. I'm trying to be patient, but we've
2 only been going for half an hour and this has now
3 happened a couple times.
4           MR. HUSENY: Will, I'm going to have a real
5 disagreement with you on that. If there is an issue
6 about an exhibit, that is on the record, and we can
7 have as much on the record as we want. So let's move
8 on.
9           You have jumps in Bates numbers on these
10 documents, and I'm entitled to ask that on the record.
11 Ask your question.
12           MR. SEARS: All right. Well, let me just
13 note that I've sent you the mapping documents, so I
14 hoped you'd looked at them before. If you didn't,
15 there's not much I can do. But let's -- let's
16 proceed.
17      Q.   BY MR. SEARS: So, Ms. Tobias, is this a
18 document that you reviewed in preparing for your
19 deposition?
20      A.   I don't recall this specific document.
21 Maybe. I don't remember.
22      Q.   It's not one of the ones that you told me
23 earlier refreshed your recollection?
24      A.   As I believe I testified earlier, I don't
25 recall which specific documents refreshed my

Page 31

1 recollection in what way or another. I -- I don't
2 recall exactly whether I saw this document or not.
3 I'm not on it.
4      Q.   Okay. I understand.
5           Now, have you had a chance to scroll through
6 the e-mail?
7      A.   No. I'll do that now.
8      Q.   Okay. If it helps, my question is going to
9 be pretty narrow and it's going to be on page 4 of the
10 PDF, which is Bates number ending in 163.
11      A.   Okay. I'm there.
12      Q.   Do you see that? Starting at the top of the
13 third page, going to the bottom, there's an e-mail
14 from someone named Shane Mulrooney at New Era to
15 counsel at Latham & Watkins.
16      A.   Yes.
17      Q.   And have you ever met Mr. Mulrooney before,
18 either in person, on Zoom, or on a phone call?
19      A.   I don't recall specifically. I had a phone
20 call with -- I think Shane was on the call, after we
21 signed our subscription agreement, to discuss
22 logistics; but I can't recall if Shane was on it,
23 sitting here today.
24      Q.   Okay. Now, one of the things that
25 Mr. Mulrooney says in the e-mail is: "Hi, Alicia."

Page 32

1           And that's to Alicia Jovais; right?
2      A.   Yes.
3      Q.   A lawyer at Latham?
4      A.   Yes.
5      Q.   Represents Live Nation in this case?
6      A.   Again, yes.
7      Q.   One of the people that I believe you told me
8 was involved in the due diligence of New Era; is that
9 right?
10      A.   I believe so, yes.
11      Q.   Okay. And then Mr. Mulrooney says: "Just
12 saw your e-mail on the historical data. Thank you for
13 that."
14           Right?
15      A.   Um-hum. Yes.
16      Q.   Do you have an understanding of what that
17 refers to?
18      A.   I believe that would refer to the number of
19 arbitrations that Live Nation and Ticketmaster had
20 been involved in over some period of time, but I can't
21 say with certainty. Excuse me.
22      Q.   And is that data that Live Nation and
23 Ticketmaster have, the number of arbitrations that
24 they've been involved in over a period of time?
25      A.   It's data that I can pull together.

Page 33

1      Q.   Is it data that you pulled together while
2 Latham was conducting diligence on New Era?
3      A.   I believe I did, yes.
4      Q.   And I will just represent to you, my
5 understanding from the New Era deposition is that
6 Latham showed New Era this information over a Zoom
7 call.
8           Does that sound right to you?
9      A.   I have no idea.
10      Q.   But you do believe you pulled this together
11 as part of the due diligence process?
12      A.   That's my recollection, yes.
13      Q.   Did you send it to anyone?
14      A.   I don't believe it was sent. I believe it
15 was in a phone call that I shared it with our lawyers.
16      Q.   So you shared it with your lawyers, and they
17 may have then relayed that information to New Era?
18      A.   That's my --
19           MR. HUSENY: Objection. Calls for
20 speculation. Go ahead.
21           THE WITNESS: Oh, yeah.
22           That's my understanding, but I wasn't in
23 that conversation with New Era and Latham.
24      Q.   BY MR. SEARS: And, to the best of your
25 knowledge, what does the historical data that you

Page 34

1   pulled together as part of the diligence process show?
2       A.   I can't recall.
3       Q.   And you can't recall even a ballpark,
4   whether it's five arbitrations or a hundred?
5       A.   The number of arbitrations filed against the
6   company varies greatly year by year.
7       Q.   So -- Well, do you remember -- Strike that.
8            Let me ask you this:  What period of time
9   did the historical data that you pulled together
10  cover?
11      A.   I don't remember.
12      Q.   How long does Live Nation or Ticketmaster
13  keep that data?
14           Is there a point at which it doesn't go back
15  any farther, or how is it stored?
16      A.   I track that data.  I've been at the company
17  for 17 years, so I have data going back quite some
18  time; but it's just stored by me in my records of our
19  litigation history.
20      Q.   And when you say "stored by you," how is it
21  stored?  Is there an Excel spreadsheet that contains
22  it all?  Is it something else?
23      A.   Various different locations and types of
24  documents.
25      Q.   And what are the locations and types of

Page 35

1   documents?
2       A.   Excel spreadsheets, reports, located on my
3   computer.
4       Q.   Sorry.  I didn't mean to cut in.
5            When you say "reports located on your
6   computer," just help me visualize:  Is that a PDF?  Is
7   it a PowerPoint?  Is it something else?
8       A.   Primarily Excel spreadsheets.
9       Q.   And you mentioned Excel before.  What's the
10  part of this that is not Excel?
11      A.   There is not one document that tracks all of
12  the company's litigation going back any number of
13  years.  As the only person at the company who handles
14  litigation, I have my own system where I have various
15  documents that I -- reporting documents for -- that I
16  use.  Some are Excel documents, some are Word
17  documents.
18      Q.   As best you can, please describe to me the
19  system that you just mentioned.
20      A.   I just did.  I just -- What's your question?
21      Q.   Well, how does it work in practice?  Is this
22  something that you update every time an arbitration is
23  filed?  Do you periodically update them?
24           Just walk me through how Kim Tobias,
25  in-house lawyer at Live Nation, keeps these reports

Page 36

1   and spreadsheets.
2       A.   I periodically update them.
3       Q.   About how often?
4       A.   Periodically.  Frequently.
5       Q.   You said it's not just one document.
6            I mean, approximately how many are we
7   talking?  Is it thousands or five?  Give me a
8   ballpark.
9       A.   Not thousands.  I don't know.  I haven't
10  researched -- I haven't pulled together all my files
11  to look at how many there are.  It's -- I don't have
12  the answer for you there.
13      Q.   Is it under a hundred?
14      A.   Let me just clarify your question here.
15           You're asking me -- Actually, why don't you
16  ask me -- You need to ask it a different way, because
17  I don't -- I don't think it's clear what exactly --
18  what information you're asking for in terms of asking
19  me how many documents would contain what information.
20  It's just very vague.
21      Q.   Thank you for clarifying.
22           So you remember you were telling me that you
23  track the number of arbitrations filed against Live
24  Nation and Ticketmaster; is that right?
25      A.   To clarify:  I don't track the number.  I

Page 37

1   keep track of and handle all litigation filed against
2   the company.
3            So I can refer back to various documents to
4   figure -- to come to an answer as to how many
5   arbitrations, class actions, whatever the question may
6   be.  It would take some time because I would need to
7   cross-reference the documents I already referred to --
8   I already explained -- various Excel spreadsheets,
9   various Word documents, various files of actual
10  litigations and arbitrations that were filed.  But,
11  no, there is no document that tracks the number of
12  arbitrations, clearly, sitting anywhere at Live
13  Nation.
14      Q.   Let me ask you this:  What was the process
15  when you pulled together this data as part of doing
16  due diligence on New Era?  What did you do?
17      A.   I asked my assistant to pull it together.
18      Q.   And how long did that take them?
19      A.   I don't recall.
20      Q.   How long did it take you personally to get
21  it together, not including the time of your assistant?
22      A.   I -- I don't recall.
23      Q.   But it is information that, when you decided
24  to pull it together for purposes of doing due
25  diligence on New Era, you were able to pull it

Page 38

1  together; right?
2      A.   To be clear:  I did not testify that we
3  pulled it together as part of doing diligence into
4  New Era.  I never said that.
5      Q.   Okay.  You pulled this information together
6  for a purpose at some point; correct?
7      A.   For a purpose.  It's not related to
8  diligence and to New Era; but, yes, for a purpose.
9      Q.   All right.  What was the purpose?
10     A.   The pricing model that New Era created was
11  based on historical data of the number of arbitrations
12  filed against the entity.
13     Q.   Got it.  So when you --
14          (Reporter request.)
15     THE WITNESS:  Which -- At least that's my
16  understanding.
17     THE STENOGRAPHIC REPORTER:  Thank you.
18     Q.   BY MR. SEARS:  I understand.  So when you
19  pulled together this historical data for purposes of
20  the pricing model that New Era has created, it was
21  something you were able to pull together; is that
22  right?
23     A.   Correct.
24     Q.   Okay.  I mean, how many consumer
25  arbitrations were filed against Live Nation or

Page 39

1  Ticketmaster in 2019?
2      Q.   Do you have a ballpark for that?
3      A.   I don't.
4      Q.   Okay.  I promise, I'm not trying to be
5  difficult.  I don't have all the information you do,
6  so I have to ask these questions different ways to
7  make sure I understand.  I hope you get it.
8      Q.   How about in the last year?  How many
9  consumer arbitrations were filed against Live Nation
10  or Ticketmaster?
11     A.   In the last 12-month period?
12     Q.   Yes.
13     A.   I don't know the exact number.
14     Q.   How many consumer arbitrations has New Era
15  administered involving Live Nation or Ticketmaster?
16     A.   They have not administered any.  One was
17  filed, one consumer arbitration was filed, with
18  New Era.  I can't recall the exact timeline.  It was
19  -- I believe it was in the last 12 months.  It was not
20  administered by New Era, because it was settled.
21     Q.   So let me ask you this:  I mean, you told me
22  earlier that, around June 2021, Live Nation and
23  Ticketmaster switched to New Era from JAMS in their
24  terms of use; right?
25     A.   Right.

Page 40

1      Q.   Am I correct, then, that there has only been
2  one consumer arbitration filed against Live Nation or
3  Ticketmaster since Ticketmaster and Live Nation
4  switched to New Era?
5      A.   Only one has been filed with New Era.  But
6  at the time we made the switch to New Era, we
7  implemented an alternate dispute resolution process in
8  our terms of use, that has led to a lot of consumer
9  complaints and issues that would likely have ended up
10  in arbitration being resolved pre-arbitration.
11     Q.   Can you explain what you mean by that?
12     A.   I'll tell you factually that, in the terms
13  of use on Ticketmaster.com and LiveNation.com, there's
14  a process by which a consumer who has a dispute with
15  Live Nation or Ticketmaster is asked -- or is required
16  in the terms of use to send an e-mail to a designated
17  e-mail address, explaining their dispute, prior to
18  filing arbitration.
19          That -- Then there is just a process laid
20  out by which a representative of the company, Live
21  Nation or Ticketmaster, confers with the individual in
22  an attempt to resolve the dispute.  And if the dispute
23  is not resolved, then the consumer could proceed with
24  arbitration.
25     Q.   And when was that process implemented in the

Page 41

1  terms of use?
2      A.   July 2nd, 2022.
3      Q.   Okay.  So that was about a year after Live
4  Nation and Ticketmaster switched to New Era?
5      A.   I'm sorry.  I have the date wrong.  July
6  2nd, 2021; not 2022.
7      Q.   Oh, I see.  So it was the same time that the
8  update in the terms of use was made to switch from --
9  from JAMS to New Era?
10     A.   Yes.
11     Q.   I see.  And how many cases or claims do you
12  believe have been resolved through that process?
13     A.   Quite a few.  I couldn't tell you.  I have
14  not -- I have nowhere -- Nowhere am I tracking those
15  coming in, but they come in with frequency.
16     Q.   But you don't know the number?
17     A.   I don't, but it's -- yeah, but they do come
18  in with some frequency.
19     Q.   Now, just focusing on arbitrations:  I
20  believe you told me that there's only been one
21  arbitration initiated against Live Nation or
22  Ticketmaster since switching to New Era.
23          Am I right about that?
24     A.   Sorry.  Ask that -- Can you ask that again.
25     Q.   Yeah, I'm just table setting.

Page 42

1             I think you told me before that there's only
2 been one consumer arbitration initiated against Live
3 Nation or Ticketmaster since switching to New Era.
4             Am I right about that?
5     A.   No, that is not right.  There's been one
6 arbitration filed with New Era since we switched.
7     Q.   Okay.  That -- Maybe that's where I'm
8 getting confused.
9             Were there -- How many arbitrations were
10 filed with another ADR provider?
11    A.   Over what time period?
12    Q.   Since switching to New Era.
13    A.   I don't know the answer to that.
14    Q.   I mean, were there any?
15    A.   Yes.
16    Q.   And what were the circumstances by which
17 arbitrations were filed with someone other than
18 New Era?
19    A.   They're employment claims.  Our -- Yeah,
20 employment claims.
21    Q.   I see.  So just to be clear:  I'm focusing
22 on consumer arbitrations, by which I mean a consumer
23 who complains about something Live Nation or
24 Ticketmaster did vis-a-vis ticket sales, for example.
25             Do you understand what I'm saying?

Page 43

1     A.   I do now, but your question didn't say
2 "consumer arbitrations."
3     Q.   It did, but that's -- that's okay.  So let
4 me just ask it again.
5             Since Live Nation and Ticketmaster switched
6 from JAMS to New Era, there's only been one consumer
7 arbitration initiated against Live Nation or
8 Ticketmaster.
9             Am I right about that?
10    A.   Through New Era, yes.
11    Q.   Through --
12    A.   Yes.  Yes.
13    Q.   Not just through New Era.
14             There's only been one consumer arbitration
15 initiated against Live Nation and Ticketmaster; is
16 that right?
17    A.   There's -- Yes, that is right.
18    Q.   Just to be perfectly clear about this:  It's
19 not like there were some consumer arbitrations -- not
20 employment, but consumer arbitrations -- initiated
21 with some other ADR provider?
22    A.   There were not.  There were lawsuits filed,
23 notwithstanding the arbitration provision; but no
24 arbitrations filed with New Era.  We do get plenty of
25 lawsuits, as you know.

Page 44

1     Q.   Now, I know you couldn't tell me exactly how
2 many consumer arbitrations were filed against Live
3 Nation and New Era before switching to New Era.
4             I'm right about that too; right?
5             MR. HUSENY:  Objection.  I think you mis --
6 I think you mis-asked your question, Will.
7             MR. SEARS:  No, I said --
8             MR. HUSENY:  Filed against Live Nation and
9 New Era?
10             MR. SEARS:  Oh, Live Nation and
11 Ticketmaster, yes.
12             MR. HUSENY:  Would you reask the question.
13             THE WITNESS:  Yeah, now I've lost the
14 question.
15    Q.   BY MR. SEARS:  Sure.  So I'm just trying to
16 table set here.
17             Before, you couldn't tell me exactly how
18 many consumer arbitrations were filed against Live
19 Nation and Ticketmaster before switching to New Era.
20             Am I right about that?
21    A.   You're right.  I still don't know that
22 answer.
23    Q.   Ballpark, was it more than one per year?
24    A.   As I said, it varies significantly from year
25 to year.  There are years where there were definitely

Page 45

1 more than one.
2     Q.   I mean, were there any other years where it
3 was just one?
4     A.   I don't remember.
5     Q.   I mean, so you can't actually tell me if
6 there was a specific year, before switching to
7 New Era, where only one consumer arbitration was filed
8 against Live Nation or Ticketmaster?
9     A.   No, I can't tell you that.  I didn't prepare
10 that in advance of this deposition; it's not one of
11 the topics in our deposition.  So, no, my testimony
12 stands:  I cannot tell you how many arbitrations were
13 filed against the company in a particular year,
14 period.
15    Q.   Okay.  Is JAMS a well-regarded ADR provider?
16    A.   I have no idea.
17    Q.   Well, Live Nation and Ticketmaster used them
18 for many years; right?
19    A.   We did.
20    Q.   And what was it that made you designate JAMS
21 as an ADR provider in the first place?
22    A.   I will not --
23             MR. HUSENY:  Objection.  Calls for
24 privileged information.
25    Q.   BY MR. SEARS:  Was there a reason that Live

Page 46

1  Nation and Ticketmaster designated JAMS as an ADR
2  provider in the first place?  Yes or no.
3       MR. HUSENY:  Objection.  Calls for
4  privileged information.
5       Q.  BY MR. SEARS:  I'm asking if there was a
6  reason; I'm not asking what it was.  That's fair game.
7  Yes or no?
8       MR. HUSENY:  Same objection.
9       MR. SEARS:  All right.  You're not going to
10  let her answer the question whether Live Nation and
11  Ticketmaster selected JAMS for a reason?
12       MR. HUSENY:  You're asking about the
13  decision-making process.  Whether or not you're asking
14  about details, Will, you're asking about the decision
15  making process in selecting JAMS, and that is
16  privileged.
17       MR. SEARS:  Okay.  I respectfully disagree,
18  but I'm going to go on and make my record.  You can
19  keep making your objections.
20       Q.  BY MR. SEARS:  You're aware that other
21  companies besides Live Nation and Ticketmaster
22  designate JAMS in online terms of use?
23       A.  I'm not aware.  I don't review other
24  companies' terms of use.
25       Q.  That's not something you looked at when

Page 47

1  selecting JAMS in the first place?
2       A.  I'm not going to answer that question,
3  because, if I would, I'd be divulging my work that
4  I've done as in-house counsel for Live Nation and
5  Ticketmaster.  How or what I look into when advising
6  my client is privileged.
7       Q.  Let me ask you this:  You mentioned the work
8  that you've done.  Were you involved in the decision
9  to select JAMS in the first place?
10       A.  Yes.
11       Q.  You said you'd been there for 17 years; is
12  that right?
13       A.  Yes.
14       Q.  And the terms of use have contained
15  mandatory -- allegedly mandatory arbitration clauses
16  since 2010 or so?
17       A.  Sorry.  Did you say allegedly the terms of
18  use contained an arbitration provision, or are you
19  asking did they contain an arbitration provision?
20       Q.  I'll just ask it again.
21       The terms of use have contained allegedly
22  mandatory arbitration clauses since 2010 or so?
23       MR. HUSENY:  Objection.  Vague and
24  ambiguous.
25       THE WITNESS:  I -- Yeah.

Page 48

1            (Reporter request.)
2       MR. HUSENY:  Calls for a legal conclusion.
3       THE STENOGRAPHIC REPORTER:  Thank you.
4       MR. SEARS:  So do you -- I'm going to make a
5  request.  My request is that you limit your objections
6  to form or privilege and instruct not to answer.
7  Thank you.
8       Q.  BY MR. SEARS:  My -- I'll ask a different
9  question, which is --
10       MR. HUSENY:  I'm -- Excuse me.
11       Will, I'm going to name my objection.  I
12  think that is absolutely appropriate.
13       When I say "objection, calls for a legal
14  conclusion," that is absolutely appropriate and I will
15  continue to do that.
16       So please stop telling me how to object.
17  I'm not instructing anything, but naming the
18  objection.  Please go on.
19       MR. SEARS:  If you interrupt me again, we're
20  going to have to pause the deposition and call the
21  judge.  You're being unprofessional.  Now, let me
22  please ask my question.
23       Q.  BY MR. SEARS:  My question is:  Since 2010
24  or so, there have been arbitration clauses in the
25  online terms of use.

Page 49

1  Am I right just about the time frame?
2       A.  I believe it was 2011.  It could be 2010.
3  More -- Around that time period, yes.
4       Q.  All right.  And has JAMS always been the ADR
5  provider before switching to New Era?
6       A.  In the terms of use, yes.
7       Q.  So the terms of use designated JAMS for
8  about a decade as the ADR provider; is that correct?
9       A.  Correct.
10       Q.  Did Live Nation or Ticketmaster have a
11  problem with JAMS over that time?
12       MR. HUSENY:  Objection.  Vague and
13  ambiguous.
14       THE WITNESS:  Yeah, I'm not sure I
15  understand.  A problem with them?
16       Q.  BY MR. SEARS:  Well, was there a concern
17  about JAMS specifically that led Live Nation and
18  Ticketmaster to stop using them and instead designate
19  New Era?
20       MR. HUSENY:  Objection.  Calls for
21  privilege.
22       THE WITNESS:  Yeah, there's no way for me to
23  answer that question without divulging privileged
24  information, my own thoughts about JAMS.
25       Q.  BY MR. SEARS:  So just to be clear:  You're

Page 50

1  not going to tell me what the reason was for switching
2  from JAMS to New Era?
3      A.   No.  Nor am I required to or was I asked to
4  in the notice.
5      Q.   Yeah, and that's fine.  I'm really just -- I
6  need to make my record.  I understand that there are
7  privilege objections, but I have to ask the questions;
8  so I hope you understand.
9           Fair enough?
10     A.   Fair enough.
11     Q.   So just so we're clear:  You're -- You're
12 not going to testify about the reason for switching
13 from JAMS to New Era?
14     A.   Absolutely not.
15     Q.   You were involved in both the decision to
16 select JAMS and the decision to select New Era?
17     A.   Yes.
18     Q.   There were legal considerations that went
19 into the decision.  Fair?
20     A.   Yes.  And I'm in-house counsel for Live
21 Nation and Ticketmaster.
22     Q.   I understand.  And that's why you're not
23 going to tell me what the considerations were or what
24 concerns, if any, led to that switch?
25     A.   All concerns, to use your word, that -- I'm

Page 51

1  sorry.  Ask the -- Can you ask the question again.
2      Q.   Yeah.  The reason you're not going to tell
3  me what concerns or considerations, if any, went into
4  the decision to switch from JAMS to New Era is because
5  you believe it was a legal decision.  Fair?
6      A.   It was a legal decision and I'm not going to
7  disclose my legal advice, privileged advice and
8  communications with my client.
9      Q.   And you're also not going to disclose the
10 consideration or process that went into vetting
11 New Era, if any?
12         MR. HUSENY:  Objection.
13         THE WITNESS:  That seems to be a very open
14 -- I mean, there may be questions that I can answer if
15 you would give me a specific question.  I wouldn't say
16 I'm not going to -- I guess I don't understand your
17 question.
18     Q.   BY MR. SEARS:  Okay.  What considerations,
19 if any, did you have in the process of vetting New Era
20 in consideration for designating them as an ADR
21 provider in the terms of use?
22         MR. HUSENY:  Objection.  Calls for
23 privileged information.
24     Q.   BY MR. SEARS:  I mean, what was the process,
25 if any, that went into vetting New Era when Live

Page 52

1  Nation and Ticketmaster considered switching from JAMS
2  to New Era in the terms of use?
3      A.   I'm sorry.  One more time.
4      Q.   Yeah.  What was the process, if any, that
5  went into vetting New Era when Live Nation and
6  Ticketmaster considered switching with New Era
7  in the terms of use?
8      A.   The process was our -- our counsel at Latham
9  & Watkins had conversations with New Era about their
10 platform, their offering, their neutrals, their rules,
11 their procedures.
12     Q.   And what concerns, if any, did Live Nation
13 have about their offerings?
14         MR. HUSENY:  Objection.  Calls for
15 privileged information again.
16     Q.   BY MR. SEARS:  Okay.  What concerns, if any,
17 did Live Nation and Ticketmaster have about their
18 rules and procedures?
19         MR. HUSENY:  Objection.  Calls for
20 privileged information.
21     Q.   BY MR. SEARS:  Okay.  What concerns, if any,
22 did Live Nation and Ticketmaster have about their
23 neutrals?
24         MR. HUSENY:  Objection.  Calls for
25 privileged information.

Page 53

1      Q.   BY MR. SEARS:  Is there any -- I'm really
2  just trying to cut through here.
3           Is there anything else you can tell me about
4  either the decision to switch from JAMS to New Era in
5  the terms of use or the process for making that
6  decision, or have you told me everything that you
7  believe is not privileged?
8          MR. HUSENY:  Objection.  Calls for
9  privileged information.
10         THE WITNESS:  I mean, again, you can
11 continue to ask questions.  There may be some I can
12 answer.  But it's hard -- it's hard for me, sitting
13 here, to tell you that I've told you everything you
14 may want to know, that you may want to ask.
15     Q.   BY MR. SEARS:  I mean, what other facts can
16 you tell me about Live Nation and Ticketmaster's
17 decision to switch from JAMS to New Era, if any?
18         MR. HUSENY:  Objection.  Vague and
19 ambiguous.
20         THE WITNESS:  Yeah, you'd have to ask me a
21 question.  What other facts can I tell you?  I...
22     Q.   BY MR. SEARS:  I mean, what factors did --
23 other than the ones you've mentioned, did Live Nation
24 and Ticketmaster consider when making the decision to
25 switch from JAMS to New Era?

Page 54

1         MR. HUSENY:  Same objection, and privileged.
2     Q.   BY MR. SEARS:  Let me ask you this:  Were
3  there any business people at Ticketmaster or Live
4  Nation involved in the decision to switch from JAMS to
5  New Era in the terms of use?
6     A.   No.
7     Q.   It was purely a legal decision made by
8  in-house counsel and outside counsel; is that fair?
9     A.   Fair.  Correct.
10    Q.   Were there any other in-house counsel
11 besides yourself involved in that decision?
12    A.   No.
13    Q.   Let me ask you this:  Was there a specific
14 point in time when the decision to switch from JAMS to
15 New Era was made?
16    A.   Sorry.  Any specific point in time when the
17 final decision was made to make the switch?
18    Q.   Yep.
19    A.   June 2021, when we were -- we executed the
20 subscription agreement, is when we switched.
21    Q.   I see.  And just as a factual matter, how
22 long did the process take?  I mean, how long did Live
23 Nation and Ticketmaster consider whether to switch
24 from JAMS to New Era?
25    A.   The process from -- when it began, my

Page 55

1  recollection is May, early May 2021, when Latham first
2  had their discussions with New Era about their
3  platform; and the agreement was executed June 22nd,
4  2021; and our terms of use were updated to reflect the
5  change to New Era on July 2nd, 2021.  So two months.
6     Q.   I see.  So it's fair to say Live Nation and
7  Ticketmaster spent about two months considering
8  whether to switch from JAMS to New Era?
9     A.   My testimony is that there was a two-month
10 period from the time we -- that Latham on our behalf
11 first had discussions with New Era and the terms of
12 use were updated and the subscription agreement was
13 signed.
14    Q.   So, I mean, yes or no:  Did Live Nation and
15 Ticketmaster spend approximately two months
16 considering whether to switch from JAMS to New Era?
17         MR. HUSENY:  Objection.
18         THE WITNESS:  Your question, the word
19 "considering," you're suggesting something that I'm
20 not -- I've testified to you that it was a two-month
21 period from the moment that -- the time when we first
22 learned of New Era and their offering and the time it
23 went live.
24         I don't know -- I'm not going to
25 characterize it as us considering making a switch for

Page 56

1  a two-month period.  The fact -- The timeline speaks
2  for itself.
3     Q.   BY MR. SEARS:  Okay.  Well, let me ask you
4  this:  Would you characterize the decision to switch
5  from JAMS to New Era and Live Nation and
6  Ticketmaster's terms of use as a careful one?
7     A.   Yes.  Everything that we do, that I do, all
8  my work for the company is carefully considered.
9     Q.   It certainly wasn't an arbitrary decision
10 that you made on a whim to switch from JAMS to
11 New Era?
12    A.   Absolutely not.
13    Q.   I understand you don't want to tell me the
14 reasons, but there were reasons?
15         MR. HUSENY:  Objection.  That's not a
16 question.  Same objection as before.
17         MR. SEARS:  Sadik, come on.
18    Q.   BY MR. SEARS:  I'm going to ask it again.  I
19 understand you don't want to tell me the reasons, but
20 there were reasons that Live Nation and Ticketmaster
21 switched from JAMS to New Era?
22         MR. HUSENY:  Same objections.
23         THE WITNESS:  I mean, why you want the
24 answer to that -- There are reasons for everything
25 that I do, that you do, that we all do, all decisions

Page 57

1  we make as professionals and in our personal lives.
2  There's a reason for everything, yes.  It was not an
3  arbitrary decision.  It was a reason --
4     Q.   BY MR. SEARS:  So the answer to my question
5  was yes?
6     A.   Sorry?
7     Q.   The answer to my question was yes, there was
8  a reason that Live Nation --
9     A.   Is that your testimony?
10    Q.   I apologize.
11    A.   There were -- Sorry.
12    Q.   Go ahead.
13    A.   My testimony is yes.  There are -- There are
14 reasons for everything that we do, yes.
15    Q.   Okay.  And I apologize.
16    A.   What the reasons are, I will not disclose;
17 but, of course.  Yes, I'll answer that.
18    Q.   Thanks.  Are you done?
19    A.   I am.
20    Q.   Yeah, sorry.  I didn't mean to cut in.  I'm
21 just going to ask it again so it's clean.
22         So just to be clear:  Live Nation and
23 Ticketmaster had reasons for switching from JAMS to
24 New Era?
25    A.   Clean answer:  Live Nation and Ticketmaster

Page 58

1  have reasons for everything we do.  All the legal work
2  we do, there is a reason behind it.  So, yes, it was a
3  reasoned decision.
4       Q.   But you will not tell me what the reasons
5  were, because you believe they are privileged?
6       A.   Because they are privileged, yes.
7            MR. SEARS:  Okay.  I'm going to mark our
8  next two exhibits, which I believe will be four and
9  five, and I'm going to do them together and I'm going
10 to drop them into the chat.
11           THE WITNESS:  Okay.  Oh, sorry.  I didn't
12 mean to cut you off.
13           MR. SEARS:  No, please.
14           THE WITNESS:  After we go through this line
15 of questioning on these exhibits, I'd like to take a
16 few-minute break.
17           MR. SEARS:  If you need a break now, that's
18 fine.  I know you're an experienced witness, so I
19 didn't give you the normal warning; but I -- in most
20 depositions, I say, "If you ever need a break, you
21 should just let me know."  So if you need to take one
22 now, that's more than okay.
23           THE WITNESS:  I'm okay.  Unless the court
24 reporter needs to rest her fingers, I'm okay for
25 another few minutes.

Page 59

1            THE STENOGRAPHIC REPORTER:  I've never
2  turned one down.  I would love a break.
3            THE WITNESS:  Okay.
4            MR. SEARS:  Sure.  Why don't we come back at
5  10:45 even, Pacific.
6            THE WITNESS:  Sounds great.
7            THE STENOGRAPHIC REPORTER:  Thank you.
8  Agreeable to go off the record?
9            We're off the record.
10           (Recess.)
11           (Exhibit 4 and Exhibit 5 marked.)
12           THE STENOGRAPHIC REPORTER:  We're back on
13 the record.
14      Q.   BY MR. SEARS:  Good morning again,
15 Ms. Tobias.
16           Are you ready to resume your deposition?
17      A.   I am.
18      Q.   Did you talk to anyone on the break?
19      A.   I called Sadik.
20      Q.   And you may have answered, I think, but
21 you're at your home right now?
22      A.   Yes.
23      Q.   Okay.  So before we took a break, I marked
24 the next two exhibits, 4 and 5.
25           Do you have those?

Page 60

1       A.   So I believe I do.  2023.1.6, 2022 -- Yeah,
2  I do have those two.
3       Q.   Can you open up the 2022.10.03.
4       A.   Sure.
5       Q.   Do you see that this is a privilege log
6  prepared by Live Nation Entertainment Inc. and
7  Ticketmaster?
8       A.   It's still opening.  Just give it a second.
9            MR. SEARS:  Oh, sorry.
10           MR. HUSENY:  Just for the record, for me,
11 Will:  This is number 5; right?
12           MR. SEARS:  If Marilynn says so, sure.
13           MR. HUSENY:  Fair enough.
14           (Reporter request.)
15           MR. SEARS:  Okay.  I thought -- I mean,
16 these are four and five; right?
17           THE STENOGRAPHIC REPORTER:  Are they labeled
18 that way?
19           MR. SEARS:  Can we go off the record?
20           THE STENOGRAPHIC REPORTER:  Thank you.
21 Agreeable to go off the record?
22           MR. HUSENY:  Yes.
23           THE STENOGRAPHIC REPORTER:  We're off the
24 record.
25           (Off the record.)

Page 61

1            THE STENOGRAPHIC REPORTER:  We're back on
2  the record.
3       Q.   BY MR. SEARS:  All right.  So, for the
4  avoidance of doubt, Exhibit 5 is a document entitled
5  "defendant's privilege log, October 3rd, 2022."
6            Do you see that, Ms. Tobias?
7       A.   Yes.
8       Q.   And Exhibit 4 is the other document that we
9  introduced.
10           Do you have that one too?
11      A.   Which is that one?
12      Q.   It's a document entitled "defendant's
13 supplemental privilege log, January 6, 2023."
14           Do you have that one?
15      A.   I don't have it open, but I see it in the
16 chat.
17      Q.   Great.  So going to Exhibit 5, the October
18 3rd, 2022, log.
19           Do you have that one in front of you?
20      A.   Yes.
21      Q.   Have you seen this before?
22      A.   Yes, I have.
23      Q.   And this shows documents that were withheld
24 for privilege in this case; right?
25      A.   Right.

Page 62

1    Q.   And the first entry here is from May 11th,
2  2021; right?
3    A.   Yes.
4    Q.   So there were no documents, prior to that
5  date, that were withheld for privilege in this
6  lawsuit; right?
7         MR. HUSENY:  Objection.  Calls for
8  speculation on this witness's part.
9         MR. SEARS:  Sadik, I'm going to repeat my
10  request that you limit it to form and privilege.
11    Q.   BY MR. SEARS:  You can answer, Ms. Tobias.
12    A.   I didn't prepare the privilege log; my
13  lawyers did that.  They reviewed the documents that I
14  provided to them, that were responsive to your
15  requests.  So I can't tell you with certainty, sitting
16  here, what was -- you know, what their thought process
17  was or what the entire universe of documents was.
18    Q.   So the reason I'm asking you is this:  I
19  want to know if there were communications -- you don't
20  have to disclose the substance, but just yes or no --
21  were there communications at Live Nation about
22  switching from JAMS to New Era before this date, May
23  11th, 2021?
24    A.   I'm sorry.  Did you ask were there
25  communications between like myself and Michael Rowles,

Page 63

1  or communications at all?
2    Q.   My question was:  Were there communications
3  at Live Nation about switching from JAMS to New Era
4  before this date, May 11th, 2021?
5    A.   Oh, I don't know the answer to that
6  question.
7    Q.   Is it possible there were?
8    A.   I mean, I guess so.  I couldn't tell you yes
9  or no.  I don't know.
10    Q.   Were there communications at Ticketmaster
11  about switching from JAMS to New Era before this date,
12  May 11th, 2021?
13    A.   Again, I don't know the answer.
14    Q.   And I'm just asking because before I asked
15  for Live Nation, and I wanted to make sure your answer
16  covered Ticketmaster.  Fair enough?
17    A.   Fair enough.
18    Q.   Now, before this date, May 11th, 2021, did
19  you have discussions with Latham & Watkins about
20  switching from JAMS to New Era?
21    A.   Yes.
22    Q.   Okay.  And those are just not reflected on
23  this privilege log?
24    A.   Phone calls.
25         MR. HUSENY:  Object to form.

Page 64

1    Q.   BY MR. SEARS:  Okay.  Were there written
2  communications between you and Latham & Watkins about
3  switching from JAMS to New Era before this date, May
4  11th, 2021?
5    A.   Oh, I don't recall.
6    Q.   Is it possible there were?
7         MR. HUSENY:  Object.  Asked and answered.
8         THE WITNESS:  I don't recall.
9    Q.   BY MR. SEARS:  You just don't know one way
10  or another?
11    A.   That's my testimony.
12         MR. HUSENY:  Same objection.
13    Q.   BY MR. SEARS:  And that's why I introduced
14  the other privilege log as well.  You can look at that
15  if you like, but my understanding is that doesn't show
16  any prior communications either.
17         Is that --
18         MR. HUSENY:  Objection.  Not a question.
19         MR. SEARS:  Sadik, for the second time,
20  you've interrupted me as I was in the middle of a
21  question.  Please give me a chance to finish.  I would
22  appreciate it.
23    Q.   BY MR. SEARS:  Is that your reading of the
24  privilege log as well, Ms. Tobias?
25    A.   No.  Well, first of all, let me open the

Page 65

1  other one.
2         Okay.  I see the other one.  Okay.  I have
3  them both up.
4         And your question was what, again?
5    Q.   And you don't see any communications here
6  that are logged before May 11th, 2021, do you?
7    A.   I don't see that there were privileged
8  documents that were withheld from the production, that
9  were dated prior to 05/11/2021.
10    Q.   Okay.  And, now, 05/11/2021, do you recall
11  that's actually the day after there was a hearing on a
12  motion to compel arbitration in a lawsuit against
13  Ticketmaster and Live Nation?
14    A.   I don't recall.
15    Q.   Do you remember the Oberstein lawsuit?
16    A.   It's ongoing.  Of course I remember it.
17    Q.   Okay.  I -- And just for the record, what is
18  the Oberstein lawsuit?
19    A.   It is a putative class action lawsuit filed
20  by your firm against Live Nation and Ticketmaster.
21    Q.   And is it a coincidence that the first
22  privileged communication that's logged here is one day
23  after the hearing on the motion to compel arbitration
24  in Oberstein?
25    A.   I absolutely have no idea.

Page 66

1    MR. HUSENY:  Objection.  Assumes facts.
2    MR. SEARS:  Okay.  Sadik, I think you talked
3  over the witness.
4    Q.   BY MR. SEARS:  Ms. Tobias, can you repeat
5  your answer.
6    A.   I'll let him make his objection first, and
7  then I'll answer.
8    MR. HUSENY:  I think the reporter got it
9  all.  Thank you very much, Ms. Hoover.
10   But my objection was assumes facts.
11   Q.   BY MR. SEARS:  And, Ms. Tobias, your answer
12 was?  Just so I can hear it.
13   A.   Now you have to ask the question again.  I
14 apologize.
15   Q.   Is it a coincidence that the first
16 privileged communication that's logged here is one day
17 after the hearing on the motion to compel arbitration
18 in Oberstein, which is O-B-E-R-S-T-E-I-N?
19   MR. HUSENY:  Same objection.
20   THE WITNESS:  I have no idea.  I can't
21 answer that question.  I don't recall specifically
22 this communication.  What other communications were
23 going on at that place, at that time, or even the date
24 of the -- you said it was the hearing on a motion to
25 compel arbitration?  I don't recall any of that.

Page 67

1    Q.   BY MR. SEARS:  Do you recall -- Sorry.  Were
2  you finished?
3    A.   I said I don't recall any of the timing
4  there.
5    Q.   Did anything that was happening in the
6  Oberstein lawsuit have any effect on Live Nation and
7  Ticketmaster's decision to switch from JAMS to
8  New Era?
9    A.   I'm not going to answer that question.  I'd
10 be divulging privileged communications, in my legal
11 opinion, as in-house counsel.
12   Q.   So just to be clear:  You can't tell me
13 whether anything in the Oberstein lawsuit contributed
14 in any way to Live Nation and Ticketmaster's decision
15 to switch from JAMS to New Era?
16   A.   It doesn't get much more privileged than
17 that; so, no.
18   (Reporter request.)
19   MR. HUSENY:  Objection.  Privilege.
20   MR. SEARS:  Sadik, I think you're going to
21 be out of a job.  The witness is doing a good job
22 about taking care of herself on these.
23   Q.   BY MR. SEARS:  Now, do you remember the
24 first time that Latham had a discussion with New Era?
25   A.   I recall it was early May 2021.

Page 68

1    Q.   Do you recall what day it was specifically?
2    A.   I don't.
3    Q.   Let me ask you this:  Was it Latham &
4  Watkins that came to Live Nation and raised the idea
5  of reaching out to New Era, or was it Live Nation or
6  Ticketmaster that raised the idea?
7    MR. HUSENY:  Objection.  Calls for
8  privileged documents -- information.
9    Q.   BY MR. SEARS:  So you can't tell me whether
10 it was Latham's idea or Live Nation or Ticketmaster's
11 idea to begin discussions with New Era?
12   A.   No, because what you're asking me to
13 disclose is what the communications were between Live
14 Nation and its counsel.
15   Q.   Let me ask you this:  Just as a factual
16 matter, date or range of dates, when did you learn
17 about New Era?
18   A.   May of 2021.
19   Q.   How did you learn about New Era?
20   MR. HUSENY:  Objection.  Privilege.
21   Q.   BY MR. SEARS:  Let me ask you this:  Did you
22 learn about New Era from any source other than your
23 counsel at Latham & Watkins?
24   MR. HUSENY:  Same objection.
25   Q.   BY MR. SEARS:  I think I'm entitled to ask

Page 69

1  this, but I'll ask it a little differently.
2    I mean, did you -- did you learn about
3  New Era yourself, for example, from marketing
4  materials or Google?
5    A.   The way you've asked that question is a
6  clear attempt at end-running around figuring out if
7  Latham and I discussed New Era and that's how I
8  learned about it, so I'm not going to answer that
9  question.
10   MR. SEARS:  That was the only question I
11 asked that Sadik didn't object to.  Really?
12   THE WITNESS:  Hey, sorry.  Sorry, Sadik, I'm
13 not going there.
14   Q.   BY MR. SEARS:  So just to be clear:  You
15 can't or won't tell me how you learned about New Era?
16   A.   Nope.
17   Q.   You'll tell me it was May 2021, but you
18 won't tell me how?
19   A.   Correct.
20   MR. SEARS:  Okay.  Let me introduce our next
21 exhibit, which will be Exhibit 6.  And this is a
22 document produced by New Era, bearing Bates number
23 NEWERA_000220.
24   (Exhibit 6 marked.)
25   Q.   BY MR. SEARS:  Let me know when you have it,

Page 70

1  Ms. Tobias.
2      A.  I do.
3      Q.  Have you seen this document before?
4      A.  I don't recall this document. I don't think
5  I've seen it before.
6      Q.  It's not one of the ones that refreshed your
7  recollection?
8      A.  Not that I recall.
9      Q.  It's not a document, as best you can recall,
10 that you saw when preparing for this deposition?
11     A.  I mean, it could have been, but I don't
12 recall it specifically.
13     Q.  Let me ask you this, just yes or no: Do you
14 have an understanding that there were exhibits
15 introduced in the New Era deposition a couple days
16 ago?
17     A.  I don't. But I know how depositions work,
18 so I would assume so.
19     Q.  What I'm trying to get at: Do you -- Do you
20 know whether you reviewed the exhibits from that
21 deposition or not?
22     A.  Not that I'm aware of. I was never told
23 anything I was looking at was an exhibit to a
24 deposition, no.
25     Q.  Nothing had like an exhibit stamp on it?

Page 71

1      A.  No, not that I recall.
2      Q.  Okay. So you're not on this e-mail, but do
3  you see it's an e-mail from Mr. Mulrooney at New Era
4  and some folks at Latham & Watkins?
5      A.  Yes.
6      Q.  Including Ms. Jovais and Ms. Ferguson, who I
7  believe you told me were involved in the process of
8  vetting New Era?
9      A.  Yep.
10     Q.  And it's from May 4th, 2021; right?
11     A.  Yes.
12     Q.  I believe you told me earlier -- I'm not
13 trying to put words in your mouth; I just want to make
14 sure I understand -- that you authorized all of
15 Latham's communications with New Era.
16         Do I have that right?
17     A.  Yes.
18     Q.  You authorized this one?
19     A.  Yes. All communications.
20     Q.  I mean --
21     A.  I was aware of all -- Sorry. I was aware of
22 all the communications as they were ongoing.
23     Q.  As best you know, is this the first time
24 that -- Well, let me just ask you this: If I'm going
25 to -- If I refer to Ms. Jovais, Ms. Ferguson,

Page 72

1  Ms. Gushman, and Mr. Huseny, as "the Live Nation
2  litigation team," can we just call them that, going
3  forward, so I have a shorthand to talk about the
4  lawyers that are representing Live Nation and talked
5  to New Era?
6      A.  Let's call them the Latham litigation team.
7      Q.  It'd be better. I just want to make sure we
8  have a shorthand.
9          So when we say "Latham litigation team,"
10 we'll understand that we're talking about Latham
11 lawyers that represent Live Nation. Fair?
12     A.  Fair. I mean, I may ask you to clarify
13 which lawyer you're speaking about, but I understand
14 generally that -- who you're referring to in general
15 when you -- if you use that phrase.
16     Q.  As best you know, is this the first time the
17 Latham litigation team spoke to New Era?
18     A.  Honestly, I'm assuming, based on the content
19 of the e-mail as I read it; but that's -- my
20 recollection of this is it's very early May, the first
21 conversation. So I would say that's my understanding.
22     Q.  You certainly don't remember earlier
23 conversations between Latham and New Era?
24     A.  You mean earlier than May 4th?
25     Q.  Correct.

Page 73

1      A.  I don't think so.
2      Q.  So remember, when we looked at the privilege
3  logs, there are no entries before May 11th, 2021.
4          Do you remember that?
5      A.  I do, yes.
6      Q.  So am I correct, then, that you had no
7  communications in writing with Latham & Watkins about
8  New Era between May 4th, 2021, and May 11th, 2021?
9      A.  That would appear to be the case.
10     Q.  Did you have phone calls -- not getting into
11 substance, just facts: Did you have phone calls with
12 the Latham litigation team between May 4th and May
13 11th, 2021?
14     A.  Did I have phone calls with them during that
15 time? Absolutely. Of course.
16     Q.  Do you remember --
17     A.  There have been phone calls with our
18 litigation team.
19     Q.  You may have answered my question, but about
20 how many?
21     A.  Oh, I -- I couldn't tell you.
22     Q.  Let me ask you this: About how many phone
23 calls or Zooms or non-written communications did you
24 have with the Latham litigation team about New Era?
25     A.  I have no idea.

Page 74

1    Q.   More than five?
2    A.   Again, "no idea" means I have no idea.
3    Q.   You can't give me a ballpark?
4    A.   No.  No.  It was a year ago or, what, almost
5  two years ago.  I have no recollection of how many
6  times we spoke.
7    Q.   All right.  And so we have the privilege log
8  which shows some of the written communications, but
9  you don't know how many oral communications there
10  were?
11    A.   Correct.
12    Q.   Now, I think you told me this, but the
13  negotiations by the Latham litigation team over the
14  subscription agreement, those were handled by Latham;
15  you weren't involved in those discussions with
16  New Era?
17    A.   I was not.
18    Q.   And your understanding of them comes from
19  speaking to the Latham litigation team?
20    A.   I was speaking with them in real-time as
21  those discussions were ongoing, yes.
22    Q.   And you may have told me this before, but
23  when you prepared for your deposition, did you speak
24  to the lawyers at Latham that were involved in those
25  discussions with New Era, like Ms. Ferguson and

Page 75

1  Mr. Jovais?
2    A.   Ms. Jovais.  Yes, Ms. Ferguson.  I believe
3  Ms. Jovais is on maternity leave.  I did not speak
4  with her.
5    Q.   I see.  She was on both of the preparatory
6  calls that you did?
7    A.   Ms. Ferguson was, yes.
8    Q.   Now, based on your understanding of the
9  negotiations between the Latham litigation team and
10  New Era, which side first proposed the idea of the
11  subscription agreement?
12    A.   So when you say "proposed the idea," it
13  suggests that that was something that was negotiated.
14  It wasn't.  That New Era -- New Era's platform, their
15  -- their offering is a subscription agreement.  It
16  wasn't a proposal by either side.  It is what it is.
17    Q.   So just to make sure I understand.
18        So there wasn't really another alternative.
19  When the Latham litigation team spoke to New Era, the
20  only option was a subscription agreement?
21    A.   That is how New Era works, yes.
22    Q.   Well, what do you mean, "that's how New Era
23  works"?
24    A.   New Era provides arbitration services.
25  Their pricing model is that the entity who enters into

Page 76

1  a subscription -- I mean, I'm sorry -- yeah, a
2  subscription agreement with them pays a subscription
3  fee for -- you know, for the services, for a
4  multi-year period.
5    Q.   As best you understand it from preparing for
6  the deposition, New Era operates on a subscription-fee
7  model for arbitration; is that right?
8    A.   Correct.  And my understanding is that it's
9  partially subscription.  There are times or
10  circumstances where some arbitrations might fall
11  outside of the subscription payment and would require
12  a separate fee, but by and large it's subscription.
13    Q.   The fact that New Era operates via a
14  subscription-fee model is different than JAMS; right?
15    A.   Correct.
16    Q.   JAMS doesn't have a subscription-fee model?
17    A.   Not that I'm aware of.
18    Q.   Has any ADR provider that Live Nation or
19  Ticketmaster has ever worked with operated with a
20  subscription-fee model like New Era's?
21    A.   We've only, as we testified -- as I
22  testified previously, we've only worked with, in our
23  terms of use, JAMS and New Era; so the answer is no.
24  JAMS doesn't have one.
25    Q.   So the subscription agreement was a new

Page 77

1  approach to arbitration by Live Nation and
2  Ticketmaster.  It wasn't something they'd done before?
3    A.   Correct.
4    Q.   And you weren't directly involved in any of
5  the discussions with New Era prior to the signing the
6  subscription agreement; right?
7    A.   No.  But I was very much kept in the loop as
8  to what the discussions -- how the discussions were
9  unfolding; but I had never had substantive
10  conversation with them, or any conversation with them
11  at all, until after the subscription agreement was
12  signed.
13    Q.   That was going to be my next question.
14        You didn't actually meet anyone from New Era
15  until after the agreement was signed?
16    A.   Correct.
17    Q.   And your understanding is that the
18  discussions between the Latham litigation team and
19  New Era often occurred via phone or Zoom?
20    A.   I actually don't know the answer to that.
21    Q.   When you -- Well, you said you authorized
22  them and got debriefs on them afterwards; right?
23    A.   Correct.
24    Q.   I mean, tell me how that process would work.
25        I'm not asking about substance, but would

Page 78

1  you generally get a debrief or a download if the
2  Latham litigation team had a call with New Era?
3      A.  Yes.  Or any communication with New Era,
4  they would update me after.
5      Q.  Would it be in writing or over the phone or
6  a combination of both?
7      A.  Most likely on the phone.  We spent a lot of
8  time on the phone.
9      MR. SEARS:  I'm going to introduce our next
10  exhibit, which I believe is Exhibit 7.
11      THE STENOGRAPHIC REPORTER:  Correct.
12      MR. SEARS:  Marilynn's going to keep me
13  honest, and I'm going to read the Bates number into
14  the record.  It's a document bearing Bates stamp
15  NEWERA_000004.
16              (Exhibit 7 marked.)
17      Q.  BY MR. SEARS:  Let me know when you have it,
18  Ms. Tobias.
19      A.  I have it.
20      Q.  Let me make sure I have it up.
21          So you see this is an e-mail dated July
22  15th, 2021, that involves you and some folks at
23  New Era?
24      A.  Yes.  If you could give me a second to read
25  through it.

Page 79

1              (Pause.)
2      THE WITNESS:  Okay.
3      Q.  BY MR. SEARS:  As best you can recall, is
4  this the first time that you were introduced to
5  New Era?
6      A.  Yes.
7      Q.  And in this e-mail -- And it's sent from
8  someone named Rich Lee.
9          You've met him?
10      A.  Yes.
11      Q.  And what's your understanding of his role at
12  New Era, if any?
13      A.  His signature block says he's CEO and
14  co-founder.
15      Q.  And here he says:  "Hi, Kim.  Thanks again
16  for taking time out of your day to meet with us."
17          Right?
18      A.  That's what it says, yes.
19      Q.  So this is after you had a call or a Zoom
20  with New Era?
21      A.  Yes.
22      Q.  And what did you discuss on that call or
23  Zoom?
24      A.  It was just logistics, setting up.  I
25  believe they asked for who on my team would need a

Page 80

1  login to access the platform.  Discussed how we would
2  be notified when we were served the new arbitration
3  demand.  It was a short call.
4      Q.  Is this one of the documents you reviewed in
5  preparing for your deposition?
6      A.  I do recall this document, yeah.
7      Q.  Is it one of the ones that refreshed your
8  recollection?
9      A.  Yeah, I actually didn't need my recollection
10  refreshed.  I recall -- I recall that conversation
11  with New Era.
12      Q.  And one of the things Mr. Lee says is:  "All
13  of us thoroughly enjoyed meeting you, and we're
14  thrilled and thankful that you believe in our vision
15  of bringing efficiency and pragmatism to dispute
16  resolution."
17          Do you see that?
18      A.  I do.
19      Q.  Did you have any discussions on this call
20  about the substance of New Era's rules and procedures?
21      A.  Not that I recall, no.
22      Q.  Did you have a discussion about their vision
23  of bringing efficiency and pragmatism to dispute
24  resolution?
25      A.  Not that I recall, no.

Page 81

1      Q.  In the process of considering whether to
2  switch from JAMS to New Era, did you personally review
3  New Era's rules and procedures?
4      A.  I did, yes.
5      Q.  And you told me, I believe, you wrote the
6  terms of use for Live Nation and Ticketmaster; right?
7      A.  Well, yes -- not single-handedly; with the
8  help of outside counsel -- but, yes, I'm responsible
9  for the terms.
10      Q.  Obviously, the terms of use and the rules
11  and procedures, they're different things, but you have
12  some understanding of the rules governing internet
13  conduct from working on the terms of use; right?  This
14  isn't something totally new for you?
15      A.  Correct.
16      Q.  So you reviewed New Era's rules and
17  procedures and developed an understanding of them?
18      A.  Yes.
19      Q.  That was something you felt that you needed
20  to do as part of deciding whether to switch from JAMS
21  to New Era?
22      A.  It's something I did.  What -- How I felt
23  about it, I won't -- I won't get into; but it is a
24  fact that I reviewed their rules and procedures.
25      Q.  That was something that was important for

Page 82

1  Live Nation and Ticketmaster to do before switching to
2  a new ADR provider?
3       A.   Again, it's a fact that I reviewed their
4  rules and procedures.
5       Q.   Presumably, you didn't do it because it's
6  fun.  You did it for a reason.  Right?
7       A.   You can presume.  I just told you I reviewed
8  them.
9       Q.   Well, I mean, I'm asking you:  You didn't do
10 it for fun or on a whim or because you needed to kill
11 some time.  You did it for a reason.  Correct?
12           MR. HUSENY:  Objection.  Asked and answered.
13           THE WITNESS:  I mean, I'll stand by my
14 previous -- You can keep asking me about whether I had
15 a reason to do anything.  I'll just tell you my
16 running response is:  There's a reason for everything
17 I do.
18           So if you need me to testify to whether
19 there's a reason for why I reviewed rules -- look, of
20 course there's a reason why I reviewed rules.  I'm
21 in-house counsel for the company and I review
22 everything that I'm responsible for --
23       Q.   BY MR. SEARS:  Did Live Nation --
24       A.   -- that I'm involved in and responsible for,
25 period.

Page 83

1       Q.   Thanks.  I'm sorry.  I didn't mean to
2  interrupt.  I thought you were done.
3           Did Live Nation or Ticketmaster do any kind
4  of comparative analysis of the JAMS rules and
5  procedures versus the New Era rules and procedures?
6       A.   A comparative analysis?  I wouldn't put it
7  that way.  I'm not sure what you mean by that.
8           Actually, can you explain what you mean by
9  "comparative analysis"?
10      Q.   Well, let me just ask you this, if the
11 "comparative" word is confusing:  Did Live Nation and
12 Ticketmaster do any analysis of New Era's rules and
13 procedures?
14      A.   For the record, I'm not confused by the word
15 "comparative."  I know what it means.
16           I will tell you that I am familiar with JAMS
17 rules and I'm familiar with New Era's rules.
18      Q.   All right.  Did Live Nation and Ticketmaster
19 do any analysis of New Era's rules?
20      A.   By that, do you mean did I?
21      Q.   We can start with that.  Sure.
22      A.   An analysis?  Based on my understanding of
23 that word, no, there was no analysis.
24           I reviewed their rules.  Beyond that, I
25 think I'd be disclosing my work product, wouldn't I?

Page 84

1  I'm not going to answer anything beyond that.
2       Q.   Well, let me just ask you, yes or no, as a
3  factual matter:  Was there work product that Live
4  Nation or Ticketmaster prepared about New Era's rules
5  and procedures?
6       A.   Written work product that I prepared?
7       Q.   Yes.
8       A.   No.
9       Q.   Did Latham & Watkins prepare written work
10 product about New Era's rules and procedures?  Just
11 yes or no.
12      A.   I don't know.
13      Q.   None that you ever saw?
14      A.   I just said I don't know.
15      Q.   All right.  So you never saw any kind of
16 analysis from Latham & Watkins about New Era's rules
17 and procedures?
18      A.   I don't recall.  I don't know.
19           MR. HUSENY:  Objection.  Asked and answered.
20           THE WITNESS:  Yeah.  Sorry, Sadik.
21           MR. HUSENY:  That's fine.
22      Q.   BY MR. SEARS:  So it's possible they did one
23 and you forgot?
24           I'm just trying to tell if it's -- if you
25 can't remember or if it's just you don't know.

Page 85

1       A.   As I testified, I actually don't know the
2  answer to your question, period.
3       Q.   Okay.  So there's nothing you saw on the
4  subject of an analysis of New Era's rules and
5  procedures?
6       A.   I don't recall.
7       Q.   Was it the topic of discussion, even if not
8  a topic of written work product?
9           MR. HUSENY:  Objection.  Vague.
10           THE WITNESS:  Also, I'm not going to
11 disclose what the -- the topics of my conversation
12 with Latham & Watkins.
13      Q.   BY MR. SEARS:  So you won't tell me if you
14 had a conversation with Latham & Watkins about the
15 New Era's rules and procedures?
16      A.   No.
17      Q.   Did you have a conversation with Latham &
18 Watkins about whether New Era's rules and procedures
19 were unconscionable?
20      A.   I'm not going to answer that question.
21 That's absolutely privileged.
22      Q.   Was there a written work product prepared
23 about whether New Era's rules and procedures were
24 unconscionable?
25      A.   Not that I recall.  I don't know.

Page 86

```
 1        Q.   So you don't recall written work product
 2   about whether New Era's rules and procedures were
 3   unconscionable, and you won't tell me if there were
 4   conversations about that topic?
 5             I just want to be sure I understand.
 6        A.   To be clear:  I'm not going to disclose any
 7   communications, the substance of them, with my
 8   lawyers, whether -- you know, even if they -- if
 9   there's work product that exists.  I'm not going to go
10   there.  It couldn't be more privileged, again.
11        Q.   Still looking at this e-mail:  Do you think
12   the -- Do you see the last line here, where Mr. Lee
13   says:  "Thank you for trusting us with your dispute
14   resolution needs"?
15        A.   I see that, yes.
16        Q.   Do Live Nation and Ticketmaster trust
17   New Era with their dispute resolution needs?
18             MR. HUSENY:  Objection.
19             THE WITNESS:  I mean, I don't even know how
20   to answer that question.  I can't speak on behalf -- I
21   mean, do I trust them?  Or who's Live Nation and
22   Ticketmaster?  Who are you referring to there, since
23   they're corporate entities?
24        Q.   BY MR. SEARS:  You're the 30(b)(6) on their
25   behalf; right?
```

Page 87

```
 1        A.   So you're asking me?
 2        Q.   Yeah.
 3        A.   So what's your question for me?  Do I trust
 4   them with our dispute resolution needs?
 5             My answer is:  We -- They are our designated
 6   arbitration provider in our terms of use.  We have a
 7   subscription agreement with them.  That's all I can
 8   testify to.  I don't -- How I feel or whether I trust
 9   them is certainly well outside the bounds of what
10   you're entitled to ask me as in-house counsel.
11        Q.   Okay.  So you won't tell me whether you
12   think New Era's rules and procedures are fair?
13        A.   No.  I -- I'm in-house counsel.  No.
14        Q.   You believe that's privileged?
15        A.   How I feel?
16             MR. HUSENY:  Objection.  One sec.
17             Objection.  You're asking the witness about
18   mental impressions and state of mind, and that is
19   privileged.
20             MR. SEARS:  I'm just trying to clarify.
21             I asked if the witness could tell me whether
22   New Era's rules and procedures are fair.  The witness
23   said no.
24             I'm trying to understand why she's not
25   answering the question.  That's all I'm getting at.
```

Page 88

```
 1        Q.   BY MR. SEARS:  If it's because you believe
 2   it's privileged, I'd just like to know.
 3        A.   I don't believe it's privileged.  It's
 4   about as privileged, again, as it gets.
 5             You're asking me, as in-house counsel, how I
 6   feel and what my thoughts and mental impressions are.
 7   It's privileged.  I'm not answering it.
 8        Q.   Okay.  I hope you understand.  I have to ask
 9   these questions --
10        A.   I get it.
11        Q.   -- to understand what the privilege is.  I
12   hope I'm not frustrating you.  That's why -- That's
13   why I'm asking the questions this way.
14             Do you know whether Latham & Watkins
15   commented on New Era's rules and procedures?
16        A.   They did not.
17        Q.   Do you know whether New Era's rules and
18   procedures were finalized, as of early May 2021, when
19   Latham & Watkins began discussions with New Era?
20        A.   My recollection is that they were largely
21   final but they had not been posted on their website
22   and publicly available, but largely final.
23        Q.   What do you mean by "largely final"?
24        A.   I -- They were essentially in final form, is
25   my understanding.
```

Page 89

```
 1        Q.   And what part of them was not final?
 2        A.   I don't know.  You'd have to -- That's a
 3   New Era question.  I'm -- I don't know.  I don't know
 4   the answer to that question.
 5        Q.   I'm just trying to understand:  How did you
 6   derive an understanding that the rules were being
 7   mostly final but not quite?
 8             Was that something that was communicated by
 9   Latham or your own review of the rules?
10        A.   No, I'm sorry.  What I was -- What -- My
11   testimony here is that I would not consider anything
12   final until it's made publicly available.  I know it
13   was made publicly available, gosh, on their website, I
14   want to say, you know, late June.
15             I don't know when they were final.  I had
16   nothing to do with, nor did Latham, with their rules
17   and procedures and their process for drafting them or
18   when they were final.  I don't know.  I don't know.
19   You need to ask New Era that question, when they were
20   final.
21        Q.   Well, let me ask you this:  Based on your
22   understanding, the New Era rules and procedures were
23   not published at the time that Latham & Watkins was
24   negotiating the subscription agreement with them?
25        A.   I believe that's true.
```

Page 90

1    Q.   Now, you told me earlier that Latham &
2 Watkins didn't comment on the rules and procedures.
3         Do you remember that?
4    A.   And -- Yes.  You mean comments to New Era
5 and providing feedback?
6    Q.   Yes.
7    A.   They did not.
8    Q.   I guess they may have commented to you on
9 the rules and procedures, but I understand you would
10 assert privilege over that; correct?
11   A.   Correct.
12   Q.   Okay.  Now focusing on Latham & Watkins and
13 New Era.  Are you with me?
14   A.   Yes.
15   Q.   How did you develop your understanding that
16 Latham & Watkins didn't comment on the rules and
17 procedures?
18   A.   That's privileged.
19   Q.   Did your lawyers tell you that?
20        MR. HUSENY:  Objection.  That's privileged.
21 You just asked her what her lawyers told her.
22        MR. SEARS:  You can just say "objection,
23 privilege," Sadik.  You've been doing so well for the
24 past half hour.  I was so proud of you.  I'll ask it
25 again.

Page 91

1        MR. HUSENY:  Because you moved to facts
2 rather than privilege, and now you're back to
3 privilege, Will.
4        I was proud of you too.  Let's -- Let's move
5 on and try to keep it to the facts.
6    Q.   BY MR. SEARS:  So my next question is:  I
7 mean, is there some other source of information, other
8 than the Latham litigation team, that developed your
9 understanding that Latham didn't comment on the rules
10 and procedures?
11   A.   So here we're back, you're doing that -- and
12 I get it; I know you have a tough job here -- but
13 you're doing the exact same thing you did with the
14 prior line of questioning, where you're trying to do
15 an end run in figuring out what my conversations were
16 with Latham by asking if anyone else told me this fact
17 that you're assuming to be true.
18        I'm not going to explain how or why I know
19 anything here on this topic.
20   Q.   Okay.  Well, I appreciate the constructive
21 feedback on my deposition.
22   A.   Hey, I'm trying to move it along, Will.  I
23 know none of us want to be here.
24   Q.   I will just ask one more question.
25        You won't tell me how you know that Latham

Page 92

1 didn't comment on New Era's rules and procedures?
2    A.   No.
3    Q.   Now, you understand, within New Era's rules
4 and procedures, that they're sort of general rules at
5 the beginning; right?
6    A.   Can you clarify that question.
7    Q.   Well, what I was going to ask is:  You
8 understand there's a subset of the rules about mass
9 arbitrations?
10   A.   There are mass -- There are rules that apply
11 to mass arbitrations, yes.
12   Q.   Right.  There are -- There are sort of a
13 general set of rules for New Era, then there is a
14 subset about mass arbitrations.
15        Is that your understanding?
16   A.   That's my recollection, yeah.
17   Q.   Now, when we were talking about the rules
18 being finalized, you said that the rules in general
19 were essentially finalized by the time Latham was
20 talking to New Era?
21   A.   They were published after -- before we
22 signed the subscription agreement.
23   Q.   Wait.  The rules were published before you
24 signed the subscription agreement?
25   A.   Yes.

Page 93

1    Q.   Just give me a moment here.
2    A.   I'm sorry.  Before we went -- Let me correct
3 that.
4        Before we pub -- Before we officially made
5 the change to New Era on our -- on our terms of use,
6 that they had been published; so we -- I confirmed the
7 rules were as I thought they would be.
8        I just need to change my testimony there.
9 By the time we posted them publicly on our website,
10 they had been published on New Era's website.
11        MR. SEARS:  Yeah, I'll just introduce our
12 next exhibit -- which, Marilynn, would you remind me
13 which number this is?
14        THE STENOGRAPHIC REPORTER:  Exhibit 8.
15        MR. SEARS:  This will be Exhibit 8.  It's a
16 document bearing Bates number NEWERA_000327.
17            (Exhibit 8 marked.)
18        THE WITNESS:  Yes, I see it.
19   Q.   BY MR. SEARS:  And is this a document you've
20 seen before, Ms. Tobias?
21   A.   I can't recall if I've seen this one in
22 particular.
23   Q.   You don't remember if it's one you saw
24 during deposition prep?
25   A.   I don't recall.

Page 94

1    Q.   Do you see it's another e-mail between
2  New Era and Latham?
3    A.   Yes.
4    Q.   And it's dated June 21st, 2021?
5    A.   Yes.
6    Q.   That's the date the subscription agreement
7  was signed.
8         Am I right about that?
9    A.   I believe it was signed June 22nd, 2021.
10   Q.   So this is one day before?
11   A.   Yes.
12   Q.   I see.  And this is -- Based on this e-mail,
13 that's the date that the rules and procedures were
14 published on the website?
15   A.   Yes.
16   Q.   So the rules and procedures by New Era were
17 published one day before Live Nation and New Era
18 signed the subscription agreement?
19   A.   Again, yes.
20   Q.   Now, earlier, remember we were talking about
21 the mass arbitration provisions and the New Era rules?
22   A.   I remember you asked me about them, yes.
23   Q.   Were those rules finalized, or essentially
24 finalized, at the time when Latham began talking to
25 New Era in May 2021?

Page 95

1    A.   I don't recall.
2    Q.   You just don't know one way or another?
3    A.   No.
4    Q.   Did you have an understanding and you can't
5  remember, or do you just never know?
6    A.   I just don't know the answer.
7         MR. SEARS:  All right.  We'll mark our next
8  exhibit.
9         THE STENOGRAPHIC REPORTER:  Exhibit 9.
10            (Exhibit 9 marked.)
11   Q.   BY MR. SEARS:  This is Exhibit 9.
12   A.   This one is taking a minute.  Hold on.
13        Hmm.  There we go.  Okay.  It's downloading
14 now.
15   Q.   So Exhibit 9 is a document bearing Bates
16 number NEWERA_000184.
17   A.   Yeah, give me one second.  It's still
18 opening.  Wow.  Some of them take a while.  It's not
19 -- Hold on.
20        Oh, here we go.  Okay.  I have it open.
21   Q.   Okay.  And I'll just -- I'll tell you, for
22 you and Mr. Huseny's benefit:  So this is a family of
23 documents produced by New Era.
24        Do you see at the beginning it's a draft of
25 the subscription agreement?

Page 96

1    A.   Yes.
2    Q.   And if you scroll down to about page 15 of
3  the PDF, you'll see an e-mail that attaches the
4  subscription agreement.
5         Do you see that?
6    A.   I'm not there.  Hold on.  Okay.
7    Q.   And then if you scroll down, you'll see
8  another attachment at the end.
9    A.   Oh, yes.
10   Q.   I'll just represent to you that my
11 understanding is that this e-mail on page 15 is what
12 attaches the subscription agreement and the other
13 document.
14        As I explained earlier, there were some
15 issues with how New Era produced the documents, but my
16 understanding is that this is all part of a family:
17 This is the e-mail, and the other two documents are
18 the attachments.
19        Does that make sense?
20   A.   I'll take your word for it.
21   Q.   And do you see that, in substance, this is
22 an e-mail from Mr. Mulrooney at New Era to the Latham
23 litigation team, attaching a draft of the subscription
24 agreement and something called "mass arbitration
25 rules"?

Page 97

1    A.   Yes.
2    Q.   As best you know, is this the first draft of
3  the subscription agreement that was sent by New Era to
4  Latham?
5    A.   I actually don't know.
6    Q.   Do you recall a prior draft?
7    A.   I would -- Honestly, I would have to review
8  all of the drafts and compare and contrast.  I don't
9  know the answer to that question.
10   Q.   Let me ask you this:  Did you -- Do you
11 recall, at this time, May/June 2021, reviewing a few
12 drafts of the subscription agreement?
13   A.   I'm trying to recall if I was reviewing
14 drafts or just having discussions with counsel.  My
15 recollection is that I did not review the drafts until
16 they were -- until it was close to final.
17   Q.   That -- You actually anticipated my next
18 question.
19        Do you remember the first time you reviewed
20 a draft?
21   A.   I believe it was when it was close to final.
22   Q.   Could you give me, I mean, even a ballpark
23 date range?  Was that like June or late May?
24   A.   That would probably be June, but I'd be --
25 I'd be guessing.

Page 98

1  Q.  So, as best as you recall, you didn't review
2  this draft of the subscription agreement from May
3  12th, 2021?
4  A.  I -- you know, I don't -- I don't think I
5  did.
6  Q.  Did you review this document in preparing
7  for your deposition?
8  A.  I don't think so.
9  Q.  So, as far as you know, you actually haven't
10  seen this draft of the subscription agreement before?
11  A.  I couldn't tell you with certainty whether
12  I've seen this particular draft.
13  Q.  But it's not something you remember being
14  prepared to testify on for your deposition?
15  A.  Each individual draft, no.
16  Q.  How -- Well, let me ask you this:  Did you
17  review drafts of the subscription agreement when
18  preparing for your deposition?
19  A.  Actually, I don't recall reviewing drafts;
20  just the subscription agreement, the executed
21  subscription agreement.
22  Q.  So you reviewed the final draft to prepare
23  for your deposition, but not the interim drafts?
24  A.  That's my recollection.
25  Q.  Are you prepared to testify about the

Page 99

1  drafting process generally?
2  A.  Yes.
3  Q.  And is your understanding of the drafting
4  process generally something you developed in real-time
5  when it was happening or something that you prepared
6  to do for this deposition?
7  A.  In real-time as it was happening.
8  Q.  Okay.  And you also -- did you also prepare
9  for it as part of your deposition?
10  A.  I'm sorry.  What was your question?  Did I
11  prepare?
12  Q.  Is this also a topic that you prepared to
13  testify on as part of your deposition prep?
14  A.  Generally, yes.
15  Q.  Okay.  So, I mean, do you know, based on
16  this e-mail or otherwise, who prepared the first draft
17  of the subscription agreement at Latham or New Era?
18  A.  New Era did.
19  Q.  Okay.  And you got downloads from Latham at
20  the time; so, even if you didn't see a draft, you may
21  have discussed it with them?
22  A.  Yes.
23  Q.  And I believe you told me this before, but
24  it was -- it was New Era's idea to do subscription
25  pricing because that's how New Era's business model

Page 100

1  works?
2  A.  Yes.
3  Q.  That wasn't something that Live Nation or
4  Ticketmaster proposed?
5  A.  Correct.
6  Q.  Now, you mentioned the pricing model
7  earlier.
8     Do you remember that?
9  A.  Yes.
10  Q.  Okay.  What is your understanding of the
11  pricing model?
12  A.  In terms of -- Are you asking generally how
13  it works or the amounts paid?
14  Q.  Generally how it works.
15  A.  Generally, we pay in our subscription
16  agreement a certain amount of money that is
17  predetermined, that was determined at the time we
18  signed the agreement, over the term of the agreement,
19  which is five or six years.  The first year is
20  [REDACTED], and that covers all mass arbitrations that
21  are filed against the company and up to 50 standalone
22  arbitrations.  And then the price each year, for the
23  first few years, goes up by a percentage and then it
24  levels off the final two years of the agreement, of
25  the period.

Page 101

1  Q.  And you mentioned that the agreement can
2  extend over a period of years.
3     Is your understanding that it's broken up
4  into one-year terms?
5  A.  I believe there are -- it is a -- it is for
6  a term of years, but both parties have termination
7  rights.
8  Q.  So, for example, Live Nation could
9  unilaterally terminate the agreement after one of the
10  years?
11  A.  Yes.
12  Q.  If it was unhappy with New Era, it could
13  tear up the agreement?
14  A.  I believe so, yes.
15  Q.  And -- Now, we were talking about the model
16  earlier.
17     I mean, what is your understanding of how
18  the model relates to subscription pricing?
19     Does the model calibrate subscription
20  pricing based on factors or is it something else?
21  A.  I'm sorry.  I don't understand your
22  question.  My understanding of what?
23  Q.  You mentioned a pricing model earlier;
24  right?
25  A.  Yes.

Page 102

1    Q.   That's a New Era pricing model?
2    A.   Yes.
3    Q.   All right.  What is your understanding of
4  what the model does and how it works?
5    A.   I thought I just answered that.
6    Q.   Let me ask it again.  I just want to make
7  sure.
8         What is your understanding of how -- Well,
9  let me ask this:  You told me about the subscription
10  payments and how they work over a period of time;
11  right?
12    A.   Correct.
13    Q.   My question is like about the model, like
14  what does the model do?
15         Is the model what comes up with that number,
16  or is it something else?  I'm asking because you
17  mentioned it earlier.
18    A.   I'm sorry.  The model comes up with that
19  number?
20    Q.   How does the number -- How does the model,
21  the pricing model that you mentioned, relate to the
22  subscription pricing in the agreement, if at all?
23    A.   I'm sorry.  I really don't understand what
24  you're asking.  I can try to explain it again.
25    Q.   Let me ask you this:  When you -- When you

Page 103

1  say "the model," are you talking about like an Excel
2  spreadsheet that spits out numbers, or are you talking
3  about generally how the subscription agreement works
4  and what the price is each year?
5    A.   Yeah, no.  When I say "pricing model," I
6  mean the pricing terms in the contract.
7    Q.   Now I understand.  That's where --
8    A.   Oh, okay.
9    Q.   We were like two ships passing in the night.
10    A.   Oh, okay.  I wasn't sure --
11    Q.   Are you aware of any internal pricing model
12  at New Era?
13    A.   Oh, no.  No.
14    Q.   Okay.  That was my -- That was my confusion.
15  Thank you.
16    A.   Okay.
17    Q.   So does Ticketmaster or Live Nation have
18  internal discussions -- just yes or no -- about the
19  subscription pricing model with New Era?
20    A.   Yeah, I had discussions with our chief
21  financial officer, informing her of the model.
22    Q.   So you had discussions with business people
23  at Ticketmaster and Live Nation about the subscription
24  pricing model?
25    A.   Not a discussion.  More informing our CFO

Page 104

1  that what -- that we had signed a subscription
2  agreement and a payment would need to be paid.
3    Q.   And when did you inform the CFO of that?
4    A.   Probably right before we signed the
5  agreement, making sure she was on board to pay the
6  subscription cost.
7    Q.   Did you inform the CFO because you needed
8  authorization from the CFO for something, or was it
9  more of a heads-up?
10    A.   Authorization under our financial
11  requirements for the company.
12    Q.   And what was it that triggered the
13  authorization?  Just help me understand that.
14    A.   I need approval from our CFO before entering
15  into an agreement that is above a certain threshold in
16  cost.
17    Q.   What's the threshold?
18    A.   It depends on the agreement.  Settlement
19  agreements are different than contracts.  I believe
20  contracts like this are, I believe, $250,000.
21    Q.   So because it's ▮▮▮▮▮▮ for the first year
22  of the subscription agreement, you needed
23  authorization from Live Nation's CFO to enter it?
24    A.   Correct.
25    Q.   And authorization was given?

Page 105

1    A.   Yes.
2    Q.   Were there e-mail communications about
3  those?
4    A.   I believe I sent an e-mail to our CFO, Kathy
5  Willard, yeah, seeking authorization.
6    Q.   Now, previously, remember when you were
7  telling me that Live Nation and Ticketmaster used to
8  use JAMS?
9    A.   I do remember that.
10    Q.   Did you ever need authorization from the CFO
11  to enter into an agreement with JAMS?
12    A.   Ticketmaster did not have an agreement with
13  JAMS.
14    Q.   Was there any point at which Ticketmaster or
15  Live Nation needed authorization from the CFO with
16  respect to anything with JAMS?
17    A.   Yes.  Before paying their hefty fees for
18  arbitrations, yes.
19    Q.   I mean, were there specific examples of
20  where that happened, or is that just more of a -- more
21  of a general thing?
22    A.   No, just in general.
23    Q.   I mean -- Okay.  Was there a recent time
24  where you recall having to go to the CFO to get
25  authorization for something with respect to JAMS?

Page 106

1    A.   With respect to a payment being made to
2  JAMS?
3    Q.   Yeah.
4    A.   Yeah.  A recent settlement.
5    Q.   Oh, okay.  Was that after -- I assume that
6  was before switching to New Era?
7    A.   No.
8    Q.   Was this a non-consumer case, then, such
9  that it was not subject to the terms of use?
10   A.   Yes.
11   Q.   Does Live Nation or Ticketmaster still use
12 JAMS for non-consumer arbitrations?
13   A.   In limited circumstances, yes.
14   Q.   Like what?
15   A.   Employment cases that have been pending for
16 some time.
17   Q.   Let me ask you this:  Live Nation and
18 Ticketmaster, are they generally transferring their
19 ADR needs to New Era as opposed to JAMS or other
20 providers, or does New Era more handle the consumer
21 disputes?
22   A.   Generally making -- We're generally making
23 the switch.
24   Q.   Are there cases, that are not legacy cases,
25 that predate the switch to New Era, that Live Nation

Page 107

1  and Ticketmaster use JAMS for?
2    A.   You mean do we have any existing pending
3  JAMS arbitrations right now?
4    Q.   I'm actually -- I'm kind of asking the
5  opposite.
6         I'm asking if Live Nation or Ticketmaster
7  have begun or been involved in any JAMS arbitrations
8  that started after July 2021.
9    A.   I can't recall.  I believe -- I can't recall
10 specifically the dates.
11   Q.   I mean, in general, does Live Nation or
12 Ticketmaster still use JAMS sometimes, even after
13 switching to New Era in the terms of use?
14   A.   Yes.
15   Q.   And you mentioned this a little bit before,
16 but like what would those circumstances be?
17        Would it be an agreement with an arm's
18 length counterparty that calls for JAMS, or something
19 else?
20   A.   With JAMS specifically, in the last year or
21 two, I can recall a couple of employment cases, as I
22 had mentioned.
23   Q.   And why does Live Nation or Ticketmaster use
24 JAMS for employment cases?
25        MR. HUSENY:  Objection.

Page 108

1         THE WITNESS:  Because that is the legacy
2  provider that's designated in our employment
3  contracts.
4    Q.   BY MR. SEARS:  And you say "legacy."
5         Is it still designated in the employment
6  contracts, or have those switched to New Era?
7    A.   I don't believe -- I believe we made the
8  switch, but I -- my colleague handles the employment
9  contracts, and I can't recall if she made the switch.
10   Q.   Okay.  What I'm trying to get at here is:
11 Is Live Nation or Ticketmaster generally sending all
12 new cases to New Era, or are there new arbitrations
13 that still get filed that Live Nation or Ticketmaster
14 are using JAMS for?
15   A.   I see where you're getting at, and I feel
16 like I've answered it.
17        So we have had arbitrations filed through
18 JAMS because we have employees who have been with the
19 company and signed their contract longer than two
20 years ago, or, you know, a while ago.  Those are run
21 through JAMS.  I don't know how else to answer that.
22   Q.   Okay.  I mean, does JAMS do a capable job of
23 handling those cases?
24   A.   Incredibly expensive.
25   Q.   And is that, what, arbitrator fees or

Page 109

1  something else?
2    A.   Yes.  The fees to use JAMS can run up to
3  $200,000 for one arbitration.
4    Q.   Okay.  And the -- So the subscription
5  pricing under the subscription agreement is ▇▇▇▇▇
6  for the first year?
7    A.   Correct.
8    Q.   How is that number arrived at by Live Nation
9  and New Era?
10   A.   That was the price that New Era gave us,
11 that said, "This would be the price based on your
12 historical arbitration figures."
13   Q.   I mean, what do you mean by "historical
14 arbitration figures"?  The number of arbitrations
15 against Live Nation and Ticketmaster?
16   A.   Yes.
17   Q.   And how, if at all, did that affect the
18 price as you understand it?
19   A.   That I don't know.  That's New Era.  That
20 was an internal New Era decision.  I -- We weren't --
21 I wasn't a part of those discussions internally at
22 New Era.
23   Q.   But were there back-and-forth discussions
24 between the Latham litigation team and New Era about
25 subscription pricing?

Page 110

```
 1    A.    There -- There were, yes.
 2    Q.    And did they haggle back and forth on the
 3  price term?
 4    A.    I don't believe so.  I believe New Era said,
 5  "This is the price," and we accepted it.
 6    Q.    So you still have this draft of the
 7  subscription agreement in front of you?
 8    A.    Yes.
 9    Q.    If you just -- If you turn to the last page
10  of the subscription agreement, so not the other
11  attachment in the e-mail but the subscription
12  agreement, which is Bates number ending 197.
13        Let me know when you're there.
14    A.    Okay.  I'm there.
15    Q.    All right.  Do you see there's a section on
16  pricing here?
17    A.    Yes.
18    Q.    And it's blank in this draft?
19    A.    Yes.
20    Q.    This is before there had been discussions
21  about price?
22    A.    Well, I don't know if this was before
23  there'd been discussions.  I just know there's no
24  price here.
25        MR. SEARS:  Okay.  I'm going to mark our
```

Page 111

```
 1  next exhibit.
 2        THE STENOGRAPHIC REPORTER:  Exhibit 10.
 3        (Exhibit 10 marked.)
 4    Q.    BY MR. SEARS:  Exhibit 10 is a document
 5  bearing Bates number NEWERA_000432.
 6    A.    Okay.  I have it open.
 7    Q.    Okay.  Ms. Tobias, do you see that this is
 8  an e-mail from June 2nd, 2011, from Mr. Mulrooney to
 9  the Latham litigation team, with a couple of other
10  New Era folks copied?
11    A.    June 2nd, 2021.  Yes, I see it.
12    Q.    And it's attaching an updated subscription
13  agreement draft; right?
14    A.    Correct.
15    Q.    Now, is this a draft that you reviewed
16  before?
17    A.    Oh, I couldn't tell you.  Same as before, I
18  could not tell you which -- what -- which of these
19  drafts.  I can't tell the difference between this
20  draft and the prior draft, without comparing every
21  word.
22    Q.    But as you told me before, you didn't look
23  at the drafts when preparing for your deposition?
24    A.    Not in -- Not in detail like this, no, not
25  to know the differences among the drafts.
```

Page 112

```
 1    Q.    I mean, did you -- I'm not trying to be
 2  pedantic, but did you look at them at all?
 3        I understood you hadn't reviewed the
 4  drafts --
 5    A.    No.
 6    Q.    -- to prepare for your deposition.
 7        Was it a cursory review when you had the
 8  document, or you just didn't look at it?
 9    A.    I didn't look at them.
10    Q.    Why don't you turn to page bearing Bates
11  number 446.  It's near the end of the document.
12    A.    Sorry.  Do you have a question?
13    Q.    Yeah.  Are you there?
14    A.    Yeah, I'm here.
15    Q.    Oh, okay.  Great.  I'm going to ask you
16  about pricing.
17        Do you see the section about "pricing and
18  refunds"?
19    A.    Yes.
20    Q.    Now, here there's a mention of a
21  subscription fee.
22        Do you see that?
23    A.    Yes.
24    Q.    That's what we were talking about earlier?
25    A.    Yes.
```

Page 113

```
 1    Q.    And it's an annual fee and it's bracketed as
 2  a range of          to         ; right?
 3    A.    Yes.
 4    Q.    I mean, what's your understanding of what
 5  those numbers mean in this draft?
 6    A.    I don't have one.  My -- My guess is that
 7  they're saying that the range would be somewhere
 8  between          and          .
 9    Q.    Okay.  So it wasn't like they just said,
10  "The price is          ."  They actually came to the
11  Latham litigation team with a range?
12    A.    I don't know.
13    Q.    Which is not something you're prepared to
14  testify about?
15    A.    Specifically whether they came to Latham
16  with a range?  I'm prepared to testify that that's --
17  Yes, that's my understanding.  I don't -- I can't tell
18  you -- Yeah, no.
19        Okay.  I do know that they -- they must have
20  -- that they did come to Latham with a range, that'd
21  it be somewhere within this area, and that New Era
22  wanted to see our historical arbitration figures to
23  determine where we would fall in that range.
24    Q.    Okay.  I'm just asking -- Before, I thought
25  you had told me that they had started with the
```

Page 114

1    █████ number, and it looks from this like it was
2    really more of a range.
3         Is your understanding that it was more of a
4    range?
5    A.   It is now, looking at this document.  I just
6    know the price they gave us was █████.
7    Q.   Did you have discussions with Latham -- just
8    yes or no -- about the pricing for the subscription
9    agreement?
10   A.   Yes.
11   Q.   Do you know how it came to be that the
12   subscription agreement went from a range of █████
13   to █████ to a final number of █████?
14   A.   Yes.  That was based on their review of our
15   historical data of arbitrations, the number of
16   arbitrations filed.
17   Q.   The price was calibrated based on the number
18   of arbitrations filed against Latham -- or, excuse me
19   -- against Live Nation and Ticketmaster?
20   A.   Yes.
21   Q.   And that was something New Era did?
22   A.   Yes.
23   Q.   You don't know how they did it, but you know
24   they did it?
25   A.   Yes.

Page 115

1    Q.   I mean, at any point, did Latham ask them
2    how they were coming up with those numbers, as best
3    you know?
4    A.   I don't -- I don't know.
5    Q.   You're just not sure?  It's not something
6    you covered in deposition prep?
7    A.   I -- Yeah, I don't know.  We didn't cover
8    it.  I don't know how -- whether Latham asked them how
9    they came up with that figure.
10   Q.   So you don't really know the history of
11   getting from the █████ to █████ range to the
12   final figure of █████?
13   A.   No -- No, I do know the history.  You were
14   asking me additional --
15        The history is this:  New Era said that they
16   determine the pricing for any particular subscription
17   agreement based on the number of arbitrations that
18   have been filed against a company or that a company
19   has been involved in over a specified period of time.
20        They said the range was somewhere, as you
21   see here, between █████ and █████.  They asked
22   us for those numbers, we provided them, and they came
23   back with a number of █████.
24        Beyond that, how New Era on their end
25   figured █████ was the right number based on our

Page 116

1    arbitration history, that's a question for New Era.
2    We have no insight into that.
3    Q.   Okay.  But, to the best of your
4    understanding, it was based largely or at least
5    somewhat on the historical data about the number of
6    arbitrations involving Live Nation and Ticketmaster?
7    A.   It was based entirely on that.
8    Q.   And that's data that Live Nation and
9    Ticketmaster through Latham provided to New Era;
10   right?
11   A.   Yes.
12   Q.   It affected the pricing for the subscription
13   agreement?
14   A.   It didn't just affect it; it determined the
15   price.
16   Q.   But -- And that's data that you pulled
17   together for this purpose; right?
18   A.   Yes.  We've discussed that ad nauseam.  Yes.
19   Q.   But you can't tell me what the data shows,
20   sitting here today?
21   A.   No.  I'll tell you it varies.  It varied
22   over, you know, each year; the number changed very
23   significantly.  But I can't recall with specificity
24   what the numbers look like on any given -- in any
25   given year.

Page 117

1    Q.   Can you flip back a couple pages to Bates
2    number 442, and just let me know when you're there.
3    A.   I'm there.
4    Q.   Do you see that there's a "governing law,
5    submission to jurisdiction" section?
6    A.   Yes.
7    Q.   Do you see that the gist of this is that
8    this is proposing that disputes involving the
9    agreement will be resolved through New Era?
10   A.   Yes.
11   Q.   Now, that's a term that was changed in the
12   final draft; right?
13   A.   Yes.
14   Q.   Why?
15   A.   Why was it changed?  We didn't agree with
16   that provision.
17   Q.   Why not?
18   A.   We didn't like it.
19   Q.   Why didn't you like it?
20   A.   I'm not going to tell you what my -- I mean,
21   Sadik, I'm not willing to talk about how -- go into
22   that.
23        MR. HUSENY:  That's correct.
24        Objection.  Privileged.
25   Q.   BY MR. SEARS:  Okay.  So just to be clear:

Page 118

1  You won't tell me why Live Nation and Ticketmaster
2  didn't want to use New Era as the platform to resolve
3  any disputes about the subscription agreement?
4        MR. HUSENY:  Same objection.
5        THE WITNESS:  Yeah, that would be disclosing
6  my -- my own thought process as counsel.
7     Q.   BY MR. SEARS:  It was a legal concern or a
8  legal issue?
9     A.   This is a legal agreement, yeah.  It's a
10 contract.
11    Q.   Give me a moment.
12         If you'll look at page Bates number 440.
13 Just let me know when you're there.
14    A.   Okay.  I'm there.
15    Q.   Do you see the term and termination period?
16    A.   Yes.
17    Q.   Is that -- That's blank here; right?
18    A.   Yes.
19    Q.   It hadn't been decided yet?
20    A.   Looks like it had not been finalized, yes.
21    Q.   And did Live Nation and Ticketmaster have
22 discussions about what the term of the subscription
23 agreement would be?  Just yes or no.
24    A.   Yes.
25    Q.   Would you consider those discussions

Page 119

1  privileged?
2     A.   Yes.  They were discussions I had, yes.
3     Q.   Now, I'm trying to move us along here, so
4  let me just -- let me just tell you:  My understanding
5  is that it's blank here, there's another agreement
6  where it's ten years, and it ultimately ends up being
7  five years.
8          As a factual matter, does that sound right?
9     A.   That's my recollection.
10    Q.   But I take it you won't tell me, on the
11 basis of privilege, how it came to be that it went
12 from blank to ten years to five years?
13    A.   No.
14    Q.   You won't tell me how Live Nation and
15 Ticketmaster ultimately settled on a term of five
16 years for the subscription agreement?
17         MR. HUSENY:  Objection.  To the extent
18 you're asking her about internal discussions, I think
19 that's correct; but your questions are now -- are now
20 vague.
21    Q.   BY MR. SEARS:  Well, let me just ask you
22 this:  I mean, did Live Nation and Ticketmaster have
23 internal discussions about the term of the
24 subscription agreement?
25    A.   So what do you mean by "internal

Page 120

1  discussions"?
2          Do you mean did I have a discussion with
3  someone at Live Nation and Ticketmaster, as opposed to
4  Latham?
5     Q.   Yes.  I was really trying to address
6  Mr. Huseny's objection.  That was the word he used, so
7  hopefully we're all clear on it.
8     A.   So, no, I did not have a discussion with
9  someone internal at Ticketmaster or Live Nation about
10 this contract negotiation.
11    Q.   No discussions, period, with anyone at
12 Ticketmaster or Live Nation about the subscription
13 agreement?
14    A.   That's not what I said.  I said about the
15 negotiation of the agreement.  So, no, I did not have
16 internal discussions with anyone at my company about,
17 you know, negotiating the term, for example.
18    Q.   Let me ask you this:  You remember earlier
19 you told me that you did communicate with the CFO
20 about executing the agreement?
21    A.   Correct.
22    Q.   Was there anyone else that you talked to
23 about the subscription agreement?
24         I wasn't trying to characterize your
25 testimony.  My understanding was that the CFO was the

Page 121

1  only other person you talked to about it.
2          Was there -- Was there someone besides that?
3     A.   I would have informed my boss, our general
4  counsel, Michael -- Mike Rowles.
5     Q.   Anyone else that you talked about the
6  subscription agreement with at Live Nation or
7  Ticketmaster?
8     A.   That I talked about -- talked about it with,
9  that suggests like in-depth conversations about the
10 substance?  No.  But our prior company controller,
11 Brandy Lecoq, I let her know.  She was in
12 communications with Kathy Willard and I about getting
13 a payment set up and getting approval for payment
14 after the agreement had been executed or just prior
15 thereto.
16    Q.   Okay.  Wait.  Let me just get this straight.
17         So you didn't talk to anyone at Live Nation
18 or Ticketmaster about the negotiation of the
19 agreement; is that right?
20    A.   No.
21    Q.   No, you didn't talk to anyone at Live
22 Nation?
23    A.   I'm sorry.  That's -- I'm sorry.  You're
24 correct, I did not, about the negotiation of the
25 agreement, yeah.

Page 122

1    Q.   But at various points you talked to
2  Mr. Rowles, the CFO, and the company controller just
3  about the agreement generally?
4    A.   Correct.
5    Q.   I take it the discussion with Mr. Rowles was
6  legal in nature?
7    A.   Oh, yes.  He's a lawyer.
8    Q.   And so you're not going to tell me about
9  that one?
10   A.   No.
11   Q.   But the ones with the controller and the CFO
12 were business in nature?
13         MR. HUSENY:  Objection.
14         THE WITNESS:  Yeah, no, they were not.  They
15 were me providing legal advice and -- to my client,
16 our CFO.  They were not -- They were absolutely legal
17 in nature as well.
18   Q.   BY MR. SEARS:  All I mean is that the one to
19 the CFO was about getting approval for the
20 subscription agreement, the one to the controller was
21 about wiring the payment; is that right?
22   A.   The communication with our CFO and the
23 controller was definitely -- it was a privileged
24 communication explaining what we were doing and asking
25 for financial approval to execute and pay.

Page 123

1    Q.   I see.  And just to close the loop on this,
2  though:  But your view is that any of the discussions
3  about the substance of the subscription agreement are
4  privileged; is that fair?
5    A.   No.
6    Q.   Okay.  Well, I mean, let me just take a few
7  provisions.
8         You believe that the back-and-forth or the
9  -- Let me ask it this way:  You believe that the
10 reasons for making changes, if any, to the term of the
11 agreement are privileged?
12   A.   Yes.
13   Q.   You believe that the reasons for arriving at
14 a pricing number, other than what you've told me about
15 New Era's model for doing so, are privileged?
16   A.   No, I did not testify to that.  I said I
17 don't know how they arrived, what algorithm or
18 whatever their -- their own pricing, how they
19 determined internally that ▮▮▮▮▮▮ a year was the
20 price for Live Nation and Ticketmaster.  That's not
21 privileged; I just don't have that information, nor
22 would I.
23   Q.   Let me ask you this:  So the way it worked
24 is you paid New Era ▮▮▮▮▮ for the first year of the
25 subscription agreement; right?

Page 124

1    A.   Yes.
2    Q.   Am I correct that no consumer arbitrations
3  were filed during that year?  I know there was one
4  later, but during that year there were none?
5    A.   Through New Era, correct.  That's my
6  recollection.
7    Q.   Do Live Nation and Ticketmaster consider it
8  a good deal to pay ▮▮▮▮▮ to an ADR provider that
9  doesn't administer any arbitrations in a year?
10        MR. HUSENY:  Objection.  Vague and
11 privileged.
12        (Reporter request.)
13   Q.   BY MR. SEARS:  Do Live Nation and
14 Ticketmaster consider it a good deal to pay ▮▮▮▮▮
15 to an ADR provider for a year in which that provider
16 administers no arbitrations for them?
17        MR. HUSENY:  Objection.  Vague and ambiguous
18 and calls for privileged information.
19        MR. SEARS:  Are you instructing the witness
20 not to answer?
21        THE WITNESS:  I think I can answer as to the
22 fact -- Sadik, let me know if that's okay -- as to
23 what the term covers.
24        MR. HUSENY:  Sure.
25        THE WITNESS:  Okay.  I won't testify to what

Page 125

1  I consider.  My considerations are my thought process.
2  But it is an agreement that covers a term of a number
3  of years.  Some years, there are many arbitrations
4  filed against Ticketmaster and Live Nation; some
5  years, there aren't.  It's not just a one-year
6  contract.  Those are the facts that I'll testify to.
7    Q.   BY MR. SEARS:  But as you told me earlier,
8  it is a contract that Live Nation can elect not to
9  renew after each year?
10   A.   Yes.
11   Q.   And Live Nation elected to renew it in 2022;
12 is that right?
13   A.   Yes.
14   Q.   And it paid more that year than the previous
15 year; right?
16   A.   Yeah, the price goes up every -- the first
17 few years, by a percentage.
18   Q.   What's the reasoning for the price going up
19 every year, if any?
20   A.   That's New Era's -- That was the way they --
21 they built it.  I don't know what their reasoning is.
22   Q.   I mean, did Live Nation and Ticketmaster
23 consider that a good term or a fair term for them?
24        MR. HUSENY:  Objection.  Privileged.
25   Q.   BY MR. SEARS:  And do you recall the

Page 126

1  approximate size of the payment in 2022 when Live
2  Nation renewed the contract?
3       A.   Yes.  It was ████.
4       Q.   Great.  You've just saved us an exhibit.
5            So it was up by about ████ and change?
6       A.   I believe it goes up by ███ per -- up by ██
7  percent of the prior year; so, yes.
8       Q.   So why did Live Nation and Ticketmaster
9  elect to renew the subscription agreement at a higher
10 price, when New Era had not administered any
11 arbitrations in the prior year?
12           MR. HUSENY:  Objection to form.
13           THE WITNESS:  Yeah, you're asking for a why
14 there, that's privileged.
15      Q.   BY MR. SEARS:  So just so I've got that
16 right:  You won't tell me why Live Nation and
17 Ticketmaster renewed the agreement?
18           MR. HUSENY:  Objection.  Mischaracterizes
19 facts.  Objection to form.
20           THE WITNESS:  The agreement, as you'll see
21 from the terms, it automatically renews.  There was no
22 -- We didn't make an affirmative election; we just
23 decided not to terminate it.
24      Q.   BY MR. SEARS:  But you won't tell me why
25 Live Nation chose to proceed and not to terminate it?

Page 127

1       A.   No.
2       Q.   Because you're asserting privilege over
3  that?
4       A.   Correct.
5       Q.   And you also, presumably, will not tell me
6  the reason that Live Nation entered into the agreement
7  in the first place?
8       A.   No.
9       Q.   Because you consider that privileged?
10      A.   Yes.  And it also isn't a topic of the
11 deposition.
12      Q.   Okay.  We -- Well, I mean, but you would
13 also object to it on privilege?
14      A.   Yes.
15           MR. HUSENY:  Well, I've objected repeatedly
16 to that same line of questioning on privilege, Will,
17 so -- for the record.
18           MR. SEARS:  Oh, believe me Sadik, I heard
19 you.
20           MR. HUSENY:  You keep coming back to it, so
21 I wanted to make it clear as well.
22           MR. SEARS:  You've made yourself extremely
23 clear.  Let's -- Next exhibit.
24           MR. HUSENY:  I'm so sorry.  It's -- We've
25 been going about an hour and 15 minutes, and I am sure

Page 128

1  Ms. Hoover would like a little bit of a break.  I
2  actually could use one, if that's okay, and perhaps
3  the witness can as well.
4            MR. SEARS:  That's fine.
5            And, Ms. Hoover and Ms. Tobias, would you
6  like a break?
7            THE WITNESS:  I'd love one.
8            THE STENOGRAPHIC REPORTER:  Yes, please.
9            MR. HUSENY:  How do you -- How do you guys,
10 or you all, want to do this?  I mean, it's a lunch
11 time.  If the witness would like lunch, we can take
12 it.
13           I have to tell you, I really -- Well, let's
14 go off the record.
15           MR. HUSENY:  Okay.
16           THE STENOGRAPHIC REPORTER:  We're off the
17 record.
18           (Lunch recess.)
19           THE STENOGRAPHIC REPORTER:  We're back on
20 the record.
21      Q.   BY MR. SEARS:  Good afternoon.  Welcome
22 back, Ms. Tobias.
23           Ready to resume your deposition?
24      A.   I am.
25      Q.   Did you talk to anyone on the break?

Page 129

1       A.   I talked briefly to Sadik and Robin.
2       Q.   Anyone else?
3       A.   No.
4       Q.   Okay.  So I believe I introduced the next
5  exhibit before we went on the break, but it looks like
6  it's disappeared in the chat, so I'm going to drop it
7  in again to make sure everyone gets it.
8            Let me know when you have it, Ms. Tobias.
9       A.   Okay.  It's just downloading.
10           MR. SEARS:  And while that's happening:
11 This is a document bearing Bates number NEWERA_000398.
12           THE STENOGRAPHIC REPORTER:  Confirm the
13 exhibit number, counsel.
14           MR. SEARS:  I want to say 11.
15           THE STENOGRAPHIC REPORTER:  Thank you.
16           (Exhibit 11 marked.)
17           THE WITNESS:  I have it open.
18      Q.   BY MR. SEARS:  Okay.  And do you see this is
19 a June 9th, 2021, e-mail about the New Era contract?
20      A.   Yes.
21      Q.   And it's from Latham to New Era?
22      A.   Yes.
23      Q.   And attached is an updated draft of the
24 subscription agreement?
25      A.   I see it attaches a draft, yes.

Page 130

1    Q.   Is this a draft that you remember reviewing?
2    A.   I don't recall which specific drafts I've
3  reviewed.
4    Q.   Okay.  So you wouldn't know what the -- what
5  changes were made in this draft or the reasoning for
6  them?
7    A.   No.
8    Q.   And if you look at section 11 on page 412 --
9  Let me know when you're there.
10   A.   Sorry, I just skipped right past it.
11  Section 11.  Oh, okay.  So, yeah, on page 411?
12   Q.   Yeah, I'm looking at 11(f), actually, which
13  is in 412.
14   A.   Okay.
15   Q.   This is the governing law section.  Remember
16  we talked about that?
17   A.   Yes.
18   Q.   And, in this draft, it's been edited so that
19  New Era is no longer the designated forum for
20  resolving disputes about the agreement.
21       Do you see that?
22   A.   Let me just read through it.  Yes, I see
23  that.
24   Q.   And a decision, in your view, to make that
25  change or not use New Era as the forum for dispute

Page 131

1  resolution was a privileged one?
2    A.   Yes.
3    Q.   If you'd turn to the statement of work,
4  which is Exhibit A, at page ending 417.
5    A.   Yes.
6    Q.   Do you see that the pricing term has now
7  been filled in for ▮▮▮?
8    A.   Yes.
9    Q.   And, as we've discussed, it ended up being
10  more than that, ▮▮▮.
11   A.   Correct.
12   Q.   Was it New Era that pushed for the price to
13  be higher?
14   A.   Yes.  We negotiated, tried to get them to
15  come down to ▮▮▮, but their price was ▮▮▮.
16   Q.   And what, if anything, can you tell me about
17  those negotiations and their substance?
18   A.   It was just your typical pricing
19  negotiation.  We preferred to pay ▮▮▮ and they
20  came back with the price as ▮▮▮.
21   Q.   And what reasoning, if any, did they give
22  for keeping it at ▮▮▮?
23   A.   I don't recall their reasoning.  It was just
24  that was the price.
25   Q.   And there's also a standard mass arbitration

Page 132

1  per-case filing fee of $300.
2       Do you see that?
3    A.   Yes.
4    Q.   Now, is that a price that New Era came up
5  with or that Live Nation or Ticketmaster came up with?
6    A.   New Era came up with it.
7    Q.   And do you -- What was their reasoning, if
8  any, for that price as opposed to another one?
9    A.   Oh, that's a question for New Era.  I don't
10  know.
11   Q.   You just don't know?
12   A.   No, that's a -- New Era made that decision.
13   Q.   Now, under the Live Nation and Ticketmaster
14  terms of use, there is a default $300 filing fee for
15  New Era arbitration.
16       Am I right about that?
17   A.   Yes.  Unless the consumer can't afford to
18  pay the $300 filing fee, in which case we cover it.
19   Q.   Now, that $300 filing fee, who came up with
20  that number, New Era or Live Nation and Ticketmaster?
21   A.   It's the New Era's price.  As I
22  testified, that is their price, the filing fee for
23  New Era that they came up with.
24   Q.   Oh, so is the standard mass arbitration
25  per-case filing fee of $300 here, that's the same

Page 133

1  thing as the $300 in the terms of use?
2    A.   Oh, I'm sorry.  I misunderstood your
3  question.
4       Yeah, the -- a filing fee that New Era
5  requires, my understanding is, for all arbitrations,
6  whether it's a mass arbitration or an individual
7  arbitration, is a $300 filing fee.
8    Q.   Okay.  So New Era came up with that number?
9    A.   Yes.
10   Q.   MR. SEARS:  Okay.  I'm going to introduce
11  our next exhibit, which I believe is Exhibit 12.  It's
12  a document bearing Bates number NEWERA_000375.
13       (Exhibit 12 marked.)
14   Q.   BY MR. SEARS:  Just let me know when you
15  have it, Ms. Tobias.
16   A.   I have it.
17   Q.   Okay.  You see this is now an e-mail back
18  from New Era to the Latham litigation team?
19   A.   I see that.
20   Q.   It's dated June 11th, 2021?
21   A.   Yep.
22   Q.   It's attaching another updated draft of the
23  subscription agreement?
24   A.   Yep.
25   Q.   Do you recall reviewing this one at any

Page 134

1    point?
2         A.   No.
3         Q.   So you don't know, sitting here today, what
4    the -- what the changes made in this version were?
5         A.   No.
6         Q.   Now, do you see this e-mail from
7    Mr. Mulrooney?
8         A.   Yes.
9         Q.   And one of the things he said is:  "We also
10   thought we'd include a quick issues list of the
11   remaining open items."  Right?
12        A.   Right.  Yeah, it says that.
13        Q.   And one of them is renewal; right?
14        A.   Yep.
15        Q.   He says:  "We'd like to discuss our
16   rationale behind our changes and potential alternative
17   options."  Right?
18        A.   Right.
19        Q.   Do you know what those changes were?
20        A.   No.
21        Q.   Do you know what the potential alternative
22   options were?
23        A.   No.
24        Q.   Then he says:  "Price.  Again, to discuss
25   rationale, break-even, and Latham discount points."

Page 135

1              Right?
2         A.   Right.
3         Q.   Do you know what "Latham discount points"
4    refers to here?
5         A.   I have no idea.
6         Q.   That's not something you've ever discussed
7    with Latham?
8         A.   No, I've never seen that.
9         Q.   You've never seen this document before?
10        A.   No, or discussed Latham discount points.  I
11   don't know what that is.
12        Q.   This is not an e-mail or a document that you
13   reviewed in preparing for your deposition?
14        A.   Not that I recall.
15        Q.   And it's not one you recall being forwarded
16   to you?
17        A.   Not that I recall.
18             MR. SEARS:  Okay.  Introduce our next
19   exhibit.  This is Exhibit 13.  This is a document
20   produced by Ticketmaster and Live Nation, bearing
21   Bates number TM00000032.
22             (Exhibit 13 marked.)
23        Q.   BY MR. SEARS:  Let me know when you have it.
24        A.   I have it.
25        Q.   Is this the final subscription agreement?

Page 136

1         A.   Yes.
2         Q.   If you scroll to the last page, is that your
3    signature?
4         A.   That's my DocuSign, yes.
5         Q.   You signed it on behalf of Live Nation?
6         A.   Yes.
7         Q.   And this one you did review?
8         A.   Yes.
9         Q.   But you won't disclose your mental
10   impressions or views about the agreement, because you
11   believe those are privileged?
12        A.   Yes.
13        Q.   Okay.  Now, we've talked earlier about
14   whether Live Nation and Ticketmaster did an analysis
15   of New Era's rules and procedures.
16             Do you remember that discussion?
17        A.   Yes.
18        Q.   And to the extent an analysis was done, I
19   understand you believe it was privileged?
20        A.   Correct.
21        Q.   And you won't tell me about it?
22        A.   I never even said an analysis was done; but,
23   no, I won't tell you about our thought process or the
24   work product that we embarked on, that I embarked on.
25        Q.   Just to be clear:  Was there an analysis

Page 137

1    done?
2         A.   I don't recall.
3         Q.   You mentioned work product that you embarked
4    on.
5              Was there work product on this subject, even
6    if you won't disclose its substance?
7         A.   On the subject of the -- We've already gone
8    over this and I -- So what was your question?  Whether
9    -- I don't know why we're rehashing this.
10        Q.   Well, you just mentioned that there was work
11   product you embarked on.  I'm just --
12        A.   I said I won't discuss any of my thought
13   process, any analyses I may or may not have done.
14             I don't recall if there was an analysis on
15   their rules and procedures.  As I've testified
16   clearly, I read their rules and procedures.
17        Q.   Well, what I'm going to do is I'm going to
18   ask you some questions about their rules and
19   procedures.
20             I mean, in general, if I ask you about a
21   term and ask you whether you think it's fair or
22   reasonable, would you consider that privileged?
23        A.   Yes.  I won't answer those questions.
24        Q.   Okay.  I'm going to do a couple, just so we
25   have examples; but I understand where you're going

Page 138

1  with this.  So just bear with me, because this is --
2  this is what I have to do.
3          Understand?
4      A.   I understand, yeah.
5          MR. SEARS:  So I'm going to mark as our next
6  exhibit, Exhibit 14.  And this is a document entitled
7  "New Era ADR rules and procedures."
8              (Exhibit 14 marked.)
9      Q.   BY MR. SEARS:  Let me know when you have it.
10     A.   Not yet.  Sorry.  It doesn't want me to open
11 it.  I keep clicking.
12     Q.   It's okay.  Just take your time.
13     A.   There we go.  Okay.
14     Q.   Now, you have reviewed New Era's rules and
15 procedures; right?
16     A.   I have.
17     Q.   I'll represent to you that, as best as I can
18 understand it, this is the most recent current rules.
19         Fair enough?
20     A.   Fair.
21     Q.   No reason to disagree with that, based on
22 skimming through them now?
23     A.   I have not skimmed through them.  I am not
24 going to agree or disagree with you.  I'll take your
25 word for it.  I have no idea if this is identical to

Page 139

1  the rules that are currently posted on their site.
2      Q.   Well, let me ask you this:  My understanding
3  is that their rules have -- and procedures have
4  changed from time to time.
5          Is that your understanding?
6      A.   I don't know.
7      Q.   When was the last time you recall reviewing
8  their rules and procedures?
9      A.   Prior to executing the subscription
10 agreement.
11     Q.   Do you remember we looked at an e-mail from
12 June 21st, 2021, about publishing the rules and
13 procedures?
14     A.   Yes.
15     Q.   So it would have been whatever version they
16 published then that you looked at?
17     A.   Yes.
18     Q.   Now, do you also remember that the
19 subscription agreement was signed the next day, June
20 22nd, 2021?
21     A.   Yes.
22     Q.   Did your entire review of New Era's rules
23 and procedures take place between June 21st and June
24 22nd, 2021?
25     A.   Yes.  I was aware generally about their

Page 140

1  procedures and what they -- you know, generally how
2  their -- their offering worked or how their platform
3  works; but my -- like a closer view of their rules and
4  procedures, yeah, it was June 21st, 22nd.
5      Q.   So the close review that you mentioned, you
6  did it between when the rules were published and when
7  you signed the contract?
8      A.   Yep.
9      Q.   And you said that you were generally -- you
10 were aware generally about their procedures before
11 that; right?
12     A.   Generally.
13     Q.   All right.  What was the general awareness
14 that you had about their rules and procedures?
15         MR. HUSENY:  Objection.  Vague.
16         THE WITNESS:  Yeah, can you clarify?  What
17 do you mean, what was my general --
18     Q.   BY MR. SEARS:  Well, you said you were
19 generally aware.
20         I mean, were there specific provisions that
21 you looked at?  Was there a certain part that you were
22 focused on?
23         What did you know about the rules and
24 procedures before you saw them?
25     A.   I was aware that they had rules and

Page 141

1  procedures governing mass arbitrations, that JAMS and
2  AAA and other arbitration providers don't have.
3      Q.   And what, if anything, did you know about
4  those rules and procedures?
5      A.   I knew that they have a system in place
6  where there's -- I believe there's a process by which
7  you can rank and strike neutrals, and there's a
8  bellwether process in place --
9      Q.   Let me ask you this --
10     A.   -- generally speaking.
11     Q.   It's not a memory test.  I'm just trying to
12 know what you as the witness and the 30(b)(6) know.
13         So I'm just going to ask you:  Sitting here
14 today, what's your understanding of the mass
15 arbitration rules that New Era has?
16     A.   I'm pretty sure I just -- Didn't I just tell
17 you?
18         MR. HUSENY:  Objection.
19         THE WITNESS:  Yeah.  I just answered the
20 question.
21     Q.   BY MR. SEARS:  Is there anything else?
22         You gave me a couple examples about rank and
23 strike process and the bellwether process.
24         I mean, is there anything else that you know
25 about them?

Page 142

1    A.    I mean, I'd have to refresh my recollection
2  and read them.  If you want to give me a minute, I'll
3  read them.
4    Q.    Well, we're going to do that in a second.
5          I just -- I want to know, you know, in
6  preparing for the deposition and from reviewing them
7  before, you mentioned a bellwether process, you
8  mentioned a rank and strike process.
9          What else, if anything, do you know about
10 the mass arbitration rules and procedures?
11         MR. HUSENY:  Objection.  Vague and
12 ambiguous.
13         THE WITNESS:  Moreover, this isn't a topic
14 of my deposition, so I didn't spend time memorizing
15 all the rules and procedures.  The last time I really
16 looked at this in depth was in June 2021.
17         If you want to ask me about them, let's go
18 over the rules.
19    Q.   BY MR. SEARS:  So we're going to do that in
20 a second, but just before that:  The only thing you
21 know, as of now, or the only thing you remember, is
22 that there's a rank and strike process and a
23 bellwether proceeding; is that fair?
24    A.    That's not fair.
25    Q.    Okay.  Why not?

Page 143

1    A.    Because I didn't say that's all I know.
2  You're completely mischaracterizing my testimony.
3    Q.    I'm simply asking questions.
4          What are the other things that you know
5  about the mass arbitration rules and procedures that
6  you haven't told me yet?
7          MR. HUSENY:  Objection.  Vague and
8  ambiguous.
9          If you have a specific provision you want to
10 ask her about, can you do that?
11         THE WITNESS:  Yeah.  Just ask me a question.
12    Q.    BY MR. SEARS:  I mean, is the answer to my
13 question there's no other -- there's nothing else you
14 can tell me about the mass arbitration rules and
15 procedures by New Era, other than the rank and strike
16 process and the bellwether process?
17    A.    I know generally about those processes.
18 Anything further, I -- let me look at it.  Give me
19 some time, I'll look at it.
20    Q.    It's right in front of you.  Let's -- Sure,
21 let's walk through a couple of them.
22    A.    Okay.
23    Q.    So let's turn to page 11.
24    A.    I'm there.
25    Q.    Okay.  Do you see at the top of the page, it

Page 144

1  says:  "All proceedings at New Era ADR are
2  time-limited with the following as expected timelines
3  as set forth above"?
4    A.    I read that, yeah.
5    Q.    Now, is that something you were aware of
6  before this deposition?
7    A.    I don't recall.
8    Q.    Then it lists a few of the things New Era
9  offers, like mediation and expedited arbitration.
10         Do you see that?
11    A.    I see those orders, yes.
12    Q.    Do you see that it says that expedited
13 arbitrations -- that it goes on to explain that they
14 will be time-limited in 45 to 60 days from
15 appointment/selection of a neutral?
16    A.    Yes.
17    Q.    Okay.  Is that something you knew before
18 this deposition just now?
19    A.    I don't recall whether I was aware of that
20 specific rule.  I read them all, so probably.
21    Q.    Okay.  Now, and let me ask you this:  Now,
22 Live Nation and Ticketmaster's terms of use specify
23 that arbitrations through New Era will go through the
24 expedited arbitration process; is that right?
25    A.    We have -- I'd have to -- You'd have to pull

Page 145

1  those up and show me.
2    Q.    Do you have those handy?
3          MR. SEARS:  Yeah, I do.  Give me one second.
4          We'll mark our next exhibit.  Please keep
5  the other one open, Ms. Tobias, but we'll just look at
6  this one for a moment.
7          I'm marking as our next exhibit, which I
8  believe is 14, a document entitled "terms of use."
9          THE STENOGRAPHIC REPORTER:  Fifteen,
10 counsel.
11         MR. SEARS:  Oh, it's 15?  Thanks for keeping
12 me honest.
13         (Exhibit 15 marked.)
14    Q.    BY MR. SEARS:  So Exhibit 15 is
15 Ticketmaster's terms of use.
16         And, Ms. Tobias, you can look if you need
17 to, but I'll represent that we pulled these off the
18 website and I believe that they're the most recent
19 ones.
20         Does that look right to you?
21    A.    I'll take your word for it, if you took them
22 off our site, but...  That's all I can do here.
23    Q.    Well, they haven't been updated since July
24 2nd, 2021, have they?
25    A.    They have not.  But, again, you pulled these

Page 146

1 and you're putting a document before me and telling me
2 this is how you obtained them.  I'll take your word
3 for it.  I'm not going to tell you under oath that
4 these are the exact terms of use on our website.  I
5 didn't pull them from our site; you did.
6      Q.  Well, there's no tricks here.  If you want
7 to take a look at it, you can.  If you have any reason
8 to believe that they're not accurate, I'd like to
9 know.
10     A.  I would -- The only way I could -- I could
11 -- I'm not trying to be difficult, but I'm under oath
12 here.
13         If you want me to do a side-by-side
14 comparison based on me pulling up our terms of use
15 that are live on the website now and reading verbatim
16 whether or not what you're representing to be our
17 current terms of use is accurate, I'm happy to do
18 that.  If you want to ask a question about whether
19 that's my understanding of a specific provision,
20 whether that is our -- what our terms of use say now,
21 I'll answer them.  But I'm not going to just accept
22 your word that this is identical.  I don't -- We've
23 litigated against each other for too long.
24     Q.  Okay.  I'm asking what I thought was a
25 straightforward question.

Page 147

1        Let's just look at the top.  Do you see that
2 it says "last updated July 2nd, 2021"?
3     A.  Yep.
4     Q.  Okay.  That's the date they were last
5 updated; right?
6     A.  Correct.
7     Q.  Okay.  And, I mean, you can scroll through
8 if you want.
9        You don't see anything that looks wrong
10 here, do you?
11     A.  Do you have a question, Will?  I'm sorry.
12 I'm not --
13         MR. HUSENY:  Yeah, objection.
14         Objection.  She just said she took your word
15 for it that you pulled it from the website.  I think
16 that's all we need, Will.  If we can just go to the
17 questions.
18     Q.  BY MR. SEARS:  I was trying to ask what I
19 thought was a simple question, but I'll move on.
20         Why don't you go down to section 17, which I
21 believe is the part that deals with arbitration.
22         Am I right about that?
23     A.  Correct.
24     Q.  Okay.  Do you see that there's a reference
25 to New Era here?

Page 148

1     A.  Yes.
2     Q.  Do you see that it says at the bottom of the
3 page:  "Any arbitration will be administered by
4 New Era ADR in accordance with their virtual expedited
5 arbitration rules and procedures as well as any
6 applicable general rules and procedures except as
7 modified by the terms"?
8     A.  Yes.
9     Q.  Okay.  Am I correct, then, that the virtual
10 expedited arbitration rules and procedures are what
11 would govern an arbitration administered by New Era
12 involving Live Nation and a consumer?
13     A.  You're correct that that's what it says,
14 yes, and this is a mandatory arbitration provision.
15     Q.  Okay.  That's all I was trying to figure
16 out.
17        Let's go back to the New Era rules.  Can you
18 let me know when you have those out.
19     A.  Yes.
20     Q.  So do you remember we were looking at the
21 language about how "all proceedings at New Era are
22 time-limited, with the following as expected
23 timelines"?
24     A.  Yes.
25     Q.  The expected timeline for an expedited

Page 149

1 arbitration is 45 to 60 days; right?
2     A.  Yes.
3     Q.  From appointment and selection of a neutral?
4     A.  Yes.
5     Q.  So 45 to 60 days from the appointment or
6 selection of a neutral is the expected timeline for an
7 arbitration administered by New Era involving Live
8 Nation.
9        Am I right about that?
10     A.  This is what it says.  This is what their
11 rules say what an expedited arbitration is.
12     Q.  Okay.  Do you think that that's a reasonable
13 amount of time to do an arbitration for an antitrust
14 case against Live Nation?
15     A.  I'm not going to provide you with my
16 thoughts.
17     Q.  But you believe that's privileged?
18     A.  I know it's privileged.
19     Q.  Let me just -- Ms. Tobias, I promise, I'm
20 trying to get you out of here as fast as I can.
21        So let me just ask:  If I have any questions
22 about whether the timeline for a New Era expedited
23 arbitration is fair or reasonable or unconscionable,
24 would you view that all as privileged?
25     A.  Yes.

Page 150

1    MR. HUSENY:  I would object as privileged
2  and calling for legal conclusions in the first
3  instance, and then Ms. Tobias can answer your
4  question.
5    THE WITNESS:  Yes, all privileged.
6    Q.  BY MR. SEARS:  So you won't, on grounds of
7  privilege, answer questions about whether the timeline
8  for New Era or arbitration is reasonable or fair?
9    A.  I will not answer those questions, based on
10  privilege.
11    Q.  Do you see about halfway down the page, it
12  says:  "Neutrals are also expected to maintain these
13  time frames"?
14    A.  Can you point me on the -- to the section
15  you're referring to?
16    Q.  It's about -- It's subsection 5 on page 11,
17  right above "witnesses".
18    A.  Oh, I see that.
19    Q.  Okay.  And do you have a -- Let me ask you
20  this:  I mean, will you answer questions about whether
21  it's reasonable for New Era to expect neutrals to
22  maintain these time frames, or do you believe that's
23  privileged?
24    A.  I believe that's privileged.
25    MR. HUSENY:  I would object as privileged,

Page 151

1  yeah.
2    Q.  BY MR. SEARS:  Now, you mentioned a rank and
3  strike process earlier.
4    Do you remember that?
5    A.  Yes.
6    Q.  Do you -- If I were to ask you whether the
7  rank and strike process is fair or reasonable, you'd
8  view that as privileged?
9    A.  How -- What I think of it?  Yes, it's
10  privileged.  And it's also what JAMS does.
11    MR. HUSENY:  Yeah, and to your question
12  earlier, Will, I would object to all of these
13  questions about whether this lawyer for Live Nation
14  thinks these terms are fair and reasonable as
15  privileged and objectionable and calling for a legal
16  conclusion.
17    Q.  BY MR. SEARS:  And let me ask you this:  I
18  mean, you're the person at Live Nation that's most
19  familiar with its relationship with New Era and the
20  New Era rules and procedures; right?
21    A.  Yep.
22    Q.  There's not some business person that I
23  could go and ask whether the New Era rules were fair
24  and reasonable, that could give testimony on that?
25    A.  No.

Page 152

1    Q.  It's just you; right?
2    A.  It's just me, yes.
3    Q.  And you won't -- you won't tell me whether
4  any aspect of the New Era rules are fair or reasonable
5  or unconscionable, because you believe that's
6  privileged?
7    A.  Correct.
8    Q.  Okay.  I'm going to go through a couple more
9  examples just to make clear, but I think we're on the
10  same page.
11    You're not going to testify about whether
12  New Era rules are fair or reasonable or
13  unconscionable; right?
14    A.  For the fourth time:  No, I'm not.
15    MR. HUSENY:  Same objection as before.
16    Q.  BY MR. SEARS:  And you're also not going to
17  testify, on grounds of privilege, about whether it
18  would be reasonable to litigate an antitrust case like
19  this one under New Era's rules and procedures?
20    MR. HUSENY:  I'm going to -- Same objection
21  as before.  I'm also going to say, Will, I've let you
22  ask all these questions about rules and procedures,
23  that were never even listed as a topic in this
24  deposition notice.  You keep asking the same questions
25  on a topic you never even listed, and it's a topic

Page 153

1  asking for privileged information.
2    So, for all those reasons, I'm just going to
3  put that objection on the record.
4    MR. SEARS:  Okay.  Thank you.
5    Just two notes:  One, you were doing well on
6  speaking objections.  The speeches on the record
7  aren't getting us out of here any faster.
8    Two, I respectfully disagree on the notice;
9  but I'll ask my questions and make my record, and we
10  can take it up afterwards.
11    Q.  BY MR. SEARS:  So why don't you look to the
12  bottom of page 11, where it talks about discovery.
13    A.  Okay.
14    Q.  Do you see where it says:  "New Era ADR
15  operates on the premise that limitations on discovery
16  are one of the primary ways efficiencies are achieved
17  in arbitration, and discovery must be narrowly
18  tailored only to the information necessary to
19  advancing neutrals understanding the case"?
20    Do you see that?
21    A.  Yes.
22    Q.  And I take it you won't testify about
23  whether discovery limitations in New Era's rules and
24  procedures are fair or reasonable?
25    A.  I won't, for two reasons:  It's not a topic

Page 154

1  of this deposition, and it calls for privileged
2  information.
3      Q.   Even if we were -- Putting aside our
4  differences in views on topics, even if we were to
5  serve a new 30(b)(6) notice and bring you back, you
6  still would not testify on that?
7      A.   Absolutely not.
8      Q.   Okay.  And I believe we're actually looking
9  at the general rules here too.
10          Do you have an understanding that there are
11 also provisions about discovery and time frame within
12 the expedited arbitration rules for New Era?
13     A.   I don't recall.  You'd have to point them
14 out to me.
15     Q.   I can.  But if I were to ask you questions
16 about the expedited rules specifically, you would have
17 the same answer, that your view of whether they're
18 fair or reasonable is privileged?
19     A.   Yes.  My views on any of this are
20 privileged.  I'm in-house counsel for the company.
21     Q.   That would be true for the mass arbitration
22 rules as well?
23     A.   For any -- Anytime you're asking me about my
24 views, my opinions, my -- my legal thought and process
25 is absolutely privileged.

Page 155

1      Q.   And same -- you know, you talked about a
2  bellwether process earlier.
3          Your views on that, if any, you consider
4  privileged?
5      A.   Yes.
6      Q.   And you consider your discussions with
7  Latham about that privileged?
8      A.   Yes.
9      Q.   And your discussions with other people at
10 Live Nation or Ticketmaster are privileged?
11     A.   Yes.
12     Q.   Now, you mentioned a bellwether process.
13          Do you understand that, under New Era's mass
14 arbitration rules, there's a process whereby
15 bellwether cases are selected?
16     A.   Yes.
17     Q.   What's your understanding, if any, of what
18 happens after that under New Era's arbitration rules?
19          Not asking for privileged views; just
20 factually, what do you understand about how it works?
21     A.   I'd have to reread the rules.  Do you want
22 me to go there?
23     Q.   I'll jump ahead.  I would have some
24 questions about whether you think certain provisions
25 are fair or reasonable, but I take it you're just not

Page 156

1  going to answer those on grounds of privilege?
2      A.   Correct.
3      Q.   Are you aware there are also limitations on,
4  for example, the number of witnesses that can appear
5  at a hearing, under New Era's rules?
6      A.   You'd have to show me.  I don't recall.
7      Q.   But, I mean, if I were to ask you about, you
8  know, the number of witnesses at a hearing in New Era,
9  I take it your response would be the same, that your
10 views on that are privileged?
11         MR. HUSENY:  Objection.
12         THE WITNESS:  Yes.
13         MR. HUSENY:  If you ask her about the number
14 of witnesses in a hearing, that -- I'm sorry.  Will, I
15 think you meant to ask a different question.  I would
16 object to that question.
17         MR. SEARS:  I didn't -- I didn't make it
18 sufficiently clear.  If you just want to say
19 "objection to form," I'll try to move it on; but, you
20 know, these long diatribes are not helping.
21     Q.   BY MR. SEARS:  So, Ms. Tobias, if I were to
22 ask you questions about the number of witnesses that
23 are allowed at a hearing under New Era's rules, you
24 know, you would consider your views on that
25 privileged?

Page 157

1      A.   My views on it, yes.  But if you want to go
2  over what the rules say, sure, I'll testify to that,
3  if you want to pull it up.
4      Q.   Well, I mean, let's do this, then:  Let's
5  look at section 2(o), which is what -- it starts at
6  the top of page 11 and goes on to page 12.
7      A.   2(o).
8      Q.   Yeah.  Bottom of 11, going on to 12.
9      A.   Yeah.
10     Q.   Okay.  There's some language about discovery
11 we were looking at earlier.
12         Do you see that?
13     A.   Yes.
14     Q.   And another thing it says is:  "A formal
15 discovery process exists solely in New Era ADR's
16 standard arbitration process and is described in
17 section 5 below."
18         Do you see that?
19     A.   Sorry.  Which section are you reading?
20     Q.   It says:  "Formal discovery process exists
21 solely in New Era ADR's standard arbitration process
22 and is described in section 5 below."
23         Do you see that?
24     A.   Sorry.  I -- It helps if you say -- The way
25 it's drafted, there's (o), "discovery," and there's

Page 158

1   subsections.
2           So if you could just tell me:  Are you on
3   subsection 4?  You're -- None of the sentences that
4   I'm looking begin -- so I have to -- Are you at
5   (o)(ii), (o)(iii), (o)(iv)?
6       Q.   I'm at (o)(i), second sentence, top of
7   page 12.
8       A.   Oh, I see.  Yeah.
9       Q.   Okay.  Does that convey that there is no
10  formal discovery process for expedited arbitrations
11  under New Era?  I'm not asking for your views; just as
12  a factual matter.
13      A.   Oh, I don't know.  I mean, it says what it
14  says.  I don't --
15      Q.   Is that --
16      A.   I can interpret it for you.
17      Q.   Look, I'm trying to save time here.
18           You mentioned that you might be able to
19  answer questions about the rules.  If your response to
20  provisions will be that they say what they say, that's
21  fine and I understand it.
22           Would that typically be your response if I
23  was to go through a number of provisions and ask you
24  about them?
25      A.   Yes.  I mean, my response is going to be

Page 159

1   that the rules are what -- that they -- they're there
2   in this document.  You can read them, I can read them
3   with you; but I'm not going to testify beyond what --
4   that I confirm that this document, you know, that
5   you're reading verbatim what it says.  I'm not going
6   to go beyond that.
7       Q.   Let me ask you this:  Do you have any
8   non-privileged views that you can share about any
9   provisions of New Era's rules and procedures?
10      A.   No.  All of my views are privileged about
11  New Era.
12      Q.   Right.
13      A.   I'm in-house counsel for this company, and
14  this is a dispute resolution proceeding -- or rules
15  and procedures for proceeding with dispute resolution.
16  This is squarely privileged.  My views on it and my
17  thoughts are completely privileged.
18      Q.   Okay.  So, you know, other than reading the
19  words on the page together, there's not really
20  anything about the substance of the rules we can
21  discuss without intruding on privilege, in your views?
22      A.   No, I would --
23           MR. HUSENY:  Objection.
24           THE WITNESS:  Whoops.  Sorry, Sadik.
25           MR. HUSENY:  No, go ahead.

Page 160

1           THE WITNESS:  Just, I mean -- Yeah, I don't
2   know.  No, there's nothing, beyond the words on the
3   page, that I could testify to without treading into
4   privileged territory.
5       Q.   BY MR. SEARS:  And I assume that would be
6   true of the Ticketmaster and Live Nation terms of use
7   as they reference New Era?
8           MR. HUSENY:  Objection.  Vague and
9   ambiguous.
10      Q.   BY MR. SEARS:  You can try to answer; and if
11  you can't, I'll ask another question.
12      A.   I can't answer as posed.
13      Q.   Okay.  Well, I mean, do you believe that the
14  references to New Era and Live Nation and Ticketmaster
15  terms of use are fair, reasonable, and not
16  unconscionable?
17      A.   I'm not going to -- I know you say you want
18  to save time, but you're asking me the same question
19  over and over and I keep giving you the same answer.
20           I'm not going to testify to my views, my
21  thoughts, my thought process, my legal opinion, my --
22  my opinion as in-house counsel.  No matter what
23  question you ask, the answer remains the same.
24           MR. SEARS:  Okay.  I'm going to suggest
25  this:  I want to take a 15 -- Well, let's go off the

Page 161

1   record.
2           THE STENOGRAPHIC REPORTER:  Agreeable,
3   counsel?
4           MR. HUSENY:  Agreeable.
5           THE STENOGRAPHIC REPORTER:  We're off the
6   record.
7               (Recess.)
8           THE STENOGRAPHIC REPORTER:  We're back on
9   the record.
10      Q.   BY MR. SEARS:  Welcome back, Ms. Tobias.
11           Are you ready to resume your deposition?
12      A.   Yes.
13      Q.   Did you talk to your lawyers on the break?
14      A.   Just Sadik, briefly.
15      Q.   So you remember earlier we talked about the
16  subscription payments that Live Nation has made to
17  New Era?
18      A.   Yes.
19      Q.   There were two; right?  There was one for
20  ███████ in 2021; right?
21      A.   Right.  Yes.
22      Q.   And then another one for ██████ in 2022?
23      A.   Correct.
24      Q.   Have there been any other payments from Live
25  Nation or Ticketmaster to New Era?

Page 162

1    A.    No.
2    Q.    Has Live Nation determined whether to renew
3  its contract with New Era in 2023?
4    A.    Not at this point.
5    Q.    And I'll just -- I'll ask it a little
6  differently based on an exchange we had earlier.
7          Has Live Nation decided whether to terminate
8  its contract with New Era when it's up in 2023?
9    A.    No.
10   Q.    It just hasn't made a decision yet?
11   A.    No.
12   Q.    Sitting here today, do you expect that Live
13 Nation will continue to contract with New Era?
14   A.    I couldn't say.
15   Q.    You couldn't say because you don't know or
16 because you believe it's privileged?
17   A.    I don't know.
18   Q.    And we talked a little bit about mass
19 arbitration earlier.
20         Do you remember that?
21   A.    Frankly, no.  I remember what -- what --
22 "Talked about it," I don't know what you're referring
23 to.
24   Q.    Well, we saw some e-mails that reference
25 mass arbitration in the header, for example.

Page 163

1          Do you remember that?
2    A.    I actually don't.
3    Q.    Are you aware of a litigation strategy or
4  type of litigation known as mass arbitration?
5    A.    I am aware of that strategy.
6    Q.    Since Live Nation and Ticketmaster began
7  using New Era in their terms of use, has anyone
8  initiated a mass arbitration against either of them?
9    A.    No.
10   Q.    Do you have any views about the concept of
11 mass arbitration that you can share with me, or do you
12 believe that that falls within privilege?
13   A.    I believe that falls within privilege.
14         MR. HUSENY:  Objection.  Privilege.
15   Q.    BY MR. SEARS:  So if I were to ask you, for
16 example, if Live Nation views mass arbitration as a
17 risk to its business model, your answer would be
18 privileged.
19   A.    Yes, because you're asking for my views.
20 I'm in-house counsel, so all of my views on litigation
21 risk are certainly privileged.
22         MR. SEARS:  Okay.  Thank you for your time,
23 Ms. Tobias.  I have no further questions at this time.
24 But, you know, I have time left.  I'm going to reserve
25 the balance of it in case additional materials are

Page 164

1  produced in discovery.
2          Sadik, I expect you'll object to that.
3  That's fine.  I'm preserving my options on the record.
4          I'm also going to put on the record a
5  request, Sadik, that you won't produce the historical
6  data that we discussed and saw in an e-mail.
7          My understanding from the New Era deposition
8  and from this deposition is that that information
9  exists, that Ms. Tobias has compiled it before, and
10 that it was shown to New Era.  So I'm going to request
11 that you produce it.  I believe it's responsive to our
12 subpoena and relevant.  And I'm going to ask that you
13 all do it as soon as possible, given upcoming
14 deadlines.
15         Thank you.
16         MR. HUSENY:  So I will -- Thank you, Will.
17         I'll put in terms of the record that, of
18 course, as you expected, I will object to keeping the
19 deposition open in any respect.  And I will consider
20 your request for the additional information; I think
21 we will talk about that offline.
22         MR. SEARS:  Thank you very much.
23         Ms. Tobias, I appreciate your time.
24         And, most of all, Ms. Hoover, thank you so
25 much for your service today.  I really appreciate it.

Page 165

1          Everyone have a great day.
2          THE STENOGRAPHIC REPORTER:  Stay on the
3  line, counsel, please.
4          We're off the record.
5          (DEPOSITION ADJOURNED AT 1:23 P.M..)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 166

```
1    STATE OF CALIFORNIA    )
                            )  SS.
2    COUNTY OF LOS ANGELES  )
3        I, MARILYNN HOOVER, CSR No. 8841 for the State of
4    California, do hereby certify:
5        That prior to being examined, the witness named
6    in the foregoing deposition was duly sworn to testify
7    the truth, the whole truth, and nothing but the truth;
8        That said deposition was taken down by me in
9    shorthand at the time and place therein named, and
10   thereafter reduced by me to typewritten form; and that
11   the same is a true, correct, and complete transcript
12   of the said proceedings.
13       Before completion of the deposition, review of
14   the transcript [X] was [ ] was not requested.  If
15   requested, any changes made by the deponent (and
16   provided to the reporter) during the period allowed
17   shall be appended hereto.
18       I further certify that I am not interested in the
19   outcome of the action.
20       Witness my hand this 27th day of January 2023.
21
22
23
24                   Marilynn Hoover, RPR
25                   California CSR No. 8841
```

Page 167

```
1    Page   Line       Change            Reason
2    _____
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Page 168

```
1               CERTIFICATE OF WITNESS
2
3
4        I, KIMBERLY TOBIAS, do hereby certify that I have
5    read the foregoing portion of the transcript of my
6    deposition taken on Thursday, the 26th day of January
7    2023, and that the said transcript is true and correct
8    except for such corrections as I may have noted.
9
10
11
12
13       _____
14               KIMBERLY TOBIAS
15
16
17
18
19   Subscribed and sworn to before me
20   this _____ day of _____ 2023.
21
22
23   _____
24   Notary Public, State of _____
25   My Commission Expires:  _____
```

Index: $200,000..agreement

**$**

**$200,000** 109:3
**$250,000** 104:20
**$300** 132:1,14,18,19, 21,25 133:1,7
███ **131:**7,15, 19
███ **100:**20 104:21 109:5 113:2, 8,10 114:1,6,12,13 115:11,12,21,23,25 123:19,24 124:8,14 131:10,15,20,22
███ **126:**3
███ **113:**2,8 114:13 115:11,21
███ **126:**5

**(**

**(o)** 157:25
**(o)(i)** 158:6

**0**

**05/11/2021** 65:9,10

**1**

**1** 6:22,23 10:13
**10** 111:2,3,4
**10:45** 59:5
**11** 129:14,16 130:8, 11 143:23 150:16 153:12 157:6,8
**11(f)** 130:12
**11th** 62:1,23 63:4,12, 18 64:4 65:6 73:3,8, 13 133:20
**12** 39:19 133:11,15 157:6,8 158:7
**12-month** 39:11
**125** 126:6

**12th** 98:3
**13** 135:19,22
**14** 138:6,8 145:8
**15** 96:2,11 127:25 145:11,13,14 160:25
**15th** 78:22
**163** 31:10
**165** 28:19
**17** 34:17 47:11 147:20
**1957** 28:19 29:11
**1960** 29:11
**197** 110:12
**1:23** 165:5
**1st** 17:20

**2**

**2** 6:22,23 21:15
**2(o)** 157:5,7
**2010** 47:16,22 48:23 49:2
**2011** 49:2 111:8
**2019** 39:1
**2020** 19:5
**2021** 7:20 17:11,12 19:22 39:22 41:6 54:19 55:1,4,5 62:2, 23 63:4,12,18 64:4 65:6 67:25 68:18 69:17 71:10 73:3,8, 13 78:22 88:18 94:4, 9,25 97:11 98:3 107:8 111:11 129:19 133:20 139:12,20,24 142:16 145:24 147:2 161:20
**2022** 41:2,6 60:1 61:5,18 125:11 126:1 161:22
**2022.10.03** 60:3
**2023** 5:1 61:13 162:3, 8

**2023.1.6** 60:1
**21st** 94:4 139:12,23 140:4
**22nd** 55:3 94:9 139:20,24 140:4
**25** 126:6
**26** 5:1
**2nd** 41:2,6 55:5 111:8,11 145:24 147:2

**3**

**3** 27:5,8,16
**30(b)(6)** 6:1 86:24 141:12 154:5
███ **161:**20
**3rd** 61:5,18

**4**

**4** 31:9 59:11,24 61:8 158:3
**411** 130:11
**412** 130:8,13
**417** 131:4
███ **161:**22
**440** 118:12
**442** 117:2
**446** 112:11
**45** 144:14 149:1,5
**4th** 71:10 72:24 73:8, 12

**5**

**5** 59:11,24 60:11 61:4, 17 150:16 157:17,22
**50** 11:14 100:21

**6**

**6** 61:13 69:21,24

**60** 144:14 149:1,5

**7**

**7** 78:10,16

**8**

**8** 93:14,15,17

**9**

**9** 95:9,10,11,15
**9th** 129:19

**A**

**AAA** 141:2
**absolutely** 17:21 48:12,14 50:14 56:12 65:25 73:15 85:21 122:16 154:7,25
**accept** 146:21
**accepted** 110:5
**access** 80:1
**accordance** 148:4
**accurate** 146:8,17
**achieved** 153:16
**act** 18:11
**acting** 18:5,8
**action** 65:19
**actions** 37:5
**actual** 37:9
**ad** 116:18
**added** 15:8
**additional** 115:14 163:25 164:20
**address** 40:17 120:5
**ADJOURNED** 165:5
**administer** 124:9
**administered** 26:16, 19 39:15,16,20 126:10 148:3,11

**149:7**
**administers** 124:16
**administrative** 29:22
**ADR** 22:9 26:9,11 42:10 43:21 45:15,21 46:1 49:4,8 51:20 76:18 82:2 106:19 124:8,15 138:7 144:1 148:4 153:14
**ADR's** 157:15,21
**advance** 45:10
**advancing** 153:19
**advice** 51:7 122:15
**advising** 47:5
**affect** 109:17 116:14
**affected** 116:12
**affiliate** 14:11
**affiliates** 14:4
**affirmative** 126:22
**afford** 132:17
**afternoon** 128:21
**agents** 14:5
**agree** 117:15 138:24
**Agreeable** 59:8 60:21 161:2,4
**agreement** 7:18,19 19:21 20:1 22:3 31:21 54:20 55:3,12 74:14 75:11,15,20 76:2,25 77:6,11,15 87:7 89:24 92:22,24 94:6,18 95:25 96:4, 12,24 97:3,12 98:2, 10,17,20,21 99:17 100:16,18,24 101:1, 9,13 102:22 103:3 104:2,5,15,18,22 105:11,12 107:17 109:5 110:7,10,12 111:13 114:9,12 115:17 116:13 117:9 118:3,9,23 119:5,16, 24 120:13,15,20,23 121:6,14,19,25 122:3,20 123:3,11,25

Index: agreements..calls

125:2 126:9,17,20 127:6 129:24 130:20 133:23 135:25 136:10 139:10,19

**agreements** 104:19

**ahead** 18:18 33:20 57:12 155:23 159:25

**algorithm** 123:17

**Alicia** 19:4 31:25 32:1

**allegedly** 47:15,17,21

**allowed** 156:23

**alternate** 40:7

**alternative** 75:18 134:16,21

**ambiguous** 47:24 49:13 53:19 124:17 142:12 143:8 160:9

**amount** 100:16 149:13

**amounts** 100:13

**analyses** 137:13

**analysis** 83:4,6,9,12,19,22,23 84:16 85:4 136:14,18,22,25 137:14

**annual** 113:1

**answering** 87:25 88:7

**anticipated** 97:17

**antitrust** 149:13 152:18

**Anytime** 154:23

**apologize** 57:10,15 66:14

**appearance** 14:21

**appears** 28:5

**appendix** 13:20

**applicable** 148:6

**applies** 10:19

**apply** 92:10

**appointment** 149:3,5

**appointment/ selection** 144:15

**apprised** 17:17

**approach** 77:1

**approval** 104:14 121:13 122:19,25

**approximate** 126:1

**approximately** 8:3 11:10 36:6 55:15

**arbitrary** 56:9 57:3

**arbitration** 35:22 39:17 40:2,10,18,24 41:21 42:2,6 43:7,14,23 45:7 47:15,18,19,22 48:24 65:12,23 66:17,25 75:24 76:7 77:1 80:2 87:6 94:21 96:24 109:3,12,14 113:22 116:1 131:25 132:15,24 133:6,7 141:2,15 142:10 143:5,14 144:9,24 147:21 148:3,5,10,11,14 149:1,7,11,13,23 150:8 153:17 154:12,21 155:14,18 157:16,21 162:19,25 163:4,8,11,16

**arbitrations** 26:16,19 32:19,23 34:4,5 36:23 37:5,10,12 38:11,25 39:9,14 41:19 42:9,17,22 43:2,19,20,24 44:2,18 45:12 76:10 92:9,11,14 100:20,22 105:18 106:12 107:3,7 108:12,17 109:14 114:15,16,18 115:17 116:6 124:2,9,16 125:3 126:11 133:5 141:1 144:13,23 158:10

**arbitrator** 108:25

**area** 113:21

**arm's** 107:17

**arrived** 109:8 123:17

**arriving** 123:13

**aspect** 152:4

**assert** 90:10

**asserting** 127:2

**assistant** 37:17,21

**assume** 13:2 26:17 28:11 70:18 106:5 160:5

**assumes** 66:1,10

**assuming** 72:18 91:17

**attached** 28:22 129:23

**attaches** 96:3,12 129:25

**attaching** 96:23 111:12 133:22

**attachment** 28:20,21 96:8 110:11

**attachments** 28:4,6,8,12,13,25 29:2,5,10,15,16 96:18

**attempt** 40:22 69:6

**attorney** 25:9

**attorneys** 5:10

**authorization** 104:8,10,13,23,25 105:5,10,15,25

**authorized** 71:14,18 77:21

**automatically** 126:21

**avoidance** 61:4

**aware** 8:8,10 15:16 16:18 17:21 46:20,23 70:22 71:21 76:17 103:11 139:25 140:10,19,25 144:5,19 156:3 163:3,5

**awareness** 140:13

**B**

**back** 21:23 29:7

34:14,17 35:12 37:3 59:4,12 61:1 91:2,11 110:2 115:23 117:1 127:20 128:19,22 131:20 133:17 148:17 154:5 161:8,10

**back-and-forth** 28:24 109:23 123:8

**balance** 163:25

**ballpark** 34:3 36:8 39:2 44:23 74:3 97:22

**based** 29:5 38:11 72:18 75:8 83:22 89:21 94:12 99:15 101:20 109:11 114:14,17 115:17,25 116:4,7 138:21 146:14 150:9 162:6

**basis** 119:11

**Bates** 27:17 28:18 30:9 31:10 69:22 78:13,14 93:16 95:15 110:12 111:5 112:10 117:1 118:12 129:11 133:12 135:21

**bear** 17:6 138:1

**bearing** 27:17 69:22 78:14 93:16 95:15 111:5 112:10 129:11 133:12 135:20

**began** 22:18 54:25 88:19 94:24 163:6

**begin** 5:6 68:11 158:4

**beginning** 92:5 95:24

**begun** 107:7

**behalf** 18:11,25 55:10 86:20,25 136:5

**bellwether** 141:8,23 142:7,23 143:16 155:2,12,15

**benefit** 95:22

**big** 21:22 22:12,19

**bit** 15:16 17:5 107:15

128:1 162:18

**blank** 110:18 118:17 119:5,12

**block** 79:13

**board** 104:5

**boss** 121:3

**bottom** 31:13 148:2 153:12 157:8

**bounds** 87:9

**bracketed** 113:1

**Brandy** 121:11

**break** 58:16,17,20 59:2,18,23 128:1,6,25 129:5 161:13

**break-even** 134:25

**briefly** 129:1 161:14

**bring** 154:5

**bringing** 80:15,23

**broken** 101:3

**built** 125:21

**business** 25:16 54:3 99:25 103:22 122:12 151:22 163:17

**C**

**calibrate** 101:19

**calibrated** 114:17

**CALIFORNIA** 5:1

**call** 8:1 17:11 31:18,20 33:7,15 48:20 72:2,6 78:2 79:19,22 80:3,19

**called** 5:3 59:19 96:24

**calling** 150:2 151:15

**calls** 7:14,22 8:2 10:22 15:23,25 17:11 18:19 23:9,24 24:15 25:2,6 26:3 33:19 45:23 46:3 48:2,13 49:20 51:22 52:14,19,24 53:8 62:7 63:24 68:7 73:10,11,

Index: capable..credentials

14,17,23 75:6 107:18
124:18 154:1

**capable** 108:22

**care** 67:22

**careful** 8:17,25 56:6

**carefully** 56:8

**case** 5:11 11:6,9
14:8,22 24:10 32:5
61:24 73:9 106:8
132:18 149:14
152:18 153:19
163:25

**cases** 41:11 106:15,
24 107:21,24 108:12,
23 155:15

**CEO** 79:13

**certainty** 32:21
62:15 98:11

**CFO** 103:25 104:3,7,
8,14,23 105:4,10,15,
24 120:19,25 122:2,
11,16,19,22

**chance** 31:5 64:21

**change** 55:5 93:5,8
126:5 130:25

**changed** 116:22
117:11,15 139:4

**characterize** 55:25
56:4 120:24

**chat** 6:25 58:10 61:16
129:6

**chief** 103:20

**chose** 126:25

**circumstances**
42:16 76:10 106:13
107:16

**claims** 41:11 42:19,
20

**clarify** 20:20 36:14,
25 72:12 87:20 92:6
140:16

**clarifying** 36:21

**class** 5:11 37:5 65:19

**clauses** 47:15,22

48:24

**clean** 57:21,25

**clear** 20:6 23:19
25:22,25 29:12 36:17
38:2 42:21 43:18
49:25 50:11 57:22
67:12 69:6,14 86:6
117:25 120:7 127:21,
23 136:25 152:9
156:18

**clicking** 138:11

**client** 47:6 51:8
122:15

**clients** 24:9

**close** 17:14 18:23
19:1 97:16,21 123:1
140:5

**closer** 140:3

**co-founder** 79:14

**coincidence** 65:21
66:15

**colleague** 108:8

**combination** 78:6

**comment** 29:9 90:2,
16 91:9 92:1

**commented** 88:15
90:8

**comments** 90:4

**communicate**
120:19

**communicated** 89:8

**communication**
65:22 66:16,22 78:3
122:22,24

**communications**
13:7 24:19 51:8
62:19,21,25 63:1,2,
10 64:2,16 65:5
66:22 67:10 68:13
71:15,19,22 73:7,23
74:8,9 86:7 105:2
121:12

**companies** 22:12,
15,19 23:2 46:21

**companies'** 46:24

**company** 18:24
19:15,18 34:6,16
35:13 37:2 40:20
45:13 56:8 82:21
100:21 104:11
108:19 115:18
120:16 121:10 122:2
154:20 159:13

**company's** 35:12

**comparative** 83:4,6,
9,11,15

**compare** 97:8

**comparing** 111:20

**comparison** 146:14

**compel** 65:12,23
66:17,25

**compiled** 164:9

**complains** 42:23

**complaints** 40:9

**completely** 143:2
159:17

**computer** 35:3,6

**concept** 163:10

**concern** 49:16 118:7

**concerns** 50:24,25
51:3 52:12,16,21

**conclusion** 48:2,14
151:16

**conclusions** 150:2

**conduct** 81:13

**conducted** 25:11

**conducting** 24:20
33:2

**confers** 40:21

**confirm** 18:14
129:12 159:4

**confirmed** 93:6

**confused** 42:8 83:14

**confusing** 5:23
83:11

**confusion** 103:14

**consideration**

51:10,20

**considerations**
50:18,23 51:3,18
125:1

**considered** 52:1,6
56:8

**constructive** 91:20

**consumer** 38:24
39:9,14,17 40:2,8,14,
23 42:2,22 43:2,6,14,
19,20 44:2,18 45:7
106:20 124:2 132:17
148:12

**contact** 17:14 18:23
19:1

**contained** 47:14,18,
21

**content** 12:12 72:18

**context** 14:10

**continue** 24:6 48:15
53:11 162:13

**contract** 103:6
108:19 118:10
120:10 125:6,8 126:2
129:19 140:7 162:3,
8,13

**contracts** 104:19,20
108:3,6,9

**contrast** 97:8

**contributed** 67:13

**controller** 121:10
122:2,11,20,23

**conversation** 9:11,
20 16:19 17:17 33:23
72:21 77:10 80:10
85:11,14,17

**conversations** 8:18
15:17,21 16:1,12,15,
21 17:18,23 18:6
23:11,25 52:9 72:23
86:4 91:15 121:9

**convey** 158:9

**copied** 13:11,15
111:10

**corporate** 6:9,13
14:11 86:23

**corporation's** 6:9

**correct** 5:18 7:21
13:12 14:20,23 19:25
20:5,19,23 22:9,10
25:15 26:8,9,10 29:5,
8,16 38:6,23 40:1
49:8,9 54:9 69:19
72:25 73:6 74:11
76:8,15 77:3,16,23
78:11 81:15 82:11
90:10,11 93:2 100:5
102:12 104:24 109:7
111:14 117:23
119:19 120:21
121:24 122:4 124:2,5
127:4 131:11 136:20
147:6,23 148:9,13
152:7 156:2 161:23

**correctly** 13:6

**cost** 104:6,16

**counsel** 5:6,16 7:7,
14,15,23 9:10 11:17,
19 16:12 18:10 22:25
23:11 24:1 27:9
31:15 47:4 50:20
52:8 54:8,10 67:11
68:14,23 81:8 82:21
87:10,13 88:5 97:14
118:6 121:4 129:13
145:10 154:20
159:13 160:22 161:3
163:20 165:3

**counterparty**
107:18

**countless** 29:6

**couple** 8:4 10:22
19:13 30:3 70:15
107:21 111:9 117:1
137:24 141:22
143:21 152:8

**court** 29:7 58:23

**cover** 6:16 34:10
115:7 132:18

**covered** 63:16 115:6

**covers** 100:20
124:23 125:2

**created** 12:13 13:18
38:10,20

**credentials** 24:23

Index: cross-reference..earlier

25:12

**cross-reference**
37:7

**cross-talk** 23:22
29:23

**current** 138:18
146:17

**cursory** 112:7

**customers** 24:9

**cut** 15:14 35:4 53:2
57:20 58:12

**D**

**data** 32:12,22,25
33:1,25 34:9,13,16,
17 37:15 38:11,19
114:15 116:5,8,16,19
164:6

**date** 19:14 41:5 62:5,
22 63:4,11,18 64:3
66:23 68:16 94:6,13
97:23 147:4

**dated** 65:9 78:21
94:4 133:20

**dates** 68:16 107:10

**day** 8:1 17:20 65:11,
22 66:16 68:1 79:16
94:10,17 139:19
165:1

**days** 70:15 144:14
149:1,5

**deadlines** 164:14

**deal** 124:8,14

**deals** 147:21

**debrief** 78:1

**debriefs** 77:22

**decade** 49:8

**decided** 37:23
118:19 126:23 162:7

**deciding** 22:23
81:20

**decision** 46:14 47:8
50:15,16,19 51:4,5,6
53:4,6,17,24 54:4,7,

11,14,17 56:4,9 57:3
58:3 67:7,14 109:20
130:24 132:12
162:10

**decision-making**
46:13

**decisions** 56:25

**decks** 13:18

**declarations** 20:15,
21

**default** 22:9 132:14

**defendant's** 61:5,12

**defined** 13:25 14:2
15:8

**definition** 14:13 15:9

**definitions** 13:21

**demand** 80:3

**depends** 104:18

**depo** 13:3

**deposed** 5:12 21:8,
11

**deposition** 5:19
6:10,25 7:13 8:8,12,
14,22 9:9,22 14:24
16:7 18:4 21:7,17
27:2 30:19 33:5
45:10,11 48:20 59:16
70:10,15,21,24 74:23
76:6 80:5 91:21
93:24 98:7,14,18,23
99:6,9,13 111:23
112:6 115:6 127:11
128:23 135:13 142:6,
14 144:6,18 152:24
154:1 161:11 164:7,
8,19 165:5

**depositions** 58:20
70:17

**depth** 142:16

**derive** 89:6

**derived** 9:16

**describe** 12:21
35:18

**designate** 45:20
46:22 49:18

**designated** 40:16
46:1 49:7 87:5 108:2,
5 130:19

**designating** 51:20

**detail** 111:24

**details** 46:14

**determine** 113:23
115:16

**determined** 100:17
116:14 123:19 162:2

**develop** 90:15

**developed** 18:1,3
81:17 91:8 99:4

**diatribes** 156:20

**difference** 111:19

**differences** 111:25
154:4

**differentiate** 6:18

**differently** 69:1
162:6

**difficult** 39:5 146:11

**diligence** 22:22,25
23:1,8 24:12,20
25:11,19 26:2 32:8
33:2,11 34:1 37:16,
25 38:3,8

**direction** 18:6,9,11

**directly** 77:4

**disagree** 46:17
138:21,24 153:8

**disagreement** 30:5

**disappeared** 129:6

**disclose** 9:10 51:7,9
57:16 62:20 68:13
85:11 86:6 136:9
137:6

**disclosing** 83:25
118:5

**discount** 134:25
135:3,10

**discovery** 153:12,
15,17,23 154:11
157:10,15,20,25
158:10 164:1

**discuss** 31:21 79:22
134:15,24 137:12
159:21

**discussed** 8:14
16:21 17:3,11,19
69:7 80:1 99:21
116:18 131:9 135:6,
10 164:6

**discussion** 9:2,8,16
17:22 67:24 80:22
85:7 103:25 120:2,8
122:5 136:16

**discussions** 10:6
16:8,16 17:15 55:2,
11 63:19 68:11
74:15,21,25 77:5,8,
18 80:19 88:19 97:14
103:18,20,22 109:21,
23 110:20,23 114:7
118:22,25 119:2,18,
23 120:1,11,16 123:2
155:6,9

**dispense** 5:21

**dispute** 29:8 40:7,14,
17,22 80:15,23
86:13,17 87:4 130:25
159:14,15

**disputes** 106:21
117:8 118:3 130:20

**divulging** 24:16 47:3
49:23 67:10

**document** 12:6,9
15:10 27:16 29:1,13
30:18,20 31:2 35:11
36:5 37:11 61:4,8,12
69:22 70:3,4,9 78:14
80:6 93:16,19 95:15
96:13 98:6 111:4
112:8,11 114:5
129:11 133:12 135:9,
12,19 138:6 145:8
146:1 159:2,4

**documents** 7:16
10:23 11:2,5,8,9,16,
21,24 12:10,13,16,
18,20,21 13:2,8,14
17:5 28:10 30:10,13,
25 34:24 35:1,15,16,
17 36:19 37:3,7,9
61:23 62:4,13,17
65:8 68:8 80:4 95:23

96:15,17

**Docusign** 136:4

**doubt** 11:8 61:4

**download** 27:14
78:1

**downloaded** 27:18

**downloading** 95:13
129:9

**downloads** 99:19

**draft** 95:24 96:23
97:2,6,20 98:2,10,12,
15,22 99:16,20
110:6,18 111:13,15,
20 113:5 117:12
129:23,25 130:1,5,18
133:22

**drafted** 15:12 157:25

**drafting** 20:13 89:17
99:1,3

**drafts** 97:8,12,14,15
98:17,19,23 111:19,
23,25 112:4 130:2

**drop** 58:10 129:6

**due** 23:8 24:11,20
26:2 32:8 33:11
37:16,24

**duly** 5:3

**E**

**e-mail** 28:3,6,11,13,
19,22 29:3,16 31:6,
13,25 32:12 40:16,17
71:2,3 72:19 78:21
79:7 86:11 94:1,12
96:3,11,17,22 99:16
105:2,4 110:11 111:8
129:19 133:17 134:6
135:12 139:11 164:6

**e-mails** 13:10 29:1
162:24

**earlier** 30:23,24
39:22 71:12 72:22,24
90:1 94:20 96:14
100:7 101:16,23
102:17 112:24
120:18 125:7 136:13

Index: earliest..filed

151:3,12 155:2
157:11 161:15 162:6,
19

**earliest** 24:9

**early** 55:1 67:25
72:20 88:18

**edited** 130:18

**effect** 67:6

**efficiencies** 153:16

**efficiency** 80:15,23

**elect** 125:8 126:9

**elected** 125:11

**election** 126:22

**Emanuel** 21:14

**embarked** 136:24
137:3,11

**employees** 108:18

**employment** 42:19,
20 43:20 106:15
107:21,24 108:2,5,8

**encroaching** 25:20

**end** 28:10,19 91:15
96:8 112:11 115:24

**end-running** 69:6

**ended** 40:9 131:9

**ending** 31:10 110:12
131:4

**ends** 119:6

**enjoyed** 80:13

**enter** 104:23 105:11

**entered** 127:6

**entering** 104:14

**enters** 75:25

**Entertainment** 6:1
14:3,18 60:6

**entire** 62:17 139:22

**entities** 6:13,19
17:18 86:23

**entitled** 16:13 29:24
30:10 61:4,12 68:25
87:10 138:6 145:8

**entity** 38:12 75:25

**entries** 73:3

**entry** 62:1

**Era** 7:17,18 8:9 9:9
12:20,21,25 13:1,7,9,
14,18 15:17,24 16:2,
9,17,24 17:16 18:2,6,
8 19:5,16,21,24 20:3
22:3,4,7,8,12,15,18,
22,23 23:2 24:21
25:11 26:2,6 27:17
28:24 29:6,14 31:14
32:8 33:2,5,6,17,23
37:16,25 38:4,8,10,
20 39:14,18,20,23
40:4,5,6 41:4,9,22
42:3,6,12,18 43:6,10,
13,24 44:3,9,19 45:7
49:5,19 50:2,13,16
51:4,11,19,25 52:2,5,
6,9 53:4,17,25 54:5,
15,24 55:2,5,8,11,16,
22 56:5,11,21 57:24
62:22 63:3,11,20
64:3 67:8,15,24 68:5,
11,17,19,22 69:3,7,
15,22 70:15 71:3,8,
15 72:5,17,23 73:8,
24 74:16,25 75:10,
14,19,21,22,24 76:6,
13,23 77:5,14,19
78:2,3,23 79:5,12,20
80:11 81:2,21 83:5
86:17 88:19 89:3,19,
22 90:4,13 92:13,20
93:5 94:2,16,17,21,
25 95:23 96:15,22
97:3 99:17,18 101:12
102:1 103:12,19
106:6,19,20,25
107:13 108:6,12
109:9,10,19,20,22,24
110:4 111:10 113:21
114:21 115:15,24
116:1,9 117:9 118:2
123:24 124:5 126:10
129:19,21 130:19,25
131:12 132:4,6,9,12,
15,20,23 133:4,8,18
138:7 141:15 143:15
144:1,8,23 147:25
148:4,11,17,21
149:7,22 150:8,21
151:19,20,23 152:4,

12 153:14 154:12
156:8 157:15,21
158:11 159:11 160:7,
14 161:17,25 162:3,
8,13 163:7 164:7,10

**Era's** 24:8 75:14
76:20 80:20 81:3,16
83:12,17,19 84:4,10,
16 85:4,15,18,23
86:2 87:12,22 88:15,
17 92:1,3 93:10
99:24,25 123:15
125:20 132:21
136:15 138:14
139:22 152:19
153:23 155:13,18
156:5,23 159:9

**essentially** 7:9
88:24 92:19 94:23

**established** 26:11

**exact** 39:13,18 91:13
146:4

**EXAMINATION** 5:7

**examined** 5:4

**examples** 105:19
137:25 141:22 152:9

**Excel** 34:21 35:2,8,9,
10,16 37:8 103:1

**exchange** 162:6

**excuse** 32:21 48:10
114:18

**execute** 122:25

**executed** 7:20 54:19
55:3 98:20 121:14

**executing** 120:20
139:9

**exhibit** 6:23 27:4,5,8,
16 30:6 59:11 61:4,8,
17 69:21,24 70:23,25
78:10,16 93:12,14,
15,17 95:8,9,10,11,
15 111:1,2,3,4 126:4
127:23 129:5,13,16
131:4 133:11,13
135:19,22 138:6,8
145:4,7,13,14

**exhibits** 6:22 27:21
58:8,15 59:24 70:14,

20

**existing** 107:2

**exists** 86:9 157:15,
20 164:9

**expect** 150:21
162:12 164:2

**expected** 144:2
148:22,25 149:6
150:12 164:18

**expedited** 144:9,12,
24 148:4,10,25
149:11,22 154:12,16
158:10

**expensive** 108:24

**experienced** 58:18

**explain** 40:11 83:8
91:18 102:24 144:13

**explained** 37:8
96:14

**explaining** 40:17
122:24

**explored** 24:11

**extend** 101:2

**extent** 9:14,18 23:10,
25 24:14 119:17
136:18

**extremely** 127:22

—————

**F**

**fact** 29:10 56:1 76:13
81:24 82:3 91:16
124:22

**factors** 53:22 101:20

**facts** 53:15,21 66:1,
10 73:11 91:1,5
125:6 126:19

**factual** 9:15,19 54:21
68:15 84:3 119:8
158:12

**factually** 40:12
155:20

**failed** 28:25

**fair** 9:13 13:3 29:17
46:6 50:9,10,19 51:5

54:8,9 55:6 60:13
63:16,17 72:11,12
87:12,22 123:4
125:23 137:21
138:19,20 142:23,24
149:23 150:8 151:7,
14,23 152:4,12
153:24 154:18
155:25 160:15

**fairly** 19:24

**fall** 76:10 113:23

**falls** 163:12,13

**familiar** 20:11 83:16,
17 151:19

**family** 95:22 96:16

**farther** 34:15

**fast** 149:20

**faster** 153:7

**favor** 6:18

**fee** 76:3,12 112:21
113:1 132:1,14,18,
19,22,25 133:4,7

**feed** 20:24 21:2

**feedback** 90:5 91:21

**feel** 87:8,15 88:6
108:15

**fees** 105:17 108:25
109:2

**felt** 81:19,22

**Ferguson** 8:7 19:3
71:6,25 74:25 75:2,7

**few-minute** 58:16

**Fifteen** 145:9

**figure** 15:15 37:4
115:9,12 148:15

**figured** 115:25

**figures** 109:12,14
113:22

**figuring** 69:6 91:15

**filed** 14:21 34:5 35:23
36:23 37:1,10 38:12,
25 39:9,17 40:2,5
42:6,10,17 43:22,24
44:2,8,18 45:7,13

Index: files..information

65:19 100:21 108:13, 17 114:16,18 115:18 124:3 125:4

**files** 36:10 37:9

**filing** 40:18 132:1,14, 18,19,22,25 133:4,7

**filled** 131:7

**final** 54:17 88:21,22, 23,24 89:1,7,12,15, 18,20 97:16,21 98:22 100:24 114:13 115:12 117:12 135:25

**finalized** 88:18 92:18,19 94:23,24 118:20

**financial** 103:21 104:10 122:25

**fine** 50:5 58:18 84:21 128:4 158:21 164:3

**fingers** 58:24

**finish** 64:21

**finished** 67:2

**firm** 15:7 21:8,22 65:20

**flip** 117:1

**focused** 140:22

**focusing** 41:19 42:21 90:12

**folks** 71:4 78:22 111:10

**forget** 27:11

**forgot** 84:23

**form** 48:6 62:10 63:25 88:24 126:12, 19 156:19

**formal** 157:14,20 158:10

**forum** 130:19,25

**forward** 24:5 72:3

**forwarded** 135:15

**founded** 19:5,8,14, 24

**fourth** 152:14

**frame** 49:1 154:11

**frames** 150:13,22

**Frankly** 11:25 162:21

**frequency** 41:15,18

**Frequently** 36:4

**front** 61:19 110:7 143:20

**frustrating** 88:12

**fun** 82:6,10

**future** 29:21

**G**

**game** 9:13 46:6

**gave** 109:10 114:6 141:22

**general** 10:7 13:5,6 17:13,22 72:14 92:4, 13,18 105:21,22 107:11 121:3 137:20 140:13,17 148:6 154:9

**generally** 16:20 17:2,17 72:14 78:1 99:1,4,14 100:12,14, 15 103:3 106:18,22 108:11 122:3 139:25 140:1,9,10,12,19 141:10 143:17

**gist** 117:7

**give** 12:6 16:23 18:18 36:7 51:15 58:19 60:8 64:21 74:3 78:24 93:1 95:17 97:22 118:11 131:21 142:2 143:18 145:3 151:24

**giving** 160:19

**good** 5:9 16:6 59:14 67:21 124:8,14 125:23 128:21

**Google** 69:4

**gosh** 89:13

**govern** 148:11

**governing** 81:12 117:4 130:15 141:1

**granular** 17:9

**gratuitous** 24:4

**great** 59:6 61:17 112:15 126:4 165:1

**greatly** 34:6

**ground** 5:21

**grounds** 8:24 150:6 152:17 156:1

**guess** 15:7 51:16 63:8 90:8 113:6

**guessing** 97:25

**Gushman** 8:6 72:1

**guys** 128:9

**H**

**haggle** 110:2

**half** 17:22 30:2 90:24

**halfway** 150:11

**hand** 20:13

**handle** 37:1 106:20

**handled** 74:14

**handles** 35:13 108:8

**handling** 108:23

**handy** 145:2

**happened** 30:3 105:20

**happening** 67:5 99:5,7 129:10

**happy** 146:17

**hard** 12:23 53:12

**header** 162:25

**heads-up** 104:9

**hear** 66:12

**heard** 127:18

**hearing** 65:11,23 66:17,24 156:5,8,14, 23

**hefty** 105:17

**helping** 156:20

**helps** 31:8 157:24

**Hey** 69:12 91:22

**higher** 126:9 131:13

**highly** 11:8

**historical** 32:12 33:25 34:9 38:11,19 109:12,13 113:22 114:15 116:5 164:5

**history** 34:19 115:10,13,15 116:1

**Hmm** 27:18 95:13

**Hold** 95:12,19 96:6

**home** 59:21

**honest** 78:13 145:12

**Honestly** 72:18 97:7

**Hoover** 66:9 128:1,5 164:24

**hope** 29:8 39:7 50:8 88:8,12

**hoped** 30:14

**hour** 30:2 90:24 127:25

**hours** 8:4 10:22 29:7

**hundred** 11:12,13 34:4 36:13

**Huseny** 8:6,23 9:6 23:4,9,14,23 24:14 25:2,6 26:3 28:17 29:9,20 30:4 33:19 44:5,8,12 45:23 46:3, 8,12 47:23 48:2,10 49:12,20 51:12,22 52:14,19,24 53:8,18 54:1 55:17 56:15,22 60:10,13,22 62:7 63:25 64:7,12,18 66:1,8,19 67:19 68:7, 20,24 72:1 82:12 84:19,21 85:9 86:18 87:16 90:20 91:1 107:25 117:23 118:4 119:17 122:13 124:10,17,24 125:24 126:12,18 127:15,20,

24 128:15 140:15 141:18 142:11 143:7 147:13 150:1,25 151:11 152:15,20 156:11,13 159:23,25 160:8 161:4 163:14 164:16

**Huseny's** 95:22 120:6

**I**

**idea** 16:3 33:9 45:16 65:25 66:20 68:4,6, 10,11 73:25 74:2 75:10,12 99:24 135:5 138:25

**identical** 138:25 146:22

**implemented** 40:7, 25

**implies** 19:18

**imply** 19:16

**important** 24:25 25:5 81:25

**impressions** 25:8 87:18 88:6 136:10

**in-depth** 121:9

**in-house** 5:16 35:25 47:4 50:20 54:8,10 67:11 82:21 87:10,13 88:5 154:20 159:13 160:22 163:20

**in-person** 16:2

**inbound** 13:10

**include** 14:3 134:10

**including** 37:21 71:6

**Incredibly** 108:24

**individual** 40:21 98:15 133:6

**inform** 104:3,7

**information** 23:10, 24 24:15,17 25:3,7, 20 26:4 29:5 33:6,17 36:18,19 37:23 38:5 39:5 45:24 46:4

Index: informed..Livenation.com

49:24 51:23 52:15,
20,25 53:9 68:8 91:7
123:21 124:18 153:1,
18 154:2 164:8,20

**informed** 121:3

**informing** 103:21,25

**initially** 28:25

**initiated** 41:21 42:2
43:7,15,20 163:8

**insight** 116:2

**instance** 150:3

**instruct** 23:21 24:1
48:6

**instructing** 23:12,14
48:17 124:19

**instruction** 24:3

**interim** 98:23

**internal** 103:11,18
109:20 119:18,23,25
120:9,16

**internally** 109:21
123:19

**internet** 81:12

**interpret** 158:16

**interrupt** 48:19 83:2

**interrupted** 64:20

**introduce** 69:20 78:9
93:11 133:10 135:18

**introduced** 6:24
61:9 64:13 70:15
79:4 129:4

**intruding** 159:21

**involved** 15:20 29:7
32:8,20,24 47:8
50:15 54:4,11 71:7
74:15,24 77:4 82:24
107:7 115:19

**involves** 78:22

**involving** 39:15
116:6 117:8 148:12
149:7

**issue** 10:20 12:3 30:5
118:8

**issued** 20:15,21

**issues** 29:22 40:9
96:15 134:10

**items** 134:11

---

**J**

**JAMS** 20:2 22:4,7,8,
23 26:6,9,19 39:23
41:9 43:6 45:15,20
46:1,11,15,22 47:1,9
49:4,7,11,17,24 50:2,
13,16 51:4 52:1,6
53:4,17,25 54:4,14,
24 55:8,16 56:5,10,
21 57:23 62:22 63:3,
11,20 64:3 67:7,15
76:14,16,23,24 81:2,
20 83:4,16 105:8,11,
13,16,25 106:2,12,19
107:1,3,7,12,18,20,
24 108:14,18,21,22
109:2 141:1 151:10

**January** 5:1 61:13

**job** 67:21 91:12
108:22

**Jovais** 19:4 32:1
71:6,25 75:1,2,3

**judge** 48:21

**July** 41:2,5 55:5
78:21 107:8 145:23
147:2

**jump** 28:20,24 29:11
155:23

**jumps** 28:19 30:9

**June** 7:20 17:12
19:22 39:22 54:19
55:3 89:14 94:4,9
97:23,24 111:8,11
129:19 133:20
139:12,19,23 140:4
142:16

**junior** 21:21

**jurisdiction** 117:5

---

**K**

**Kathy** 105:4 121:12

**keeping** 27:11
131:22 145:11
164:18

**kill** 82:10

**Kim** 35:24 79:15

**KIMBERLY** 5:2

**kind** 83:3 84:15 107:4

**Kirsten** 8:6 19:3

**knew** 19:9,10 141:5
144:17

**knowing** 19:13

**knowledge** 6:10
9:18 29:4 33:25

---

**L**

**labeled** 60:17

**laid** 40:19

**language** 148:21
157:10

**large** 76:12

**largely** 88:20,22,23
116:4

**late** 89:14 97:23

**Latham** 7:15 8:7
14:7,17 15:3,18,24
16:4,9,24 17:14 18:2,
5,7,18,24,25 19:2
31:15 32:3 33:2,6,23
52:8 55:1,10 63:19
64:2 67:24 68:3,23
69:7 71:4 72:6,9,10,
17,23 73:7,12,24
74:13,14,19,24 75:9,
19 77:18 78:2 84:9,
16 85:12,14,17
88:14,19 89:9,16,23
90:1,12,16 91:8,9,16,
25 92:19 94:2,24
96:22 97:4 99:17,19
109:24 111:9 113:11,
15,20 114:7,18
115:1,8 116:9 120:4
129:21 133:18
134:25 135:3,7,10
155:7

**Latham's** 68:10

**71:15**

**law** 21:8 117:4
130:15

**lawsuit** 14:19 62:6
65:12,15,18,19 67:6,
13

**lawsuits** 20:15,21,23
43:22,25

**lawyer** 5:14 21:21
32:3 35:25 72:13
122:7 151:13

**lawyers** 8:20 9:17,20
10:22 24:19 33:15,16
62:13 72:4,11 74:24
86:8 90:19,21 161:13

**learn** 23:1 68:16,19,
22 69:2

**learned** 9:11 55:22
69:8,15

**leave** 75:3

**Lecoq** 121:11

**led** 40:8 49:17 50:24

**Lee** 79:8 80:12 86:12

**left** 163:24

**legacy** 106:24 108:1,
4

**legal** 14:12 18:23
25:17 48:2,13 50:18
51:5,6,7 54:7 58:1
67:10 118:7,8,9
122:6,15,16 150:2
151:15 154:24
160:21

**length** 107:18

**levels** 100:24

**limit** 23:21 29:23 48:5
62:10

**limitations** 153:15,
23 156:3

**limited** 106:13

**list** 134:10

**listed** 10:8 152:23,25

**lists** 144:8

**litigate** 152:18

**litigated** 146:23

**litigation** 15:6 34:19
35:12,14 37:1 72:2,6,
9,17 73:12,18,24
74:13,19 75:9,19
77:18 78:2 91:8
96:23 109:24 111:9
113:11 133:18 163:3,
4,20

**litigations** 37:10

**live** 5:16 6:1,11,17,25
7:16 12:11 13:25
14:2,3,8,11,18 15:4,9
16:2,4 18:8,12,13,15,
17,20 19:20 20:2,9
22:2,3,11,17 24:8,21
25:1,11,23 26:1,6,19,
24 32:5,19,22 34:12
35:25 36:23 37:12
38:25 39:9,15,22
40:2,3,15,20 41:3,21
42:2,23 43:5,7,15
44:2,8,10,18 45:8,17,
25 46:10,21 47:4
49:10,17 50:20 51:25
52:5,12,17,22 53:16,
23 56:5,20 57:8,22,
25 60:6 62:21 63:3,
15 65:13,20 67:6,14
68:4,5,10,13 72:1,4,
11 76:18 77:1 81:6
82:1,23 83:3,11,18
84:3 86:16,21 94:17
100:3 101:8 103:17,
23 104:23 105:7,15
106:11,17,25 107:6,
11,23 108:11,13
109:8,15 114:19
116:6,8 118:1,21
119:14,22 120:3,9,12
121:6,17,21 123:20
124:7,13 125:4,8,11,
22 126:1,8,16,25
127:6 132:5,13,20
135:20 136:5,14
144:22 146:15
148:12 149:7,14
151:13,18 155:10
160:6,14 161:16,24
162:2,7,12 163:6,16

**Livenation.com**

Index: lives..non-consumer

40:13

**lives** 57:1

**LLC** 6:2

**located** 35:2,5

**locations** 34:23,25

**log** 60:5 61:5,13,18
62:12 63:23 64:14,24
74:7

**logged** 65:6,22 66:16

**login** 80:1

**logistics** 31:22 79:24

**logs** 73:3

**long** 8:2 34:12 37:18,
20 54:22 146:23
156:20

**longer** 26:15 108:19
130:19

**looked** 12:7 27:2
30:14 46:25 73:2
139:11,16 140:21
142:16

**loop** 77:7 123:1

**lost** 44:13

**lot** 40:8 78:7

**love** 59:2 128:7

**lunch** 128:10,11,18

_____

**M**

**made** 40:6 41:8
45:20 54:7,15,17
56:10 89:12,13 93:4
106:1 108:7,9 127:22
130:5 132:12 134:4
161:16 162:10

**maintain** 150:12,22

**make** 7:11 28:21
29:11 39:7 46:18
48:4 50:6 54:17 57:1
63:15 66:6 71:13
72:7 75:17 78:20
96:19 102:6 126:22
127:21 129:7 130:24
152:9 153:9 156:17

**making** 46:15,19
53:5,24 55:25 104:5
106:22 123:10

**mandatory** 47:15,22
148:14

**mapping** 29:1,13
30:13

**marching** 18:18,21

**Marilynn** 60:12
93:12

**Marilynn's** 78:12

**mark** 6:21 27:3 58:7
95:7 110:25 138:5
145:4

**marked** 6:23 27:5
59:11,23 69:24 78:16
93:17 95:10 111:3
129:16 133:13
135:22 138:8 145:13

**marketing** 13:17
69:3

**marking** 145:7

**mass** 92:8,10,11,14
94:21 96:24 100:20
131:25 132:24 133:6
141:1,14 142:10
143:5,14 154:21
155:13 162:18,25
163:4,8,11,16

**materials** 13:17 69:4
163:25

**maternity** 75:3

**matter** 21:5 54:21
68:16 84:3 119:8
158:12 160:22

**May/june** 97:11

**means** 6:5 14:10
74:2 83:15

**meant** 15:7 16:4
156:15

**mediation** 144:9

**meet** 77:14 79:16

**meeting** 80:13

**memorizing** 142:14

**memory** 19:3 141:11

**mental** 25:8 87:18
88:6 136:9

**mention** 112:20

**mentioned** 11:2
19:20 35:9,19 47:7
53:23 100:6 101:1,23
102:17,21 107:15,22
137:3,10 140:5
142:7,8 151:2 155:12
158:18

**met** 31:17 79:9

**Michael** 62:25 121:4

**middle** 64:20

**Mike** 121:4

**mind** 87:18

**minute** 95:12 142:2

**minutes** 58:25
127:25

**mis** 44:5

**mis-asked** 44:6

**Mischaracterizes**
126:18

**mischaracterizing**
143:2

**misunderstood**
133:2

**model** 38:10,20
75:25 76:7,14,16,20
99:25 100:6,11
101:15,18,19,23
102:1,4,13,14,15,18,
20,21 103:1,5,11,19,
21,24 123:15 163:17

**modified** 148:7

**moment** 55:21 93:1
118:11 145:6

**money** 100:16

**month** 17:23

**months** 7:10 39:19
55:5,7,15

**morning** 5:9 59:14

**motion** 65:12,23
66:17,24

**mouth** 71:13

**move** 30:7 91:4,22
119:3 147:19 156:19

**moved** 91:1

**muddy** 29:25

**Mulrooney** 31:14,17,
25 32:11 71:3 96:22
111:8 134:7

**multi-year** 76:4

_____

**N**

**named** 31:14 79:8

**names** 19:2

**naming** 48:17

**narrow** 31:9

**narrowly** 153:17

**Nation** 5:17 6:1,11,
17,25 7:17 12:11
13:25 14:2,3,8,12,18
15:4,9 16:2,4 18:8,
12,13,15,17,20 19:21
20:2,9 22:2,3,11,17
24:8 25:1,11,23 26:1,
6,19,24 32:5,19,22
34:12 35:25 36:24
37:13 38:25 39:9,15,
22 40:2,3,15,21 41:4,
21 42:3,23 43:5,7,15
44:3,8,10,19 45:8,17
46:1,10,21 47:4
49:10,17 50:21 52:1,
5,12,17,22 53:16,23
54:4,23 55:6,14 56:5,
20 57:8,22,25 60:6
62:21 63:3,15 65:13,
20 67:6,14 68:4,5,10,
14 72:1,4,11 76:18
77:1 81:6 82:1,23
83:3,11,18 84:4
86:16,21 94:17 100:3
101:8 103:17,23
105:7,15 106:11,17,
25 107:6,11,23
108:11,13 109:8,15
114:19 116:6,8
118:1,21 119:14,22
120:3,9,12 121:6,17,
22 123:20 124:7,13
125:4,8,11,22 126:2,

8,16,25 127:6 132:5,
13,20 135:20 136:5,
14 144:22 148:12
149:8,14 151:13,18
155:10 160:6,14
161:16,25 162:2,7,13
163:6,16

**Nation's** 24:21
104:23

**nature** 122:6,12,17

**nauseam** 116:18

**needed** 81:19 82:10
104:7,22 105:15

**negotiated** 75:13
131:14

**negotiating** 89:24
120:17

**negotiation** 120:10,
15 121:18,24 131:19

**negotiations** 74:13
75:9 131:17

**neutral** 144:15
149:3,6

**neutrals** 24:23 25:13
52:10,23 141:7
150:12,21 153:19

**NEWERA_000004**
78:15

**NEWERA_000160**
27:17

**NEWERA_000184**
95:16

**NEWERA_000220**
69:23

**NEWERA_000327**
93:16

**NEWERA_000375**
133:12

**NEWERA_000398**
129:11

**NEWERA_000432**
111:5

**night** 103:9

**non-consumer**
106:8,12

Index: non-privileged..preparing

**non-privileged** 159:8

**non-written** 73:23

**normal** 58:19

**note** 7:6 29:6 30:13

**notes** 153:5

**notice** 6:10 9:22 12:3,4 50:4 152:24 153:8 154:5

**notices** 6:25 7:4

**notified** 80:2

**notwithstanding** 43:23

**number** 21:15 27:17 31:10 32:18,23 34:5 35:12 36:23,25 37:11 38:11 39:13 41:16 60:11 69:22 78:13 93:13,16 95:16 102:15,19,20 109:8, 14 110:12 111:5 112:11 114:1,13,15, 17 115:17,23,25 116:5,22 117:2 118:12 123:14 125:2 129:11,13 132:20 133:8,12 135:21 156:4,8,13,22 158:23

**numbering** 28:18

**numbers** 30:9 103:2 113:5 115:2,22 116:24

**O**

**O-B-E-R-S-T-E-I-N** 66:18

**oath** 5:3 146:3,11

**Oberstein** 65:15,18, 24 66:18 67:6,13

**object** 8:23 9:6 29:24 48:16 63:25 64:7 69:11 127:13 150:1, 25 151:12 156:16 164:2,18

**objected** 127:15

**objection** 23:4,9,23 24:2,3,14 25:2,6 26:3 33:19 44:5 45:23 46:3,8 47:23 48:11, 13,18 49:12,20 51:12,22 52:14,19,24 53:8,18 54:1 55:17 56:15,16 62:7 64:12, 18 66:1,6,10,19 67:19 68:7,20,24 82:12 84:19 85:9 86:18 87:16,17 90:20,22 107:25 117:24 118:4 119:17 120:6 122:13 124:10, 17 125:24 126:12,18, 19 140:15 141:18 142:11 143:7 147:13, 14 152:15,20 153:3 156:11,19 159:23 160:8 163:14

**objectionable** 151:15

**objections** 23:20 46:19 48:5 50:7 56:22 153:6

**obtained** 146:2

**occurred** 77:19

**October** 61:5,17

**offering** 52:10 55:22 75:15 140:2

**offerings** 52:13

**offers** 144:9

**officer** 103:21

**officially** 93:4

**offline** 164:21

**one-year** 101:4 125:5

**ongoing** 65:16 71:22 74:21

**online** 20:3,8 23:2 46:22 48:25

**open** 7:3 10:1,3 51:13 60:3 61:15 64:25 95:20 111:6 129:17 134:11 138:10 145:5 164:19

**opening** 60:8 95:18

**operated** 76:19

**operates** 76:6,13 153:15

**opine** 14:12

**opinion** 67:11 160:21,22

**opinions** 154:24

**opposed** 106:19 120:3 132:8

**opposite** 107:5

**option** 75:20

**options** 134:17,22 164:3

**oral** 74:9

**orders** 18:18,21 144:11

**outbound** 13:10

**P**

**P.m** 165:5

**Pacific** 59:5

**pages** 29:15 117:1

**paid** 100:13 104:2 123:24 125:14

**PALOS** 5:1

**parents** 14:4

**part** 16:6 23:1 28:11 33:11 34:1 35:10 37:15 38:3 62:8 81:20 89:1 96:16 99:9,13 109:21 140:21 147:21

**partially** 76:9

**parties** 101:6

**passing** 103:9

**past** 90:24 130:10

**patient** 30:1

**pause** 48:20 79:1

**pay** 100:15 104:5 122:25 124:8,14

131:19 132:18

**paying** 105:17

**payment** 76:11 104:2 106:1 121:13 122:21 126:1

**payments** 102:10 161:16,24

**pays** 76:2

**PDF** 28:8 31:10 35:6 96:3

**pedantic** 112:2

**pending** 106:15 107:2

**people** 32:7 54:3 103:22 155:9

**per-case** 132:1,25

**percent** 126:7

**percentage** 100:23 125:17

**Perfect** 27:25

**perfectly** 43:18

**performing** 18:11

**period** 17:23 32:20, 24 34:8 39:11 42:11 45:14 49:3 55:10,21 56:1 76:4 82:25 85:2 100:25 101:2 102:10 115:19 118:15 120:11

**periodically** 35:23 36:2,4

**person** 31:18 35:13 121:1 151:18,22

**personal** 57:1

**personally** 15:21 37:20 81:2

**perspective** 24:21

**phone** 7:14 31:18,19 33:15 63:24 73:10, 11,14,17,22 77:19 78:5,7,8

**phrase** 72:15

**pick** 9:24

**place** 7:24 8:16 45:21 46:2 47:1,9 66:23 127:7 139:23 141:5,8

**platform** 16:3 24:23 25:13 52:10 55:3 75:14 80:1 118:2 140:2

**plenty** 43:24

**point** 6:18 12:11 19:9 34:14 38:6 54:14,16 105:14 115:1 134:1 150:14 154:13 162:4

**points** 122:1 134:25 135:3,10

**posed** 160:12

**posted** 88:21 93:9 139:1

**potential** 134:16,21

**Powerpoint** 35:7

**practice** 21:18 35:21

**pragmatism** 80:15, 23

**pre-arbitration** 40:10

**predate** 106:25

**predetermined** 100:17

**preferred** 131:19

**premise** 153:15

**prep** 93:24 99:13 115:6

**preparation** 10:17, 19 16:7 27:2

**preparatory** 75:5

**prepare** 7:12 10:15 16:8,11 45:9 62:12 84:9 98:22 99:8,11 112:6

**prepared** 10:8,10,23, 24 14:24 17:2 60:6 74:23 84:4,6 85:22 98:14,25 99:5,12,16 113:13,16

**preparing** 18:3 30:18 70:10 76:5

80:5 98:6,18 111:23
135:13 142:6

**preserving** 164:3

**presume** 82:7

**pretty** 31:9 141:16

**previous** 82:14
125:14

**previously** 76:22
105:6

**price** 100:22 103:4
109:10,11,18 110:3,
5,21,24 113:10
114:6,17 116:15
123:20 125:16,18
126:10 131:12,15,20,
24 132:4,8,21,22
134:24

**pricing** 38:10,20
75:25 99:25 100:6,11
101:18,20,23 102:1,
21,22 103:5,6,11,19,
24 109:5,25 110:16
112:16,17 114:8
115:16 116:12
123:14,18 131:6,18

**Primarily** 35:8

**primary** 153:16

**prior** 40:17 62:4
64:16 65:9 77:5
91:14 97:6 111:20
121:10,14 126:7,11
139:9

**private** 21:17

**privilege** 8:24 23:20
48:6 49:21 50:7 60:5
61:5,13,24 62:5,10,
12 63:23 64:14,24
67:19 68:20 73:2
74:7 88:11 90:10,23
91:2,3 119:11 127:2,
13,16 150:7,10
152:17 156:1 159:21
163:12,13,14

**privileged** 8:17
23:10,15,24 24:15,16
25:3,7,20 26:4 45:24
46:4,16 47:6 49:23
51:7,23 52:15,20,25
53:7,9 54:1 58:5,6

65:7,22 66:16 67:10,
16 68:8 85:21 86:10
87:14,19 88:2,3,4,7
90:18,20 117:24
119:1 122:23 123:4,
11,15,21 124:11,18
125:24 126:14 127:9
131:1 136:11,19
137:22 149:17,18,24
150:1,5,23,24,25
151:8,10,15 152:6
153:1 154:1,18,20,25
155:4,7,10,19
156:10,25 159:10,16,
17 160:4 162:16
163:18,21

**problem** 49:11,15

**procedures** 24:22
25:12 52:11,18 80:20
81:3,11,17,24 82:4
83:5,13 84:5,10,17
85:5,15,18,23 86:2
87:12,22 88:15,18
89:17,22 90:2,9,17
91:10 92:1,4 94:13,
16 136:15 137:15,16,
19 138:7,15 139:3,8,
13,23 140:1,4,10,14,
24 141:1,4 142:10,15
143:5,15 148:5,6,10
151:20 152:19,22
153:24 159:9,15

**proceed** 30:16 40:23
126:25

**proceeding** 142:23
159:14,15

**proceedings** 144:1
148:21

**process** 5:19 33:11
34:1 37:14 40:7,14,
19,25 41:12 46:13,15
51:10,19,24 52:4,8
53:5 54:22,25 62:16
71:7 77:24 81:1
89:17 99:1,4 118:6
125:1 136:23 137:13
141:6,8,23 142:7,8,
22 143:16 144:24
151:3,7 154:24
155:2,12,14 157:15,
16,20,21 158:10
160:21

processes 143:17

**produce** 28:25
164:5,11

**produced** 7:16 11:6,
9 12:21,24,25 13:9
27:16 69:22 95:23
96:15 135:20 164:1

**product** 83:25 84:3,
6,10 85:8,22 86:1,9
136:24 137:3,5,11

**production** 65:8

**professionals** 57:1

**promise** 39:4 149:19

**proposal** 75:16

**proposed** 5:10
75:10,12 100:4

**proposing** 117:8

**proud** 90:24 91:4

**provide** 149:15

**provided** 29:5,14
62:14 115:22 116:9

**provider** 22:9 26:9,
11 42:10 43:21
45:15,21 46:2 49:5,8
51:21 76:18 82:2
87:6 108:2 124:8,15

**providers** 106:20
141:2

**providing** 90:5
122:15

**provision** 43:23
47:18,19 117:16
143:9 146:19 148:14

**provisions** 94:21
123:7 140:20 154:11
155:24 158:20,23
159:9

**pub** 93:4

**publicly** 88:22 89:12,
13 93:9

**published** 89:23
92:21,23 93:6,10
94:14,17 139:16
140:6

**publishing** 139:12

**pull** 32:25 37:17,24,
25 38:21 144:25
146:5 157:3

**pulled** 33:1,10 34:1,9
36:10 37:15 38:3,5,
19 116:16 145:17,25
147:15

**pulling** 146:14

**purely** 25:17 54:7

**purpose** 17:12,13
24:20 25:16,17 38:6,
7,8,9 116:17

**purposes** 37:24
38:19

**pushed** 131:12

**put** 15:10 18:21 22:12
71:13 83:6 153:3
164:4,17

**putative** 65:19

**putting** 146:1 154:3

**Q**

**question** 8:24 11:8
20:20 23:6,7 24:13
30:11 31:8 35:20
36:14 37:5 43:1 44:6,
12,14 46:10 47:2
48:9,22,23 49:23
51:1,15,17 53:21
55:18 56:16 57:4,7
63:2,6 64:18,21 65:4
66:13,21 67:9 69:5,9,
10 73:19 77:13 85:2,
20 86:20 87:3,25
89:3,4,19 91:6,24
92:6 97:9,18 99:10
101:22 102:13
112:12 116:1 132:9
133:3 137:8 141:20
143:11,13 146:18,25
147:11,19 150:4
151:11 156:15,16
160:11,18,23

**questioning** 58:15
91:14 127:16

**questions** 5:22 6:16
21:23 29:24 39:6
50:7 51:14 53:11

88:9,13 119:19
137:18,23 143:3
147:17 149:21 150:7,
9,20 151:13 152:22,
24 153:9 154:15
155:24 156:22
158:19 163:23

**quick** 7:11 134:10

**Quinn** 21:13

**R**

**raised** 23:8 68:4,6

**range** 68:16 97:23
113:2,7,11,16,20,23
114:2,4,12 115:11,20

**rank** 141:7,22 142:8,
22 143:15 151:2,7

**rationale** 134:16,25

**reaching** 68:5

**read** 28:15 72:19
78:13,24 130:22
137:16 142:2,3
144:4,20 159:2

**reading** 64:23
146:15 157:19 159:5,
18

**ready** 59:16 128:23
161:11

**real** 30:4

**real-time** 18:1,5
20:24 21:2 74:20
99:4,7

**reask** 44:12

**reason** 27:19 28:20,
23 45:25 46:6,11
50:1,12 51:2 57:2,3,8
58:2 62:18 82:6,11,
15,16,19,20 127:6
138:21 146:7

**reasonable** 137:22
149:12,23 150:8,21
151:7,14,24 152:4,
12,18 153:24 154:18
155:25 160:15

**reasoned** 58:3

Index: reasoning..Sears

**reasoning** 125:18,21
130:5 131:21,23
132:7

**reasons** 56:14,19,
20,24 57:14,16,23
58:1,4 123:10,13
153:2,25

**recall** 7:25 13:6,16,
19 19:13 28:15
30:20,25 31:2,19,22
34:2,3 37:19,22
39:18 64:5,8 65:10,
14 66:21,25 67:1,3,
25 68:1 70:4,8,9,12
71:1 79:3 80:6,10,21,
25 84:18 85:6,25
86:1 93:21,25 95:1
97:6,11,13 98:1,19
105:24 107:9,21
108:9 116:23 125:25
130:2 131:23 133:25
135:14,15,17 137:2,
14 139:7 144:7,19
154:13 156:6

**received** 12:14

**recent** 105:23 106:4
138:18 145:18

**recess** 59:10 128:18
161:7

**recollection** 11:22
12:1,7,12 30:23 31:1
33:12 55:1 70:7
72:20 74:5 80:8,9
88:20 92:16 97:15
98:24 119:9 124:6
142:1

**record** 16:23 27:16,
23 29:12,22,25 30:6,
7,10 46:18 50:6 59:8,
9,13 60:10,19,21,24,
25 61:2 65:17 78:14
83:14 127:17 128:14,
17,20 153:3,6,9
161:1,6,9 164:3,4,17
165:4

**record's** 20:6

**records** 34:18

**refer** 6:11 32:18 37:3
71:25

**reference** 147:24

**160:7 162:24**

**referenced** 6:14

**references** 160:14

**referred** 37:7

**referring** 6:12 20:7
72:14 86:22 150:15
162:22

**refers** 32:17 135:4

**reflect** 55:4

**reflected** 63:22

**refresh** 142:1

**refreshed** 11:21,25
12:7,12 30:23,25
70:6 80:7,10

**refunds** 112:18

**rehashing** 137:9

**relate** 102:21

**related** 38:7

**relates** 101:18

**relationship** 18:22
151:19

**relay** 16:15

**relayed** 33:17

**relevant** 164:12

**remaining** 134:11

**remains** 160:23

**remember** 13:19
21:10,24 22:1 30:21
34:7,11 36:22 45:4
65:15,16 67:23 72:22
73:2,4,16 84:25 90:3
93:23 94:20,22 95:5
97:19 98:13 100:8
105:6,9 120:18
130:1,15 136:16
139:11,18 142:21
148:20 151:4 161:15
162:20,21 163:1

**remembered** 12:17

**remembering** 12:24

**remind** 93:12

**remove** 27:20

**renew** 125:9,11
126:9 162:2

**renewal** 134:13

**renewed** 126:2,17

**renews** 126:21

**repeat** 23:23 62:9
66:4

**repeatedly** 127:15

**replaced** 22:4,7

**reporter** 5:5 25:24
27:8 38:14,17 48:1,3
58:24 59:1,7,12
60:14,17,20,23 61:1
66:8 67:18 78:11
93:14 95:9 111:2
124:12 128:8,16,19
129:12,15 145:9
161:2,5,8 165:2

**reporting** 35:15

**reports** 35:2,5,25

**represent** 15:6 18:15
33:4 72:11 96:10
138:17 145:17

**representative** 6:9
14:7 15:4 40:20

**representatives**
14:5 15:9

**represented** 29:2

**representing** 5:10
14:18 18:10 72:4
146:16

**Represents** 32:5

**request** 25:24 38:14
48:1,5 60:14 62:10
67:18 124:12 164:5,
10,20

**requests** 62:15

**require** 76:11

**required** 40:15 50:3

**requirements**
104:11

**requires** 133:5

**reread** 155:21

**researched** 36:10

**reserve** 163:24

**resolution** 40:7
80:16,24 86:14,17
87:4 131:1 159:14,15

**resolve** 40:22 118:2

**resolved** 40:10,23
41:12 117:9

**resolving** 130:20

**respect** 105:16,25
106:1 164:19

**respectfully** 46:17
153:8

**response** 82:16
156:9 158:19,22,25

**responsible** 20:14
81:8 82:22,24

**responsive** 62:14
164:11

**rest** 58:24

**result** 20:1

**resume** 59:16 128:23
161:11

**review** 11:5,10,17
13:13,17 46:23 81:2
82:21 89:9 97:7,15
98:1,6,17 112:7
114:14 136:7 139:22
140:5

**reviewed** 7:16,17
11:8 12:22,24 13:3
30:18 62:13 70:20
80:4 81:16,24 82:3,7,
19,20 83:24 97:19
98:22 111:15 112:3
130:3 135:13 138:14

**reviewing** 10:23
11:2 97:11,13 98:19
130:1 133:25 139:7
142:6

**Rich** 79:8

**rights** 101:7

**risk** 163:17,21

**Robin** 8:6 129:1

**role** 79:11

**Rowles** 62:25 121:4
122:2,5

**rule** 5:25 144:20

**rules** 5:21 24:22
25:12 52:10,18 80:20
81:3,10,12,16,24
82:4,19,20 83:4,5,12,
17,19,24 84:4,10,16
85:4,15,18,23 86:2
87:12,22 88:15,17
89:6,9,16,22 90:2,9,
16 91:9 92:1,3,4,8,
10,13,17,18,23 93:7
94:13,16,21,23 96:25
136:15 137:15,16,18
138:7,14,18 139:1,3,
8,12,22 140:3,6,14,
23,25 141:4,15
142:10,15,18 143:5,
14 148:5,6,10,17
149:11 151:20,23
152:4,12,19,22
153:23 154:9,12,16,
22 155:14,18,21
156:5,23 157:2
158:19 159:1,9,14,20

**run** 91:15 108:20
109:2

**running** 82:16

---

**S**

**Sadik** 8:6 16:13
25:19 56:17 59:19
62:9 64:19 66:2
67:20 69:11,12 84:20
90:23 117:21 124:22
127:18 129:1 159:24
161:14 164:2,5

**sales** 42:24

**save** 158:17 160:18

**saved** 126:4

**scroll** 28:7 31:5 96:2,
7 136:2 147:7

**Sears** 5:8,9 6:21,24
9:3,12 23:7,12,18
24:4,7,18 25:4,10,25
26:5 27:3,6,10,15,23,
25 28:23 29:18,21
30:12,17 33:24 38:18
44:7,10,15 45:25

Index: sec..switch

46:5,9,17,20 48:4,8,
19,23 49:16,25
51:18,24 52:16,21
53:1,15,22 54:2 56:3,
17,18 57:4 58:7,13,
17 59:4,14 60:9,12,
15,19 61:3 62:9,11
64:1,9,13,19,23 66:2,
4,11 67:1,20,23 68:9,
21,25 69:10,14,20,25
78:9,12,17 79:3
82:23 84:22 85:13
86:24 87:20 88:1
90:22 91:6 93:11,15,
19 95:7,11 108:4
110:25 111:4 117:25
118:7 119:21 122:18
124:13,19 125:7,25
126:15,24 127:18,22
128:4,9,21 129:10,
14,18 133:10,14
135:18,23 138:5,9
140:18 141:21
142:19 143:12 145:3,
11,14 147:18 150:6
151:2,17 152:16
153:4,11 156:17,21
160:5,10,24 161:10
163:15,22 164:22

**sec** 87:16

**section** 110:15
112:17 117:5 130:8,
11,15 147:20 150:14
157:5,17,19,22

**seeking** 105:5

**select** 11:17 47:9
50:16

**selected** 11:16,19
46:11 155:15

**selecting** 46:15 47:1

**selection** 149:3,6

**send** 33:13 40:16

**sending** 108:11

**sense** 15:3,5 96:19

**sentence** 158:6

**sentences** 158:3

**separate** 76:12

**serve** 154:5

**served** 7:7,10 80:2

**serves** 19:3

**service** 164:25

**services** 75:24 76:3

**set** 44:16 92:13
121:13 144:3

**setting** 41:25 79:24

**settled** 39:20 119:15

**settlement** 104:18
106:4

**Shane** 31:14,20,22

**share** 159:8 163:11

**shared** 33:15,16

**ships** 103:9

**short** 80:3

**shorthand** 72:3,8

**show** 34:1 64:15
145:1 156:6

**showed** 33:6

**shown** 164:10

**shows** 61:23 74:8
116:19

**side** 75:10,16

**side-by-side** 146:13

**signature** 79:13
136:3

**signed** 19:21 22:2,15
31:21 55:13 77:12,15
92:22,24 94:7,9,18
100:18 104:1,4
108:19 136:5 139:19
140:7

**significantly** 44:24
116:23

**signing** 77:5

**simple** 147:19

**simply** 143:3

**single-handedly**
81:7

**site** 139:1 145:22
146:5

**sitting** 31:23 37:12
53:12 62:15 116:20
134:3 141:13 162:12

**size** 126:1

**skimmed** 138:23

**skimming** 138:22

**skipped** 130:10

**solely** 20:14 157:15,
21

**sort** 16:3 92:4,12

**sound** 33:8 119:8

**Sounds** 59:6

**source** 68:22 91:7

**speak** 74:23 75:3
86:20

**speaking** 23:20 24:2
72:13 74:19,20
141:10 153:6

**speaks** 56:1

**specific** 6:13 8:1
12:5,9,15,19 17:11
28:15 30:20,25 45:6
51:15 54:13,16
105:19 130:2 140:20
143:9 144:20 146:19

**specifically** 7:8
17:19 31:19 49:17
66:21 68:1 70:12
107:10,20 113:15
154:16

**specificity** 116:23

**speculate** 15:7

**speculation** 33:20
62:8

**speeches** 153:6

**speed** 17:16

**spend** 55:15 142:14

**spent** 29:6 55:7 78:7

**spits** 103:2

**spoke** 72:17 74:6
75:19

**spreadsheet** 34:21
103:2

**spreadsheets** 35:2,
8 36:1 37:8

**squarely** 159:16

**stamp** 70:25 78:14

**stand** 82:13

**standalone** 100:21

**standard** 131:25
132:24 157:16,21

**stands** 45:12

**start** 83:21

**started** 107:8 113:25

**starting** 23:19 31:12

**starts** 157:5

**startup** 19:12

**state** 87:18

**statement** 131:3

**Stay** 165:2

**stenographic** 5:5
16:23 27:8 38:17
48:3 59:1,7,12 60:17,
20,23 61:1 78:11
93:14 95:9 111:2
128:8,16,19 129:12,
15 145:9 161:2,5,8
165:2

**stop** 48:16 49:18

**stored** 34:15,18,20,
21

**straight** 121:16

**straightforward**
146:25

**strategy** 163:3,5

**strike** 11:20 21:5
28:2 34:7 141:7,23
142:8,22 143:15
151:3,7

**subject** 85:4 106:9
137:5,7

**subjects** 12:16

**submission** 117:5

**subpoena** 13:21
164:12

**subscription** 7:18,
19 19:21 20:1 22:2
31:21 54:20 55:12
74:14 75:11,15,20
76:1,2,9,11,12,25
77:6,11 87:7 89:24
92:22,24 94:6,18
95:25 96:4,12,23
97:3,12 98:2,10,17,
20,21 99:17,24
100:15 101:18,19
102:9,22 103:3,19,23
104:1,6,22 109:4,5,
25 110:7,10,11
111:12 112:21 114:8,
12 115:16 116:12
118:3,22 119:16,24
120:12,23 121:6
122:20 123:3,25
126:9 129:24 133:23
135:25 139:9,19
161:16

**subscription-fee**
76:6,14,16,20

**subsection** 150:16
158:3

**subsections** 158:1

**subset** 11:6 92:8,14

**subsidiaries** 14:4
18:16

**substance** 7:9
16:16,19 62:20 73:11
77:25 80:20 86:7
96:21 121:10 123:3
131:17 137:6 159:20

**substantive** 77:9

**sufficiently** 156:18

**suggest** 160:24

**suggesting** 55:19

**suggests** 75:13
121:9

**supplemental** 61:13

**switch** 22:23 40:6
41:8 50:24 51:4 53:4,
17,25 54:4,14,17,23
55:8,16,25 56:4,10
67:7,15 81:2,20
106:23,25 108:8,9

Index: switched..turned

**switched** 20:2 22:8 39:23 40:4 41:4 42:6 43:5 54:20 56:21 108:6

**switching** 26:5 41:22 42:3,12 44:3, 19 45:6 49:5 50:1,12 52:1,6 57:23 62:22 63:3,11,20 64:3 82:1 106:6 107:13

**sworn** 5:3

**system** 35:14,19 141:5

**T**

**table** 41:25 44:16

**tailored** 153:18

**taking** 67:22 79:16 95:12

**talk** 14:14 19:19 59:18 72:3 117:21 121:17,21 128:25 161:13 164:21

**talked** 18:7 66:2 72:4 120:22 121:1,5,8 122:1 129:1 130:16 136:13 155:1 161:15 162:18,22

**talking** 18:2 21:24 23:10 36:7 72:10 92:17,20 94:20,24 101:15 103:1,2 112:24

**talks** 153:12

**team** 72:2,6,9,17 73:12,18,24 74:13,19 75:9,19 77:18 78:2 79:25 91:8 96:23 109:24 111:9 113:11 133:18

**tear** 101:13

**technically** 19:14

**telling** 36:22 48:16 105:7 146:1

**ten** 26:14,22 119:6,12

**term** 13:24 15:8

100:18 101:6 110:3 117:11 118:15,22 119:15,23 120:17 123:10 124:23 125:2, 23 131:6 137:21

**terminate** 101:9 126:23,25 162:7

**termination** 101:6 118:15

**terms** 10:17 20:3,7,8 21:6,24 22:4,9,13,18, 23 23:2 36:18 39:24 40:8,12,16 41:1,8 46:22,24 47:14,17,21 48:25 49:6,7 51:21 52:2,7 53:5 54:5 55:4,11 56:6 76:23 81:6,9,10,13 87:6 93:5 100:12 101:4 103:6 106:9 107:13 126:21 132:14 133:1 144:22 145:8,15 146:4,14,17,20 148:7 151:14 160:6,15 163:7 164:17

**territory** 160:4

**test** 141:11

**testified** 9:1 20:18 21:6 25:10 30:24 55:20 76:21,22 85:1 132:22 137:15

**testify** 5:4 10:7,8,10, 25 16:8 38:2 50:12 82:18 87:8 98:14,25 99:13 113:14,16 123:16 124:25 125:6 152:11,17 153:22 154:6 157:2 159:3 160:3,20

**testifying** 6:8

**testimony** 8:21 9:15, 19 45:11 55:9 57:9, 13 64:11 89:11 93:8 120:25 143:2 151:24

**thankful** 80:14

**that'd** 113:20

**there'd** 110:23

**thereto** 121:15

**thing** 91:13 105:21 133:1 142:20,21 157:14

**things** 12:17 24:24 25:14 31:24 80:12 81:11 134:9 143:4 144:8

**thinking** 15:11

**thinks** 151:14

**thought** 60:15 62:16 83:2 93:7 102:5 113:24 118:6 125:1 134:10 136:23 137:12 146:24 147:19 154:24 160:21

**thoughts** 49:24 88:6 149:16 159:17 160:21

**thousands** 36:7,9

**threshold** 104:15,17

**thrilled** 80:14

**THURSDAY** 5:1

**ticket** 42:24

**Ticketmaster** 6:2, 12,17 7:1,17 9:24 10:3 18:12,14,16,18, 20 20:2,8 22:3,11,18 25:5 26:1,6,20,25 32:19,23 34:12 36:24 39:1,10,15,23 40:3, 15,21,41:4,22,42:3, 24 43:5,8,15 44:11, 19 45:8,17 46:1,11, 21 47:5 49:10,18 50:21 52:1,6,17,22 53:24 54:3,23 55:7, 15 56:20 57:23,25 60:7 63:10,16 65:13, 20 68:6 76:19 77:2 81:6 82:1 83:3,12,18 84:4 86:16,22 100:4 103:17,23 105:7,12, 14 106:11,18 107:1, 6,12,23 108:11,13 109:15 114:19 116:6, 9 118:1,21 119:15,22 120:3,9,12 121:7,18 123:20 124:7,14 125:4,22 126:8,17

132:5,13,20 135:20 136:14 155:10 160:6, 14 161:25 163:6

**Ticketmaster's** 18:9 53:16 56:6 67:7,14 68:10 144:22 145:15

**Ticketmaster.com** 40:13

**time** 12:23 17:15 22:17 23:17 32:20,24 34:8,18 35:22 37:6, 21 40:6 41:7 42:11 49:1,3,11 52:3 54:14, 16 55:10,21,22 64:19 66:23 67:24 71:23 72:16 73:15 78:8 79:4,16 82:11 89:23 92:19 93:9 94:24 97:11,19 99:20 100:17 102:10 105:23 106:16 115:19 128:11 138:12 139:4,7 142:14,15 143:19 149:13 150:13,22 152:14 154:11 158:17 160:18 163:22,23,24 164:23

**time-limited** 144:2, 14 148:22

**timeline** 39:18 56:1 148:25 149:6,22 150:7

**timelines** 144:2 148:23

**times** 21:11 30:3 74:6 76:9

**timing** 12:13 67:3

**TM00000032** 135:21

**Tobias** 5:2,9 15:15 23:11,25 24:8 25:10 27:7 28:1 30:17 35:24 59:15 61:6 62:11 64:24 66:4,11 70:1 78:18 93:20 111:7 128:5,22 129:8 133:15 145:5,16 149:19 150:3 156:21 161:10 163:23 164:9, 23

**today** 31:23 116:20 134:3 141:14 162:12 164:25

**told** 30:22 32:7 39:21 41:20 42:1 53:6,13 70:22 71:7,12 74:12, 22 81:5 82:7 90:1,21 91:16 99:23 102:9 111:22 113:25 120:19 123:14 125:7 143:6

**tone** 24:5

**top** 31:12 143:25 147:1 157:6 158:6

**topic** 10:13,16 21:9 24:11 85:7,8 86:4 91:19 99:12 127:10 142:13 152:23,25 153:25

**topics** 6:10 9:21,23 10:5,8,16,20,24 12:3, 4 16:20 17:17,22 45:11 85:11 154:4

**totally** 81:14

**tough** 91:12

**track** 22:16 26:25 27:11 34:16 36:23,25 37:1

**tracking** 41:14

**tracks** 35:11 37:11

**training** 5:14

**transcript** 8:11

**transferring** 106:18

**treading** 160:3

**tricks** 146:6

**triggered** 104:12

**true** 14:17 18:13 89:25 91:17 154:21 160:6

**trust** 86:16,21 87:3,8

**trusting** 86:13

**turn** 110:9 112:10 131:3 143:23

**turned** 59:2

**two-month** 55:9,20 56:1

**type** 163:4

**types** 34:23,25

**typical** 131:18

**typically** 158:22

___

**U**

**ultimately** 119:6,15

**Um-hum** 32:15

**unclear** 5:23

**unconscionable** 85:19,24 86:3 149:23 152:5,13 160:10

**understand** 5:12,19, 25 6:12 7:8 10:5 20:7 24:22 25:12 31:4 38:18 39:7 42:25 49:15 50:6,8,22 51:16 56:13,19 71:14 72:10,13 75:17 76:5 86:5 87:24 88:8,11 89:5 90:9 92:3,8 101:21 102:23 103:7 104:13 109:18 136:19 137:25 138:3, 4,18 155:13,20 158:21

**understanding** 6:4, 7,8 8:21 9:14 14:9 17:6,9,10 18:1,3 29:19 32:16 33:5,22 38:16 64:15 70:14 72:21 74:18 75:8 76:8 77:17 79:11 81:12,17 83:22 88:25 89:6,22 90:15 91:9 92:15 95:4 96:11,16 99:3 100:10 101:3, 17,22 102:3,8 113:4, 17 114:3 116:4 119:4 120:25 133:5 139:2,5 141:14 146:19 153:19 154:10 155:17 164:7

**understood** 9:12 112:3

**unfolding** 77:9

**unhappy** 101:12

**unilaterally** 101:9

**universe** 62:17

**unprofessional** 48:21

**upcoming** 164:13

**update** 35:22,23 36:2 41:8 78:4

**updated** 55:4,12 111:12 129:23 133:22 145:23 147:2, 5

___

**V**

**vague** 36:20 47:23 49:12 53:18 85:9 119:20 124:10,17 140:15 142:11 143:7 160:8

**vaguely** 8:16

**varied** 116:21

**varies** 34:6 44:24 116:21

**verbatim** 146:15 159:5

**VERDES** 5:1

**version** 134:4 139:15

**versus** 12:25 17:20 83:5

**vetting** 51:10,19,25 52:5 71:8

**view** 123:2 130:24 140:3 149:24 151:8 154:17

**viewing** 27:21

**views** 136:10 154:4, 19,24 155:3,19 156:10,24 157:1 158:11 159:8,10,16, 21 160:20 163:10,16, 19,20

**virtual** 148:4,9

**vis-a-vis** 42:24

**vision** 80:14,22

**visualize** 35:6

___

**W**

**Wait** 92:23 121:16

**walk** 35:24 143:21

**wanted** 63:15 113:22 127:21

**warning** 58:19

**Watkins** 7:15 14:7, 18 15:3 16:5,25 18:7 31:15 52:9 63:19 64:2 68:4,23 71:4 73:7 84:9,16 85:12, 14,18 88:14,19 89:23 90:2,12,16

**ways** 39:6 153:16

**website** 88:21 89:13 93:9,10 94:14 145:18 146:4,15 147:15

**week** 7:25 8:9

**well-regarded** 45:15

**whim** 56:10 82:10

**Whoops** 159:24

**Willard** 105:5 121:12

**wiring** 122:21

**withheld** 61:23 62:5 65:8

**witness's** 62:8

**witnesses** 150:17 156:4,8,14,22

**word** 15:10 35:16 37:9 50:25 55:18 83:11,14,23 96:20 111:21 120:6 138:25 145:21 146:2,22 147:14

**words** 71:13 159:19 160:2

**work** 18:11,24 35:21 47:3,7 56:8 58:1 70:17 77:24 83:25 84:3,6,9 85:8,22 86:1,9 102:10 131:3

136:24 137:3,5,10

**worked** 24:23 25:13 76:19,22 123:23 140:2

**working** 81:13

**works** 9:25 18:22 75:21,23 100:1,13,14 102:4 103:3 140:3 155:20

**Wow** 95:18

**writing** 73:7 78:5

**written** 64:1 74:8 84:6,9 85:8,22 86:1

**wrong** 41:5 147:9

**wrote** 81:5

___

**Y**

**year** 19:14 21:8 34:6 39:8 41:3 44:23,24, 25 45:6,13 74:4 100:19,22 103:4 104:21 107:20 109:6 116:22,25 123:19,24 124:3,4,9,15 125:9, 14,15,19 126:7,11

**years** 19:13 26:13,15 34:17 35:13 44:25 45:2,18 47:11 74:5 100:19,23,24 101:2, 6,10 108:20 119:6,7, 12,16 125:3,5,17

**yesterday** 7:7 8:1

___

**Z**

**Zoom** 15:1,23,25 31:18 33:6 77:19 79:19,23

**Zooms** 73:23

# EXHIBIT E

***CONFIDENTIAL UNDER PROTECTIVE ORDER***

**KELLEY DRYE & WARREN LLP**
  Sandra Musumeci (State Bar No. )
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897
SMusumeci@kelleydrye.com

Becca Wahlquist
BWahlquist@kelleydrye.com
Attorneys for Defendant
NEW ERA ADR, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SKOT HECKMAN, Luis Ponce, Jeanene Popp, and Jacob Roberts, on behalf of themselves and all those similarly situated,<br><br>              Plaintiffs,<br><br>   v.<br><br>LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER LLC,<br><br>              Defendants. | Case No.  22-cv-00047-GW-GJS<br><br>Hon. George Wu<br><br>**DECLARATION OF COLLIN WILLIAMS ON BEHALF OF NEW ERA ADR, INC.** |

**Exhibit 2**

DocuSign Envelope ID: AAAA6360-8A45-4382-A186-B335F1F05900

***CONFIDENTIAL UNDER PROTECTIVE ORDER***

1    I, COLLIN WILLIAMS, declare as follows:

2         1.    I am the Chairman and Co-Founder of New Era ADR, Inc. ("New

3    Era"). I am an attorney in good standing in the States of Colorado, Illinois, and

4    Mississippi. I make this Declaration in accord with the order of this Court dated

5    November 18, 2022 (ECF No. 98) as a witness on behalf of New Era pursuant to

6    Fed.R.Civ.P. 30(b)(6). I am authorized to testify on behalf of New Era itself, and

7    unless otherwise noted, I have personal knowledge of the facts set forth herein based

8    on my personal experience founding, building, and working for New Era and my

9    review of New Era's financial and other records.

10        2.    In particular, it is my understanding that the Court has required that

11   New Era provide a sworn declaration through a Rule 30(b)(6) witness setting forth

12   information "regarding the percentage of New Era's business that is comprised of

13   subscription payments (or other remuneration) from" Live Nation Entertainment,

14   Inc. ("Live Nation") and Ticketmaster LLC ("Ticketmaster," or collectively,

15   "Defendants"). (ECF No. 98, at 3.) The Court also required that New Era disclose

16   "how many other subscription customers the business has as well as New Era's total

17   revenue (so that percentage can be applied to that number)." (*Id.*) By this

18   declaration, I am providing that information as a Rule 30(b)(6) witness on behalf of

19   New Era.

20        3.    New Era was established as a corporation in 2020 and first launched its

21   alternative resolution platform in April 2021.

22        4.    In 2020, zero percent of New Era's business was comprised of

23   subscription payments or other remuneration from Live Nation and/or Ticketmaster.

24        5.    In 2021, approximately 98% percent of New Era's revenue was

25   comprised of subscription payments or other remuneration from Live Nation and/or

26   Ticketmaster. New Era also procured $1.7M in pre-seed investment to fund

27   operations and expenses and was not reliant on Live Nation's subscription revenue

28   to operate the business.

1

***CONFIDENTIAL UNDER PROTECTIVE ORDER***

6.    In 2022, approximately ████ percent of New Era's revenue was comprised of subscription payments or other remuneration from Live Nation and/or Ticketmaster.  New Era also procured $4.6M in seed investment to fund operations and expenses and was not reliant on Live Nation's subscription revenue to operate the business.

7.    New Era currently has 6 subscription customers, and its total 2022 revenue is ████.

8.    This information concerning New Era's revenues and subscription revenue is sensitive and proprietary information that New Era is designating as CONFIDENTIAL under the terms of the Protective Order issued in this litigation. The disclosure of this information beyond the parties in this litigation and beyond the purposes of this litigation would very likely have a detrimental impact on New Era and put New Era at a competitive disadvantage, both with respect to competitors and when negotiating with potential customers.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of January, 2023.

DocuSigned by:

*Collin Williams*

18D1E76E9CE64D8...

Collin Williams

2

# EXHIBIT F

Message

| | |
|---|---|
| **From**: | Collin Williams [collin@neweraadr.com] |
| **on behalf of** | Collin Williams <collin@neweraadr.com> [collin@neweraadr.com] |
| **Sent**: | 2/8/2021 12:11:20 PM |
| **To**: | cathy.birkeland@lw.com |
| **Subject**: | New Era Materials |

Hey Cathy!

Here are some materials on the new venture. This is a <u>one pager</u> that is very easy to circulate and tells the 50,000ft view.

This is the <u>deck</u> that we use for our presentation. This obviously makes more sense as we go through it in person. It only takes about 20 minutes and then we leave time for Q&A.

Would love to present to the firm and/or to talk to anyone who is interested!

Best,

Collin


--
Collin Williams
Founder and Chairman - **New Era ADR**
<u>collin@neweraadr.com</u> I 312-890-3747
<u>LinkedIn</u>





Confidential

4-SER-553

NEWERA_000227



## Tell Your Story. Get a Decision. Get Back to Growth.

Court litigation and traditional ADR forums are inefficient and costly for your clients. New Era is the first fully-digital, fully-virtual, and modern alternative forum that allows attorneys to resolve their clients' disputes faster and to ultimately deliver a vastly better client experience. Clients want new, better solutions that resolve their problems quickly, but they haven't existed until now. We know, we were those clients.

| | Federal & State Courts | Traditional Arbitration | NEW ERA |
|---|:---:|:---:|:---:|
| EXPERIENCED NEUTRALS | ◉ | ◉ | ◉ |
| PRIVATE AND SECURE | | ◉ | ◉ |
| EASY TO NAVIGATE EASY TO USE | | | ◉ |
| LEGALLY BINDING DECISION IN UNDER 100 DAYS | | | ◉ |
| FULLY DIGITAL MEDIATION AND ARBITRATION PROCESS | | | ◉ |
| FLAT FEE (INCLUDING NEUTRAL FEES); COST CERTAINTY FOR ALL PARTIES | | | ◉ |

## How We Foster Efficient, Effective Resolutions With FLAT Fees

# How We Foster Efficient, Effective Resolutions With FLAT Fees



## Virtual Mediation

Virtual mediations that are streamlined and more user-friendly using New Era's Virtual Mediation Wizard.  We also offer a hybrid mediation option with binding resolution creating additional efficiencies.



## E-Arbitration

Virtual arbitrations that are conducted digitally through our online platform with simplified procedures.  We also offer an expedited e-arbitration for simpler, less intensive matters.



## Virtual Moot Arguments

Moot your case, portions of your case, or simply case theories, in front of one of our experienced neutrals creating additional case efficiencies and more effective advocacy for your clients.

# Highly Experienced Neutrals

You get the same caliber decision-makers as judges in court or neutrals in traditional ADR forums. The only difference is New Era ADR uses a modern purpose-built technology platform to drive efficient resolutions.

### Judicial Arbiter Group (JAG)
Standing bench of 30 ex-judges
www.jaginc.com

### National Academy of Distinguished Neutrals (NADN)
Hundred of the top neutrals across the country
www.nadn.org



www.neweraadr.com

Confidential

NEWERA_001679



# Advanced Dispute Resolution

**The Digital ODR Platform — A _Free_, Powerful Client Service Tool for Law Firms**

Rachel Thompson, Strategic Client Development Lead

Shane Mulrooney, Head of Growth & Co-Founder

Collin Williams, Founder/Chairman

Rich Lee, CEO & Co-Founder



Confidential

© New Era ADR, Inc.

NEWERA_001963



**U.S. Courts and Traditional ADR Forums Are Costly and Unpredictable**

*Businesses reluctantly accept litigation in these antiquated forums as a cost of doing business*

*This drains companies of valuable time and money*

Average Time To Resolution

**175 Days**
Small Claims Court Disputes

**309 Days**
Contract Claims In Court

**365 Days**
$500k - $1M Arbitrations

**414+ Days**
$1M - $10M+ Arbitrations

Confidential

NEW ERA ADR

© New Era ADR, Inc.

NEWERA_001964

**4-SER-557**

**There's A Disconnect About What Clients Really Want From Litigation**

"Litigators [fight over countless procedural issues] because they're just responding to existing systems and the perception that clients demand closure of every loophole.

However, if it were up to the clients, they [will choose to] forego some of the so-called 'due process' in favor of a solution that focuses on the actual business needs of the parties and a speedy timeframe in order to get back to business"

- SVP, Litigation at Fortune Global 200 Manufacturer

NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001965

**4-SER-558**



# Businesses Want Change…They Need Change

## Businesses and Corporate Legal Teams Constantly Try To Do More With Less
## From: *Norton Rose Litigation Trends Survey*

### Magnified by the Pandemic

- 31% of corporations reported **increase in disputes**
- 50% of in-house legal teams are being **pressured to reduce spend**
- 70% of corporations reported an **increase in workload**
- 33% of in-house legal teams have seen an **increase in their backlog of disputes**
- Volume of **disputes increased 65%** for companies over >$1B
- Legal department headcount is static - **forced to do more with less**
- 75% of corporations want new **preventative dispute mitigation procedures**
- **Contracts and commercial disputes** are the largest category of litigation

NEW ERA ADR

© New Era ADR, Inc.

## Digital ODR Platform - A True Alternative to Courts & Traditional Arbitration



New Era brings qualities to litigation that have long been desired by businesses, in-house counsel, and their attorneys. Resulting in a finite, predictable process that achieves companies' business and litigation objectives



**Predictable Processes**

**Transparent Flat Fee**

**Digital-Native & Purpose-Built for ADR**

**Experienced Arbitrators + Mediators**

Confidential

NEW ERA ADR

© New Era ADR, Inc.

NEWERA_001967

**4-SER-560**

## Experienced Neutrals

New Era partners with the National Academy of Distinguished Neutrals (NADN).

Bringing only **the most experienced professionals** who've done and seen it all.

For example:



### Sandy Brook

- Former Chief Judge, Indiana Court of Appeals
- Former Chief Judge, Trial Court Indiana
- 16 years as a trial judge
- NADN Member



### Larry Naves

- Former Chief District Court Judge
- Fellow, College of Commercial Arbitrators
- 13 years as a judge
- NADN Member



### Nancy Rice

- Former Chief Justice, Colorado Supreme Court
- Former Professor - University of Colorado School of Law
- 31 years as a judge
- NADN Member



**New Era ADR Bench:** Creating the next generation of neutrals with a priority on diversity in background and experience. We invite firms to help create this bench.

NEW ERA ADR

Confidential

© New Era ADR, Inc.

NEWERA_001968

4-SER-561

## Streamlined, Predictable Procedures for a Digital World

Focus on your **best arguments** and **best evidence**.

Save client's time and money by not exhausting *every* argument and *every* piece of evidence.

### Status Quo

Overwhelming amount of rules, minutia and procedure

Unnecessary focus on granularity

Motions about motions

Inundation with documents

### New Era ADR

Neutral-Driven Process

Reduced/Simplified Discovery

No superfluous motion practice

Laser focus on the story/ Be an Advocate

7

NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001969

**4-SER-562**

## Two Primary Solutions

### On-Demand Arbitrations and Mediations

- Any business can opt for New Era's streamlined arbitrations and mediations without an upfront subscription fee
- Access the same highly experienced neutrals as subscription customers





### Customized Subscription Solutions

- Every business faces unique and nuanced risks
- New Era creates highly customized pricing and protections tailored to the specific risk of each organization
- **Mass arbitrations**

### All Built On Our Digital ADR Platform

- Highly extensible to meet dispute resolution needs in even the most niche industries
- Higher ed, athletic associations, niche areas of law



Confidential

 NEW ERA ADR

© New Era ADR, Inc.

NEWERA_001970

**4-SER-563**

## New Era ADR Comparison Chart

| | FEDERAL AND STATE COURTS | JAMS / AMERICAN ARBITRATION ASSOCIATION | NEW ERA ADR |
|---|---|---|---|
| **EXPERIENCED NEUTRALS** | ✓ | ✓ | ✓ |
| **PRIVATE AND SECURE** | | ✓ | ✓ |
| **EASY TO NAVIGATE, EASY TO USE** | | | ✓ |
| **LEGALLY BINDING DECISION IN UNDER 100 DAYS** | | | ✓ |
| **FULLY-DIGITAL, PREDICTABLE ARBITRATION PROCESS** | | | ✓ |
| **FLAT FEE (INCLUDING NEUTRAL FEES); COST CERTAINTY FOR ALL PARTIES** | | | ✓ |

Confidential

NEW ERA ADR

© New Era ADR, Inc.

NEWERA_001971

4-SER-564



## Deliver Better Client Service

The law is a client service industry. Clients want attorneys to be problems solvers so they can focus on their businesses and their lives. Firms who find innovative ways to de-risk their clients always come out ahead.

## New Era Adds Immense Value to Law Firms

## All at *no cost* to firms



## Create Highly Profitable Flat Fee Models

Clients crave flat fees. **New Era = time certainty + cost certainty**. That Certainty allows firms to create **highly profitable flat fee models** that meet client asks and your firm's economic requirements.



## Refer out fewer cases

Many firms refer away smaller cases (often from existing clients) because they cannot be handled economically. But each case referred elsewhere is a lost opportunity to build + nurture your client relationship



## Moot Arguments
*(The only benefit that's for a fee)*

Test the theories and narratives of your case with one or more of the 800+ experienced neutrals available to you. Hone your arguments, target your discovery, and deliver better, more cost-effective representation



## Train young attorneys

Faster and simpler cases offer unparalleled opportunity to provide a younger and more diverse pool of attorneys strong substantive (even first-chair) experience litigating disputes from start to finish.

Confidential



© New Era ADR, Inc.

NEWERA_001972

**4-SER-565**

## Law Firms & Businesses Are Already Adopting New Era

New Era launched in April 2021. Highlights from our first five months:

### AmLaw 20 Firm Diligence + Approval

- Contacted by AmLaw 20 litigation partners on behalf of their client
- Three litigation partners conducted 7 weeks of intense diligence
- Approved New Era as **ADR provider in client's global TOUs**
- Approved New Era subscription solution as critical prophylactic measure for client's **mass arbitration** risk

### Fortune 500 Multi-Year Subscription

- Primary ADR provider for Fortune 500 consumer-facing company
- Multi-year subscription tailored to reduce risk or gamesmanship in mass arbitrations

— — — — — — — — — — — — — — —

*"I can't begin to tell you how excited our global executive team is and how grateful we are to [AmLaw 20 Firm] that we found a solution to mass arbitrations in New Era"*

*— Legal Dept VP*

### Wide Contract Adoption

- Adopted in 32,000,000 contracts and counting across multiple industries:
  - Retail, Real estate, Technology, Health-tech, Staffing even law firm engagement letters

### Pilot Projects

- 23 higher ed institutions (*kicking off in October 2021*)
- Large athletic governing body
- Wisconsin court

NEW ERA ADR

© New Era ADR, Inc.

NEWERA_001973

**4-SER-566**

## News Outlets Are Talking

**Bloomberg Law**

"Lee compared dispute resolution to the surging telehealth sector as being ready to embrace new ways of doing business as a result of the pandemic"

 **REUTERS**

"New Era's tech platform proposes to make the litigation and dispute resolution process more efficient, aiming to resolve business disputes in less than 100 days"

**CHICAGOINNO**

"New Era ADR's plan is ambitious: to help companies and law firms completely rethink the way disputes are settled, allowing the process to be done entirely online"

 **LawSites**
By: Robert Ambrogi

"[A]s we come off a year in which the legal and business worlds have adapted to operating online….the timing could be just right for New Era ADR."

 **LAW360 Pulse**
A LexisNexis Company

"2020 was the confluence of the logical end to our general counsel positions and the pandemic creating the right atmosphere to bring this to market."

**LAW.COM**

"COVID-19 may have permanently removed that [remote hearing] trepidation…I think it's opened a lot of eyes that we can do things in this way and it works"

NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001974

4-SER-567

## The Founding Team



### Collin Williams
**FOUNDER/CHAIRMAN**

- General Counsel, Reverb
- Corporate Counsel, Oracle
- Greenberg Traurig, LLP
- Butler Snow, LLP
- Attorney for 18 years
- Exit: Reverb acquired by Etsy for $275M



### Rich Lee
**CO-FOUNDER & CEO**

- General Counsel, Civis Analytics
- General Counsel, Livevol
- Attorney for 15 years
- Exit: Livevol acquired by CBOE Holdings



### Shane Mulrooney
**CO-FOUNDER & HEAD OF GROWTH**

- General Counsel, Home Chef
- Kirkland and Ellis, LLP
- Attorney for 8 years
- Exit: HomeChef acquired by Kroger for $700M



### Michelle Tyler
**CO-FOUNDER & HEAD OF OPERATIONS**

- Director, Compliance & Legal Operations, Civis Analytics
- Director of Operations, ICAP Patent Brokerage
- Kirkland and Ellis, LLP

NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001975

**4-SER-568**

## Board of Advisors



### Pete Kadens

· Chairman, Kadens Family Foundation



### Anthony Casey

· Deputy Dean, University of Chicago Law School



### Jae Um

· Renowned legal industry strategist
· Founder, Six Parsecs
· Former Director, Pricing Strategy, Baker McKenzie; Seyfarth Shaw



### Lisa Young

· General Counsel, Lending Tree, Inc.



### Leslie Vickrey

· Founder/CEO, Clearedge Marketing



### John Higginson

· CTO, Groupon



### David Kalt

· Founder and Former CEO, Reverb (acq'd by Etsy) & Options xPress (acq'd by Charles Schwab)



### Alex Green

· General Counsel, Medix



### Chris Shulman

· Shulman ADR Law, P.A.



### Kevin Sherlock

· General Counsel, SpotHero



### Mark Partin

· Chief Privacy Officer, Oracle



### Dan Abel

· CEO, Pilot Project Brewing

NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001976

4-SER-569

## Early Investors and Evangelists

**Venture Capital:**







**Evangelists From:**





























NEW ERA ADR

© New Era ADR, Inc.

Confidential

NEWERA_001977

**4-SER-570**





Confidential

NEWERA_001978

## Sample Pricing: Flat Fees = Cost Certainty

All fees are inclusive of platform and neutral fees and divided between the parties:



**Virtual Mediation**

$8,000-$10,000



**Expedited Arbitration**

$8,000 - $10,000



**New Era Arbitration**

*Commercial disputes*

$35,000

*Fee may vary for other types of disputes*



**Subscription Solutions**

Customized and calibrated to each company's risk profile and budget

Confidential



© New Era ADR, Inc.

NEWERA_001979

**4-SER-572**

# EXHIBIT G

Message

| | |
|---|---|
| **From:** | nima.mohebbi@lw.com [nima.mohebbi@lw.com] |
| **Sent:** | 4/28/2021 8:40:01 PM |
| **To:** | shane@neweraadr.com |
| **Subject:** | RE: New Era ADR Launch! |

Perfect. Sorry re: delay. Been drinking from a fire hose.

**Nima H. Mohebbi**

**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100 | Los Angeles, CA 90071-1560
D: +1.213.891.7482 | M: +1.304.633.3271

**From:** Shane Mulrooney <shane@neweraadr.com>
**Sent:** Wednesday, April 28, 2021 4:56 AM
**To:** Mohebbi, Nima (LA) <nima.mohebbi@lw.com>
**Subject:** Re: New Era ADR Launch!

Hey Nima -- I went ahead and threw something on our calendars for next Thursday just to get it up, let me know if that doesn't work and I'm happy to reschedule.

Looking forward to it!

--
Shane Mulrooney
Head of Growth and Customer Experience - **New Era ADR**
shane@neweraadr.com | 630-853-8536
LinkedIn





On Mon, Apr 26, 2021 at 4:30 PM Shane Mulrooney <shane@neweraadr.com> wrote:

Sure thing, how about Thursday 5/6? I'm free from 9 AM PT / 12 PM ET - 12 PM PT / 3 PM ET. Anything in there work for you?

--
Shane Mulrooney
Head of Growth and Customer Experience - **New Era ADR**
shane@neweraadr.com | 630-853-8536
LinkedIn


**Exhibit 4**
4-SER-574





On Mon, Apr 26, 2021 at 3:34 PM <nima.mohebbi@lw.com> wrote:

Perf.  I have been meaning to reach out.  Let me know if you have a moment to chat next week.  This week is nuts for me.


**Nima H. Mohebbi**


**LATHAM & WATKINS LLP**

355 South Grand Avenue, Suite 100 | Los Angeles, CA 90071-1560

D: +1.213.891.7482 | M: +1.304.633.3271


**From:** Shane Mulrooney <shane@neweraadr.com>
**Sent:** Monday, April 26, 2021 12:34 PM
**To:** Mohebbi, Nima (LA) <nima.mohebbi@lw.com>
**Subject:** New Era ADR Launch!


Hi Nima,

I hope all is well.  I just wanted to reach out quickly to let you know that New Era has officially launched!  If you haven't seen it already, you can find our new website here: New Era ADR.

We were also recently featured in this Bloomberg Article as a new and unique tool for attorneys to have at their disposal for improving client service.  As we've already discussed, there are several other use cases for law firms as well, allowing them to hold onto more cases, moot arguments, train associates, develop creative fee structures, and ultimately earn additional revenue while increasing client loyalty.

I'd love the opportunity to quickly show you a demo of the product and revisit some of these topics with you.  Do you have 25 minutes later this week or next week to discuss?

Again, we have really appreciated all of your interest and support already!

Best,
Shane

Confidential

Shane Mulrooney

Head of Growth and Customer Experience **- New Era ADR**

shane@neweraadr.com | 630-853-8536

LinkedIn



This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

Confidential

# EXHIBIT I

Message

| | |
|---|---|
| **From:** | Andrew.Prins@lw.com [Andrew.Prins@lw.com] |
| **Sent:** | 6/29/2021 9:19:26 PM |
| **To:** | shane@neweraadr.com; kirsten.ferguson@lw.com; Alicia.Jovais@lw.com |
| **CC:** | collin@neweraadr.com; rich@neweraadr.com |
| **Subject:** | RE: New Era Follow Up |

I have a couple of clients that may be interested.  One small with a number of individual employment-based arbitrations each year and very low risk of mass arbs, and one very large client with a modest number of individual arbitrations but a greater risk of mass arbs.  I need to do a bit of work still on my end before pursuing further with you all.  Will circle back when ready.

Andrew

**From:** Shane Mulrooney <shane@neweraadr.com>
**Sent:** Tuesday, June 29, 2021 12:47 PM
**To:** Ferguson, Kirsten (Bay Area) <kirsten.ferguson@lw.com>; Prins, Andrew (DC) <Andrew.Prins@lw.com>; Jovais, Alicia (Bay Area) <Alicia.Jovais@lw.com>
**Cc:** Collin Williams <collin@neweraadr.com>; Rich Lee <rich@neweraadr.com>
**Subject:** New Era Follow Up

Kirsten, Andrew, and Alicia,

I hope all is well and that you had a great weekend.

We wanted to follow up here now that the Live Nation contract is signed to see if we could continue the conversation in regards to some of the other clients you have mentioned that would be interested in the same type of contract (I believe, for example, Andrew mentioned another consumer-facing company client of his).

We are free next Tuesday (7/6) 10:30 AM - 12:30 PM PT, Wednesday (7/7) 10 AM - 2:30 PM PT, and basically all afternoon on Friday (7/9).

Let us know what works for you and I'll get it on our calendars.

Best,
Shane

--
Shane Mulrooney (he/his)
Head of Growth and Customer Experience - **New Era ADR**
shane@neweraadr.com | 423-497-0195
LinkedIn | Calendar Schedule



Read about us in **Bloomberg** and **Reuters**



Confidential

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**4-SER-579**

Confidential

# EXHIBIT J

Message
| | |
|---|---|
| **From:** | Rich Lee [rich@neweraadr.com] |
| **on behalf of** | Rich Lee <rich@neweraadr.com> [rich@neweraadr.com] |
| **Sent:** | 8/18/2021 7:00:22 PM |
| **To:** | Elizabeth.Deeley@lw.com |
| **CC:** | Collin Williams [collin@neweraadr.com]; Shane Mulrooney [shane@neweraadr.com] |
| **Subject:** | Re: New Era ADR / Introduction |

Alicia -- Thanks so much for connecting us. I moved you and Kirsten to bcc to spare your inboxes from scheduling emails. We're of course more than happy to add you both to a call with Beth, just say the word.

Beth -- Great to meet you and to be connected. We'd love to share more and discuss your clients' needs. Would any of these times work for you to hop on a video call with us these next couple days and early next week?

    - 8/19 - 12:30-2:30pm PDT
    - 8/20 - 12-3pm PDT
    - 8/23 - 9-11am; 1:30pm PDT
    - 8/24 - 11-1pm PDT

Looking forward to meeting you,
-Rich

---
Rich Lee *(he/him/his)*
CEO & Co-Founder | **New Era** ADR
Chicago, IL 60607
LinkedIn | neweraadr.com
rich@neweraadr.com

Check us out in **Bloomberg** and **Reuters**


On Wed, Aug 18, 2021 at 6:49 PM <Alicia.Jovais@lw.com> wrote:

Collin, Rich, and Shane – please meet Beth Deeley, a partner in Latham's SF office who is interested in discussing New Era ADR for some of her clients.


Beth – please meet Collin, Rich, and Shane, the folks we worked with to move Live Nation from JAMS to New Era ADR.


I will let the four of you take it from here!


Best,



**Exhibit 16**
4-SER-581

NEWERA_000593

Alicia


**Alicia R. Jovais**


**LATHAM & WATKINS LLP**

505 Montgomery Street

Suite 2000

San Francisco, CA 94111-6538

Direct Dial: +1.415.395.8170

Fax: +1.415.395.8095

Email: alicia.jovais@lw.com

http://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**4-SER-582**

# EXHIBIT K

Message

| | |
|---|---|
| **From:** | Rich Lee [rich@neweraadr.com] |
| **on behalf of** | Rich Lee <rich@neweraadr.com> [rich@neweraadr.com] |
| **Sent:** | 8/23/2021 7:40:18 PM |
| **To:** | Elizabeth.Deeley@lw.com |
| **CC:** | Aamir.Virani@lw.com; Collin Williams [collin@neweraadr.com]; Shane Mulrooney [shane@neweraadr.com] |
| **Subject:** | Re: New Era ADR / Introduction |
| **Attachments:** | Form New Era Subscription Agreement (LW_MassArbs_8-23-21).pdf |

Beth and Aamir -- It was a pleasure meeting you both earlier this afternoon. Thanks for taking time to speak, we really enjoyed the discussion. Attached and below are materials we promised to share on our call. We'd love to reconnect late next week (Sept 1-3) or on Sept 7-8. If that works, are there some times that are better for you both on any of those days?

Materials:

1) Attached is the **template agreement** for Latham clients.
   - *Note*: We value our relationship with Latham, and we truly appreciate that your firm shares our vision for pragmatic and efficient dispute resolution. For this reason, the subscription agreement we'd offer to all Latham clients includes all of the terms that Kirsten and Alicia negotiated for Live Nation.

2) Expedited Arbitration Walkthrough
   - This is a guided walkthrough of our platform from a litigant's perspective.

3) Mass arbitration one-pager

   - *Note*: the price range listed in this doc is an estimated range for larger and medium-sized organizations. As we mentioned, while pricing is dependent on an organization's litigation history and anticipated risk of future litigation, we can tailor pricing/coverage to fit the budget of any size organization.

4) Overview of our Expedited Arbitration Process
   - Our mass arbitration solution is built on top of this expedited arbitration process, which provides both plaintiffs and defendants a highly efficient forum that quickly resolves meritorious claims with some of the most experienced arbitrators in the country.

5) New Era Rules and Procedures
   - Our full set of rules and procedures, including our expedited arbitration and mass arbitration procedures.

6) New Era Team
   - Background on our team that you can forward to clients to share that New Era, though relatively new, is founded by a highly-experienced team of three former General Counsel (Shane, Collin, me) and a former head of legal ops and compliance.

Thanks again for your time. We're looking forward to continuing our conversation!

-Rich

---
Rich Lee *(he/him/his)*
CEO & Co-Founder | **New Era** ADR



**Exhibit 17**

4-SER-584

# EXHIBIT L

Message

| | |
|---|---|
| **From:** | Rich Lee [rich@neweraadr.com] |
| **on behalf of** | Rich Lee <rich@neweraadr.com> [rich@neweraadr.com] |
| **Sent:** | 9/8/2021 10:16:19 PM |
| **To:** | Alicia.Jovais@lw.com |
| **CC:** | kirsten.ferguson@lw.com |
| **Subject:** | Re: New Era ADR // Reference call with Cozen O'Connor |

Wonderful! Thanks so much, both of you.

-Rich

---
Rich Lee
CEO & Co-Founder | **New Era** ADR
Chicago, IL 60607
LinkedIn | neweraadr.com
rich@neweraadr.com
*Pronouns: he/him/his*

Check us out in **Bloomberg** and **Reuters**

On Wed, Sep 8, 2021 at 2:42 PM <Alicia.Jovais@lw.com> wrote:

Hi, Rich.  Hope you had a nice holiday weekend.  Yes, we'd be happy to chat with the Cozen O'Connor lawyers.  Feel free to connect us via email.

**Alicia R. Jovais**

**LATHAM & WATKINS** LLP

505 Montgomery Street | Suite 2000 | San Francisco, CA 94111-6538

D: +1.415.395.8170

**From:** Rich Lee <rich@neweraadr.com>
**Sent:** Thursday, September 2, 2021 2:55 PM
**To:** Ferguson, Kirsten (Bay Area) <kirsten.ferguson@lw.com>; Jovais, Alicia (Bay Area) <Alicia.Jovais@lw.com>
**Subject:** New Era ADR // Reference call with Cozen O'Connor

Hi Kirsten and Alicia,



4-SER-586

NEWERA_000742

We recently spoke with the two class action litigation co-chairs at Cozen O'Connor, Meredith Slawe and Michael McTigue. They actually found us because they came across Live Nation's "innovative and forward-thinking" (their words) terms of use on their own! During the call, they asked if you'd be open to speaking with them directly to compare notes.

Would you be willing to speak with them? If so, we'd deeply appreciate it, and I'm of course happy to connect you all over email.

-Rich

---

Rich Lee *(he/him/his)*

CEO & Co-Founder | **New Era** ADR

Chicago, IL 60607

LinkedIn | neweraadr.com

rich@neweraadr.com

**Check us out in Bloomberg and Reuters**

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**4-SER-587**

NEWERA_000743

# EXHIBIT N

Message

| | |
|---|---|
| **From:** | CATHY.BIRKELAND@lw.com [CATHY.BIRKELAND@lw.com] |
| **Sent:** | 11/15/2021 12:16:27 PM |
| **To**: | collin@neweraadr.com |
| **Subject:** | RE: Catching Up |

Hi!  Yes, how about next Wednesday at 9 am?

**From:** Collin Williams <collin@neweraadr.com>
**Sent:** Monday, November 15, 2021 12:14 PM
**To:** Birkeland, Cathy (CH) <CATHY.BIRKELAND@lw.com>
**Subject:** Catching Up

Hey Cathy!

Just checking in again.  Would love to catch up if you have some time in the coming weeks.

Best,

Collin

--
Collin Williams (he/him/his)
Founder and Chairman - New Era ADR
collin@neweraadr.com I www.neweraadr.com
LinkedIn



**Read about us in <u>Bloomberg</u> and <u>Reuters</u> and check out the origin story in <u>Chicago Inno</u>.**

**Book a meeting with me <u>here</u>.**

---

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.



4-SER-589

# EXHIBIT N

Message

| | |
|---|---|
| **From:** | Rich Lee [rich@neweraadr.com] |
| **on behalf of** | Rich Lee <rich@neweraadr.com> [rich@neweraadr.com] |
| **Sent:** | 12/20/2021 12:24:13 PM |
| **To:** | kirsten.ferguson@lw.com |
| **CC:** | Alicia.Jovais@lw.com |
| **Subject:** | Re: New Era ADR Reference // General Counsel @ Wayfair |

Hi Kirsten and Alicia,

Sorry I missed your note from last week, Kirsten. Thank you so much for your willingness to connect with the Wayfair GC (Enrique Colbert). We added your contact info to the list we shared with him. If you don't mind, would you let me know if you end up connecting with him?

For background, he's doing some initial diligence because he wants to personally pull together a group of tech companies to subscribe to New Era at the same time. Maybe there are a few clients of Latham's who'd be interested in speaking with him to explore joining on.

For our catch up, how do these times work for you both?
- M 1/24 - 2:30-4:30pm PST
- Tu 1/25 - 3:30pm PST
- W 1/26 - 9am-12pm PST
- Th 1/27 - 12:30-2:30pm PST

I can send an invite!

-Rich

---
Rich Lee
CEO & Co-Founder | **New Era** ADR
LinkedIn | neweraadr.com | *(he/him/his)*
rich@neweraadr.com

**Read about us in Bloomberg and Reuters**

On Wed, Dec 15, 2021 at 9:24 PM <kirsten.ferguson@lw.com> wrote:

Hi Rich,

Good to hear from you. Happy to connect with the GC form Wayfair. And mid- to –late January works for a check-in. My schedule's pretty open at this point.

Hope all is well—happy holidays!



**Exhibit 22**

4-SER-591

Kirsten

**From:** Rich Lee <rich@neweraadr.com>
**Sent:** Wednesday, December 15, 2021 2:21 PM
**To:** Ferguson, Kirsten (Bay Area) <kirsten.ferguson@lw.com>; Jovais, Alicia (Bay Area) <Alicia.Jovais@lw.com>
**Subject:** New Era ADR Reference // General Counsel @ Wayfair

Hi Kirsten and Alicia -- I hope you're both doing well. We spoke with the GC at Wayfair recently who's been thinking a lot about the mass arbitration issue along with a number of other tech company GCs. He's hoping to hear your perspective on this and New Era.

Could I add your emails to a list of referrals for him to reach out to?

Separately, I'd love to catch up in early/mid-January to say hello and share updates. Are there some times that work well for you then?

-Rich

---

Rich Lee

CEO & Co-Founder | **New Era** ADR

LinkedIn | neweraadr.com | *(he/him/his)*

rich@neweraadr.com

Read about us in **Bloomberg** and **Reuters**

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Confidential
NEWERA_000702

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

--

-Rich

---
Rich Lee
CEO & Co-Founder | New Era ADR
rich@neweraadr.com | linkedin.com/in/richardtlee

**4-SER-593**

Confidential